COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters V. Lee

E.D.N.Y.

13-CV-3636(JG)

## EXHIBIT A

The Transcript of Defendant's State Court Trial and Sentencing

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF KINGS:  CRIMINAL TERM : PART 1
     --------------------------------------------------X
 3   THE PEOPLE OF THE STATE OF NEW YORK          :
                                                  :
 4                 - against -                    : IND.#
                                                  : 3464/06
 5   GENERAL WAITERS                              :
                                                  :
 6                         Defendant              :
     --------------------------------------------------X
 7
                                  Kings Supreme Court
 8                                320 Jay Street
                                  Brooklyn, New York  11201
 9

10                                November  16, 2007

11   B E F O R E :
                   HONORABLE DEBORAH DOWLING
12                                Justice

13   A P P E A R A N C E S :

14         FOR THE PEOPLE:

15
                   OFFICE OF CHARLES HYNES, ESQ.
16                 Kings County District Attorney
                       BY:  MARK HALE, ESQ.
17                         Assistant District Attorney

18

19         FOR THE DEFENDANT:

20             BY:  CALVIN SIMONS,ESQ.

21

22

23
                           NADONNA BLANDING, RPR
24                         OFFICIAL COURT REPORTER

25
```

- PROCEEDINGS -

Page 2

1          THE CLERK:  This is number one on the
2     calendar, indictment 3464 of 2006, People of the State
3     of New York General Waiters.  The defendant is present
4     before the Court.
5               Counsel, note your appearances.
6          MR. SIMONS:  Calvin Simons, 616 Eastern
7     Parkway for Mr. Waiters.
8               Good afternoon, your honor.
9          THE COURT:  Good afternoon.
10          MR. HALE:  For the Office of the District
11     Attorney, Mark Hale.
12               Good afternoon, your honor.
13          THE COURT:  Good afternoon.  The last time the
14     matter was on, blank CDs were given to the Assistant
15     District Attorney and I believe um, Mr. Simons, you said
16     you needed the audio tapes; is that correct?
17          MR. SIMONS:  Yes.
18          THE COURT:  And you've received those?
19          MR. SIMONS:  No.
20          MR. HALE:  Audio tapes of.
21          MR. SIMONS:  I believe there are four 911
22     calls.
23          MR. HALE:  Right, which were sent to you.  But
24     I think primary, what you had it on was for a Huntley
25     hearing.

- PROCEEDINGS -

Page 3

1          **THE COURT:**  That's correct.

2          Are both sides ready?

3          **MR. HALE:**  I'm ready.

4          **MR. SIMONS:**  Your honor, I believe Mr. Waiters

5     has a motion that he would like to address the Court

6     prior to any hearing.

7          **THE COURT:**  And what is the nature of the

8     motion?

9          **MR. SIMONS:**  I believe the nature of it is

10    reassignment of counsel.  He would like a new attorney.

11         **THE COURT:**  On what basis, Mr. Waiters?

12         **THE DEFENDANT:**  Because I feel like my

13    attorney is not helping me in his best interest on my

14    behalf in this case.

15         **THE COURT:**  Well, have you received papers?

16    You've received papers from Mr. Simons?

17         **THE DEFENDANT:**  Right.  And I would like for

18    you to um, read this motion and tell you in the motion.

19         **MR. SIMONS:**  He's, I believe -- Mr. Waiters is

20    providing the Court with a motion attach -- just so the

21    Court knows, attach to the motion is a letter that I

22    wrote to him, which I am advising not to make it part of

23    the motion but he still wants to make that part of the

24    motion.

25         **THE COURT:**  Well, if it's attorney/client

- PROCEEDINGS -

Page 4

1    privilege information that really shouldn't appear

2    before the Court because that is advice that you're

3    giving the Court.

4             **MR. SIMONS:**  Yes.

5             **THE DEFENDANT:**  I still would like for you to

6    read it, your honor.

7             **THE COURT:**  Let me say this.  It is privileged

8    information.  Certainly, I'm not going to read the

9    letter.  You need to tell me what it is that you want

10   the Court to know in regards to this matter.  But I'm

11   not going to read it.  But anything that is attached

12   really shouldn't be a part of the motion.

13            **MR. HALE:**  Yes or no, he can waive the

14   privilege, Judge.

15            **THE COURT:**  He can.  But at this point, I'm

16   not going to under the circumstances, Mr. Hale.  I

17   don't know whether I would trust a waiver in any event.

18            **MR. HALE:**  Okay.

19            **THE COURT:**  You can pass up the motion without

20   the letter.

21            **MR. SIMONS:**  Without the paper.

22            **THE COURT:**  That's right.

23                     (handing).

24            **THE COURT:**  Well, Mr. Waiters, have you

25   received copies of the papers in this case?

- PROCEEDINGS -

Page 5

1          THE DEFENDANT:  No.  Copy of this case.

2          THE COURT:  I'm saying the papers that the

3     attorney has, has he been turning over those papers to

4     you?

5          THE DEFENDANT:  No.

6          THE COURT:  You're saying you received no

7     papers?

8          THE DEFENDANT:  Some papers.

9          THE COURT:  What are the some papers that

10    you've received?

11         THE DEFENDANT:  Like when the case first

12    started that's as far as I understand it about the case.

13    And, your honor, I would like to say um, I am trying

14    to -- I would like to cop out to something but not with

15    life on it.  And my attorney, I don't think he is for

16    that.

17         THE COURT:  Well, let me say this.  Mr. Simons

18    can't get you that offer.  The only way that it would be

19    available is if the People made that kind of offer, that

20    is number one.  Even, Mr. Waiters, you took a plea in

21    front of this Court, this Court would only be allowed to

22    take a plea on the top counts.  And with the top counts,

23    that carries a sentence to life.  Do you understand what

24    I'm saying to you, sir?  So Mr. Simons can't get you

25    something that the Court is unable to give, number one.

- PROCEEDINGS -

Page 6

1    Number two, the People aren't making any offers in this

2    case, is that correct, Mr. Hale?

3              **MR. HALE:**  That is correct, Judge.

4              **MR. SIMONS:**  Mr. Waiters was not present

5    during the last adjournment, but I did inform him that I

6    did make a request and I did talk to Mr. Hale regarding

7    an offer where there was no life.  I did make a request.

8    I gave him a specific number.  I think I mentioned 25

9    but something without life, which he said he could not

10   do.  I did approach the Court and asked what kind of

11   offer the Court would consider.  And I believe when we

12   last left, the Court said that you would consider an

13   offer of 20 to life, which I have communicated with

14   Mr. Waiters.  I did talk to Mr. Hale.  He said he could

15   live with an offer of twenty to life.  So, that is the

16   only -- and it appears to be the lowest offer that is

17   available to him, so that's where we are.  And he should

18   understand.

19             **THE COURT:**  And I'm reading through the

20   motion.

21             **THE DEFENDANT:**  I'm just going to trial.

22             **THE COURT:**  You do have to consult with him.

23   The case is only in a posture where we are conducting

24   the preliminary hearings.  And as far as obtaining the

25   documents, a lot of the adjournments have been

– PROCEEDINGS –

1    requested, Mr. Simons.  So that you can update the

2    documents which your client gave you the bear minimum

3    information that you had to track down to find out if

4    records existed.  And in fact you found the records

5    which did exist.  And you did have those brought into

6    Court.  So I'm a little bit puzzled when you say that

7    Mr. Simons haven't been doing anything.  Because again,

8    based upon the sketchy information you've submitted to

9    him, you had to eventually track down those social

10   security records and have them produced in Court on your

11   behalf that the Court is aware of.  And certainly, this

12   Court is certainly aware that certainly he's had

13   evaluations done in regard to any positions that the

14   defense could have in regard to this case.  So when you

15   say he hasn't been doing anything, that is not quite

16   accurate at all, Mr. Waiters, that I see.

17          And I know it says that the case been pending

18   for 18 months.  But certainly defense counsel has been

19   doing certain things and discovery has taken a while.  I

20   don't see a basis to really grant this motion.

21          **MR. SIMONS:**  Your honor, just for the record.

22   Mr. Waiters had concerns regarding the availability of

23   our doctor.  If we were to pursue that defense, I'm

24   letting him know that we will make sure that he is

25   available if we decide to use him.  We will get his

1   schedule.  It was a question of his availability whether

2   we will actually use him or not.  And he wanted me to

3   ask the court to maybe we can get another doctor to

4   examine him.  But I don't believe we need to do that.

5   We have submitted all of the records and everything to

6   the doctors.  Two doctors have examined it and we are

7   prepared to deal with their analysis of that and proceed

8   with what we have.

9          **THE COURT:**  And certainly without saying more,

10  there is no basis to grant this motion.  I don't believe

11  that there has been a break down in communications.

12         **MR. SIMONS:**  And the final thing is

13  Mr. Waiters is informing me that he's not interested

14  in -- if there is a twenty to life offer, he's not

15  interested in that offer.  As he stated, he's not

16  interested in any offer.

17         **THE COURT:**  That was why we are here to try

18  the case.  And I'm saying that certainly, um, he is

19  talking about the case pending forever.  Even if the

20  Court were to even consider it substituting counsel,

21  that would only mean a further delay again.  The new

22  attorney would have to go through the same process and

23  procedures, Mr. Simons, that you would be going through.

24  And certainly in terms of your skill and ability to

25  represent Mr. Waiters on this matter, I don't see any

- PROCEEDINGS -

Page 9

1    deficiency which has occurred.

2              And I don't see there being any impediment in

3    your terms of communication.

4              **MR. SIMONS:**  Well, in light of that, he's now

5    prepared to go forward with the case.  And we are ready

6    to go hearings today.

7              **THE COURT:**  For the record, this motion will

8    be denied.

9              **MR. HALE:**  Your honor, as I understand it, the

10   subject matter of the hearing is Huntley.  Statement

11   which was given to Detective Duffy on May the 8th of

12   2006.  I have given Mr. Simons the Grand Jury testimony.

13   Detective Duffy in reference to that statement as well

14   as Detective Duffy's handwritten notes concerning that

15   statement and the Miranda card concerning that

16   statement.

17              Are you ready to proceed, Mr. Simons?

18              **MR. SIMONS:**  Yes.

19              **THE COURT:**  Call your first witness.

20              **MR. HALE:**   The People call Detective Timothy

21   Duffy.

22   D E T E C T I V E   T I M O T H Y   D U F F Y, a witness

23   called on behalf of Peopleafter having first been duly sworn

24   by the Court Clerk, was examined and testified as follows:

25              **THE WITNESS:**  Yes, I do.

PEOPLE - DIRECT - DET. T. DUFFY

1        **THE CLERK:**  Be seated, please.

2        Please state for the record your full name,

3    your shield number and your command.

4        **THE WITNESS:**  Detective Timothy Duffy, shield

5    number 2381.  Assigned to the Brooklyn North Homicide

6    Squad.  D-U-F-F-Y.

7        **THE CLERK:**  Thank you.

8        **THE COURT:**  Good afternoon, Detective Duffy.

9        **THE WITNESS:**  Good afternoon.

10        **THE COURT:**  I will ask that you please keep

11    your voice up.  You need to speak loud enough because we

12    need to hear your answer.

13        Detective, if you're asked a question by any

14    of the attorneys and the question isn't quite clear to

15    you, I don't want you to guess as to what you think you

16    are being asked.  If the question isn't clear, you will

17    let the attorneys know.  They will then rephrase that

18    question and ask you the question in such a way that you

19    should be able to understand it and you will then answer

20    it.

21        And finally, Detective Duffy, if you hear any

22    of the attorneys object to a question, you cannot answer

23    that question until I have instructed you as to whether

24    you may answer the question.  Is that understood by you,

25    Detective.

PEOPLE - DIRECT - DET. T. DUFFY

Page 11

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  You may inquire.

3          **MR. HALE:**  Thank you, your honor.

4    DIRECT EXAMINATION

5    BY MR. HALE:

6          Q    Sir, you work for the New York City Police

7    Department?

8          A    Yes.

9          Q    How long have you been assigned to the Brooklyn

10   North Homicide Squad, sir?

11         A    Over four years now.

12         Q    Were you working as a detective investigator at the

13   homicide squad on May 8th of 2006?

14         A    Yes, I was.

15         Q    Now, sir, during the course of that particular day,

16   were you requested to perform some assignments in regards to a

17   past homicide, one that occurred on May the 7th of 2006?

18         A    Yes, I was.

19         Q    And what was it that you were requested and by

20   whom?

21         A    I was asked by my Sergeant to respond over to the

22   hospital to see if I can interview Mr. Waiters.

23         Q    Now, sir, had you had any involvement with the case

24   from the 7th at all before that time?

25         A    None whatsoever, no.

PEOPLE - DIRECT - DET. T. DUFFY

Page 12

1      Q      After you received that request from your sergeant,

2    where did you receive that to?

3      A      Kings County Hospital.

4      Q      And any specific location within Kings County

5    hospital?

6      A      If I can refer to my notes.

7              **THE COURT:**  Certainly, with the Court's

8            permission.  Can you just tell us what you're looking at

9            and refresh your recollection.

10              **THE WITNESS:**  Yes.

11      A      I'm looking at a DD5 of a police report that I

12    filled out.  I responded to ICU D3 north.  That is where

13    Mr. Waiters was a patient.

14      Q      And you responded there by yourself or with anyone

15    else?

16      A      With my partner, Detective Krisstoffersen (ph).

17      Q      Now, sir, do you recall approximately when it was

18    that you responded to Kings Hospital?

19      A      Approximately eleven o'clock in the morning.

20      Q      And when you arrived at the location that you

21    mentioned, sir what, if anything, did you observe?

22      A      Mr. Waiters was in the hospital bed with some

23    severe injuries to his head.  I believe there were two female

24    police officers watching him.

25      Q      At the time that you first observed Mr. Waiters,

PEOPLE - DIRECT - DET. T. DUFFY

Page 13

1    was he awake or asleep?

2        A    He was awake.

3        Q    And, sir, at that time, did you make any inquiry as

4    to Waiters?

5        A    I introduced myself to him, yes.

6        Q    Had you recall what words you used?

7        A    No, I don't recall.

8        Q    Um, after you introduced yourself, did you do

9    anything with regards to Mr. Waiters?

10       A    Yes.  I read him his Miranda rights.

11       Q    Now, sir, from what or in what form did you read

12   him his Miranda rights?

13       A    From a card that I brought with me.

14       Q    And, sir, do you have that card with you now?

15       A    Yes, I do.

16       Q    If I can have that, please.

17                      (handing)

18

19            **MR. HALE:**  People's 1 for identification?

20            **THE COURT:**  I'll deem mark it People's 1 for

21   purposes only.

22                 It will be shown to defense counsel.

23                 (Whereupon, People' 1, was marked for

24            identification)

25       Q    Detective, again, taking a look at People's 1 for

PEOPLE - DIRECT - DET. T. DUFFY

Page 14

1 identification.  There are some printing on there.  There are

2 some writing in ink?

3     A    That's correct.

4     Q    And the writing in ink, sir, who completed that and

5 when was it completed?

6     A    I filled out the time and the date and I signed my

7 name and put my shield number.  Mr. Waiters signed his name on

8 the lower left.

9     Q    Now, sir, that particular document a long with the

10 writing that you just identified, is it substantially in the

11 same condition as it was when you utilized to read the Rights

12 to Mr. Waiters on May 8th of 2006?

13     A    Yes, sir, it is.

14          **MR. HALE:**  I'll offer 1 in evidence for the

15     hearing.

16          **MR. SIMONS:**  No objection.

17          **THE COURT:**  People's 1 will be in evidence for

18     the purposes of the hearing.  We will deem it mark into

19     evidence.

20          (Whereupon, People's 1, document, was moved

21          into evidence)

22     Q    Now, sir, you indicated that you put the time on

23 there.  What time did you put when the Miranda warnings were

24 read?

25     A    1105 hours.

PEOPLE - DIRECT - DET. T. DUFFY

Page 15

1      Q     And sir, if you could tak People's Exhibit Number

2      1.  Did you read the Rights to him exactly as they are printed

3      on that particular document?

4      A     Yes, sir, I did.

5      Q     What was the first Right that you read to

6      Mr. Waiters.  And you may utilize that, sir?

7      A     You have the right to remain silent and refuse to

8      answer questions.  Do you understand.

9      Q     Now, what answer did Mr. Waiters give to you when

10     you read that warning?

11     A     Yes.

12     Q     Did you read anything else to him at that point?

13     A     Yes, I read the remaining.

14     Q     Tell us what those are?

15     A     Anything you do say maybe used against you in a

16     Court of Law.  Do you understand.  He responded Yes.

17           You have the right to consult an attorney before

18     speaking to the police and to have an attorney present during

19     any questioning now or in the future.  Do you understand.  He

20     responded yes.

21           If you cannot afford an attorney, one will be

22     provided for you without cost.  Do you understand.  He

23     responded yes.

24           If you do not have an attorney available, you have

25     the right to remain silent and until you have an opportunity

PEOPLE - DIRECT - DET. T. DUFFY

1  to consult with one.  Do you understand.  He responded yes.

2          And then now that I have advised you of your

3  rights, are you willing to answer questions.  He responded

4  Yes.

5          Q    Was it at that point, sir, that he signed the

6  document in question?

7          A    Yes, sir.

8          Q    And you supplied him with the pen to sign that?

9          A    I did, yes.

10          Q    Now, sir, thereafter, did you proceed to have a

11  discussion with Mr. Waiters about the events of the previous

12  day?

13          A    Yes, sir, I did.

14          Q    And in substance, sir, what was it that you said to

15  him?  What was it that he said to you?

16          A    I asked him what happened.  If I knew why he was

17  there and he explained to me what happened.

18          Q    Now sir, when he explained to you what had

19  happened, did you in fact enter that information on to any

20  sort of notes or forms?

21          A    Yes.  I took handwritten notes.

22          Q    If you can, sir, if you need to refresh your

23  recollection as you go on, can you tell us in substance what

24  it was that Mr. Waiters told you about the previous day?

25          A    He informed me that --

PEOPLE - DIRECT - DET. T. DUFFY

Page 17

1        **THE COURT:** Do you need to refresh your

2    recollection?

3        **THE WITNESS:** Yes, ma'am.

4        **THE COURT:** Certainly, what are you using.

5        **THE WITNESS:** My notes and the DD5 that I

6    filled out. He informed me that he was celebrating his

7    birthday at his house and that he had been drinking with

8    his girlfriend. And that his girlfriend and aunt and

9    his girlfriends kids were home. Um, that they drank all

10   night and they were drinking Bacardi Light with

11   some kind of soda. And one of Jackie's oldest son kept

12   coming in the room and was giving him a hard time about

13   how much he had been drinking. He said that he

14   shouldn't be getting drunk in the house the way that he

15   was. And um, he said that he went into the room and got

16   a gun. He got the gun from somewhere down south in

17   Florence, South Carolina years before. It had just been

18   lying around the house. And he said that Jackie's son

19   started to come at him down the hallway. He thought

20   that he had fired the gun five times but he thought

21   maybe it might have been three. He didn't know if he

22   hit anyone. And then her son got on top of him started

23   stomping him. They smashed a fish tank over his head

24   that he had gotten. The son had gotten the gun away

25   from him and he didn't know what he did with it. Then

PEOPLE - DIRECT - DET. T. DUFFY

Page 18

1      another one of her sons came in and start beating him,

2      too.  And then he says that he passed out.  And the next

3      thing he remembers, he woke up and he was in the

4      ambulance.  He said that when he started shooting the

5      gun, that Mary granddaughter and Mary and Jackie were in

6      another room and he didn't see them at all after the two

7      sons had beat him.  One of the sons is about 24 and he

8      was wearing all red and the other son is 17.  He didn't

9      remember what he was wearing.  And that they had just

10     come in and started beating him and he couldn't fight

11     both of them.

12         Q    Did he say also, sir, what his intentions was when

13   he was firing the gun at Jackie son?

14         A    No, sir.

15         Q    Now, the interview that you talked about that you

16   recounted here for us, approximately, how long was it that you

17   were talking to Mr. Waiters to gather the information that

18   you've just recounted?

19         A    Maybe ten minutes.

20         Q    And during that time, sir, did Mr. Waiters appear

21   to be lucid understanding your questions and give coherent

22   answers?

23         A    He was having a difficult time speaking with me.

24   He seemed to understand the conversation, but he was in pretty

25   bad shape.

PEOPLE - DIRECT - DET. T. DUFFY

Page 19

1    Q    When you said had trouble speaking.

2    A    He took a pretty good beating, so I don't know what

3    the extent of his injuries were, but his face was severely

4    swollen.

5    Q    Sir, at the end of that ten minutes, did you feel

6    the necessity to continue the interview at all?

7    A    No.

8    Q    And did you terminate the interview at that point?

9    A    Yes.

10    Q    Did you ever interview him again?

11    A    Never.

12    Q    When you concluded the interview, sir, did you stay

13    at Kings County Hospital or did you leave?

14    A    I left.

15    Q    Did you have any further investigation with the

16    investigation of the case thereafter?

17    A    Not until Grand Jury.

18    Q    And that point you testified concerning what you

19    just talked about here?

20    A    Yes, sir.

21    Q    Anything else?

22    A    That is it.

23         **MR. HALE:**  Thank you.  No further questions,

24    your honor.

25         **THE COURT:**  Cross-examination.

PEOPLE - DIRECT - DET. T. DUFFY

Page 20

1    CROSS-EXAMINATION

2    BY MR. SIMONS:

3         Q    Detective Duffy, when you went to Kings County

4    Hospital at 11:05 in the morning on -- excuse me, on May

5    8th, can you tell the Court what was Mr. Waiters' status?

6         A    I don't know.

7         Q    Do you know if he was under arrest or not under

8    arrest?

9         A    I believe he was under arrest, Yes.

10        Q    You mentioned that there were two female officers.

11   I believe you said they were watching him?

12        A    Correct.

13        Q    And you also mention he was in the ICU?

14        A    That's correct.

15        Q    And do you know what the is ICU?

16        A    The Intensive Care Unit.

17        Q    And do you remember whether he was handcuffed at

18   all when you saw him?

19        A    I believe he was.

20        Q    Just so the Court will understand.  Just describe

21   where he was in bed?

22        A    He was lying face up in a bed covered with bed

23   sheets and blankets.

24        Q    Do you remember whether there were any IVs in his

25   arm?

DEFENSE - CROSS - DET. T. DUFFY

Page 21

1       A    I don't remember.

2       Q    Prior to talking to Mr. Waiters, did you talk to

3  any doctors or nurses that were treating him?

4       A    Only to find out exactly what room he was in.

5       Q    And prior to talking to him, do you know whether he

6  was under any medication or using any medication?

7       A    I don't know.  No, sir.

8       Q    Now, you stated that you, I believe the first thing

9  you did was introduce yourself?

10      A    That's correct.

11      Q    And when you introduced yourself, did he respond to

12 that at all?

13      A    Yes.

14      Q    And could you just tell the Court how you

15 introduced yourself and how he respond?

16      A    I just explained to him that I was a detective and

17 said hello.  Nothing.  Just introduced myself Detective Duffy.

18 Asked how he was feeling.

19      Q    And did Mr. Waiters say anything?

20      A    Yes.  He said that he was hurting.

21      Q    Did he say anything else just.  So the Court would

22 know, what did he say?

23      A    I don't recall the details of the conversation.  It

24 was just a basic introduction.

25      Q    Did he say he was in a lot of pain?

DEFENSE - CROSS - DET. T. DUFFY

Page 22

1     A     I believe he did tell me that he was in quite a bit

2     of pain.

3     Q     At any point did he ask for any medication or any

4     doctors, nurses, or anything like that?

5     A     From me, no.

6     Q     Well, at any point during the interview, did you

7     hear him request any medication from anybody?

8     A     No, sir.

9     Q     Now, you mention that you read Mr. Waiters the

10    Miranda warnings as you already described in court?

11    A     That's correct.

12    Q     And after each warning, you stated that he

13    responded with an answer yes?

14    A     Yes, that's correct.

15    Q     And how did he do that?

16    A     I'm sorry.

17    Q     Did he say yes or you could understand him?

18    A     Yes.

19          **THE COURT:**  Allow him to finish the question,

20          Detective Duffy, before you start answering it.

21    Q     And did he have any questions at all after any of

22    the questions that you asked him on the Miranda warnings?

23    A     No, sir.

24    Q     When he -- I'll withdraw that.

25          You also stated that at some point after the

DEFENSE - CROSS - DET. T. DUFFY

Page 23

1    Miranda warnings you signed the card, correct?

2         A    That's correct.

3         Q    And did he have any difficulty signing the card?

4         A    Yes, sir.

5         Q    And could you describe that to the Court?

6         A    He was in a lot of pain and I guess banged up so he

7    did the best that he could.

8         Q    And you asked Mr. Waiters to sign the card, right?

9         A    I did, yes.

10        Q    And did he say yes or how did he agree to sign the

11   card?

12        A    I gave him a pen and he signed it.

13        Q    Did he say anything to you at all prior to you

14   giving him the pen?

15        A    There was -- he was in a lot of pain.  It was going

16   to be hard for him to do.

17        Q    And after he told you that, what did you say to

18   him, if anything?

19        A    Do the best that he could.

20        Q    At any point, did he tell you that he did not want

21   to sign this card?

22        A    No, sir.

23        Q    Now, after you gave him the pen, could you describe

24   to the Court how he signed this card?

25        A    How?

DEFENSE - CROSS - DET. T. DUFFY

Page 24

1    Q    Well, I'll rephrase it.  You mentioned that he was

2    in bed handcuffed?

3    A    That's correct.

4    Q    The hand that he -- do you remember which hand he

5    signed the card?

6    A    I do not.

7    Q    Do you remember the hand that he signed the card

8    with, was that arm handcuffed?

9    A    No.

10   Q    And do you remember whether the hand that he signed

11   the card with, did it appear to be hurt in any way?

12   A    I don't recall, no, sir.

13   Q    Did you bring the card to him or how did he get in

14   position to sign the card at this point?

15   A    I brought it to him.

16   Q    And did his hand move on the card or did you move

17   the card for him, I mean.  Or would you just describe to the

18   Court how he did it?

19   A    I gave him a pen and he signed his name the best he

20   could.  He signed it as best.  I know he was injured so he did

21   the best he could.

22   Q    Were you holding the card while he was signing it?

23   A    Yes, I was.

24   Q    And while he was signing the card, was he making

25   any noise, you know, any grunts or anything as if he was in

1    pain?

2        A    Not that I recall.

3        Q    After he signed the card, did he request to see a

4    doctor or anybody or a nurse?

5        A    No, sir.

6        Q    Now, how long did it take Mr. Waiters to sign this

7    card?

8        A    A couple of seconds.

9        Q    After he sign the cards that is when you had a

10   conversation with him?

11       A    Yes, sir.

12       Q    And prior to having the conversation with

13   Mr. Waiters, did you tell him why you were there?  What

14   specific incident you were talking about?

15       A    No, sir.  I just explained -- I asked him to tell

16   me if he remembered why he was there.

17       Q    And then after that, he started telling you the

18   story that you described?

19       A    That's correct.

20       Q    Did he tell you the whole story or did you ask him

21   specific questions as he was telling you the story?

22       A    I didn't ask any specific questions.  I didn't

23   really have that many details about the case.

24       Q    And how long did it take him to tell the story?

25       A    About ten, fifteen minutes, maybe.

DEFENSE - CROSS - DET. T. DUFFY

Page 26

1       Q     And I believe you mentioned that you were taking

2    notes as he was telling you the story?  Were you taking these

3    notes at the same time that he was talking.

4       A     As he was speaking, yes.

5       Q     Now, you also said that he was having a difficult

6    time speaking?

7       A     He was in pain, yeah.

8       Q     And how did you know he was in pain during this

9    conversation?

10      A     I can tell.

11      Q     Well, so the Court would know?

12      A     Well, just from his physical injuries that I can

13   see.  You can see that it was quite painful.  His eye was

14   swollen shut.  He had taken a pretty good beating.

15      Q     Did it appear to you that it was painful for him to

16   talk as he was talking to you?

17      A     Not really.  He was pretty clear on what he was

18   saying.

19      Q     Did you -- was his voice clear or was he having

20   trouble with words?  Or if you could describe to the Court, it

21   would be helpful?

22      A     He was speaking clearly but low.  He wasn't

23   speaking loudly.

24      Q     And how did the conversation with Mr. Waiters end?

25      A     I'm sorry?

DEFENSE - CROSS - DET. T. DUFFY

1      Q     How did it end?  Did he just stop talking or what

2  happened.

3      A     Well, he was finish telling me the story that he

4  remembered waking up in the ambulance and that was pretty much

5  the details I needed to know.

6      Q     And did you ask any follow-up questions?

7      A     No, sir.

8      Q     At any point, did you ask a question and he was not

9  able to answer it?

10     A     No, sir.

11     Q     And after you finished talking to him, I believe

12  you said that you left the room?

13     A     That's correct.

14     Q     Prior to leaving the room, do you remember whether

15  Mr. Waiters requested to see a doctor or a nurse or any

16  medication?

17     A     No, sir.  Not that I all, no.

18            **MR. SIMONS:**  One second.

19     Q     Just one other question.  Before Mr. Waiters sign

20  the Miranda forms, did you have him review the form in any

21  way?

22     A     No, sir.

23            **MR. SIMONS:**  Your honor I have no further

24     questions.

25            **MR. HALE:**  No redirect, your honor.

- PROCEEDINGS -

Page 28

1      **THE COURT:**  Okay.  The card that you have, you

2   can give it to me.

3                  (handing).

4      **THE COURT:**  You can be excused.

5      (Whereupon, the witness was excused)

6      **THE COURT:**  Any other witnesses you wish to

7   call?

8      **MR. HALE:**  No, the People rest on the hearing,

9   your honor.

10     **THE COURT:**  Mr. Simons, any witnesses you wish

11  to call?

12     **MR. SIMONS:**  Just one second.  No.

13     **THE COURT:**  Any closing arguments you wish to

14  make, Mr. Simons.

15     **MR. SIMONS:**  Your honor, I'm going to rely on

16  the record, I would request that the Court would

17  consider suppressing the statement of Mr. Waiters based

18  on the conditions as described by the detective.  But I

19  believe it speaks for itself, so I would move to

20  suppressed it based on what the officer testified to.

21  Thank you.

22     **MR. HALE:**  Your honor, it appears the

23  record -- it's the uncontroverted record at this point

24  that even though the defendant was hospitalized and had

25  suffered some injuries, that did not debilitate him from

- PROCEEDINGS -

Page 29

1   making a voluntarily waiver of his Right, which were

2   read to him in accordance with the case law.  And he was

3   not subjected to an extensive interrogation by any

4   means.  But ask merely to recount the incident in a

5   fairly abbreviated fashion.  So that he was not

6   subjected because of his physical condition to anything

7   that would be close to being considered interrogation.

8   But just to put it briefly, there is no constitutional

9   rights of any sort and it's rather clear that he was

10   capable and did in fact made a knowing voluntary waiver

11   of his rights in recounting his version in question.

12          **THE COURT:**  I will reserve decision on this.

13   Today is the 16th.  May I see counsel with regards to

14   scheduling.

15          (At which time, there was an off-the-record

16          discussion held)

17

18          **THE COURT:**  And certainly, Mr. Simons, I will

19   order the minutes of the hearing.

20          **MR. SIMONS:**  Yes, 18B.

21          **THE COURT:**  The Court has returned the

22   original to the People.

23          **MR. HALE:**  And I acknowledge receipt.  That's

24   People's exhibit 1.

25          **THE COURT:**  The Court will reserve the

- PROCEEDINGS -

1   decision on the hearing.  This matter will be adjourned

2   until December 7th.  Put that on for 10:00 a.m.

3           And again, certainly Mr. Hale, you acknowledge

4   receipt of the original of People's 1, which was deemed

5   in evidence.

6           **MR. HALE:**  The Miranda card, that's correct,

7   your honor.  And I think that we can use that adjourn

8   date probably when the Court makes its decision on the

9   Huntley hearing as a final conference scheduling for

10  trial in this case.

11          **THE COURT:**  Certainly.  Any other matters to

12  go on the record before we recess?

13          **MR. SIMONS:**  No.

14          **MR. HALE:**  Thank you, your Honor.

15          *        *        *        *        *

16      IT IS HEREBY CERTIFIED THAT THE FOREGOING IS A TRUE

17      AND ACCURATE CERTIFIED TO BE A TRUE AND ACCURATE
    TRANSCRIPT

18

19      OF THE PROCEEDINGS.

20

21  NADONNA V. BLANDING
    Official Court Reporter

22

23          (not certified without original signature)

24

25

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF KINGS:  CRIMINAL TERM:  PART: 1

3   ----------------------------------------X

4   PEOPLE OF THE STATE OF NEW YORK,        :
                                                Indictment
5                                           : No. 3464/06
          -against-
6                                           :
    GENERAL WAITERS,
7                                           :
                    Defendant.
8   ----------------------------------------X

9                                 320 Jay Street
                                  Brooklyn, New York
10                                December 7, 2007

11  B E F O R E:

12      HONORABLE DEBORAH DOWLING,
            Justice of Supreme Court
13
    A P P E A R A N C E S:
14
        CHARLES J. HYNES, ESQ.
15          DISTRICT ATTORNEY KINGS COUNTY
        BY:  MARK HALE, ESQ.
16      Assistant District Attorney

17      CALVIN SIMONS, ESQ.
            616 Eastern Parkway
18          Brooklyn, New York
        Attorney for the Defendant
19

20

21

22                                PHYLLIS PRICE
                                  OFFICIAL COURT REPORTER
23

24

25

1          THE CLERK:   Number one on the calendar.

2     Indictment 3464 of 2006, People of the State of New York

3     against General Waiters.

4          Defendant is not present. Counsel has -- for the

5     Defense -- has submitted an affirmation of actual

6     engagement.

7          MR. HALE:  Office of the District Attorney by

8     Mark Hale.

9          I don't know whether Mr. Simons suggested any

10     particular adjourned dates.

11          THE COURT:  According to what I have before me,

12     it says, good dates are January 15th and January 21st. And

13     I know this matter was on for the Court's decision on the

14     Huntley hearing

15          And, certainly, based upon the testimony and evidence

16     adduced at the Huntley hearing, this Court finds that the

17     People have not met their burden of proof as to the fact

18     that the defendant knowingly and intelligently waived his

19     rights.

20          So, therefore, the statements will be suppressed.

21     There is a written decision. I am sure your exception is

22     noted for the record.

23          MR. HALE:  Whatever date then, your Honor, is

24     fine.

25          THE COURT:   The 15th or 21st, whatever date.

Decision                                        3

1           I will put it on for the 15th.

2                 MR. HALE:  Very good.

3                 THE COURT:  That will be at ten a.m.

4                 *                 *                 *

5                 Certified to be a true and accurate

6           transcript of the foregoing proceedings.

7

8           _____

9                 PHYLLIS PRICE

10                OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PP

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS : CRIMINAL TERM : PART 1

- - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK    :    INDICTMENT NO.
                                                3464/06

        - against -                    :

GENERAL WAITERS                        :

                              DEFENDANT  :    JURY VOIR DIRE
                                             VOLUME I

- - - - - - - - - - - - - - - - - - - -X

                         320 JAY STREET
                         BROOKLYN, NEW YORK  11201

                         APRIL 30, 2008
                         MAY 1 & 2, 2008




BEFORE:    HONORABLE DEBORAH A. DOWLING, JUSTICE



APPEARANCES:


          CHARLES J. HYNES, ESQ.
              District Attorney, Kings County
              BY:  MARK HALE, ESQ.
                  Assistant District Attorney


          CALVIN J. SIMONS, ESQ.
              Attorney for Defendant
              616 Eastern Parkway
              Brooklyn, New York




                         VINCENT M. GERALDI, JR.
                         SENIOR COURT REPORTER

PROCEEDINGS                                    2

1          THE CLERK:  Number two on the calendar,

2     Indictment 3464 of 2006, People of the State of New York

3     against General Lee Waiters.

4              The defendant is present.

5              Counsels, note your appearances for the

6     record, please.

7          MR. SIMONS:  Calvin J. Simons, 616 Eastern

8     Parkway, for Mr. Waiters.

9              Good morning, your Honor.

10         THE COURT:  Good morning.

11         MR. HALE:  Office of the District Attorney, by

12    Mark Hale.

13             Good morning, your Honor.

14         THE COURT:  Good morning.

15             This matter is scheduled for trial.

16             Are both sides ready?

17         MR. HALE:  The People are ready, Judge.

18         MR. SIMONS:  Yes.

19         THE COURT:  Also, before we get to that point,

20    People, is there any Sandoval hearing that you're

21    requesting in this matter?

22         MR. HALE:  No, your Honor.

23         THE COURT:  Or any other Molineux or anything

24    of that nature?

25         MR. HALE:  Only insofar, your Honor, as I

PROCEEDINGS                                            3

1   believe is documented in the psychiatric reports, the

2   defense expert, Doctor Drob, and the People's expert,

3   Doctor Bardey, in referencing the defendant's past

4   conduct in terms of alcoholism and drug abuse, which I

5   believe are bad acts, but here wouldn't go to the

6   psychiatric issue.  So I don't know if it falls into the

7   ambit of Molineux.  I expect it will be first raised by

8   the defense expert, Doctor Drob.  The People will

9   respond in kind, obviously, if it goes to any sort of

10  diagnosis that will be referenced.

11          MR. SIMONS:  The People aren't presenting this

12  on their direct case, so they're going to wait for

13  whatever Doctor Drob raises.  Whatever he raises, I

14  guess, will be a fair issue.

15          MR. HALE:  I'm more concerned, just along that

16  line, your Honor, I know that the Court suppressed the

17  statement that was given by Mr. Waiters in the hospital

18  to Detective Duffy from Brooklyn North Homicide.  Both

19  of the doctors, again, in their reports, weighed in in

20  terms of both reality testing and diagnosing in terms of

21  their determining the defendant's credibility with the

22  version of events that he gave to them, testing it

23  against the version of events as he gave it to the

24  detectives in the now suppressed statement.

25          I frankly don't know how we're going to handle

PROCEEDINGS                                    4

1    that in terms of the case.  Again, it would be very

2    difficult for the doctors to say:  I think that his

3    mental condition is this because the version of events

4    that he gave me I either credit or I don't credit

5    because it differed or was similar to the previous

6    statement.

7                Again, they factored that statement into their

8    diagnosis in their analysis of Mr. Waiters' state of

9    mind.  I'm not sure how the Court wants to handle that

10   or where it will come up.

11               MR. SIMONS:  Well, I've talked to Doctor Drob,

12   and I did inform him the statement was suppressed.  It

13   was my intention of having Doctor Drob make a diagnosis

14   not using that statement but statements that Mr. Waiters

15   made directly to him and any other report and document

16   he evaluated.

17               I know the People's doctor, Doctor Bardey, he

18   did make an analysis, and I don't think he focused so

19   much on the statement that was suppressed versus just

20   evaluating Doctor Drob, the test results, and all the

21   other conclusions.

22               I don't think there's a problem.

23               MR. HALE:  Here's where the problem comes in,

24   to Doctor Bardey anyway.  The defendant described a

25   number of symptoms of a psychiatric nature to which

-VMG-

PROCEEDINGS                                    5

1    Doctor Bardey's ultimate conclusion was that the

2    defendant was malingering or feigning the symptoms.

3              As part of that credibility testing, he was

4    talking about the wildly divergent version of the events

5    as they happened from what he tells Doctor Bardey versus

6    what he told the police, and factored that in as part of

7    why he believed the defendant was malingering because

8    the defendant describes to the detectives a rather

9    solidly based reality sort of version of events and then

10   describes to the doctor one that is influenced by

11   psychiatric issues that he never said to the police.

12             Again, your Honor, I understand the Court

13   suppressed that, and that was the People's use of that

14   in their case in chief.  But I think that if the

15   psychiatric issue is raised, as it will be by

16   Doctor Drob, then that then becomes fair play for the

17   People's expert to talk about that in his determination

18   of whether the defendant was being credible in his

19   description of his symptoms.

20             I frankly don't know that there's a way to get

21   around that.

22             MR. SIMONS:  Let me just say that Doctor Drob

23   is not going to use that statement.  I've already told

24   him to forget it.  So, when he testifies, that statement

25   won't be brought up or used in his diagnosis, because he

PROCEEDINGS                                6

1    has other information to make a diagnosis.

2         MR. HALE:   But also understanding the entirety

3    of the diagnosis is dependent upon the defendant

4    accurately reporting what his symptoms are.

5         THE COURT:   I understand that.   But I don't

6    know quite frankly whether, in fact, that would have

7    been something he would have stated to the detectives,

8    in terms of his mental representations that he would

9    have made to a doctor.

10        I understand what you're saying in terms of

11   the statement that he gave to the detectives, which is

12   certainly, you're saying, divergent from one and

13   different from one that he gave to the doctors.   But I

14   didn't know, under those circumstances, if he would have

15   given the same statement.

16        MR. HALE:   Let's put it this way, Judge, and

17   I'll be more specific.   In the statements, when he's

18   talking about --  he says:  "I snapped.  I don't know

19   what's going on, I black out.  I'm not aware of what's

20   going on, and all of a sudden I'm on the floor."

21   Whereas, in the statements to the police, he says:

22   "Lorenzo is coming at me, I shoot the gun at him, he

23   dances out of the way, I don't mean to shoot him."  He's

24   talking about intentional acts as opposed to where he's

25   describing to the doctor something that he has no

-VMG-

PROCEEDINGS                                    7

1    conscious awareness of what's going on.

2              So, again, when the doctors are sitting there

3    and going, okay, is he giving me a candid account of

4    what's going on, in these cases the doctors would have

5    taken into account if he had said to the police hey, I

6    just blacked out, I don't know what went on, I just

7    snapped, or things of that nature.  They would take that

8    into account in making their diagnosis.

9              Here, they're comparing the two and sitting

10   there going well, maybe something's wrong, and then

11   analyzing his statements as to whether he's accurately

12   reporting what's going on.

13             It's a little bit hard for the doctor to make

14   his opinion, specifically when we're talking about the

15   People's doctor, that the defendant was malingering his

16   symptoms.  Frankly, I wouldn't be doing my job if I

17   didn't cross-examine Doctor Drob and say he gave you one

18   version of events and here's this another version of

19   events, how do you explain that?

20             The Court can take it under consideration.

21             THE COURT:  I was going to say.  Absolutely.

22             Not only that, there are some other matters we

23   have to get out of the way.  Certainly, I would say to

24   both sides, in terms of whatever openings you wish to

25   make, that certainly should not be part of whatever

-VMG-

PROCEEDINGS                              8

1   openings in terms of specifics about any statements or

2   any doctors' evaluations in regard to the defendant's

3   mental state.  That certainly would not be a part of it.

4   So, we'll revisit that issue.

5              Mr. Waiters, let me say this to you.  The next

6   phase of your trial will be known as voir dire or jury

7   selection.  Now, the Court, the assistant district

8   attorney, and your attorney will be asking questions of

9   jurors collectively as a group and also individually.

10             Mr. Waiters, sometimes due to the personal

11  nature of their answers to the questions, jurors will

12  indicate that they prefer to speak to the Court

13  privately, and that will be done outside of all others

14  in the courtroom, except the Court, your attorney, the

15  assistant district attorney, and yourself.

16             Now, Mr. Waiters, I'm telling you now that you

17  would have an absolute right to be present at all

18  conversations and all discussions which take place

19  between the Court, the attorneys, and the prospective

20  juror which explores a prospective juror's background

21  and their ability to objectively weigh the evidence.

22             Mr. Waiters, while you have an absolute right

23  to be present at all phases of your trial, certainly you

24  have a right to waive your appearance at those

25  discussions which take place between the Court, the

PROCEEDINGS                                    9

1    attorneys, and the prospective jurors.

2              What I'm going to ask you to do now is to take

3    some time to speak to your attorney and indicate to the

4    Court whether, in fact, you wish to be present at those

5    conversations.

6              Now, Mr. Waiters, if, in fact, you waive your

7    right to be present at those conversations, certainly,

8    before anything is done, I would give you an opportunity

9    to speak to your attorney about any decisions.

10             As I said, certainly I'm going to ask you to

11   go over that form with your attorney, and then you'll

12   indicate to me what it is, Mr. Waiters, you wish to do.

13             (Defendant consulting with counsel)

14             THE COURT:  Mr. Waiters, did you have enough

15   time to discuss this matter with your attorney, sir?

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  Do you wish to waive your right to

18   be present at those conversations which take place

19   between the Court, the attorneys, and the prospective

20   jurors?

21             THE DEFENDANT:  Yes, ma'am.

22             THE COURT:  Okay.  Certainly, you've signed

23   the form that the Court has before it?

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  And you've signed that of your own

-VMG-

PROCEEDINGS                                    10

1    free will, Mr. Waiters?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  Mr. Waiters, let me say this:  The

4    next phase in your trial, sir, will be voir dire or

5    what's also known as jury selection.  In order to avoid

6    any confusion, I will now advise you, in the presence of

7    your attorney, of the procedures that will be followed

8    in selecting trial jurors and alternate jurors from the

9    panel of prospective jurors.

10          Certainly, if there are no challenges to the

11    panel of prospective jurors, the Court will then

12    inquire, with consent of counsel, whether, in fact,

13    there are any prospective jurors who, because of

14    something personal or business reasons, wish to be

15    excused.

16          Should any prospective jurors so indicate

17    that, I will then examine them at sidebar and determine

18    and dispose of those applications in the presence of

19    counsel, and will counsel consent to that.

20          Let me ask you this, Mr. Hale.  How long do

21    you think it will take you to present your case?

22          MR. HALE:  It should only be a matter of at

23    the most four days.  At the most.

24          MR. SIMONS:  The only witness that I would add

25    to that would be Doctor Sanford Drob at this time.

-VMG-

PROCEEDINGS                    11

1          THE COURT:  Does your client come to court on

2    Fridays?

3          MR. SIMONS:  Yes.

4          THE COURT:  Is that correct?

5          (Defendant consulting with counsel)

6          MR. SIMONS:  Yes, he does come to court on

7    Fridays.  He has no religious reason not to come to

8    court or Fridays.

9          THE COURT:  Is that correct, Mr. Waiters?

10         THE DEFENDANT:  Yes, that's correct.

11         MR. SIMONS:  Just so the Court knows, this

12    Friday, though, in the afternoon, I would request time

13    off because I'm taking my daughter to see a doctor.

14         THE COURT:  Today is Wednesday.  If, in fact,

15    we have a jury by Thursday, then I would anticipate

16    getting started on Monday, rather than having the People

17    bring in whatever witnesses.  We'll just get started on

18    Monday.  I will indicate that to the jurors as well.

19         MR. HALE:  That works, your Honor.

20         Thank you.

21         THE COURT:  Again, Mr. Waiters, in order to

22    avoid any confusion, certainly I will have the jurors

23    spoken to, and if the attorneys are saying it's five

24    days, normally I would say six to eight days in order to

25    be on the safe side, because I don't know what may

PROCEEDINGS                    12

1    occur.  So, normally, when I say the trial will take

2    approximately six to eight days to try, a lot of jurors

3    will then indicate that they cannot serve for that

4    length of time.  That is when I'll get the most people

5    asking to come up and speak to the Court at sidebar

6    because they cannot serve that length of time.

7              Certainly, normally what I would do, Counsels,

8    if a juror indicates to me that they cannot serve

9    because of the length of time of a case, because either

10   they have vacations planned, or other things, or job

11   constraints, what I would normally do is not excuse them

12   at the time that they're asking to be excused.  However,

13   with the consent of counsel, they will be excused at

14   some point later in the proceeding.

15             What I would do normally is have those jurors

16   who have not expressed any reservation about sitting on

17   the jury placed in the jury box first.  And then, as a

18   civic lesson to those who say I can't serve, I've

19   postponed my jury service in the past, for whatever

20   reason, I can't be bothered with serving jury duty, with

21   the understanding that they're not going to be put on

22   this jury--because any time a juror says to the Court

23   and counsel that they have other things that are more

24   pressing than this case, that's not the kind of juror

25   you would want to have serve in any event--as a civic

PROCEEDINGS                    13

1    lesson, I would, in fact, have them remain, have them

2    see everything that goes on in the courtroom, and

3    certainly place them in the jury box at the end of all

4    of the rounds.

5              Certainly, before they are placed into the

6    jury box, I would notify both counsel that these are the

7    jurors that we agree should be excused, so that you do

8    not waist your time in questioning those jurors who said

9    that they cannot serve for whatever period of time that

10   we indicate, which would be approximately six to eight

11   days.

12             Certainly, for the information of counsel, the

13   grounds of challenge for cause for a prospective juror

14   are contained in Criminal Procedure Law Section 270.20.

15             Also, the qualifications, disqualifications

16   and exemptions of jurors also are noted in the Judiciary

17   Law, Section 509 through 518.

18             And the procedure for exercising peremptory

19   challenges of an individual juror and the number of

20   peremptory challenges that are allowed to each side is

21   set forth in Criminal Procedure Law Section 270.25.

22             In this case, the number of peremptory

23   challenges is twenty.

24             The voir dire will be conducted in accordance

25   with Criminal Procedure Law Section 270.15 and also in

PROCEEDINGS                                    14

1   accordance with the rules of the Chief Judge of the

2   Court of Appeals.

3              After eighteen prospective jurors have been

4   called at random from the panel and sworn to true

5   answers to give to questions that will be asked of them,

6   the Court will then first examine those jurors as to

7   their qualifications to serve as fair and impartial

8   trial jurors on this case.

9              After the Court has had an opportunity to

10   question those prospective jurors, the next thing that

11   will happen, Mr. Waiters, is that the Court will then

12   give the assistant district attorney an opportunity to

13   question those prospective jurors, either individually

14   or collectively, as he sees fit.

15             After the assistant district attorney has had

16   an opportunity to question the prospective jurors, then

17   defense counsel will be given an opportunity to question

18   those prospective jurors as well, either individually or

19   collectively, as defense counsel sees fit.

20             Certainly, I would ask that counsel avoid, if

21   possible, repetitious questioning or redundant probing

22   that might have been covered by the Court or by opposing

23   counsel.

24             Let me just back up now.  If there is

25   questioning by the Court and both sides find that a

PROCEEDINGS                              15

1    juror should be excused for cause during questioning by

2    the Court, certainly that juror will then be replaced on

3    consent by counsel.

4            If a juror is replaced on consent by counsel

5    during questioning by the Court for cause, certainly

6    that will not be counted as a peremptory challenge.

7            MR. SIMONS:  I'm sorry, Judge?

8            THE COURT:  If you agree to excuse a juror for

9    cause during questioning by the Court, whether the juror

10   expresses a particular opinion or indicates that they

11   don't understand English at the time they are in the

12   jury box, that will not be counted as a peremptory

13   challenge.

14           Normally, I would give both sides for the

15   first round twenty minutes to question the prospective

16   juror panel.  Certainly, when you've gone over your

17   time, I'll indicate that you have a minute left, but it

18   really means that you've gone over your time and you

19   should wrap it up.

20           Thereafter, you'll be given fifteen minutes

21   for the second round, ten minutes for the third round,

22   et cetera, until we've exhausted the prospective jurors.

23           Certainly, Mr. Waiters, after all questioning

24   has been completed, the Court will then indicate:  Do

25   the People have any challenges for cause?  Does the

PROCEEDINGS                                            16

1    defendant have any challenges for cause?  Do the People

2    wish to exercise any peremptory challenges?  Does the

3    defense wish to exercise any peremptory challenges?

4         Certainly, the order in which challenges will

5    be made is as follows:  First, the People challenge for

6    cause.  Then, second, the defense challenges for cause.

7    Third, the People will exercise their peremptory

8    challenges.  Fourth, the defense will exercise his

9    peremptory challenges.

10        After both sides have exercised their

11   peremptory challenges, in the sequence that I've just

12   described, then the remaining prospective jurors, that

13   is, those jurors who have not been excluded from

14   service, must retain their place in the jury box and

15   will then be immediately sworn as trial jurors on this

16   case.

17        After the swearing of the remaining trial

18   jurors, the jury box will then be refilled, and

19   certainly the questioning will continue in the manner

20   that I've just described, until twelve jurors have been

21   selected to serve as the trial jury in this case.

22        Certainly, Mr. Waiters, you need to bear in

23   mind that the juror whose name was first drawn, called,

24   and sworn must be designated by this Court as the

25   foreperson of the jury.

PROCEEDINGS                                17

1          After twelve jurors have been selected,

2     certainly I would think that at least four alternates

3     may be necessary just in order to ensure a swift

4     transition of this case in order to avoid any problem.

5          Finally, I would say to counsel, during the

6     course of your questioning, please bear in mind that the

7     Court will not permit questioning of prospective jurors

8     as to their specific knowledge or attitude as to any

9     matter of law, nor will you be permitted to certainly

10    question jurors and suggest to them, whether directly or

11    indirectly, that they should refuse to reason together

12    with their co-jurors, or that solicits and encourages a

13    protective juror, either directly or indirectly, to hold

14    out or to do anything less than render a true and

15    impartial verdict in this case.

16          Also, please note that this Court will not

17    permit questioning of prospective jurors that either

18    directly or indirectly solicits a prospective juror to

19    treat a defendant either as a member of the juror's own

20    family or as a juror himself or herself would wish to be

21    treated, because certainly such questions would

22    constitute an appeal to emotion, fear, favor, sympathy,

23    passion and prejudice that would be impermissible.

24          Also, this Court will not permit questioning

25    of prospective jurors which either directly or

PROCEEDINGS                    18

1    indirectly urges or solicits a prospective juror to

2    judge all issues in such a way that his or her decision

3    should reflect the undefined conscience of the

4    community.

5              Of course, you may appropriately ask

6    prospective jurors whether or not they would heed and

7    follow the instructions of the Court.

8              Certainly question them as to their

9    occupation, education, experience with crime, certainly

10   their feelings about the police, and whether or not they

11   would give the defendant a fair trial in this case.

12             Normally, what I do--because I don't know if

13   I've tried a case with either counsel--is I would read

14   the indictment to the jury.  I don't know if any of the

15   counts have been dismissed.  If they do not appear to

16   be, normally I would do that.

17             Also, what I would normally do in a case like

18   this is to indicate that this is not a death penalty

19   case.  So, for those jurors who might have some concern,

20   that may be an issue for them.

21             I would be inclined in this case to make the

22   inquiry of both sides, upon agreement, whether, in fact,

23   anyone has read anything about this case or seen any

24   media coverage in connection with this case.

25             MR. SIMONS:  Yes.

PROCEEDINGS                              19

1          The only one additional thing I would request

2     is that the Court let the jury know that, I believe, the

3     victim in this case was three years old.

4          MR. HALE:  Four.

5          MR. SIMONS:  Four.

6          THE COURT:  What I had proposed to do is

7     indicate that the person that was killed was a young

8     child, and based on the nature of those accusations,

9     whether there's anyone who feels that they could not sit

10    on a case like this.

11         Also, let me say this, Mr. Waiters.  I don't

12    know what's going to be said during the course of the

13    People's questioning of the jurors.  I don't know what

14    may happen.  But let me say this, sir--and I'm just

15    saying it to you as I would say to every

16    defendant--certainly I would not expect you to say

17    "that's a lie" or object to anything that Mr. Hale may

18    say during the course of his questioning to the jurors.

19    Because if there's anything that occurs in this

20    courtroom certainly as a result of anything that you say

21    or do, you don't get a chance to get a do over.  You

22    don't get a chance to have all the jurors sent back

23    downstairs and to start with a fresh panel.

24         It's one thing if something happens in this

25    court during the process of voir dire that would cause

PROCEEDINGS                                        20

1    the Court to send the jurors back downstairs, something

2    outside of your control.  I'm not going to send a jury

3    panel back downstairs because of anything, Mr. Waiters,

4    that you may do.

5             Is that understood by you?

6             THE DEFENDANT:  Yes, ma'am.

7             THE COURT:  I only say this because sometimes

8    a defendant may say, "You know what, Judge?  You didn't

9    tell me if I got overly nervous or excited or angry and

10   I said something that the people that were in the

11   courtroom would be the same people to try my case.  So I

12   didn't know that."  That's why I'm telling you now,

13   because it is just that important.

14            Is that understood by you?

15            THE DEFENDANT:  Yes, ma'am.

16            THE COURT:  Certainly, if any juror expresses

17   any bias or prejudice, that's the kind of juror we will

18   send immediately back downstairs.  Because anyone who

19   says they cannot give you a fair trial will not be

20   permitted to remain in the courtroom, because I would

21   not want that kind of juror to taint the rest of the

22   panel.  But anything you do, sir, certainly will not

23   require the Court to start over in this case.

24            Anything questions about anything that I've

25   said, Mr. Waiters?

JURY VOIR DIRE                                    21

1              THE DEFENDANT:  No, ma'am.

2              THE COURT:  Are both sides ready?

3              MR. SIMONS:  Yes.

4              MR. HALE:  Yes, your Honor.

5              (Pause in the proceedings)

6              COURT OFFICER:  Ready for the panel, Judge?

7              THE COURT:  Yes.

8              Both sides are ready?

9              MR. HALE:  Yes.

10             MR. SIMONS:  Yes.

11             COURT OFFICER:  Panel entering.

12             (At this time, the panel of prospective jurors

13     entered the courtroom)

14             THE CLERK:  Will the jurors please rise and

15     raise your right hand, and answer the following

16     question:

17             Do you and each of you sincerely and solemnly

18     swear or affirm that you will answer truthfully all

19     questions asked of you relating to your qualifications

20     to serve as a juror in this action?

21             Please say, "I do."

22             PROSPECTIVE JURORS:  I do.

23             THE CLERK:  Thank you.

24             Please be seated.

25             THE COURT:  Good morning, jurors.

1               My name is Judge Deborah Dowling, and I will

2       be the judge presiding at this trial.

3               The People are represented by the District

4       Attorney of this county, Mr. Charles Hynes, and seated

5       to my left is Assistant District Attorney Mr. Mark Hale.

6               MR. HALE:  Thank you, Your Honor.

7               Good morning, ladies and gentlemen.

8               THE COURT:  And he will be presenting evidence

9       to you in this case.

10              Seated to my right is defense counsel,

11      Mr. Calvin Simons.

12              MR. SIMONS:  Good morning.

13              THE COURT:  He represents the defendant in

14      this case, seated next to him, Mr. General Waiters.

15              THE DEFENDANT:  Good morning.

16              THE COURT:  The case on trial is the People of

17      the State of New York against General Waiters.

18              The defendant stands accused by way of an

19      indictment.  The indictment accuses the defendant of the

20      following:

21              First count:  The Grand Jury of the County of

22      Kings, by this indictment, accuses the defendant of the

23      crime of Murder in the Second Degree, Penal Law Section

24      125.25(1), committed as follows:

25              The defendant, on or about May 7, 2006, in the

JURY VOIR DIRE                                23

1   County of Kings, with intent to cause the death of

2   Lorenzo Warren, caused the death of Tajmere Clark, by

3   shooting her with a deadly weapon, namely:  a revolver,

4   thereby inflicting various wounds and injuries upon

5   Tajmere Clark, and thereafter and on or about May 7,

6   2006, Tajmere Clark died of the wound and injuries.

7            Second count:  The Grand Jury of the County of

8   Kings, by this indictment, accuses the defendant of the

9   crime of Attempted Murder in the Second Degree, Penal

10  Law Section 110/125.25(1), committed as follows:

11           The defendant, on or about May 7, 2006, in the

12  County of Kings, with intent to cause the death of

13  Lorenzo Warren, attempted to cause the death of Lorenzo

14  Warren by means of a deadly weapon, namely:  a revolver.

15           Third count:  The Grand Jury of the County of

16  Kings, by this indictment, accuses the defendant of the

17  crime of Assault in the First Degree, Penal Law Section

18  120.10(1), committed as follows:

19           The defendant, on or about May 7, 2006, in the

20  County of Kings, with intent to cause serious physical

21  injury to Lorenzo Warren, caused such injury to Lorenzo

22  Warren by means of a deadly weapon, namely:  a revolver.

23           The subject matter of this count being an

24  armed felony, as that term is defined in Section 1.20 of

25  the Criminal Procedure Law.

1          Fourth count:  The Grand Jury of the County of

2     Kings, by this indictment, accuses the defendant of the

3     crime of Assault in the First Degree, Penal Law Section

4     120.10(1), committed as follows:

5          The defendant, on or about May 7, 2006, in the

6     County of Kings, with intent to cause serious physical

7     jury to Lorenzo Warren, caused such injury to Mary Lee

8     Clark, by means of a deadly weapon, namely:  a revolver.

9          The subject matter of this count being and

10    armed felony, as that term is defined in Section 1.20 of

11    the Criminal Procedure Law.

12         Fifth count:  The Grand Jury of County of

13    Kings, by this indictment, accuses the defendant of the

14    crime of Assault in the First Degree, Penal Law Section

15    120.10(1), committed as follows:

16         The defendant, on or about May 7, 2006, in the

17    County of Kings, with intent to cause serious physical

18    jury to Lorenzo Warren, caused such injury to Shatashia

19    Lewis, by means of a deadly weapon, namely:  a revolver.

20         The subject matter of this count being an

21    armed felony, as that term is defined in Section 1.20 of

22    the Criminal Procedure Law.

23         Sixth count:  The Grand Jury of the County of

24    Kings, by this indictment, accuses the defendant of the

25    crime of Criminal Possession of a Weapon in the Second

JURY VOIR DIRE                                      25

1    Degree, Penal Law Section 265.03(2), committed as

2    follows:

3              The defendant, on or about May 7, 2006, in the

4    County of Kings, knowingly and unlawfully possessed a

5    loaded firearm, namely: a revolver, with intent to use

6    the same unlawfully against another.

7              The subject matter of this count being an

8    armed felony, as that term is defined in Section 1.20 of

9    the Criminal Procedure Law.

10             Seventh Count:  The Grand Jury of the County

11   of Kings, by this indictment, accuses the defendant of

12   the crime of Criminal Possession of a Weapon in the

13   Fourth Degree, Penal Law Section 265.01(1), committed as

14   follows:

15             The defendant, on or about May 7, 2006, in the

16   County of Kings, knowingly and unlawfully possessed a

17   firearm, namely:  a revolver.

18             Jurors, the incident is alleged to have

19   occurred on May 7, 2006, at approximately 11:30 a.m.,

20   inside of 340 Williams Avenue, apartment 4I, in the

21   County of Kings, in Brooklyn.

22             Does anyone know anything about this case?  I

23   would ask that you raise your hand.  Because this matter

24   appeared in the media and might have appeared in

25   newspapers.

JURY VOIR DIRE                                    26

1           If anyone knows anything, you don't have to

2     shout it out, just raise your hand if you know anything

3     about the case.

4           If you do, then certainly I would ask to see

5     counsel with the reporter at sidebar.

6           (The following occurred at sidebar out of

7     hearing of the panel of prospective jurors:)

8           THE COURT:   Good morning.

9           May I have your card, please.

10          (Handed to the Court)

11          THE COURT:   Your name, please?

12          PROSPECTIVE JUROR:   Esther Rubin.

13          THE COURT:   Miss Rubin, I would ask, in fact,

14    if you heard anything?

15          PROSPECTIVE JUROR:   Yes, I did.

16          THE COURT:   What did you hear?

17          PROSPECTIVE JUROR:   Those shootings.   There

18    were shootings, and my children said, "Ma, he's guilty."

19    I feel that --

20          THE COURT:   That you couldn't put that out of

21    your mind at this point?

22          PROSPECTIVE JUROR:   No.   I mean, I would like

23    to give the man a fair chance, but after all the

24    evidence, I'm afraid I'm not qualified.   I would like to

25    disqualify myself for that.

JURY VOIR DIRE                                      27

1           THE COURT:  Any questions?

2           MR. HALE:  No.

3           MR. SIMONS:  No.

4           THE COURT:  Ma'am, I can't excuse you from

5      jury duty.  The only thing you're going to do,

6      Miss Rubin, you're going back downstairs to the second

7      floor.  You can go there now.  You can go directly

8      there.

9              (PROSPECTIVE JUROR EXCUSED)

10             (The following occurred in open court in the

11     presence of the panel of prospective jurors:)

12          THE COURT:  Certainly, jurors, I will ask

13     whether, in fact, you know any of the parties that I

14     introduced, either the attorneys, Mr. Waiters, or

15     myself.  Because, again, jurors, it would be

16     inappropriate for you to sit on this case if you know

17     any of the parties.

18             Now, jurors, the following witnesses may be

19     called, or you may hear these names during the course of

20     this trial.  Certainly, I caution you that just because

21     I mention a name it imposes no burden on either side to

22     call that person as a witness.  I am only mentioning the

23     names to determine whether or not you recognize any of

24     the names.  Because, again, it would be inappropriate

25     for you to sit as a juror on this particular case if you

1      know any of these witnesses or the names that I'm

2      calling.

3                  Tajmere Clark.

4                  Mary Lee Clark.

5                  Lorenzo Warren.

6                  Shatashia Lewis.

7                  Jacqueline Warren.

8                  Derrick Warren.

9                  Koneisha Clark.

10                 Sergeant Timothy Corleto.

11                 Police Officer Jolene Anderson.

12                 Police Officer David Cononico.

13                 Detective Joseph Castellano.

14                 Detective John Bruton.

15                 Detective Michael Pacchione.

16                 Detective Richard Amato.

17                 Detective George Boston.

18                 Detective Edward Dingman.

19                 Doctor Michelle Slone, Medical Examiner.

20                 Doctor Alexander Bardey.

21                 Detective James Valenti.

22                 Doctor Sanford Drob.

23                 Is anyone familiar with any of those names

24     that I've mentioned?

25                 If so, I would ask that you raise your hand.

JURY VOIR DIRE                                    29

1        (HAND RAISED)

2        THE COURT:  Okay.  I see one hand raised.

3        Counsel, at sidebar.

4        (The following occurred at sidebar out of the

5    hearing of the panel of prospective jurors:)

6        (At this time, a prospective juror approached

7    at sidebar)

8        THE COURT:  Good afternoon, may I have your

9    card, please.

10        Your name?

11        PROSPECTIVE JUROR:  Joshua Baez.

12        THE COURT:  Mr. Baez, I asked if you

13    recognized any of the names.  You said you might

14    recognize someone?

15        PROSPECTIVE JUROR:  Derrick Warren sounds like

16    he might be another inspector with the Fire Department.

17        MR. HALE:  No.

18        PROSPECTIVE JUROR:  Then I don't think I know

19    him.

20        THE COURT:  Is that the only concern you had?

21        PROSPECTIVE JUROR:  Yes.

22        THE COURT:  Okay.  If that's it, you can have

23    a seat back in the audience.

24        (At this time, the prospective juror returned

25    to the audience)

                                  JURY VOIR DIRE                    30

1                    THE SERGEANT:  There's one more individual.

2        He's coming up.

3                    (At this time, a prospective juror approached

4        at sidebar)

5                    THE COURT:  Good afternoon.

6                    May I have your card, please.

7                    Your name, sir?

8                    PROSPECTIVE JUROR:  Joseph Johnson.

9                    THE COURT:  Mr. Johnson, you said you might

10       recognize someone?

11                   PROSPECTIVE JUROR:  I'm a Correction officer.

12       I work in Corrections, New York City.

13                   THE COURT:  And?

14                   PROSPECTIVE JUROR:  If I'm not mistaken, I

15       might have recognized the defendant.  I only see him

16       from the back, but from the side, I might recognize him.

17                   THE COURT:  Where are you stationed?

18                   PROSPECTIVE JUROR:  Rikers Island.

19                   THE COURT:  Okay.  You're saying that because

20       of the fact that you're there, that would affect your

21       ability to be fair?

22                   PROSPECTIVE JUROR:  Not really, but just to be

23       on the safe side.  Like, for instance --

24                   THE COURT:  That's okay.

25                   Mr. Johnson, at this point, I'm just not sure

                                       -VMG-

1      that the job that you do would affect your ability on

2      this particular case.  I'm not going to excuse you from

3      jury duty, I'm only going to send you back downstairs to

4      the second floor.

5                  PROSPECTIVE JUROR:  No problem.

6                  THE COURT:  Go there now.

7                  PROSPECTIVE JUROR:  Okay, ma'am.

8                  (PROSPECTIVE JUROR EXCUSED)

9                  THE COURT:  I send them downstairs because I

10     don't want them to get into anything about it with the

11     other prospective jurors.

12                 MR. HALE:  Okay.

13                 MR. SIMONS:  Okay.

14                 (The following occurred in open court in the

15     presence of the panel of prospective jurors:)

16                 THE COURT:  Now, jurors, if you do not

17     recognize a witness' name but later you recognize a

18     witness once he or she takes the witness stand, you must

19     bring it to the Court's attention immediately.

20                 Now, jurors, the first step in the trial of a

21     criminal case is to select a jury.  A jury that will be

22     free of any preconceived notions and prejudices, and

23     that will be fair to the defendant in this case and also

24     fair to the People.

25                 Now, as prospective jurors, we will be asking

JURY VOIR DIRE                                    32

1    you a serious of questions, and the purpose of the

2    questions that we will be asking you is to determine

3    whether or not, if you're selected to serve as a juror

4    on this particular case, whether you can do so fairly

5    and impartially.

6              Now, the procedure of questioning prospective

7    jurors is known as voir dire.  Voir dire refers to the

8    procedure by which each juror takes an oath to speak the

9    truth, to speak the truth in answers to questions that

10   will be put to you.

11             Now, jurors, the questions are designed to

12   ascertain your ability to serve as fair and impartial

13   trial jurors on this particular case.  I can tell you

14   now, jurors, that the questions are not intended to pry

15   into your private lives, although sometimes, due to the

16   very nature of the kinds of questions that we will be

17   asking you, it may appear that way to you.

18             But I can tell you now, jurors, that both this

19   Court, as well as the attorneys in this case, have the

20   highest responsibility to choose as trial jurors those

21   individuals who will be fair and impartial and give both

22   sides a fair trial, which they're entitled to receive.

23             Jurors, you will also appreciate the fact that

24   the questions will be designed in many instances to

25   alert you as prospective jurors to your functions and

1    your responsibilities.  Jurors, therefore, you will be

2    able to make your own determination and your own

3    evaluation that if you are selected to serve as a juror

4    on this particular case, whether you can do so fairly

5    and impartially.

6             Now, if you are selected to serve as a juror

7    on this case, it will be your responsibility to

8    determine what happened in this case.  Now, jurors, you

9    may be asking yourselves how can you determine what

10   happened in this case since you were not there on May 7,

11   2006.

12            Jurors, the law provides that you are the sole

13   and exclusive judges of the facts, and you will have to

14   make a determination based upon the evidence that will

15   be presented to you in this case.

16            Jurors, I can tell you now that the primary

17   source of the evidence that you will hear during the

18   course of this trial will come from the witnesses who

19   will come into this courtroom and take the witness

20   stand, take an oath, and testify orally on direct

21   examination and perhaps cross-examination, and redirect

22   and recross-examination, if any.

23            Now, jurors, certainly, in order for you to

24   determine what the facts in this case are, you must

25   evaluate the evidence that you will hear.  And evaluate

1    is the first most important word to a juror.

2                Evaluate means that you must go behind the

3    witness' oath and determine the credibility of the

4    testimony that you hear.  That is, whether a witness is

5    telling the truth, is lying, or is mistaken.

6                Jurors, you will also have to determine the

7    reliability of the testimony that you hear.  That is,

8    whether that testimony is probable or improbable in

9    light of the other evidence that you accept as proven.

10               Now, as jurors, you would have the right to

11   accept or reject the testimony of any witness, either in

12   whole or in part.

13               Jurors, after you have heard all of the

14   evidence in this case, at the end of the trial you will

15   be instructed as to the law that will be applicable in

16   this particular case.  Certainly, jurors, after that,

17   you will then retire to deliberate for the purpose of

18   reaching a verdict or verdicts.

19               Certainly, deliberations is the second most

20   important word to a juror.  A jury is composed of twelve

21   different people, and in deliberations there may be

22   pressure to convince you of another position.  Now, it

23   is the duty of each juror to give their own individual

24   views and also to listen to the arguments of the other

25   jurors, and to weigh their arguments.  But then, each

JURY VOIR DIRE                    35

1    juror must vote according to that juror's own

2    conscience.

3              The fact that this action is brought in the

4    name of the People of the State of New York or that

5    evidence will be presented to you by a public official

6    in no way indicates that the public wants a specific

7    verdict in this case.  Certainly, the People of the

8    County of Kings are served by whatever verdict is

9    justified by the law and the evidence in this case.

10             Now, this trial involves Murder in the Second

11   Degree, attempted Murder in the Second Degree, Assault

12   in the First Degree--three counts, Criminal Possession

13   of a Weapon in the Second Degree, and Criminal

14   Possession of a Weapon in the Fourth Degree.

15             For those jurors who may be concerned,

16   certainly this case is not a death penalty case.

17             I should also mention the fact that certainly

18   the person that was killed in this case is a young

19   child.

20             Now, is there anyone who, based upon the

21   nature of the accusations in this case, feels that they

22   could not serve on this particular case, based on the

23   nature of the accusations?

24             If so, I would ask that you raise your hand.

25             (HANDS RAISED)

-VMG-

JURY VOIR DIRE                                    36

1         THE COURT:  I see a number of hands raised,

2    and I will speak to those jurors.

3         Counsel, I'll see you with the reporter.

4         (The following occurred at sidebar out of the

5    hearing of the panel of prospective jurors:

6         (At this time, a prospective juror approached

7    at sidebar)

8         THE COURT:  Good afternoon.

9         May I have your card, please.

10        Your name, please?

11        PROSPECTIVE JUROR:  My name is Olga Shumilova.

12        THE COURT:  Miss Shumilova, you said that you

13   would find it difficult to sit on this case because of

14   the nature of the accusations?

15        PROSPECTIVE JUROR:  I can't do it.

16        THE COURT:  But you understand that you

17   haven't heard any evidence up to this point?

18        PROSPECTIVE JUROR:  No, I don't know.

19        THE COURT:  So, when you say you can't do it,

20   exactly what are you saying?

21        PROSPECTIVE JUROR:  I can't accept the

22   situation in any form.  I can't.

23        THE COURT:  I'm not quite clear when you say

24   you cannot accept the situation in any form.  Can you be

25   a little more specific?

1    PROSPECTIVE JUROR:  I never scream at each

2    other.  I can't imagine that someone can push someone.

3    I'm not talk about kill or somebody else.

4    THE COURT:  So you're saying just because of

5    the nature of the accusation you would be unable to

6    serve?

7    PROSPECTIVE JUROR:  Yes.

8    THE COURT:  Do you have any questions?

9    MR. HALE:  I do not.

10    MR. SIMONS:  No.

11    THE COURT:  Ma'am, I cannot excuse you from

12    jury duty.  The only thing that's going to happen is you

13    have to go back downstairs to the large room on the

14    second floor that you came from.  You can go there now.

15    PROSPECTIVE JUROR:  Okay.  I have to return to

16    the second floor?

17    THE COURT:  Yes.

18    (PROSPECTIVE JUROR EXCUSED)

19    (The following occurred in open court in the

20    presence of the panel of prospective jurors:)

21    THE COURT:  I would also say this to the

22    jurors, that I cannot excuse anyone from jury duty.  The

23    only thing that's going to happen, if you give me a

24    reason that's good enough, is that you'll go downstairs

25    to the second floor.

JURY VOIR DIRE                                    38

1              (The following occurred at sidebar out of the

2       hearing of the panel of prospective jurors:)

3              (At this time, a prospective juror approached

4       at sidebar)

5              THE COURT:  Your name, please.

6              PROSPECTIVE JUROR:  Batzion Ifraimov.

7              THE COURT:  Miss Ifraimov, you said it would

8       be a hardship?

9              PROSPECTIVE JUROR:  Yes, because in '95 my

10      husband was falsely accused and prosecuted.  My husband

11      was a cab driver at that time, and the crime happened.

12             THE COURT:  What crime happened?

13             PROSPECTIVE JUROR:  I don't know.  Some cab

14      dragged a person, and they prosecuted my husband.  My

15      husband wasn't there.  So, I don't know.  It's going to

16      be hard for me to be a juror.

17             THE COURT:  You said in '95?

18             PROSPECTIVE JUROR:  Yeah.

19             THE COURT:  Did that happen in Brooklyn?

20             PROSPECTIVE JUROR:  In Manhattan.

21             THE COURT:  What was your husband accused of?

22             PROSPECTIVE JUROR:  They accused him of --  he

23      went to jail.

24             THE COURT:  But what was he convicted of?

25      What was he accused of doing, ma'am?

1          PROSPECTIVE JUROR:  They said like some

2   passenger wants to stop, he didn't stop, and supposedly

3   that cab dragged that person.

4          THE COURT:  Dragged the person?

5          PROSPECTIVE JUROR:  Yes, but my husband was

6   home.

7          THE COURT:  So you're saying that because of

8   that situation --

9          PROSPECTIVE JUROR:  I don't think I would be a

10  good juror.  I don't know.  It's very hard.  Since that

11  day, it's like --  our life is turned upside down, you

12  know.

13         THE COURT:  Do you have any questions?

14         MR. SIMONS:  No questions.

15         MR. HALE:  Nothing, Judge.

16         THE COURT:  Ma'am, I cannot excuse you from

17  jury duty.  The only thing I can do is send you back

18  downstairs to the second floor.

19         PROSPECTIVE JUROR:  Okay.  Thank you.

20         (PROSPECTIVE JUROR EXCUSED)

21         (At this time, a prospective juror approached

22  at sidebar)

23         THE COURT:  Ma'am, your card, please.

24         Your name, please?

25         PROSPECTIVE JUROR:  Laurel Rockefeller.

JURY VOIR DIRE                                    40

1          THE COURT:  Miss Rockefeller, you said you

2    would be unable to serve because of the nature of the

3    accusations?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  You don't think you can put your

6    feelings aside and listen to the evidence?

7          PROSPECTIVE JUROR:  No.  I've been --  I'm the

8    victim of some violent crimes, and once it was with a

9    firearm, and I don't think I could be fair.

10         THE COURT:  Even though you haven't heard any

11   evidence?

12         PROSPECTIVE JUROR:  No.  The nature of the

13   crime is too much in line with what I suffered.

14         THE COURT:  Any questions?

15         MR. HALE:  No.

16         MR. SIMONS:  No.

17         THE COURT:  Ma'am, the only thing I can do is

18   send you back down downstairs to the second floor.

19         PROSPECTIVE JUROR:  Of course.

20         THE COURT:  You can go back down there right

21   now, Miss Rockefeller.

22         (PROSPECTIVE JUROR EXCUSED)

23         (At this time, a prospective juror approached

24   at sidebar)

25         THE COURT:  Sir, your card, please.

1          Your name, sir?

2          PROSPECTIVE JUROR:  Peter Weiss.

3          I'm a licensed child therapist in a day

4    treatment program for emotionally disturbed children and

5    their families.  Situations like this, frankly, are all

6    too familiar to me.  I just don't know about my judgment

7    in the case.

8          THE COURT:  Well, I have to ask you the tough

9    questions, Mr. Weiss.

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  What I need to ask you is whether,

12   in fact, and I know it may be difficult because you say

13   you do this on a daily basis, whether you can set those

14   experiences aside and listen to the evidence as it comes

15   in to this particular case and then base your judgment

16   based upon what you hear coming from that witness stand

17   and the law as I give it to you?  I don't know if you

18   can do it.  I have to ask you whether you can.

19         PROSPECTIVE JUROR:  It would be difficult.

20   I've been at this for forty years.

21         THE COURT:  Okay.  When you're saying

22   difficult, I'm going to push you a little more.

23         PROSPECTIVE JUROR:  I don't know really how

24   objective I could be given all of the evidence

25   presented.  That's what I'm saying.

1           THE COURT:  So you feel that you have feelings

2    about it coming in?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Any questions?

5           MR. SIMONS:  No questions.

6           MR. HALE:  No.

7           THE COURT:  Okay.  I can't excuse you from

8    jury duty, Mr. Weiss.

9           PROSPECTIVE JUROR:  I understand.

10          THE COURT:  You have to go back downstairs to

11   the second floor.

12          (PROSPECTIVE JUROR EXCUSED)

13          (At this time, a prospective juror approached

14   at sidebar)

15          THE COURT:  Good afternoon.

16          May I have your card, please.

17          Your name, sir?

18          PROSPECTIVE JUROR:  John Schmidt.

19          THE COURT:  Mr. Schmidt, you said you would

20   have difficulty sitting on a case like this?

21          PROSPECTIVE JUROR:  I have a lot of anxiety.

22   I have a five-year-old, and my wife is expecting within

23   a month.  I don't have a clear conscience right now.  As

24   an unusual coincidence, below where we live there was a

25   murder six week ago.  So, I'm uncomfortable sitting on

1    such a case.

2             THE COURT:  Did that incident happen in

3    Brooklyn?

4             PROSPECTIVE JUROR:  Yes.  Fifth Avenue, in

5    Sunset Park.  It made the news.

6             THE COURT:  So, you're saying --

7             PROSPECTIVE JUROR:  I do not feel I can

8    consider evidence in such a case, you know, in an

9    unbiased way.

10            THE COURT:  Any questions?

11            MR. SIMONS:  No questions.

12            MR. HALE:  No.  Thank you.

13            THE COURT:  I cannot excuse you from jury duty

14   in this case, Mr. Schmidt.  The only thing I can do is

15   send you back downstairs to the second floor.

16            PROSPECTIVE JUROR:  I understand.

17            Good luck with the case.

18            (PROSPECTIVE JUROR EXCUSED)

19            (At this time, a prospective juror approached

20   at sidebar)

21            THE COURT:  Good afternoon.

22            May I have your card, please.

23            Your name?

24            PROSPECTIVE JUROR:  Patricia Olds.

25            THE COURT:  Miss Olds, you said based on the

JURY VOIR DIRE                                    44

1    nature of the accusations that you would be unable to

2    sit as a juror?

3                 PROSPECTIVE JUROR:  I'm just very freaked out

4    right now.  I'm uncomfortable.  My father was a police

5    officer for fifteen years.  I feel like I wouldn't be

6    able to be impartial in this situation.  I'm very

7    freaked out.

8                 THE COURT:  Okay.

9                 What kind of work do you do for a living?

10               PROSPECTIVE JUROR:  I'm an actor and a

11   waitress.  I just graduated.

12               THE COURT:  You're saying that you wouldn't be

13   able to set your feelings aside and listen to the

14   evidence as it comes in in this case?

15               PROSPECTIVE JUROR:  I have two nephews that

16   are young, and my sister is seven months pregnant.  If

17   there's a child involved, I don't think I would be able

18   to handle that.

19               THE COURT:  Any questions?

20               MR. SIMONS:  No questions.

21               MR. HALE:  No.

22               THE COURT:  I can't excuse you, Miss Olds,

23   from jury duty.  I have to send you back downstairs to

24   the second floor.

25               PROSPECTIVE JUROR:  No problem.

1          Thank you.

2          (PROSPECTIVE JUROR EXCUSED)

3          (At this time, a prospective juror approached

4     at sidebar)

5          THE COURT:  Good afternoon.

6          May I have your card, please.

7          Your name, sir?

8          PROSPECTIVE JUROR:  My name is David

9     Leybengrub.

10          THE COURT:  I asked you, sir, whether, in

11     fact, there was anything about the nature of the

12     accusations in this case.

13          PROSPECTIVE JUROR:  Yeah.  Due to the

14     children, I have three kids between the age of seven and

15     one, and I don't know, I think I'll get too emotional

16     based on this.

17          Also, I have a close friend of mine gunned

18     down.

19          THE COURT:  Did that happen in Brooklyn?

20          PROSPECTIVE JUROR:  In Brooklyn, Crown

21     Heights.

22          THE COURT:  You don't think you could set

23     those experiences aside and listen to the evidence?

24          PROSPECTIVE JUROR:  I could never put that

25     first experience aside because we had to go to the

JURY VOIR DIRE                                    46

1      funeral and bury a 10-year-old.

2              THE COURT:  Any questions?

3              PROSPECTIVE JUROR:  No.  I have my own kids,

4      and I think I'm going to get too emotional.

5              THE COURT:  Any questions?

6              MR. HALE:  Nothing from me.

7              MR. SIMONS:  No.

8              THE COURT:  I can't excuse you from jury duty,

9      sir.  The only thing I can do is send you back

10     downstairs to the large room you came from, on the

11     second floor.

12             PROSPECTIVE JUROR:  I understand.

13             THE COURT:  Go there now, sir.

14             (PROSPECTIVE JUROR EXCUSED)

15             (At this time, a prospective juror approached

16     at sidebar)

17             THE COURT:  Good afternoon.

18             May I have your card, please.

19             Your name, please?

20             PROSPECTIVE JUROR:  Rashida Sheikh.

21             THE COURT:  Miss Sheikh, you said that based

22     on the nature of the accusations that you don't think

23     you would be able to sit on this case?

24             PROSPECTIVE JUROR:  Yes, because I am a

25     mother, I have two young kids.  I don't think I would be

JURY VOIR DIRE                                          47

1    able to, you know.

2           THE COURT:  Miss Sheikh, I have to ask you

3    this.  This is a tough question.  You don't know if you

4    can do it or if you can't do it.  You have to let me

5    know.

6           I'm going to ask you whether you can put those

7    feelings or hold those feelings aside and only listen to

8    the evidence as it comes in in this particular case?

9           PROSPECTIVE JUROR:  I don't think so.

10          THE COURT:  You don't believe you can do it?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Any questions?

13          MR. HALE:  No.

14          MR. SIMONS:  No.

15          THE COURT:  I can't excuse you from jury duty;

16   the only thing I can do is excuse you from this case.

17   You have to go back downstairs to the second floor.

18          PROSPECTIVE JUROR:  Thank you.

19          (PROSPECTIVE JUROR EXCUSED)

20          (At this time, a prospective juror approached

21   at sidebar)

22          THE COURT:  Good afternoon.

23          May I have your card, please.

24          Your name, please?

25          PROSPECTIVE JUROR:  Tara Foster.

JURY VOIR DIRE                                    48

1          THE COURT:  Miss Foster, certainly I asked

2     whether there was anything about the nature of the

3     accusations in this case that might prevent you from

4     being able to serve on this case?

5          PROSPECTIVE JUROR:  Both the aspect of the

6     weapon used as well as the fact that a child was the

7     victim I think would bar me from being an impartial

8     juror.

9          THE COURT:  Even though you haven't heard any

10    evidence up to this point?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  You're saying if you heard

13    evidence you would automatically make up your mind?

14         PROSPECTIVE JUROR:  I don't think my emotions

15    tie into both of those issues that would make me see

16    passed the evidence.

17         THE COURT:  Any questions?

18         MR. SIMONS:  No questions.

19         MR. HALE:  No.  Thank you.

20         THE COURT:  I can't excuse you from jury duty,

21    only from this case, Miss Foster.  You have to go back

22    downstairs to the second floor.

23         (PROSPECTIVE JUROR EXCUSED)

24         (At this time, a prospective juror approached

25    at sidebar)

1          THE COURT:  Good afternoon.

2          May I have your card, please?

3          Your name, please?

4          PROSPECTIVE JUROR:  Susan Webster.

5          THE COURT:  Miss Webster, you said based on

6    the nature of the accusations in this case you couldn't

7    sit on this case?

8          PROSPECTIVE JUROR:  I have eleven

9    grandchildren, and I don't think I could focus.

10         THE COURT:  You think that would interfere

11   with your ability to listen to the evidence on this

12   case?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Okay.  And you couldn't put it

15   aside?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Okay.  I have to ask the tough

18   questions.  Okay?

19         Any questions?

20         MR. SIMONS:  No questions.

21         MR. HALE:  No.

22         THE COURT:  Ma'am, I can't excuse you from

23   jury duty.  The only thing I can do is send you back

24   downstairs to the second floor.  You can go there now.

25         (Prospective juror crying)

JURY VOIR DIRE                              50

1          THE COURT:  Certainly we don't mean to make

2     you upset, Miss Webster.  Take a moment.

3          PROSPECTIVE JUROR:  I'm okay.

4          THE COURT:  Just calm down.  It's not our

5     intent to make you upset.

6          PROSPECTIVE JUROR:  Okay.  Okay.

7          THE COURT:  Are you going to be okay,

8     Miss Webster?

9          PROSPECTIVE JUROR:  Yes.  I'm just a big baby.

10         THE COURT:  That's okay.  We want you to be

11    okay.  We don't want you to show emotion for those

12    jurors who can be fair and impartial.  We don't want you

13    to do anything to affect them.

14         PROSPECTIVE JUROR:  Can I go out the back door

15    or something?

16         MR. HALE:  Just take a breath.

17         THE COURT:  Just don't make any comments on

18    your way out.

19         PROSPECTIVE JUROR:  Definitely not.

20         (PROSPECTIVE JUROR EXCUSED)

21         (At this time, a prospective juror approached

22    at sidebar)

23         THE COURT:  Good afternoon.

24         PROSPECTIVE JUROR:  Hi.

25         THE COURT:  May I have your card, please.

JURY VOIR DIRE                                51

1          Your name, please?

2          PROSPECTIVE JUROR:  Wona Marie Magsuci.

3          THE COURT:  Miss Magsuci, you said it would be

4    a hardship if you were to serve on this case based on

5    the accusations in this case?

6          PROSPECTIVE JUROR:  I wouldn't be a good juror

7    in this case.  My decision is already biased.  I am a

8    nurse, we take care of the sick.  We take care of them,

9    we don't kill them.

10         THE COURT:  So you're saying just based on the

11   nature of the accusations you've already made up your

12   mind?

13         PROSPECTIVE JUROR:  I don't need to listen.  I

14   don't need to see the witness.  I'm sorry.

15         THE COURT:  But at the same time you haven't

16   heard any evidence.

17         PROSPECTIVE JUROR:  A kid is helpless.

18         THE COURT:  Any questions?

19         MR. SIMONS:  No questions.

20         MR. HALE:  No.

21         THE COURT:  Ma'am, I can't excuse you from

22   jury duty.  You have to go back downstairs to the second

23   floor.

24         PROSPECTIVE JUROR:  Sure.

25         THE COURT:  Go there now.

-VMG-

JURY VOIR DIRE                                    52

1            Please don't make any comments on your way

2       out.

3                    PROSPECTIVE JUROR:  Okay.

4                    (PROSPECTIVE JUROR EXCUSED)

5                    (At this time, a prospective juror approached

6       at sidebar)

7                    THE COURT:  Good afternoon.

8                    May I have your card, please.

9                    Your name, please?

10                   PROSPECTIVE JUROR:  Margareta Goldzal.

11                   THE COURT:  Miss Goldzal, you said based on

12      the nature of the accusations in this case it would be

13      difficult for you to sit on this case?

14                   PROSPECTIVE JUROR:  Yeah.  As a teacher, I

15      work with children all day.  I don't think I would judge

16      him fairly.  You know, I -- I'm also very emotional

17      because I'm expecting now.  I don't think it would be

18      fair for me to sit on this because I get very emotional

19      when it comes to children, and I won't really judge him

20      fairly.

21                   THE COURT:  Let me ask you this question.  I

22      have to ask the tough questions.  I don't know whether

23      you can do it.  You let me know.  Whether, in fact, you

24      can hold your emotions aside and listen to the evidence

25      as it comes in and then make your decision based upon

1   the evidence or the lack of evidence in this case?  If

2   you can do it, you can.  If you can't, that's fine.

3            PROSPECTIVE JUROR:  I don't think I would.

4            THE COURT:  Any questions?

5            MR. SIMONS:  No questions.

6            MR. HALE:  No.

7            THE COURT:  Ma'am, I can't excuse you from

8   jury duty, only from this case.  You have to go back

9   downstairs to the second floor.

10            PROSPECTIVE JUROR:  Okay.  Thank you.

11            (PROSPECTIVE JUROR EXCUSED)

12            (At this time, a prospective juror approached

13   at sidebar)

14            THE COURT:  Good afternoon.

15            May I have your card, please.

16            Your name, sir?

17            PROSPECTIVE JUROR:  Jacob Djmal.

18            THE COURT:  Mr. Djmal, you indicated it would

19   be difficult for you to sit on this case based on the

20   nature of the accusations in this case?

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  Why?

23            PROSPECTIVE JUROR:  Two weeks ago I was

24   walking in my area in Brooklyn and I was chased by some

25   guy.  I was freaked out.  I won't be too fair to this

JURY VOIR DIRE                                    54

1    guy.

2              THE COURT:  I have to ask you the tough

3    question.  I don't know if you can do it.  Certainly the

4    person who chased you is not the person who is on trial.

5              PROSPECTIVE JUROR:  I understand.  But I was

6    freaked out.

7              THE COURT:  Let me ask you this:  Do you think

8    you can put that experience aside that you had two weeks

9    ago and listen to the evidence as it comes in in this

10   particular case and judge the evidence in this

11   particular case?  If you can do it, fine.  If you

12   can't --

13             PROSPECTIVE JUROR:  I'll tell you the truth.

14   I could be blinded a little bit because my mind is in

15   one direction.  I'm not going to be thinking a hundred

16   percent clear.

17             THE COURT:  I just want to make sure if you're

18   saying you're going to use your experience to influence

19   how you evaluate the evidence in this case?

20             PROSPECTIVE JUROR:  I'm freaked out from crime

21   and things like that.  I don't think I would be too

22   fair.

23             THE COURT:  Okay.

24             Any questions?

25             MR. SIMONS:  No.

JURY VOIR DIRE                                    55

1              MR. HALE:  No.

2              THE COURT:  I can't excuse you from jury duty,

3       Mr. Djmal.  The only thing I can do is send you back

4       downstairs to the second floor, the large room.

5              PROSPECTIVE JUROR:  What do I do there?

6              THE COURT:  You'll sit there and they'll tell

7       you.

8              (PROSPECTIVE JUROR EXCUSED)

9              (At this time, a prospective juror approached

10      at sidebar)

11             THE COURT:  Good afternoon.

12             May I have your card, please.

13             Your name, please?

14             PROSPECTIVE JUROR:  Zelma Hines.

15             THE COURT:  Miss Hines, I asked whether there

16      was anything about the nature of the accusations in this

17      case that might prevent you from being able to sit

18      fairly.

19             PROSPECTIVE JUROR:  Well, my nephew got killed

20      in October.  It's too much pain for me to be on

21      something like this.

22             THE COURT:  October of 2007?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Was anyone ever arrested as a

25      result of that?

                              -VMG-

JURY VOIR DIRE                                    56

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  And you're saying because of that

3      you don't believe you would be able to sit?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Any questions?

6              MR. HALE:  No.

7              MR. SIMONS:  No.

8              THE COURT:  Thank you for your honesty,

9      Miss Hines.

10             I can't excuse you from jury duty, only from

11     this case.  You have to go back downstairs to the second

12     floor, that large room.  You need to go there now.

13             (PROSPECTIVE JUROR EXCUSED)

14             (At this time, a prospective juror approached

15     at sidebar)

16             THE COURT:  Good afternoon.

17             May I have your card, please.

18             Your name, please?

19             PROSPECTIVE JUROR:  Huandi Chen.

20             THE COURT:  Miss Chen, you wanted to speak to

21     the Court?

22             PROSPECTIVE JUROR:  Yes.  I can speak English

23     a little bit.

24             THE COURT:  You speak English a little bit.

25     How long have you been in this country?

JURY VOIR DIRE                                    57

1          PROSPECTIVE JUROR:  How long this country?

2          THE COURT:  Yes.  10 years?  20 years?

3          PROSPECTIVE JUROR:  No, 1999 in U.S.A.

4          THE COURT:  Do you work, Miss Chen?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  What kind of work do you do?

7          PROSPECTIVE JUROR:  I pack.

8          THE COURT:  If understanding everything was

9    one hundred percent, how much would you say you

10   understood when I was talking?

11         PROSPECTIVE JUROR:  I don't understand.

12         THE COURT:  You didn't understand?

13         She's saying she didn't understand.

14         Barry, she's saying she doesn't understand

15   English.

16         I'm going to send you back downstairs to the

17   second floor.

18         PROSPECTIVE JUROR:  In the second floor?

19         THE COURT:  Yes.

20         (PROSPECTIVE JUROR EXCUSED)

21         (At this time, a prospective juror approached

22   at sidebar)

23         THE COURT:  Good afternoon.

24         May I have your card, please.

25         Your name, please?

-VMG-

JURY VOIR DIRE                                    58

1              PROSPECTIVE JUROR:  Lap Yee Soo.

2              THE COURT:  Miss Soo, you said you wanted to

3     speak to the Court?

4              PROSPECTIVE JUROR:  Speak not good.

5              THE COURT:  You don't speak that much English?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  How long have been in the United

8     States, ma'am?

9              PROSPECTIVE JUROR:  Nineteen years.

10             THE COURT:  Nineteen years, and you don't

11    understand English after nineteen years?

12             PROSPECTIVE JUROR:  A little bit.

13             THE COURT:  What kind of work do you do,

14    Miss Soo?

15             PROSPECTIVE JUROR:  Sample maker before.

16             THE COURT:  What kind of work do you do now?

17             PROSPECTIVE JUROR:  Now unemployed.

18             THE COURT:  If understanding everything was

19    one hundred percent, how much would you say you

20    understood when I was talking?

21             PROSPECTIVE JUROR:  A little bit.  You were

22    saying the kid, the kid was killed; right?

23             THE COURT:  What?

24             PROSPECTIVE JUROR:  One is robbing and killed

25    something.

JURY VOIR DIRE                                    59

1          THE COURT:  She's saying she doesn't

2    understand everything.

3          MR. HALE:  That's fine.

4          MR. SIMONS:  No objection.

5          THE COURT:  Miss Soo, I'm going to send you

6    back downstairs to the second floor since you say you

7    don't understand English.  You can go there now.

8          PROSPECTIVE JUROR:  Thank you.

9          (PROSPECTIVE JUROR EXCUSED)

10         (At this time, a prospective juror approached

11   at sidebar)

12         THE COURT:  Good afternoon.

13         May I have your card, please.

14         Your name?

15         PROSPECTIVE JUROR:  Kit Y. Lai.

16         THE COURT:  Miss Lai, you said you wanted to

17   speak to the Court?

18         PROSPECTIVE JUROR:  I feel nervous, and when

19   people speak fast, I can't pick up.

20         THE COURT:  You're saying that when people

21   speak fast you don't understand?

22         PROSPECTIVE JUROR:  Yes.  I feel nervous.

23         THE COURT:  Miss Lai, how long have you been

24   in this country?

25         PROSPECTIVE JUROR:  Probably five years.

JURY VOIR DIRE                                     60

1          THE COURT:  Do you work, Miss Lai?

2          PROSPECTIVE JUROR:  A housewife.

3          THE COURT:  How much would you say you

4     understood when I was speaking?  If understanding

5     everything is one hundred percent, how much would you

6     say that you understood?

7          PROSPECTIVE JUROR:  I only can speak simple

8     English.  Only to market.

9          THE COURT:  Any questions?

10         MR. HALE:  No.

11         MR. SIMONS:  No.

12         THE COURT:  Ma'am, I can't excuse you from

13    jury duty.  I can only send you back downstairs to the

14    second floor.  You can go there now.

15         PROSPECTIVE JUROR:  Wait in the second floor?

16         THE COURT:  Yes.  Thank you.

17         (PROSPECTIVE JUROR EXCUSED)

18         (At this time, a prospective juror approached

19    at sidebar)

20         THE COURT:  Good afternoon.

21         May I have your card, please.

22         Your name?

23         PROSPECTIVE JUROR:  Yee L. Mai.

24         THE COURT:  Miss Mai, you said that --

25         PROSPECTIVE JUROR:  I don't know English.

-VMG-

JURY VOIR DIRE                                    61

1          THE COURT:  How long have you been in the

2   United States, Miss Mai?

3          PROSPECTIVE JUROR:  (No response).

4          THE COURT:  30 years?  20 years?

5          PROSPECTIVE JUROR:  I don't know.

6          THE COURT:  Do you work?

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  What kind of work do you do?

9          PROSPECTIVE JUROR:  (No response)

10          THE COURT:  Any questions?

11          MR. HALE:  No.

12          MR. SIMONS:  No.

13          THE COURT:  Ma'am, I cannot excuse you from

14   jury duty.  You have to go back downstairs to the second

15   floor.  You can go there now.

16          (PROSPECTIVE JUROR EXCUSED)

17          (At this time, a prospective juror approached

18   at sidebar)

19          THE COURT:  Good afternoon.

20          PROSPECTIVE JUROR:  Good afternoon.

21          THE COURT:  May I have your card, please.

22          Your name, sir?

23          PROSPECTIVE JUROR:  Dmitry.

24          THE COURT:  The last name?

25          PROSPECTIVE JUROR:  Gorenitsyn.

1          THE COURT:  Sir, you wanted to speak to the

2    Court?  I asked you whether there was anything about the

3    nature of the accusations that might prevent you from

4    sitting on this case.  You wanted to speak to the Court,

5    sir?

6          PROSPECTIVE JUROR:  I mean, what it mean?

7          THE COURT:  You asked to speak to the Court.

8          Do you understand English, sir?

9          PROSPECTIVE JUROR:  I understand, but

10   sometimes I have issue.  Sometimes I have difficulty

11   with English.

12         THE COURT:  What language do you speak, sir?

13         PROSPECTIVE JUROR:  Russian.

14         THE COURT:  How long have you been in the

15   United States?

16         PROSPECTIVE JUROR:  Seven years.

17         THE COURT:  Do you work, sir?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  What kind of work do you do?

20         PROSPECTIVE JUROR:  It's a plumbing company.

21         THE COURT:  If understanding was one hundred

22   percent, how much would you say that you understood when

23   I was speaking, sir?

24         PROSPECTIVE JUROR:  In general, but I couldn't

25   understand most of the details.  I even have to ask my

JURY VOIR DIRE                                    63

1        neighbor what happened to the child.

2                The second reason, I have a one-year-old

3        child, and I don't believe I can be enough objective in

4        this case.

5                THE COURT:  Do you have any questions?

6                MR. SIMONS:  No questions.

7                MR. HALE:  No.

8                THE COURT:  Sir, I cannot excuse you from jury

9        duty, so you don't get to go home.  You have to go back

10       downstairs to the second floor.  You can go there now.

11               PROSPECTIVE JUROR:  Okay.

12               (PROSPECTIVE JUROR EXCUSED)

13               (At this time, a prospective juror approached

14       at sidebar)

15               THE COURT:  Good afternoon.

16               May I have your card, please.

17               Your name, sir?

18               PROSPECTIVE JUROR:  Te H. Ooi.

19               THE COURT:  Mr. Ooi, I asked whether there was

20       anything about the nature of the case that might prevent

21       you from being fair in this case.

22               PROSPECTIVE JUROR:  Yes.  The reason I give,

23       my wife, my daughter is going away to Malaysia May 8th,

24       and I have a son 11 years old that I have to take care

25       of.

JURY VOIR DIRE                                    64

1          THE COURT:  Have you postponed your jury duty

2     in the past, sir?

3          PROSPECTIVE JUROR:  No, this is the first time

4     this happened, I got the jury summons.  They're coming

5     back on the 24th.

6          THE COURT:  Let me say this:  The reason that

7     you gave me, Mr. Ooi is not good enough for me to excuse

8     you.  It's just your wife is going away.

9          PROSPECTIVE JUROR:  My daughter.

10         THE COURT:  I understand that.  That's not

11    good enough for me to send you back downstairs just yet.

12    There may come a time that you will go downstairs,

13    Mr. Ooi.

14         (At this time, the prospective juror returned

15    to the audience)

16         MR. SIMONS:  Juror excused, your Honor?

17         THE COURT:  I would be inclined to excuse him,

18    but not at this time.

19         MR. SIMONS:  Okay.

20         MR. HALE:  Okay.

21         (At this time, a prospective juror approached

22    at sidebar)

23         THE COURT:  Good afternoon.

24         May I have your card, please.

25         Your name, please?

JURY VOIR DIRE                                65

1        PROSPECTIVE JUROR:  Theodora Headley.

2        THE COURT:  Miss Headley, I asked whether, in

3   fact, based on the nature of the accusations whether

4   there was anything that might prevent you from sitting

5   on this case?

6        PROSPECTIVE JUROR:  Yeah.  On June 5, 2005, I

7   was assaulted, and the person punched me in my face

8   twice, and I went back.  My neighbor come to help.  He's

9   spending three years now for that crime.  I don't think

10  I can be fair with this.

11       THE COURT:  You're saying you don't think you

12  can put your own personal experience aside and listen to

13  the evidence?

14       PROSPECTIVE JUROR:  You know, that was the

15  third time I was assaulted.  Three times.  I don't think

16  I can.

17       THE COURT:  It was the same person or --

18       PROSPECTIVE JUROR:  No, three different times.

19  So I don't think I can.  And I had to have x-rays for my

20  jaw for this last one.

21       THE COURT:  Any questions?

22       MR. SIMONS:  No questions.

23       MR. HALE:  No.

24       Did they catch the people?

25       PROSPECTIVE JUROR:  Yeah, they catch.  He's

1        spending three years.

2                THE COURT:  Ma'am, I can't excuse you from

3        jury duty, I can only send you back downstairs to the

4        second floor.  You probably can go back down there at

5        2:00.

6                (PROSPECTIVE JUROR EXCUSED)

7                (At this time, a prospective juror approached

8        at sidebar)

9                THE COURT:  Good afternoon.

10               May I have your card, please.

11               Your name, please?

12               PROSPECTIVE JUROR:  Lanzhen Tsui.

13               THE COURT:  Miss Tsui, you said you wanted to

14       speak to the Court?

15               PROSPECTIVE JUROR:  I just afraid the name you

16       read the case, I didn't even catch them all.  I just

17       heard a child was killed.  So, if I don't understand

18       everything, how can I be?  That's what I'm worried

19       about.

20               THE COURT:  What language do you speak?

21               PROSPECTIVE JUROR:  I do speak English and do

22       my job very well.  Just very narrow area.

23               THE COURT:  What kind of job do you have,

24       ma'am?

25               PROSPECTIVE JUROR:  I do payroll and general

JURY VOIR DIRE                                    67

1    cashier.  I do my job pretty good.

2              THE COURT:  Is that at a corporation?

3              PROSPECTIVE JUROR:  Hotel.  I'm working at

4    hotel.  I do speak English.  I don't want to say I don't

5    speak.  I do my job pretty good.

6              THE COURT:  Right.

7              PROSPECTIVE JUROR:  But I tried to understand

8    when you read the case.

9              THE COURT:  Let me ask you this:  If it's

10   legal terms, that's one thing.  Certainly we'll explain

11   the legal terms in the law to you.  My concern is the

12   fact that you said you didn't understand everything, if

13   it's English that is a problem, that's one thing.  If

14   you're saying the legal terms you didn't understand --

15             PROSPECTIVE JUROR:  I think that's the

16   language.  Legal terms, whatever, you said you have to

17   tell the truth.

18             THE COURT:  Yes.

19             PROSPECTIVE JUROR:  That I can do.  But I have

20   to understand what happened.  I have to reach a judgment

21   yes or no.  I have to understand first; right?  So, if I

22   don't understand good, before saying that, I have to

23   know which is which.  That's what I'm afraid.

24             THE COURT:  You're saying you don't understand

25   everything one hundred percent; is that correct?

-VMG-

JURY VOIR DIRE                                          68

1              PROSPECTIVE JUROR:  Right.

2              When you read, the only thing I understand is

3    you said when child was killed.  Then, of course, a lot

4    of details in this case.

5              THE COURT:  She's saying she doesn't

6    understand everything one hundred percent.

7              MR. SIMONS:  No questions.

8              MR. HALE:  Okay.

9              THE COURT:  Ma'am, I can't excuse you from

10   jury duty.  You have to go back downstairs to the second

11   floor.  You can go there at 2:00.

12             PROSPECTIVE JUROR:  So I just go downstairs?

13             THE COURT:  Yes.

14             (PROSPECTIVE JUROR EXCUSED)

15             (At this time, a prospective juror approached

16   at sidebar)

17             THE COURT:  Good afternoon.

18             May I have your card, please.

19             Your name, please?

20             PROSPECTIVE JUROR:  Henry Gbarjuewaye.

21             THE COURT:  Mr. Gbarjuewaye, I asked whether

22   there was anything based on the nature of the

23   accusations in this case that may prevent you from being

24   fair and impartial in this case?

25             PROSPECTIVE JUROR:  I had a brother who was

JURY VOIR DIRE                                    69

1     killed in 2004.  For me, I don't think I could be

2     impartial.

3                 Also, I have a three-year-old daughter.

4                 THE COURT:  Your brother was killed here?

5                 PROSPECTIVE JUROR:  Yeah, it was in Brooklyn,

6     in Crown Heights.  It was in the news.

7                 THE COURT:  Was anybody arrested?

8                 PROSPECTIVE JUROR:  Yeah, two guys.

9                 THE COURT:  You're saying based on that you

10    don't think you would be able to sit on this case?

11                PROSPECTIVE JUROR:  Yes.

12                THE COURT:  Any questions?

13                MR. HALE:  No questions.

14                MR. SIMONS:  No questions.

15                THE COURT:  Okay.  You're excused.

16                You have to go back downstairs to the second

17    floor.

18                (PROSPECTIVE JUROR EXCUSED)

19                (At this time, a prospective juror approached

20    at sidebar)

21                THE COURT:  Good afternoon.

22                May I have your card, please.

23                Your name, sir?

24                PROSPECTIVE JUROR:  Jerzy Monasterski.

25                THE COURT:  Sir, I asked you whether there was

JURY VOIR DIRE                    70

1      anything about the nature of the accusations that might

2      prevent you from sitting on this case and being fair and

3      you asked to speak to the Court; is that correct?

4                  PROSPECTIVE JUROR:   That's correct.

5                  THE COURT:   You're saying the nature of the

6      accusations about a child would just make you unable to

7      serve on this case, sir?

8                  PROSPECTIVE JUROR:   Yes.

9                  THE COURT:   Is that correct?

10                 PROSPECTIVE JUROR:   Yeah.

11                 THE COURT:   You couldn't put that aside?

12                 PROSPECTIVE JUROR:   No.

13                 THE COURT:   Is that a no?

14                 PROSPECTIVE JUROR:   I can't do like that, not

15     with the child.  I have three kids.

16                 THE COURT:   Any questions?

17                 MR. HALE:   No.

18                 MR. SIMONS:   No.

19                 THE COURT:   Sir, you have to go back

20     downstairs to the second floor.

21                 (PROSPECTIVE JUROR EXCUSED)

22                 (At this time, a prospective juror approached

23     at sidebar)

24                 THE COURT:   Good afternoon.

25                 May I have your card, please.

1          Your name, sir?

2          PROSPECTIVE JUROR:  Aleksandr Kobiler.

3          THE COURT:  Mr. Kobiler, I asked whether there

4   was anything about the nature of the accusations that

5   might prevent you from sitting on this case and being

6   fair?

7          PROSPECTIVE JUROR:  The problem is language.

8   When I hear you, it's maybe thirty, forty percent I

9   understand.  Sometimes nothing.  This is my problem.

10         THE COURT:  What language do you speak?

11         PROSPECTIVE JUROR:  Russian.

12         THE COURT:  How long have you been in this

13  country?

14         PROSPECTIVE JUROR:  17 years.

15         THE COURT:  Are you working, Mr. Kobiler?

16         PROSPECTIVE JUROR:  Yes, I'm working.  I'm a

17  driver.

18         THE COURT:  You only understand --

19         PROSPECTIVE JUROR:  Forty, sometimes fifty.

20  But not everything.

21         THE COURT:  Any questions?

22         MR. HALE:  No.

23         MR. SIMONS:  No questions.

24         THE COURT:  Sir, I cannot excuse you from jury

25  duty.  You have to go back downstairs to the second

JURY VOIR DIRE                              72

1    floor.  You'll do that at 2:00.

2              PROSPECTIVE JUROR:  Okay.  Thank you.

3              (PROSPECTIVE JUROR EXCUSED)

4              (At this time, a prospective juror approached

5    at sidebar)

6              THE COURT:  Good afternoon.

7              May I have your card, please.

8              Your name, ma'am?

9              PROSPECTIVE JUROR:  Gwendolyn Flowers.

10             THE COURT:  Miss Flowers, I asked whether

11   based on the nature of the accusations in this case

12   whether that might prevent you from being fair and

13   impartial in this particular case?

14             PROSPECTIVE JUROR:  I think so.  I'm a

15   teacher, and I've been teaching for twenty-three years.

16   I just can't see anybody killing a child.  I can't

17   justify that.  I would have a hard time doing that.

18             THE COURT:  Even though you haven't heard any

19   evidence, you don't think you could put that aside?

20             PROSPECTIVE JUROR:  It's still a child

21   involved.

22             THE COURT:  So you're saying you couldn't be

23   fair?

24             PROSPECTIVE JUROR:  I don't think, no.

25             THE COURT:  Any questions?

                        -VMG-

JURY VOIR DIRE                              73

1          MR. SIMONS:  No questions.

2          MR. HALE:  No.

3          THE COURT:  I can't excuse you from jury duty.

4    I'm only going to send you back downstairs to the second

5    floor.  You can go there at 2:00.

6          PROSPECTIVE JUROR:  Okay.

7          (PROSPECTIVE JUROR EXCUSED)

8          (The following occurred in open court in the

9    presence of the panel of prospective jurors:)

10         THE COURT:  Certainly, jurors, at this point

11   we are close to the luncheon recess, so I will, in fact,

12   permit you to take your luncheon recess.

13         Before doing that, certainly there are some

14   rules and guidelines that I must give you.

15         The first is that you may not discuss any

16   aspect of this case amongst yourselves, because you

17   haven't heard any evidence, and it would be unfair to

18   speculate about the evidence that you will hear.

19         Also, jurors, you certainly have met, I

20   introduced you to the parties in this case.  You cannot

21   speak to them.  You cannot ask them:  How long do I have

22   to be here?  When do we get started?  When can I leave?

23   They will not speak to you.  It's not that they're being

24   rude, but they're following the instructions of the

25   Court.  Because if they're seen talking to you, the

JURY VOIR DIRE                         74

1    assumption is that they're talking to you about this

2    case.  So, please, do not speak to them.  They will not

3    speak to you.

4              Jurors, at this point, you'll return--I do

5    have one other matter--so I'm going to permit you to

6    return at 2:30.

7              When you return at 2:30, you will come

8    directly back outside of this courtroom.  Do not enter

9    the courtroom until one of the court officers has come

10   out to bring you in.  That is important.  Do not enter

11   this courtroom on your own.

12             That being said, I'll see you at 2:30.

13             Exit the courtroom quietly, and thank you for

14   your consideration.

15             (At this time, the panel of prospective jurors

16   left the courtroom)

17             THE COURT:  Okay.  We'll meet back at 2:30.

18             *         *         *         *

19             (At this time, a luncheon recess was taken,

20   and the trial adjourned to 2:30 p.m.)

21

22

23

24

25

PROCEEDINGS                                              75

1                       A F T E R N O O N   S E S S I O N

2

3                   THE CLERK:  Case on trial, General Waiters.

4           The defendant is present with his attorney.

5           The district attorney is present.

6                   THE COURT:  Good morning.

7                   I know we originally said approximately --

8       Mr. Hale, you said, four days.  But the way that I see

9       this case going, I'm going to tell the prospective

10      jurors six to nine days.  I think we would be lucky to

11      do it within that period of time, depending upon how

12      many jurors we get today.

13                  MR. HALE:  I understand that, your Honor.  I

14      didn't know if you were talking about from today or

15      business days.

16                  THE COURT:  I like to keep it fuzzy, because

17      if I'm too specific and it goes a day over, I don't want

18      jurors to scream.

19                  MR. HALE:  You never want to get nailed down

20      on that, you're right.

21                  THE COURT:  Are both sides ready?

22                  MR. SIMONS:  Yes.

23                  MR. HALE:  Sure.

24                  THE COURT:  I do use a questionnaire, and at

25      the appropriate time, you will be given a copy of the

-VMG-

PROCEEDINGS                          76

1    questionnaire.

2              (Pause in the proceedings)

3              COURT OFFICER:  Panel entering.

4              (At this time, the panel of prospective jurors

5    entered the courtroom)

6              THE COURT:  Thank you, jurors.

7              What's going to happen is names will be called

8    to have a seat in the jury box, so eventually you'll

9    have more room.  So, I appreciate your patience.

10             Juror, certainly, where I left off, I was

11   telling you about the nature of the accusation.

12   Certainly, jurors, we would expect this case would take

13   approximately six to nine days to try.  We would be

14   starting with testimony on Monday, May 5th, in this

15   case.

16             Is there anyone who, by reason of extreme

17   hardship, could not serve until that time?

18             If so, I would ask that you raise your hand.

19             (HANDS RAISED)

20             THE COURT:  Okay.  I see two hands, and I'll

21   speak to those individuals at sidebar.

22             (The following occurred at sidebar out of the

23   hearing of the panel of prospective jurors:)

24             (At this time, a prospective juror approached

25   at sidebar)

-VMG-

PROCEEDINGS                    77

1          THE COURT:  Good afternoon.

2          May I have your card, please.

3          Your name?

4          PROSPECTIVE JUROR:  Fatima Marcelle.

5          THE COURT:  Miss Marcelle, you said it would

6     be a hardship if you had to serve six to nine days,

7     ma'am?

8          PROSPECTIVE JUROR:  I'm currently living in a

9     shelter due to loss of job and home.  I have mandatory

10    appointments with Housing starting next week, and the

11    week after.

12         Also, I have appointments for medical purposes

13    also that's coming up.

14         THE COURT:  Okay.  Do you have anything

15    scheduled at this point?

16         PROSPECTIVE JUROR:  Yes, I do.  I have one

17    tomorrow.  Every day is an appointment.  For me, with

18    HRA, Housing, medical, both my husband and myself.

19         THE COURT:  Okay.  Let me ask you this, and

20    certainly you'll let me know.  I know normally in a

21    situation like that where a person is on jury duty, they

22    would make accommodations for a person serving on jury

23    duty.

24         PROSPECTIVE JUROR:  Okay.

25         THE COURT:  So I'm asking would that address

-VMG-

PROCEEDINGS                              78

1      the concerns that you have?

2                 PROSPECTIVE JUROR:  Yes.  Because if I don't

3      meet with HRA, they would close my case, and that would

4      keep me forty-five days more.

5                 THE COURT:  If, in fact, we were able to

6      contact them to actually let them know that you're

7      serving on jury duty, would that address the concerns

8      that you have?

9                 PROSPECTIVE JUROR:  I don't know if that would

10     happen, if they would agree to it.  I don't know.  HRA

11     says one thing and does something else.  I couldn't say

12     yes; I couldn't say no.

13                THE COURT:  Let me say this.  If you're

14     actually on jury duty, I don't know if you're saying

15     you're disabled, if you're actually on jury duty and not

16     attending your sessions, they shouldn't close your case.

17     We all know things can fall through the cracks.  That

18     wouldn't be a basis for closing your case, if you're

19     serving on jury duty.

20                PROSPECTIVE JUROR:  This is all knew to me.

21     This is what I'm saying.  I don't know.

22                THE COURT:  Would that affect your ability to

23     concentrate on the evidence in this case?

24                PROSPECTIVE JUROR:  Because of my medical,

25     yes.  I'm seeing a cardiologist; I'm see a psychiatrist.

PROCEEDINGS                          79

1      I'm having problems with my heart.  Right now, I'm in a

2      lot of pain.

3               THE COURT:  How old are you, ma'am?

4               PROSPECTIVE JUROR:  I'm 52.

5               THE COURT:  How long have you had the cardiac

6      problem?

7               PROSPECTIVE JUROR:  It's now assessing.  Since

8      last year.

9               THE COURT:  Okay.  Do you feel that the

10     medical problems that you have with interfere with your

11     ability to sit on this particular case?

12              PROSPECTIVE JUROR:  The pain with my legs,

13     yes.

14              THE COURT:  Any questions?

15              MR. SIMONS:  No questions.

16              MR. HALE:  No questions.

17              THE COURT:  I can't excuse you from jury duty.

18     I can only send you back downstairs to the second floor.

19              PROSPECTIVE JUROR:  Okay.

20              THE COURT:  You can go there now.

21              PROSPECTIVE JUROR:  Thank you.

22              (PROSPECTIVE JUROR EXCUSED)

23              (At this time, a prospective juror approached

24     at sidebar)

25              THE COURT:  Good afternoon.

PROCEEDINGS                                    80

1              May I have your card, please.

2              Your name?

3              PROSPECTIVE JUROR:  Yvone Findlay.

4              THE COURT:  Miss Findlay, you said it would be

5    a hardship if you had to serve six to nine days?

6              PROSPECTIVE JUROR:  Right, because I do

7    contract work.  No work, no pay.

8              THE COURT:  What kind of work do you do?

9              PROSPECTIVE JUROR:  Health insurance.  I audit

10   their applications.

11             THE COURT:  How long have you been doing that?

12             PROSPECTIVE JUROR:  I've been doing that since

13   September of last year.  On a contract basis.

14             THE COURT:  Have you postponed your jury duty

15   in the past, Miss Findlay?

16             PROSPECTIVE JUROR:  No, I served four years

17   ago.  I had a full-time job then.

18             THE COURT:  I'm talking about when you got the

19   card this time.

20             PROSPECTIVE JUROR:  No, I didn't.

21             THE COURT:  Is there a reason why you didn't

22   attempt to postpone?

23             PROSPECTIVE JUROR:  Well, I figured one day it

24   wouldn't hurt.

25             THE COURT:  There's no case that can be tried

PROCEEDINGS                                    81

1      in one day, Miss Findlay.

2                  Let me say this, that the reason that you gave

3      me is not good enough.  I'm not telling you that we're

4      going to pick you.  I'm saying the reason that you gave

5      me is not good enough for me to send you back downstairs

6      just yet.  There may be a time that you will go back

7      downstairs, but not at this time.

8                  You can have a seat in the audience.

9                  PROSPECTIVE JUROR:  Okay, thanks.

10                 (At this time, the prospective juror returned

11     to the audience)

12                 THE COURT:  Counsel, I'm prepared to excuse

13     her, but not at this time.

14                 MR. SIMONS:  Okay.

15                 MR. HALE:  Okay.  Yes.

16                 (At this time, a prospective juror approached

17     at sidebar)

18                 THE COURT:  May I have your card, please.

19                 Your name, sir?

20                 PROSPECTIVE JUROR:  My name is Wen Wu.

21                 THE COURT:  Mr. Wu, you said it would be a

22     hardship if you had to serve six to nine days?

23                 PROSPECTIVE JUROR:  Yes, during that time, for

24     me, I got college.

25                 THE COURT:  What college do you go to?

-VMG-

PROCEEDINGS                                    82

1          PROSPECTIVE JUROR:  Kingsborough.

2          THE COURT:  When are your finals scheduled?

3          PROSPECTIVE JUROR:  The 12th, 13th.  That's

4    the first week of finals.  The 5th, that's the last week

5    of classes, to hand in all works and projects and hand

6    in papers.

7          THE COURT:  Have you postponed your jury duty

8    in the past, Mr. Wu?

9          PROSPECTIVE JUROR:  No, this is the first

10   time.

11         THE COURT:  Let me say this, the reason that

12   you gave me is not good enough for me to send you back

13   downstairs just yet.  I'm not telling you we're going to

14   pick you to serve, but it's not good enough for me to

15   send you back downstairs just yet.

16         Have a seat.

17         (At this time, the prospective juror returned

18   to the audience)

19         THE COURT:  Again, I'll probably excuse him,

20   but not at this time.

21         (At this time, a prospective juror approached

22   at sidebar)

23         THE COURT:  Good afternoon.

24         May I have your card, please.

25         Your name,  sir?

-VMG-

PROCEEDINGS                                    83

1          PROSPECTIVE JUROR:  Jacques Sadda.

2          THE COURT:  Mr. Sadda, you said it would be a

3     hardship for you if you had to serve six to nine days,

4     sir?

5          PROSPECTIVE JUROR:  I have a pain in my legs.

6     I cannot stand all the time.

7          THE COURT:  Do you work, sir?

8          PROSPECTIVE JUROR:  Yeah, I work.

9          THE COURT:  What kind of work do you do?

10         PROSPECTIVE JUROR:  I walk and sit down.

11         THE COURT:  What kind of work do you do?

12         PROSPECTIVE JUROR:  I'm a manager in the

13    store.  I'm sitting down.  Two employee work with me in

14    the store.  Right now, I have --

15         THE COURT:  What's wrong with your leg, sir?

16         PROSPECTIVE JUROR:  See, it's swollen here.  I

17    have to make operation for two legs.  I have accident

18    before, long time ago, and I don't feel good.  I have

19    very pain.

20         THE COURT:  Sir, you don't have to pull up

21    your pant leg.

22         Are you taking any medication for that

23    condition?

24         PROSPECTIVE JUROR:  Yes, I have medication.

25         THE COURT:  I can't tell what a pill in your

-VMG-

PROCEEDINGS                          84

1    hand is.

2              PROSPECTIVE JUROR:  I don't take it today

3    because I'm just issue; I don't eat some Kosher food

4    from here.  I appreciate if you give me water, I take

5    it, please.

6              THE COURT:  Let me say, sir, I don't know what

7    that is.

8              How old are you, sir?

9              PROSPECTIVE JUROR:  56.

10             THE COURT:  If you're saying you have a

11   medical condition --

12             Do you have any questions?

13             MR. HALE:  No.

14             MR. SIMONS:  No.

15             THE COURT:  Sir, I can't excuse you from jury

16   duty.  Everyone has to serve.  I'm going to send you

17   back downstairs to the second floor, that large room you

18   came from.  You can go there now.  Go down to the second

19   floor.  I can only excuse you from this case, not from

20   serving on jury duty, sir.

21             PROSPECTIVE JUROR:  Okay.

22             (PROSPECTIVE JUROR EXCUSED)

23             (At this time, a prospective juror approached

24   at sidebar)

25             THE COURT:  Good afternoon.

-VMG-

PROCEEDINGS                    85

1             May I have your card, please.

2             Your name, please?

3             PROSPECTIVE JUROR:  Mildred Torres.  There is

4    a physical I have for my job.  I work in a day care

5    center.

6             THE COURT:  When is this scheduled?

7             PROSPECTIVE JUROR:  Right here.

8             And, in my job, if I miss two days, we get

9    written down.

10            THE COURT:  Okay.  Let me say this, if we were

11   able to reschedule that for you, would that make a

12   difference?

13            PROSPECTIVE JUROR:  I really have to do it,

14   because it's two days we have where we call, that's it,

15   where we make the appointment.  On the 19th is the due

16   day, and I'm supposed to have it done.

17            THE COURT:  Let me ask you this:  If we're

18   able to get it scheduled for you before then or to work

19   with you to have it earlier in the day, would that make

20   a difference, Miss Torres?

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  Would you be able to serving if

23   that were the case?

24            PROSPECTIVE JUROR:  Yes.  But I really have to

25   do it.

PROCEEDINGS                                86

1            THE COURT:  I'm saying if we made

2   arrangements, either having it done earlier in the day

3   or maybe breaking later in the afternoon so you can go

4   and get that done, if we had it rescheduled to

5   accommodate you, would that be the only concern you

6   would have?

7            PROSPECTIVE JUROR:  Yes, yes.

8            THE COURT:  Okay.  Let me say this, if, in

9   fact, you're selected, we know we would have to make

10   arrangements for you to go.

11            PROSPECTIVE JUROR:  Sure.

12            THE COURT:  Is that the only concern you have?

13            PROSPECTIVE JUROR:  It's my job.  They're so

14   strict with this.

15            THE COURT:  If we address that concern, your

16   job concern, is that the only issue that would prevent

17   you from serving on this case?

18            PROSPECTIVE JUROR:  Not really.  I don't know.

19            THE COURT:  I'm saying, if we could get your

20   physical done, is that it?  Is that the only concern

21   that you have?

22            PROSPECTIVE JUROR:  Yes, yes.

23            THE COURT:  That's what I was trying to ask

24   you.

25            PROSPECTIVE JUROR:  I'm sorry.  I'm nervous.

-VMG-

PROCEEDINGS                                      87

1            THE COURT:  Okay.  So, if you're selected, we

2    know we have to get that done.  That's not a problem.

3            PROSPECTIVE JUROR:  Yes, yes.

4            THE COURT:  We would accommodate you to get it

5    done.  Okay?

6            PROSPECTIVE JUROR:  Okay.

7            That's why I said at least I bring it in at

8    least to let you know I'm not lying.

9            THE COURT:  Okay.  You can have a seat in the

10   audience.

11           (At this time, the prospective juror returned

12   to the audience)

13           THE COURT:  Counsels, I'm going to make her a

14   regular juror.  We'll just have to make arrangements.

15           MR. SIMONS:  Okay.

16           MR. HALE:  Okay.

17           (At this time, a prospective juror approached

18   at sidebar)

19           THE COURT:  Good afternoon:

20           May I have your card, please.

21           Your name?

22           PROSPECTIVE JUROR:  Linda Lalima.

23           THE COURT:  Miss Lalima, you said it would be

24   a hardship for you if you had to serve six to nine days?

25           PROSPECTIVE JUROR:  I have a temp job through

-VMG-

PROCEEDINGS                                    88

1     an agency.  If I'm here, I won't be getting paid through

2     my job.  I don't think the agency either.

3                  THE COURT:  How long have you been doing temp

4     work?

5                  PROSPECTIVE JUROR:  With this job, I'm there

6     over a year.  A year and about four, five months.

7                  THE COURT:  Have you postponed your jury duty

8     in the past?

9                  PROSPECTIVE JUROR:  No.

10                 THE COURT:  Let me say this, the reason you

11    gave me is not good enough to exclude you.  I'm not

12    saying we're going to pick you.

13                 PROSPECTIVE JUROR:  I understand that.

14                 THE COURT:  Certainly, it's not good enough

15    for me to send you downstairs just yet.  There may be a

16    time when you will be sent downstairs, but not yet.

17                 (At this time, the prospective juror returned

18    to the audience)

19                 THE COURT:  Counsel, I will excuse her, but

20    not at this time.

21                 MR. HALE:  Yes.

22                 MR. SIMONS:  Yes.

23                 (At this time, a prospective juror approached

24    at sidebar)

25                 THE COURT:  Good afternoon.

-VMG-

PROCEEDINGS                          89

1          May I have your card, please.

2          Your name, sir?

3          PROSPECTIVE JUROR:  My name is Morel Georges.

4          THE COURT:  Mr. Georges, you said it would be

5    a hardship, sir, if you had to serve six to nine days?

6          PROSPECTIVE JUROR:  See, I don't believe in

7    the system.

8          THE COURT:  When you say you don't believe in

9    the system, the system of justice?

10         PROSPECTIVE JUROR:  I see too many things

11   here.  I don't believe in the system.

12         THE COURT:  Well, let me say this, sir, this

13   is the only system we have.  Sometimes it works, and

14   sometimes, to your way of thinking, it may not work.

15   However, what I'm asking you, and what every defendant

16   is entitled to, is to have a trial by a jury and to have

17   a jury listen to the evidence and then make a decision

18   based upon the evidence or the lack of evidence.

19         So, what I'm asking you is whether you can put

20   aside your personal opinion in general about what you

21   think about the justice system and listen to the

22   evidence as it comes in in this particular case?

23         PROSPECTIVE JUROR:  I don't judge people

24   myself.  That's my problem.

25         THE COURT:  We're not asking you to judge a

PROCEEDINGS                             90

1      person.  What we're asking you is to judge the quality

2      of the evidence that will be presented to you and then

3      make a decision, whether you can call it straight up and

4      down as you see it?

5                      PROSPECTIVE JUROR:  Sometimes I can make the

6      wrong decision, too.

7                      THE COURT:  Do you have any questions?

8                      MR. SIMONS:  No.

9                      MR. HALE:   No.

10                     THE COURT:  As I said, this is the only system

11     we have, and certainly that's one of the benefits you

12     have of living in this country, to be certainly a

13     beneficiary of this justice system.

14                     I'm going to send you back downstairs, sir.

15                     You can go there now.

16                     (PROSPECTIVE JUROR EXCUSED)

17                     (At this time, a prospective juror approached

18     at sidebar)

19                     THE COURT:  Good afternoon, ma'am.

20                     May I have your card, please.

21                     Your name?

22                     PROSPECTIVE JUROR:  Zelda Hyll.

23                     THE COURT:  Miss Hyll, you said it would be a

24     hardship if you had to serve for six to nine days?

25                     PROSPECTIVE JUROR:  No, it's not a hardship.

PROCEEDINGS                              91

1      If it's going over like to the 12th, I'm scheduled to go

2      to a conference from the 12th, 13th, 14th.  But from now

3      on, this week, next week, I'm okay.

4              THE COURT:  The 12th would be that Monday.  Is

5      it in connection with your job?

6              PROSPECTIVE JUROR:  I'm not working.  I'm an

7      evangelist.  I going away for a training conference.  I

8      already booked and everything.

9              THE COURT:  Have you postponed your jury

10     service in the past, Miss Hyll?

11             PROSPECTIVE JUROR:  Never.

12             THE COURT:  Let me say this, ma'am.  I can't

13     excuse you from jury duty.

14             PROSPECTIVE JUROR:  You can't?

15             THE COURT:  The only thing I can do is send

16     you back downstairs to the large room that you came

17     from.

18             You can go there now.

19             PROSPECTIVE JUROR:  But I think you said it

20     would be like six days.

21             THE COURT:  No, no.  I'm sending you back

22     downstairs.

23             PROSPECTIVE JUROR:  I know.  But you said this

24     case would take six days.

25             THE COURT:  Approximately six to nine days.

-VMG-

PROCEEDINGS                          92

1     Approximately.  Maybe less; maybe close to nine.  That's

2     why I'm saying I don't want to put you in a position

3     where you'll be unable to serve.

4              So you have to go back downstairs.

5              You can go there now.

6              PROSPECTIVE JUROR:  Thanks.

7              (PROSPECTIVE JUROR EXCUSED)

8              (At this time, a prospective juror approached

9     at sidebar)

10             THE COURT:  Good afternoon.

11             May I have your card, please.

12             Your name, please?

13             PROSPECTIVE JUROR:  Guadalupe Rosales.

14             THE COURT:  You indicated it would be a

15     hardship if you had to serve six to nine days, ma'am?

16             PROSPECTIVE JUROR:  Yes, because I'm traveling

17     on Friday.  I already changed my flight information to

18     come to this, but then I'm flying on Friday to the 13th.

19             THE COURT:  Have you postponed your jury duty

20     in the past, Miss Rosales?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  When they sent you the card

23     telling you you had jury duty, did you ask to put it

24     over for another date.

25             PROSPECTIVE JUROR:  No.

PROCEEDINGS                                93

1           THE COURT:  Is there any reason you didn't ask

2      to put it over for another time?

3           PROSPECTIVE JUROR:  I mean, I'm here.  This is

4      the 30th.

5           THE COURT:  Okay.  Let me say this, ma'am.

6      The reason that you gave me is not good enough for me to

7      send you back downstairs just yet.  I'm not telling you

8      we're going to pick you, but it's not good enough for me

9      to send you downstairs just yet.

10          PROSPECTIVE JUROR:  Okay.

11          (At this time, the prospective juror returned

12     to the audience)

13          THE COURT:  Counsel, I would excuse her, but

14     not at this time.

15          MR. HALE:  Okay.

16          MR. SIMONS:  Yes.

17          (At this time, a prospective juror approached

18     at sidebar)

19          THE COURT:  Good afternoon.

20          May I have your card, please.

21          Your name, please?

22          PROSPECTIVE JUROR:  Norenda Peterslubin.

23          THE COURT:  You indicated it would be a

24     hardship if you had to serve the six to nine days?

25          PROSPECTIVE JUROR:  Yes.

-VMG-

PROCEEDINGS                    94

1          THE COURT:  Why is that?

2          PROSPECTIVE JUROR:  Because I just returned

3    back to work two months ago after being out of work.  I

4    had a hard pregnancy, for six months I was out.  I'm way

5    behind on my mortgage and all my bills right now.  I'm

6    playing catch-up.  So, I have to be working overtime to

7    keep my house out of foreclosure.

8          THE COURT:  What kind of work do you do,

9    ma'am?

10          PROSPECTIVE JUROR:  I work in the emergency

11    room at Maimonides.

12          THE COURT:  Let me say this.  How long have

13    you been working there?

14          PROSPECTIVE JUROR:  Well, overall, a year.

15    But I was out my first six whole months of that year

16    working there.  I just returned back to work on

17    February 25th.

18          THE COURT:  Would that prevent you from

19    concentrating on the evidence on this particular case?

20          PROSPECTIVE JUROR:  Well, my bills are all

21    like past due.  I'm playing catch-up.  The length of

22    time is the problem.  I don't mind serving because

23    that's my duty.  It's just the length of time.  I can't

24    afford to be out for that long a period of time.

25          THE COURT:  What I'm asking you, if, in fact,

PROCEEDINGS                      95

1    you were selected to serve, the fact that you have the

2    issue --

3                 PROSPECTIVE JUROR:  Yes, because I have

4    creditors calling me every day.

5                 THE COURT:  Do you have any questions?

6                 MR. HALE:  No.

7                 MR. SIMONS:  No questions.

8                 THE COURT:  Ma'am, I can't excuse you from

9    jury duty.  I can only send you back downstairs to the

10   second floor.

11                PROSPECTIVE JUROR:  I understand.

12                THE COURT:  Go there now.

13                (PROSPECTIVE JUROR EXCUSED)

14                (The following occurred in open court in the

15   presence of the panel of prospective jurors:)

16                THE COURT:  Certainly, jurors, there's no one

17   who knows you like you know yourself.  Therefore, we

18   have to depend upon you to tell us anything that you

19   think may interfere with your judgment of this case, and

20   certainly anything that may cause you to be distracted

21   from the evidence in this case.  That would include any

22   physical conditions that you may have that would cause

23   you to be distracted from the case at hand.

24                Now, jurors, if any such problem comes to

25   mind, you can always ask to approach the bench and speak

PROCEEDINGS                    96

1    to the Court privately.

2            Jurors, I will now state to you certain basic

3    principles of law that you must accept, whether you

4    agree with these principles of law or not, or even if

5    you believe that the law should be something other than

6    what it actually is, and you must accept these

7    principles of law without hesitation and without

8    reservation.

9            Again, as I said, if you cannot accept any one

10   of these principles of law, then you must raise your

11   hand and so indicate that so that we can discuss those

12   areas together.

13           Jurors, the defendant was brought into this

14   courtroom by way of an indictment.  The indictment is a

15   name given to a piece of paper.

16           Jurors, an indictment is not proof of

17   anything.  It is only the means by which this defendant

18   has been brought into court, and it outlines the

19   complaint against the defendant.

20           Jurors, an indictment is only an accusation of

21   a crime, and you cannot infer that a defendant is guilty

22   because he has been arrested and because he has been

23   indicted by a Grand Jury.

24           Can each of you accept that fact?

25           Jurors, I can't hear you.

PROCEEDINGS                                    97

1          (AFFIRMATIVE RESPONSE FROM JURORS)

2          THE COURT:  Is there any one of you who cannot

3     accept that fact?

4          I would ask that you raise your hand high so

5     that we can explore that area together.

6          (NO HAND RAISED)

7          THE COURT:  Jurors, I can tell you now that

8     there are no right or wrong answers, only truthful

9     answers.  Because the worse thing that you can do is

10    give us an answer that you think we wish to hear, and

11    then during the course of your deliberations you find

12    that there is something in your background that you have

13    not told us that will prevent you from giving a fair

14    trial to these parties that are in this courtroom.

15         Now, jurors, the defendant comes into this

16    courtroom when he answers the indictment by pleading not

17    guilty.  The law provides that the defendant is presumed

18    innocent until proven guilty beyond a reasonable doubt.

19         Jurors, can each of you accept the fact that

20    at this point this defendant is innocent of all crimes

21    against him?

22         Can everyone accept that fact?

23         (AFFIRMATIVE RESPONSE FROM JURORS)

24         THE COURT:  Is there any one of you who cannot

25    accept that fact?

PROCEEDINGS                                98

1              I would ask that you raise your hand high so

2      that we can explore that area together.

3              (NO HAND RAISED)

4              THE COURT:  Again, I don't see any hands.

5              Jurors, you understand that because of these

6      concepts and because you have not heard any evidence up

7      to this point, if you were asked to vote right now, you

8      would have to vote that the defendant is not guilty.

9              Can each of you accept that fact?

10             (AFFIRMATIVE RESPONSE FROM JURORS)

11             THE COURT:  Is there any one of you who could

12     not accept that fact?

13             I would ask that you raise your hand high so

14     that we can explore that area together.

15             (NO HAND RAISED)

16             THE COURT:  Again, I don't see any hands.

17             Jurors, do any of you feel that because

18     Mr. Waiters has been brought into court on an indictment

19     and arrested, that he must be guilty of something?

20             Does any one feel that way?

21             (NEGATIVE RESPONSE FROM JURORS)

22             THE COURT:  Okay.

23             Because if any of you do, I would ask that you

24     raise your hand high so that we can explore that area

25     together.

PROCEEDINGS                           99

1          (NO HAND RAISED)

2          THE COURT:  Again, I don't see any hands.

3          Now, jurors, the law grants this defendant the

4     presumption of innocence throughout the trial.  The law

5     has placed the burden to prove that the defendant is

6     guilty beyond a reasonable doubt on the shoulders of the

7     District Attorney's Office.  That burden of proof never

8     shifts.

9          Jurors, please bear in mind that the defendant

10    in this case need not prove anything.  The law says that

11    if the prosecution meets its burden and proves that the

12    defendant is guilty beyond a reasonable doubt, it will

13    be your responsibility as a juror to find the defendant

14    guilty.

15         Now, jurors, can you find the defendant guilty

16    if the People prove his guilt to you beyond a reasonable

17    doubt?

18         Can everyone do that?

19         (AFFIRMATIVE RESPONSE FROM JURORS)

20         THE COURT:  Jurors, is there any one of you,

21    because of religion, moral, or other reasons, feel that

22    you would be unable to do that?

23         I would ask that you raise your hand high so

24    that we can explore that area together.

25         (NO HAND RAISED)

-VMG-

PROCEEDINGS                                100

1           THE COURT:  Again, I don't see any hands.

2           Jurors, if identity is an issue, then, of

3    course, the People must also prove beyond a reasonable

4    doubt that the defendant was, in fact, the person who

5    committed the offenses charged.

6           Jurors, under our system of law, the defendant

7    is not obligated to take the witness stand or to call

8    any witnesses in this case.

9           Now that means that the defendant's attorney

10   does not have to participate during jury selection, he

11   does not have to make an opening statement--whereas, the

12   District Attorney's Office, by law, is required to make

13   an opening statement in this case, defense counsel does

14   not have to object to a single question that will be put

15   to any of the witness, and defense counsel does not have

16   to sum up at the end of the case, because a defense has

17   no obligation or burden to do anything whatsoever.

18          Now, jurors, the defendant in this case has

19   the right to remain silent and not testify.

20          If he exercises the right to remain silent,

21   you're not to presume anything or speculate as to why he

22   did not testify.  The fact that he did not testify is

23   not to enter into your deliberations.

24          I know often times jurors will say to me, you

25   know what, Judge, I need to hear from both sides and

PROCEEDINGS                          101

1    then I'll make up my mind.  But that is not the law.

2              Jurors, certainly, the defendant has no

3    obligation to testify or to call any witnesses in this

4    case.  Certainly I will say to you, jurors, that this

5    will be unlike any other experience that you will ever

6    have in life, because in this courtroom, certainly

7    you're only entitled to hear from one side, and that is

8    the side of the District Attorney's Office.  Because if,

9    in fact, a person is accused of committing a crime, it

10   is up to the District Attorney to prove that the

11   individual committed that crime, and they have to do

12   that beyond a reasonable doubt.

13             Now, jurors, would you be able to, if the

14   defendant does not testify in this case, hold the People

15   to their burden of proof of establishing guilt beyond a

16   reasonable doubt based solely on the evidence as

17   introduced by the People and the law as I give it to

18   you?

19             Can everyone do that?

20             (AFFIRMATIVE RESPONSE FROM JURORS)

21             THE COURT:  Is there anyone who would be

22   unable to do that?

23             I would ask that you raise your hand high so

24   that we can explore that area together.

25             (NO HAND RAISED)

PROCEEDINGS                          102

1           THE COURT:  Again, I don't see any hands.

2           Jurors, please keep in mind that if the

3    defendant chooses to testify on his own behalf or to

4    call a witness on his own behalf, this does not shift

5    the burden of proof from the District Attorney's Office.

6    Again, the District Attorney's Office always has the

7    burden to establish guilt beyond a reasonable doubt.

8           Now, I will define reasonable doubt at the end

9    of the trial, but, in substance, a reasonable doubt is

10   not a mere possibility or a whim or a speculation which

11   is unrelated to the evidence.  Rather, jurors, it is a

12   doubt which you have in your mind after you have

13   considered all of the evidence in the case, and when,

14   after such consideration of all of the evidence in the

15   case, either the presence of certain facts or the

16   absence of certain facts leaves your mind in such a

17   state of uncertainty that you're not fully convinced of

18   the defendant's guilt, and you're also satisfied that in

19   entertaining such a doubt you are acting as a reasonable

20   person should act in a matter of this importance,

21   jurors, then that sort of doubt which seems reasonable

22   to you is a reasonable doubt.

23          Now, jurors, can you find the defendant not

24   guilty if you have a reasonable doubt of his guilt?

25          Can everyone do that?

PROCEEDINGS                                                103

1          (AFFIRMATIVE RESPONSE FROM JURORS)

2          THE COURT:  Is there any one of you who would

3    be unable to do that?

4          I would ask that you raise your hand high so

5    that we can explore that area together.

6          (NO HAND RAISED)

7          THE COURT:  Again, I don't see any hands.

8          Jurors, let me say this, that you may not

9    consider the issues of punishment, sympathy, or

10   prejudice in your verdict.

11         Now, is there any one of you who could not

12   eliminate the feelings of punishment, sympathy or

13   prejudice in your verdict?

14         If you feel that way, I would ask that you

15   raise your hand high so that we can explore that area

16   together.

17         Again, jurors, I would remind you that there

18   are no right or wrong answers, only truthful answers.

19         (NO HAND RAISED)

20         THE COURT:  Again, I don't see any hands.

21         Now, jurors, at the end of this case, you will

22   be called upon to make a factual judgment.  Jurors,

23   you're not here to make a moral judgment or to determine

24   whether or not Mr. Waiters is a good or a bad person.

25   Jurors, what is on trial in this courtroom is what, if

PROCEEDINGS                          104

1    any, involvement Mr. Waiters had with the incident which

2    occurred on May 7, 2006.

3              Now, as I told you at the outset, you must

4    evaluate the testimony of every witness that you hear in

5    this case, and you must then determine whether the

6    witness who testified is telling the truth and whether

7    their testimony is reliable testimony.

8              Jurors, you will have to listen carefully and

9    then determine whether you will accept or reject the

10   testimony of the witness, either in whole or in part.

11             Now, jurors, for example, a number of the

12   People's witnesses in this case will be police officers.

13   They will take the same oath to tell the truth as any

14   other witness that will come into this courtroom.

15             Now, the fact that a witness is a police

16   officer or wears a police officer's uniform does not

17   make him or her any more or any less credible by the

18   fact that he or she is a police officer.

19             Now, jurors, is there any one of you who have

20   any feelings about the police which would lead you to

21   give a police officer's testimony any greater or any

22   less weight than you would any other witness in this

23   case?

24             If you feel that way, I would ask you that

25   raise your hand so that we can explore that area

-VMG-

PROCEEDINGS                              105

1     together.

2              (HAND RAISED)

3              THE COURT:  I do see a hand.

4              (The following occurred at sidebar out of the

5     hearing of the panel of prospective jurors:)

6              (At this time, a prospective juror approached

7     at sidebar)

8              THE COURT:  Good afternoon.

9              Your name, sir?

10             PROSPECTIVE JUROR:  Mustapha Rahiim.

11             THE COURT:  Mr. Rahiim, you indicated you have

12    feelings about the police that would give you --  that

13    would lead you to give their testimony greater or less

14    weight than you would any other witness in the case?

15             PROSPECTIVE JUROR:  Correct.

16             THE COURT:  Why?

17             PROSPECTIVE JUROR:  In my own incidents with

18    the police, I've had different occasions where I've been

19    charged with having drugs or weapons on me for no reason

20    at all.  It happened over the last twelve years of my

21    life.  I have a strong distress for the police officers

22    at this point.

23             THE COURT:  Let me ask you this, Mr. Rahiim:

24    What kind of work do you do?

25             PROSPECTIVE JUROR:  I'm a chef.

-VMG-

1              THE COURT:   A chef.   You would agree with me

2    there are some chefs who cut corners?

3              PROSPECTIVE JUROR:   Yes.

4              THE COURT:   Some chefs who do it by the book?

5              PROSPECTIVE JUROR:   Yes.

6              THE COURT:   And some chefs who are just

7    fantastic.

8              Certainly I know there are a number of police

9    officers in this city.   At last count, thirty thousand.

10   I don't know.

11             Would you agree with me, and I don't know

12   whether you would, that there are some police officers

13   who may be great, some are good, some doing their job,

14   and some are bad?

15             PROSPECTIVE JUROR:   I agree.

16             THE COURT:   Okay.

17             What I'm asking is rather than paint the

18   entire Police Department with the same brush, whether

19   you could listen to the officers' testimony as they come

20   before you and then decide:   You know, what?   Their

21   testimony doesn't ring true; I don't believe it.   It

22   rings true; I do believe it.   Or something in between.

23             PROSPECTIVE JUROR:   I would have a hard time.

24   Because, like my father and myself, when he grew up

25   there were certain situations that passed on to me.

PROCEEDINGS                                    107

1          THE COURT:  Well, I have to ask the tough

2    questions.

3              Any questions?

4          MR. SIMONS:  No.

5          MR. HALE:  No.

6          THE COURT:  I can't excuse you from the jury

7    service, Mr. Rahiim.  I can only send you downstairs to

8    the second floor.

9              You can go down there now.

10             Thank you for your honesty.

11             (PROSPECTIVE JUROR EXCUSED)

12             (At this time, a prospective juror approached

13   at sidebar)

14         THE COURT:  Good afternoon.

15             Your name?

16         PROSPECTIVE JUROR:  Avellanet Gangeri.

17             It's not about this question, the one before.

18             You said if we felt that because he was

19   brought in you might already think he's guilty, I kind

20   of felt like that.  But I didn't raise my hand.  I don't

21   want to be unfair to him if I have that feeling already.

22         THE COURT:  That's correct.  Because if you're

23   telling me that you made up your mind without hearing

24   any of the evidence, then --

25         PROSPECTIVE JUROR:  Kind of.  Like, well, he

1     was here because --  I don't want to do that to him.

2               THE COURT:  All right.

3               Any questions?

4               MR. SIMONS:  No questions.

5               MR. HALE:  No.

6               THE COURT:  I appreciate your honesty.

7               I can't excuse you from jury duty.  You have

8     to go downstairs to the second floor.

9               PROSPECTIVE JUROR:  That's okay.

10              Thank you.

11              (PROSPECTIVE JUROR EXCUSED)

12              (At this time, a prospective juror approached

13    at sidebar)

14              THE COURT:  Good afternoon.

15              Your name, please?

16              PROSPECTIVE JUROR:  Stacy Rink.

17              THE COURT:  Miss Rink, is there anything about

18    a police officer's testimony that would lead you to give

19    greater or less weight than you would any other witness?

20              PROSPECTIVE JUROR:  Yes.  I went to Fordham

21    Law, I'm not admitted to practice, but I work for a firm

22    at 26 Court Street that handles police misconduct cases

23    and criminal defense, and I had some bad experiences

24    with some of our police officers who weren't necessarily

25    truthful on the stand.

PROCEEDINGS                                          109

1          I wanted to talk to you about it, I guess,

2     because I'm not sure one way or the other how I feel

3     about it.  I've definitely not had the most positive

4     experiences in a courtroom with police officers.

5          THE COURT:  Let me tell you this, as I said to

6     the other gentleman.  Certainly you have attorneys who

7     do a phenomenal job, some attorneys who are good, and

8     some attorneys who are not so good.  What I'm asking,

9     rather than paint the police with a broad brush, whether

10    you can listen to their testimony and decide whether you

11    believe it or don't believe it?

12         My question to you would be this:  If you saw

13    an officer who reminded you or looked like in stature or

14    posture, or someone else, some of the others you dealt

15    with, whether you would stop thinking about the evidence

16    in this case --

17         PROSPECTIVE JUROR:  That's what I'm worried

18    about it.

19         THE COURT:  -- and say that looks like kind of

20    the same officer who came before us?

21         PROSPECTIVE JUROR:  That's what I'm worried

22    about.  If this was a small case, I would feel like

23    maybe I wouldn't.  But I don't know, this is big deal.

24    I don't know if I'm the right person to be here.  I'm

25    not trying to get out of it.

-VMG-

PROCEEDINGS                          110

1          THE COURT:  Any questions?

2          MR. SIMONS:  No.

3          MR. HALE:  No.

4          THE COURT:  Okay.

5          I can't excuse you from jury duty.  You have

6   to go downstairs to the second floor.

7          Actually, you can go downstairs now.

8          (PROSPECTIVE JUROR EXCUSED)

9          (The following occurred in open court in the

10  presence of the panel of prospective jurors:)

11         THE COURT:  At the end of this case, jurors, I

12  will explain to you all of the law that will be

13  applicable in this particular case.  Jurors, you must

14  accept the law from me without hesitation and without

15  reservation, even if you disagree with the law or even

16  if you believe that the law should be something other

17  than what it actually is.

18         Now, jurors, can you accept the law from me

19  without hesitation and without reservation?

20         Can everyone do that?

21         (AFFIRMATIVE RESPONSE FROM JURORS)

22         THE COURT:  Is there anyone because of

23  religious, moral or other reasons feel they would be

24  unable to do that?

25         I would ask that you raise your hand so that

-VMG-

PROCEEDINGS                              111

1     we can explore that area together.

2              (NO HAND RAISED)

3              THE COURT:  I don't see any hands.

4              Now, jurors, what's going to happen at this

5     point, names will be called to have a seat in the jury

6     box.  I will be asking you questions from a

7     questionnaire, and certainly, after I've had an

8     opportunity to ask you questions, I will then give the

9     assistant district attorney, Mr. Hale, an opportunity to

10    ask you questions.

11             Thereafter, if defense counsel, Mr. Simons,

12    chooses, he may also ask you questions.  But, again,

13    there is no obligation or burden to do anything

14    whatsoever, so certainly Mr. Simons need not ask you any

15    questions.

16             Remember, there are no right or wrong answers,

17    only truthful answers.

18             THE CLERK:  Seat number one, Gwendolyn Abdul

19    Munim.

20             That's A-B-D-U-L M-U-N-I-M.

21             Seat number one.

22             Seat number two, Shawn Hunt.

23             H-U-N-T.  The first name is S-H-A-W-N.

24             Seat number three, Kasim Lachmansingh.

25             That's K-A-S-I-M; last name

PROCEEDINGS                                    112

1        L-A-C-H-M-A-N-S-I-N-G-H.

2                 Seat number three.

3                 Seat number four, Eleanor Ruocco.

4                 Last name R-U-O-C-C-O.

5                 Seat number five, Stephen Ment.

6                 Last name M-E-N-T; first name S-T-E-P-H-E-N.

7                 Seat number six, Simon John Koike.

8                 Simon, S-I-M-O-N; Koike, K-O-I-K-E.

9                 Seat number seven, Winifred Lawrence.

10                 Winnifred, W-I-N-N-I-F-R-E-D; Lawrence,

11       L-A-W-R-E-N-C-E.

12                 Seat number eight, Carmen Pagan.

13                 Carmen, C-A-R-M-E-N; Pagan, P-A-G-A-N.

14                 Seat number nine, Milagros Nunez.

15                 That's spelled M-I-L-A-G-R-O-S; Nunez,

16       N-U-N-E-Z.

17                 Seat number ten, Rongxian Li.

18                 Rongxian, R-O-N-G-X-I-A-N; Li, L-I.

19                 Seat number eleven, Albelto Diaz Valdez.

20                 Albelto, A-L-B-E-L-T-O; Diaz, D-I-A-Z; Valdez,

21       V-A-L-D-E-Z.

22                 Seat number twelve, Jennifer Jordan.

23                 J-E-N-N-I-F-E-R; J-O-R-D-A-N.

24                 Seat number thirteen, Patricia Chardavoyne.

25                 Patricia, P-A-T-R-I-C-I-A; Chardavoyne,

PROCEEDINGS                                113

1    C-H-A-R-D-A-V-O-Y-N-E.

2               Seat number fourteen, Pablo Santandermorales.

3               Pablo, P-A-B-L-O; Santandermorales,

4    S-A-N-T-A-N-D-E-R-M-O-R-A-L-E-S.

5               Seat number fifteen, Pauline Short.

6               Pauline, P-A-U-L-I-N-E; Short, S-H-O-R-T.

7               Seat number sixteen, Naeem Chaudry.

8               Naeem, N-A-E-E-M; Chaudry, C-H-A-U-D-R-Y.

9               Seat number seventeen, Lynnette Jones.

10              L-Y-N-N-E-T-T-E; Jones, J-O-N-E-S.

11              Seat number eighteen, Tracey Jackson,

12              T-R-A-C-E-Y; Jackson, J-A-C-K-S-O-N.

13              THE COURT:  I'm going to ask the people in the

14   audience to please pay attention to the questions that I

15   will be asking and certainly the attorneys will be

16   asking of you.  Because, when it becomes your turn to

17   have a seat in the jury box, we will be asking you the

18   same questions as well.  It will make the process go

19   just a little bit more smoothly if you're familiar with

20   it.

21              Jurors, I will say to you, and repeat

22   constantly, there are no right or wrong answers to any

23   of my questions or any of the attorneys' questions.

24   Because, again, we are looking for jurors who will be

25   fair and impartial, and give both sides a fair trial,

-VMG-

PROCEEDINGS                          114

1     which they're entitled to receive.

2             Also, jurors, if I mispronounce your name,

3     please correct me.  Your name is important to us, and we

4     may not say it as eloquently as you will say it, but

5     certainly we will try.

6             Miss Abdul Munim, starting with question

7     number one and continuing straight down with your

8     answers on the questionnaire.

9             You don't have to read us the question, just

10    give us the number and the answer to the question,

11    please.

12            PROSPECTIVE JUROR:  Gwendolyn Abdul Munim.

13            THE COURT:  You have to keep your voice up,

14    Miss Munim.  I'm looking right at you, and I cannot hear

15    your answer.

16            PROSPECTIVE JUROR:  Gwendolyn Abdul Minim.

17            Age 60.

18            Place of birth, U.S.

19            I live in Midwood.

20            My occupation is public health.

21            I have a Master's degree.

22            I'm married.

23            I do health education in a hospital.

24            The answer to number nine is no.

25            I have no vision or hearing problems.

PROCEEDINGS                                      115

1              My daughter is in law school, in answer to

2       number eleven.

3              My son is in the Police Academy in Arlington,

4       Virginia.

5              The answer to number thirteen is yes.

6              THE COURT:  Can you tell us about that.

7              PROSPECTIVE JUROR:  My brother-in-law was

8       murdered in a robbery.

9              THE COURT:  How long ago was that?

10             PROSPECTIVE JUROR:  It would be ten years.

11             THE COURT:  Did that happen in Brooklyn or

12      somewhere else?

13             PROSPECTIVE JUROR:  In Manhattan.

14             THE COURT:  Was anyone of ever arrested as a

15      result of that incident?

16             PROSPECTIVE JUROR:  I don't believe so.

17             THE COURT:  Certainly, it has to be a

18      traumatic event that happened to your brother-in-law.

19      Is there anything about that experience that certainly

20      might affect your ability to sit on this case and judge

21      the evidence fairly in this particular case?

22             PROSPECTIVE JUROR:  Not at all.

23             THE COURT:  Okay.

24             Question number fourteen?

25             PROSPECTIVE JUROR:  Yes.

PROCEEDINGS                                116

1            THE COURT:  Can you tell us about that.

2            PROSPECTIVE JUROR:  It was a crime that

3    occurred about thirty years ago.

4            THE COURT:  What was the nature of the crime?

5            PROSPECTIVE JUROR:  Endangerment of the

6    welfare of a child.

7            THE COURT:  Is there anything about that

8    experience that might affect your ability, either the

9    way you were treated by the Police Department or whoever

10   was treated, yourself or a relative or a friend was

11   treated by the Police Department or the District

12   Attorney's Office that might affect your ability to sit

13   on this case and judge the evidence fairly in this case?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Okay.

16           You mentioned that you were born in the U.S.

17   Brooklyn?  Queens?  Vermont?  Virginia?

18           PROSPECTIVE JUROR:  New York City.

19           THE COURT:  Okay.  I didn't hear you.

20           Thank you.

21           Mr. Hunt?

22           PROSPECTIVE JUROR:  My name is Shawn Hunt.

23           My age is 32.

24           I was born in Coney Island, Brooklyn.

25           I live in Crown Heights.

-VMG-

1                I'm an equity derivatives trader for a hedge

2       fund.

3                I have my Master's degree.

4                Single.

5                No kids.

6                Number nine is no.

7                Number ten is no.

8                Number eleven is no.

9                Number twelve is yes.

10               THE COURT:  Can you tell us about that yes

11      answer, Mr. Hunt.

12               PROSPECTIVE JUROR:  A couple of guys I went to

13      school with are in the Police Department down in

14      Georgia.

15               THE COURT:  Okay.

16               PROSPECTIVE JUROR:  Thirteen is no.

17               Fourteen is yes.  My brother was arrested.

18      He's military.

19               THE COURT:  How long ago was that?

20               PROSPECTIVE JUROR:  That was about eight years

21      ago.

22               THE COURT:  Did that happen in Brooklyn or

23      somewhere else?

24               PROSPECTIVE JUROR:  It was in Oklahoma.

25               THE COURT:  Anything about the way that he was

PROCEEDINGS                     118

1     treated there by the police or the District Attorney's

2     Office that might affect your ability to sit on this

3     case and judge the evidence fairly in this case,

4     Mr. Hunt?

5              PROSPECTIVE JUROR:  No, ma'am.

6              THE COURT:  Thank you.

7              Mr. Lachmansingh?

8              PROSPECTIVE JUROR:  My name is Kasim

9     Lachmansingh.

10             Age 20.

11             I was born in Mount Sinai.

12             I live in Coney Island.

13             I'm unemployed.

14             Number six, G.E.D..

15             Seven, I'm single.

16             Eight, no.

17             Nine, no.

18             Ten, no.

19             Eleven, no.

20             Twelve, my uncle, he's a police officer, and

21    he's also in the Army.  He's serving in Iraq right now.

22             Thirteen, no.

23             Fourteen, no.

24             THE COURT:  Okay.  You mentioned that you're

25    unemployed now.  What kind of work did you do before you

1       became unemployed?

2                   PROSPECTIVE JUROR:  I was working for UPS for

3       two years.

4                   THE COURT:  Miss Ruocco?

5                   PROSPECTIVE JUROR:  My name is Eleanor Ruocco.

6                   64.

7                   Brooklyn, Gravesend.

8                   My occupation, I'm retired now.

9                   High school.

10                  I'm married.

11                  I have two children, or had two children.

12                  THE COURT:  The occupation of your husband?

13                  PROSPECTIVE JUROR:  He works for the M.T.A.

14                  No.

15                  Number ten is no.

16                  Eleven is no.

17                  Twelve, my cousin is a police officer.

18                  Thirteen is yes.

19                  THE COURT:  Can you tell us about your yes

20      answer, Miss Ruocco.

21                  PROSPECTIVE JUROR:  My daughter-in-law's

22      brother was murdered.

23                  THE COURT:  How long ago was that?

24                  PROSPECTIVE JUROR:  I would say about thirteen

25      years.

PROCEEDINGS                          120

1          THE COURT:  Did that happen in Brooklyn or

2    somewhere else?

3          PROSPECTIVE JUROR:  We don't know.

4          THE COURT:  Is there anything about that

5    experience with your daughter-in-law's brother --

6          PROSPECTIVE JUROR:  It was upsetting because

7    they never knew why or where or how or who.

8          THE COURT:  Let me ask you this.  With that

9    experience, would that affect your ability to sit on

10   this particular case and judge the evidence?

11         PROSPECTIVE JUROR:  I think so, because I also

12   lost a son.

13         THE COURT:  Okay.

14         Again, there are no right or wrong answers,

15   only truthful answers.

16         I thank you for your forthcomingness on that

17   question.

18         Question number fourteen?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Can you tell us about that.

21         PROSPECTIVE JUROR:  My brother was convicted

22   of a crime, forgery, and served jail time.

23         THE COURT:  Was that in Brooklyn or somewhere

24   else?

25         PROSPECTIVE JUROR:  In Brooklyn.

PROCEEDINGS                                    121

1              THE COURT:  Anything about his experience,

2      either the way he was treated by the police or the

3      District Attorney's Office, that might affect you?

4              PROSPECTIVE JUROR:  It's hard to say, because

5      it was a drug problem.  It was years ago.  It was very

6      bad.  They didn't have what they have today.

7              THE COURT:  Thank you.

8              Mr. Ment?

9              PROSPECTIVE JUROR:  One, Stephen Ment.

10             Two, 41.

11             Three, Brooklyn.

12             Four, Mill Basin.

13             Five, sales.

14             Six, some college.

15             Seven, married; no children.

16             Eight, my wife is a teacher.

17             Nine, I served on a civil jury five years ago.

18     It was settled, so there was no deliberation.

19             Ten, no.

20             Eleven, no.

21             Twelve, no.

22             Thirteen, a couple of muggings, and a car

23     theft in the 70s.  Nothing serious.

24             THE COURT:  Anything about any of those

25     experiences, Mr. Ment, that might prevent you from

                           -VMG-

PROCEEDINGS                                    122

1      sitting on this case and judging the evidence fairly in

2      this case?

3                   PROSPECTIVE JUROR:   No.

4                   Fourteen, no.

5                   THE COURT:   Thank you.

6                   Mr. Koike?

7                   PROSPECTIVE JUROR:   My same is Simon Koike.

8                   I'm 40.

9                   Born in Los Angeles, California.

10                  I live in Fort Greene.

11                  I'm a lawyer.

12                  I went to law school.

13                  I'm married.   I have two children, ages one

14     and four.

15                  My wife is a teacher.

16                  I've never served on a jury.

17                  I have no vision or hearing problems.

18                  I know people who are lawyers.

19                  Twelve is no.

20                  Thirteen is no.

21                  Fourteen is no.

22                  THE COURT:   What kind of law do you practice?

23                  PROSPECTIVE JUROR:   Labor law.

24                  THE COURT:   Thank you.

25                  Miss Lawrence?

-VMG-

PROCEEDINGS                               123

1          PROSPECTIVE JUROR:  My name is Winnifred

2    Lawrence.

3          My age is 64.

4          By birthplace is Jamaica.

5          I live in Canarsie.

6          My occupation is housekeeper.

7          I finished school.

8          Widowed.

9          Four children--ages are, 45, 44, 41,

10   and 32.

11         THE COURT:  What do they do for a living,

12   Miss Lawrence?

13         PROSPECTIVE JUROR:  One is a lawyer, one is a

14   paralegal, the other work in a lawyer's office as a

15   receptionist, and my eldest is in electronics.

16         I have a vision problem in my left eye, number

17   eleven.

18         THE COURT:  Let me ask you this,

19   Miss Lawrence.  Do the glasses that you wear correct the

20   vision problem that you have?

21         PROSPECTIVE JUROR:  I was told by my doctor

22   that I have a cataracts that need to be removed from my

23   left eye.

24         THE COURT:  Would that affect your ability to

25   see if something was placed on the board?  Would you be

1        able to see it?

2                    PROSPECTIVE JUROR:  No, I don't think so.

3                    THE COURT:  Okay.

4                    PROSPECTIVE JUROR:  Number twelve, no.

5                    Number thirteen, no.

6                    THE COURT:  Number thirteen is whether you or

7        any member of your family or close friend have ever been

8        the victim of a crime.  Did something happen to you?

9                    PROSPECTIVE JUROR:  No.

10                   THE COURT:  Number fourteen?

11                   PROSPECTIVE JUROR:  No.

12                   THE COURT:  Thank you.

13                   You also mentioned that your daughter --  that

14       one of your children happens to be an attorney.  What

15       kind of law do they practice?

16                   PROSPECTIVE JUROR:  Corporate law.

17                   THE COURT:  Miss Pagan?

18                   PROSPECTIVE JUROR:  My name is Carmen Pagan.

19                   My age is 58.

20                   My place of birth is Puerto Rico.

21                   I live in Flatbush.

22                   I'm not working right now.

23                   I went to the 11th grade.

24                   I am single.

25                   I have three daughter's, age 28, 25, and 21.

PROCEEDINGS                                125

1              THE COURT:  What do they do for a living, if

2      they work?

3              PROSPECTIVE JUROR:  One of them is a

4      pharmacist technician, another one is going to school

5      for paramedic, and another one works at Children's

6      Place.

7              The answer to number nine is no.

8              No to ten.

9              No to eleven.

10             No to twelve.

11             No to thirteen.

12             Fourteen, no.

13             THE COURT:  You mentioned that you're

14     unemployed now.  What kind of work did you do before you

15     became unemployed?

16             PROSPECTIVE JUROR:  I was a medical assistant,

17     but I got injured and I can't stand too long or sit for

18     too long.

19             THE COURT:  Let me ask you this.  The longest

20     you can sit without it affecting your condition would be

21     what, an hour or two hours?

22             PROSPECTIVE JUROR:  Like an hour,

23     hour-and-a-half.

24             THE COURT:  Okay.  Thank you.

25             Miss Nunez?

-VMG-

PROCEEDINGS                                    126

1          PROSPECTIVE JUROR:  My name is Milagros Nunez.

2          I'm 31 years old.

3          I was born in Brooklyn, New York.

4          I live Williamsburg, Brooklyn.

5          I am a sales assistant.

6          Number six is high school.

7          Seven, I am single with three children, ages

8     13, 10 and four months.

9          Number eight is no.

10          Number nine is no.

11          Number ten, no.

12          Number eleven, no.

13          Twelve, no.

14          Thirteen, no.

15          Fourteen, no.

16          THE COURT:  Thank you.

17          Mr. Li?

18          PROSPECTIVE JUROR:  My name is Rongxian Li.

19          I'm 54.

20          Birthplace is China.

21          I live in Coney Island.

22          Occupation is technician.

23          Number six is college.

24          I'm married.

25          I have two children, nine and eleven.

-VMG-

PROCEEDINGS                                    127

1              My wife is a housewife.

2              Number nine is no.

3              Number ten is no.

4              Number eleven is no.

5              Number twelve, no.

6              Thirteen, no.

7              Fourteen, no.

8              THE COURT:  What was your occupation?  I

9       didn't hear you.

10             PROSPECTIVE JUROR:  Technician.

11             THE COURT:  Technician.

12             Thank you.

13             Mr. Diaz Valdez?

14             PROSPECTIVE JUROR:  My name is Albelto Diaz.

15             My age is 26.

16             My birthplace is Santo Domingo.

17             I live East New York.

18             My occupation is car driver.

19             THE COURT:  Can you just keep your voice up.

20      You're speaking so softly, Mr. Diaz, I'm straining to

21      hear you.

22             You said you were a cab driver?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Number six?

25             PROSPECTIVE JUROR:  I no go to the school.

PROCEEDINGS                                128

1          I'm married.

2          I have one children.

3          Number eight, no.

4          Number nine, no.

5          Number ten, no.

6          Number eleven, no.

7          Number twelve, no.

8          Number thirteen, no.

9          Number fourteen, no.

10         THE COURT:  Okay.

11         How far did you go in school?  If you went to

12    school in Santo Domingo, what grade level or standard

13    did you reach?

14         PROSPECTIVE JUROR:  11th.

15         THE COURT:  Okay.

16         You mentioned that you're married.  Does your

17    wife work, or what kind of work does she do?

18         PROSPECTIVE JUROR:  She no work.

19         THE COURT:  Okay.

20         Miss Jordan?

21         PROSPECTIVE JUROR:  Jennifer Jordan.

22         50.

23         Guyana.

24         Crown Heights.

25         Teacher assistant.

-VMG-

PROCEEDINGS                            129

1              College.

2              Single.

3              Two kids--28 and 18.

4              Number eight is no.

5              Nine is criminal jury, as a alternate in 2003?

6              Ten, no.

7              Eleven, no.

8              Twelve, no.

9              Thirteen, yes.  I was the victim of a mugging.

10             THE COURT:  How long ago was that,

11     Miss Jordan?

12             PROSPECTIVE JUROR:  Like eight years.

13             THE COURT:  Was anyone arrested as a result of

14     that experience?

15             PROSPECTIVE JUROR:  No.  They just snatch the

16     bag.

17             THE COURT:  Anything about that experience

18     that might affect your ability to sit on this case and

19     judge the evidence fairly?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Question number fourteen?

22             PROSPECTIVE JUROR:  Yes, my brother was

23     arrested.  Marijuana.

24             THE COURT:  How long ago was that?

25             PROSPECTIVE JUROR:  2003.

PROCEEDINGS                                    130

1              THE COURT:  Did that happen in Brooklyn or

2       somewhere else?

3              PROSPECTIVE JUROR:  In Brooklyn.

4              THE COURT:  Anything about the way he was

5       treated by the Police Department or the District

6       Attorney's Office that might affect your ability to sit

7       on this case and be fair?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Thank you.

10              Miss Chardavoyne?

11              PROSPECTIVE JUROR:  Yes.  My name is Patricia

12       Chardavoyne.

13              I'm 48.

14              I was born in Kings County.

15              I live in Bay Ridge, Brooklyn.

16              I am a timekeeper for the District Attorney's

17       Office.

18              College.

19              I'm married.

20              I have no children.

21              My husband works for the Social Security

22       Department.

23              I've served on a civil jury, four years ago.

24       It was settled before we reached a verdict.

25              No.

-VMG-

PROCEEDINGS                          131

1            Through work, yes.

2            Through work, yes.

3            No.

4            And no.

5            THE COURT:  Is that the District Attorney's

6     Office in Brooklyn?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Okay.

9            Mr. Santandermorales?

10           PROSPECTIVE JUROR:  Pablo Santandermorales.

11           31.

12           Ecuador.

13           I live in East New York.

14           My occupation is I'm a manager.

15           Married.

16           My wife is a teacher.

17           Nine is no.

18           Ten, no.

19           Eleven, no.

20           Twelve, no.

21           Thirteen, no.

22           Fourteen, no.

23           THE COURT:  Okay.  How far did you go in

24     school?

25           PROSPECTIVE JUROR:  College.

PROCEEDINGS                                    132

1          THE COURT:  Thank you.

2          Miss Short?

3          PROSPECTIVE JUROR:  My name is Pauline Short.

4          I'm 62.

5          Born in Providence, Rhode Island.  Raised from

6    three months in Brooklyn, New York.

7          I live in Bay Ridge.

8          I'm a legal assistant.

9          Three years in college.

10         I'm separated.

11         I served on a civil jury.  It was quite some

12   time ago, I can't remember how many years ago.  It was a

13   car accident.

14         I have no vision or hearing problem.

15         I work in the legal department in a bank.  I

16   previously worked in law firms.  Yes.  I know people in

17   law enforcement also.

18         Yes, people have been victims of a crime.

19         THE COURT:  Can you tell me what stands out in

20   your mind?

21         PROSPECTIVE JUROR:  Well, two.  My first born

22   daughter was accosted on her way to school when she was

23   eight.  She didn't get in the car, but he was arrested.

24   He was accosting a lot of kids, and we went to court.  I

25   think he got therapy.  So that's how that was settled.

- VMG -

PROCEEDINGS                          133

1          THE COURT:  Anything about that experience,

2     because you said you mentioned two things.

3          PROSPECTIVE JUROR:  It was intense as a

4     mother.

5          THE COURT:  No, no.  I'm saying is there

6     anything about it, although it happened awhile ago, that

7     might affect your ability to sit on this case and judge

8     the evidence fairly in this case?

9          PROSPECTIVE JUROR:  No, totally different.

10    No.

11         THE COURT:  Question number fourteen?

12         PROSPECTIVE JUROR:  I've never been arrested,

13    about my little brother, 38 years ago, for marijuana.

14         THE COURT:  Anything about his experience that

15    might affect your ability to sit on this case and judge

16    the evidence fairly in this case?

17         PROSPECTIVE JUROR:  No, no.

18         THE COURT:  Okay.

19         Mr. Chaudry?

20         PROSPECTIVE JUROR:  My name is Naeem Chaudry.

21         38.

22         Pakistan.

23         Bensonhurst, Brooklyn.

24         Sales person, cashier.

25         No school.

PROCEEDINGS                                    134

1          Married; two kids.

2          Number eight, no.

3          Nine, no.

4          Ten, no.

5          Eleven, no.

6          Twelve, no.

7          Thirteen, no.

8          Fourteen, no.

9          THE COURT:   Thank you.

10         Miss Jones?

11         PROSPECTIVE JUROR:  Number one, Lynnette

12   Jones.

13         Number two, 31.

14         Number three, Brooklyn, New York.

15         Number four, Brownsville, Brooklyn.

16         Number five, paraprofessional.

17         Number six, high school graduate.

18         Number seven, single.

19         Three children--ages 10, 8 and 3.

20         Number eight, no.

21         Number nine, no.

22         Number ten, no.

23         Number eleven, no.

24         Number twelve, yes.  My brother is a cop.

25         Number thirteen, yes.  I was shot at the age

PROCEEDINGS                                135

1    of 14.

2              THE COURT:  Was anyone arrested as a result of

3    that, Miss Jones?

4              PROSPECTIVE JUROR:   No.

5              THE COURT:  Anything about that experience

6    that might affect your ability to sit on this particular

7    case, based on the nature of the accusations in this

8    case?

9              PROSPECTIVE JUROR:   No.

10             Number fourteen, no.

11             THE COURT:  Miss Jackson?

12             PROSPECTIVE JUROR:  Tracy Jackson.

13             23.

14             Brooklyn, New York.

15             Clinton Hills, Brooklyn.

16             Receptionist.

17             College student.

18             Single.

19             One kid, three years old.

20             No.

21             No.

22             No.

23             THE COURT:  Can you just give us the numbers

24    to the question you're saying no to, Miss Jackson?

25             PROSPECTIVE JUROR:  No to eight.

PROCEEDINGS                          136

1              No to nine.

2              No to ten.

3              Eleven, yes.

4              THE COURT:  Can you tell us about that?

5              PROSPECTIVE JUROR:  I work for a law firm.

6              THE COURT:  What kind of law do they practice?

7              PROSPECTIVE JUROR:  Employment law, criminal

8    law, immigration, bankruptcy.

9              Twelve, yes.

10             THE COURT:  Can you tell us about that?

11             PROSPECTIVE JUROR:  A lot of my family members

12   are C.O.'s.

13             Thirteen, my goddaughter's father was killed

14   two years ago.

15             THE COURT:  Did that happen in Brooklyn or

16   somewhere else?

17             PROSPECTIVE JUROR:  In Brooklyn, New York.

18             THE COURT:  Was anyone arrested as a result of

19   that incident?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Anything about that experience,

22   which has to be traumatic, that might affect your

23   ability to sit on this case, Miss Jackson, and judge the

24   evidence fairly in this case?

25             PROSPECTIVE JUROR:  No.

PROCEEDINGS                                    137

1          THE COURT:  Fourteen?

2          PROSPECTIVE JUROR:  Fourteen, no.

3          THE COURT:  Jurors, again, in the audience,

4   I'm going to ask you to pay attention.  When it becomes

5   your turn to have a seat in the jury box, I'll be asking

6   you the same kind of questions.

7          At this time, I will give the assistant

8   district attorney, Mr. Hale, an opportunity to ask you

9   questions.

10          Again, jurors, there are no right or wrong

11   answers, only truthful answers.

12          You may proceed, Mr. Hale.

13          MR. HALE:  Thank you, your Honor.

14          Good afternoon, ladies and gentlemen.

15          Again, my name is Mark Hale.  I'll be asking

16   you some questions that hopefully we can get some

17   answers about whether you are the right people who would

18   be qualified to sit on this particular case.

19          I may ask questions of you individually or as

20   a group.  But what I do need is to hear an audible

21   response.  We don't get much information by hearing my

22   voice up here, we get information by hearing your voice.

23          So, can all of you answer up when I ask you

24   questions?

25          (AFFIRMATIVE RESPONSE FROM JURORS)

PROCEEDINGS                                    138

1          MR. HALE:  Very good.

2          First things first.  You've all heard that the

3     allegation again Mr. Waiters and the case for which

4     you've been brought up here is murder.  I know the Court

5     asked this before, but I think that everybody knows, you

6     know, murder is about as serious as it gets.

7          Is there anybody here that does not think they

8     would be able to give this case the serious attention,

9     and I mean while you're in here it's the one hundred

10    percent attention and devotion to this case, that it

11    deserves, or if there's anything that would be

12    distracting you from it?  Anything in your outside life?

13    We'll listen to anything that you have.

14         Yes, ma'am?  Because of what you told us

15    before?

16         PROSPECTIVE JUROR:  Right.  A whole lot of

17    other things, too.

18         MR. HALE:  A whole lot of other things, too.

19    But, primarily, that would be what you told us before

20    about what happened in you family?

21         PROSPECTIVE JUROR:  Yes.

22         MR. HALE:  Okay.  That's fine.

23         Sir?

24         PROSPECTIVE JUROR:  I'm a money manager, and

25    there's nobody to watch the book when I'm gone.  So,

1    right now, it's a problem.

2                MR. HALE:  Let me ask you this, sir.  Listen,

3    everybody knows that everybody has lives outside of

4    what's going on here.

5                The whole question here, sir, is while you're

6    in here would your occupation and what's going on, would

7    it distract you to an extent that you couldn't give this

8    your full attention?

9                PROSPECTIVE JUROR:  Probably.

10               MR. HALE:  Probably.

11               PROSPECTIVE JUROR:  I would say yes.

12               MR. HALE:  You would say yes.  You mean that

13   making a decision on whether this gentleman did or did

14   not commit the crime as alleged here, in this case,

15   murder, your personal concerns would distract you from

16   that?

17               PROSPECTIVE JUROR:  Yeah.  I would say that

18   wondering how the portfolio is doing could be on my

19   mind.  It would probably stop me or hinder me from

20   giving this my full and undivided attention.

21               MR. HALE:  You mean while the witnesses are

22   testifying, you would be worried about the money and you

23   would be thinking about that?

24               PROSPECTIVE JUROR:  Not exactly, but --

25               MR. HALE:  Well, is that the situation, sir?

PROCEEDINGS                                140

1          PROSPECTIVE JUROR:  That is the situation.

2          MR. HALE:  And you would not be able to put

3     that aside?

4          PROSPECTIVE JUROR:  I would find it difficult.

5          MR. HALE:  All right.

6          Anybody else have that particular problem,

7     that they would be worried about their outside lives or

8     outside interests and not able to give this case its

9     full attention?

10         (NO HAND RAISED)

11         MR. HALE:  Okay.

12         Now, one of the things about this case,

13    because it is murder--again, the Court talked about this

14    a little bit--the person that died in this case was a

15    little girl four years old.  Three other people were

16    also shot in this case.

17         It would be unnatural if you didn't feel at

18    least some sympathy for the person that died, for their

19    survivors.  I think you would all agree with that,

20    right?

21         (AFFIRMATIVE RESPONSE FROM JURORS)

22         MR. HALE:  By the same token, this gentleman

23    over here, Mr. Waiters, I mean, guilty or not guilty,

24    and we don't know what that is because you haven't heard

25    the evidence, but I'm sure none of us would want to be

-VMG-

PROCEEDINGS                                  141

1      trading places with him or have somebody near and dear

2      to us be in the position that he is in.

3                  MR. SIMONS:  Objection.

4                  THE COURT:  I would sustain the objection.

5                  Jurors, let me say this, that you are to

6      decide this case based on the evidence or the lack of

7      evidence, and sympathy cannot play any part.  Although

8      you may have emotions, you cannot allow your emotions to

9      shape or influence how you evaluate the evidence in this

10     case.

11                 MR. HALE:  That was my question, your Honor.

12                 And it doesn't just go to talking about the

13     victims of the crime, it also goes to the defendant.

14                 Does anybody think that their decision would

15     be shaped or formed by any sort of sympathy or from the

16     appearance of any person here in the courtroom, whether

17     it's the defendant or anybody else, that you'd be

18     thinking about that as opposed to just concentrating on

19     the evidence here?

20                 Anybody think that at all?

21                 Again, it's a tough question.  The judge said

22     it once, and I reiterate, that nobody knows you better

23     than yourselves.  I think that we all know that there

24     are people who make decisions in their life, you know,

25     some of them based upon reason, but a lot of times there

PROCEEDINGS                              142

1    are some people that make decisions that are ruled by

2    their emotions.  If you're that sort of person, that's

3    the sort of thing we have to know right now.

4              Can all of you assure us that whatever you're

5    feeling in terms of your heart, in terms of sympathy,

6    that when it comes time to make a decision in this case,

7    that you would be able to put that aside and decide this

8    case with your head and not with your heart?

9              Will you be able to do that, ma'am?

10             PROSPECTIVE JUROR:  Yes.

11             MR. HALE:  Any problem over there?

12             PROSPECTIVE JUROR:  Yeah.  I don't think I

13   would be able to do it.

14             MR. HALE:  Just explain that a little bit.

15   What do you think?

16             PROSPECTIVE JUROR:  I don't know.  I'm always

17   sympathizing with somebody.  I know my feelings would

18   get the best of me.  I don't think I would be able to

19   make a decision on just evidence itself.

20             MR. HALE:  On just evidence itself?

21             PROSPECTIVE JUROR:  No.

22             MR. HALE:  What does that mean, that just on

23   somebody saying so, you don't think you would be able to

24   make a decision?

25             PROSPECTIVE JUROR:  No.

-VMG-

PROCEEDINGS                           143

1        MR. HALE:   Okay.

2        This is a question about the case.  The judge

3   talked about this.  You know, juries are called upon to

4   make decisions in here based upon evidence.  Most of

5   what you're going to get in evidence is going to be

6   testimony coming from the witness stand here.  You're

7   going to see some other things and some exhibits, other

8   things of that nature, but it's never going to be any

9   substitute for you being right there.  In other words,

10  this is not a case of your making your decision on

11  seeing is believing.  You're going to be taking stuff

12  from other sources.

13       Now, some people--and I'm getting this from

14  you--they can't make a decision that way.  They got to

15  say well, if you're saying beyond a reasonable doubt,

16  well, unless I'm seeing it, I can never get there.

17       Is there anybody, besides this young lady, who

18  feels that they would have a problem deciding this case

19  and judging it upon saying somebody else who was there,

20  we're not talking about an incident that happened

21  yesterday or the day before, almost two years ago, of

22  them recounting what happened?

23       Would anybody think that they would have any

24  problem with that whatsoever?

25       How about you, ma'am, what do you think?

-VMG-

PROCEEDINGS                                      144

1              PROSPECTIVE JUROR:  No.

2              MR. HALE:  How about you, sir, do you

3       understand what I'm talking about?

4              PROSPECTIVE JUROR:  No.

5              MR. HALE:  Okay.  For some people, people can

6       tell them about incidents that they've seen or incidents

7       they've heard, and they'll sit there and they will be

8       skeptical about it unless they've seen it themselves.

9              Are you that sort of person?  Or are you the

10      sort of person that can sit there and say okay, here's

11      this person, I'm evaluating what they're like, how they

12      communicate with me, and I either believe them or I

13      don't believe them.

14             Can you do that?

15             PROSPECTIVE JUROR:  No.

16             MR. HALE:  Do you understand me, or can you

17      not do it?

18             PROSPECTIVE JUROR:  I don't understand too

19      much.

20             MR. HALE:  All right.

21             Is there anybody else that has any confusion

22      about what I'm talking about?

23             Sir, you're in law; right?

24             PROSPECTIVE JUROR:  Yes, sir.

25             MR. HALE:  Okay.

PROCEEDINGS                    145

1          Did you ever have an interest in this end of

2     the law at all, in criminal law or trial work, things of

3     that nature?

4          PROSPECTIVE JUROR:  I do trial work.

5          MR. HALE:  You do trial work.  Listen, I know

6     next to nothing about labor law.  I don't know what kind

7     of trial work you would do.  What kind of trial work do

8     you do?

9          PROSPECTIVE JUROR:  I work for the National

10    Labor Relations Board, it's a federal agency.

11         MR. HALE:  Right.

12         PROSPECTIVE JUROR:  We practice before

13    administrative law judges, also employed by the same

14    agency.

15         MR. HALE:  Okay.  That has to do with disputes

16    about labor, I assume, or contracts in labor, things in

17    that?

18         PROSPECTIVE JUROR:  It's a statute.  The

19    National Labor Relations Act.

20         MR. HALE:  Okay.

21         Is there anything from your training, sir, or

22    your experience that you think would affect your ability

23    here to follow the law as the judge gives it to you?

24    That's a question we always ask lawyers.

25         PROSPECTIVE JUROR:  No.

PROCEEDINGS                     146

1              MR. HALE:  Okay.

2              You understand that you can't substitute

3     whatever your understanding of the rules of evidence or

4     criminal law is for what the judge tells you; right?

5              PROSPECTIVE JUROR:  Yes.

6              MR. HALE:  You would be able to do that?

7              PROSPECTIVE JUROR:  Yes.

8              MR. HALE:  I have a question for you, sir.

9              He's on the jury now.  You're on the jury now.

10    He's a lawyer.  You're not.  Do you think that his

11    opinion about what goes on in the case is any better or

12    any more well-informed than yours?

13             PROSPECTIVE JUROR:  No.

14             MR. HALE:  I want all of you to understand

15    that I'm not picking on you.  Yes, I am.

16             All of you, regardless of your training and

17    your background, you know what the extent of your

18    schooling is, what the level of your income is, what

19    sort of job you do, none of your opinions is any better

20    or any worse than anybody else's.

21             Do you all understand that?

22             (AFFIRMATIVE RESPONSE FROM JURORS)

23             MR. HALE:  I want everybody to get this right

24    now.  Because some people would sit there and go well,

25    you know, this guy is more experienced than me, this guy

1     makes more money than me, or this guy has more education

2     than I do, so maybe he's right and I'm wrong.

3             Can all of you kind of resist that?  Because

4     we're all asking you to the very same thing.  It's the

5     sort of thing you do every day in your life.  Which is

6     somebody tells you something or you look at something

7     and you decide where the truth lies.

8             All right?  It's not rocket science.

9             Do you think you can do that, ma'am?

10            PROSPECTIVE JUROR:  Yes.

11            MR. HALE:  Do you think you would have any

12    problem with that?

13            PROSPECTIVE JUROR:  No, I don't think I would

14    have any problem.

15            MR. HALE:  Okay.

16            The judge also told you something else.  Which

17    is that you got to make --  This isn't something you do

18    in every your every day lives, and we're asking you to

19    kind of do something that is sort of unnatural.  We're

20    asking you to make a decision here without consideration

21    and without worrying or thinking about what the

22    consequences of that decision are.

23            Ma'am, let me ask you this.  The judge said

24    you've got to make your decision in this case, and you

25    can't worry about whether it's guilty or not guilty,

PROCEEDINGS                                        148

1    what happens afterward.  In other words, after you say

2    guilty or not guilty, your decision can't be based upon

3    what you think that means.  If it's guilty, you can't

4    worry about punishment.  If it's not guilty, you can't

5    worry about how people feel about that.

6              Now, in our every day life, when we make

7    decisions, we think about what are the consequences.

8              Can you put that aside and just make your

9    decision just based upon what the evidence is here?

10             PROSPECTIVE JUROR:  Yes.

11             MR. HALE:  Can you do that?

12             PROSPECTIVE JUROR:  Yes.

13             MR. HALE:  And part of the evidence in this

14   case never, never will be, and should never be a

15   consideration what happens afterward.

16             Do you think you can do that?

17             PROSPECTIVE JUROR:  Yes.

18             MR. HALE:  Is there anybody who doesn't think

19   that they can do that?  From whatever experience that

20   they may have had in their life, that they don't think

21   they would be able to do that?

22             Ma'am, you're one of the younger people up

23   here, but do you think you would be able to do that,

24   make your decision without worrying what the

25   consequences are?

PROCEEDINGS                    149

1          PROSPECTIVE JUROR:  Yes.

2          MR. HALE:  Now, I've been giving notice, and

3    it's probably going to occur in this case, that you may

4    hear certain evidence having to do with psychiatric sort

5    of testimony.

6          MR. SIMONS:  Objection.

7          THE COURT:  Let me say this, jurors.  At this

8    time, I'm going to sustained the objection.

9          MR. HALE:  May I approach, your Honor?

10         THE COURT:  Not at this time, no.

11         Jurors, you will listen to the evidence.

12   Whatever evidence you will hear, you will evaluate it

13   and make your own determination of what you believe to

14   be the credible, believable evidence, and certainly you

15   will evaluate all of the evidence and make your

16   determination based upon all of the evidence that is

17   presented before you.

18         MR. HALE:  Let me put it this way.  Ladies and

19   gentlemen, do any of you have any experience with or

20   training in psychology or psychiatry or anything that

21   has to do with the mentally disabled or the mentally

22   deficient?  Anybody at all?

23         (NO RESPONSE)

24         MR. HALE:  This is the part where I need to

25   hear an audible response.

PROCEEDINGS                     150

1        (NEGATIVE RESPONSE FROM JURORS)

2        MR. HALE:  Do any of you have any opinion from

3    anything that you might have read or anything that you

4    might have heard about about the role of psychiatry or

5    psychology as it applies to the law or as it's used in

6    courtrooms?  Anybody have any opinion as to that at all?

7        (NEGATIVE RESPONSE FROM JURORS)

8        MR. HALE:  Anything you might have seen in a

9    real life case or in a TV sort of case that has anything

10   to do with people accused of crime and talking about or

11   discussing mental issues having to do with psychology or

12   psychiatry?  Anybody have any opinions as to that?

13       (NEGATIVE RESPONSE FROM JURORS)

14       MR. HALE:  Can all of you keep an open mind as

15   to psychiatric type of evidence?  Let me preface it this

16   way.  There are some people --  I'll give you a range of

17   opinions.  Some people think that mental health

18   professionals and psychiatry and psychology is great

19   stuff, and everybody should be in therapy.  And there's

20   other people at the other end of the spectrum that say

21   oh, it's just a bunch of junk, I can't believe anything

22   any of those people say, and they call the doctors

23   shrinks.  Okay?

24           Is there anybody that has such an extreme

25   opinion about that that you don't think you would be

PROCEEDINGS                                    151

1    able to judge it as if you would any other sort of

2    science?  That is, listen to the person, listen to their

3    qualifications, listen to what they're basing their

4    opinion on, and then you decide it, whether their

5    opinion is credible or not credible or has anything to

6    do with this case.

7              Ma'am, do you think you would be able to do

8    that?

9              PROSPECTIVE JUROR:  Yes.

10             MR. HALE:  Again, I can't tell you whether

11   you're going to hear that sort of testimony or not.  But

12   you can keep an open mind to it?

13             PROSPECTIVE JUROR:  Yes.

14             MR. HALE:  Can you follow the judge's

15   instructions when it comes to evaluating not only that

16   type of evidence but all types of evidence that might be

17   called expert testimony?

18             PROSPECTIVE JUROR:  Yes.

19             MR. HALE:  Can you do that?

20             PROSPECTIVE JUROR:  Yes.

21             MR. HALE:  Is there anybody here that just

22   thinks that because somebody has certain educational

23   qualifications, or they might have a title including

24   doctor, that everything that they say you automatically

25   have to believe?

PROCEEDINGS                                    152

1            PROSPECTIVE JUROR:  No.

2            MR. HALE:  Do you think that, ma'am?

3            PROSPECTIVE JUROR:  No.

4            MR. HALE:  You don't think that, sir; right?

5            PROSPECTIVE JUROR:  No.

6            MR. HALE:  Okay.

7            Can you keep an open mind that those people,

8    just like everybody else in every other profession--we

9    talked a little bit about this before when the Court was

10   talking about police officers--that, you know, you don't

11   prejudge--that's where that word prejudice comes

12   from--you don't prejudge people about their own

13   profession or their educational background, you listen

14   to what they have to say and then you decide whether you

15   believe it or not?

16           Any problem with that at all, ma'am?

17           PROSPECTIVE JUROR:  No.

18           MR. HALE:  Okay.

19           Talking about the police.  I don't think this

20   will be a case in which there will be a tremendous

21   dependence upon police testimony.  But is there anybody

22   here that thinks that because somebody is a police

23   officer they wouldn't be able to judge their testimony

24   in the same as they would anybody else in any other

25   profession?

1              Ma'am, you got any problem with that?

2              PROSPECTIVE JUROR:  No.

3              MR. HALE:  Sir, how about you?

4              PROSPECTIVE JUROR:  No.

5              MR. HALE:  You're okay with police testimony?

6       You don't think that they tell the truth all the time;

7       you don't think that they lie all the time?  You have to

8       hear and then decide; right?

9              PROSPECTIVE JUROR:  Sometimes I don't think

10      that they all the time right.

11             MR. HALE:  Well, no.  Nobody is all the time

12      right, are they?

13             PROSPECTIVE JUROR:  No.

14             MR. HALE:  But you're not going to know

15      whether they're all the time right or all the time

16      wrong, or some of the time right or some of the time

17      wrong until you hear what they say; right?

18             PROSPECTIVE JUROR:  Yes.

19             MR. HALE:  And just because they're police

20      officers doesn't mean that they're some of time wrong,

21      some the time right, or all the time wrong or all the

22      time right; right?

23             I confused myself with that question.

24             There are some things in terms of laughs when

25      I'm getting to know you here and when we're all getting

PROCEEDINGS                     154

1    to know you, but I think all of you understand that this

2    is a very, very serious matter, and I'm not making light

3    of it at all.

4            What is important, though, ladies and

5    gentlemen, is that all of you exercise your individual

6    judgments to the best of your ability on what you hear

7    in here, that you don't bring in anything from the

8    outside.

9            For instance:  How many of you watch any of

10   the cops-and-robbers shows on TV?  I raised my hand

11   because I do.  Okay?

12           Which one do you like?

13           PROSPECTIVE JUROR:  Law and Order.

14           MR. HALE:  Oh, God.  Law and Order.

15           How about you, ma'am?

16           PROSPECTIVE JUROR:  Law and Order and Cops.

17           MR. HALE:  C.S.I. fans here, anybody?

18           PROSPECTIVE JUROR:  Yes.

19           MR. HALE:  Okay.  We have some of that over

20   here.

21           Listen.  We get I can almost say bombarded.

22   If it's not a reality show, it's one of these cop shows.

23   Okay?  We hear a lot about that.  We certainly hear not

24   just about fictional stuff, but we hear about a lot of

25   real life stuff, because we have more news outlets now

PROCEEDINGS                    155

1    and we get more real life information like this.

2    Listen.  It would be almost be unnatural if you weren't

3    getting a certain amount of information from those

4    shows, whether it's real life or whether it's fiction.

5              Can all of you assure me that no matter how

6    entertaining those shows are, no matter how interesting

7    they are, or whether you love them or you detest them,

8    that again you don't bring anything from those shows in

9    here, you don't bring anything from the newspaper in

10   here, you don't bring anything from the radio in here,

11   you don't bring anything from your buddy at work in

12   here, that you make your decisions based upon just what

13   you hear in here.

14             Can you do that, sir?

15             PROSPECTIVE JUROR:  Not a problem for me.

16             MR. HALE:  Ma'am, how about you?

17             PROSPECTIVE JUROR:  Not a problem.

18             MR. HALE:  Here's another thing.  Your

19   decision, again, has to be yours, and because of that,

20   while this case is going on, you can't talk to each

21   other about the case, not until the judge tells you you

22   can deliberate on the case.

23             Worse than that, when you go home at night,

24   you can't talk to anybody there about the case either.

25   You know why?  Because we want your opinion about the

PROCEEDINGS                    156

1    case, you're opinion about the witnesses.  Not what your

2    brother-in-law thinks, your next door neighbor thinks,

3    or your mailman thinks.  That's why you can't discuss

4    the case.

5              Again, that's a terribly unnatural thing.

6    Here's the worse thing:  What kind of case are you on?

7    Oh, I'm on murder case.  Now, you're not intending to

8    talk about the case whatsoever because you're following

9    the judge's instruction, but the natural inclination is

10   for people to ask you about the case.

11             Well, what happened?  Well, he testified.

12   Well, what do you think?  You have to be able to sit

13   there and say:  You know something, the judge told me

14   not to talk about it.  And there's good reason why.

15   Just what I explained to you.

16             Do you think all of you would be able to do

17   that?

18             (AFFIRMATIVE RESPONSE FROM JURORS)

19             MR. HALE:  Okay.  It's very, very important.

20             Now here's the part where you are going to

21   talk.  Because at end of this case you're going to have

22   to talk to each other.

23             Now, just take a look at each other.  Just

24   think about it for a minute.  Now, here is something

25   scary.  But for the fact that all of you answered your

PROCEEDINGS                    157

1     jury notice at the same time, most of you would never

2     have any occasion to share anything with anybody else

3     who sitting here with you.   Think about that.

4              You're all different, and you're all from

5     different backgrounds.   You all have different likes and

6     dislikes.   So, you probably wouldn't talk to each other

7     except for this.   And we're asking you to talk to each

8     other and come to a decision, a unanimous decision.   I

9     mean, everybody has to agree.

10             Does anybody think because of their own

11    personality that they would not be able to engage in

12    that give-and-take?

13             That means not just listening to your fellow

14    jurors, that means talking to your fellow jurors.   That

15    means not just talking about passing the time of day, it

16    means talking about opinions, about very important

17    things.   It's not just talking about your opinions about

18    very, very important things, it's talking about opinions

19    about something that all of you have seen at the same

20    time.

21             Do you think you would have a problem with

22    that, sir?

23             PROSPECTIVE JUROR:   No.

24             MR. HALE:   I mean, it goes young and old and

25    everything else.   Just like I talked about with this

-VMG-

PROCEEDINGS                                    158

1    gentleman being a lawyer.  You can look at this young

2    lady right next to her and you might think:  Well, what

3    does she know?  She's young, she hasn't been around.

4    I've got more experience.

5             Do you think you would be able to listen to

6    what she has to say?

7             PROSPECTIVE JUROR:  Yes.

8             MR. HALE:  How about this, you know, long in

9    the tooth guy over here.  Would you say, well, he's got

10   more life experience than me and in different areas, he

11   must know what he's talking about and I don't?

12            PROSPECTIVE JUROR:  No.

13            MR. HALE:  Any problems sharing and

14   interchanging ideas with him?

15            PROSPECTIVE JUROR:  No.

16            MR. HALE:  You get my point, don't you, ladies

17   and gentlemen?

18            (AFFIRMATIVE RESPONSE FROM JURORS)

19            THE COURT:  You have another minute, Counsel.

20            MR. HALE:  Thank you, your Honor.

21            Does anybody think you'd have any problem with

22   that whatsoever?

23            (NEGATIVE RESPONSE FROM JURORS)

24            MR. HALE:  The last question.  Because I

25   couldn't get to all of the questions and because I

PROCEEDINGS                                159

1    couldn't get to all of you individually, is there

2    anything that any of you can think about, over and above

3    what we've talked about, what I've asked you about, that

4    thinks that any of you, any of you, could be less than a

5    fair and impartial juror and judge this case on the

6    evidence, and only the evidence, and the law as supplied

7    by the Court?

8          Anybody have any problem with that whatsoever?

9          (NEGATIVE RESPONSE FROM JURORS)

10         MR. HALE:  Thank you for your time, ladies and

11   gentlemen.

12         THE COURT:  Certainly, jurors, I've indicated

13   that the defense has no obligation or burden to do

14   anything whatsoever.  So, certainly defense counsel need

15   not inquire.

16         Do you wish to inquire, Mr. Simons?

17         MR. SIMONS:  Yes, your Honor.

18         Good afternoon, ladies and gentlemen.

19         Let me apologize to you because I know I'm

20   going to get your name wrong.  I wrote it down the best

21   that I could, but I'm sorry.

22         I will be asking you some questions, but I may

23   not get to everyone.  I also apologize.

24         If you want to ask me any question, please

25   feel free to ask me anything.  I'll try to answer it or

PROCEEDINGS                                    160

1        the Court will answer it.  Because if you are selected,

2        you really won't be able to say anything until the end

3        of the case, when you actually make your decision.

4                   Let me start with Mr. Koike.

5                   Now, you mentioned that you actually do trial

6        work.

7                   PROSPECTIVE JUROR:  Yes, sir.

8                   MR. SIMONS:  You prepare witnesses, you go

9        before administrative judges, I believe you said?

10                  PROSPECTIVE JUROR:  Yes.

11                  MR. SIMONS:  Now, if you're in the jury room

12       and the judge tells you something which you say:  Well,

13       wait a minute.  That's not what I know, that's what I

14       don't believe in, that's not the law as I know it.

15       Would you be able to follow it anyway?

16                  PROSPECTIVE JUROR:  Yes.

17                  MR. SIMONS:  No problem?

18                  PROSPECTIVE JUROR:  No.

19                  MR. SIMONS:  Do you feel that maybe you will

20       be evaluating the witnesses and maybe myself--you may

21       see me, I may not do anything--and say:  Oh, he should

22       be asking questions.  He should be doing this.  Or

23       Mr. Hale.

24                  Do you think that would be a problem with you

25       since you are a trial attorney yourself?

-VMG-

PROCEEDINGS                                     161

1          PROSPECTIVE JUROR:  I don't think it would be

2     a problem, no.

3          MR. SIMONS:  You don't think?

4          PROSPECTIVE JUROR:  Well, I might have that

5     thought, but it wouldn't be a problem with me making a

6     decision.

7          MR. SIMONS:  I'm glad you said "I don't

8     think".  Another judge, and this is his statement, he

9     says:  Imagine you're in an airplane and the weather is

10    bad, the pilot is about to land the plane, and he says,

11    "Ladies and gentlemen, I think I can land the plane."

12    You'd get a little nervous; right?

13          So, we just need your assurance that no matter

14    what training you had in cross-examining or whatever you

15    do, you would still be able to be fair and objective in

16    this case.

17          PROSPECTIVE JUROR:  Yes.

18          MR. SIMONS:  Okay.  Miss Nunez?

19          PROSPECTIVE JUROR:  Yes.

20          MR. SIMONS:  Now, the judge did tell you

21    something about this case, that this is a murder case.

22    I'll just ask you, have you heard anything so far that

23    would help you decide this case at this moment?

24          PROSPECTIVE JUROR:  No.

25          MR. SIMONS:  Right, nothing.

PROCEEDINGS                                    162

1          Does everyone agree with that?

2          (AFFIRMATIVE RESPONSE FROM JURORS)

3          MR. SIMONS:   Thank you.   That was good.

4              Now, I'll ask you, Miss Nunez, throughout the

5     case, you know, it's a murder case, you're going to hear

6     some medical testimony, a medical examiner, and it's

7     going to get very graphic.   But it's something has to

8     get done.   You know, the cause of death.   You already

9     her there's a gun was involved.

10             Knowing what's coming, because you're going to

11    hear that, and I'm asking you but this is for everyone,

12    do you feel you won't be able to handle it?  Or, it may

13    get to the point, you know, once you're on the jury, you

14    say, "This is just too much.   I don't want to hear any

15    more about guns and the injuries or anything like that."

16         Do you think that would be a problem?

17         PROSPECTIVE JUROR:   No, no problem.

18         MR. SIMONS:   As I said, I ask you, but this is

19    for everybody.   Does everyone feel --  You know it's a

20    murder case.   You know someone was killed; you know

21    there will be some injuries.   You know a medical

22    examiner is going to talk about it.

23             So, everyone can assure me that you will be

24    able to handle that, listen to it, and still objectively

25    evaluate the case and the evidence?

PROCEEDINGS                                    163

1        (AFFIRMATIVE RESPONSE FROM JURORS)

2              MR. SIMONS:  Mr. Li, no problem?

3              PROSPECTIVE JUROR:  A little, because my

4    English is not so good.  Maybe about 60 or 70 percent I

5    understand.  Some I don't understand.

6              THE COURT:  Okay.  You said you only

7    understand English 60 to 70 percent.  Okay.

8              MR. SIMONS:  Do you feel that will be a

9    problem --  I mean, it will get technical when you do

10   hear it.  I believe Mr. Hale mentioned there were

11   several people injured.  So, you will hear from, I don't

12   know, one doctor or multiple doctors describing the

13   injuries, and I'm sure they will use some medical terms,

14   and you could have a read back to you, but do you feel

15   that may be a problem for you in fairly judging this

16   case?

17             PROSPECTIVE JUROR:  Yeah, a little problem.

18             MR. SIMONS:  Anyone else?

19             I'm not saying you need a medical degree.  I

20   mean, they will be witnesses, they will explain things

21   and you would just have to listen and analyze it and

22   judge it for yourself.

23             Sir, you raised your hand.  I'll ask you what

24   is your concern?

25             PROSPECTIVE JUROR:  You know, the same

PROCEEDINGS                           164

1    problem.  Like I understand the words, because court and

2    the medical words are difficult to understand for me.

3              MR. SIMONS:  Like I said, you don't have to

4    know the medical words.  They will be explained to you.

5    The question is:  After it is explained to you, will you

6    still be able to fairly analyze what you hear?

7              PROSPECTIVE JUROR:  Not good.  Just so-so.

8              MR. SIMONS:  Now, have you been able to

9    understand everything that you've heard from the judge,

10   from Mr. Hale and myself so far?

11             PROSPECTIVE JUROR:  No.

12             MR. SIMONS:  Okay.  Since we're using a

13   percentage, about how much percent did you understand?

14   100 percent?  95 percent?  I don't want to give numbers

15   to you, but around how much did you understand?

16             PROSPECTIVE JUROR:  Around 70, 75.

17             MR. SIMONS:  Anyone else?

18             Let me ask, Miss Chardavoyne.  How long have

19   you been a timekeeper at the Brooklyn District

20   Attorney's Office?

21             PROSPECTIVE JUROR:  Since 1999.

22             MR. SIMONS:  Is that at 320 Jay Street?

23             PROSPECTIVE JUROR:  350 Jay.

24             MR. SIMONS:  350.  Excuse me.

25             PROSPECTIVE JUROR:  We're at 320 now.

1          MR. SIMONS:  Now, Mr. Hale works at the

2     District Attorney's Office.

3          PROSPECTIVE JUROR:  I do staff time only.  So

4     I have no --  The attorneys I don't see.

5          MR. SIMONS:  You don't know Mr. Hale as he

6     sits here?

7          PROSPECTIVE JUROR:  No.

8          MR. SIMONS:  The fact that you do work for the

9     District Attorney's Office and it's the District

10    Attorney's Office that's office bringing this case, do

11    you feel that any influence at all would be put on you

12    to decide one way or the other?

13         PROSPECTIVE JUROR:  No.

14         MR. SIMONS:  Miss Jones?

15         PROSPECTIVE JUROR:  Yes.

16         MR. SIMONS:  You had made a statement --

17    actually, you made a couple statements.  I believe you

18    said that you were shot when you were 14 years old.

19         PROSPECTIVE JUROR:  Yes.

20         MR. SIMONS:  Do you feel that may be a problem

21    of how you evaluate this case?  Because, as you heard,

22    there were four people that were shot and injured in

23    this case.

24         PROSPECTIVE JUROR:  No.

25         MR. SIMONS:  You did mention at some point,

-VMG-

PROCEEDINGS                                   166

1    and I didn't get all of it, that you can't make a

2    decision or --  Did you say something like that?

3              PROSPECTIVE JUROR:  No, he said --  I think

4    the question was as far as having sympathy or something

5    like that, having sympathy for someone, and I said I'm

6    always sympathetic to people.  So, if that came into

7    play, that probably would have an affect on my judgment.

8              MR. SIMONS:  Now, in the judge told you, and

9    I'm sure the judge may tell you, that you cannot use

10   sympathy at all, in either way, to decide this case,

11   would you be able to follow the judge's decision and

12   make a decision without using sympathy?

13             PROSPECTIVE JUROR:  Honestly, I'm not sure.  I

14   don't know.

15             MR. SIMONS:  You remember that airplane in the

16   storm?  You know, the pilot says, "I'm not sure whether

17   I could land it."  You know, everybody gets a little

18   nervous.  You can't assure us you can do that?

19             PROSPECTIVE JUROR:  I can't assure you I will

20   do that.

21             MR. SIMONS:  Okay.

22             Now, Miss Jackson, I believe you also

23   mentioned that it was your goddaughter's father who was

24   killed about two years ago.

25             PROSPECTIVE JUROR:  Correct.

PROCEEDINGS                          167

1            MR. SIMONS:  Do you feel that would influence

2     you or affect you in any way in evaluating or handling

3     this case?

4            PROSPECTIVE JUROR:  No.

5            MR. SIMONS:  No problem being fair and

6     impartial and judging the evidence on what you hear?

7            PROSPECTIVE JUROR:  No.

8            MR. SIMONS:  Okay.

9            Let me go to Miss Munim.  You also mentioned

10    that your brother-in-law was I believe murdered and

11    robbed.

12            PROSPECTIVE JUROR:  Yes.

13            MR. SIMONS:  How long ago was that?

14            PROSPECTIVE JUROR:  Actually it was more than

15    ten years ago.  I'm thinking it would be about fifteen

16    years.

17            MR. SIMONS:  Okay, fifteen years.

18            Now, do you think that would have any effect

19    at all in evaluating anything, you know, this being a

20    murder case?

21            PROSPECTIVE JUROR:  No.

22            MR. SIMONS:  Does anyone have any questions

23    for me?

24            (NO RESPONSE)

25            MR. SIMONS:  Well then thank you very much.

PROCEEDINGS                                168

1          THE COURT:  Jurors, what's going to happen at

2     this point is that the attorneys and myself will discuss

3     who's to be selected to sit on this jury panel.  If

4     you're not selected to serve as a juror on this

5     particular case, please don't take it as any indication

6     or a statement on your character or self-worth, because

7     it is not.

8          Again, we have the highest responsibility to

9     choose as trial jurors those individuals who will be

10    fair and impartial and give both sides a fair trial.

11         Also, I will remind you, as well as the people

12    in the audience, please do not discuss any aspect of

13    this case amongst yourselves or with anyone else.

14         If anyone attempts to improperly discuss this

15    case with you, do not discuss it with your co-jurors,

16    but you are to bring it to the Court's attention

17    immediately.

18         So, what's going to happen at this point is

19    that the jurors that are seated will remain outside

20    until you're brought back in.  Those in the jury box

21    also will remain outside until you're brought back in by

22    one of the court officers.  So, you'll remain outside

23    until you're brought back in.

24         Please follow the direction of the court

25    officer.

PROCEEDINGS                    169

1              You can leave the questionnaires on your seat.

2              (At this time, the panel of prospective jurors

3     left the courtroom)

4              THE COURT:  Certainly, Mr. Hale, if you want

5     to be heard on the objection that I sustained when

6     Mr. Simons made it in regard to the psychiatric element,

7     I'll give you the opportunity.

8              MR. HALE:  Yes, your Honor.

9              We have notice now of intent to present this

10    sort of testimony--Doctor Drob has been put on the

11    witness list.  It is important to know how the jurors

12    feel about psychiatric experts, but it's also important

13    to know how they feel about their general perception of

14    psychiatric testimony, which I don't think that they can

15    do in a vacuum.  I tried the best that I could.

16             I think it's rather disingenuous at this point

17    if that is, in fact, going to be the defense to sit

18    there and cloak it.  I think the jurors should know

19    that, that the defendant is intending to place an

20    affirmative defense or a mitigation regarding

21    psychiatric testimony.

22             Since I go first, obviously, I have to know

23    how the jurors feel about that particular type of

24    evidence, because it is something that there is popular

25    perception about.

PROCEEDINGS                    170

1          I didn't understand at the time when the Court

2     sustained the objection, but I understood within that

3     framework, I tried to deal with it as best that I could.

4     I thank the Court for the latitude that it did give me.

5     But I don't know why we're sticking it under a bush

6     right now.  I have no clue.

7               THE COURT:  Yes?

8               MR. SIMONS:  Your Honor, I objected because

9     psychiatric testimony is an affirmative defense, but the

10    People still have to go forward and establish the

11    evidence beyond a reasonable doubt.  The defense, I did

12    not bring up a specific psychiatric defense, and I don't

13    really have to do anything.  Because if the People fail

14    their burden, then I don't ever have to present it.

15              Mr. Hale got all the questions out regarding

16    if anyone couldn't handle psychiatric evidence if they

17    hear it.  So, he got everything out that he wanted

18    without specifically saying the defense has a

19    psychiatric defense.

20              MR. HALE:  Except that the Court had given me

21    instruction that the People have the burden and that

22    burden never shifts.  Except in regard to the

23    psychiatric defenses, there is a burden that is placed

24    upon the defense to prove it by a preponderance of the

25    evidence.  I wanted to know from the jurors whether they

1    thought that that was fair or not or whether they could

2    accept that or not.  That's fair questioning to see what

3    their qualifications are.

4              THE COURT:  Let me say this, that I sustained

5    it because the defense has no obligation or burden.  I

6    understand what you're saying, the fact that it's

7    raised.  Certainly, Mr. Hale, I believe you got in the

8    questions that you wanted the jurors to consider, as

9    well that they should, in terms of any kind of

10   psychiatric considerations and how they feel about it.

11   Certainly, that would be important.

12             But, again, the defense has no obligation or

13   burden to do anything whatsoever, and it wasn't

14   mentioned by them at this point, so I don't want to be

15   perceived as shifting any burden at this point.  Because

16   they really didn't raise it, and they have no obligation

17   to raise it.

18             MR. HALE:  It doesn't, but again, Judge, it

19   doesn't say that they have to put that on.  But to not

20   deal with it, and I think in a vacuum --  I'm glad the

21   Court thinks I got everything out, I didn't, in my

22   opinion, because the jury is left there trying to guess

23   what I'm talking about.  Maybe some guessed right, maybe

24   some guessed wrong.  I don't know.  But I don't think

25   they should have to guess.  That's all.

PROCEEDINGS                              172

1      THE COURT:  Let me say this, that if, in fact,
2   in the worse case scenario, it's not put on at all, I
3   don't know, then certainly I don't want it to appear
4   that they were obligated to put anything on at this
5   point.  I don't know what the twists and turns will be,
6   Mr. Hale, but certainly it's not for me to guess.
7      MR. HALE:  I think it's somewhere in the case
8   law, Judge, and of course I don't have it right here
9   with me, but I know I've done that a number of times in
10   a number of other courtrooms, and I have litigated
11   before, Judge.
12      THE COURT:  As I said, I don't have a problem
13   with you questioning them in regard to their feelings
14   about it and whether, in fact, they would consider that.
15      (Pause in the proceedings)
16      THE COURT:  Are both sides ready, or do you
17   need another minute?
18      MR. SIMONS:  We're ready.
19      MR. HALE:  Ready.
20      THE COURT:  Challenges for cause as to
21   prospective jurors one through twelve.
22      People?
23      MR. HALE:  Number two, Mr. Hunt, who's worried
24   about the hedge fund.
25      THE COURT:  Mr. Simons?

-VMG-

PROCEEDINGS                      173

1              MR. SIMONS:  No objection, Judge.

2              THE COURT:   Number two will be excused for

3     cause, on consent.

4              Is that it for your cause challenges,

5     Mr. Hale?

6              MR. HALE:  Number four, Miss Ruocco, who

7     has -- her problem was with sympathy or the emotional

8     side of the case, I believe, in terms of her background,

9     in terms of her son having been murdered.

10             MR. SIMONS:  No objection.

11             THE COURT:   Number four will be excused for

12    cause, on consent.

13             Is that it?

14             MR. HALE:  No.

15             Number ten, Mr. Li, who only understands about

16    60 or 70 percent of what's going on.

17             MR. SIMONS:  No objection.

18             THE COURT:   Number ten will be excused for

19    cause, on consent.

20             MR. HALE:  Mr. Diaz Valdez, number eleven, has

21    a similar problem, that he doesn't understand English to

22    the full extent.

23             THE COURT:  Mr. Simons?

24             He did indicate that he didn't understand.

25             MR. SIMONS:  No objection.

PROCEEDINGS                           174

1                THE COURT:  Number eleven will be excused for

2       cause, on consent.

3                Is that it for your cause challenges?

4                MR. HALE:  From the first twelve, yes.

5                THE COURT:  Any cause challenges as to the

6       remaining jurors, one through twelve, Defense?

7                MR. SIMONS:  No.

8                THE COURT:  Any peremptory, People, as to the

9       remaining jurors, one through twelve?

10               MR. HALE:  Yes.

11               Number one.

12               THE COURT:  Is that it?

13               MR. HALE:  No.

14               Number three.

15               That's it.

16               THE COURT:  Any peremptories as to the

17      remaining jurors, Defense?

18               MR. SIMONS:  Number seven.

19               Number six.

20               THE COURT:  Is that it?

21               MR. SIMONS:  One second, please.

22               THE COURT:  Certainly.

23               (Defendant consulting with counsel)

24               MR. SIMONS:  Number eight.

25               That's it, Judge.

PROCEEDINGS                    175

1           THE CLERK:  So Stephen Ment is juror

2     number one.

3           Milagros Nunez is juror number two.

4           Jennifer Jordan is juror number three.

5           We have three selected jurors.

6           The People have used two challenges; the

7     defense has used three.

8           THE COURT:  Any challenges for cause as to

9     prospective jurors thirteen through eighteen, People?

10          MR. HALE:  Number sixteen, Mr. Chaudry.

11          MR. SIMONS:  No objection.

12          THE COURT:  Number sixteen will be excused for

13    cause, on consent.

14          MR. HALE:  And number seventeen, Ms. Jones,

15    who had a plethora of problems regarding controlling

16    emotions and sympathy.

17          MR. SIMONS:  I have no objection.

18          THE COURT:  And number seventeen will be

19    excused for cause, on consent.

20          MR. HALE:  That's it.

21          THE COURT:  Any cause challenges as to any of

22    the other jurors, thirteen through eighteen, Defense?

23          MR. SIMONS:  No.

24          THE COURT:  Any peremptories, People, as to

25    the remaining jurors, thirteen through eighteen.

-VMG-

PROCEEDINGS                                          176

1          MR. HALE:  Number fourteen,

2     Mr. Santandermorales.

3               THE COURT:  Is that it?

4          MR. HALE:  Yes, your Honor, that's it.

5               THE COURT:  Defense?

6          MR. SIMONS:  Number thirteen.

7               Number fifteen.

8               That's it.

9               THE COURT:  Certainly, for the record,

10    Mr. Simons, you've been discussing --  Well, I can tell

11    that you have.  In terms of the jurors who are to be

12    selected, you've been discussing that with your client

13    as well?

14               MR. SIMONS:  Yes.  He's very active in

15    selecting the jury.

16               THE CLERK:  We have selected four jurors.

17               The People have used three challenges; the

18    defense has used five.

19               Tracy Jackson is juror number four.

20               THE COURT:  Let me say this, that we don't

21    have enough time to go through another round.  Normally

22    I try to make them stay, but I don't think that they may

23    be up for that.  We can start at 9:30 in the morning.

24               We have nineteen jurors who are good jurors

25    that we can get through, then we have I think like three

PROCEEDINGS                                177

1    or four reserve jurors who we indicated we would excuse.

2              So, we can start at 9:30, and then I don't

3    know if we can press them to give us another panel, as

4    many as they can give us, to start up fresh tomorrow.

5              What I would need to know from both sides is

6    whether you want the sworn jurors to come back or just

7    to be told to come back on Monday at 10:00, which is

8    normally the time that I would give them.

9              MR. SIMONS:  Your Honor, I have no objection

10   for the jurors coming back on Monday.

11             THE COURT:  The sworn jurors.

12             MR. SIMONS:  Yes, the sworn jurors.

13             MR. HALE:  That's fine, Judge.

14             THE COURT:  And the others will be told to

15   come tomorrow at 9:30.

16             MR. SIMONS:  Okay.

17             THE COURT:  Okay.  Let's bring the ones in the

18   box in and put them in the front row, and everybody else

19   will fill in around them.

20             (Pause in the proceedings)

21             COURT OFFICER:  Ready, Judge?

22             THE COURT:  Yes.

23             (At this time, the panel of prospective jurors

24   entered the courtroom)

25             THE CLERK:  Ladies and gentlemen, we have

PROCEEDINGS                                178

1    selected four jurors.  I will call those names.  Please

2    answer here or present as I call your name.

3                Stephen Ment.

4                JUROR:  Here.

5                THE CLERK:  Milagros Nunez.

6                JUROR:  Here.

7                THE CLERK:  Jennifer Jordan.

8                JUROR:  Here.

9                THE CLERK:  And Tracy Jackson.

10               JUROR:  Here.

11               THE CLERK:  Thank you.

12               If I just called your name, remain seated.

13               If you were in the jury box and I didn't call

14   your name, only those people in the jury box who I

15   didn't call your name, go outside and wait for

16   instructions from one of the court officers.  They'll

17   give you further instructions.

18               THE COURT:  For those who weren't in the jury

19   box, if you weren't in the jury box, you have to remain

20   inside.

21               (At this time, the unselected jurors left the

22   courtroom)

23               THE CLERK:  Will the four selected jurors

24   please rise.

25               Raise your right hand.

-VMG-

PROCEEDINGS                                         179

1          Answer the following question:  Do you and

2    each of you sincerely and solemnly swear or affirm that

3    you will try this case in a just and impartial manner,

4    to the best of your judgment, and that you will render a

5    verdict according to the law and the evidence?

6          Please say "I do."

7          (AFFIRMATIVE RESPONSE FROM JURORS)

8          THE CLERK:  Thank you.

9          Be seated, please.

10         THE COURT:  Certainly, I will say to the

11   jurors in the audience as well, as you can tell, jury

12   selection is a slow and a tedious process, but an

13   important one.  Because certainly both sides are

14   entitled to have jurors who will be fair and impartial

15   and give both sides a fair trial.

16         To those jurors who have not had an

17   opportunity to be seated in the jury box.  You're going

18   to have to come back tomorrow to be questioned by the

19   Court.  Certainly, you'll get here at 9:30 and we'll get

20   started at 9:30.  Please be here on time, jurors.

21         Also, I'm going to instruct you that when you

22   come back tomorrow, certainly do not come into the

23   courtroom.  You'll wait outside until you're brought

24   back in by one of the court officers.

25         Certainty, you found your way to this

PROCEEDINGS                                    180

1   courtroom, 20.21.  This is where you will return

2   tomorrow morning at 9:30.

3              Again, jurors, please do not discuss any

4   aspect of the case amongst yourselves or with anyone

5   else, or permit anyone else to discuss it in your

6   presence.

7              For those of you who have not gotten into the

8   jury box, you'll return at 9:30.

9              The four sworn jurors, just remain here

10  momentarily.

11             Everyone else can leave.  You have a good

12  evening, I'll see you tomorrow morning at 9:30 in the

13  morning.

14             (At this time, the panel of prospective jurors

15  left the courtroom)

16             THE COURT:  Certainly, I will say to the sworn

17  jurors, you can tell that jury selection is going to be

18  a long and a tedious process.  I've spoken with the

19  attorneys, and they've been gracious enough to agree

20  with the Court that we're not going to make you come

21  back tomorrow.

22             Certainly, for those of you who are working,

23  you have to return to your places of employment on

24  Thursday and on Friday.  We are scheduled to begin this

25  case on Monday morning at 10 a.m.

-VMG-

1          Therefore, jurors, if you are working, you

2     must return to work on Thursday and Friday, and you'll

3     return to this courthouse on Monday, which is May 5th,

4     at 10:00.

5          There is a jury room that you'll be shown to,

6     where you should go when you report on that date.

7          Again, you will not come back to the

8     courtroom, you will go directly to the jury room that

9     the officer will show you to.

10         You won't be permitted to go in, there's

11    somebody in there now, but certainly that is the room

12    you will come to on Monday, May 5th, at 10 a.m.

13         You'll follow the direction of the officer.

14         (At this time, the four sworn jurors left the

15    courtroom)

16         THE COURT:  Also, if the nineteen jurors show

17    up tomorrow at 9:30, we'll have the nineteen to work

18    with, and you'll have fifteen minutes.

19         I'm going to try to do everything that I can

20    to try to get a new panel up.  The regular clerk is not

21    going to be here tomorrow morning, so I'll do everything

22    that I can to advise the clerk, but I've been told that

23    normally they don't like to send up additional jurors

24    until we've exhausted the panel.  We'll try to do that

25    as expeditiously as possible.

PROCEEDINGS                                    182

1           Hopefully Mr. Waiters will be here at 9:30 as

2     well.

3                    *         *         *         *         *

4           (At this time, court stands in recess, and the

5     trial adjourned to Thursday, May 1, 2008, at 10:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS : CRIMINAL TERM : PART 1

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK      :      INDICTMENT NO.
                                                    3464/06
            - against -                  :

GENERAL WAITERS                          :

                        DEFENDANT        :      JURY VOIR DIRE

- - - - - - - - - - - - - - - - - - - -X

                              320 JAY STREET
                              BROOKLYN, NEW YORK  11201

                              MAY 1, 2008


BEFORE:    HONORABLE DEBORAH A. DOWLING, JUSTICE


APPEARANCES:


            CHARLES J. HYNES, ESQ.
                District Attorney, Kings County
                BY:  MARK HALE, ESQ.
                    Assistant District Attorney


            CALVIN J. SIMONS, ESQ.
                Attorney for Defendant
                616 Eastern Parkway
                Brooklyn, New York



                              VINCENT M. GERALDI, JR.
                              SENIOR COURT REPORTER

JURY VOIR DIRE                                    184

1          THE COURT:   This is number two on the

2     calendar, Indictment number 3464 of 2006, General

3     Waiters.

4          MR. SIMONS:   Calvin Simons, for Mr. Waiters.

5          MR. HALE:   The Office of the District

6     Attorney, by Mark Hale.

7          THE COURT:   Certainly all parties are here

8     with the defendant, Mr. Waiters.

9          I will do a check in the hallway.   There

10    should be nineteen viable jurors, and then four jurors

11    who indicated previously that they could not serve for

12    that length of time, and we indicated they would be

13    excused but not at the time they were requesting.

14          So, we're going to call to make sure that the

15    jurors, the nineteen jurors or however many jurors are

16    present.

17          (Pause in the proceedings)

18          COURT OFFICER:   Ready for the panel?

19          THE COURT:   Both are sides ready?

20          MR. HALE:   Yes.

21          MR. SIMONS:   Yes.

22          THE COURT:   Yes.

23          COURT OFFICER:   Panel entering.

24          (At this time, the panel of prospective jurors

25    entered the courtroom)

JURY VOIR DIRE                           185

1          THE COURT:  Good morning, jurors.

2          I apologize for the delay.

3          What's going to happen is that names will be

4    called for people to have a seat in the jury box.

5    Hopefully you were paying attention, because we will be

6    asking you the same types of questions that we asked the

7    jurors yesterday.

8          THE CLERK:  As I call your name, please take

9    the seat in the jury box.

10         Philip Lombardo, seat number one.

11         L-O-M-B-A-R-D-O.

12         Joseph Johnson.

13         He's not Present.

14         Yvrote Duplan, seat number two.

15         First name is Y-V-R-O-T-E; last name is

16   D-U-P-L-A-N.

17         Robert Camp, seat number three.

18         C-A-M-P.

19         Patricia Anna-Munro Hills, seat number four.

20         That's A-N-N-A - M-U-N-R-O H-I-L-L-S.

21         Dwight Bartholomew, seat number five.

22         No appearance.

23         Irma Archer, seat number five.

24         A-R-C-H-E-R.

25         Mark Punch, seat number six.

JURY VOIR DIRE                                    186

1              No appearance.

2              Pauletta Ferreira, seat number six.

3              F-E-R-R-E-I-R-A.

4              Odette Holness, seat number seven.

5              H-O-L-N-E-S-S.

6              Baynes Richards, seat number eight.

7              First name is B-A-Y-N-E-S; Richards is the

8     last name.

9              Michelle Denzine, seat number nine.

10             D-E-N-Z-I-N-E.

11             Nicole Castle, seat number ten.

12             C-A-S-T-L-E.

13             Dane Johnson.

14             No appearance.

15             Beatrice Wright, seat number eleven.

16             W-R-I-G-H-T.

17             Lucille Lovisi, seat number twelve.

18             L-O-V-I-S-I.

19             JoAnne Dalleo Locascio, seat number thirteen,

20    in the back row.

21               D-A-L-L-E-O L-O-C-A-S-C-I-O.

22             Janice Porter, seat number fourteen, in the

23    front row.

24               P-O-R-T-E-R.

25             Sally Brisbon, seat number fifteen, in the

1   back row.

2               B-R-I-S-B-O-N.

3               Camilla Avril, seat number sixteen, front row.

4               A-V-R-I-L.

5               Guadalupe Rosales, seat number seventeen, back

6   row.

7               G-U-A-D-A-L-U-P-E, first name; R-O-S-A-L-E-S.

8               Joshua Baez, seat number eighteen.

9               B-A-E-Z.

10              THE COURT:  May I see counsel at sidebar.

11              (Off-the-record discussion held at the bench)

12              THE COURT:  Jurors, what I'm going to do,

13  since there are so few jurors left in the audience, I'm

14  going to just question everybody as well.

15              THE CLERK:  The following individuals, you're

16  going to be taking seats in the first row, but you will

17  still be as if you were in the jury box.

18              This will be seat number nineteen, Mildred

19  Torres.

20              T-O-R-R-E-S.

21              Linda Lalima, seat number twenty.

22              L-A-L-I-M-A.

23              Wen Wu, seat number twenty-one.

24              First name W-E-N; W-U.

25              Yvone Findlay, seat number twenty-two.

JURY VOIR DIRE                                              188

1              That's Y-V-O-N-E, F-I-N-D-L-A-Y.

2              Tee Ooi, seat number twenty-three.

3              That's T-E-E O-O-I.

4              THE COURT:  Again, jurors, I hope you were

5    paying attention because it is important that we hear

6    your answers.

7              Jurors, there are no right or wrong answers,

8    only truthful answers.

9              Again, if you think there is anything that

10   might interfere with your judgment, it's important for

11   us to know.

12             Starting with question number one,

13   Mr. Lombardo, and going straight down with your answers,

14   please.

15             PROSPECTIVE JUROR:  My name is Philip

16   Lombardo.

17             My age is 20.

18             My place of birth is Coney Island, Brooklyn,

19   New York.

20             I live in the neighborhood of Bensonhurst

21   Brooklyn.

22             My occupation is casual mail handler for the

23   United States Postal Service.

24             Number six, G.E.D.

25             Number seven, I am single.

JURY VOIR DIRE                    189

1              Number eight, I live with my sister, who is a

2     student.

3              Number nine, no.

4              Number ten, no.

5              Number eleven, no.

6              Number twelve, yes.  I train with several

7     police officers in mixed martial arts.

8              Thirteen, no.

9              Fourteen, no.

10             THE COURT:  Thank you.

11             Mr. Duplan?

12             PROSPECTIVE JUROR:  My name is Yvrote Duplan.

13             My age is 45.

14             My place of birth is Haiti.

15             I live in East Flatbush, Brooklyn.

16             My occupation is teacher.

17             Number six, college.

18             Seven, divorced.  One child.

19             Number eight --

20             THE COURT:  What is the occupation of your

21     ex-spouse?  What did your ex-wife do for a living,

22     Mr. Duplan?

23             PROSPECTIVE JUROR:  She's a nurse.

24             Number eight, I live alone.  My daughter is in

25     college.

1              Number nine, no.

2              Number ten, no.

3              Number eleven, no.

4              Number twelve, no.

5              Number thirteen, yes.

6              THE COURT:  Can you tell us about that,

7      Mr. Duplan.

8              PROSPECTIVE JUROR:  My car was vandalized a

9      couple of times, about ten to fifteen years ago.

10             THE COURT:  Was anyone arrested as a result of

11     those experiences that you had?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Anything about those experiences,

14     Mr. Duplan, that might affect your ability to sit on

15     this case and judge the evidence fairly in this case,

16     sir?

17             PROSPECTIVE JUROR:  Not at all.

18             THE COURT:  Question number fourteen?

19             PROSPECTIVE JUROR:  Number fourteen, no.

20             THE COURT:  Thank you.

21             Mr. Camp?

22             PROSPECTIVE JUROR:  My name is Robert Camp.

23             My age is 27.

24             My place of birth, number three, is Bronx, New

25     York.

JURY VOIR DIRE                                191

1          Number four, I live in Sunset Park, Brooklyn.

2          Number five, I'm a business analyst.

3          My six, Bachelor's degree.

4          Number seven, I'm single.  No children.

5          Number eight, I live with my girlfriend, who

6     is a student.

7          Number nine, no.

8          Number ten, no.

9          Eleven, no.

10         Twelve is no.

11         Thirteen is no.

12         Fourteen is no.

13         THE COURT:  Thank you.

14         PROSPECTIVE JUROR:  My name is Patricia Hills.

15         Number two, my age is 49.

16         My place of birth is Grenada, West Indies.

17         I live in East Flatbush.

18         My occupation is retail and seamstress.

19         High school diploma.

20         I'm divorced, with two children, age 26

21    and 23.

22         THE COURT:  Your ex-husband, what did he do

23    for a living?

24         PROSPECTIVE JUROR:  He was a teacher.

25         Nine, one is a graphic artist, and the other

1           one is administrative assistant.

2                     Number nine, no.

3                     Ten, no.

4                     Eleven, no.

5                     Twelve, no.

6                     Thirteen, no.

7                     Fourteen, no.

8                     THE COURT:  Thank you.

9                     Miss Archer?

10                    PROSPECTIVE JUROR:  My name is Irma Archer.

11                    My age is 43.

12                    My place of birth is Trinidad, West Indies.

13                    I live in Sunset Park, Brooklyn.

14                    I'm a housewife.

15                    G.E.D.

16                    I'm married with two young children, ages five

17          and six.

18                    Number eight is yes.

19                    Number nine is no.

20                    Ten, no.

21                    Eleven, no.

22                    Twelve, yes.  My husband.

23                    THE COURT:  What does your husband do?

24                    PROSPECTIVE JUROR:  He's a police officer.

25                    Thirteen, yes.

JURY VOIR DIRE                                    193

1          THE COURT:  Can you tell us about that.

2          PROSPECTIVE JUROR:  My husband's youngest

3    brother was murdered.

4          THE COURT:  How long ago was that?

5          PROSPECTIVE JUROR:  About 12 years ago.

6          THE COURT:  Did that happen in Brooklyn or

7    somewhere else?

8          PROSPECTIVE JUROR:  Somewhere else.

9          THE COURT:  Anything about that experience,

10   which has to be a traumatic experience for you as well

11   as your husband's family, anything about that that might

12   affect your ability to sit on this particular case,

13   based on the nature of the accusations in this

14   particular case?

15         PROSPECTIVE JUROR:  No.

16         Number fourteen, no.

17         THE COURT:  Thank you.

18         Miss Ferreira?

19         PROSPECTIVE JUROR:  My name is Pauletta

20   Ferreira.

21         Age 41.

22         Guyana.

23         I live in East New York.

24         My occupation is supervising housekeeping.

25         I graduated from Bishops High School,

-VMG-

JURY VOIR DIRE                                    194

1        Georgetown, Guyana.

2                I'm married four months ago.

3                My son is going to be 20.  He attends

4        Bridgeport University, studying architecture, forensic

5        science.

6                Number nine, no.

7                Number ten, no.

8                Eleven, no.

9                Twelve, no.

10               Thirteen, no.

11               Fourteen, no.

12               THE COURT:  What does your husband do for a

13       living, Miss Ferreira?

14               PROSPECTIVE JUROR:  He lives in Guyana.

15               THE COURT:  What is the nature of his

16       employment in Guyana?

17               PROSPECTIVE JUROR:  He has a boutique.

18               THE COURT:  Thank you.

19               Miss Holness?

20               PROSPECTIVE JUROR:  My name is Odette Holness.

21               I am 59.

22               THE COURT:  Miss Holness, can you just keep

23       your voice up.  You're speaking so sweetly, I could

24       barely hear you, and I'm looking right at you.

25               PROSPECTIVE JUROR:  I'm sorry.

                          -VMG-

JURY VOIR DIRE                                          195

1              Odette Holness

2              59.

3              Costa Rica.

4              I live in East Flatbush.

5              I'm a registered nurse, manager.

6              I have a Master's degree.

7              I am married.

8              My husband is a computer programmer.

9              I served in the Grand Jury.

10             No to number ten.

11             No to number eleven.

12             No to number twelve.

13             Yes, to number thirteen.

14             THE COURT:  Can you tell us about that,

15        Miss Holness.

16             PROSPECTIVE JUROR:  My younger son was

17        assaulted as a teenager.

18             THE COURT:  How long ago was that?

19             PROSPECTIVE JUROR:  I'm sorry?

20             THE COURT:  How long ago did that happen?

21             PROSPECTIVE JUROR:  About eight years ago.

22             THE COURT:  Was anyone arrested as a result of

23        that incident?

24             PROSPECTIVE JUROR:  Yes, he was.  There was a

25        trial, and he got three years probation and anger

-VMG-

JURY VOIR DIRE                              196

1    management training.

2              THE COURT:  Anything about the experience that

3    your son had with being assaulted and what you just

4    described your family went through, anything about that

5    that might affect your ability to sit on this particular

6    case and be fair in this particular case, Miss Holness?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Question number fourteen.

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Thank you.

11             You mentioned you have a son.  If so, what are

12   the ages and occupations of your children?

13             PROSPECTIVE JUROR:  I have three children.  My

14   older son is 28, my second son is 26, and my daughter

15   is 23.

16             THE COURT:  What are their occupations?  What

17   do they do for a living?

18             PROSPECTIVE JUROR:  My older son is in

19   business, my second son is in marketing, and my daughter

20   is in business.

21             THE COURT:  Thank you, Miss Holness.

22             Mr. Richards?

23             PROSPECTIVE JUROR:  My name is Baynes Patrick

24   Richards.

25             My age is 80 years or age.

1          My place of birth is Guyana.

2          I live in Brooklyn.

3          My occupation is a laundry worker.

4          Seven, 11th grade in school.

5          I am single.

6          Occupation of other members of household, I

7     have none.

8          Have you ever previously served on a jury?

9     Yes.  That was five years ago.

10          Number ten, do you have serious vision --

11     Sometimes because I walk between machinery.

12          THE COURT:  Mr. Richards, let me stop you for

13     a moment.

14          You said you have a vision problem.  Is it

15     corrected by your classes, sir, or no?

16          PROSPECTIVE JUROR:  Yes, ma'am.

17          THE COURT:  Okay.

18          Question number eleven is where I stopped you.

19          PROSPECTIVE JUROR:  Do you know anybody who

20     have any legal training?  Yes, ma'am, my daughter.

21          Do you know any person who is involved in law

22     enforcement?  My daughter.

23          Number thirteen, no.

24          Number fourteen, no.

25          THE COURT:  You mentioned your daughter works

1    in the legal field.   What area is it?   Criminal?   Civil?

2              PROSPECTIVE JUROR:   Well, she's in John Jay

3    College.   She have one more semester.   But she works at

4    Rikers Island; she's a captain there.

5              THE COURT:   Also, you mentioned that you live

6    in Brooklyn.   Without telling us what the address is,

7    what part of Brooklyn.

8              PROSPECTIVE JUROR:   I'm sorry.   702 --

9              THE COURT:   Don't tell us the address.   I may

10   come for dinner tonight.   Just tell us the area, whether

11   it's Flatbush, Canarsie, Coney Island.

12             PROSPECTIVE JUROR:   Crown Heights.

13             THE COURT:   Your age, sir.

14             PROSPECTIVE JUROR:   80.   Born 1928, 15th of

15   March.

16             THE COURT:   You're going to tell us

17   everything, Mr. Richards.

18             Thank you.

19             Miss Denzine?

20             PROSPECTIVE JUROR:   My name is Michelle

21   Denzine.

22             My age is 43.

23             Place of birth, Trinidad, West Indies.

24             Neighborhood, Crown Heights.

25             Occupation, housekeeper.

1            Graduated from high school.

2            I'm single.

3            My mom is a housekeeper also.

4            Nine is no.

5            Ten is no.

6            Eleven is no.

7            Twelve is no.

8            Thirteen is yes.

9            THE COURT:  Can you tell us about your yes

10     answer, Miss Denzine.

11            PROSPECTIVE JUROR:  My cousin's cousin was

12     murdered, a drive-by shooting.

13            THE COURT:  Did that happen in Brooklyn?

14            PROSPECTIVE JUROR:  Yes, it did.

15            THE COURT:  How long ago was that?

16            PROSPECTIVE JUROR:  About August of last year.

17            THE COURT:  Was anyone arrested as a result of

18     that?

19            PROSPECTIVE JUROR:  I have no idea.

20            THE COURT:  Certainly, I know that has to be a

21     traumatic event --

22            PROSPECTIVE JUROR:  Yes.

23            THE COURT:  -- a traumatic incident for your

24     family.  Anything about that experience that might

25     affect your ability to sit on this particular case?

-VMG-

1           PROSPECTIVE JUROR:  Yes, ma'am.

2           THE COURT:  Okay.

3           Again, there are no right or wrong answers,

4      only truthful answers.

5           Question number fourteen?

6           PROSPECTIVE JUROR:  Fourteen, yes.  My brother

7      was arrested for robbery ten years ago.

8           THE COURT:  Was that in Brooklyn or somewhere

9      else?

10          PROSPECTIVE JUROR:  Brooklyn.

11          THE COURT:  Anything about the way that he was

12     treated by the Police Department or the District

13     Attorney's Office that might affect your ability to sit

14     on this case and judge the evidence fairly in this case?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Miss Castle?

17          PROSPECTIVE JUROR:  My name is Nicole Castle.

18          My age is 39.

19          Place of birth, Trinidad Tobago, West Indies.

20          I live in Crown Heights.

21          My occupation, I'm a field mechanic with

22     Keyspan Energy.

23          I graduated from senior secondary school in

24     Trinidad.

25          I'm divorced, but I'm also engaged.

1          Occupation a member of my household, my fiance

2     is a elevator mechanic.

3          I have one son, he's a student, and he works

4     part-time in a nursing home.

5          Number nine is no.

6          Number ten is no.

7          Number eleven is no.

8          Number twelve is yes.  My son's father is a

9     police inspector back in Trinidad Tobago.

10         Number thirteen is yes.  I was a victim of a

11    crime while on duty with Keyspan.  There was some kind

12    of shooting between two people in the housing project on

13    Bainbridge and Patchen about three years ago.  While I

14    was working, heading back to the company vehicle, one of

15    the guy was running up the street, and I just paid

16    attention that he was running in my direction with a gun

17    in his hand, so I jumped into the company truck and

18    locked the door.  He didn't get me, but he throw the gun

19    over the fence.  I was working with a City Marshal at

20    the time, and he held him.  I was able to show the cops

21    were the gun was and everything.

22              THE COURT:  Let me ask you this:  Anything

23    about that experience that you just described that might

24    affect your ability to sit on this particular case?

25              PROSPECTIVE JUROR:  No, nothing.

1            THE COURT:  Okay.

2            Number fourteen?

3            PROSPECTIVE JUROR:  Number fourteen, yes.  My

4    ex-husband, he was arrested for domestic violence about

5    thirteen years ago.

6            THE COURT:  Anything about that experience

7    that might affect your ability to sit on this case and

8    be fair?

9            PROSPECTIVE JUROR:  No.  It was over thirteen

10   years ago.

11           THE COURT:  Thank you.

12           Miss Wright?

13           PROSPECTIVE JUROR:  Yes.

14           My name is Beatrice Wright.

15           My age is 53.

16           I was born in Harlem.

17           I live in Canarsie.

18           My occupation is home health aid.

19           I went to the 12th grade, but I didn't

20   graduate.

21           My daughter is 37.  I have one child.

22           I'm a widow.  My husband passed away.

23           THE COURT:  What did he do for a living before

24   he passed away?

25           PROSPECTIVE JUROR:  He did housing.

-VMG-

JURY VOIR DIRE                                        203

1                  Number nine, no.

2                  Number ten, no.

3                  Number eleven, no.

4                  Number twelve, no.

5                  Thirteen, no.

6                  Fourteen, no.

7                  THE COURT:  You mentioned that you have a

8       daughter.  What does she do for a living?

9                  PROSPECTIVE JUROR:  She's a stay-at-home mom.

10      She has two daughters.

11                 THE COURT:  Thank you.

12                 Miss Lovisi?

13                 PROSPECTIVE JUROR:  Hi.  My name is Lucille

14      Lovisi.

15                 I'm 45 years old.

16                 I was born in Sunset Park, Brooklyn.

17                 I live in Homecrest.

18                 I'm a clerk for the United States Postal

19      Service.

20                 I went to college.

21                 I'm married.  My husband is also a clerk for

22      the Postal Service.

23                 I've never served on a jury.

24                 I have non-corrective nearsightedness in my

25      left eye, but my right eye is 20/20.

                              -VMG-

1              I have friends who are lawyers.

2              THE COURT:  What kind of law do they practice,

3      Miss Lovisi?

4              PROSPECTIVE JUROR:  You know, like

5      slip-and-fall kind of things.

6              I have cousins who are police officers.

7              No to thirteen.

8              No to fourteen.

9              THE COURT:  Thank you, Miss Lovisi.

10             Miss Dalleo Locascio?

11             PROSPECTIVE JUROR:  My name is JoAnne Dalleo

12     Locascio.

13             I'm 49.

14             I was born in upstate New York.

15             I live in Greenpoint, Brooklyn.

16             I'm a special education teacher.

17             I have a Master's degree.

18             I am married, with two children, ages 13

19     and 19.

20             My husband is an architect.

21             I have not served on a jury.

22             The answers to ten through fourteen are

23     all no.

24             THE COURT:  Thank you.

25             Miss Porter?

JURY VOIR DIRE                              205

1            PROSPECTIVE JUROR:  My name is Janice Porter.

2            I'm 51.

3            My place of birth is St. Vincent, West Indies.

4            I live Bedford Stuyvesant.

5            My occupation, I'm a teacher.

6            College, Master's degree.

7            I am married.  Two children, 20 and

8      21-and-a-half.  They're both in college.

9            My husband is an auto mechanic.

10           I've never served on a jury.

11           Number ten, no.

12           Number eleven, no.

13           Number twelve, no.

14           Number thirteen, no.

15           Number fourteen, no.

16           THE COURT:  Thank you.

17           Miss Brisbon?

18           PROSPECTIVE JUROR:  My name is Sally Brisbon.

19           My age is 69.

20           My place of birth is Georgia.

21           I live in East Flatbush.

22           My occupation, retired.

23           I finished high school.

24           I have a Bachelor's in theology.

25           Married to the same man for 47 years.

-VMG-

1           I have two children, 46 and 37.

2           My oldest son works for Transit.  My youngest

3    son is autistic.

4           My husband retired from New York City Housing.

5           Number nine, I worked on a criminal jury about

6    four or five years ago.

7           From ten to fourteen, no.

8           THE COURT:  Thank you.

9           You mentioned that you're retired.  What line

10   of work did you retire from?

11          PROSPECTIVE JUROR:  Nurse's aide.

12          THE COURT:  Thank you.

13          Miss Avril?

14          PROSPECTIVE JUROR:  My name is Camilla Avril.

15          I'm 58 years old.

16          My place of birth, St. Lucia.

17          I live in the neighborhood of Canarsie,

18   Brooklyn.

19          My occupation is laundry worker.

20          12th grade.

21          I am single.  I have two children, age 31

22   and 19.  She works with autistic children.  The little

23   one goes to John Dewey High School.

24          I served Grand Jury five years ago.

25          THE COURT:  You said that was Grand Jury five

1        years ago?

2                    PROSPECTIVE JUROR:  Yes.

3                    Number ten is no.

4                    Number eleven is no.

5                    Number twelve is no.

6                    Number thirteen, no.

7                    Number fourteen, no.

8                    THE COURT:  Thank you.

9                    Miss Rosales?

10                   PROSPECTIVE JUROR:  My name is Guadalupe

11       Rosales.

12                   I'm 27.

13                   I was born in California.  L.A.

14                   I live in Bed Stuy.

15                   I'm a coordinator.

16                   I have a B.A.

17                   I am single.

18                   Eight is no.

19                   Nine is no.

20                   Ten is no.

21                   Eleven, no.

22                   Twelve, no.

23                   Thirteen, yes.  My cousin was killed like two

24       years ago.

25                   THE COURT:  Was that in Brooklyn or somewhere

1       else?

2                       PROSPECTIVE JUROR:  In California.

3                       THE COURT:  Anything about that experience --

4       First of all, was anyone ever arrested as a result of

5       that?

6                       PROSPECTIVE JUROR:  Yes.

7                       THE COURT:  Do you know what happened to that

8       person's case, if you know?

9                       PROSPECTIVE JUROR:  No.

10                      THE COURT:  Anything about that experience

11      that might affect your ability to sit on this particular

12      case and judge the evidence fairly in this case,

13      Miss Rosales?

14                      Again, there are no right or wrong answers,

15      only truthful ones.

16                      PROSPECTIVE JUROR:  Yes.

17                      THE COURT:  Okay.

18                      Question number fourteen?

19                      PROSPECTIVE JUROR:  No.

20                      THE COURT:  Thank you.

21                      Mr. Baez?

22                      PROSPECTIVE JUROR:  Yes.  My name is Joshua

23      Baez.

24                      My age is 44.

25                      My place of birth is Manhattan, New York.

1          I live in the neighborhood of East New York

2    in Brooklyn.

3          My occupation is fire protection inspector.  I

4    have Peace Officer status.

5          I have an Associate degree from college.

6          I am married.

7          I have three children.  Their ages are 16,

8    15, and 13.

9          My wife is a homemaker.

10         My mother-in-law is retired.  She was probably

11   a homemaker before that.  My father is retired.  He was

12   a waiter.

13         I've never served on a jury.

14         Ten, I don't have any serious vision or

15   hearing problems.

16         Eleven, my sister is a lawyer.

17         THE COURT:  What kind of law does she

18   practice, Mr. Baez?

19         PROSPECTIVE JUROR:  She practices --  She did

20   family.  Now she does immigration.

21         Twelve, my brother-in-law works in California

22   as a Correction officer.

23         Thirteen, no.

24         Fourteen, no.

25         THE COURT:  Thank you.

1          Miss Torres?

2          PROSPECTIVE JUROR:  My name is Mildred Torres.

3          My age is 47.

4          I was born in Puerto Rico.

5          I live in Brooklyn.

6          My occupation is teacher's aide.

7          High school diploma.

8          I'm married.  My husband is maintenance at a

9     health spa.

10          My daughter is 23.  She works at Staples as a

11     cashier.  My son is unemployed.

12          Nine through twelve, no.

13          Thirteen, yes.

14          THE COURT:  Can you tell us about that.

15          PROSPECTIVE JUROR:  My son's best friend was

16     shot and hammered three times in the head.

17          THE COURT:  How long ago was that?

18          PROSPECTIVE JUROR:  Twelve years.

19          THE COURT:  Did that happen in Brooklyn or

20     somewhere else?

21          PROSPECTIVE JUROR:  Yes, in Brooklyn.

22          THE COURT:  Anything about your son's friend's

23     experience that might affect your ability to sit on this

24     case and judge the evidence in this case?

25          PROSPECTIVE JUROR:  Yes.

JURY VOIR DIRE                                      211

1          THE COURT:  Fourteen?

2          PROSPECTIVE JUROR:  Fourteen, no.

3          THE COURT:  Thank you for your honesty.

4          PROSPECTIVE JUROR:  You're welcome.

5          THE COURT:  Miss Lalima?

6          PROSPECTIVE JUROR:  My name is Linda Lalima.

7          I'm 48.

8          I was born in Bay Ridge, Brooklyn.

9          I live in Bensonhurst.

10         I work in data entry.

11         I've had some college.

12         Single.

13         Eight, no.

14         Nine, no.

15         Ten, no.

16         Eleven, no.

17         Twelve, I have some cousins that are cops.

18         Thirteen, I was mugged like seven years ago.

19         THE COURT:  Was anyone arrested as a result of

20    that incident?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Anything about that experience,

23    Miss Lalima, that might affect your ability to sit on

24    this case and judge the evidence fairly in this case?

25         PROSPECTIVE JUROR:  No.

1              Fourteen, no.

2              THE COURT:   Thank you.

3              Mr. Wu?

4              PROSPECTIVE JUROR:   My name is Wen Wu.

5              I'm 21 years old.

6              I was born in China.

7              I live in Bensonhurst.

8              I'm a full-time student.

9              I'm single.

10             Nine through thirteen is no.

11             Fourteen is yes.

12             THE COURT:   Can you tell us about your yes

13    answer.

14             PROSPECTIVE JUROR:   I was arrested in a school

15    fight.

16             THE COURT:   How long ago was that?

17             PROSPECTIVE JUROR:   Four years.

18             THE COURT:   What happened to your case?

19             PROSPECTIVE JUROR:   It was thrown out.

20             THE COURT:   Anything about the way you were

21    treated by the Police Department or the District

22    Attorney's Office that might affect your ability to sit

23    on this case --

24             PROSPECTIVE JUROR:   Yes.

25             THE COURT:   -- and judge the evidence?

1              PROSPECTIVE JUROR:   Yes.

2              THE COURT:   You said yes?

3              PROSPECTIVE JUROR:   Yes.

4              THE COURT:   Okay.

5              Thank you.

6              Miss Findlay?

7              PROSPECTIVE JUROR:   My name is Yvone Findlay.

8              My age is 52.

9              My place of birth is Jamaica, West Indies.

10             I live in Midwood, Brooklyn.

11             My occupation is auditor.

12             School, high school diploma.

13             I'm single.   No children.

14             Number eight, not applicable.

15             I served on a civil jury four years ago.   It

16       was settled before deliberations.

17             Ten through fourteen, no.

18             THE COURT:   Thank you.

19             Mr. Ooi?

20             PROSPECTIVE JUROR:   My name is Tee Ooi.

21             I'm 47.

22             I was born in Malaysia.

23             I live in Sheepshead Bay.

24             My occupation is salesman.

25             I have some college.

JURY VOIR DIRE                                          214

1              I'm married.  Two children, 11 and 14.  Both

2    are students.

3              My wife is a counselor.

4              Number nine, no.

5              Number ten, I need reading glasses.

6              Number eleven, I have two niece that work in

7    law firm, corporate law.

8              Number twelve, my brother-in-law is retired

9    police.

10             Number thirteen, yes.

11             THE COURT:  Can you tell us about that.

12             PROSPECTIVE JUROR:  About twenty years ago, I

13   was robbed.

14             THE COURT:  Did that happen in Brooklyn or

15   somewhere else?

16             PROSPECTIVE JUROR:  It happened in Long

17   Island.

18             THE COURT:  Anything about that experience

19   that might affect your ability to sit on this case and

20   judge the evidence in this case?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Okay.

23             PROSPECTIVE JUROR:  Number fourteen, no.

24             THE COURT:  Thank you.

25             Again, jurors, I'm going to remind you that

JURY VOIR DIRE                                    215

1    there are no right or wrong answers, only truthful

2    answers.  Because, again, we need to know whether

3    there's anything that may interfere with your judgment

4    on this particular case.

5              Again, I will give the assistant district

6    attorney, Mr. Hale, an opportunity to ask you questions.

7              Again, jurors, there are no right or wrong

8    answers, only truthful answers.

9              MR. HALE:  Thank you, your Honor.

10             Good morning, jurors.  Did everybody hear the

11   questions that were put to the jurors yesterday by

12   myself and Mr. Simons?  Did everybody hear those?

13             (AFFIRMATIVE RESPONSE FROM JURORS)

14             MR. HALE:  You're going to be hearing much the

15   same thing.

16             Again, we want to hear your voice.  You

17   started off very well today, actually.

18             One of the things the judge talks about, and I

19   emphasize also, and I think I want you to consider on

20   your own, in order for both sides here to get a fair

21   trial, your decision has to be free from sympathy.  In

22   this case, there's a lot of obvious sympathy that can be

23   seen in this case.

24             You would agree with that, ma'am, would you

25   not?

1          PROSPECTIVE JUROR:  No.

2              MR. HALE:  You wouldn't agree?

3          PROSPECTIVE JUROR:  No.

4              MR. HALE:  Well, there's a child that was

5      killed; three other people that were injured.  The

6      defendant's on trial for murder.

7              Do you think that sympathy would enter into

8      your thinking at all?

9          PROSPECTIVE JUROR:  No, because I did not hear

10     the case.

11             MR. HALE:  Right.  But you will hear the case.

12         PROSPECTIVE JUROR:  Well, when that comes in,

13     I will see.  But right now I can't see.  Sympathy is not

14     anything to do with the case.

15             MR. HALE:  You know, it's a wait-and-see sort

16     of thing.  That's why we tell you a little bit about it.

17             Under those sort of circumstances, and you are

18     going to hear this sort of information, and I think

19     Mr. Simons had talked about some of the information as

20     things we don't necessarily want to hear but we have to,

21     about the examination of the child's body after death,

22     the treatment of the injuries of the other people.  Some

23     of that may be disquieting and may cause certain

24     emotions.

25             My question is, even if you do feel something

1    like that, can you put it aside beside the case in your

2    head?

3                PROSPECTIVE JUROR:   Of course.

4                MR. HALE:   Okay.

5                You understand why that is important, do you

6    not?

7                PROSPECTIVE JUROR:   Yes.

8                MR. HALE:   As is all sorts of other things.   I

9    mean, you know, this case is not about your feelings

10   about maybe anger either for what happened in this case

11   or anything else that happened in your outside lives.

12   You've got to decide it rationally on what you hear in

13   here.

14               You can agree to do that and you would do

15   that?

16               PROSPECTIVE JUROR:   Absolutely.

17               MR. HALE:   Absolutely.

18               Any problem with that at all, sir?

19               PROSPECTIVE JUROR:   No.

20               MR. HALE:   When we're talking about those sort

21   of feelings, that's why we talk about the testimony of

22   various people.  You know, you may have nothing in

23   common with the people who are testifying; they may not

24   even be people that you would ever care to associate

25   with.  Some of them, as the Court said, are police

1     officers.

2              Do you think that you can look at somebody and

3     decide whether or not they're being truthful?  I mean,

4     when you hear about them, whether you like them or not.

5              Do you think you would be able to do that?

6              PROSPECTIVE JUROR:  To decide just by looking

7     at them?

8              MR. HALE:  And listening to what they have to

9     say and everything.  Listen, we go through life and we

10    associate with people and we sit there and we go, you

11    know, gee, what a great guy.  Then other people, we say,

12    gee, what a blank.  You know.  But that doesn't mean

13    that the people who are that blank can't be truthful or

14    the people that are the nice guys can't be, you know,

15    making something up; right?.

16             PROSPECTIVE JUROR:  Yes.

17             MR. HALE:  Okay.

18             Again, can you listen to what they say and not

19    do it on impressions?

20             PROSPECTIVE JUROR:  Yes.

21             MR. HALE:  Okay.

22             And the same thing goes for everybody you're

23    going to see here in the courtroom.

24             Is there anybody here that thinks that they

25    can tell something about a person just by looking at

JURY VOIR DIRE                                        219

1   them or watching their mannerisms?

2              PROSPECTIVE JUROR:  Sometimes.

3              MR. HALE:  Sometimes?

4              PROSPECTIVE JUROR:  Can I ask a question?

5              MR. HALE:  Yeah, you can ask a question, sure.

6              PROSPECTIVE JUROR:  At the time of this scene,

7   how long did it take to arrest him?

8              MR. HALE:  That's not something I can answer.

9              THE COURT:  Let me say this, Mr. Richards.  If

10  you're selected as a juror, you will hear all of the

11  evidence.  Certainly, some of the questions that you may

12  be asking have no relevancy.  You will determine whether

13  it, in fact, has any relevancy as to whether the People

14  prove their case beyond a reasonable doubt.  Because, if

15  you're selected, you decide the facts.  I can't tell you

16  what the facts are, the attorneys can't tell you what

17  the facts are.  The evidence comes from the mouths of

18  the witnesses as you hear them, and you will decide

19  whether they're telling the truth, are mistaken, or

20  lying.  That's going to be your sole and exclusive job,

21  and an important job, the most important job.

22              You may continue.

23              MR. HALE:  Just to follow up on that a little

24  bit.  I understand you give out a lot of information,

25  you want a lot of information in return.

1              It really doesn't matter.  Because the fact

2     that he was arrested, it isn't evidence of anything.

3     The police making an arrest doesn't say whether he did

4     the crime or he didn't do the crime.  That's dependent

5     upon the evidence that you hear.  But it's a good

6     question.

7              Sir, you've been on a jury before; right?

8              PROSPECTIVE JUROR:  No.

9              MR. HALE:  You've never been on a jury before?

10             PROSPECTIVE JUROR:  I watch too much movie.

11             Go ahead.

12             MR. HALE:  That's what I was talking about

13    yesterday.  Everybody is looking at the movies and

14    stuff, and you get an idea about well, the police are

15    supposed to do this, or that assistant district attorney

16    should do that, and why is the judge saying that,

17    because they don't say that on TV.

18             Can you put all that stuff aside?

19             PROSPECTIVE JUROR:  I can put all that aside.

20    But the question I'm asking, the crime commit now, they

21    hold him now or they hold him two, three days after?

22             MR. HALE:  Wait and see.

23             PROSPECTIVE JUROR:  That's why I ask the

24    question.

25             THE COURT:  Okay.  As I said, as to whether it

1    has relevancy, you will decide it.  Because, if you look

2    at television shows, you know it never takes this long

3    to select a jury.  A jury is automatically in the jury

4    box.  They never show you the process by which they get

5    there, and that's a slow and a tedious process.

6              PROSPECTIVE JUROR:  Yes, ma'am.

7              MR. HALE:  Do you have any problems with

8    anything we talked about so far, sir, in terms of you

9    being a fair and impartial juror?  You know what I mean

10   by that, fair and impartial?  Giving everybody a share

11   shake and starting from a level playing field.

12             You can do that?

13             PROSPECTIVE JUROR:  Yes, I'm all right.

14             MR. HALE:  All right.

15             Ma'am, do you have anything in your background

16   that would cause you to be anything less than a fair and

17   impartial juror?

18             PROSPECTIVE JUROR:  Yes.  A child's life was

19   lost.

20             MR. HALE:  I'm sorry?

21             PROSPECTIVE JUROR:  A child's life was lost.

22   I sympathize with that.

23             MR. HALE:  That's the big thing here.

24   Frankly, we lost a lot of people yesterday.  When the

25   judge said there was a four-year-old child that had

1    died, there were a lot of people that couldn't be fair

2    about that sort of thing.

3                PROSPECTIVE JUROR:  Because I have nieces and

4    nephews.

5                MR. HALE:  People got kids, people got

6    grandkids, we were kids once.

7                The fact of the matter is on that, you know,

8    what it comes right down to is a human life is a human

9    life is a human life.  There's laws about that.  It's

10   not a question about whether a child died; that's a

11   given.  It's just a question about whether he's

12   criminally responsible for that.  Okay?

13               Do you think the fact that the child is a

14   victim would keep you from being fair and impartial in

15   this case?

16               PROSPECTIVE JUROR:  Yes.

17               MR. HALE:  Thank you for your honesty on that.

18               Is there anybody else that thinks that you got

19   a child victim here, among the victims, but the one that

20   died was a child, that would keep you from deciding this

21   case rationally, intellectually, and maybe make you less

22   than fair and impartial?  Anybody at all?

23               (NO RESPONSE)

24               MR. HALE:  Does anybody, from any personal

25   experience that you have had, think you would have any

1      sort of problem looking at police testimony in this

2      case?

3                  Ma'am, let me ask you that.

4                  PROSPECTIVE JUROR:  Yeah.  I've seen police

5      officers, the way the do it, especially looking at crime

6      scenes, like Law and Order, stuff like that.  I've seen

7      stuff like that before.  You can tell when they're

8      telling the truth or not.

9                  MR. HALE:  Let me ask you this.  Is there

10     anything about that that you think well, all police

11     officers and then fill in the blank.  Do you think that

12     there's something that you might, I don't know, maybe

13     prejudge a police officer even before you hear anything

14     that comes out of their mouth?

15                 PROSPECTIVE JUROR:  No, no.

16                 MR. HALE:  Listen, I can't pretend.  There are

17     people that have had great experiences with police

18     officers, there are people that have lousy experiences

19     with police officers.  We read stuff in the paper about

20     guys who perform as heroes, and we read stuff in the

21     papers about guys who are bums.  I mean, it's going to

22     happen when you have any group of 30, 35,000 people who

23     are doing a job like that.

24                 But is there anybody here who is going to sit

25     there and say well, because of those things, I don't

1   think that I could be fair to a police officer?  That

2   when I look at him, I think all police officers are and

3   then fill in the blank.

4           How do you feel about that?

5           PROSPECTIVE JUROR:  Well, I wouldn't feel that

6   all police officers is like that, no.

7           THE COURT:  There was a hand in the audience.

8           MR. HALE:  I did not see.

9           Thank you.

10          Yes, sir?

11          We talked a little bit about that when you

12  said about your situation.

13          PROSPECTIVE JUROR:  Yes.  I really don't feel

14  comfortable around cops.

15          MR. HALE:  That's fine.  You would say your

16  discomfort of that would keep you from listening to what

17  they had to say and deciding whether you believe them or

18  not; right?

19          PROSPECTIVE JUROR:  Yes, because the way I was

20  treated.

21          MR. HALE:  Because the way you were treated.

22          Again, here's a gentlemen who's had a specific

23  life experience, and there's maybe those of you who have

24  had friends who told you about other life experiences.

25  It's very, very important at this point that we know

1   whether you can look at this case with an open mind as

2   to the testimony of a police officer or any other

3   person.

4          Anybody at all have the same sort of problem

5   that this individual does from any personal experience

6   or anything that you've seen, anything you've heard

7   about?

8          (NO RESPONSE)

9          MR. HALE:  Mr. Baez, you said that your job,

10  actually you have police officer status in your job;

11  right?

12         PROSPECTIVE JUROR:  Peace officer status.

13         MR. HALE:  Peace officer status.  Okay.

14         You'll have to fill me in.  I don't know

15  exactly what the details of what you do are.  You're a

16  fire inspector; right?

17         PROSPECTIVE JUROR:  Yes.  I look for

18  violations in the fire code, especially pertaining to

19  sprinkler systems.  I write out violations and I have to

20  represent the Fire Department in court regarding those

21  violations.

22         MR. HALE:  Like summons court?

23         PROSPECTIVE JUROR:  So far just Environmental

24  Control Board court.

25         MR. HALE:  I guess then the question obviously

JURY VOIR DIRE                        226

1    is, along these same lines, since you are in I guess a

2    quasi law enforcement sort of situation, whether you

3    think you would favor one side or the other here, or

4    would you be able to keep an open mind?

5              PROSPECTIVE JUROR:  I would be able to keep an

6    open mind.

7              MR. HALE:  Okay.

8              Let me ask you, ma'am.  You talked about your

9    experience with the truck and with the City Marshal.

10   Did you end up being --  I know you witnessed what you

11   saw, but did you end up actually being a witness?  That

12   is, either testifying in the Grand Jury or in court?

13             PROSPECTIVE JUROR:  No.

14             MR. HALE:  Do you know what happened with that

15   guy's case at all?

16             PROSPECTIVE JUROR:  No.

17             MR. HALE:  That experience, you know, a lot of

18   people hear about crime, sometimes it affects our

19   families and we hear about it that way, but very few of

20   us actually are in a situation where we see something

21   going on like that.

22             Do you think that that experience would affect

23   you in this particular case?

24             PROSPECTIVE JUROR:  No.  Because the job that

25   I do, I deal with a lot of people on a daily basis.  I

JURY VOIR DIRE                                    227

1    go into people home, my job is to go into their home.

2    You know, I'm around a little bit of everybody.

3              MR. HALE:  Since your job is to go into

4    people's homes and to talk to people, do you think that

5    you would have any difficulty at all in terms of

6    listening to these people and evaluating their

7    testimony?

8              PROSPECTIVE JUROR:  No.

9              MR. HALE:  I'm sure some of the people whose

10   homes you go into by comparison are people you've never

11   had anything in common with.

12             PROSPECTIVE JUROR:  Right.

13             MR. HALE:  Do you think you would have any

14   problem listening to this?

15             PROSPECTIVE JUROR:  No, I wouldn't have a

16   problem.

17             MR. HALE:  How about in terms of your fellow

18   jurors?  I know that the group yesterday and the group

19   today might not necessarily you would think of them

20   being people who would the get together and talk, but do

21   you think you would have any problem with that?

22             PROSPECTIVE JUROR:  No.

23             MR. HALE:  Ma'am, how about you, any

24   difficulty with that one?

25             PROSPECTIVE JUROR:  No.

JURY VOIR DIRE                                    228

1          MR. HALE:  Who has had previous jury

2     experience?  You'll forgive me, because I'm up here and

3     my notes are over here.

4          You've previously had jury duty.  How old ago

5     was that, ma'am?

6          PROSPECTIVE JUROR:  About four or five years

7     ago.

8          MR. HALE:  And that was a criminal case?

9          PROSPECTIVE JUROR:  Yes.

10         MR. HALE:  Okay.  Don't tell me what the

11    verdict was, but what was the charge?

12         PROSPECTIVE JUROR:  Murder.

13         MR. HALE:  Murder.

14         And, again, don't tell me what the verdict

15    was, but did you reach a verdict?

16         PROSPECTIVE JUROR:  Yes, we did.

17         MR. HALE:  What did you think of that

18    experience, a positive experience or a negative

19    experience?

20         PROSPECTIVE JUROR:  Well, at first it started

21    off negative, then positive.

22         MR. HALE:  Is it the sort of thing that you

23    think you would be able to do?

24         PROSPECTIVE JUROR:  Yes.

25         MR. HALE:  Were you able to listen to --  You

1     know, all these things, I'm talking to all these people

2     about these concepts sort of in the abstract, but you

3     actually had to do it.

4             PROSPECTIVE JUROR:  Yes.

5             MR. HALE:  Were you able to make your decision

6     based just on the evidence and the law in that case?

7             PROSPECTIVE JUROR:  It took a little while,

8     but we did come to a decision.

9             MR. HALE:  All right.

10            And you were satisfied with your performance

11    as a juror?

12            PROSPECTIVE JUROR:  Yes, I was.

13            MR. HALE:  And you followed the law, didn't

14    you?

15            PROSPECTIVE JUROR:  Yes.

16            MR. HALE:  Ma'am, you were also a juror?

17            PROSPECTIVE JUROR:  Yes.

18            MR. HALE:  How long ago was that?

19            PROSPECTIVE JUROR:  Eight or nine years.

20            MR. HALE:  In a criminal case?

21            PROSPECTIVE JUROR:  In the Grand Jury.

22            MR. HALE:  In the Grand Jury.

23            The Grand Jury is a little bit different,

24    because you're just finding probable cause in the Grand

25    Jury.

JURY VOIR DIRE                                    230

1        Do you think that experience --  In that

2   experience you see most of the witnesses are police

3   officers, you see an assistant district attorney every

4   day, numbers of them.  Do you think that that experience

5   would affect you at all in this case?

6            PROSPECTIVE JUROR:  No.

7            MR. HALE:  The thing I'm going to ask both of

8   you to do is to forget everything you've heard in those

9   other times.  Can you forget everything you've heard in

10  those other cases or what you think the law may be from

11  those other situations, and listen to the judge as she

12  applies the law here?  Can you do that?

13           PROSPECTIVE JUROR:  Yes.

14           PROSPECTIVE JUROR:  Yes.

15           MR. HALE:  Can you keep that experience, you

16  know, shove it way back in the back and make your

17  decision just upon what you here in here?

18           PROSPECTIVE JUROR:  Yes.

19           PROSPECTIVE JUROR:  Yes.

20           MR. HALE:  Folks, my time is running short.

21  Is there anything that any of you in searching your own

22  background, looking inside of yourself, that you want to

23  say to me, anything that you think would affect your

24  ability to be a fair and impartial juror on this very

25  important matter?  Anybody think they would have any

1    problem whatsoever from something we haven't talked

2    about?

3              Yes, ma'am.

4              PROSPECTIVE JUROR:  You asked a question

5    yesterday about people's experience with mental health,

6    mental illness, mental deficiencies.

7              MR. HALE:  It's something that may come about

8    in this case, there may be some issue having to do with

9    psychiatry and mental issues.  There's a possibility

10   that you will hear from a psychiatric or psychological

11   professional for one side or the other.

12             So, is there anything about that that you

13   think would affect you?

14             PROSPECTIVE JUROR:  Yes.  I have personal

15   experience with a daughter who has a diagnosis of mental

16   illness.

17             MR. HALE:  Okay.

18             My question is, because you know that, do you

19   think that that would give you any particularized

20   knowledge or a leg up on hearing --  Say somebody comes

21   in and they talk about a diagnosis of somebody.  Are you

22   in a position where you could replace that person's

23   knowledge because you have some inside information?

24             PROSPECTIVE JUROR:  I've done a lot of

25   reading.

1          MR. HALE:  Okay.

2          PROSPECTIVE JUROR:  I've done a lot of reading

3   and a lot of research, and I have a lot of opinions

4   about it.

5          MR. HALE:  Do you have any opinions about it

6   in the context, we call it a forensic context, in the

7   context of court work and its use in courts?  Anything

8   about that at all?

9          PROSPECTIVE JUROR:  Just with my own reading.

10  I have had no personal experience.

11         MR. HALE:  Do you think you could be fair and

12  open-minded if you do hear health professionals talking

13  about mental illness or psychiatric issues and deciding

14  whether to credit the expert or not, or is your personal

15  experience going to keep you from being able to do that?

16         PROSPECTIVE JUROR:  My personal experience may

17  keep me from making a decision on that.

18         MR. HALE:  That brings up an interesting point

19  and, I forgot to ask it.

20         Again, it may come about that you may hear a

21  psychologist, a psychiatrist, it may come about in this

22  trial that you will have to make some sort of a decision

23  based upon psychiatric or psychological evidence.

24         Does anybody have any personal experience or

25  any personal opinion from something that you heard,

1     something that you read, from research that you may have

2     done that would keep you from having an open mind

3     listening to that sort of testimony or considering those

4     sort of issues?

5               Anything about that at all, sir?

6               PROSPECTIVE JUROR:  No.

7               MR. HALE:  Ma'am, any problem with that at

8     all?

9               PROSPECTIVE JUROR:  No.

10              MR. HALE:  Ma'am, any problem with that at

11    all?

12              PROSPECTIVE JUROR:  No.

13              MR. HALE:  I think I said yesterday, it runs

14    the gamut.  People have opinions about psychiatry and

15    psychology, whether it's something that is viable or

16    whether it's something that's not.

17              Again, do you have any such opinion that would

18    keep you from having an open mind?

19              PROSPECTIVE JUROR:  No.

20              MR. HALE:  Ma'am, how about you, any problem

21    with that at all?

22              PROSPECTIVE JUROR:  No.

23              MR. HALE:  Okay, folks, thank you very much.

24              Does anybody have anything else?

25              (NO RESPONSE)

1          MR. HALE:  You don't have any further

2     questions?  You're sure?

3          PROSPECTIVE JUROR:  Yes.

4          MR. HALE:  Okay.  Very good.

5          Thank you very much for your time.

6          THE COURT:  Certainly, jurors, I'm going to

7     remind you that the defense has no obligation or burden

8     to do anything whatsoever, so certainly defense counsel

9     need not ask any questions.

10         That being said, Mr. Simons, do you wish to

11    inquire?

12         MR. SIMONS:  Yes.

13         Good morning, ladies and gentlemen.

14         I don't have a lot of questions for you.  Once

15    again, I apologize if I get your name wrong.  I have a

16    chart, but I know I will get your names wrong.

17         If there's anything that you want to say to

18    me, any questions, please feel free to ask it.

19         Let me just start off with you, Mr. Richards.

20    I didn't hear all of it.  You said you were 80 years

21    old?

22         PROSPECTIVE JUROR:  Born 1928, 15th of March.

23         MR. SIMONS:  Happy birthday.

24         PROSPECTIVE JUROR:  Thank you very much.

25         MR. SIMONS:  Let me go to Miss Hills.

JURY VOIR DIRE                     235

1          I ask you the question, similar to what I did

2     yesterday, this is kind of open to everybody:  Have you

3     heard anything so far since you've been in here that

4     would help you decide this case at all?

5               PROSPECTIVE JUROR:  No.

6               MR. SIMONS:  Does everyone agree with that?

7               (AFFIRMATIVE RESPONSE FROM JURORS)

8               MR. SIMONS:  Okay.

9               Miss Archer?

10              PROSPECTIVE JUROR:  Yes.

11              MR. SIMONS:  Now, you had mentioned that --  I

12    believe you said it was your husband's younger brother

13    who was killed, you said, about twelve years ago?

14              PROSPECTIVE JUROR:  Yes.

15              MR. SIMONS:  I missed it.  You said it wasn't

16    in Brooklyn, it was someplace else?

17              PROSPECTIVE JUROR:  Yes.

18              MR. SIMONS:  I think you might have been asked

19    that.  Do you remember, was anyone arrested?

20              PROSPECTIVE JUROR:  Yes, someone was arrested.

21              MR. SIMONS:  Was there a trial?

22              PROSPECTIVE JUROR:  There was.

23              MR. SIMONS:  Did you attend the trial at all?

24              PROSPECTIVE JUROR:  No.

25              MR. SIMONS:  But did you hear about it?

1        PROSPECTIVE JUROR:  I did, from my husband and

2    my mother-in-law.

3        MR. SIMONS:  Now, do you feel anything you

4    might have heard--you don't have to tell us what you

5    heard--about the trial or what happened, do you think

6    that may affect you in any way in evaluating this case?

7        PROSPECTIVE JUROR:  No.

8        MR. SIMONS:  Let me go to Miss Holness?

9        PROSPECTIVE JUROR:  Yes.

10        MR. SIMONS:  Now, you mentioned at some point

11    you did serve in the Grand Jury; correct?

12        PROSPECTIVE JUROR:  Yes.

13        MR. SIMONS:  How long ago was that?

14        PROSPECTIVE JUROR:  Eight, nine years ago.

15        MR. SIMONS:  Would you be able to kind of

16    forget everything you've heard in the Grand Jury and

17    just follow the judge's instruction?  It is different.

18        PROSPECTIVE JUROR:  Yes.

19        MR. SIMONS:  You won't have a problem with

20    that?

21        PROSPECTIVE JUROR:  No.

22        MR. SIMONS:  And you mentioned that the case

23    involving your son, I believe you said there was a

24    trial?

25        PROSPECTIVE JUROR:  Yes.

1              MR. SIMONS:  Did you attend the trial?

2              PROSPECTIVE JUROR:  Yes.

3              MR. SIMONS:  Did you testify?

4              PROSPECTIVE JUROR:  No.

5              MR. SIMONS:  Do you think anything about the

6       trial, the way the defense attorney asked questions or

7       didn't ask questions, the way the prosecutor handled the

8       case, or the way the judge handled that case, do you

9       think that will affect you in any way in how you would

10      evaluate this case?

11             PROSPECTIVE JUROR:  No.

12             MR. SIMONS:  You would be able to forget

13      everything --

14             PROSPECTIVE JUROR:  I would not forget

15      everything.  I would never forget it.

16             MR. SIMONS:  I mean, when you decide this

17      case, will you be able to forget how the judge acted,

18      how the defense attorney acted, and just evaluate this

19      case not on what happened with your son's trial but with

20      actually happens in this case?

21             PROSPECTIVE JUROR:  Yes.

22             MR. SIMONS:  I didn't want you to forget it.

23             Thank you.

24             Now, let me as Miss Castle.

25             I believe you stated that at some point many

1    years ago your ex-husband was involved in some domestic

2    violence?

3              PROSPECTIVE JUROR:  Yes, I got a broken hand

4    over a stupid argument.  He broke my hand.

5              MR. SIMONS:  Was he arrested?

6              PROSPECTIVE JUROR:  He was arrested.

7              MR. SIMONS:  Was there a trial involved?

8              PROSPECTIVE JUROR:  No, trial.  He just went

9    to anger management.

10             MR. SIMONS:  Were you satisfied the way the

11   case was handled?

12             PROSPECTIVE JUROR:  Yes.

13             MR. SIMONS:  Was that in Brooklyn?

14             PROSPECTIVE JUROR:  In Brooklyn.

15             MR. SIMONS:  Anything about that that will

16   affect you in any way in evaluating this case?

17             PROSPECTIVE JUROR:  No.

18             MR. SIMONS:  Let me ask Miss Lovisi.  Now you

19   said that --  I believe you work in the Post Office.

20             PROSPECTIVE JUROR:  Yes.

21             MR. SIMONS:  And I believe your --  is it your

22   husband who works in the Post Office?

23             PROSPECTIVE JUROR:  Yes.

24             MR. SIMONS:  Now, it's possible, I'm not sure,

25   one of the witnesses may be a current employee with the

1    Post Office or a former employee of the Post Office.  I

2    guess the question is would you evaluate this person,

3    because they either used to work for the Post Office or

4    currently work for the Post Office --

5              PROSPECTIVE JUROR:  No, a lot of people work

6    for the Post Office.

7              MR. SIMONS:  -- differently than someone else?

8              PROSPECTIVE JUROR:  No, not at all.

9              MR. SIMONS:  So, that wouldn't be a problem.

10             PROSPECTIVE JUROR:  No.

11             MR. SIMONS:  Like I said, if I don't get to

12   everyone, I apologize.

13             Mr. Baez, you mentioned as part of your job

14   you have gone before a court and you've presented, I

15   guess, evidence regarding violations.

16             PROSPECTIVE JUROR:  Let me try to describe it.

17   I basically sit before a judge in Environmental Control

18   Board court.  It's just a small room.  It's myself

19   basically giving testimony as to what I saw and wrote,

20   kind of backing it up, saying yes, this is indeed what I

21   saw, the violations.  Then there's a Fire Department

22   representative who talks to the judge and the person.

23             MR. SIMONS:  Do you get cross-examined by

24   lawyers?

25             PROSPECTIVE JUROR:  Sometimes.  Sometimes a

1    lawyer will ask me a question like, "Are you sure you

2    were really there at that building?"

3              MR. SIMONS:   Now, has anything happened as you

4    were working that you believed you --

5              Withdrawn.

6              Has anything happened to you that you believe

7    may affect on how you evaluate either the way I ask

8    questions of the witness, the way the witnesses react,

9    or anything in this trial?

10             PROSPECTIVE JUROR:   No.

11             MR. SIMONS:   Let me get to the other people

12   over here.

13             Miss Torres, I believe you had mentioned I

14   believe something about your son's friend was injured

15   and I believe you said you would have a problem with

16   that.   Correct?

17             PROSPECTIVE JUROR:   Yes.

18             MR. SIMONS:   Would the problem be you would

19   have trouble evaluating this case fairly because of what

20   happened to your son's friend?

21             PROSPECTIVE JUROR:   Yes.

22             MR. SIMONS:   Okay.

23             Mr. Ooi, you had also mentioned that twenty

24   years ago, I believe, you were robbed?

25             PROSPECTIVE JUROR:   Yes.

1           MR. SIMONS:  And something happened with that

2    which you believe will affect you in this case?

3           PROSPECTIVE JUROR:  Yes.

4           MR. SIMONS:  Whatever happened, do you believe

5    that will affect you in evaluating the evidence fairly

6    in this case?

7           PROSPECTIVE JUROR:  Yes.

8           MR. SIMONS:  Does anyone have any questions

9    for me?

10          (NO RESPONSE)

11          MR. SIMONS:  Well, then, thank you very much.

12          THE COURT:  Jurors, what's going to happen at

13   this time is myself and the attorneys will discuss who's

14   to be selected to sit on this jury panel.

15          Jurors, if you're not selected to sit on this

16   case, please don't take it as any indication or a

17   statement about your character or self-worth.  It is

18   not.

19          Again, we have the highest responsibility to

20   choose as trial jurors those individuals who will be

21   fair and impartial and give both sides a fair trial,

22   which they're entitled to receive.

23          Again, jurors, I will instruct you please

24   don't discuss any aspect of this case amongst yourselves

25   or with anyone else, or permit anyone else to discuss it

1   in your presence, because you haven't heard any evidence

2   and it would be unfair to speculate about what you may

3   hear during the course of this trial.  Because to do so

4   would be to go in with a made up mind, and certainly

5   that is contrary to everything that I've told you.

6   Again, if you're selected as a juror, you have to have

7   an open mind and be willing to listen to all of the

8   evidence in this case.

9            That being said, certainly, jurors, what I'm

10  going to have you do is to follow the directions of the

11  Clerk, and you'll remain in the area that he will show

12  you to because there are other jurors outside and I do

13  not want you to get commingled with the other jurors.

14  That's very important.

15           So you'll follow the direction of the court

16  Clerk and he'll show you the area that you should wait.

17           Do not come back into the courtroom until

18  you're brought back in by one of the court officers.

19           (At this time, the panel of prospective jurors

20  left the courtroom)

21           THE COURT:  Certainly, I'll give both sides an

22  opportunity to go over their notes.

23           When I asked to speak to counsel at sidebar,

24  that was in reference to prospective juror seventeen,

25  who originally came up to speak to the Court.

JURY VOIR DIRE                              243

1         Since that time, juror number nineteen was a

2    viable juror.  But certainly jurors twenty through

3    twenty-three also was in the group of people who came up

4    and said that they could not serve because of time

5    constraints, and we previously agreed would be excused

6    for cause but not at the time that they were asking.

7         That being said, I'll give both sides an

8    opportunity to go over their notes.

9         (Pause in the proceedings)

10        THE COURT:  Are both sides ready?

11        MR. SIMONS:  Yes.

12        MR. HALE:  Yes.

13        THE COURT:  How many sworn jurors do we have,

14   Barry?

15        THE CLERK:  Four.

16        THE COURT:  People, any challenges for cause

17   as to prospective jurors one through eight?

18        MR. HALE:  No.

19        THE COURT:  Defense?

20        MR. SIMONS:  No.

21        THE COURT:  Any peremptory challenges, People,

22   as to prospective jurors one through eight?

23        MR. HALE:  Yes.

24        Number six, Miss Ferreira.

25        THE COURT:  Is that it?

JURY VOIR DIRE                    244

1            MR. HALE:  Yes, that is it.

2            THE COURT:  Any peremptory, Defense, as to the

3     remaining jurors, one through eight?

4            MR. SIMONS:  Number one.

5            THE COURT:  Is that it?

6            MR. SIMONS:  No.

7            Number four, Miss Hills.

8            (Pause in the proceedings)

9            THE COURT:  Is that it, Mr. Simons?

10           MR. SIMONS:  And number seven, Miss Holness.

11           THE COURT:  Is that it?

12           MR. SIMONS:  That is it.

13           THE CLERK:  Judge, I missed the People's

14     perempt.

15           MR. HALE:  Number six.

16           THE CLERK:  So Yvrote Duplan becomes juror

17     number five.

18           Robert Camp becomes juror number six.

19           Irma Archer becomes juror number seven.

20           Baynes Richards becomes juror number eight.

21           We have eight selected jurors.  The People

22     have used four challenges; the defense has used eight.

23           THE COURT:  Any challenges for cause as to

24     prospective jurors nine through twelve?

25           People?

-VMG-

JURY VOIR DIRE                                245

1               MR. HALE:  Number nine.

2               MR. SIMONS:  I have no objection.

3               THE COURT:  Number nine will be excused for

4    cause, on consent.

5               Is that it for your cause challenge?

6               MR. HALE:  That's it for cause up to juror

7    number twelve.

8               THE COURT:  Any cause challenges as to the

9    remaining jurors, ten through twelve?

10              MR. SIMONS:  No.

11              THE COURT:  Any peremptory challenges, People,

12   as to jurors ten through twelve?

13              MR. HALE:  Number eleven, Miss Wright.

14              That's it.

15              THE COURT:  Any peremptory challenges as to

16   the remaining jurors, ten and twelve?

17              MR. SIMONS:  Number ten.

18              THE COURT:  Is that it?

19              MR. SIMONS:  Yes, that's it.

20              THE CLERK:  So Lucille Lovisi becomes juror

21   number nine.

22              The People have used five challenges; the

23   Defense has used nine.

24              THE COURT:  Any challenges for cause as to

25   prospective jurors thirteen through fifteen?

JURY VOIR DIRE                                  246

1              People?

2              MR. HALE:  Ms. Dalleo Locascio, seat thirteen.

3    Because of the psychiatric issue, she couldn't be fair.

4              MR. SIMONS:  No objection.

5              THE COURT:  Number thirteen will be excused

6    for cause, on consent.

7              MR. HALE:  That's all for cause.

8              THE COURT:  Any cause challenges as to

9    prospective jurors fourteen and fifteen?

10             Defense?

11             MR. SIMONS:  No.

12             THE COURT:  Any peremptory challenges, People,

13   as to fourteen and fifteen?

14             MR. HALE:  Fourteen.

15             THE COURT:  Any peremptory challenge as to the

16   remaining juror, Defense, number fifteen?

17             MR. SIMONS:  Number fifteen.

18             THE CLERK:  The People have used six

19   challenges; the Defense has used ten challenges.

20             THE COURT:  Any challenges for cause as to

21   sixteen through eighteen?

22             Again, I would point out that number

23   seventeen, Miss Rosales, initially came up to speak to

24   us in regard to the fact that she could not devote the

25   time needed on this case.  Originally, I indicated to

1      both sides that I would excuse her but not at the time

2      that she was requesting, and she was told to have a seat

3      back in the audience.

4                  MR. HALE:  Yes, she would be a cause challenge

5      then.

6                  MR. SIMONS:  I have no objection.

7                  THE COURT:  So, number seventeen is excused

8      for cause, as previously noted by the parties, Counsel.

9                  Any challenges for cause as to jurors sixteen

10     and eighteen?

11                 People?

12                 MR. HALE:  No.

13                 THE COURT:  Cause challenges as to sixteen and

14     eighteen?

15                 MR. SIMONS:  No.

16                 THE COURT:  Any peremptory challenges, People,

17     as to sixteen and eighteen?

18                 MR. HALE:  Sixteen.

19                 That's it.

20                 THE COURT:  Any peremptory challenges,

21     Defense, as to number eighteen?

22                 MR. SIMONS:  Yes.

23                 THE CLERK:  The People have used seven

24     challenges; the Defense has used eleven challenges.

25                 We have nine selected jurors.

JURY VOIR DIRE                                 248

1          THE COURT:  Any challenges for cause as to

2     number nineteen, People?

3          MR. HALE:  Yes.  She had the thing with the

4     child who was shot and beaten with the hammer, she said

5     she couldn't be fair.

6          MR. SIMONS:  No objection.

7          THE COURT:  Number nineteen will be excused

8     for cause, on consent.

9          Also let me point out again that jurors

10    twenty, twenty-one, twenty-two and twenty-three were

11    jurors who indicated they could not serve because of

12    time constraints, and in addition some mentioned some

13    additional reasons why they could not serve.  So, it's

14    on consent that the Court will excuse prospective jurors

15    twenty, twenty-one, twenty-two, and twenty-three.

16          Is that correct?

17          MR. SIMONS:  Yes.

18          MR. HALE:  As previously agreed, yes, your

19    Honor.

20          THE COURT:  Again, what I will do with the

21    sworn jurors from this panel is to indicate to them that

22    they should return on Monday morning at 10 a.m.

23          MR. HALE:  Your Honor, do you think it would

24    be possible after we do this just to have a very short

25    break before we bring in the next group?

1                THE COURT:  Absolutely.

2                MR. HALE:  I appreciate it.  Thank you.

3                COURT OFFICER:  Do you want the panel, Judge?

4                THE COURT:  Yes.

5                (Pause in the proceedings)

6                COURT OFFICER:  Ready for the panel, Judge?

7                THE COURT:  Both are sides ready?

8                MR. HALE:  Yes.

9                MR. SIMONS:  Yes.

10               COURT OFFICER:  Panel entering.

11               (At this time, the panel of prospective jurors

12       entered the courtroom)

13               THE CLERK:  Ladies and gentlemen, we have

14       selected five additional jurors.  Please listen for your

15       name and answer here or present.

16               Yvrote Duplan.

17               PROSPECTIVE JUROR:  Present.

18               THE CLERK:  Thank you.

19               Robert Camp.

20               PROSPECTIVE JUROR:  Present.

21               THE CLERK:  Thank you.

22               Irma Archer.

23               PROSPECTIVE JUROR:  Present.

24               THE CLERK:  Thank you.

25               Baynes Richards.

1          PROSPECTIVE JUROR:  Here.

2          THE CLERK:  Thank you.

3          Lucille Lovisi.

4          PROSPECTIVE JUROR:  Here.

5          THE CLERK:  Thank you.

6          If I called your name, remain seated.  If I

7     have not called your name, go back downstairs to the

8     second floor, Central Jury, with the thanks of the

9     Court.

10          If I called your name, remain seated.  If I

11     didn't, go down to Central Jury.

12          (At this time, the unselected panel of

13     prospective jurors left the courtroom)

14          THE CLERK:  Will the five selected jurors

15     please rise and raise your right hand and answer the

16     following question:

17          Do you and each of you sincerely and solemnly

18     swear or affirm that you will try this case in a just

19     and impartial manner, to the best of your judgment, and

20     that you will render a verdict according to the law and

21     the evidence.

22          Please say I do.

23          (AFFIRMATIVE RESPONSE FROM JURORS)

24          THE CLERK:  Thank you.

25          Be seated, please.

1        THE COURT:  Again, jurors, you can see that

2   jury selection is a slow and a tedious process, but the

3   most important process.

4        You've been selected because it's been

5   determined that you will be fair and impartial and give

6   both sides a fair trial, which they're entitled to

7   receive.

8        Jurors, certainly at this point we have not

9   completed jury selection.  However, rather than make you

10   sit through another round of jurors being selected, the

11   attorneys have been gracious enough to agree with the

12   Court that at this point you will be excused for the

13   rest of this day.

14        Now, for those of you who are working and you

15   have jobs, we will not be in session with this case on

16   tomorrow, which is Friday.  So that if you're working,

17   you have to return to your places of employment on

18   Friday.

19        This case is scheduled to begin with testimony

20   on Monday morning at 10 a.m., and that's May 5th.

21        Let me say this, jurors, that certainly I'm

22   going to remind you that you may not visit the premises

23   or area where the offenses allegedly took place.

24        You may not discuss any aspect of this case

25   amongst yourselves or with anyone else, or permit anyone

JURY VOIR DIRE                                          252

1    else to discuss it in your presence.

2              I do not anticipate this case appearing in the

3    media, but as a precaution, I would have to mention that

4    you may not listen to any media accounts.

5              Also, jurors, when you return on Monday

6    morning, May 5th, at 10 a.m., you will go to the jury

7    room and the officer will show you the jury room that

8    you will report to on that date.  So you will not come

9    into the courtroom, you will go directly there.

10             At this point, I'm going to excuse you.

11   You'll follow the direction of the officer, and he will

12   certainly be able to give you more information if you

13   need more information.

14             (At this time, the sworn jurors left the

15   courtroom)

16             THE COURT:  At this time, we'll take a brief

17   recess.

18             Certainly, if Mr. Waiters has to use the rest

19   room, now will be a good time to do so.

20             *         *         *         *         *

21             (RECESS TAKEN)

22

23             THE CLERK:  Case on trial, General Waiters.

24             All parties are present.

25             THE COURT:  Any matters you want to put on the

PROCEEDINGS                              253

1    record before we begin?

2              MR. HALE:  I do, your Honor.

3              The Court had taken a break after we had

4    selected the last round of jurors, and then became

5    involved with a note from its deliberating jury.

6              During that time period, the new venire of the

7    supplemental panel, I don't know how many people it

8    is --

9              THE COURT:  Fifty-five.

10             MR. HALE:  -- were in the area outside the

11   courtroom toward the windows in the lobby area.

12             I had gone out of the courtroom and was

13   returning when I encountered a gentleman, whom I've

14   known for fifteen years, Terrence Jackson.  I knew him

15   in conjunction with a case that didn't work out to his

16   satisfaction.  Let's put it that way.

17             THE COURT:  And it's unrelated to the matter

18   before the Court?

19             MR. HALE:  Completely unrelated.  Like I said,

20   it's fifteen years old.

21             Mr. Jackson has appeared in many courtrooms as

22   a court watcher.  He has always appeared in my

23   courtrooms.  Sometimes he's very cordial to me; on other

24   times he has an ax to grind.

25             Today, when I was approaching the courtroom,

PROCEEDINGS                                              254

1    he accosted me and started yelling at me concerning what

2    I was doing and whether I would be miscarrying justice

3    once again, and that my boss ought to resign.

4              I was trying to shush him up without being

5    obvious, but this is going on in full view of all the

6    members of the venire, where he was calling me by name.

7              Apparently, after I had entered the courtroom,

8    Terrence Jackson remained outside, and Assistant

9    District Attorney Howard Jackson, who has the

10   deliberating jury with the Court, who came in after I

11   did, observed Terrence Jackson still in that same area,

12   actually talking directly to people who were seated and

13   who are prospective jurors in our case about the

14   District Attorney's Office, identifying Howard Jackson

15   by name, having identified me by name.

16             My opinion, your Honor, since we haven't done

17   anything with these people at all, and because of the

18   Court's work with the other jury our morning is just

19   about shot here anyway, I would ask that the Court get

20   another venire panel to fill out this jury, if that is

21   possible.

22             I think that rather than going through it and

23   having to make inquiry of each and every one of these

24   individuals what they observed, and after the Court

25   introduces me and then have to say well, did you observe

PROCEEDINGS                    255

1    a confrontation between Mr. Hale and this other person?

2    What did you hear?  What you did think?  It might just

3    be more expedient to get a new group of individuals.

4              MR. SIMONS:  Actually, your Honor, I have

5    really no opinion on this.

6              Just so the Court would know, I was in the

7    hallway, but I did not see the encounter because I was

8    hiding in Judge Lott's courtroom because I saw some of

9    our regular jurors by the elevator and I did not want to

10   stand out in the hall.  But I did hear someone ranting

11   at some point in the hallway.  But, by the time I came

12   out, it was over.

13             Whatever the Court wants to do, it's not a

14   problem with the defense.

15             MR. HALE:  I understand that Terrence Jackson

16   has been escorted off the floor.

17             Is that correct?

18             THE SERGEANT:  That's correct.

19             MR. HALE:  And won't cause us any more

20   problems.

21             As I said, he has good days and bad days, but

22   today was a bad day.

23             THE COURT:  Let me say this.  In order to err

24   on the side of caution, certainly we can inquire whether

25   there are any additional jurors.  I can tell you now

-VMG-

PROCEEDINGS                                    256

1      that there are no fresh jurors on Friday.  So, we would

2      be working with whatever they have.  If not, we have to

3      do it on Monday.  That may be the other alternative.

4      We'll see what we can do.

5                    *         *         *         *         *

6                    (RECESS TAKEN)

7

8                    THE CLERK:  Case on trial continued.

9                    COURT OFFICER:  Ready for the panel, Judge?

10                   THE COURT:  Both are sides ready?

11                   MR. HALE:  Yes.

12                   MR. SIMONS:  Yes.

13                   COURT OFFICER:  Panel entering.

14                   (At this time, the panel of prospective jurors

15     entered the courtroom)

16                   THE CLERK:  Will the jurors please rise and

17     raise your right hand and answer the following question:

18                   Do you and each of you sincerely and solemnly

19     swear or affirm that you will answer truthfully all

20     questions asked of you relating to your qualifications

21     to serve as a juror in this action?

22                   Please say I do.

23                   (AFFIRMATIVE RESPONSE FROM JURORS)

24                   THE CLERK:  Thank you.

25                   Be seated, please.

-VMG-

PROCEEDINGS                                257

1          THE COURT:   Good afternoon, jurors.

2          My name is Judge Deborah Dowling, and I will

3    be the judge presiding at this trial.

4          I know that it's a little bit over the

5    luncheon recess, so I'm not going to keep you.   I just

6    didn't want you to be out in the hallway and not be

7    brought in and have the opportunity for me to introduce

8    myself.

9          Certainly, I'm just going to briefly introduce

10   the parties at this time.   After we return from lunch, I

11   will give you a further formal introduction.

12         Certainly, we have an assistant district

13   attorney here, Mr. Mark Hale.

14         MR. HALE:   Thank you, Judge.

15         Good afternoon, ladies and gentlemen.

16         THE COURT:   And we have defense counsel,

17   Mr. Calvin Simons.

18         MR. SIMONS:   Good afternoon.

19         THE COURT:   And we have the defendant here,

20   Mr. General Waiters.

21         THE DEFENDANT:   Good afternoon.

22         THE COURT:   I introduce them, jurors, because

23   of the fact if you see them over the luncheon recess,

24   please don't stop them, don't ask them when do we get

25   started, when can I leave, or anything else.   They will

PROCEEDINGS                          258

1    not answer your questions; they will not speak to you.

2    So it's important that you do not try to speak to them.

3              At this time, jurors, I'll permit you to take

4    your luncheon recess, and you'll return at --  Well,

5    since it's after one, I want to be fair.  You'll return

6    at 2:15.

7              Please be here on time so we can get started

8    on time.

9              Do not come back into the courtroom until the

10   court officer has come out to bring you into the

11   courtroom.

12             You'll enjoy juror lunch, and I'll see you at

13   2:15.

14             This is courtroom 20.21.

15             THE CLERK:  Judge, this is the last juror.

16             Sir, I'll have to swear you in like I sworn in

17   the entire panel.

18             Raise your right hand, sir.

19             Do you solemnly swear or affirm that you will

20   answer truthfully all questions asked of you relating to

21   you as qualifications to serve as a juror in this

22   action?

23             PROSPECTIVE JUROR:  I do.

24             THE COURT:  Sir, you have to return back at

25   2:15.

PROCEEDINGS                              259

1              You'll come directly to this part, which is

2      courtroom 20.21.  Remain outside until you're brought

3      back in by one of the court officers.

4              Enjoy your lunch, sir.

5              PROSPECTIVE JUROR:  Thank you.

6              (At this time, the prospective juror left the

7      courtroom)

8              THE COURT:  I'll see the parties at 2:15.

9              *         *         *         *

10             (At this time, a luncheon recess was taken,

11     and the trial adjourned to 2:15 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                    260

1                   A F T E R N O O N   S E S S I O N

2

3              THE CLERK:  Case on trial, General Waiters.

4              All parties are present.

5              COURT OFFICER:  Ready for the panel, Judge?

6              THE COURT:  Both sides are ready?

7              MR. HALE:  Yes.

8              MR. SIMONS:  Yes.

9              COURT OFFICER:  Panel entering.

10             (At this time, the panel of prospective jurors

11        entered the courtroom)

12             THE COURT:  Good afternoon, jurors.

13             Jurors, I really owe you an apology because of

14        the fact that I'm certainly on trial and the jury

15        requested readback.  So, I had to make sure they got the

16        testimony that they wanted to have read back to them.

17             So, what did that was, it pushed back

18        everything and it caused the Court to keep you waiting.

19        I tell you that because I don't want you to think that

20        somehow the Court or the attorneys or the parties here

21        were just ignoring you.  That is far from the case.

22             Certainly, as I said, I apologize for the

23        inconvenience.  You're going to be even more

24        inconvenienced because as of now you must return

25        tomorrow at 9:30.

- VMG -

PROCEEDINGS                    261

1           At that time, jurors, I will, in fact, tell

2   you what the case is about and further question you to

3   see if, in fact, you are the kind of juror qualified to

4   sit on this particular case.

5           So, again, I apologize.  But you must return

6   tomorrow morning at 9:30.  You'll come directly back to

7   this part.

8           At 9:30, we should be prepared, as I said, for

9   me to tell you what the case is about and then to begin

10  the process of questioning you.  Because it is a process

11  that is important, it is a tedious process, but the most

12  important.  Because we must find jurors who will be fair

13  and impartial to give both sides a fair trial.

14          So, again, I thank you for your patience.  I'm

15  going to ask that you leave now.

16          Have a good evening, and I'll see you tomorrow

17  at 9:30.

18          (At this time, the panel of prospective jurors

19  left the courtroom)

20          THE COURT:  I'll see the parties tomorrow at

21  9:30.

22          *          *          *          *          *

23          (At this time, court stands in recess, and the

24  trial adjourned to Friday, May 2, 2008, at 9:30 a.m.)

25

PROCEEDINGS                                262

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS : CRIMINAL TERM : PART 1

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK     :     INDICTMENT NO.
                                                    3464/06
          - against -                   :

GENERAL WAITERS                         :

                    DEFENDANT           :     JURY VOIR DIRE

- - - - - - - - - - - - - - - - - - - -X

                              320 JAY STREET
                              BROOKLYN, NEW YORK  11201

                              MAY 2, 2008

BEFORE:    HONORABLE DEBORAH A. DOWLING, JUSTICE

APPEARANCES:

          CHARLES J. HYNES, ESQ.
              District Attorney, Kings County
              BY:  MARK HALE, ESQ.
                   Assistant District Attorney

          CALVIN J. SIMONS, ESQ.
              Attorney for Defendant
              616 Eastern Parkway
              Brooklyn, New York

                              VINCENT M. GERALDI, JR.
                              SENIOR COURT REPORTER

                         -VMG-

PROCEEDINGS                                    263

1              THE CLERK:  This is the case on trial,

2      Indictment 3464 of '06, General Waiters.

3              All parties are present.

4              THE COURT:  Any matters to go on the record

5      before the prospective jury panel is brought in?

6              MR. SIMONS:  No.

7              MR. HALE:  Not for me, your Honor.  No, thank

8      you.

9              THE COURT:  Just to remind both sides, you

10     have twenty minutes for the first round.  Any questions

11     you wish to ask, certainly, that's the time.

12              Let's get the panel in, please.

13              (Pause in the proceedings)

14              COURT OFFICER:  Ready for the jury, Judge?

15              THE COURT:  Both sides are ready?

16              MR. HALE:  Yes.

17              MR. SIMONS:  Yes.

18              COURT OFFICER:  Panel entering.

19              (At this time, the panel of prospective jurors

20     entered the courtroom)

21              THE COURT:  Good morning, ladies and

22     gentlemen.

23              Again, I'm going to reintroduce myself.  My

24     name is Judge Deborah Dowling, and I will be the judge

25     presiding at this trial.

Case 1:13-cv-03636-DLI   Document 6-1   Filed 09/18/13   Page 298 of 452 PageID #: 356

1          Now, the People are represented by the

2    District Attorney of this county, Mr. Charles Hynes.

3    Seated to my left is assistant district attorney

4    Mr. Mark Hale.

5          MR. HALE:  Thank you, your Honor.

6          Good morning, ladies and gentlemen.

7          THE COURT:  He will be presenting evidence to

8    you in this case.

9          Seated to my right is defense counsel,

10   Mr. Calvin Simons.

11         MR. SIMONS:  Good morning.

12         THE COURT:  And he represents the defendant in

13   this case, who is seated next to him, Mr. General

14   Waiters.

15         THE DEFENDANT:  Good morning.

16         THE COURT:  The case on trial is the People of

17   the State of New York against General Waiters.

18         The defendant stands accused by way of an

19   indictment.  The indictment accuses the defendant of the

20   following:

21         First count:  The Grand Jury of the County of

22   Kings, by this indictment, accuses the defendant of the

23   crime of Murder in the Second Degree, Penal Law Section

24   125.25(1), committed as follows:

25         The defendant, on or about May 7, 2006, in the

-VMG-

1    County of Kings, with intent to cause the death of

2    Lorenzo Warren, caused the death of Tajmere Clark, by

3    shooting her with a deadly weapon, namely:  a revolver,

4    thereby inflicting various wounds and injuries upon

5    Tajmere Clark, and thereafter and on or about May 7,

6    2006, Tajmere Clark died of the wounds and injuries.

7        Second count:  The Grand Jury of the County of

8    Kings, by this indictment, accuses the defendant of the

9    crime of Attempted Murder in the Second Degree, Penal

10   Law Section 110/125.25 (1), committed as follows:

11       The defendant, on or about May 7, 2006, in the

12   County of Kings, with intent to cause the death of

13   Lorenzo Warren, attempted to cause the death of Lorenzo

14   Warren by means of a deadly weapon, namely:  a revolver.

15       Third count:  The Grand Jury of the County of

16   Kings, by this indictment, accuses the defendant of the

17   crime of Assault in the First Degree, Penal Law Section

18   120.10(1), committed as follows:

19       The defendant, on or about May 7, 2006, in the

20   County of Kings, with intent to cause serious physical

21   injury to Lorenzo Warren, caused such injury to Lorenzo

22   Warren by means of a deadly weapon, namely:  a revolver.

23       The subject matter of this count being an

24   armed felony, as defined in Section 1.20 of the Criminal

25   Procedure Law.

JURY VOIR DIRE                              266

1          Fourth count:  The Grand Jury of the County of

2     Kings, by this indictment, accuses the defendant of the

3     crime of Assault in the First Degree, Penal Law Section

4     120.10(1), committed as follows:

5          The defendant, on or about May 7, 2006, in the

6     County of Kings, with intent to cause serious physical

7     injury to Lorenzo Warren, caused such injury to Mary Lee

8     Clark, by means of a deadly weapon, namely:  a revolver.

9          The subject matter of this count being and

10    armed felony, as that term is defined in Section 1.20 of

11    the Criminal Procedure Law.

12         Fifth count:  The Grand Jury of the County of

13    Kings, by this indictment, accuses the defendant of the

14    crime of Assault in the First Degree, Penal law Section

15    120.10(1), committed as follows:

16         The defendant, or about May 7, 2006, in the

17    County of Kings, with intent to cause serious physical

18    injury to Lorenzo Warren, caused such injury to

19    Shatashia Lewis, by means of a deadly weapon, namely:  a

20    revolver.

21         The subject matter of this count being an

22    armed felony, as that term is defined in Section 1.20 of

23    the Criminal Procedure Law.

24         The sixth count:  The Grand Jury of the County

25    of Kings, by this indictment, accuses the defendant of

1    the crime of Criminal Possession of a Weapon in the

2    Second Degree, Penal Law Section 265.03(2), committed as

3    follows:

4              The defendant, on or about May 7, 2006, in the

5    County of Kings, knowingly and unlawfully possessed a

6    loaded firearm, namely:  a revolver, with intent to use

7    the same unlawfully against another.

8              The subject matter of this count being an

9    armed felony, as that term is defined in section 1.20 of

10   the Criminal Procedure Law.

11             The seventh count:  The Grand Jury of the

12   County of Kings, by this indictment, accuses the

13   defendant of the crime of Criminal Possession of a

14   Weapon in the Fourth Degree, Penal Law Section

15   265.01(1), committed as follows:

16             The defendant, on or about May 7, 2006, in the

17   County of Kings, knowingly and unlawfully possessed a

18   firearm, namely:  a revolver.

19             Now, the incident is alleged to have occurred

20   on May 7, 2006, at approximately 11:30 a.m., inside of

21   340 Williams Avenue, apartment 4-I, in the County of

22   Kings, in Brooklyn.

23             Does anyone know anything about this case?

24             If so, I would ask that you raise your hand.

25             (NO HAND RAISED)

1        THE COURT:  Jurors, this matter appeared in

2   the news media.  So, again, as I said, if anyone knows

3   anything about this case, I would ask that they raise

4   their hand.

5        (NO HAND RAISED)

6        THE COURT:  I don't see any hands.

7        Do any of you know the attorneys I introduced,

8   Mr. Hale, Mr. Simons, or the defendant, Mr. Waiters, or

9   myself?

10       Jurors, the reason why I'm asking you if you

11  know any of the parties in this case is because it would

12  be inappropriate for you to sit as a juror on this

13  particular case if you know any of the parties.

14       Now, jurors, you may hear the following names

15  during the course of this trial or the people may be

16  called as witnesses in this case.

17       I caution you that certainly I'm only

18  mentioning the names to determine whether you're

19  familiar with them or if you know the individuals' names

20  that I'm calling.

21       I caution you that just because I mention the

22  name it poses no burden on either side to call that

23  person as a witness.  I only mention them to determine

24  whether or not you recognize any of the names.  Because

25  again, jurors, it would be inappropriate for you to sit

JURY VOIR DIRE                                   269

1       as a juror on this particular case if you know any of

2       the witnesses or are familiar with any of the names.

3                   Tajmere Clark.

4                   Mary Lee Clark.

5                   Lorenzo Warren.

6                   Shatashia Lewis.

7                   Jacqueline Warren.

8                   Derrick Warren.

9                   Koneisha Clark.

10                  Sergeant Timothy Corleto.

11                  Police Officer Jolene Anderson.

12                  Police Officer David Cononico.

13                  Detective Jose Castellano.

14                  Detective John Bruton.

15                  Detective Michael Pacchione.

16                  Detective Richard Amato.

17                  Detective George Boston.

18                  Detective Edward Dingman.

19                  Doctor Michelle Slone.

20                  Doctor Alexander Barday.

21                  Detective James Valenti.

22                  Doctor Sanford Drob.

23                  Does anyone recognize any of those names or

24      are familiar with any one of those names?

25                  If so, I would ask that you raise your hand.

-VMG-

1            (NO HAND RAISED)

2            THE COURT:  Again, I don't see any hands.

3            Now, jurors, if you do not recognize a

4      witness' name but later you recognize a witness when he

5      or she takes the witness stand, you must bring it to the

6      Court's attention immediately.

7            Now, jurors, the first step in the trial of a

8      criminal case is to select a jury.  A jury that will be

9      free of any preconceived notions and prejudices, and

10     that will be fair to the defendant in this case and also

11     fair to the People.

12           Now, as prospective jurors, we will be asking

13     you a series of questions, and the purpose of the

14     questions that we will be asking you is to determine

15     whether or not if you're selected to serve as a juror on

16     this particular case, whether you can do so fairly and

17     impartially.

18           Now, the procedure of questioning prospective

19     jurors, for your information, is known as voir dire.

20     Voir dire refers to the procedure by which each juror

21     takes an oath to speak the truth, to speak the truth in

22     answers to questions that will be put to you.

23           Now, jurors, the questions are designed to

24     ascertain your ability to serve as fair and impartial

25     trial jurors on this case.  I can tell you now that the

1    questions are not intended to pry into your private

2    lives, although sometimes, due to the very nature of the

3    kinds of questions that we will be asking you, it may

4    appear that way to you.

5              But I can tell you now, jurors, that both this

6    Court, as well as the attorneys in this case, have the

7    highest responsibility to choose as trial jurors those

8    individuals who will be fair and impartial, and give

9    both sides a fair trial.

10             Jurors, you will also appreciate the fact that

11   in many instances the questions will be designed to

12   alert you to your functions and your responsibilities,

13   and therefore, jurors, you will be able to make your own

14   evaluation and your own determination that if you are

15   selected to serve as a juror on this particular case,

16   whether you can do so fairly and impartially.

17             Now, if you are selected to serve as a juror

18   on this case, it will be your responsibility to

19   determine what happened in this particular case.

20             Now, jurors, you may be asking yourselves well

21   how can you determine what happened in this particular

22   case since you were not there on May 7, 2006.

23             Now, jurors, the law provides that you are the

24   sole and exclusive judges of the facts,  Jurors, you

25   will have to make a determination of what the facts are

JURY VOIR DIRE                                    272

1    in this case, based upon the evidence that will be

2    presented to you in this case.

3              Jurors, I can tell you now that the source of

4    the evidence that you will hear, the primary source of

5    the evidence that you will hear will come from the

6    witnesses who will come into this courtroom, take the

7    witness stand, testify under oath orally on direct

8    examination and perhaps cross-examination, and redirect

9    and recross-examination, if any.

10             Jurors, in order for you to determine what the

11   facts are in this case, you must evaluate the evidence

12   that you hear.

13             "Evaluate" is the first most important word to

14   a juror.  Certainly, evaluate means that you must go

15   behind the witness' oath and determine the credibility

16   of the testimony that you hear.  That is, whether a

17   witness is telling the truth, is lying, or is mistaken.

18             Jurors, you will also have to determine the

19   reliability of the testimony that you hear.  That is,

20   whether that testimony is probable or improbable in

21   light of the other evidence that you accept as proven.

22             Now, as jurors, you would have the right to

23   accept or reject the testimony of any witness, either in

24   whole or in part.

25             Jurors, after you have heard all of the

1    evidence in this case, and after I have instructed you

2    as to the law that will be applicable in this particular

3    case, you will then retire to the jury room to

4    deliberate.

5            "Deliberate" is the second most important word

6    to a juror.  Certainly a jury is composed of twelve

7    differ people, and in deliberations there will be

8    pressure to convince you of another position.  Now, it

9    is the duty of each juror to give their own individual

10   views and also to listen to the arguments of the other

11   jurors and to weigh their arguments.  But then each

12   juror must vote according to that juror's own

13   conscience.

14           The fact that this action is brought in the

15   name of the People of the State of New York or that

16   evidence will be presented to you by a public official

17   in no way indicates that the public wants a specific

18   verdict in this case.  Certainly, the People of the

19   County of Kings are served by whatever verdict is

20   justified by the law and the evidence in this case.

21           Now, this trial involves Murder in the Second

22   Degree, Attempted Murder in the Second Degree, Assault

23   in the First Degree--three counts, Criminal Possession

24   of a Weapon in the Second Degree, and Criminal

25   Possession of a Weapon in the Fourth Degree.

1            There may be some concern by jurors, this is

2       not a death penalty case.  So, there's no concern or

3       should be no concern as far as that is concerned.

4            Also, jurors, let me say this, that the person

5       that was killed in this particular case is a young

6       child.

7            Based upon the nature of that accusation, is

8       there anyone who believes that they would be unable to

9       serve on this case as a result of that?

10           If so, I would ask that you raise your hand.

11           (HANDS RAISED)

12           THE COURT:  I see a few hands.

13           You can put your hands down.

14           Let me say this, jurors, that certainly I'm

15      not in a position to excuse anyone from jury duty.

16      There may be some individuals who cannot serve because

17      of the nature of that accusation, and I understand that.

18      But I would ask that you be open and honest in your

19      reasons as to why you cannot serve.  I understand that

20      jury duty interferes with your everyday lives, and

21      certainly you have other things that you would prefer to

22      be doing.  That I understand.

23           But, again, our judicial system, whether on

24      the civil side or the criminal side, cannot operate

25      without citizens, such as yourself, who stand ready,

1    willing and able to serve.

2              Certainly, other than military service and

3    exercising your right to vote, it is one of the most

4    important civic duties that you have.

5              However, I do understand that sometimes

6    because of the nature of an accusation some people feel

7    they cannot serve on a particular case.  But, again, I'm

8    going to ask that you look within yourself and be open

9    and honest in your reasoning as to why you cannot serve.

10             Let me just see the hands of the individuals

11   that indicated that.

12             What I will do, we'll start with this first

13   section, and I'll speak to everyone who indicated that

14   they cannot serve based on the nature of the

15   accusations.  Then we will go to the second section.

16             I'm going to ask that you follow the direction

17   of the officers, because we want to do it in an orderly

18   fashion.

19             Again, as I said, I will speak to everyone,

20   but I want to do it in an orderly fashion.

21             That being said, certainly I'll see counsel

22   with the reporter.

23             (The following occurred at sidebar out of the

24   hearing of the panel of prospective jurors:)

25             (At this time, a prospective juror approached

JURY VOIR DIRE                                          276

1        at sidebar)

2              THE COURT:  Good morning.

3              May I have your card, please.

4              Your name, please?

5              PROSPECTIVE JUROR:  James J. Creighton.

6              THE COURT:  Mr. Creighton, based on the nature

7    of the accusations, being that the victim was a young

8    child, you indicated that you didn't believe you would

9    be able to serve based upon that.

10             Is that correct, sir?

11             PROSPECTIVE JUROR:  That's correct.

12             THE COURT:  Why is that, sir?

13             PROSPECTIVE JUROR:  Because he wouldn't have a

14   chance with me, because I think it's disgusting.  I have

15   a stepdaughter and several nieces, and I would not be

16   able to look at that man as innocent.

17             THE COURT:  Even though you have not heard any

18   evidence or anything up to now?

19             PROSPECTIVE JUROR:  It wouldn't matter to me.

20             THE COURT:  Okay.

21             Any questions?

22             MR. HALE:  No.

23             MR. SIMONS:  No.

24             THE COURT:  I can't excuse you from jury duty.

25             Sir, you'll wait outside until you get further

-VMG-

JURY VOIR DIRE                               277

1     instruction.

2                   (PROSPECTIVE JUROR EXCUSED)

3                   (At this time, a prospective juror approached

4     at sidebar)

5                   THE COURT:  Good morning.

6                   May I have your card, please.

7                   Your name, please?

8                   PROSPECTIVE JUROR:  Elizabeth Day.

9                   THE COURT:  Miss Day, you indicated that based

10    upon the nature of this case that would prevent you from

11    serving in this particular case?

12                  PROSPECTIVE JUROR:  There's two pieces.  One

13    is I got a two-year-old.  Just the idea of a murder of a

14    young child, it's very painful to think about.

15                  The other piece is I'm feeling I have a

16    preconceived notion in a case like this where there were

17    so many people who were involved, and it's people who

18    knew each other.  I feel when there's this many people

19    involved, I have this preconceived notion that it's just

20    like technicalities and everybody sort of knows the guy

21    did it.

22                  THE COURT:  Even though you haven't heard

23    anything?

24                  PROSPECTIVE JUROR:  Even though I haven't

25    heard anything.

JURY VOIR DIRE                                    278

1          THE COURT:  Any questions?

2          MR. SIMONS:  No questions.

3          MR. HALE:  No.

4          THE COURT:  Ma'am, I can't excuse you.  Just

5     have a seat outside the courtroom.

6          (PROSPECTIVE JUROR EXCUSED)

7          (At this time, a prospective juror approached

8     at sidebar)

9          THE COURT:  Good morning.

10          May I have your card, please.

11          Your name, please?

12          PROSPECTIVE JUROR:  Liliya Neboga.

13          THE COURT:  Ma'am, I asked whether there was

14     anything about the nature of the accusations in this

15     particular case, that it involved a young child, whether

16     that would affect your ability to sit on this case and

17     be fair.

18          PROSPECTIVE JUROR:  I work in a hospital, I

19     work with people over a hundred years old.  One of the

20     reason --  I don't know, the child.  I felt like --  You

21     know, I just can't do it.  I'm sorry.

22          THE COURT:  Well, let me ask you this, and I

23     have to ask the tough question.  I understand that you

24     said you work with older patients; is that correct?

25          PROSPECTIVE JUROR:  Yes.

JURY VOIR DIRE                                    279

1              I know the pediatric department.

2              THE COURT:  You don't think you can hold that

3    in abeyance?

4              PROSPECTIVE JUROR:  I don't think so, no.

5              THE COURT:  Any questions?

6              MR. SIMONS:  No.

7              MR. HALE:  No.

8              THE COURT:  I can't excuse you from jury duty.

9    The only thing is, you'll have to wait outside for

10   further instructions.

11             (PROSPECTIVE JUROR EXCUSED)

12             (At this time, a prospective juror approached

13   at sidebar).

14             THE COURT:  Good morning.

15             May I have your card, please.

16             Your name, please?

17             PROSPECTIVE JUROR:  Evanthia Tastsidis.

18             THE COURT:  Ma'am, I asked whether there was

19   anything about the nature of the accusations or in this

20   particular case that it involved a young child, whether

21   that would affect your ability to sit on this case and

22   be fair.

23             PROSPECTIVE JUROR:  Yes, it would.  I brought

24   up two young kids.  I know if anything happens to them,

25   I'm very disappointed.  Even if you will commit a crime.

1      That's why against kids I have very strong views about

2      that.

3                  THE COURT:  Let me ask you this.  I don't know

4      whether you can do it, you have to let me know.

5                  I know you said you have strong emotions and

6      you also have strong feelings with anything that deals

7      with children.  Would you be able to --  not put it out

8      of your mind, but hold that kind of like aside and deal

9      with the evidence as it comes in in this particular case

10     and then make up your mind based upon what you hear or

11     you don't hear coming from that witness stand?  I know

12     that's a tough question.

13                 PROSPECTIVE JUROR:  It's going to be hard.

14     Like I said, it depends on my mind, about the kid,

15     thinking of my own kids.

16                 THE COURT:  Will you allow that to influence

17     your judgment on this case?

18                 PROSPECTIVE JUROR:  I really --  I don't know.

19     I would be a little bit confused.

20                 THE COURT:  Let me say this.  If you hear

21     something that strikes you or reminds you of your own

22     children --

23                 PROSPECTIVE JUROR:  It would affect me.

24                 THE COURT:  Okay.

25                 Any questions?

JURY VOIR DIRE                                    281

1          MR. HALE:  No.

2          MR. SIMONS:  No.

3          THE COURT:  Okay, ma'am, you have to wait

4     outside for further instructions.

5          (PROSPECTIVE JUROR EXCUSED)

6          (At this time, a prospective juror approached

7     at sidebar)

8          THE COURT:  Good morning.

9          May I have your card, please.

10         Your name, please?

11         PROSPECTIVE JUROR:  Lois Anshus.

12         THE COURT:  Ma'am, you said it would be a

13    hardship or you would be unable to serve on this case

14    based on the nature of the accusations in this case?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Why is that, ma'am?

17         PROSPECTIVE JUROR:  I have a child myself and

18    I immediately reacted.  I don't know if it's valid or

19    not, but I immediately reacted.  I don't know, it really

20    disturbs me and bothers me.  I don't know if I would be

21    fair.

22         THE COURT:  Well, let me ask you this.  I have

23    to ask the tough questions, and you have to let me know.

24    The fact that you have a child, whether you can put it

25    out of your mind, not forget about it, but certainly not

1   allow it to affect how you evaluate the evidence in this

2   particular case and just make your determination based

3   on the evidence or the lack of evidence and call it

4   straight up and down as you see it on the evidence in

5   this particular case?

6           PROSPECTIVE JUROR:   I don't know.   That's

7   why --   I don't know if I'm able to remove myself.

8           THE COURT:   Any questions?

9           MR. HALE:   No.

10          MR. SIMONS:   No.

11          THE COURT:   At this point, I can't excuse you

12  from jury duty.   You'll have to wait outside for further

13  instructions.

14          PROSPECTIVE JUROR:   That's fine.

15          Thank you.

16          (PROSPECTIVE JUROR EXCUSED)

17          (At this time, a prospective juror approached

18  at sidebar)

19          THE COURT:   Good morning.

20          May I have your card, please.

21          Your name, please?

22          PROSPECTIVE JUROR:   Manik Hinchey.

23          THE COURT:   Mr. Hinchey, you said it would be

24  difficult for you to serve on this case if it involved a

25  child?

JURY VOIR DIRE                                    283

1          PROSPECTIVE JUROR:  Yes.  I have a

2    six-month-old baby.  I'm not sure I can be objective in

3    the case with a child being killed, and particularly

4    hearing about a gunshot wound or something like that.  I

5    don't know how I could be objective.

6          THE COURT:  Well, let me ask you, and this is

7    a tough question, you have to let me know whether you

8    can do it.

9          Let me ask you, I know we all have emotions.

10   If we didn't, we would be robots.  Can you hold those

11   emotions in abeyance?

12         PROSPECTIVE JUROR:  I don't know.  I don't

13   know I would be able to do that.  I would try if I was

14   on the jury, but I don't know.

15         THE COURT:  Let me say this.  If you hear

16   something that reminds you of your child, my concern

17   would be you would be influenced how you feel about your

18   child and impose this on the evidence in this particular

19   case.

20         PROSPECTIVE JUROR:  I think just reading books

21   where things happen to children, it's very difficult for

22   me.  I don't know whether actually seeing a real child

23   have something happen to a child, it would be very

24   difficult.  I can't help but think of my own child.

25         THE COURT:  Any questions?

JURY VOIR DIRE                                    284

1              MR. SIMONS:  No.

2              MR. HALE:  No.

3              THE COURT:  Okay, ma'am.  I can't excuse you

4    from jury duty.  You'll remain outside the courtroom and

5    they'll give you further instructions.

6              (PROSPECTIVE JUROR EXCUSED)

7              (At this time, a prospective juror approached

8    at sidebar)

9              THE COURT:  Good morning.

10             May I have your card, please.

11             Your name, please?

12             PROSPECTIVE JUROR:  Inna Beytelman.

13             THE COURT:  Miss Beytelman, you indicated that

14   it would be a hardship if you had to serve on this case

15   based on the nature of the accusations in this case?

16             PROSPECTIVE JUROR:  Very hard for me, yes,

17   because I have very young children.  I'm a very

18   emotional person.  When you started, my heart was

19   pumping up.  I can't deal with it.  I work with kids.

20   Everything to kids and to me.

21             THE COURT:  So you don't think you would be

22   able to set that aside?

23             PROSPECTIVE JUROR:  I don't think.  I don't

24   think I would be able to sit on the case.

25             THE COURT:  Any questions?

1          MR. HALE:  No.

2          MR. SIMONS:  No.

3          THE COURT:  Okay.  Ma'am, I can't excuse you

4    from jury duty.

5          PROSPECTIVE JUROR:  That's okay.

6          THE COURT:  You'll wait outside, and they'll

7    give you further instructions.

8          (PROSPECTIVE JUROR EXCUSED)

9          (At this time, a prospective juror approached

10   at sidebar)

11         THE COURT:  Good morning.

12         May I have your card, please.

13         Your name, please?

14         PROSPECTIVE JUROR:  Ruby Brookschaudhary.

15         THE COURT:  Miss Brookschaudhary, you said it

16   would be a hardship if you had to serve on this case?

17         PROSPECTIVE JUROR:  It's not a hardship.  But

18   I feel there's no justice for black people.  Sean Bell.

19   I feel sorry for him.

20         THE COURT:  Well, ma'am, let me say this.  I

21   know we all have feelings about certain issues,

22   including the justice system or anything else.  What

23   we're looking for is jurors who can be fair and

24   impartial and call things straight up and down as they

25   see it.  I don't know whether, in fact, you can set

JURY VOIR DIRE                    286

1   aside the feelings you have.

2              PROSPECTIVE JUROR:  Uh-uh.

3              THE COURT:  When you I say "uh-uh", is that a

4   no?

5              PROSPECTIVE JUROR:  (Shaking head)

6              THE COURT:  I can't hear you.  No?

7              PROSPECTIVE JUROR:  No.  He didn't get no

8   justice.

9              THE COURT:  That's that case.  What I'm asking

10  you is whether you can concentrate on this particular

11  case.

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Any questions?

14             MR. SIMONS:  No questions.

15             MR. HALE:  No questions.

16             THE COURT:  I'm going to excuse you.

17             Without people willing to sit on juries to

18  make sure people have a fair trial, then the myths

19  you're saying will always be perpetuated.

20             (PROSPECTIVE JUROR EXCUSED)

21             THE COURT:  That's a person who doesn't want

22  to serve.

23             (At this time, a prospective juror approached

24  at sidebar)

25             THE COURT:  Good morning.

-VMG-

1          May I have your card, please.

2          Your name, sir?

3          PROSPECTIVE JUROR:  My name is Gerald Seidman.

4          THE COURT:  Mr. Seidman, you said it would be

5     a hardship if you had to serve on a case such as this?

6          PROSPECTIVE JUROR:  Yes, because a child was

7     killed.  My wife is diabetic and we struggled for years

8     to have a child, and to take the life of a child is a

9     terrible thing.

10         THE COURT:  You understand that this is just

11    an accusation?

12         PROSPECTIVE JUROR:  I know, but we struggled,

13    and she's diabetic and we had a lot of complications.

14         THE COURT:  So you're saying you can't set

15    your personal feelings aside?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Any questions?

18         MR. SIMONS:  No.

19         MR. HALE:  No.

20         THE COURT:  Okay, sir, just step out outside.

21         (PROSPECTIVE JUROR EXCUSED)

22         (At this time, a prospective juror approached

23    at sidebar)

24         THE COURT:  May I have your card, please.

25         Your name, sir?

JURY VOIR DIRE                                    288

1        PROSPECTIVE JUROR:  Larry Wilson, Jr.

2        THE COURT:  Mr. Wilson, Jr., you indicated it

3   would be difficult for you to sit on a case like this if

4   a child was involved?

5        PROSPECTIVE JUROR:  I work for the District

6   Attorney's Office also.  I don't know him, but I know

7   Vinny.  I saw him before.  But you said everyone has to

8   serve on the jury.  I don't know if it matters because I

9   work there.

10        THE COURT:  Well, the only way that it would

11   matter to me is if you're going to allow your

12   affiliation to affect how you view the evidence in this

13   particular case, Mr. Wilson.

14        PROSPECTIVE JUROR:  It definitely would.

15        MR. HALE:  We've seen each other.  I don't

16   know him, but we've interacted many times in the past.

17        THE COURT:  But my concern is, as I said, if

18   you're going to allow your affiliation to affect how you

19   call the evidence in this case, if that's going to be

20   the case, then you know that's unfair.

21        PROSPECTIVE JUROR:  That's unfair.  I think

22   it's going to be unfair for the jury and the

23   prosecution.

24        THE COURT:  Okay.  You'll have to wait

25   outside, Mr. Wilson, Jr., until they give you further

JURY VOIR DIRE                                    289

1          instructions.

2                    (PROSPECTIVE JUROR EXCUSED)

3                    (At this time, a prospective juror approached

4          at sidebar)

5                    THE COURT:  May I have your card, please.

6                    Your name, please?

7                    PROSPECTIVE JUROR:  Yuying Wong.

8                    THE COURT:  Miss Wong, you indicated that it

9          would be difficult for you to sit on a case like this if

10         a young child was involved; is that correct?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Why is that, Miss Wong?

13                   PROSPECTIVE JUROR:  First of all, I would get

14         very emotion, and I would be unhappy and I would cry a

15         lot.  Especially, I have two young kids.  I stay home

16         and I don't want this to stay in my mind.

17                   THE COURT:  So you think that would affect

18         your judgment in this case?

19                   PROSPECTIVE JUROR:  Yes.

20                   THE COURT:  Any questions?

21                   MR. SIMONS:  No questions.

22                   MR. HALE:  No questions.

23                   THE COURT:  Ma'am, you have to wait outside

24         until given further instructions.  Just have a seat

25         outside the courtroom and wait for further instructions.

JURY VOIR DIRE                                    290

1               (PROSPECTIVE JUROR EXCUSED)

2               (At this time, a prospective juror approached

3       at sidebar)

4               THE COURT:   Good morning.

5               May I have your card, please.

6               Your name, please?

7               PROSPECTIVE JUROR:   Guo Peng.

8               I don't understand so much English.

9               THE COURT:   You don't understand so much

10      English?

11              PROSPECTIVE JUROR:   No.

12              THE COURT:   How long have you been in this

13      country, Miss Peng?

14              PROSPECTIVE JUROR:   Ten years.

15              THE COURT:   Do you work, Miss Peng?

16              PROSPECTIVE JUROR:   Yes.

17              THE COURT:   Where do you work?

18              PROSPECTIVE JUROR:   Manhattan.

19              THE COURT:   Doing what?

20              PROSPECTIVE JUROR:   Jewelry.

21              THE COURT:   You make jewelry?

22              PROSPECTIVE JUROR:   (No response)

23              THE COURT:   If understanding everything was

24      one hundred percent, how much would you say you

25      understood when I was speaking, Miss Peng?

JURY VOIR DIRE                              291

1           PROSPECTIVE JUROR:  Just so-so.  About ten

2   percent.

3           THE COURT:  Miss Peng, I can't excuse you from

4   jury duty.  Just wait outside and they'll give you

5   further instructions.  Just wait outside the courtroom.

6           PROSPECTIVE JUROR:  Thank you.

7           (PROSPECTIVE JUROR EXCUSED)

8           (At this time, a prospective juror approached

9   at sidebar)

10          THE COURT:  Good morning.

11          May I have your card, please.

12          Your name, sir?

13          PROSPECTIVE JUROR:  Emanoix Piton.

14          THE COURT:  Mr. Piton, you said it would be

15  difficult if you had to serve on this case if it

16  involved a young child?

17          Is that correct, Mr. Piton?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Why is that, sir?

20          PROSPECTIVE JUROR:  Yes, because it's too big

21  for my English.  In Criminal Court is a burden for me.

22  I'm self-employed, a taxi driver.

23          THE COURT:  You're saying a lot of things.

24          The language, sir, what do you speak?

25          PROSPECTIVE JUROR:  French and Creole.

JURY VOIR DIRE                                    292

1          THE COURT:  How long have you been in this

2     country?

3          PROSPECTIVE JUROR:  Thirty-five years.

4          THE COURT:  You're saying you don't

5     understand?

6          PROSPECTIVE JUROR:  I say there's some terms

7     in the law.

8          THE COURT:  If it's a term in the law, I will

9     explain it to you.

10          PROSPECTIVE JUROR:  Yes.  But I don't like to

11     judge and condemn people.

12          THE COURT:  Well, what you're being asked to

13     do is not to condemn people, just judge the quality of

14     the evidence or the lack of evident in this particular

15     case.  So, you're not being asked to judge the person.

16     You're being asked to judge the evidence.

17          Do you understand what I'm saying, Mr. Piton?

18          PROSPECTIVE JUROR:  Yes, I do.

19          I don't like this case.

20          THE COURT:  Well, it's not a matter of whether

21     you like the case or you don't like the case.  It's a

22     matter of whether you can be fair and impartial in this

23     case.

24          I'm sure if I made a blanket statement, "Well,

25     does anyone like the nature of this kind of case?"

JURY VOIR DIRE                                    293

1    everyone in here is going to say no.  That's just the

2    nature of the case itself.  That's one thing.

3              My concern is whether you could be fair and

4    impartial and give both sides a fair trial in this case.

5              PROSPECTIVE JUROR:  I don't think so.

6              THE COURT:  Do you have any questions?

7              MR. SIMONS:  No questions.

8              MR. HALE:  No questions.

9              THE COURT:  Sir, have a seat outside.  They'll

10   give you further instructions.

11             (PROSPECTIVE JUROR EXCUSED)

12             (At this time, a prospective juror approached

13   at sidebar)

14             THE COURT:  Good morning.

15             May I have your card, please.

16             Your name, sir?

17             PROSPECTIVE JUROR:  Brian Pescetto.

18             THE COURT:  Mr. Pescetto, I asked whether

19   there was anything about the nature of the accusations

20   and the fact that it involved a child, whether that

21   would affect your ability to sit on this particular

22   case.

23             PROSPECTIVE JUROR:  Yes, it would, Judge.

24             When you first started reading the charges,

25   the first thing that kept going to my mind was:  Was it

1    a child?  Was it a child?  And when you stated it was a

2    child, you know, my stomach turned, number one.

3              With that in mind, also, I've had family

4    members and close friends victims of gun violence.  So,

5    just those two issues alone, I don't feel I can be

6    impartial and make a decision in this case.

7              THE COURT:  You think you've already kind of

8    like made up your mind?

9              PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  Without hearing anything?

11             PROSPECTIVE JUROR:  Without hearing anything.

12             THE COURT:  Any questions?

13             MR. SIMONS:  No questions.

14             MR. HALE:  No questions.

15             THE COURT:  Sir, you have to wait outside the

16   courtroom, and they'll give you further instructions.

17             PROSPECTIVE JUROR:  Thank you.

18             (PROSPECTIVE JUROR EXCUSED)

19             (At this time, a prospective juror approached

20   at sidebar)

21             THE COURT:  Good morning.

22             May I have your card, please.

23             Your name, sir?

24             PROSPECTIVE JUROR:  Jeffrey Tichenor.

25             THE COURT:  Mr. Tichenor, I asked whether, in

1      fact, there was anything about the nature of the case or

2      the fact that it involved a young child that might

3      prevent you from sitting on this case, and you asked to

4      speak to the Court as far as that is concerned.

5                  PROSPECTIVE JUROR:  The reason, I believe the

6      murder of a small child, whether it happened or not, I

7      just cannot impartially sit there and listen to the

8      evidence.  A child is the most innocent thing, and to

9      think that someone, whether they did it or not, killed a

10     child --  I don't know.

11                 THE COURT:  In your mind, if, in fact, there

12     is a loss of a life of a young child, you've already

13     made up your mind?

14                 PROSPECTIVE JUROR:  Yes.  The child is too

15     innocent.

16                 THE COURT:  Any questions?

17                 MR. SIMONS:  No.

18                 MR. HALE:  No questions.

19                 THE COURT:  Sir, you have to remain outside

20     until you're given further instructions.

21                 (PROSPECTIVE JUROR EXCUSED)

22                 (At this time, a prospective juror approached

23     at sidebar)

24                 THE COURT:  Good morning.

25                 May I have your card, please.

1          Your name, sir?

2          PROSPECTIVE JUROR:  Boris Fukhansky.

3          THE COURT:  Mr. Fukhansky, I asked whether

4   there was anything about the nature of this case or the

5   fact that it involved a young child that might affect

6   your ability to be fair and impartial, and you asked to

7   speak to the Court.

8          PROSPECTIVE JUROR:  I would like to say this,

9   that I am retired, I am not busy with anything, except I

10  am volunteering for charity organization once a week.

11         I would love to help you have a fair trial,

12  but when I was thirty years old, my grandfather was

13  assaulted, killed, and his body was abused, and I

14  witnessed it.  Since then, it's very painful.  I'm

15  pretty sure I can't be impartial.  This is only reason.

16         If you think this is enough to participate,

17  I'm ready.

18         THE COURT:  Well, let me say this.  If you're

19  saying that you can't put that incident that happened

20  with your grandfather out of your mind, that would

21  concern me because if, in fact, you heard something that

22  reminded you of that incident, my concern as a judge is

23  you might start thinking about what happened to your

24  family member and allow it to influence how you evaluate

25  the evidence in this case.  Only you can answer that

-VMG-

1    question.

2                PROSPECTIVE JUROR:  Very painful.  And a

3    murder like this makes me sick.

4                THE COURT:  That's what I'm saying.

5                Any questions?

6                MR. SIMONS:  No questions.

7                MR. HALE:  No questions.

8                THE COURT:  Sir, you'll have to wait outside.

9    Just have a seat outside and await further instructions.

10               (PROSPECTIVE JUROR EXCUSED)

11               (At this time, a prospective juror approached

12   at sidebar)

13               THE COURT:  Good morning.

14               May I have your card, please.

15               Your name, sir?

16               PROSPECTIVE JUROR:  My name is Eric

17   Wolliastow.

18               THE COURT:  Mr. Wolliastow, I asked whether

19   there was anything about the nature of the case and the

20   fact that it involved a young child that might affect

21   your ability to be fair and impartial, and you came up

22   to speak to the Court, sir.

23               PROSPECTIVE JUROR:  I just came back from

24   South Carolina about two months ago.  A young man that I

25   was grooming to be an electrician, like myself, had been

1     killed.  The person who did this is still out on the

2     street and found with a gun about two weeks ago and is

3     still out on the street.

4              Also, my sister was held up, my wife was held

5     up, and the cops were driving around with her to see if

6     she could identify anyone.  I got a very bad passion

7     about that.

8              THE COURT:  Well, as a judge, with the bad

9     passion you have, would that affect your ability to be

10    fair and impartial in this particular case?

11             PROSPECTIVE JUROR:  Well, I might be too

12    controversial about it.  Because I'm definitely against

13    anyone who would have a gun without a permit or

14    something.  They should apply for it, but they shouldn't

15    be having illegal guns.  That's my opinion.

16             THE COURT:  Let me ask you this tough

17    question, Mr. Wolliastow.  Can you move beyond that and

18    listen to the evidence in this case and then decide

19    based upon what you hear coming from the mouths of the

20    witnesses, number one, whether a crime was committed,

21    and number two, whether the person on trial committed

22    the crime, and call the evidence straight up and down as

23    you see it, or are you going to allow the experiences

24    that you have affect how you evaluate the evidence in

25    this case?  Certainly, that would be unfair to the

JURY VOIR DIRE                                          299

1      parties.

2              PROSPECTIVE JUROR:  It would be very hard for

3      me to decide, you know, someone's fate that way.

4              THE COURT:  Let me put it this way.  If you

5      heard something that reminded you of either your wife's

6      situation or the young man that you were grooming to

7      become an electrician, if it reminded you of their

8      situation, would you then start thinking about their

9      situation and allow that to affect how you view the

10     evidence?

11             PROSPECTIVE JUROR:  Yes, it would.

12             THE COURT:  Any questions?

13             MR. SIMONS:  No questions.

14             MR. HALE:  No questions.

15             THE COURT:  All right.

16             Sir, you have to remain outside until they

17     give you further instructions.

18             (PROSPECTIVE JUROR EXCUSED)

19             (At this time, a prospective juror approached

20     at sidebar)

21             THE COURT:  Good morning.

22             May I have your card, please.

23             Your name, please.

24             PROSPECTIVE JUROR:  Cristina Jimenez.

25             THE COURT:  Miss Jimenez, I asked whether

1       there was anything about the fact that this case

2       involved a young child that might prevent you from being

3       fair and impartial, and you asked to speak to the Court.

4                   PROSPECTIVE JUROR:  Sure.  I have a

5       four-year-old daughter I would give my life for.  My

6       maiden name is Lorenzo, and my sister was falsely

7       accused for prostitution, and she sued the City of

8       New York.

9                   THE COURT:  You mentioned a number of things.

10                  What I need to find out from you is whether

11      the fact that you have a young child, would that affect

12      how you evaluate the evidence?

13                  PROSPECTIVE JUROR:  Yes.  I'm a very emotional

14      person.

15                  THE COURT:  Any questions?

16                  MR. SIMONS:  No questions.

17                  MR. HALE:  No questions.

18                  THE COURT:  Okay.

19                  Ma'am, you have to remain outside the court

20      and await further instructions.

21                  (PROSPECTIVE JUROR EXCUSED)

22                  (At this time, a prospective juror approached

23      at sidebar)

24                  THE COURT:  Good morning.

25                  May I have your card, please.

JURY VOIR DIRE                                301

1          Your name, sir?

2          PROSPECTIVE JUROR:  Ralph Richardson.

3          THE COURT:  Mr. Richardson, I asked whether

4   there was anything about the nature of the case and the

5   fact that it involved a young child that might affect

6   your ability to be fair and impartial in this particular

7   case.

8          PROSPECTIVE JUROR:  Yeah, very much so.  I

9   think it's despicable.

10          THE COURT:  Let me say this.  I have to ask

11   the tough questions, Mr. Richardson, and you have to let

12   me know, because we all have feelings as humans,

13   otherwise we would be robots, whether, in fact, you can

14   listen to the evidence in this case without having your

15   personal feelings affect how you evaluate the evidence

16   in this case.  If you can do that.  I know it's a tough

17   question.

18          PROSPECTIVE JUROR:  That's a good question.  I

19   don't know if I can transcend my emotions.  I don't know

20   if I can rise above it.  It's somebody's life.  I think

21   it's wild.  It's a little girl.  If it was an adult, I

22   would be fine, but a child and a little girl --

23          THE COURT:  You don't think you can do it?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Any questions?

JURY VOIR DIRE                                        302

1              MR. SIMONS:  No questions.

2              MR. HALE:  No questions.

3              THE COURT:  Thank you for your honesty.

4         You'll wait outside the courtroom until you

5    get further instructions, Mr. Richardson.

6              (PROSPECTIVE JUROR EXCUSED)

7              (At this time, a prospective juror approached

8    at sidebar)

9              THE COURT:  Good morning.

10             May I have your card, please.

11             Your name, sir?

12             PROSPECTIVE JUROR:  Maury Loeb.

13             THE COURT:  Mr. Loeb, I mentioned the fact

14   that this matter involved a child, if there was anything

15   about that that might affect your ability to be fair and

16   impartial, and you asked to speak to the Court.

17             PROSPECTIVE JUROR:  Yes.  I have a

18   three-year-old daughter and a brand new baby boy.  It's

19   an emotional time for me anyway.  There was a shooting

20   in my daughter's playground earlier in the year, and I

21   just think about this stuff.  It drives me crazy, this

22   kind of stuff.

23             THE COURT:  Well, let me ask you the tough

24   question, Mr. Loeb.  Certainly it would drive anybody

25   crazy, what you just said.  What I'm asking is whether,

JURY VOIR DIRE                                    303

1    in fact, you can hold those emotions in abeyance and

2    listen to the evidence as it comes in in this particular

3    case?  I know it's a tough question.  You have to tell

4    me whether, in fact, you can do it.

5              PROSPECTIVE JUROR:  I don't know.  I don't

6    know if I can do it.

7              THE COURT:  You don't know if you can?

8              PROSPECTIVE JUROR:  I don't think so.

9              THE COURT:  Any questions?

10             MR. SIMONS:  No questions.

11             MR. HALE:  Nothing.

12             THE COURT:  Sir, you have to wait outside

13   until they give you further instructions.

14             (PROSPECTIVE JUROR EXCUSED)

15             (At this time, a prospective juror approached

16   at sidebar)

17             THE COURT:  Good morning.

18             May I have your card, please.

19             Your name, sir?

20             PROSPECTIVE JUROR:  Yisrael Zwick.

21             THE COURT:  Mr. Zwick, I mentioned the fact

22   there was a young child involved and whether there was

23   anything about that that might affect your ability to be

24   fair and impartial, and you asked to speak to the Court.

25             PROSPECTIVE JUROR:  Yes.  I have a

JURY VOIR DIRE                                    304

1    two-and-a-half-year-old son, and we're expecting our

2    second.  I don't know --  I mean, sitting here and

3    listening to a story like this, it's hard.

4             THE COURT:  I know it's hard.  But, Mr. Zwick,

5    I have to ask you the tough question, whether, in fact,

6    you can put your emotions aside and listen to the

7    evidence as it comes in in this particular case and

8    judge the evidence or --

9             PROSPECTIVE JUROR:  I don't know.

10            THE COURT:   -- the lack of evidence in this

11   courtroom?

12            PROSPECTIVE JUROR:  I haven't heard anything

13   other than the fact there's a young child involved, and

14   already it's like --  I don't know.

15            THE COURT:  You're saying already you're

16   starting to leaning in one direction?

17            PROSPECTIVE JUROR:  Yes.  My stomach is

18   starting to turn.

19            THE COURT:  Do you think that would affect

20   your ability to be fair and impartial in this case, sir?

21            PROSPECTIVE JUROR:  I suspect it would.

22            THE COURT:  Any questions?

23            MR. SIMONS:  No questions.

24            MR. HALE:  No.

25            THE COURT:  Sir, you'll wait outside the

JURY VOIR DIRE                           305

1      courtroom for further instructions.

2                   (PROSPECTIVE JUROR EXCUSED)

3                   (At this time, a prospective juror approached

4      at sidebar)

5                   THE COURT:  Good morning.

6                   May I have your card, please.

7                   Your name, sir?

8                   PROSPECTIVE JUROR:  My name is Wesner Felix.

9                   THE COURT:  Mr. Felix, I mentioned that the

10     case involved a young child and whether there was

11     anything about that that might affect your ability to be

12     fair and impartial in this particular case, and you

13     asked to speak to the Court.

14                  PROSPECTIVE JUROR:  Yes, because --

15                  THE COURT:  I'm going to ask that you lean in

16     and speak louder.

17                  PROSPECTIVE JUROR:  This is going to be very

18     hard for me to understand the judicial system.  As a

19     father, I'm very --  I cannot take it.  The judicial

20     system.

21                  THE COURT:  Do you have any questions?

22                  MR. SIMONS:  No, no.

23                  THE COURT:  Certainly, sir, you'll remain

24     outside until they give you further instructions.

25                  (PROSPECTIVE JUROR EXCUSED)

-VMG-

JURY VOIR DIRE                                    306

1              (At this time, a prospective juror approached

2       at sidebar)

3                   THE COURT:   Good morning.

4                   May I have your card, please.

5                   Your name, please?

6                   PROSPECTIVE JUROR:   Enza Yau.

7                   THE COURT:   Miss Yau, I mentioned the fact

8       that there was a young child that was involved and

9       whether there was anything about that that might affect

10      your ability to be fair and impartial in this case, and

11      you asked to speak to the Court.

12                  PROSPECTIVE JUROR:   I don't understand too

13      much.

14                  THE COURT:   You don't understand English?

15                  PROSPECTIVE JUROR:   A little bit only.

16                  THE COURT:   Okay.   How long have you been in

17      this country, Miss Yau?

18                  PROSPECTIVE JUROR:   Nine.

19                  THE COURT:   Nine years?

20                  PROSPECTIVE JUROR:   Yes.

21                  THE COURT:   Do you work, Miss Yau?

22                  PROSPECTIVE JUROR:   Yes.

23                  THE COURT:   What kind of work do you do?

24                  PROSPECTIVE JUROR:   Sales.   Spanish.

25                  THE COURT:   You speak Spanish, but you don't

JURY VOIR DIRE                    307

1  speak English?

2             PROSPECTIVE JUROR:  A little bit.

3             THE COURT:  Let me ask you this.  When I was

4  speaking, Miss Yau, how much would you say you

5  understood?  If understanding everything was one hundred

6  percent, how much would you say you understood?

7             PROSPECTIVE JUROR:  I don't understand.  Only

8  very little.  Not even one quarter.  When you asked, I

9  had to ask people what you say because you talk too

10 fast.

11            THE COURT:  I wasn't talking any faster than

12 you, Miss Yau.

13            She's saying she doesn't understand.

14            You'll have to remain outside the courtroom

15 until they give you further instructions, Miss Yau.

16 Just have a seat outside.

17            (PROSPECTIVE JUROR EXCUSED)

18            (At this time, a prospective juror approached

19 at sidebar)

20            THE COURT:  Good morning.

21            May I have your card, please.

22            Your name, sir?

23            PROSPECTIVE JUROR:  Ashfaq Mehmood.

24            THE COURT:  Mr. Mehmood, I asked whether there

25 was anything about the fact that a child was involved in

- VMG -

1    this case, whether that would affect your ability to be

2    fair and impartial, and you asked to speak to the Court,

3    Mr. Mehmood.

4              PROSPECTIVE JUROR:  I don't really much

5    understand.

6              THE COURT:  What language do you speak, sir?

7              PROSPECTIVE JUROR:  Urdu.

8              THE COURT:  How long have you been in this

9    country?

10             PROSPECTIVE JUROR:  It's almost fifteen years.

11             THE COURT:  Fifteen years?  Do you work,

12   Mr. Mehmood?

13             PROSPECTIVE JUROR:  I drive a cab.

14             THE COURT:  How do you know where to drive?

15             PROSPECTIVE JUROR:  I understand, but not the

16   court.  This is really very hard for me to understand.

17             THE COURT:  Let me ask you, if understanding

18   everything was one hundred percent, how much would you

19   say you understood when I was speaking, Mr. Mehmood?

20             PROSPECTIVE JUROR:  I just heard like you say

21   the murder.  So, just a couple questions, not very much.

22             THE COURT:  Okay.  If he's saying he doesn't

23   understand, he doesn't understand.

24             Any questions?

25             MR. SIMONS:  No questions.

JURY VOIR DIRE                              309

1          MR. HALE:  No questions.

2          THE COURT:  Sir, you have to remain outside

3    the courtroom and wait for further instructions.  Okay?

4          PROSPECTIVE JUROR:  Thank you.

5          (PROSPECTIVE JUROR EXCUSED)

6          (The following occurred in open court in the

7    presence of the panel of prospective jurors:)

8          THE COURT:  Jurors, this case involves Murder

9    in the Second Degree, Attempted Murder in the Second

10   Degree, Assault in the First Degree--three counts,

11   Criminal Possession of a Weapon in the Second Degree,

12   and Criminal Possession of a Weapon in the Fourth

13   Degree.

14         We expect this case to take approximately six

15   to nine days to try, and that will be starting on

16   Monday.

17         Now, is there anyone who, by reason of extreme

18   hardship, could not serve until that time?

19         If so, I would ask that you raise your hand.

20         (HANDS RAISED)

21         THE COURT:  I see a few hands.  A number of

22   hands.

23         I will speak to those who indicate that it is

24   a hardship.

25         Again, jurors, let me say this.  I'm going to

1       ask that you be open and honest in your reasons because,

2       again, I do know injury duty interferes with your

3       everyday lives.  Certainly, again, our system cannot

4       operate without jurors, such as yourself, who stand

5       ready, willing and able to serve.

6               Let me see the hands of those jurors who said

7       because of the length of the trial it would be a

8       hardship.

9               What I'm going to ask you to do is follow the

10      instructions of the Sergeant in this case.

11              (The following occurred at sidebar out of the

12      hearing of the panel of prospective jurors:)

13              (At this time, a prospective juror approached

14      at sidebar)

15              THE COURT:  Good morning.

16              May I have your card, please.

17              Your name, sir?

18              PROSPECTIVE JUROR:  Mark Rohrer.

19              THE COURT:  Mr. Rohrer, you said it would be a

20      hardship if you had to serve the six to nine days, sir?

21              PROSPECTIVE JUROR:  Yes.

22              THE COURT:  Why is that?

23              PROSPECTIVE JUROR:  I owe $12,000 to the

24      I.R.S. after taxes.  I didn't work for January and

25      February, and I just found work.  I'm a freelancer, so I

1           don't get paid unless I work.

2                    THE COURT:  What kind of work do you do?

3                    PROSPECTIVE JUROR:  I'm an animator in

4           broadcast.

5                    THE COURT:  You're saying that --

6                    PROSPECTIVE JUROR:  That I would lose a

7           considerable amount of money that I owe.  I'm in debt.

8                    THE COURT:  Let me say this, sir.  If you are

9           selected to serve, would that affect your ability to sit

10          on this case and concentrate on this case?

11                   PROSPECTIVE JUROR:  No, it wouldn't.

12                   THE COURT:  You're saying that you can serve,

13          but it would be a financial hardship?

14                   PROSPECTIVE JUROR:  Exactly, yes.

15                   THE COURT:  And it would not affect your

16          ability to be fair and impartial?

17                   PROSPECTIVE JUROR:  I don't think so, no.

18                   THE COURT:  Let me say this.  At this point,

19          I'm not going to exclude you from consideration.  I'm

20          not saying we're going to pick you, but I'm certainly

21          not going to exclude you.

22                   (At this time, the prospective juror returned

23          to the audience)

24                   (At this time, a prospective juror approached

25          at sidebar)

JURY VOIR DIRE                                        312

1        THE COURT:  Good morning.

2        May I have your card, please.

3        Your name, sir?

4        PROSPECTIVE JUROR:  Chaskel Zenwirth.

5        THE COURT:  Mr. Zenwirth, you stated that it

6   would be a hardship if you had to serve six to nine

7   days, sir?

8        PROSPECTIVE JUROR:  I don't think I'll be able

9   to take the case, so I don't think it's necessary for me

10   to sit here.

11        THE COURT:  When you say "take the case", you

12   have to be more specific than that, Mr. Zenwirth.

13        PROSPECTIVE JUROR:  I mean to say, since I was

14   10 years old, I was taught that a murder is to be

15   killed, and this is the way we learned --  I don't even

16   think another way.

17        THE COURT:  Let me say this, sir.  At this

18   point, you haven't heard any evidence, you only heard

19   accusations.  It's going to be up to the jurors to

20   determine, number one, whether a crime was committed,

21   and, number two, whether the person on trial is the

22   person who committed the offenses charged.

23        PROSPECTIVE JUROR:  I don't think that a

24   murder case, in my eyes, are usually not by accident.

25   It is the way I was taught.  Especially a young child.

-VMG-

1    My grandfather had a young child killed in the

2    Holocaust.  He said if you kill a young child, you

3    didn't kill one person, you killed all the people that

4    would come out afterwards.

5             THE COURT:  You haven't heard any evidence.

6             Do you have any questions?

7             MR. SIMONS:  No questions.

8             MR. HALE:  No questions.

9             THE COURT:  Sir, you'll have a seat outside

10   the courtroom and await further instructions.

11             (PROSPECTIVE JUROR EXCUSED)

12             (At this time, a prospective juror approached

13   at sidebar)

14             THE COURT:  Good morning.

15             May I have your card, please.

16             Your name, sir?

17             PROSPECTIVE JUROR:  Flavio Lemelle.

18             THE COURT:  Mr. Lemelle, I indicated the case

19   would take approximately six to nine days to try, and

20   you stated it would be a hardship?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Why is that, sir?

23             PROSPECTIVE JUROR:  I'm a composer, I'm

24   self-employed.  I just went out on my own about six

25   months ago.  Things are slow, but calls are coming in.

JURY VOIR DIRE                                        314

1    If I'm not available, I might lose clients.  If it was

2    two or three days, that would be fine.  But six to nine

3    days, that would be rough for me.

4              THE COURT:  You're saying the calls are

5    starting to come in.  Do you have anything lined up as

6    of now?

7              PROSPECTIVE JUROR:  No.  I've been calling,

8    calls come in, and if I'm not available --  You know,

9    things can turn around in a day.  If I'm not available,

10   I would lose those jobs.

11             THE COURT:  Let me say this.  You would have

12   to respond to the calls.

13             PROSPECTIVE JUROR:  If I don't impress them

14   with the calls, they don't call back.  That's the way it

15   works in this business.

16             THE COURT:  You're saying that if you don't

17   answer the call the first time they call you --

18             PROSPECTIVE JUROR:  If I'm not available to

19   turn the work around in that day or day-and-a-half, I'm

20   pretty much going to lose that contact.  I'm not going

21   to be able to do work for them anymore.  It's pretty

22   competitive.

23             THE COURT:  How long does it take, to turn

24   things around?

25             PROSPECTIVE JUROR:  Like a day,

JURY VOIR DIRE                                    315

1    day-and-a-half, they want it.  That's when I turn it

2    around.  If I can't do it in that amount of time --

3    Right now, I'm trying to establish my credibility.  It's

4    pretty tough.

5              THE COURT:  Let me say this.  If we're working

6    from nine to five, you would have time to work on

7    whatever projects you had?

8              PROSPECTIVE JUROR:  If I was available nine to

9    five, I would be able to.

10             THE COURT:  No, no.  I'm saying we're in

11   session nine to five.

12             PROSPECTIVE JUROR:  The problem is I rent a

13   studio, I share it with another guy.  If I could work at

14   night, I would do it.  I have a studio that I rent, and

15   I share with someone else.  I can't afford it by myself.

16   I can't work overnight and do the work.  I'm pretty much

17   locked to the day.

18             I don't take this lightly.  I thought about

19   getting on line here because six to nine days is really

20   serious to me.  Two or three days is different.

21             THE COURT:  There's nothing much that can be

22   tried in two or three days, I can tell you that.

23             Do you have any questions?

24             MR. SIMONS:  No.

25             MR. HALE:  No questions.

-VMG-

1              THE COURT:  Sir, you can have a seat outside

2       and await further instructions.

3              (PROSPECTIVE JUROR EXCUSED)

4              (At this time, a prospective juror approached

5       at sidebar)

6              THE COURT:  Good morning.

7              May I have your card, please.

8              Your name, sir?

9              PROSPECTIVE JUROR:  Thaer Abdelrasoul.

10             THE COURT:  Sir, you said it would be

11      difficult for you to serve the six to nine days on this

12      case?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Why is that?

15             PROSPECTIVE JUROR:  Because this is my last

16      semester in college; I have finals coming up.  I can't

17      afford to miss my final projects.  I should be

18      graduating in June.

19             THE COURT:  Okay.  When are your finals

20      scheduled, sir?

21             PROSPECTIVE JUROR:  Starting next week.

22             THE COURT:  Let me say this.  I know that

23      sometimes students who have been in college who have

24      gone through finals, we give them a letter from the

25      Court stating that they're actually on jury duty so that

1    the professors know they're actually performing jury

2    duty and not on vacation.  If we did that, would that

3    address the concerns you have and maybe they would have

4    to make arrangements to reschedule your finals?

5            PROSPECTIVE JUROR:  I'm pretty sure they'll

6    allow me to retake them, but I'd rather be on time.

7            THE COURT:  I understand what you're saying.

8    I'm sure there would be difficulty, but I'm asking you

9    now whether that would affect your judgment on this

10   particular case?

11           PROSPECTIVE JUROR:  I don't think so.

12           THE COURT:  Okay.  Sir, I'm going to ask that

13   you have a seat in the audience at this point.  I'm not

14   going to excuse you at this point.  Just have a seat in

15   the audience.

16           (At this time, the prospective juror returned

17   to the audience)

18           THE COURT:  I'm not going to excuse him at

19   this point.

20           (At this time, a prospective juror approached

21   at sidebar)

22           THE COURT:  Good morning.

23           May I have your card, please.

24           Your name, sir?

25           PROSPECTIVE JUROR:  Stanislaw Pietras.

1               THE COURT:  Mr. Pietras, you said it would be

2      a hardship if you had to serve the six to nine days,

3      sir?

4               PROSPECTIVE JUROR:  I think so because I am

5      scheduled for knee surgery next Friday.

6               THE COURT:  You're scheduled for knee surgery

7      next Friday, you said?

8               PROSPECTIVE JUROR:  Yes.  Not exactly, I have

9      to talk to the doctor.  He promised me to do it next

10     Friday.

11              THE COURT:  If you have the knee surgery, how

12     long will you have to be off that leg, sir?

13              PROSPECTIVE JUROR:  About four weeks.

14              THE COURT:  How old are you, sir?

15              PROSPECTIVE JUROR:  58.

16              THE COURT:  Do you have any questions?

17              MR. SIMONS:  No.

18              MR. HALE:  No.

19              THE COURT:  Sir, have a seat outside and

20     they'll give you further instructions.

21              PROSPECTIVE JUROR:  Another problem, my

22     English is --

23              THE COURT:  Sir, you'll go outside and remain

24     for further instructions.

25              (PROSPECTIVE JUROR EXCUSED)

1            (At this time, a prospective juror approached

2    at sidebar)

3            THE COURT:  Good morning.

4            May I have your card, please.

5            Your name, sir?

6            PROSPECTIVE JUROR:  John Oliver.

7            THE COURT:  Mr. Oliver, you said it would a

8    hardship for you if you had to serve the six to nine

9    days?

10           PROSPECTIVE JUROR:  Yes.  I start a new job on

11   Monday.  Before I started this job, I was working

12   freelance, so I'm also transitioning out of those jobs

13   as a designer.  I have basically two jobs right now, and

14   I'm a manager on a team.  I got here late today because

15   I had a project meeting at 7:30 this morning.  I got

16   four voice mails.

17           THE COURT:  Let me ask you this.  Would the

18   things that you're juggling affect your ability to

19   concentrate on the evidence in this particular case?

20           PROSPECTIVE JUROR:  Based on this morning, I

21   heard basically half the stuff you said about what the

22   indictment was.  I heard the first three or four things.

23   My head is just elsewhere.

24           THE COURT:  So you don't believe you'll be

25   able to concentrate; is that correct?

JURY VOIR DIRE                              320

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Any questions?

3           MR. HALE:  No.

4           MR. SIMONS:  No.

5           THE COURT:  Okay, sir.  You'll have to wait

6    outside the courtroom.  They'll give you further

7    instructions, Mr. Oliver.

8           (PROSPECTIVE JUROR EXCUSED)

9           (At this time, a prospective juror approached

10   at sidebar)

11          THE COURT:  Good morning.

12          May I have your card, please.

13          Your name, sir?

14          PROSPECTIVE JUROR:  Douglas Wexler.

15          THE COURT:  Mr. Wexler, you said it would be a

16   hardship if you had to serve the six to nine days?

17          PROSPECTIVE JUROR:  I'm a one-man company, and

18   I have one client Wednesday next week and Monday the

19   following.  I'm contractually obligated to give three

20   seminars, and those are two of the three.

21          THE COURT:  What kind of work do you do?

22          PROSPECTIVE JUROR:  Investment advising and

23   financial planning for unions and groups of different

24   organizations.

25          THE COURT:  You said it's Wednesday of next

JURY VOIR DIRE                           321

1      week?

2                    PROSPECTIVE JUROR:  Monday and Wednesday.

3                    THE COURT:  You're talking about Monday, May

4      7th, and the 12th?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  And that's all day; is that

7      correct?

8                    PROSPECTIVE JUROR:  Yes, with the travel.

9                    THE COURT:  Okay.  Let me ask you this,

10     Mr. Wexler.  If, in fact, you were picked to serve on

11     this particular case, would it affect your ability to

12     concentrate on the evidence in this case?

13                   PROSPECTIVE JUROR:  I can't see not being

14     extremely anxious and distracted.

15                   THE COURT:  Any questions?

16                   MR. SIMONS:  No questions.

17                   MR. HALE:  No.

18                   THE COURT:  Mr. Wexler, you'll remain outside

19     until you receive further instructions.

20                   (PROSPECTIVE JUROR EXCUSED)

21                   (At this time, a prospective juror approached

22     at sidebar)

23                   THE COURT:  Good morning.

24                   May I have your card, please.

25                   Your name, please?

-VMG-

JURY VOIR DIRE                                    322

1          PROSPECTIVE JUROR:  Lisa Sinckler.

2          THE COURT:  Miss Sinckler, you said it would

3    be a hardship if you had to serve the six to nine days?

4          PROSPECTIVE JUROR:  Yes.  I'm a consultant and

5    I work on per diem.  I mean, I only get paid for the

6    days I worked.  I have a mortgage to pay, bills,

7    everything.

8          THE COURT:  What kind of work do you actually

9    do?

10          PROSPECTIVE JUROR:  I'm a project manager for

11    I.B.M.

12          THE COURT:  Do you have jobs lined up at this

13    point?

14          PROSPECTIVE JUROR:  What do you mean by that?

15          THE COURT:  You said you're a consultant?

16          PROSPECTIVE JUROR:  Right.  I'm working right

17    now for I.B.M.  Right now, I have three projects that

18    I'm managing right now, and I'm only getting paid for

19    the days I'm working.  So even for this week, I'm only

20    going to get paid for three days.

21          THE COURT:  Let me ask you this,

22    Miss Sinckler.  If you were selected to serve on this

23    particular case, and the fact of your circumstances,

24    would that affect whether you would be able to

25    concentrate on the evidence in this case?

1          PROSPECTIVE JUROR:  Yeah.  Exactly.  I have

2     bills to pay, you know?

3          THE COURT:  Any questions?

4          MR. SIMONS:  No questions.

5          MR. HALE:  No questions.

6          THE COURT:  Remain outside until they give you

7     further instructions.

8          (PROSPECTIVE JUROR EXCUSED)

9          (At this time, a prospective juror approached

10    at sidebar)

11         THE COURT:  Good morning.

12         May I have your card, please.

13         Your name, sir?

14         PROSPECTIVE JUROR:  Daniel Cipriano.

15         THE COURT:  Mr. Cipriano, you said it would be

16    a hardship for you to serve the six to nine days?

17         PROSPECTIVE JUROR:  I just want to be sure

18    before we start.  Because I'm supporting my sister in

19    the Philippines and my nephew who is mentally retarded.

20    I just want to be sure, because I'm picking up cases

21    outside, you know, treatment.

22         THE COURT:  What is the nature of the work you

23    do?

24         PROSPECTIVE JUROR:  I'm a therapist.  I just

25    want to be sure it would be no problem with my income

JURY VOIR DIRE                                324

1        coming in.

2                THE COURT:  Well, normally we're in session

3        from nine to five.  So, when you say your income --

4                PROSPECTIVE JUROR:  You know, there would be

5        interruption with my income.  You know what I'm saying?

6        I am a state worker, but I pick up cases outside also to

7        support my sister and my nephew.  I just want to be

8        sure.  You know what I'm saying?

9                THE COURT:  No, I'm not really sure.

10               You work for the state?

11               PROSPECTIVE JUROR:  Yes.

12               THE COURT:  In what capacity?

13               PROSPECTIVE JUROR:  I'm also paying for the

14       Chapter 13 bankruptcy.  I'm picking up cases outside.  I

15       just want to make sure there's no interruption if it

16       happens I'm selected in this case.

17               THE COURT:  I don't know when you're scheduled

18       to do the other cases that you have, but this is for the

19       six to nine days, it would be from 9 a.m. to 5 p.m.

20               PROSPECTIVE JUROR:  I just want to be sure it

21       won't affect my income.

22               THE COURT:  If you don't schedule your

23       appointments from 9 a.m. to 5 p.m.  If it's after that,

24       then certainly it should not.

25               PROSPECTIVE JUROR:  Sure.

1              THE COURT:   Okay?

2              PROSPECTIVE JUROR:   Yes.

3              THE COURT:   Is that the only question you had?

4              PROSPECTIVE JUROR:   Yes.

5              THE COURT:   Any questions?

6              MR. SIMONS:   No.

7              MR. HALE:   No.

8              THE COURT:   Thank you.

9              (At this time, the prospective juror returned

10     to the audience)

11             (At this time, a prospective juror approached

12     at sidebar)

13             THE COURT:   Good morning.

14             May I have your card, please.

15             Your name sir?

16             PROSPECTIVE JUROR:   Sam Wainer.

17             THE COURT:   Mr. Wainer, you said it would be a

18     hardship if you had to serve six to nine days, sir?

19             PROSPECTIVE JUROR:   Yes.  I'm leaving the

20     country in two weeks and leaving New York state after

21     that.  As a result of that, I need to be able to get a

22     vaccine on Wednesday of next week, and also need to be

23     at work to close out accounts during these two weeks.

24             THE COURT:   What kind of work do you do?

25             PROSPECTIVE JUROR:   I'm a marketing

JURY VOIR DIRE                                    326

1    consultant.  I do marketing research.  I have a note

2    from the doctor about the vaccine.

3              THE COURT:  Certainly it's not going to take

4    all day for the vaccine.

5              PROSPECTIVE JUROR:  No.  I have to get it on

6    Wednesday.

7              THE COURT:  But I'm saying is there a

8    particular time you're scheduled for?

9              PROSPECTIVE JUROR:  Yes, there is.

10             THE COURT:  What time?

11             PROSPECTIVE JUROR:  Two.

12             THE COURT:  So, let me say then that that

13   should not be an issue.

14             What I'm more concerned about, if you're

15   saying two weeks, when are you actually planning to

16   leave the country?

17             PROSPECTIVE JUROR:  The flight leaves on

18   the 19th.

19             THE COURT:  I don't know, that may or may not

20   be a problem.  You're saying you're leaving on the 19th?

21             PROSPECTIVE JUROR:  Yes, it's nonrefundable.

22             THE COURT:  You mentioned about closing out

23   accounts.

24             PROSPECTIVE JUROR:  Because I'm leaving the

25   country and leaving New York, my job, I need to be there

JURY VOIR DIRE                         327

1    to train people and help people to do my job, and there

2    is no one else who can do it.

3                THE COURT:   I don't know if that's an excuse,

4    because God forbid, let's say, something happened to you

5    where you weren't around, they would find somebody to

6    train.  And it's not as though you're leaving early to

7    go on vacation.  That's certainly not the issue.

8                Mr. Wainer, let me ask you this.  If you were

9    selected to serve, with everything that you know you

10   have to do, would that affect your ability to listen to

11   the evidence and concentrate on the evidence in this

12   case?

13               PROSPECTIVE JUROR:  I think my need to leave

14   could affect my ability, obviously.

15               THE COURT:  Do you have any questions?

16               MR. HALE:  No.

17               MR. SIMONS:  No.

18               THE COURT:  Sir, you'll wait outside until you

19   hear further instructions.

20               (PROSPECTIVE JUROR EXCUSED)

21               (At this time, a prospective juror approached

22   at sidebar)

23               THE COURT:  Good morning.

24               May I have your card, please.

25               Your name, please?

JURY VOIR DIRE                                    328

1          PROSPECTIVE JUROR:  Falon Chavous.

2          THE COURT:  Miss Chavous, you said it would be

3    a hardship if you had to serve the six to nine days?

4          PROSPECTIVE JUROR:  It's how many?

5          THE COURT:  Six to nine days.

6          PROSPECTIVE JUROR:  My thing is I just got a

7    new job that I started a month and a half ago.  I know

8    they cover five days for jury duty.  I'm not sure if

9    they're going to cover the rest.

10         THE COURT:  Is it new employment?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  I guess you haven't spoken with

13   them.  Let me ask you this.  If, in fact, we wrote a

14   letter to indicate that you were actually on jury duty

15   and with the expected length of the trial, would that

16   help you?

17         PROSPECTIVE JUROR:  I'm not sure.  I'm new to

18   the company.  I don't know what the procedures are.  I

19   did speak to them about the first initial jury day, and

20   they stated they'll cover that.  I'm not sure about the

21   extended period of time.

22         THE COURT:  Well, do you know if there's

23   anyone you can call to find out?

24         PROSPECTIVE JUROR:  Yeah, I can try to call

25   H.R.

JURY VOIR DIRE                                    329

1          THE COURT:  Okay.  What I would ask that you

2     do is try to do that during the luncheon recess to see

3     if you can get an answer as far as that is concerned,

4     and then you'll speak to the Court again.

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  And tell them what the expected

7     trial time is, six to nine days.  That the case would

8     take approximately six to nine days to try.

9          PROSPECTIVE JUROR:  Okay.  I don't know if

10    it's going to affect the dates, but I'm also going on

11    vacation in three weeks.

12         THE COURT:  Three weeks wouldn't be the

13    problem.

14         PROSPECTIVE JUROR:  The 22nd.

15         THE COURT:  That shouldn't be a problem.

16         PROSPECTIVE JUROR:  Okay.

17         THE COURT:  So maybe you can find out from

18    your job.

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Okay.  Have a seat in the

21    audience.

22              (At this time, the prospective juror returned

23    to the audience)

24         THE COURT:  I don't think we should discount

25    her at this point.

1            (The following occurred in open court in the

2     presence of the panel of prospective jurors:)

3            THE COURT:  Certainly, jurors, you have to

4     tell us anything you think might interfere with your

5     judgment of this case.  That would be include any

6     physical disability or any conditions that you have that

7     might prevent you from concentrating on the evidence.

8            Certainly, jurors, if any such problem comes

9     to mind, you can always ask to approach the bench and

10    speak to the Court privately.

11           Now, jurors, I will now state to you certain

12    basic principles of law which you must accept, whether

13    you agree with these principles of law or not, or even

14    if you think that the law should be something other than

15    what it actually is.

16           Now, jurors, if for any reason you cannot

17    accept any one of these principles of law, then you must

18    raise your hand and so indicate that so that we can then

19    explore those areas together.

20           Now, jurors, the defendant was brought into

21    this courtroom by way of an indictment.  An indictment

22    is a name given to a piece of paper.  Jurors, an

23    indictment is not proof of anything.  It is only the

24    means by which this defendant has been brought into

25    court, and it outlines the complaint against the

1    defendant.

2              Jurors, an indictment is only an accusation of

3    a crime, and you cannot infer that a defendant is guilty

4    because he has been arrested and because he has been

5    indicted by a Grand Jury.

6              Can each of you accept that fact?

7              (AFFIRMATIVE RESPONSE FROM JURORS)

8              THE COURT:  Is there any one of you who cannot

9    accept that fact?

10             I would ask you to raise your hand high so

11   that we can explore that area together.

12             (NO HAND RAISED)

13             THE COURT:  Again, I don't see any hands.

14             Now, jurors, the defendant comes into this

15   courtroom to answer the indictment when he pleads not

16   guilty.  The law provides that the defendant is presumed

17   innocent until proven guilty beyond a reasonable doubt.

18             Jurors, can each of you accept the fact that

19   at this point this defendant is innocent of all crimes

20   against him?  Can everyone accept that fact?

21             (AFFIRMATIVE RESPONSE FROM JURORS)

22             THE COURT:  Is there any one of you who cannot

23   accept that fact?

24             I would ask that you raise your hand high so

25   that we can explore that area together.

-VMG-

JURY VOIR DIRE                                332

1                    (NO HAND RAISED)

2                    THE COURT:  Again, I don't see any hands.

3                    Jurors, I'm going to tell you that there are

4        no right or wrong answers, only truthful answers.

5                    Jurors, you understand that because of these

6        concepts and because you have not heard any evidence up

7        to this point, jurors, if you are asked to vote right

8        now, you would have to vote that the defendant is not

9        guilty.

10                    Can each of you accept that fact?

11                    (AFFIRMATIVE RESPONSE FROM JURORS)

12                    THE COURT:  Is there any one of you who cannot

13        accept that fact?

14                    I would ask that you raise your hand high so

15        that we can explore that area together.

16                    (NO HAND RAISED)

17                    THE COURT:  Again, I don't see any hands.

18                    Jurors, do any of you feel that because

19        Mr. Waiters has been brought into court on an indictment

20        and arrested that he must be guilty of something?

21                    Does anyone feel that way?  I would ask that

22        they raise their hand.

23                    (NO HAND RAISED)

24                    THE COURT:  Again, I don't see any hands.

25                    Jurors, the law grants this defendant the

1    presumption of innocence throughout the trial, and the

2    law has placed the burden to prove that the defendant is

3    guilty beyond a reasonable doubt on the shoulders of the

4    District Attorney's Office, and that burden of proof

5    never shifts.

6             Jurors, please bear in mind that the defendant

7    in this case need not prove anything.  The law says that

8    if the prosecution meets its burden and proves that the

9    defendant is guilty beyond a reasonable doubt, it will

10   be your responsibility as a juror to find the defendant

11   guilty.

12            Now, jurors, can you find the defendant guilty

13   if the People prove his guilt to you beyond a reasonable

14   doubt?  Can everyone do that?

15            (AFFIRMATIVE RESPONSE FROM JURORS)

16            THE COURT:  Is there any juror, because of

17   religious, moral or other reasons, that feels that you

18   would be unable to do that?

19            I would ask that you raise your hand high so

20   that we can explore that area together.

21            (NO HAND RAISED)

22            THE COURT:  Again, I don't see any hands.

23            Now, jurors, if identity is an issue, then of

24   course the defendant must --  I'm sorry.

25            If identity is an issue, then of course the

1    People must also prove beyond a reasonable doubt that

2    the defendant was, in fact, the one who committed the

3    offenses charged.

4              Jurors, under our system of law, the defendant

5    is not obligated to take the witness stand or to call

6    any witnesses.

7              Jurors, that means that the defendant's

8    attorney does not have to participate during jury

9    selection, and he does not have to make an opening

10   statement, whereas the District Attorney's Office, by

11   law, is required to make an opening statement, and

12   defense counsel does not have to object to a single

13   question that will be put to any of the witnesses, and

14   defense counsel does not have to sum up at the end of

15   the case.  Because, again, the defense has no obligation

16   or burden to do anything whatsoever in this case.

17             Jurors, the defendant has the right to remain

18   silent and not testify.  If he exercises the right to

19   remain silent, you're not to presume anything or

20   speculate as to why he did not testify.  The fact that

21   he did not testify is not to enter into your

22   deliberation.

23             I know often times jurors will say to me --

24   prospective jurors will say to me that they would like

25   to hear from both sides and then they'll make up their

1    minds.  However, jurors, that is not the law.  The law

2    says that the defendant is not obligated to testify or

3    to call any witnesses in this case.

4           Now, jurors, would you be able to, if the

5    defendant does not testify, hold the People to their

6    burden of proof of establishing guilt beyond a

7    reasonable doubt based solely on the evidence as

8    introduced by the People and the law as I give it to

9    you?

10          Can everyone do that?

11          (AFFIRMATIVE RESPONSE FROM JURORS)

12          THE COURT:  Is there any juror who believes

13   that they would be unable to do that?

14          I would ask that you raise your hand high so

15   that we can explore that area together.

16          (NO HAND RAISED)

17          THE COURT:  Again, I don't see any hands.

18          Jurors, please keep in mind that if the

19   defendant chooses to testify on his own behalf or to

20   call witnesses, this does not shift the burden of proof

21   from the District Attorney's Office.  The District

22   Attorney's Office always has the burden to establish

23   guilt beyond a reasonable doubt.

24          Now, I will define reasonable doubt at the end

25   of the trial.  But, in substance, a reasonable doubt is

1    not a mere possibility or a guess or a whim or a

2    speculation outside of the evidence.  Rather, jurors, it

3    is a doubt which you have after you have heard all of

4    the evidence in the case, when after such consideration

5    of all of the evidence in the case, either the presence

6    of certain facts or the absence of certain facts leaves

7    your mind in such a state of uncertainty that you're not

8    fully convinced of the defendant's guilt, and you're

9    also satisfied that in entertaining such a doubt you're

10   acting as a reasonable person should act in a matter of

11   this importance.  Jurors, that sort of doubt which seems

12   reasonable to you is a reasonable doubt, of which the

13   defendant is entitled to the benefit of.

14            Now, jurors, can you find the defendant not

15   guilty if you have a reasonable doubt of his guilt?  Can

16   everyone do that?

17            (AFFIRMATIVE RESPONSE FROM JURORS)

18            THE COURT:  Is there any one of you who

19   believes that you would be unable to do that?

20            I would ask that you raise your hand high so

21   that we can explore that area together.

22            (HAND RAISED)

23            THE COURT:  I see one hand.  I see half a

24   hand.

25            I'll see the attorneys with the reporter.

JURY VOIR DIRE                                337

1          (The following occurred at sidebar out of the

2     hearing of the panel of prospective jurors:)

3               (At this time, a prospective juror approached

4     at sidebar)

5               THE COURT:  Good morning.

6               May I have your card, please.

7               Your name, please?

8               PROSPECTIVE JUROR:  Yerachmiel Beer.

9               THE COURT:  Mr. Beer, if, in fact, at the end

10    of the case the People have not proven the defendant

11    guilty beyond a reasonable doubt, would be able to find

12    the defendant not guilty if you had a reasonable doubt

13    of his guilt?

14              PROSPECTIVE JUROR:  That's why I only gave

15    half a hand.  I'm not really sure.  See, my father, as a

16    teenager, was walking in Prospect Park and one of his

17    friends was murdered.  My father was a witness and he

18    testified and the guy got acquitted.

19              I grew up my whole life calling it the system

20    that let guilty people get away.  There's no reason why

21    he got away.  I'm not sure if I'll be able to find a

22    person not guilty.  I always had that thing about people

23    getting away with the system.

24              THE COURT:  Mr. Beer, let me say, if you're

25    selected as a juror, it would not be your decision as to

JURY VOIR DIRE                                    338

1   whether, as you say, letting people out of the system or

2   in the system.

3                   Basically, what you're saying is you've always

4   grown up with the fact that people who are guilty are

5   let go?

6                   PROSPECTIVE JUROR:  Yes.

7                   THE COURT:  My concern is if that is your

8   feelings, because of your personal feelings you might

9   allow your personal feelings to interfere with how you

10  judge the evidence in this case, and there's nothing

11  wrong with that, however, you need to let us know now.

12  Because the worse thing you can do is allow yourself to

13  be selected as a juror, and because you have these deep

14  feelings about certain issues, to allow those

15  deep-seated feelings to affect or influence how you

16  judge the evidence.  That would be a travesty.

17                  PROSPECTIVE JUROR:  That's why I'm not sure.

18  I can't know.

19                  THE COURT:  Let me say this.  If you hear

20  something that reminds you of your dad's situation, will

21  you start thinking about that, your dad's situation, and

22  allow that to affect how you judge the evidence in this

23  case?

24                  PROSPECTIVE JUROR:  Right now?

25                  THE COURT:  I'm saying if it's yes.

JURY VOIR DIRE                                    339

1          PROSPECTIVE JUROR:  Right now, I feel like

2    anger right now.  I very, very upset, here's my chance

3    to get back.

4          THE COURT:  No, no, that's not the kind of

5    feelings that either the People or the defense would

6    want, nor the Court.

7          Thank you, sir, for your honesty.

8          You'll remain outside until they give you

9    further instructions.

10          (PROSPECTIVE JUROR EXCUSED)

11          (The following occurred in open court in the

12    presence of the panel of prospective jurors:)

13          THE COURT:  Certainly, jurors, you may not

14    allow the feeling or consider anything connected with

15    punishment, sympathy or prejudice in your verdict.

16          Jurors, is there any one of you who feels that

17    you could not eliminate the feeling of punishment,

18    sympathy or prejudice from your deliberation?

19          If you feel that way, I would ask you to raise

20    your hand high so that we can explore that area

21    together.

22          (HAND RAISED)

23          THE COURT:  Okay.  I see one hand.

24          (The following occurred at sidebar out of the

25    hearing of the panel of prospective jurors:)

-VMG-

1          (At this time, a prospective juror approached

2     at sidebar)

3               THE COURT:   Good morning.

4               May I have your card, please.

5               Your name, please?

6               PROSPECTIVE JUROR:  Richard Bartow.

7               THE COURT:  Mr. Bartow, I asked whether, in

8     fact, you could eliminate the feeling of punishment,

9     sympathy or prejudice from your deliberation, and you

10    raised your hand to say you could not eliminate that?

11              PROSPECTIVE JUROR:  Yeah, I can't.  I just

12    think it's impossible.  Excuse me, I'm nervous.  I just

13    think it's impossible to eliminate sympathy at all.

14              THE COURT:  When you say "sympathy", you're

15    talking about sympathy for the defendant, who is on

16    trial?

17              PROSPECTIVE JUROR:  For everyone.  Mostly for

18    the defendant, I guess.  I don't know.  I guess for

19    everyone involved in the case.  I don't think anyone

20    could eliminate sympathy.

21              THE COURT:  Mr. Bartow, we all have sympathy.

22    If we didn't, we'd be robots.

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  What I'm asking you is if you can

25    hold that sympathy in abeyance and not allow it to

-VMG-

1    affect the evidence in this case.  What we're looking

2    for, and I don't know whether you can do it, what we're

3    looking for is jurors who can listen to the evidence and

4    call it straight up and down as they see it without

5    being influenced by anything else.  Okay?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  As I said, call it straight up and

8    down, without saying gee, I feel sorry for this person,

9    I feel sorry for that person.  But, even if you say

10   that, not to allow it to affect your judgment.  Gee, I

11   feel so bad, I'm going to decide this way because I feel

12   so bad, or I'm going to decide that way because I feel

13   so bad.  We're looking for jurors who listen critically

14   to all of the evidence and then call it straight up and

15   down, as they say, without going to the left or to the

16   right, but straight up and down.  I don't know whether

17   you can do it, but that's the kind of juror we're

18   looking for.

19                   PROSPECTIVE JUROR:  I don't know if I'm going

20   to be able to do that.

21                   THE COURT:  Okay.

22                   Any questions?

23                   MR. SIMONS:  No questions.

24                   MR. HALE:  No.

25                   THE COURT:  Thank you, sir, for your honesty.

JURY VOIR DIRE

1      You'll remain outside until you hear further

2  instructions.

3           (PROSPECTIVE JUROR EXCUSED)

4           (The following occurred in open court in the

5  presence of the panel of prospective jurors:)

6           THE COURT:  Jurors, at the end of this case,

7  you will be called upon to make a factual judgment.

8  You're not here to make a moral judgment or to determine

9  whether or not Mr. Waiters is a good or a bad person.

10          Jurors, what is on trial in this courtroom is

11  what, if any, involvement Mr. Waiters had with the

12  incident which occurred on May 7, 2006.

13          Now, as I told you at the outset, you must

14  evaluate the testimony of every witness that will come

15  into this courtroom to testify, and you must then

16  determine whether the witnesses who do testify are

17  telling the truth and whether their testimony is

18  reliable testimony.

19          Jurors, you will have to listen carefully to

20  each witness and then determine whether you will accept

21  or reject their testimony, either in whole or in part.

22          Jurors, for example, a number of the People's

23  witnesses in this case will be police officers.  They

24  will take the same oath to tell the truth as any other

25  witness in this case.

1           Now, the fact that a witness is a police

2    officer or wears a police officer's uniform does not

3    make him or her any more are or any less credible by the

4    fact that he or she is a police officer.

5           Now, jurors, is there any one of you who have

6    any feelings about police officers which would lead you

7    to give a police officer's testimony any greater or any

8    less weight than you would any other witness in this

9    case?

10          If you feel that way, I would ask that you

11   raise your hand so that we can explore that area

12   together.

13               (NO HAND RAISED)

14          THE COURT:  Again, I don't see any hands.

15          Now, jurors, at the end of this case, I will

16   explain to you all of the law that will be applicable in

17   this particular case.  Jurors, you must accept the law

18   from me, whether, in fact, you agree with the law or

19   not, or even if you believe that the law should be

20   something other than what it actually is.  And you must

21   accept the law from me without hesitation and without

22   reservation.

23          Now, jurors, can you accept the law from me

24   without hesitation and without reservation?  Can

25   everyone do that?

JURY VOIR DIRE                                    344

1          (AFFIRMATIVE RESPONSE FROM JURORS)

2          THE COURT:  Is there any juror, because of

3   religious, moral or other reasons, feel that you would

4   be unable to do that?

5          I would ask that you raise your hand high so

6   that we can explore that area together.

7          (NO HAND RAISED)

8          THE COURT:  Again, I don't see any hands.

9          Jurors, what's going to happen at this point

10  is that names will be called to have a seat in the jury

11  pocks.  I will be asking you questions from a

12  questionnaire.

13         Jurors, there are no right or wrong answers to

14  the questions that I ask.

15         Certainly, after I've asked you questions, I

16  will give the assistant district attorney, Mr. Hale, an

17  opportunity to ask you questions as well.

18         Thereafter, if defense counsel, Mr. Simons,

19  chooses, he may also ask you questions.  But, again,

20  since the defense has no obligation or burden to do

21  anything whatsoever, defense counsel need not ask you

22  any questions.

23         Again, as I said, jurors, there's no right or

24  wrong answers to my questions or to their questions.

25  Because the worse thing that you can do is tell us an

1    answer you think that we wish to hear and then during

2    the course of your deliberations you find that there is

3    something in your background that you have not told us

4    that will prevent you from being fair and impartial to

5    both sides.

6                Proceed.

7                THE CLERK:   As I call your name, please take

8    the seat that I call in the jury box.

9                Falon Chavous.

10               F-A-L-O-N, C-H-A-V-O-U-S.

11               Seat number one.

12               Mazhar Al Hadid.

13               M-A-Z-H-A-R, A-L, H-A-D-I-D.

14               Seat number two.

15               Daniel Cipriano.

16               C-I-P-R-I-A-N-O.

17               Seat number three.

18               Victor Montiel.

19               M-O-N-T-I-E-L.

20               Seat number four.

21               Eleanor Cadle.

22               C-A-D-L-E.

23               Seat number five.

24               Alexander Podulke.

25               P-O-D-U-L-K-E.

JURY VOIR DIRE                                346

```
 1              Seat number six.

 2              Maurice Vannkeuren.

 3              V-A-N-N-K-E-U-R-E-N.

 4              Seat number seven, in the top row.

 5              Thaer Abdelrasoul.

 6              First name, T-H-A-E-R; last name,

 7      A-B-D-E-L-R-A-S-O-U-L.

 8              Seat number eight.

 9              Robert Thomas, seat number nine.

10              Mark Rohrer.

11              R-O-H-R-E-R.

12              Seat number ten.

13              Orison Diaz.

14              O-R-I-S-O-N, D-I-A-Z.

15              Seat number eleven.

16              John Perkins.

17              P-E-R-K-I-N-S.

18              Seat number twelve.

19              Jill Meerpohl.

20              M-E-E-R-P-O-H-L.

21              Seat number thirteen, in the back row.

22              Juan Ynoa.

23              That's Y-N-O-A.

24              Seat number fourteen, in the front row.

25              Guerdy Oxilus.
```

JURY VOIR DIRE                                      347

1              First name, G-U-E-R-D-Y; last name

2       O-X-I-L-U-S.

3              Seat number fifteen, in the back row.

4              Felix Onyenwe.

5              That's O-N-Y-E-N-W-E.

6              Seat number sixteen, in the front row.

7              Franklin Uribe.

8              U-R-I-B-E.

9              Seat number seventeen, in the back row.

10             Darryl Williams.

11             Seat number eighteen, in the front row.

12             Thomas Wegiel.

13             W-E-G-I-E-L.

14             Sir, take a seat in the front row just over

15      there.  That will be seat number nineteen.

16             THE COURT:  Jurors, I'm going to ask that you

17      please keep your voice up.  You need to speak loud

18      enough so that we can hear your answers.

19             Also, jurors, myself and the attorneys will

20      make every effort to pronounce your name correctly.  If

21      we do not, please tell us how to correctly pronounce

22      your name, and we'll try our best.

23             Certainly, we may not be as eloquent as your

24      are in saying it, but we will make every best effort to

25      do so.

-VMG-

JURY VOIR DIRE                                    348

1              You don't have to read us the question, just

2        tell us the number and the answer to your question.

3        Number one, two, and go straight down with your answers.

4              Starting with question number one,

5        Miss Chavous?

6              PROSPECTIVE JUROR:  My name is Falon Chavous.

7              23 years old.

8              I am born in New York City.

9              THE COURT:  Can you just keep your voice up.

10       You're speaking so sweetly, I'm having difficulty

11       hearing you.

12             PROSPECTIVE JUROR:  I was born in New York

13       City.

14             I live in --  I don't know what area it's

15       called, Starrett City.

16             THE COURT:  Okay.

17             PROSPECTIVE JUROR:  I'm an administrative

18       assistant.

19             I have my Bachelor's degree.

20             I'm single.

21             No kids.

22             There are two other members in my household,

23       they're teachers.

24             I've never served on any jury.

25             I don't have any vision or hearing problem.

JURY VOIR DIRE                                    349

1          I have an uncle who is a C.O.

2          THE COURT:  Anyone who works at a law office?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Number thirteen?

5          PROSPECTIVE JUROR:  No, not that I know of.

6          Number fourteen, yeah, I have several members

7    of my family who have been arrested.

8          THE COURT:  Can you tell us what they were

9    arrested for, and how the case was resolved.

10          PROSPECTIVE JUROR:  I don't know specifically.

11    My parents was a drug conviction.

12          THE COURT:  Okay.

13          Did that happen in Brooklyn or somewhere else?

14          PROSPECTIVE JUROR:  Manhattan.

15          THE COURT:  Anything about the way that they

16    were treated, that you remember, either by the police,

17    or the District Attorney's Office, that might affect

18    your ability to sit on this case and judge the evidence

19    fairly in this case, Miss Chavous?

20          PROSPECTIVE JUROR:  I was a little girl, it

21    was about fifteen years ago, so I don't remember too

22    much about it.

23          THE COURT:  So it would not affect your

24    judgment; is that correct?

25          PROSPECTIVE JUROR:  No.

JURY VOIR DIRE                          350

1              THE COURT:  Okay.  Thank you.

2              Mr. Al Hadid?

3              PROSPECTIVE JUROR:  My name is Mazhar Al

4      Hadid.

5              I am 29 years old.

6              I was born in Aleppo, Syria.

7              I live in the neighborhood of Williamsburg,

8      Brooklyn.

9              My occupation is a dentist.

10             I received my D.D.S. degree.

11             I am single.

12             I live with my girlfriend.  She's a student.

13             I've never served on a jury before.

14             I do not have any serious vision or hearing

15     problems.

16             I do not know anybody who's had any legal

17     training or is employed at a law firm.

18             I do not know anyone in law enforcement.

19             None of my friends or family have been victims

20     of crime.

21             I have not been arrested, and neither have

22     members of my family been arrested.

23             THE COURT:  Okay.

24             Mr. Cipriano?

25             PROSPECTIVE JUROR:  My name is Daniel

JURY VOIR DIRE                                          351

1       Cipriano.

2                   My age is 49.

3                   My place of birth is Philippines.

4                   I live in the neighborhood of Midwood,

5       Brooklyn.

6                   My occupation is physical therapist.

7                   I have three years in physical therapy and

8       four years in psychology.

9                   I'm single.

10                  Eight, I'm by myself here.

11                  Number nine, no.

12                  Number ten, no.

13                  I have couple friends, two lawyers I know.

14                  THE COURT:  What kind of law do they practice?

15                  PROSPECTIVE JUROR:  Once in a while, it's more

16      on like the --  How would you say?  It's more on the

17      concentration of adult, like the medical aspect.

18                  THE COURT:  Personal injury?

19                  PROSPECTIVE JUROR:  Yes.

20                  Law enforcement, no.

21                  Thirteen, no.

22                  Fourteen, no.

23                  THE COURT:  Thank you.

24                  Mr. Montiel?

25                  PROSPECTIVE JUROR:  My name is Victor Montiel.

JURY VOIR DIRE                                    352

1              I'm 26 years old.

2              I was born in Brooklyn.

3              I live in the neighborhood of Midwood in

4      Brooklyn.

5              My occupation is, I am in sales.  I work for

6      Coach.

7              High school.

8              I am single.

9              I live with my parents and two sisters.  They

10     go to school.  My parents, one works in a restaurant; my

11     mother does maintenance.

12             I have never served in a jury before.

13             I do not have any serious vision or hearing

14     problem.

15             No for eleven.

16             No for twelve.

17             No.

18             THE COURT:  That's no to thirteen?

19             PROSPECTIVE JUROR:  Yes, no.

20             And no to number fourteen.

21             THE COURT:  Okay.

22             Miss Cadle?

23             PROSPECTIVE JUROR:  My name is Eleanor Cadle.

24             My age is 66.

25             My place of birth is Belize, Central America.

JURY VOIR DIRE                                        353

1            I live in Bed Stuy.

2            My occupation, I am retired now.

3            THE COURT:  What was your occupation before

4    you retired, Miss Cadle?

5            PROSPECTIVE JUROR:  Teaching.

6            I have my Bachelor.

7            I am divorced.

8            I have six children.

9            THE COURT:  Their ages and occupations,

10   Miss Cadle?

11           PROSPECTIVE JUROR:  My oldest, he works

12   Transit.  The second one work teaching.  The third one,

13   she works also as a school aide.  Number fourteen is the

14   fourth one.  The fifth, she works with mentally retarded

15   children.  And the sixth one, she's a housewife.

16           THE COURT:  Okay.

17           PROSPECTIVE JUROR:  Number eight, the one who

18   live with me, she work with the mentally retarded

19   children.

20           Number nine, no.

21           Number ten, no, I don't have anything serious.

22   I just wear glasses.

23           Number eleven, my sister work with a law firm

24   on Wall Street.  I forgot the name of it.

25           I don't have anyone involved in number twelve.

JURY VOIR DIRE                                    354

1            Number thirteen, yes.

2            Number fourteen, yes.  He was arrested for

3       drugs.

4            THE COURT:  Was that in Brooklyn or somewhere

5       else?

6            PROSPECTIVE JUROR:  In Brooklyn.

7            THE COURT:  What happened to your son's case?

8            PROSPECTIVE JUROR:  He's in jail.

9            THE COURT:  Anything about the way that he was

10      treated by the police or the District Attorney's Office

11      that might affect your ability to sit on this case and

12      judge the evidence fairly in this case, Miss Cadle?

13           PROSPECTIVE JUROR:  No.  Because, honestly, he

14      had it.  So, he was arrested for it, and that's it.

15           THE COURT:  You also mentioned that some

16      family members were victims of crime.  Did somebody

17      happen to them?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  Let me ask you this.  When you say

20      you're divorced, what kind of work did your ex-spouse do

21      for a living?

22           PROSPECTIVE JUROR:  Taxi.

23           THE COURT:  Thank you.

24           Mr. Podulke?

25           PROSPECTIVE JUROR:  My name is Alex Podulke.

-VMG-

JURY VOIR DIRE                                      355

1            I am 37.

2            I was born in St. Paul, Minnesota.

3            I live in Williamsburg, Brooklyn.

4            My occupying is an actor.

5            I got a graduate degree, but it's not

6    supported by an undergraduate degree.

7            I am engaged.  I live with my fiancee, who

8    works for a publishing company, and our roommate, who is

9    a producer for a Lincoln Center festival.

10           I've never been on a jury.

11           No vision or hearing problems.

12           I have an uncle and an aunt who are both

13   lawyers.  My aunt was a criminal prosecution lawyer, and

14   my uncle was criminal defense for years.  Then he became

15   a clerk for Supreme Court for the state of Minnesota,

16   and ended his career as, I guess, the head of the.

17   Appellate Court for the state of Minnesota.

18           I used to be a bartender for a bar that a lot

19   of cops went to.

20           My sister was the victim of a sex crime, and

21   they never caught the person.

22           THE COURT:  Did that happen in Brooklyn or

23   back in Minnesota?

24           PROSPECTIVE JUROR:  In Minnesota.

25           THE COURT:  Anything about her experience,

-VMG-

1    which has to be traumatic, that might affect your

2    ability to sit on this case and judge the evidence

3    fairly in this case?

4              PROSPECTIVE JUROR:  No.

5              My little brother was arrested for drug

6    possession in Wyoming, and the charges were dropped.

7              THE COURT:  Anything about your brother's

8    experience, how he was treated out there, that might

9    affect your ability to sit on this case and be fair in

10   this case?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Thank you.

13             Mr. Vannkeuren?

14             PROSPECTIVE JUROR:  My name is Maurice

15   Vannkeuren.

16             I'm 21 years old.

17             My birth place is New York City.

18             The neighborhood I live in now is East New

19   York.

20             At the time, I don't have an occupation.

21             THE COURT:  If you were employed, what were

22   you doing before?

23             PROSPECTIVE JUROR:  It was in a youth

24   assistance for a boys and girls club.

25             I just got my high school diploma.

JURY VOIR DIRE                                    357

1          I have one child.  I'm in a relationship.

2          THE COURT:  How old is she?

3          PROSPECTIVE JUROR:  Seven months.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  My mother works for the

6   D.M.V. on Atlantic Avenue.

7          Number nine, no.

8          Number ten, no.

9          Eleven and twelve, no, also.

10         Thirteen, I had some family members and my

11  brother also has been arrested and convicted of crimes.

12  Gun possession.

13         THE COURT:  Can you tell us about that,

14  Mr. Vannkeuren.

15         PROSPECTIVE JUROR:  Well, I only know my

16  cousin being convicted of possession of a gun.  But my

17  brother, he was arrested for drug possession.

18         THE COURT:  Did that happen in Brooklyn or

19  somewhere else?

20         PROSPECTIVE JUROR:  Yes, in Brooklyn.

21         THE COURT:  Anything about the way they were

22  treated by the Police Department or the District

23  Attorney's Office that might affect your ability to sit

24  on this case and judge the evidence fairly in this case?

25         PROSPECTIVE JUROR:  Well, with my cousin, I

JURY VOIR DIRE                    358

1    wasn't really around to know the whole story.  But I

2    actually watched them arrest my brother and beat him

3    with the nightsticks and stuff while he was in

4    handcuffs.

5         I mean, I can try my best not to let that

6    affect my judgment, but I'm not sure that it wouldn't.

7         THE COURT:  Let me say this.  My concern as

8    the judge would be this:  If, in fact, during the course

9    of a police officer's testimony something they said or

10   did reminded you of your brother's situation, my concern

11   would be whether you would start thinking about your

12   brother's situation and allow it to affect how you

13   evaluate the evidence in this case.

14        PROSPECTIVE JUROR:  Well, it's possible that

15   it would bring back the site of me watching what they

16   did to my brother, but I'm not sure if it would keep me

17   from --  or affecting my judgment.

18        THE COURT:  You also mentioned that you had

19   family members that were victims of crime?  Did

20   something happen to them?

21        PROSPECTIVE JUROR:  I'm not sure, I wasn't

22   there.  I heard over the telephone talking with the rest

23   of my family.

24        THE COURT:  Okay.  Thank you.

25        Mr. Abdelrasoul?

-VMG-

JURY VOIR DIRE                                          359

1          PROSPECTIVE JUROR:  My name is Thaer

2     Abdelrasoul.

3          I am 29 years of age.

4          I was born in Jerusalem, Palestine.

5          I live in Bay Ridge, Brooklyn.

6          I am currently a student.  I am in my last

7     semester in college.

8          I am single, with no kids.

9          My father is the operator of a supermarket.

10          I have never served on a jury before.

11          I have no serious vision or hearing problems.

12          I do have a cousin who works for the U.N. as I

13     think a lawyer.  And a few friends who work at law

14     firms, too.

15          I have maybe five, six friends who work in law

16     enforcement.

17          I have never been a victim of a crime, or any

18     friend.

19          I do have a younger brother who has been

20     arrested for graffiti a couple years ago.

21          THE COURT:  What happened with his case?

22          PROSPECTIVE JUROR:  He was a minor, so I guess

23     it was dropped or sealed.

24          THE COURT:  Anything about the way that your

25     brother was treated by the police or the District

JURY VOIR DIRE                              360

1    Attorney's Office that might affect your ability to sit

2    on this case?

3                    PROSPECTIVE JUROR:  I may have a similar

4    problem as him.  He wasn't treated right.  He was a

5    minor and he was kept for a couple of nights until he

6    saw a judge.  So, I don't think it was correct.  I hope

7    it won't affect me.

8                    THE COURT:  Okay.  What part of Brooklyn do

9    you reside in?

10                   PROSPECTIVE JUROR:  In Bay Ridge.

11                   THE COURT:  Okay.

12                   Mr. Thomas?

13                   PROSPECTIVE JUROR:  My name is Robert Thomas.

14                   I am 66.

15                   I was born in Wilmington, North Carolina.

16                   I live in Cypress Hills, Brooklyn.

17                   I am retired.

18                   I have a year of college.

19                   I'm married for 44 years.

20                   I have five children.  The oldest is 43, and

21   the youngest is 38.

22                   THE COURT:  What do they do for a living?

23                   PROSPECTIVE JUROR:  The oldest one is an

24   actuary with an insurance company.  The second one is a

25   truck driver.  The other two, I'm not familiar with

1    because they live out of state.  And my daughter is an

2    emergency room R.N.

3              I served on a civil jury five years ago.  I

4    did not deliberate.  I was taken ill, so I was excused.

5              Ten, no.

6              Eleven, no.

7              Twelve no.

8              Thirteen, no.

9              Fourteen, no.

10             THE COURT:  You mentioned that you're retired.

11   What kind of work did you do, Mr. Thomas, before you

12   retired?

13             PROSPECTIVE JUROR:  I'd say I was a jack of

14   all trades.  I did everything.  The last job I had I was

15   a bartender.  But I've had hospital training and so on.

16             THE COURT:  Your wife, what does she do for a

17   living?  And if she's retired, what did she do for a

18   living before she retired?

19             PROSPECTIVE JUROR:  She mostly stayed at home.

20   But, in her later years, she got a job as a clerk.

21   She's also retired now, too.

22             THE COURT:  Thank you.

23             Mr. Rohrer?

24             PROSPECTIVE JUROR:  My name is Mark Rohrer.

25             I'm 27.

JURY VOIR DIRE                                          362

1            I was born in Norfolk, Virginia.

2            I live in Prospect Heights, Brooklyn.

3            I'm an animator.

4            I have a college degree.

5            I'm single.  I live alone.

6            I've never been on a jury.

7            I have no vision or hearing problems.

8            I have several friends who are lawyers, and a

9    sister who is a lawyer.

10           THE COURT:  What kind of law do they practice,

11   if you know?

12           PROSPECTIVE JUROR:  One is an A.D.A. in Family

13   Court here in the city.  Another is a criminal defense

14   attorney.  My sister is a real estate lawyer back in

15   Virginia.

16           I don't know anybody in law enforcement.

17           I had a sister who was the victim of a violent

18   crime.

19           Nobody in my family, I don't know anybody

20   who's been arrested.

21           THE COURT:  You say your sister was the victim

22   of a violent crime?

23           PROSPECTIVE JUROR:  Yes.  This was in Fort

24   Collins, Colorado.  She had a stalker, and later it was

25   a sexual battery and assault.

-VMG-

JURY VOIR DIRE                                                 363

1          THE COURT:  Was anyone arrested as a result of

2      that?

3          PROSPECTIVE JUROR:  Initially, the D.A.

4      refused prosecute the stalking, and he eventually broke

5      into her apartment.  And now the trial is ongoing.  It

6      has been for awhile.

7          THE COURT:  Let me ask you this.  Anything

8      about that experience, either the way your sister was

9      treated by the police there or the District Attorney's

10     Office there that might affect your judgment --

11         PROSPECTIVE JUROR:  The police were very

12     helpful.  The D.A. situation was unfortunate.  Later,

13     there was an election, he got replaced, and the new D.A.

14     is prosecuting the case.  We had pretty negative

15     associations with that first D.A.  But, since then, it's

16     been pretty good.

17         THE COURT:  You're not going to hold it

18     against the D.A. here?

19         PROSPECTIVE JUROR:  The New York D.A., no.

20         THE COURT:  Okay.

21         Mr. Diaz?

22         PROSPECTIVE JUROR:  My name is Orison F. Diaz.

23     I am 52.

24     I was born in El Salvador.

25     I live in the neighborhood of Brooklyn

1    Heights.

2           My occupation is the volunteer of the Jehovah

3    Witnesses headquarters.

4           I have a college degree.

5           I'm married.  My wife is also a volunteer as

6    me.

7           I served in a civil jury five years ago.  I

8    was elected as a alternate juror.  I never was involved

9    in the deliberation.

10          Ten is no.

11          Eleven is no.

12          Twelve is yes.

13          From my wife side, I have --  her nephew is a

14   Correction officer.

15          Thirteen is no.

16          Fourteen is no.

17          THE COURT:  Thank you.

18          Mr. Perkins?

19          PROSPECTIVE JUROR:  Yes, ma'am.

20          My name is John Perkins.

21          My age is 67.

22          My place of birth is Jamaica, West Indies.

23          I live in the neighborhood of Canarsie,

24   Brooklyn.

25          My occupation is really welder, but I also do

1    work up to this year, February 1st, I was working in a

2    bank as a vault attendant.

3              I do a lot of religious studies.  I got a

4    diploma in religious education and other religious

5    studies.

6              I am married for 32 years.  I live with my

7    wife and my daughter.

8              Both my wife and my daughter work as nurses.

9              I served in all three, in the Grand Jury as

10   well here, and also in the civil jury.

11             THE COURT:  How long ago was the civil case?

12             PROSPECTIVE JUROR:  The civil case was like

13   about maybe '02.

14             THE COURT:  '02?

15             PROSPECTIVE JUROR:  Because then it was two

16   years apart.

17             THE COURT:  Okay.

18             Without telling me what it was, did you reach

19   a verdict on the civil case, if you can recall?

20             PROSPECTIVE JUROR:  It's so many cases.

21   Sometimes three, four cases.

22             THE COURT:  You're talking about the Grand

23   Jury.

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Okay.

-VMG-

JURY VOIR DIRE                          366

1          PROSPECTIVE JUROR:  Neither hearing nor vision

2     problem.

3          My brother was a detective back in Jamaica for

4     some years, also a school teacher.

5          Number thirteen, no.

6          Number fourteen, no.

7          THE COURT:  Thank you.

8          Miss Meerpohl?

9          PROSPECTIVE JUROR:  My name is Jill Meerpohl.

10         I just turned 28.

11         I'm from Naples, Florida.

12         I live in DUMBO.

13         I'm the sales director in the fashion

14    industry.

15         I have a Bachelor's degree.

16         I'm single.

17         My boyfriend is a chef.

18         I've never served.

19         I don't have any vision or hearing problems.

20         I have a friend in Philly that's trying to

21    pass the bar.  That's about it.

22         I don't know anybody in law enforcement.

23         No to thirteen.

24         For fourteen, my brother was arrested for

25    D.U.I. in Florida, and he served months.  Now he's on

JURY VOIR DIRE                                367

1    probation.

2              THE COURT:  Did that happen in New York or

3    somewhere else?

4              PROSPECTIVE JUROR:  Florida.

5              THE COURT:  Anything about the way your

6    brother was treated by the police officers in Florida or

7    the District Attorney's Office there that might affect

8    your ability to sit on this particular case?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:   Thank you.

11             Mr. Ynoa?

12             PROSPECTIVE JUROR:  My name is Juan Ynoa.

13             My age is almost 50.

14             My place or birth was in Dominican Republic.

15             I live in Bushwick.

16             My occupation is porter.

17             I did G.E.D. in this country.  In my country

18   what they call twelve.

19             I'm divorced.

20             I have four children.  One is 2, another is 4,

21   one is 22, the other 23.

22             I live with my father and my mother.

23             Number nine is no.

24             Ten is no.

25             Eleven is no.

JURY VOIR DIRE                              368

1             Twelve is no.

2             Thirteen is no.

3             Fourteen is no.

4             THE COURT:  You said that you're divorced.

5    What kind of work did your wife do for a living before

6    you were divorced, sir?

7             PROSPECTIVE JUROR:  She work in a bank for

8    Citi Bank.

9             THE COURT:  I didn't hear what your employment

10   was.  What do you do for a living?

11            PROSPECTIVE JUROR:  Porter.

12            THE COURT:  A porter?

13            PROSPECTIVE JUROR:  Yes.

14            THE COURT:  Thank you.

15            Miss Oxilus?

16            PROSPECTIVE JUROR:  My name is Guerdy Oxilus.

17            My age is 51.

18            My place of birth is Haiti.

19            I live in the neighborhood of Bushwick.

20            My occupation is director at a day care

21   center.

22            I have my Master's degree.

23            I was divorced, but remarried.

24            I have three children, ages 27, 24, and 23.

25            My first son work at Best Buy.  My second son

1       is at home.  And my daughter is in Africa.

2                   I never served.

3                   I'm wearing glasses.

4                   Number nine, I never served.

5                   Number ten is no.

6                   Number eleven is no.

7                   Number twelve is no.

8                   Number thirteen is no.

9                   My first husband was arrested for abusing me.

10                  THE COURT:  Anything about that experience

11      with your first husband, either the way he was treated

12      by the police or the District Attorney's Office that

13      might affect your ability to sit on this particular

14      case, Mr. Oxilus?

15                  PROSPECTIVE JUROR:  No.  But I did not like

16      the way he was treating me.

17                  THE COURT:  You didn't like the way he was

18      treating you.  As long as you're not going to hold it

19      against nobody else.

20                  PROSPECTIVE JUROR:  No.

21                  THE COURT:  You mentioned that you remarried.

22      What is the occupation of your current husband?  What

23      does he do for a living?

24                  PROSPECTIVE JUROR:  He likes to travel and do

25      commerce, back and forth from here.

1                 THE COURT:  Thank you.

2                 Mr. Onyenwe?

3                 PROSPECTIVE JUROR:  Yes.  My name is Felix

4        Onyenwe.

5                 My age is 65.

6                 My place of birth is Nigeria.

7                 I live in the neighborhood of Crown Heights in

8        Brooklyn.

9                 My occupation is public and health advisor in

10       the Department of Health.

11                I have a Master's degree here.

12                I'm married.

13                I have two children.  My wife is a housewife,

14       but was a teacher.  My daughter is thirty, a nurse.  My

15       son, 28, he's a student and works also for the

16       Department of Human Resources.

17                I haven't served in the jury.

18                I don't have a vision problem.

19                Extended family member is a police officer

20       here.  That's a nephew.  Extended family.

21                THE COURT:  Anyone that is involved with legal

22       training, such as an attorney or anyone else?

23                PROSPECTIVE JUROR:  No.

24                Number fourteen, no.

25                THE COURT:  And number thirteen?

-VMG-

JURY VOIR DIRE                                        371

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Okay.  Thank you.

3            Mr. Uribe?

4            PROSPECTIVE JUROR:  My name is Franklin Uribe.

5            My age is 19.

6            I was born in Brooklyn.

7            I live in Kensington.

8            My occupation is assistant manager.

9            I am in college right now.

10           I'm single.

11           I live with my parents.

12           My dad works in a textile factory, and my

13      mother is a clerk.

14           I have never served.

15           Ten is no.

16           Eleven is no.

17           My brother-in-law is a narcotics detective.

18           Thirteen is no.

19           Fourteen is no.

20           THE COURT:  Thank you. Mr. Uribe.

21           Mr. Williams?

22           PROSPECTIVE JUROR:  My name is Darryl

23      Williams.

24           I'm 44 years old.

25           Place of birth, Brooklyn.

JURY VOIR DIRE                                    372

1          I live in the neighborhood of Canarsie.

2          Occupation is unemployed veteran.

3          As far as school, I got some college.  I

4    finished high school.

5          I'm married, separated.

6          I got a 17-year-old daughter.

7          I live alone right now.

8          I've never served.

9          I don't have any hearing or vision problems.

10          I don't know anyone in --  Eleven is no.

11          Law enforcement, I have a uncle, retired

12    lieutenant.  My brother is a school safety agent.

13          Thirteen is no.

14          Fourteen is no.

15          THE COURT:  Thank you.

16          I know you said you're an unemployed vet.

17          PROSPECTIVE JUROR:  Yes, ma'am.

18          THE COURT:  What were you doing in between?

19          PROSPECTIVE JUROR:  Before the military?

20          THE COURT:  Right.

21          PROSPECTIVE JUROR:  Security.

22          THE COURT:  Thank you.

23          Mr. Wegiel?

24          PROSPECTIVE JUROR:  Yes.  My name is Thomas

25    Wegiel.

JURY VOIR DIRE                                          373

1               I'm 34 years old.

2               Brooklyn.

3               Number four is Greenpoint.

4               Number five is computer technician.

5               Number six is high school.

6               Number seven is married.

7               Two children--one is 6 and one is 10.

8               My wife works at a bank.

9               I served on a criminal jury, and this was

10      about six or seven years ago.  I did deliberate and

11      reach a verdict.

12              I don't have any serious vision or hearing

13      problems.

14              Number eleven is no.

15              Number twelve, I do on occasion do work at

16      police precincts, but it's a work relationship, not

17      personal.

18              Thirteen is no.

19              Fourteen, my wife's brother was arrested for

20      a D.U.I.

21              THE COURT:  How long ago was that?

22              PROSPECTIVE JUROR:  Four or five years ago.

23              THE COURT:  Did that happen in Brooklyn or

24      somewhere else?

25              PROSPECTIVE JUROR:  Queens, I think.

JURY VOIR DIRE                                    374

1           THE COURT:  Anything about the way your

2    brother-in-law was treated by the police or the District

3    Attorney's Office that might affect your ability to sit

4    on this case and be fair and impartial in this

5    particular case?

6           PROSPECTIVE JUROR:  Honestly, no, because he

7    barely even mentioned anything about it.

8           THE COURT:  Okay.  Thank you.

9           At this point, I will give the assistant

10   district attorney an opportunity to ask you questions.

11          Jurors, there are no right or wrong answers,

12   only truthful answers.

13          MR. HALE:  Thank you, your Honor.

14          Good afternoon, ladies and gentlemen.

15          Again, my name is Mark Hale.  I will be

16   prosecuting this case for the People of the State of New

17   York.

18          What is important here in the brief time that

19   we have is to get to know you a little bit so that we

20   could make a decision about whether one or more of you

21   would be appropriate jurors for our particular case.

22          In order to do that we need to hear your

23   voices and not just hear mine.  So, if I ask you a

24   question, either individually or collectively, can you

25   all answer up?

-VMG-

JURY VOIR DIRE                                    375

1          (AFFIRMATIVE RESPONSE FROM JURORS)

2          MR. HALE:  That's a pretty lousy start.

3          Can we all answer up when I ask a question?

4          (AFFIRMATIVE RESPONSE FROM JURORS)

5          MR. HALE:  Very good.

6          You've heard that this is a case --  what

7    little you have heard about this case involves murder

8    and the injury of a number of people during a shooting

9    incident which Mr. Waiters is accused of.

10         There were a lot of people, and you saw them,

11   who got in line just because of the nature of the

12   charges and the fact that a child was one of the

13   victims, the victim who was killed in this case, that

14   they couldn't be fair.

15         Now, I just need to know at the outset, right

16   now here, you've had some time to reflect on this, the

17   fact that the nature of the charge is murder, it's a

18   serious charge, and the fact that there was a child who

19   was a victim, and there are other victims, does that

20   cause anyone to think that you could not be fair and

21   impartial in deciding this case?

22         Let me just say.  We've used that term a lot,

23   fair and impartial.  But what that means is not bringing

24   in any preconceived ideas, but literally starting with a

25   blank slate and saying okay, I'm going to make my

JURY VOIR DIRE                                      376

1    decision upon not what I heard at the barber shop, not

2    what I saw on TV, but on what I hear in the courtroom.

3              Is there anybody that thinks they would be

4    unable to do that, based upon the nature of the charges

5    or the nature of the victims in this case?  Anybody at

6    all?

7              (NO RESPONSE)

8              MR. HALE:  Okay.

9              A very important point.  Sympathy, you know,

10   whether you feel it or you won't feel it, I expect that

11   during this trial you will.  It's a human emotion.  It's

12   very important to be able to put that aside and decide

13   this case I guess it would be with your head and not

14   with your heart.

15             Ma'am, do you think you would have any problem

16   with that at all?

17             PROSPECTIVE JUROR:  No problem.

18             MR. HALE:  Sir, how about you?

19             PROSPECTIVE JUROR:  No.

20             MR. HALE:  What we're talking about is sort of

21   a very rational thing here.  You know, there are people

22   who make decisions based upon how they feel about

23   something, out of their emotions.

24             A lot of us know when people make decisions

25   like that, they're not always right.  But what we need

1    for you here is to be albe to say okay, let me think

2    this through.  Yes, you are going to be hearing things

3    that you don't normally hear and that are unpleasant.

4    I'm going to tell you that right now.  You're going to

5    hear details of injuries, autopsies, things of that

6    nature.  They're disquieting.

7              Sir, can you look at it and see the purpose

8    for which those are put in?  And, again, it's a legal

9    purpose.  It's part of proving the case.  You have to

10   prove cause of death and the nature of injuries, things

11   like that.  It's not to meant to inflame you or anything

12   like that.  You understand that?

13             PROSPECTIVE JUROR:  Yes.

14             MR. HALE:  Do you think you would be able to

15   take it for why it's offered?

16             PROSPECTIVE JUROR:  Yes.

17             MR. HALE:  I do not expect, I do not expect

18   that you're going to be shown anything visually graphic.

19   You're going to hear things that perhaps are so.

20             Is there anyone here who thinks, because of

21   your own constitution, that they wouldn't be able to

22   handle those sort of details about things, especially in

23   relation to a child?

24             Is everybody okay with that?

25             (AFFIRMATIVE RESPONSE FROM JURORS)

1          MR. HALE:  Okay.

2          The police.  We talked a little bit about the

3     two of you.  I know you had the situation with both of

4     your siblings, where they were arrested.  The police in

5     your case were sort of extreme in terms of hitting and

6     stuff like that.

7          PROSPECTIVE JUROR:  Yes.

8          MR. HALE:  In your case, you felt he was a

9     young guy, they kept him in jail for a couple of days

10    that you felt rather needless over a graffiti thing;

11    right?

12         PROSPECTIVE JUROR:  Yes.

13         MR. HALE:  Now, there's a lot of police in the

14    world, a lot of police in New York.  Some will testify

15    here.  I don't think it's going to be a case that's

16    tremendously dependent upon the police.

17         My question to either of you is:  Do you think

18    that when you look at a police officer and they come in

19    here, are you going to be able to give them a fair shake

20    in terms of saying okay, I know you're a cop, and you've

21    had this bad experience with police officers, but I

22    don't know who you are and you weren't involved in the

23    situation with either of your brothers, I'll listen to

24    what you have to say and I'll decide whether I believe

25    you on what I hear and not because of what you do?

JURY VOIR DIRE                                    379

1              PROSPECTIVE JUROR:  Yes.

2              MR. HALE:  Do you think you would be able to

3       do that?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Is that a yes?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Okay.

8              MR. HALE:  How about you, sir?

9              PROSPECTIVE JUROR:  Yes.

10             MR. HALE:  This goes for everybody else,

11      because it's not just personal experiences that people

12      have with the police.  I mean, it's something that's the

13      subject matter of newspaper articles that we see a lot,

14      television reports, fictional TV series.

15             You know, we start getting an idea in our

16      heads and thinking well, perhaps all cops are this.

17             I mean, I watch the cop shows on TV.  Who else

18      does?  Come on.

19             (HANDS RAISED)

20             MR. HALE:  There we go.

21             You know, they couldn't sell things on TV if

22      it wasn't for the police shows.  They have all the

23      commercials in there.

24             Sir, which one do you watch?

25             PROSPECTIVE JUROR:  C.S.I., Most Wanted, Cops.

JURY VOIR DIRE                                              380

1          MR. HALE:  Oh, you hit them all.

2          PROSPECTIVE JUROR:  Yes.

3          MR. HALE:  Well, the reason that they're all

4     on is because they're very popular.  But, again, you

5     know, if you said hey, on C.S.I. Miami last night David

6     Caruso did this, and, you know, I bet that they do that

7     in real life in a courtroom.

8          Is there anything about that that's going to

9     affect you here?

10         PROSPECTIVE JUROR:  Oh, no.  No way.

11         MR. HALE:  Of course not.

12         PROSPECTIVE JUROR:  No way.

13         MR. HALE:  You're right.  Because, again,

14    that's somebody's idea, it's theatrics and stuff.

15         The judge made a point to another group

16    yesterday and said that you never see on TV the part

17    about them picking a jury.  That's because it's too damn

18    boring.  I mean, they couldn't sell anything.  This is

19    reality.  You're not going to take anything from that;

20    right?

21         PROSPECTIVE JUROR:  No.

22         MR. HALE:  Okay.

23         Can all of you agree with me that it would be

24    wrong to make your decision in here based upon anything

25    that you've ever derived from a television, newspaper or

JURY VOIR DIRE                                              381

1    anything like that?  Can you all promise me that you

2    will not let those influence your decision in here?

3               (AFFIRMATIVE RESPONSE FROM JURORS)

4               MR. HALE:  Can you do that?

5               (AFFIRMATIVE RESPONSE FROM JURORS)

6               MR. HALE:  And that includes real-life news

7    accounts.  Specifically, with regard to police officers.

8               I'll be the first person to tell you that

9    among the --  I think an article I saw the other day

10   said 37,000 police officers.  That among the 37,000

11   police officers, that there is a percentage of them who

12   are heroes, there is a percentage of them who are bums,

13   and there's a lot of people in between.  Okay?

14               Any group that big, it would be hard to say

15   all police officers are fill in the blank.

16               You'd agree with that, wouldn't you?

17               PROSPECTIVE JUROR:  Yes.

18               MR. HALE:  If you read an article that a cop

19   did the most heroic thing in the whole world, and it's

20   terrific, apple pie and mom and everything else, that

21   wouldn't tell you that the other 36,999 are all great

22   guys, would it?

23               PROSPECTIVE JUROR:  What do you mean?

24               MR. HALE:  I mean you can't judge all them by

25   the acts of one.

JURY VOIR DIRE                              382

1           PROSPECTIVE JUROR:  Of course not.

2           MR. HALE:  The same thing if one of them ends

3    up being an absolute criminal.

4           PROSPECTIVE JUROR:  Of course not.

5           MR. HALE:  Right.  You can't do that.

6           Right?

7           PROSPECTIVE JUROR:  Yes.

8           MR. HALE:  Again, all of you would give them a

9    fair shake and look at them as individuals?

10          (AFFIRMATIVE RESPONSE FROM JURORS)

11          MR. HALE:  Can you do that, sir?

12          PROSPECTIVE JUROR:  Yes.

13          MR. HALE:  Any problem with that whatsoever?

14          PROSPECTIVE JUROR:  No.

15          MR. HALE:  Okay.

16          It may come about --  Well, let me ask you

17   this.  Do any of you have any involvement either

18   personally or with somebody in your family, somebody

19   close to you, with psychiatric health professionals or

20   issues with psychiatry or psychology?

21          PROSPECTIVE JUROR:  I work with them.

22          MR. HALE:  You work with that.  Okay.

23          Anybody else?

24          PROSPECTIVE JUROR:  What do you mean, issues

25   with --

JURY VOIR DIRE                                383

1          MR. HALE:  It might even be a friend that is

2     afflicted with a psychiatric disturbance, a friend that

3     you know that works with the either the mentally

4     challenged or the mentally disturbed.  Anything like

5     that.

6          PROSPECTIVE JUROR:  I have my sister, she's

7     kind of sick.

8          MR. HALE:  She's kind of sick.  Okay.

9          The reason I asked, this goes for you, sir,

10    because you have some training.

11         PROSPECTIVE JUROR:  My sister is suffering

12    from schizophrenia.

13         MR. HALE:  All right.  It may come about

14    during the course of this trial, this I can't guarantee,

15    but it may come about that there will be an issue that

16    has to do with mental illness or mental retardation, and

17    that you would hear a witness, a professional, either a

18    PhD or a medical doctor talking about these psychiatric

19    or mental issues.

20         My question to you, who has some direct

21    involvement here, do you think that your personal

22    experiences would make it difficult for you to judge a

23    situation where somebody's state of mind in terms of

24    mental disease or a mental defect comes into play?

25         Do you think you would have any problem with

JURY VOIR DIRE                                    384

1      that at all, sir?

2                PROSPECTIVE JUROR:  No.

3                MR. HALE:  Ma'am, how about your situation

4      with your sister?

5                PROSPECTIVE JUROR:  It is a very difficult

6      situation.

7                MR. HALE:  It is a very difficult situation.

8                Do you think that if you --

9                I'm trying to think how to phrase it.

10               Do you think that that would cause you to have

11     more sympathy or more understanding or maybe less

12     tolerance for a claim that somebody is or is not

13     mentally ill or mentally retarded?

14               PROSPECTIVE JUROR:  Because of my background

15     also, I come from Haiti, and sometimes we don't really

16     believe in mental sickness.

17               MR. HALE:  See, that's something else.  I'll

18     let you think about that for a minute because I'm going

19     to ask all the rest of the people here.

20               There's a lot of people that have opinions

21     about, you know, mental health and mental health

22     professionals.  There are some people that think that

23     therapy is a great thing, that everybody should be in

24     therapy and they should be in therapy five times a week.

25     There's other people at the other end that think that

1    psychiatry and psychology are, you know, a bunch of

2    bunk, and there's all sort of, like you were talking

3    about, that nobody really believes in that or they think

4    there's a religious component to it or something else

5    like that.

6             Is there anybody here that has such strong

7    opinions about psychiatry and psychology that they would

8    not be able to look at issues like that, if they come up

9    here, and look at the professionals who deal with those

10   issues and do so with an open mind?

11            Any problem with that at all, sir?

12            PROSPECTIVE JUROR:  No, not one way or the

13   other.

14            MR. HALE:  Let me just ask you about experts

15   in general, because you're definitely going to hear from

16   experts that have to do with the autopsy of the victim

17   that was killed and other doctors that treated injuries

18   of other people that were shot in this case.

19            Do you think that anybody just because that

20   they have "Doctor" or "MD", I'm not knocking dentists or

21   anything, do you think that automatically their opinion

22   is one that you should accept or are you going to be

23   able to look at that critically?

24            PROSPECTIVE JUROR:  Are you saying that would

25   I tend to believe testimony from someone that's like a

JURY VOIR DIRE                                386

1    professional or something?

2             MR. HALE:  Yes.  Would you automatically

3    believe it?

4             PROSPECTIVE JUROR:  No.

5             MR. HALE:  The reason I ask, I grew up --  my

6    parents were of that generation where, you know, if the

7    family doctor said something, it was gospel, no matter

8    what happened.  But what we're asking all of you to do

9    is to be able to look --

10             You're close to that generation, so you know

11    what I'm talking about.

12             PROSPECTIVE JUROR:  Yes.

13             MR. HALE:  You know, you look at these people

14    critically, you look at all the witnesses critically,

15    whether it's a doctor, MD, a doctor of PhD, police

16    officers, whatever, that you don't accept or don't

17    reject their testimony just because of what they are.

18             Can all of you keep an open mind and just

19    listen to that?

20             (AFFIRMATIVE RESPONSE FROM JURORS)

21             MR. HALE:  No problem with that at all, ma'am?

22             PROSPECTIVE JUROR:  No.

23             MR. HALE:  Okay.

24             Just a different area.  We talked about

25    testimony, whether you accept it or don't accept it.

1    The judge said one of the most important things for a

2    jury is the notion of deliberating.

3             Ma'am, I could ask you.  You could look around

4    the group of people who are here and say, you know,

5    except for the idea that you all answered your jury

6    notice at the same time, you might not have any occasion

7    to have any interest in ever having a conversation or

8    interaction with any of these people.

9             PROSPECTIVE JUROR:  No.

10            MR. HALE:  It's a completely random thing.

11            PROSPECTIVE JUROR:  Yes.

12            MR. HALE:  Do you think that you would have

13   any difficulty in terms of talking about the important

14   issues in this case?  That is, listening to what these

15   people have to say, and then accepting it or adding to

16   it, or adding your two cents into it?

17            Do you think you would have any problem with

18   that at all?

19            PROSPECTIVE JUROR:  I don't think so.

20            MR. HALE:  That goes too in terms of life

21   experience or anything else.  For instance, this

22   gentleman who is sitting here next to you, who may be, I

23   don't know, a year or two older than you.  You might

24   well be in a position to say here's a man who has life

25   experience and everything, and he thinks this way, you

JURY VOIR DIRE                              388

1    know, perhaps he's right and I'm wrong.

2              Do you think that's an automatic?

3              PROSPECTIVE JUROR:  I don't think it's

4    automatic.

5              MR. HALE:  No.  And you're right.

6              You know something?  All of you, your life

7    experience and your education or whatever, from the

8    dentist here, who goes by doctor, it doesn't make him

9    any more qualified to have an opinion on this case than

10   any of the rest of you.

11             Can you all accept that in terms of talking to

12   one another?

13             (AFFIRMATIVE RESPONSE FROM JURORS)

14             MR. HALE:  Okay.

15             When you do so, you understand that all of

16   your opinions, regardless of your background, regardless

17   of your income, regardless of what education that you've

18   achieved, it's all the same.  Everybody's opinion is

19   just as good as everybody else's, as long as your

20   opinion is based on the evidence and not speculating on

21   something outside of it.

22             You all understand that?

23             (AFFIRMATIVE RESPONSE FROM JURORS)

24             MR. HALE:  The young lady, you can listen to

25   what she has to say?

JURY VOIR DIRE                                389

1          PROSPECTIVE JUROR:  Yes.

2          MR. HALE:  Ladies and gentlemen, my time is

3     very short here, so I'm going to ask you all generally

4     if there's anything that we didn't touch on, if you're

5     sitting there and you're thinking to yourself, because

6     you know yourself better than I'm ever going to get to

7     know you in fifteen or twenty minutes, is there anything

8     that you think would affect your ability to be a fair

9     and impartial juror in this case, decide this important

10    matter only on what you hear here in court in terms of

11    the evidence from the witness stand and the law from the

12    Court?

13          Anybody have any problem with that whatsoever?

14          (NEGATIVE RESPONSE FROM JURORS)

15          MR. HALE:  Thanks for your time, folks.

16          THE COURT:  Certainly, jurors, I will remind

17    you that the defense has no obligation or burden to do

18    anything whatsoever in this case, so certainly defense

19    counsel, Mr. Simons, need not ask you any questions.

20          That being said, do you wish to inquire,

21    Mr. Simons?

22          MR. SIMONS:  Yes.

23          Good afternoon, ladies and gentlemen.

24          I'm not going to be too long.  I'm going to

25    try to talk to you by stating your name.  I apologize, I

1    know I'm going to get it wrong, but I'm going to try.

2              The other thing is, if you have anything you

3    want to say to me, this is the time to say it.  Because

4    once you are selected, if you are selected on the jury,

5    you really won't be able to ask any questions, say

6    anything, until the case is finished.

7              Let me ask, Mr. Cipriano.

8              PROSPECTIVE JUROR:  Yes.

9              MR. SIMONS:  Is that right?

10             PROSPECTIVE JUROR:  Yes.

11             MR. SIMONS:  I'm asking you the question, but

12   it's for everybody.  But I'll direct it to you.

13             Have you heard anything so far, since you've

14   been in this courtroom, that would help you decide this

15   case?

16             PROSPECTIVE JUROR:  (No Response)

17             MR. SIMONS:  No.  It's not a trick question.

18             PROSPECTIVE JUROR:  I'm trying to think about

19   your question.

20             MR. SIMONS:  There's nothing to think about

21   because you haven't heard anything; right?

22             PROSPECTIVE JUROR:  Right.

23             MR. SIMONS:  Does everyone here agree with

24   that?

25             (AFFIRMATIVE RESPONSE FROM JURORS)

1           MR. SIMONS:  Okay.  There's no problem with

2      that.

3           Let me ask you, since I'm talking to you.  You

4      said you're a physical therapist but you also work with

5      psychology.

6           PROSPECTIVE JUROR:  Yes.  My concentration

7      right now is physically and mentally handicapped

8      individuals.  It's a mixed population.  We have

9      psychiatric cases in our facility.  From that, we work

10     with developmentally disabled individuals.

11          Now they're mixing our facility with

12     psychiatric cases.

13          MR. SIMONS:  Okay.

14          Let me just move on to Miss Cadle, is it?

15          PROSPECTIVE JUROR:  Yes.

16          MR. SIMONS:  I believe you mentioned that your

17     son was arrested, and he's in jail.

18          PROSPECTIVE JUROR:  Yes.

19          MR. SIMONS:  And he's in jail now.

20          PROSPECTIVE JUROR:  Yes.

21          MR. SIMONS:  The fact that your son is in

22     jail, do you believe that will affect how you decide

23     this case in any way?

24          PROSPECTIVE JUROR:  No.

25          MR. SIMONS:  Okay.  No, you would be able to

1    separate the two, no problem?

2              PROSPECTIVE JUROR:  Because it's two separate

3    things.  How could I compare it?

4              MR. SIMONS:  I don't know if you stated, he

5    was arrested in Brooklyn?

6              PROSPECTIVE JUROR:  Yes.

7              MR. SIMONS:  You might have stated this

8    before, and I apologize if I'm asking again, you had no

9    problem the way he was being treated by the prosecutor

10   or the police or the court system?

11             PROSPECTIVE JUROR:  No.

12             MR. SIMONS:  Let me ask Miss Chavous.

13             PROSPECTIVE JUROR:  Yes.

14             MR. SIMONS:  Now, you mentioned that --  Who

15   did you say, your parents were convicted of drugs a long

16   time ago?

17             PROSPECTIVE JUROR:  Yes.

18             MR. SIMONS:  How long ago was that?

19             PROSPECTIVE JUROR:  I was five, six years old

20   about, so seventeen years ago.

21             THE COURT:  Can you just keep your voice up,

22   please.

23             PROSPECTIVE JUROR:  About seventeen years ago.

24             MR. SIMONS:  Anything about that do you

25   believe would affect you on how you would evaluate this

1        case in any way?

2                PROSPECTIVE JUROR:  Well, it's two different

3        circumstances.  It's different situations, so no.

4                MR. SIMONS:  All right.  So, as you're

5        evaluating evidence in this case, you won't think back

6        to what happened to your parents to help you decide the

7        evidence in this case?

8                PROSPECTIVE JUROR:  I don't remember much

9        about what happened to them, so no.

10               MR. SIMONS:  Okay.

11               Let me ask Mr. Vannkeuren.

12               PROSPECTIVE JUROR:  Yes.

13               MR. SIMONS:  I'm doing okay with the names.

14               You also mentioned that I believe you saw your

15       brother arrested.

16               PROSPECTIVE JUROR:  Yes.

17               MR. SIMONS:  And that was in Brooklyn.

18               PROSPECTIVE JUROR:  Yes.

19               MR. SIMONS:  Is his case finished?

20               PROSPECTIVE JUROR:  Yes, it is now.

21               MR. SIMONS:  After everything, did you have

22       any -- I know you mentioned that you saw him being

23       arrested.  Did you have any problems with the way he was

24       treated by the court, the District Attorney's Office?

25               PROSPECTIVE JUROR:  Well, I never got to go to

JURY VOIR DIRE                                      394

1    the courthouse and actually sit and watch the trial and

2    everything.  I was actually outside on the street when

3    they were hitting him and stuff.

4              MR. SIMONS:  But you didn't follow up with the

5    case after he was arrested?

6              PROSPECTIVE JUROR:  No.

7              MR. SIMONS:  Now, is there anything about that

8    that you think will affect either the way you'll

9    evaluate the prosecutor, the way he acts in this case,

10   the defense, or anything?

11             PROSPECTIVE JUROR:  Well, at this point, no.

12             MR. SIMONS:  At this point, no?

13             PROSPECTIVE JUROR:  Yes.  I can't really say

14   because --  You know, seeing that, it was hard for me,

15   because I was about eleven, twelve years old.

16             MR. SIMONS:  So this is about ten years ago.

17             PROSPECTIVE JUROR:  Yes.

18             MR. SIMONS:  Can we get an assurance that it

19   will not affect the way you evaluate the evidence in

20   this case?

21             PROSPECTIVE JUROR:  Yes.

22             MR. SIMONS:  No problem?

23             PROSPECTIVE JUROR:  No problem.

24             MR. SIMONS:  I guess the same thing goes for

25   Mr. Abdelrasoul.

                          -VMG-

1            PROSPECTIVE JUROR:  Yes.

2            MR. SIMONS:  You mentioned that there was an

3    issue where your brother was treated, the way he was

4    arrested.

5            PROSPECTIVE JUROR:  Right.

6            MR. SIMONS:  Did you follow up and follow his

7    case?

8            PROSPECTIVE JUROR:  I did, actually, yes.  I

9    had to go get him from the precinct.

10           MR. SIMONS:  How long ago was that?

11           PROSPECTIVE JUROR:  This was around three

12   years ago.

13           MR. SIMONS:  Was there anything about the way

14   the prosecutor handled the case or the way the Court

15   handled the case that would affect you with this case?

16           PROSPECTIVE JUROR:  It's not the court itself.

17   I think it's more of the police officers themselves

18   rather than the court.

19           MR. SIMONS:  So, as far as the Court is

20   concerned and the prosecutor is concerned, you have no

21   problems --

22           PROSPECTIVE JUROR:  No problems.

23           MR. SIMONS:  -- and that won't affect you.

24           PROSPECTIVE JUROR:  No.

25           MR. SIMONS:  But you said the way he was

1    handle by the police, you believe that may affect how

2    you evaluate the evidence?

3              PROSPECTIVE JUROR:  Every time I hear words

4    out of a police officer now, I have to think twice about

5    it.  Because they say one thing and they do a different

6    thing.

7              MR. SIMONS:  Because I know the Court had

8    asked, I believe the question before, will you be

9    evaluating the police officers differently than you

10   would, say, a non police officer witness?

11             PROSPECTIVE JUROR:  Not differently, but I

12   would have to think twice about it.

13             MR. SIMONS:  Okay.

14             Mr. Thomas, I know you stated you're retired,

15   and did you everything.  Well, did everything include,

16   were you a peace officer or a police officer?

17             PROSPECTIVE JUROR:  No, no, nothing

18   professionally like that.

19             MR. SIMONS:  No law enforcement?

20             PROSPECTIVE JUROR:  No.

21             MR. SIMONS:  Did you do security?

22             PROSPECTIVE JUROR:  No, no.

23             MR. SIMONS:  Once, again, I'm just -- Let me

24   just move on it real quick.

25             Mr. Diaz, you mentioned that you volunteer and

JURY VOIR DIRE                                397

1     your wife both volunteer at the Jehovah Witness

2     organization.

3                   PROSPECTIVE JUROR:  Yes.

4                   MR. SIMONS:  Anything about your beliefs or

5     anything that will affect on how you evaluate the

6     evidence?

7                   PROSPECTIVE JUROR:  I don't think so.

8                   MR. SIMONS:  I have to say this, and I

9     mentioned this before, could you imagine yourself in an

10    airplane where the pilot says there's a storm and we're

11    going to land, and you say, "Well, can you land the

12    plane?" and he says, "Well, I think so."  You'd be a

13    little nervous; right?  Because you would want him to

14    say definitely, don't worry, relax, we'll be safe.

15                   So, that's what I'm asking you.  When you say

16    you don't think so, would you be able to assure the

17    Court, the prosecutor, and the defense that you would

18    not have any problems evaluating this case?

19                   PROSPECTIVE JUROR:  I don't know the evidence

20    at this point.

21                   THE COURT:  Well, let me say this.  You're

22    right, you don't know the evidence.  Mr. Diaz, my

23    concern is this:  If you hear something and it goes

24    against your religious teachings, I don't know, let's

25    just say it does, or I instruct you on the law and

1    that's not in sync with your religious teachings, my

2    concern as the judge would be then that you would impose

3    your religious beliefs on how you evaluate the evidence

4    in this case.  That would be unfair, because we're

5    looking for jurors who will be fair and call it straight

6    up and down, and without being influenced by anything

7    else, based upon the evidence or the lack of evidence.

8    Because, again, it would be unfair to impose any kind of

9    moral values, religious values, or anything else on how

10   you evaluate the evidence.

11        Again, I know you haven't heard anything, but

12   that's what the kind of juror that I'm looking for, who

13   can call it straight up and down, without being

14   influenced by any other thing other than what comes out

15   of the mouths of the witnesses, and the exhibits, and

16   your careful unbiased consideration of all of the

17   evidence.

18        PROSPECTIVE JUROR:  What I can say to be fair

19   is I can't divorce myself from what I believe, so

20   basically my beliefs are going to be part of my

21   deliberation and also my decision upon whatever is going

22   to be presented.

23        THE COURT:  Certainly, that's an honest

24   answer.

25        MR. SIMONS:  Thank you.

JURY VOIR DIRE                              399

1           Let me go to Mr. Perkins.  I believe you

2   mentioned, and I might have gotten this wrong, you have

3   a diploma in religious studies?

4           PROSPECTIVE JUROR:  Yes.

5           MR. SIMONS:  Is there anything about that that

6   will affect you in following the judge's rulings and

7   deciding the evidence in this case?

8           PROSPECTIVE JUROR:  No, sir.

9           MR. SIMONS:  Okay.

10           If I don't get to everyone, I apologize.

11           Mr. Uribe, you mentioned that your

12   brother-in-law is a narcotics detective; correct?

13           PROSPECTIVE JUROR:  Yes.

14           MR. SIMONS:  Do you or have you in the past

15   talked to him about his job, what he does, and how he

16   does it?

17           PROSPECTIVE JUROR:  No.  Not too much, no.

18           MR. SIMONS:  Anything that he might have told

19   you do you believe will affect you in how you evaluate

20   this case?

21           PROSPECTIVE JUROR:  No.

22           MR. SIMONS:  Does anyone have any questions

23   for me?

24           (NO RESPONSE)

25           MR. SIMONS:  Then thank you very much.

-VMG-

JURY VOIR DIRE                                    400

1           THE COURT:  Okay.  Jurors, what's going to

2    happen at this time is the attorneys and myself will

3    discuss who's to be selected to sit on this jury panel.

4           Jurors, if you're not selected to serve as a

5    juror, please don't take it as any indication or a

6    statement about your character or self-worth.  It is

7    not.

8           Again, we have the highest responsibility to

9    choose as trial jurors those individuals who will be

10   fair and impartial and give both sides a fair trial,

11   that they're entitled to receive.

12          Again, jurors, I would instruct you please do

13   not discuss any aspect of this case amongst yourselves

14   or with anyone else.

15          You haven't heard any evidence up to this

16   point in this case and you will not hear any evidence

17   unless and until you're selected as a juror, so it would

18   be unfair to speculate about anything that you may hear.

19          That being said, jurors, I'm going to ask that

20   you step outside.  You can hand the questionnaires to

21   the officer on your way out.  You'll remain outside of

22   the courtroom until you're brought back in by one of the

23   court officers.

24          Thank you.

25          (At this time, the panel of prospective jurors

-VMG-

1       left the courtroom)

2                   MR. HALE:  Your Honor, I have a question, if

3       it's okay?

4                   THE COURT:  Certainly.

5                   MR. HALE:  Juror number one, Miss Chavous

6       was --

7                   THE COURT:  She was supposed to call and find

8       out.

9                   MR. HALE:  Yes.

10                  THE COURT:  What I can do is ask her to call

11      her job now to fine out whether, in fact, she's going to

12      be paid for whatever days.

13                  We can call her in.

14                  (Pause in the proceedings)

15                  COURT OFFICER:  Ready for the juror?

16                  THE COURT:  Yes.

17                  (At this time, a prospective juror entered the

18      courtroom)

19                  THE COURT:  Can you just please state your

20      name for the record.

21                  PROSPECTIVE JUROR:  Falon Chavous.

22                  THE COURT:  Miss Chavous, you indicated that

23      you were going to call your job to find out whether, in

24      fact, they would pay you for the time for your jury

25      service, so I asked you to do that during the luncheon

1       recess.  I'm going to ask that you do that now and see

2       if you have an answer.

3                     If you do, certainly we'll have an officer

4       outside who will be able to get that information.  The

5       officer will be outside.  So please try to do that now.

6                     PROSPECTIVE JUROR:  Okay.

7                     (At this time, the prospective juror left the

8       courtroom)

9                     (Pause in the proceedings)

10                    THE COURT:  Okay.  The juror is coming in.

11                    COURT OFFICER:  Ready for Miss Chavous?

12                    THE COURT:  Yes.

13                    (At this time, a prospective juror entered the

14      courtroom)

15                    THE COURT:  Would you restate your name for

16      the record, please.

17                    PROSPECTIVE JUROR:  Falon Chavous.

18                    THE COURT:  Miss Chavous, did you have an

19      opportunity to call your job, ma'am?

20                    PROSPECTIVE JUROR:  I was able to speak to

21      Human Resources, but the person I spoke to informed me

22      that she would have to speak with someone else.  Because

23      I'm new, she would have to verify, before the

24      three-month period, if I am going to get paid or not.

25                    THE COURT:  Let me ask you this, ma'am.  In

JURY VOIR DIRE                                    403

1      the worse case scenario, where they indicate that you

2      don't get paid and you just get the $40 from jury duty

3      on each day, would that affect your ability to sit on

4      this case and judge the evidence fairly in this case?

5                   PROSPECTIVE JUROR:  As far as evidence, no,

6      but it would definitely place a hardship on me as far as

7      what I would be making, $40 a day.

8                   THE COURT:  Okay.  Well, let me ask you this.

9      Is that hardship that you would face, would that affect

10     how you evaluate the evidence in this case,

11     Miss Chavous?

12                  PROSPECTIVE JUROR:  Well --

13                  THE COURT:  Again, there are no right or wrong

14     answers, only truthful answers.

15                  Let's say you are selected and then all of you

16     sudden you say $40 a day, that's not enough, I feel I

17     have to rush to judgment or do something that would be

18     unfair to the parties as a result of that.  Because,

19     again, they're entitled to have jurors who will be fair

20     and impartial.  Anything that might interfere with your

21     judgment on this case, we need to know.

22                  PROSPECTIVE JUROR:  I don't think it would

23     make me go either way on a verdict, but it would

24     probably distract me.

25                  THE COURT:  Would it distract you to the point

1      that you would be unable to concentrate on the evidence?

2                  PROSPECTIVE JUROR:  Possibly.  I hope not.

3                  THE COURT:  Okay.  Let me ask you this.  I

4      know you said you're scheduled to go on vacation also.

5      As a new employee, how did you work that out?

6                  PROSPECTIVE JUROR:  It was already scheduled

7      before I was hired, so it wasn't anything I could do.

8                  They are calling me right now.

9                  THE COURT:  Okay.  Maybe you should step

10     outside and take the call.

11                 (At this time, the prospective juror left the

12     courtroom)

13                 (Pause in the proceedings)

14                 THE COURT:  Okay.  The juror is coming back

15     in.

16                 COURT OFFICER:  Ready for Miss Chavous?

17                 THE COURT:  Yes.

18                 (At this time, a prospective juror entered the

19     courtroom)

20                 THE COURT:  Back on the record.

21                 Miss Chavous?

22                 PROSPECTIVE JUROR:  They informed me that I do

23     get paid for the time that I'm serving.

24                 THE COURT:  So you would, in fact, get paid.

25     So that takes care of all of the concerns that you have?

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  And we would provide you a letter

3    to indicate that you are on jury duty if, in fact, you

4    are selected.  So that you don't have any qualms at this

5    point about your service; is that correct?

6            PROSPECTIVE JUROR:  None at all.

7            THE COURT:  Thank you.

8            You may step outside.

9            (At this time, the prospective juror left the

10   courtroom)

11           THE COURT:  Any challenges for cause, People,

12   as to prospective jurors one through three?

13           MR. HALE:  No.

14           THE COURT:  Defense?

15           MR. SIMONS:  No.

16           THE COURT:  Any peremptories, People, as to

17   one through three?

18           MR. HALE:  Number three, Mr. Cipriano.

19           THE COURT:  Is that it?

20           MR. HALE:  That's it.

21           THE COURT:  Any peremptories as to jurors one

22   and two, Defense?

23           MR. SIMONS:  Number one.

24           THE COURT:  Is that it?

25           MR. SIMONS:  Yes.

JURY VOIR DIRE                                          406

1          THE CLERK:  So Mazhar Al Hadid becomes juror

2     number ten.

3          We have ten selected jurors.

4          THE COURT:  Any challenges for cause as to

5     prospective jurors four and five?

6          People?

7          MR. HALE:  No.

8          THE COURT:  Defense?

9          MR. SIMONS:  No.

10         THE COURT:  Any peremptories as to four and

11    five?

12         People?

13         MR. HALE:  Number four.

14         That's it.

15         THE COURT:  Any peremptory, Defense, as to

16    number five?

17         MR. SIMONS:  Yes.

18         THE CLERK:  Judge, the People have challenged

19    have used nine challenges; the defense has used

20    thirteen.

21         THE COURT:  Any challenges for cause as to

22    prospective jurors six and seven?

23         People?

24         MR. HALE:  No.

25         THE COURT:  Defense?

-VMG-

1           MR. SIMONS:  No.

2           THE COURT:  Any peremptories as to six and

3      seven?

4           People?

5           MR. HALE:  Seven, Mr. Vannkeuren.

6           That's it.

7           THE COURT:  Any peremptories as to number six?

8           Defense?

9           MR. SIMONS:  Yes.

10          THE CLERK:  The People have used ten

11     challenges; the defense has used fourteen.

12          THE COURT:  Any challenges for cause as to

13     eight and nine?

14          People?

15          MR. HALE:  No.

16          THE COURT:  Defense?

17          MR. SIMONS:  No.

18          THE COURT:  Any peremptories as to eight and

19     nine?

20          People?

21          MR. HALE:  Number eight.

22          That's it.

23          THE COURT:  Any peremptory as to number nine?

24          Defense?

25          MR. SIMONS:  No.

JURY VOIR DIRE                                    408

1              THE CLERK:  So Robert Thomas becomes juror

2     number eleven.

3              Eleven selected jurors.  The People have used

4     eleven challenges; the defense has used fourteen.

5              THE COURT:  Any challenges for cause as to

6     number ten?

7              People?

8              MR. HALE:  No.

9              THE COURT:  Defense?

10             MR. SIMONS:  No.

11             THE COURT:  Any peremptories as to number ten?

12             People?

13             MR. HALE:  No.

14             THE COURT:  Defense?

15             MR. SIMONS:  No.

16             THE CLERK:  So Mark Rohrer becomes juror

17    number twelve.

18             THE COURT:  Any challenges for cause as to

19    number eleven as a first alternate?

20             People?

21             MR. HALE:  No.

22             THE COURT:  Defense?

23             MR. SIMONS:  Yes.

24             I believe Mr. Diaz stated he would put his

25    religious beliefs above --

JURY VOIR DIRE                                    409

1              MR. HALE:  He's right.  I'll concede that.

2              THE COURT:  Okay.  Number eleven will be

3         excused for cause, on consent.

4              Any challenges for cause as to number twelve?

5              People?

6              MR. HALE:  No.

7              THE COURT:  Defense?

8              MR. SIMONS:  No.

9              THE COURT:  Any peremptories as to number

10        twelve?

11             People?

12             MR. HALE:  No.

13             MR. SIMONS:  Defense?

14             THE COURT:  No.

15             THE CLERK:  So John Perkins becomes alternate

16        number one.

17             THE COURT:  Any challenges for cause as to

18        number thirteen as a second alternate?

19             People?

20             MR. HALE:  No.

21             THE COURT:  Defense?

22             MR. SIMONS:  No.

23             THE COURT:  Any peremptories as to number

24        thirteen?

25             People?

1              MR. HALE:  No.

2              THE COURT:  Defense?

3              MR. SIMONS:  Yes.

4              THE COURT:  Any challenges for cause as to

5      number fourteen as a second alternate?

6              People?

7              MR. HALE:  No.

8              THE COURT:  Defense?

9              MR. SIMONS:  No.

10             THE COURT:  Any peremptories as to number 14?

11             People?

12             MR. HALE:  Yes.

13             THE CLERK:  Both sides have used one challenge

14     towards this seat, out of the two.

15             THE COURT:  Any challenges for cause as to

16     number fifteen?

17             People?

18             MR. HALE:  No.

19             THE COURT:  Defense, for cause challenge?

20             MR. SIMONS:  No.

21             THE COURT:  Any peremptories as to number

22     fifteen?

23             MR. HALE:  No.

24             THE COURT:  Defense?

25             MR. SIMONS:  Yes.

-VMG-

JURY VOIR DIRE                          411

1              THE CLERK:   The defense has exhausted their

2      challenges towards this seat.

3              THE COURT:   Any challenges for cause, as to

4      number sixteen?

5              People?

6              MR. HALE:   No.

7              THE COURT:   Any cause challenge, Defense, as

8      to number sixteen?

9              MR. SIMONS:   No.

10             THE COURT:   Any peremptories, People?

11             MR. HALE:   No.

12             THE CLERK:   So Felix Onyenwe is alternate

13     number two.

14             THE COURT:   Any challenges for cause as to

15     number seventeen?

16             People?

17             MR. HALE:   No.

18             THE COURT:   Defense?

19             MR. SIMONS:   No.

20             THE COURT:   Any peremptories as to number

21     seventeen as a third alternate?

22             People?

23             MR. HALE:   Yes.

24             THE COURT:   Any challenges for cause as to

25     number eighteen as the third alternate?

                        -VMG-

JURY VOIR DIRE                           412

1               People?

2               MR. HALE:  No.

3               THE COURT:  Defense?

4               MR. SIMONS:  No.

5               THE COURT:  Any peremptories as to number

6       eighteen?

7               People?

8               MR. HALE:  No.

9               THE COURT:  Defense?

10              MR. SIMONS:  No.

11              THE CLERK:  So Darryl Williams is alternate

12      number three.

13              THE COURT:  We'll see if we can get a fourth

14      alternate.

15              Any challenges for cause as to number

16      nineteen?

17              People?

18              MR. HALE:  No.

19              THE COURT:  Defense?

20              MR. SIMONS:  No.

21              THE COURT:  Any peremptories as to number

22      nineteen?

23              People?

24              MR. HALE:  No.

25              THE COURT:  Defense?

1                MR. SIMONS:  Yes.

2                THE COURT:  Do you think we can try to get a

3     fourth alternate?  If we can.  If not, then I'll go with

4     the three that we have.

5                (Pause in the proceedings)

6                THE COURT:  If not, I'll go with the three

7     that we have.

8                MR. HALE:  You want to go with the three?

9                MR. SIMONS:  Yes.

10               MR. HALE:  That's works, Judge.

11               THE COURT:  Okay.

12               Are both sides ready?

13               MR. HALE:  Yes.

14               MR. SIMONS:  Yes.

15               (Pause in the proceedings)

16               COURT OFFICER:  Ready for the jury?

17               THE COURT:  Are both sides ready for the jury?

18               MR. HALE:  Yes.

19               MR. SIMONS:  Yes.

20               THE COURT:  Yes.

21               COURT OFFICER:  Jury entering.

22               (At this time, the panel of prospective jurors

23     entered the courtroom)

24               THE CLERK:  We have selected a jury.  I'll

25     call the names of those of you who have been selected.

1               Please answer here or present.

2               Mazhar Al Hadid.

3               A JUROR:  Here.

4               THE CLERK:  Robert Thomas.

5               A JUROR:  Here.

6               THE CLERK:  Mark Rohrer.

7               A JUROR:  Here.

8               THE CLERK:  John Perkins.

9               A JUROR:  Here.

10              THE CLERK:  Felix Onyenwe.

11              A JUROR:  Here.

12              THE CLERK:  Darryl Williams.

13              A JUROR:  Here.

14              THE CLERK:  All right.  If I called your name,

15      remain seated.

16              If I didn't call your name, please wait

17      outside in the corridor and we will be out shortly to

18      give you further directions.

19              Thank you.

20              (At this time, the unselected jurors left the

21      courtroom)

22              THE CLERK:  Will the six newly selected jurors

23      please rise and raise your right hand and answer the

24      following question:

25              Do you and each of you solemnly swear or

JURY VOIR DIRE                                    415

1    affirm that you will try this case in a just and

2    impartial manner, to the best of your judgment, and that

3    you will render a verdict according to the law and the

4    evidence?

5              Please say I do.

6              (AFFIRMATIVE RESPONSE FROM JURORS)

7              THE CLERK:  Thank you.

8              Be seated, please.

9              THE COURT:  Again, jurors, as you can tell,

10   jury selection is a slow and a tedious process, but an

11   important one.

12             You have been selected because it's been

13   determined that you will be fair and give both sides a

14   fair trial, which they're entitled to receive.

15             Again, jurors, I'm going to instruct you

16   please don't discuss any aspect of this case amongst

17   yourselves or with anyone else.  You haven't heard any

18   evidence, it would be unfair to speculate.

19             Also, jurors, I'm going to instruct you that

20   if you see any of the parties, you cannot ask them how

21   long do I have to be here, when do we get started, and

22   when can I leave.  They will ignore you.  Not that

23   they're being rude, but they're following the

24   instructions of the Court.

25             Also, jurors, you're going to return on Monday

JURY VOIR DIRE                                    416

1      morning, which is May 5th, at 10 a.m.

2            At that time, I will give you further

3      instructions, and you will also hear an opening

4      statement that the district attorney's office is

5      required to make to you by law.  Certainly, thereafter,

6      if defense counsel chooses, he may also make an opening

7      statement.  And testimony is expected to begin on

8      Monday.

9            Again, as I said, jurors, you all said you

10     would keep an open mind and be fair and impartial, and

11     we're going to hold you to the oath that you took.

12            On Monday, when you return, you will be shown

13     to the jury room.  The officer will take information

14     from you and show you the jury room that you should

15     report to on Monday.

16            You'll follow the direction of the court

17     officer.

18            (At this time, the jury left the courtroom)

19            THE COURT:  Certainly, I'll see the parties at

20     10:00.

21            MR. SIMONS:  Your Honor, at this time, since

22     the jury has been sworn, I would request Rosario

23     material, if there is anything outstanding, to be turned

24     over at this time.

25            THE COURT:  Mr. Hale, do you have anything

PROCEEDINGS                        417

1    that's outstanding?

2              MR. HALE:  Can I confer with counsel for just

3    a second, your Honor?  I don't exactly remember what I

4    have given him.

5              THE COURT:  Okay.

6              (Off-the-record discussion held)

7              MR. HALE:  Your Honor, there are two tape

8    recordings that were of the witness Jacqueline Warren

9    and one of Derrick Warren, that I do have transcripts

10   for.  Those are still outstanding.  I haven't been back

11   to my office today, or much of yesterday, as it were, so

12   I do not have those items with me.

13             If Mr. Simons wants to stick around a little

14   while, I'll give them to him.

15             MR. SIMONS:  Well, I would walk to his office,

16   so then I can keep going on.

17             MR. HALE:  That's very nice of you to do that.

18             I believe that's everything, Judge.

19             THE COURT:  Okay.

20             Also, I will say this.  Mr. Waiters, you have

21   no obligation or burden to do anything whatsoever.  The

22   jury has been selected.  I imagine at some point in time

23   either next week or thereafter, the People will rest.  I

24   certainly will need to have an answer as to whether, in

25   fact, you wish to exercise your right to testify.

-VMG-

PROCEEDINGS                          418

1          Of course, you have no obligation to do so,

2     but I would not want you to come back to this Court on

3     any other date and say, "You know what, Judge?  I wanted

4     to get up on that witness stand and tell my side of the

5     story, but my lawyer stopped me from doing it."  Or, "I

6     didn't want to testify, my lawyer told me I had to get

7     up on that witness stand and tell my side of the story."

8          Because, again, certainly you need to consult

9     with your attorney, but ultimately that decision belongs

10    to each and every defendant.

11          Is that understood by you, Mr. Waiters?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  I'll see the parties at 10 a.m. on

14    Monday.

15          MR. HALE:  Did the Court give any more thought

16    to the issue concerning the statements to the police in

17    relation to the expert witness?

18          THE COURT:  I really didn't.  Let's pick that

19    up on Monday.  If you want to start before then, at

20    9:45, I'll certainly do that as well.

21          MR. HALE:  All right.  We'll see you then,

22    Judge.

23          *        *        *        *        *

24          (At this time, court stands in recess, and the

25    trial adjourned to Monday, May 5, 2008, at 9:45 a.m.)

-VMG-