COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT B**

Defendant's Main Brief to the Appellate
Division, Second Department

*To be argued by*
JONATHAN M. KRATTER
*(10 Minutes)*

# New York Supreme Court

### APPELLATE DIVISION -- SECOND DEPARTMENT

**PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

- against -

**GENERAL WAITERS,**

*Defendant-Appellant.*

*TO BE HEARD ON*
*THE ORIGINAL*
*RECORD*

Kings County
Ind. No.  3464/06
A.D. No. 08-05247

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
Attorney for Defendant-
Appellant
2 Rector Street, 10th Floor
New York, NY 10006
(212) 693-0085

JONATHAN M. KRATTER
*Of Counsel*
April, 2010

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . 2

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . 3

    Introduction . . . . . . . . . . . . . . . . . . . . . . . 3

    The Indictment . . . . . . . . . . . . . . . . . . . . . . 4

    People's Case . . . . . . . . . . . . . . . . . . . . . . . 5

        The Shooting and its Aftermath – Four Eyewitness
        Accounts . . . . . . . . . . . . . . . . . . . . . . 5

        Injuries, Ballistics Evidence, and Appellant's
        Alleged Statement . . . . . . . . . . . . . . . . . 12

    Defense Case . . . . . . . . . . . . . . . . . . . . . . . 15

    Defense Summation . . . . . . . . . . . . . . . . . . . . . 15

    Prosecutor's Summation . . . . . . . . . . . . . . . . . . 16

    Jury Charge and Verdict . . . . . . . . . . . . . . . . . 19

    Sentencing . . . . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT

    POINT I

    THE VERDICT WAS AGAINST THE WEIGHT OF THE
    EVIDENCE WHERE, PROCEEDING UNDER A THEORY OF
    TRANSFERRED INTENT, THE PEOPLE FAILED TO PROVE
    THAT APPELLANT INTENDED TO SHOOT THE PERSON
    SPECIFIED IN THE INDICTMENT RATHER THAN THE
    THREE OTHER PEOPLE WERE SHOT IN ADDITION TO
    THAT PERSON (U.S. CONST. AMEND. XIV; N.Y.
    CONST. ART. I, §6; JACKSON V. VIRGINIA, 443
    U.S. 307 [1979]). . . . . . . . . . . . . . . . . 21

POINT II

APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO
A FAIR TRIAL BY THE PROSECUTOR, WHO, INTER
ALIA, IN A CASE WHERE INTENT WAS THE KEY
ISSUE, REPEATEDLY MADE FACTUALLY MISLEADING
SUMMATION ARGUMENTS NOT SUPPORTED BY THE
EVIDENCE CONCERNING THE INTENT ELEMENTS OF THE
CRIMES, MISSTATED THE LAW APPLICABLE TO THOSE
ELEMENTS, AND VOUCHED FOR HIS CASE WITH REGARD
TO THOSE ELEMENTS.   U.S. CONST., AMENDS. V,
XIV; N.Y. CONST., ART. I, §6. . . . . . . . . . . . 30

POINT III

APPELLANT   WAS   ILLEGALLY   SENTENCED,   IN
VIOLATION  OF  P.L.  §70.25,  WHEN  THE  COURT
IMPOSED CONSECUTIVE SENTENCES FOR EACH OF THE
FOUR COUNTS ALTHOUGH THE PEOPLE DID NOT MEET
THEIR BURDEN OF DEMONSTRATING THAT THE CRIMES
WERE COMMITTED THROUGH SEPARATE ACTS.   U.S.
CONST., AMEND. XIV; N.Y. CONST., ART. I, §6.  . . . 38

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . 43

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,       :

               Respondent,       :

             -against-       :

GENERAL WAITERS,       :

             Defendant-Appellant.       :

----------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.   The indictment number in the court below was 3464/06.

2.   The full names of the original parties were People of the State of New York against General Waiters.  There has been no change of parties on appeal.

3.   This action was commenced in Supreme Court, Kings County.

4.   This action was commenced by the filing of an indictment.

5.   This appeal is from a judgment convicting appellant, after a jury trial, of murder in the second degree, attempted murder in the second degree, and assault in the first degree.

6.   This is an appeal from a judgment of conviction rendered June 2, 2008.

7.   Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

1

PRELIMINARY STATEMENT

This is an appeal from a judgment rendered in the Supreme Court, Kings County, on November 13, 2007, convicting appellant, after a jury trial, of murder in the second degree [P.L. §125.25(1)], attempted murder in the second degree [P.L. §§110.00/125.25(1)], and assault in the first degree [P.L. §120.10(1) (2 counts)]. Appellant was sentenced to consecutive prison sentences of 25 years to life for murder, 10 years for attempted murder, and 25 years and 5 years for assault (Dowling, J., at hearing, trial and sentence).

Appellant filed a timely notice of appeal, and on August 20, 2008, this Court granted him leave to appeal as a poor person and assigned Lynn W. L. Fahey as appellate counsel.

Appellant had no co-defendants in the trial court.

Appellant is currently incarcerated pursuant to the judgment. No stay has been sought.

QUESTIONS PRESENTED

1. Whether the verdict was against the weight of the evidence where, proceeding under a theory of transferred intent, the people failed to prove that appellant intended to shoot the person specified in the indictment rather than the three other people were shot in addition to that person (U.S. Const. Amend. XIV; N.Y. Const. Art. I, §6; Jackson v. Virginia, 443 U.S. 307 [1979]).

2.    Whether appellant was denied his due
process right to a fair trial by the
prosecutor, who, <u>inter alia</u>, in a case where
intent was the key issue, repeatedly made
factually misleading summation arguments not
supported by the evidence concerning the
intent elements of the crimes, misstated the
law applicable to those elements, and vouched
for his case with regard to those elements.
U.S. Const., Amends. V, XIV; N.Y. Const., Art.
I, §6.

2.    Whether appellant was illegally sentenced,
in violation of P.L. §70.25, when the court
imposed consecutive sentences for each of the
four counts although the people did not meet
their burden of demonstrating that the crimes
were committed through separate acts.   U.S.
Const., Amend. XIV; N.Y. Const., Art. I, §6.


<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

The indictment charged appellant with the attempted murder of

his girlfriend's son and transferred intent murder and assault of

three other victims on the theory that all the shots were fired at

the son.   Appellant had lived with his girlfriend and her family

for about six years, and the two drank heavily every day.

Appellant was an angry, but not violent, drunk, and she had never

seen a gun in his possession.   But the girlfriend and three members

of her family testified that in a May 2006 argument between the two

in which her aunt and her mid-twenties son participated, appellant

fired no more than five shots.   Shot three times, the aunt remains

in a coma, and her young granddaughter was killed by shots to her

head and chest.   The girlfriend's son and teenaged daughter received leg wounds.

The prosecutor admitted in summation that it was impossible to know exactly where the victims were when the shots were fired, there were more bullet holes than shots, and there was no way to reconstruct exactly what happened.  He also repeatedly argued that, if appellant intended to kill anyone when he fired the gun, the jury should convict him regardless of specifically whom he wanted to kill, adding that a gun was a "killing machine that had only one purpose." The court instructed the jury on the transferred intent theory charged in the indictment, and the jury convicted of attempted murder of the son, transferred intent murder of the aunt's granddaughter, and transferred intent assault of the aunt and the girlfriend's daughter.

The court imposed consecutive sentences for each of the four crimes of which appellant was convicted.

The Indictment

Appellant was charged, inter alia, with the murder of Tajmere Clark by shooting her with the intent to kill Lorenzo Warren, the attempted murder of Lorenzo Warren, and the first-degree assaults of Mary Lee Clark and Shatashia Lewis by shooting them with the intent to cause serious physical injury to Lorenzo Warren (see indictment in court file).

People's Case

The Shooting and its Aftermath - Four Eyewitness Accounts

Jacqueline Warren and appellant became romantically involved in 1999, and he came to live with her, at 340 Williams Avenue in Brooklyn, the following year. By 2006, her son Lorenzo, 25 years old at trial, and her teenage son and daughter, Derrick Warren and Shatashia Lewis, also lived in the apartment.[1] Following a 2002 accident in which appellant was hit on the head at work, he received Worker's Compensation and disability payments. Lorenzo generally had no problems with appellant, but did not interact with him very much. They had three or four verbal arguments in the 10 or more months before the incident (Lorenzo: 156-159, 197-201, 204-205; Lewis: 296-298, 316-317; Jacqueline: 380-386, 425-431; Derrick: 469-471).[2]

Jacqueline and appellant drank every day, finishing a fifth bottle of rum in a day or two. Appellant became verbally abusive when he drank. They drank with Jacqueline's aunt, Mary Lee Clark, every other weekend (Jacqueline: 386, 390, 436-437). The only incident of physical abuse in Jacqueline's relationship with appellant occurred when he pushed her and she pushed him back.

---

[1] For purposes of clarity, Jacqueline, Lorenzo, and Derrick are referred to by their first names in this brief.

[2] Numbers in parentheses refer to pages of the trial testimony; numbers in parentheses preceded by "S" refer to the sentencing minutes.

Lorenzo had never seen appellant hit anyone in the family (Lorenzo: 206-207; Jacqueline: 431-433).  Jacqueline had never seen appellant in possession of a gun, and while she did the cleaning her apartment, she had never seen a gun there (Jacqueline: 395).

On May 6, 2006, Jacqueline held a birthday party for appellant that was attended by Lewis, Clark and her five grandchildren under the age of 11 (including four-year-old Tajmere Clark), and other family members.  Appellant, Jacqueline and Clark began drinking during the afternoon.  Lorenzo, Derrick, Clark and her grandchildren stayed at the apartment that night (Lorenzo: 158-159; Lewis: 298-301, 318-322; Jacqueline: 386, 433-435, 438; Derrick: 472-477, 497-498).

The next morning, appellant, Jacqueline, and Clark resumed their drinking in the living room.  When Jacqueline told appellant he was drinking "too much," he said loudly:  "Fuck you bitch," and she responded in kind.  Clark intervened, loudly telling appellant to calm down.  The argument escalated as appellant put his hands on Jacqueline's face (Jacqueline: 396-401, 441-447).

Eventually, appellant went into their bedroom, returning after 15 to 20 minutes wearing a jacket.  He began screaming at Jacqueline again, calling her names, while Clark, in a loud voice, told him to calm down and Jacqueline told him to leave the apartment (Jacqueline: 401-404, 445-447, 451-457).  From the bedrooms, Lorenzo, Derrick, and Lewis all heard the argument,

6

including Clark's voice (Lorenzo: 162, 215-216; Lewis: 303-305, 328-333; Derrick: 500).

A diagram of Jacqueline's apartment (Sergeant <u>Timothy Corleto</u>: 58)[3] reveals that the living room is an elongated rectangle that is longer up and down than side to side.   The entrance to the apartment is in the upper right corner of the living room.   The left half of the lower end of the living room extends further down the page than the right half.  On the left side of this living room extension, in the lower left corner of the room, is an opening to the hall leading to the bedrooms and kitchen.  On the right side of this extension, opposite the opening to the hall, is a wall that contained the fire escape door.  Lorenzo said this area was by the window screen on the floor shown in Appellant's Exhibit F, a photograph (Lorenzo: 239-242).[4]

According to Jacqueline, as the argument continued, she was sitting on the left side of a round table in the lower right portion of the main part of the living room underneath the term "Living Room" on the diagram, Clark was sitting at the bottom of

---

[3]This diagram, People's Exhibit 1, is being provided to the Court as Appellant's Exhibit A in this appeal.  While the witnesses frequently used a pointer to show where the participants were on the diagram, they did not make any marks on the diagram indicating those locations.

[4]This photograph is being provided to the Court as Appellant's Exhibit B in this appeal.  Also provided, as Appellant's Exhibit C in this appeal, is People's Exhibit 4, a photograph that shows the living room extension from a different angle.

the table near the horizontal wall on the diagram where the main portion of the living room ends, and appellant was standing between them.  Lorenzo went behind Clark near the wall, so that he was in the lower right corner of the main section of the living room. Lorenzo told appellant to "get out of [Jacqueline's] face" and said he was "tired of" hearing appellant talk disrespectfully to Jacqueline and Clark.  The two men yelled at each other, but neither tried to hit the other.  Clark touched Lorenzo's arm in an effort to calm him down (Jacqueline: 402-406, 410-411, 448-450, 453-459).

Jacqueline told appellant to leave, grabbed his arm, and pulled him towards the main door to the apartment.  Appellant cursed at her as they walked there.  Clark's granddaughter, three year old Tajmere Clark, ran to Clark, who was still sitting at the table.  Jacqueline was within arms-length of the door, and appellant was "right behind" her, when he pulled a gun from his jacket and fired at Lorenzo, walking towards Lorenzo as he did so. Jacqueline ran outside the apartment into the hallway, where she heard about four more shots, "[o]ne after the other" (Jacqueline: 411-415, 450-451, 456-462).

Lorenzo said he entered the living room after hearing Clark talking loudly and saw Jacqueline sitting in a chair to the left of the couch, appellant standing to her side, and Clark behind appellant.  Lorenzo testified that those three were not in the

8

lower right corner of the main portion of the living room, but were nearly half way up and to the left of the center of the room. Lorenzo said that he stayed in the lower left portion of the living room, near the closet and the hall to the bedrooms. Appellant was calling Jacqueline names in a loud voice, she told him to leave, and Clark told him to calm down (Lorenzo: 162-164, 166-168, 216-218).

Lorenzo recounted that from a distance of 10 feet, he argued with appellant and told him to step away from Jacqueline and not to "get in [her] face." Appellant told Lorenzo to stay out of the argument as it did not concern him, and the two moved towards each other arguing. Lorenzo concluded that appellant was intoxicated because his speech was "a little bit slurred." Lorenzo had seen appellant substantially more intoxicated about 10 times over the years (Lorenzo: 168-169, 207-208, 217-223).

Lorenzo asserted that Jacqueline and Clark got between the two men. Jacqueline told appellant to leave and pushed him towards the main door to the apartment, while Clark pushed Lorenzo in the opposite direction towards the hall and the bedrooms. Lorenzo said that Derrick entered from the bedroom hall, stood next to Lorenzo, and joined the argument, until Clark left Lorenzo and pushed Derrick back into the hall. As the argument continued, Lorenzo remained where he was and did not advance towards appellant (Lorenzo: 169-171, 222-232).

When Lorenzo saw appellant put his hand into his jacket pocket, Lorenzo said:  "You don't have a gun in your pocket." Appellant pulled out a gun and pointed it at Lorenzo, who responded:  "You don't have any bullets in that gun."  Lorenzo, who had no weapon and never threatened appellant, was still near the entrance to the hall at the bottom left corner of the living room, while appellant was near the center of the room, in front of the couch in back of which was the round table.  Jacqueline was next to appellant, but moving back towards the entrance to the apartment (Lorenzo: 172-176, 192-193, 233-235, 243).  When appellant pointed the gun and fired a shot, Lorenzo felt a sharp pain in his thigh; he looked down at his thigh and did not see the other shots being fired.  He heard about four shots, "one after another," without delay.  After the second shot, Lorenzo went near the fire escape door in the living room extension and examined his leg until he found a bullet hole in his pants.  By the time of the third shot he had entered the hall to the kitchen and bedrooms (Lorenzo: 176-178, 236-243).

Derrick testified that he left one of the bedrooms in the apartment after he heard Lorenzo join the loud argument.  Derrick stood behind Lorenzo not far from the lower left corner of the living room near the hall, and aside from telling appellant to "Get out," he did not participate in the argument.  Jacqueline and appellant were near the far end of the room, Jacqueline towards the

10

left side and appellant towards the right.  Clark, who was behind
Derrick and Lorenzo and even closer to the hallway at the bottom
left corner of the living room, never grabbed Derrick or tried to
push him out of the room (Derrick: 480-482, 493, 501-502).

Derrick heard appellant say "I got something for you" to
Lorenzo, who did not respond.  Appellant "act[ed] like he was
walking out the [apartment] door," then turned and pulled a gun
from his jacket pocket.  He fired once towards the ceiling, then
aimed at Lorenzo, who was by the couch near the center of the
living room 7 to 8 feet from appellant, and started shooting.
Derrick stayed where he was and ducked while six shots were fired.
Lorenzo, and then appellant, ran past Derrick into the hall to the
bedrooms, as the shots were fired (Derrick: 483-486, 503-507).

Lewis said she left the same bedroom after Derrick and stopped
near him at the bottom of the living room close to the bedroom
hall.  She saw appellant, Jacqueline, and Lorenzo at the upper end
of the room, with Lorenzo directly to the left of the other two and
not far from them.  Clark was to the left of the round table behind
the couch, which would put her in the lower right quadrant of the
room.  By the time appellant said:  "You don't want me to pull out
what I got in my jacket," and Lorenzo responded:  "You don't got
nothing in your jacket," Lorenzo had advanced just to the left of
appellant, with Jacqueline behind Lorenzo.  Clark, Derrick, and
Lewis remained in the corner of the room near the bedroom hallway

11

(Lewis: 307-309, 339-348).  Lewis heard only one shot and saw "the fire" from appellant's gun.  Realizing that she had been shot in the left thigh and seeing Clark lying on the floor, Lewis went into a bedroom and called 911 (Lewis: 310-312, 348-350).

Derrick asserted that after the shooting stopped, appellant, who had gone into the hall to the bedrooms, came back out and, as he passed Derrick, pointed the gun at Derrick's face at point blank range and pulled the trigger.  The gun made a clicking noise but did not fire.  Realizing the gun had no bullets, Derrick tackled appellant, who was moving towards the main apartment door.  They ended up on the floor with Derrick on top (Derrick: 486-487, 507-511).  Then Lorenzo returned, took Derrick's place on top of appellant, and hit him repeatedly.  Lorenzo broke a fish tank filled with water over appellant's head, then continued hitting him as Derrick hit appellant with a vase.  Jacqueline returned from outside the apartment and wrested the gun from appellant's hand. Lorenzo remained on top of appellant until the police arrived (Lorenzo: 178-184, 248-258; Jacqueline: 416-418; Derrick: 488, 511).

### Injuries, Ballistics Evidence, and Appellant's Alleged Statement

Sergeant Corleto and Police Officer Jolene Anderson separated and handcuffed Lorenzo and appellant.  Lorenzo had what appeared to be a gunshot wound, while appellant was semi-conscious.  Both were

removed to a hospital, as was Lewis (Corleto: 57-60, 64-65; Anderson: 87-89; Lorenzo: 184, 188-189; Derrick: 492). Lorenzo's wound was cleaned but he received no stitches and was released after five hours. He said the injury still affected him at the time of the trial (Lorenzo: 191-192). Lewis's wound required surgery and several days in the hospital, but she was fine at trial (Lewis: 315).

Corleto and Anderson found Clark lying face down by the round table behind the couch, which would place her in the lower right part of the living room. Tajmere was underneath her (Corleto: 66; Anderson: 90, 93). Tajmere was struck by two bullets, one that entered the back of the right side of her head and was recovered from the left side of her head and another that entered through her left chest, grazed her heart, passed through her left lung, fractured two ribs in her back, and exited through her back (Michelle Slone, M.D.: 274-276, 279-280). These wounds "could" be fatal and were in this case as, together, they caused her death (279, 282-283).

Clark suffered gunshot wounds to her head, abdomen, and leg. One bullet entered her head near her left temple. There was no exit wound, and small multiple bullet fragments remained in her brain. Clark was in a coma at the time of the trial. The bullets that struck Clark's abdomen and leg exited her body without causing injury to a life sustaining organ or system (Slone: 284-286;

13

Jacqueline: 421-422; People's Exhibit 11: 5/30/06 CT scan of head/brain).

The .357 magnum revolver used by appellant contained five empty shell casings that remain when a bullet is fired; all had been discharged by that gun (Anderson: 83-86, 97-99; Lorenzo: 172; Detective Luis Fontanez: 365-373; Jacqueline: 412-413; Derrick: 487-488). The six-cylinder weapon could hold as many as six rounds, but one of the cylinders contained no evidence of discharge while five had evidence "that sometimes indicates that this cylinder was recently discharged" (Detective George Boston: 106-107).

Boston found a bullet hole in the wall between the living room and a closet where the hall to the bedrooms leaves the living room extension. He and Fontanez described this evidence (People's Exhibit 8) as part of the copper jacketing of a bullet, which is a coating on the lead part of the bullet that is designed to give the bullet strength and stability. This jacketing, a deformed copper-jacketed bullet from the bedroom closest to the living room, and the bullet from Tajmere's head had all been fired from appellant's gun. There were no other bullet fragments or bullet impact marks in the apartment (Boston: 110-123; 114-116, 134-137; Fontanez: 373-377).

Jacqueline claimed that sometime after the incident, appellant told her on the phone that he was aiming at her son because he was

14

coming between them.   While the prosecutor's leading question seemed to elicit that this exchange occurred about a year after the incident, Jacqueline later admitted that she could remember neither the month, nor even the year, of this conversation (420-421, 464-645).

Defense Case

Appellant's hospital records stated that he was brought to the hospital by EMS in an intoxicated state and that medical personnel could not assess him due to that condition (552-553, 556-557).

Defense Summation

Defense counsel stated that although three people in addition to Lorenzo were shot, all of the charges were based on the People's ability to prove that appellant intended to kill Lorenzo (555-557, 604).   Yet Derrick and Lewis testified that people were in different positions than described by Lorenzo at the time of the shooting (595-596, 598-599).   While appellant had lived with the family for years, he had had few prior conflicts with Lorenzo, which was also relevant to whether appellant intended to kill him (580-581).   Lorenzo clearly did not think that appellant intended to harm him physically, as he baited appellant by saying he did not believe that appellant had a gun or that the gun was loaded (591-592).   Counsel further pointed out that appellant drank regularly and often became verbally, although not physically, abusive when he

15

did so, and he was drunk at the time of the incident (578-579, 590, 604).  Thus, the evidence failed to prove appellant's specific intent, and if appellant acted only recklessly, the jury would have to acquit him of the specific intent crimes (604-607).

Prosecutor's Summation

At the start of his summation, the prosecutor argued that the gun used during the crime was a "tool" or "machine" that was created for only one purpose, which was "to cause a piece of metal to go of out of the barrel at supersonic speed and tear through flesh and bone and organs and to kill."  Thus, it had no other purpose than as "a killing machine," a phrase he returned to repeatedly (611-614, 626-627, 632-633).  He further claimed that "we all know that that is a killing machine, and . . . when you point a gun at another human being and pull the trigger . . . [y]ou intend to kill."  He asserted that the mechanics of firing the gun prevented non-intentional reckless or careless discharge of the weapon (626-628).

The prosecutor maintained that the jury did not "have to decide whether [appellant] intended to cause death or any sort of harm to" Tajmere, Clark, or Lewis because

> the judge is going to tell you[] it doesn't
> matter.  If when shooting that gun . . .
> [appellant] had in his head, had in his heart
> murder . . . the intent to kill anybody, and
> in this case particularly the intent to kill
> Lorenzo Warren[,] when he's firing that gun,
> he becomes responsible for the damage that was

16

> caused by each and every bullet . . . [and
> for] his human act of willing that killing
> machine to work, as if he intended it himself
> (616-617).

The prosecutor confirmed that Tajmere was in Clark's arms or lap when the shots were fired and added that it did not matter if appellant intended to kill Lorenzo, not Tajmere, or if the bullet passed through Lorenzo or Clark or a wall, because under the law appellant was responsible even if he intended to kill someone else (616-618).  He continued:  "that's the reason you don't have to decide whether he was shooting at" Tajmere or Clark or Lewis because:

> whether he was or not, if he was shooting at
> Lorenzo Warren and if he was intending to kill
> Lorenzo Warren, he's responsible for all for
> the injuries.
>
>      In other words, if [appellant] has it in
> his head and . . . his heart to kill, then all
> of the bloodshed, all of the pain . . . he
> becomes responsible (618-619).

The prosecutor emphasized that appellant's intent could be gleaned from the results of his actions:  that he hit Lorenzo, "his target" (626-629).  Appellant's intent was further shown because he "kept firing over and over again . . . in the same line" (628). The prosecutor asserted that "any disagreement about where exactly people were standing" did not matter because "everybody who was able to see it," except Derrick, said that appellant pointed the gun at Lorenzo (626, 628).  He admitted that where the people "are exactly at the time that this [] happened, you can't know.  There's

17

no way to know; there's no way to reconstruct it.  I submit to you it doesn't matter.  It's not something really you have to decide" (616).  The prosecutor maintained that Derrick's testimony that appellant fired at the ceiling was "not true" because no bullet marks were found on the ceiling (626, 628).

Responding to defense counsel's argument about inconsistencies in the testimony of the witnesses, the prosecutor claimed that "it doesn't matter what the nature of the argument was" and that whether appellant "hated" Lorenzo was "totally immaterial" (619-624).  Nor did it matter whether there was previous "animosity" or "bad blood" between them (625).  He also maintained that testimony about whether Lorenzo taunted appellant before the shooting was irrelevant (643).

In concluding, the prosecutor told the jurors that their choice was "clear:" were they "going to make [appellant] responsible for his choices" and "apply the law" or would they not hold him responsible and not apply the law.  He added that he was "confident" that the jurors would "make [appellant], as the law requires, be responsible for his actions on that day and all the damage and misery and death that he caused" (644).  He predicted that the jurors were

> going to come back with your one unanimous
> voice and speak the verdict which is true,
> which is just, and does justice to the offense
> that happened. . . .  And you're going to do
> all that by speaking with your one unanimous
> voice and only one word:  Guilty (645).

18

<u>Jury Charge and Verdict</u>

The court charged the jury that while intoxication was not a defense to a criminal charge, it could consider whether defendant was so intoxicated that he was unable to form the intent necessary for the commission of the crimes (685).

The court submitted to the jury, <u>inter</u> <u>alia</u>, second-degree murder of Tajmere, and first-degree manslaughter as a lesser included offense, based on the transferred intent to kill Lorenzo; attempted second-degree murder of Lorenzo; and first-degree assault of Clark and Lewis based on the transferred intent to cause serious physical injury to Lorenzo (671-676, 678-681, 693). It instructed the jury that if it convicted of those four counts it should not consider any of the other counts, namely first-degree manslaughter, first-degree intentional assault of Lorenzo, and weapon possession (672-674, 676-678, 681-685, 689-691).

The jury convicted appellant of all four counts it reached pursuant to the court's instructions (700-703).

19

<u>Sentencing</u>

The prosecutor asked the court to impose "as much time as it can," meaning the maximum sentences running consecutively (S8-9). He made this request even though, in his summation, he had admitted that there was no "dispute . . . that there are more holes here in people and in walls than there are rounds from that gun" or that bullets "passed though people and into other people."   Later he added that "whether that bullet passed through Lorenzo and hit [Lewis], or passed through somebody else and then hit her, and passed through her and ended up in the bedroom, because you saw the one bullet that was there in the bedroom . . . who knows?" (630-631).

The court imposed an indeterminate sentence of 25 years to life for murder and determinate sentences of 10 years for attempted murder, 25 years for first-degree assault of Clark, and 5 years for first-degree assault of Lewis.  The court directed that all four sentences be served consecutively (S12-13).

ARGUMENT

POINT I

THE VERDICT WAS AGAINST THE WEIGHT OF THE
EVIDENCE WHERE, PROCEEDING UNDER A THEORY OF
TRANSFERRED INTENT, THE PEOPLE FAILED TO PROVE
THAT APPELLANT INTENDED TO SHOOT THE PERSON
SPECIFIED IN THE INDICTMENT RATHER THAN THE
THREE OTHER PEOPLE WERE SHOT IN ADDITION TO
THAT PERSON (U.S. CONST. AMEND. XIV; N.Y.
CONST. ART. I, §6; JACKSON V. VIRGINIA, 443
U.S. 307 [1979]).

The prosecution's theory of the case, as charged in the indictment and to the jury, was that all of the shots were fired at Lorenzo, who suffered the least serious injury, with the intent to kill or seriously physically injure him, not at the three more seriously injured victims. However, the witnesses did not agree where the victims were standing, or even that they were near Lorenzo, when the shots were fired, and just as appellant ran out of bullets, he allegedly pointed the gun at Lorenzo's brother at point blank range and pulled the trigger. Also, there was no other strong proof of who, if anyone, appellant intended to shoot, and all agreed that appellant was substantially intoxicated at the time. Thus, the People failed to prove beyond a reasonable doubt that appellant fired each shot with the intent to kill Lorenzo, and the verdicts on the transferred intent counts must be reversed as against the weight of the evidence. See People v. Danielson, 9 N.Y.3d 342 (2007); People v. Bleakley, 69 N.Y.2d 490 (1977).

21

The first step in the two-step process that this Court must undertake when making a weight of the evidence review is "to determine whether an acquittal would not have been unreasonable." People v. Danielson, 9 N.Y.3d at 348; see also People v. Romero, 7 N.Y.3d 633, 643 (2006). Assuming it makes such a finding, the Court must then move to step two of the weight of the evidence review process, when this Court "sits as a thirteenth juror," People v. Danielson, 9 N.Y.3d at 348, and "weigh[s] the relative probative force of conflicting testimony and the relative strength of conflicting inferences." People v. Romero, 7 N.Y.3d at 643. See People v. Danielson, 9 N.Y.3d at 349.

The prosecution consistently asserted that appellant intended to shoot Lorenzo when he fired all of the shots. The indictment and the court's jury instructions charged appellant with attempted murder of Lorenzo, transferred intent murder of Tajmere, and transferred intent assault of Clark and Lewis. Having adopted the theory of transferred intent throughout this case, the prosecution was bound to prove beyond a reasonable doubt the specific intents alleged in the indictment for each crime, without variance from those allegations. See People v. Kaminski, 58 N.Y.2d 886, 887 (1983)(conviction based on sodomy indictment charging forcible compulsion by physical force reversed where court told the jury it could convict based on either use of physical force or threatened use); People v. Barnes, 50 N.Y.2d 375, 379, n. 3 (1980)(where

22

burglary charges identified specific crime defendant intended to commit in the building, prosecution had to prove that specific intent); People v. Acosta, 289 A.D.2d 975 (4th Dept. 2001)(in weapon possession case, improper to vary the basis for the unlawful use of the knife element from that stated in the bill of particulars); People v. Chin, 267 A.D.2d 404 (2d Dept. 1999)(where indictment charged defendant rendered rape victim unconscious by hitting her, improper to change theory at trial to "dissociative amnesia" or "psychoneurological shock"). Accordingly, since the People went to trial only on the theory that appellant intended to shoot Lorenzo, the jury was required to acquit unless the People proved that specific intent. See People v. Kaminski, 58 N.Y.2d at 887; People v. Barnes, 50 N.Y.2d at 379, n. 3.

The People failed to provide strong proof that appellant intended to hit Lorenzo when he fired all the shots. Clearly, a jury should determine a defendant's intent based on "all the evidence, all the testimony and all the circumstances surrounding the incident." People v. Getch, 50 N.Y.2d 456, 465 (1980). See People v. Steinberg, 79 N.Y.2d 673, 682, 684-685 (1992).

The prosecutor argued in summation that the jury could gauge appellant's intent from the results produced, namely that Lorenzo suffered a leg wound. But the prosecutor's application of this principle was hardly persuasive. Clark had bullet wounds to her head, abdomen, and leg, while Tajmere, who was apparently in

23

Clark's arms, had wounds to her head and chest.   Thus, divining appellant's intent from the results actually leads to the conclusion that appellant was firing at Clark (or Tajmere), not at Lorenzo.   Notably, Clark intervened loudly in appellant's argument with his girlfriend, which could have triggered appellant's anger, and while the intentional killing of a child seems unlikely, such things do happen.

The transferred intent theory was also not supported by any substantial history of problems between Lorenzo and appellant during the six years appellant lived in the apartment that could have explained why appellant intended to kill Lorenzo and only Lorenzo.   To the contrary, they had just three or four verbal arguments over the years.   The events immediately preceding the shooting similarly failed to create a strong inference that appellant's intent was to kill Lorenzo.   The argument began with appellant being verbally abusive with Jacqueline, as happened often since they drank every day and appellant was normally an angry, but not violent, drunk.   Jacqueline, not reticent about responding, told appellant to leave.   Shortly before the shooting, Lorenzo joined the argument but did not threaten appellant.   That Lorenzo expressed disbelief that appellant had a gun and, when appellant displayed it, that it was loaded, does not support the conclusion that shots that struck other people were necessarily intended for

24

Lorenzo, as firing the gun anywhere would have sufficed to show Lorenzo that he was wrong.

Further, while the testimony of Jacqueline, Lorenzo and Derrick supported the conclusion that the first shot was purposefully directed at and hit Lorenzo, the proof with regard to the other shots was much weaker. The prosecutor's claim that appellant was shooting at Lorenzo when the others were shot depended substantially on proof that they were standing in the same line of fire as Lorenzo, because otherwise it could hardly be argued that appellant was shooting at, and with the intent to hit, Lorenzo, but instead hit the others. Yet, the prosecutor admitted in summation that where the victims were "exactly at the time that this [] happened, you can't know. There's no way to know; there's no way to reconstruct it" (616). He added: "whether that bullet passed through Lorenzo and hit [Lewis], or passed through somebody else and then hit her, and passed through her and ended up in the bedroom . . . who knows?" (630-631).

The prosecutor was forced to make this concession because the witnesses provided inconsistent testimony as to the location of the victims when the shooting occurred and, more critically, failed to place them in the same line of fire as Lorenzo. Jacqueline and Lewis placed Clark in the lower right part of the living room when the shooting began, Jacqueline saw Tajmere go to Clark at that location just prior to the shooting, and that is where the two were

25

lying when the shooting ended. Thus, that was probably their location throughout the shooting, and Lorenzo and Derrick were likely mistaken in placing Clark elsewhere. However, only Jacqueline said Lorenzo was in that area when the first shot was fired, and Jacqueline left the apartment and did not see what happened after that shot.

In contrast, Lewis placed Lorenzo to the left of appellant at the top of the living room on the apartment diagram, so that Lorenzo and Clark were at right angles from appellant's perspective when he fired the first shot, and Lewis was not near either. Lewis could provide no information as to where people went after the first shot. Thus, her testimony utterly failed to support the thesis that appellant intended to hurt Lorenzo when he shot the other three victims.

Further, Lorenzo and Derrick said they were in the lower left part of the living room, near the hall to the bedrooms, when the first shot was fired. They were the only two who testified to what happened while the subsequent shots were fired, stating that Lorenzo moved into the living room extension, or even the hall, and thus was not near Clark for those shots. While Derrick claimed that appellant pursued appellant into the hall, nobody else saw this occur. In addition, this testimony was undermined by the evidence that most of the shots hit Clark and Tajmere, who were in the living room, and thus behind appellant if he were entering or

26

in the hall.  A shot fired as appellant pursued Lorenzo down the hall could not have hit them.

The theory that appellant intended to shoot at Lorenzo, and only Lorenzo, was further weakened by the witnesses' accounts of the incident gave appellant reasons to shoot at Clark and Derrick as much as at Lorenzo.  When appellant and Jacqueline were arguing, Clark intervened loudly enough to be heard in the bedrooms. Appellant could well have been angry that Clark intervened aggressively in the argument and been intending to hit her with all the shots after the first one.  Similarly, Lorenzo testified that Derrick joined in the argument when he entered the living room to the extent that Clark found it necessary to leave Lorenzo and push Derrick from the room, and Derrick said that Clark was in the same part of the room as he and Lorenzo.  Thus, having hit Lorenzo with his first shot, appellant could have been shooting at Derrick after that, but hit Clark instead, especially since, just as appellant's gun ran out of bullets, he pointed it point blank at Derrick's face and pulled the trigger.  It could hardly be clearer that by the end of the shooting, appellant's intent was directed at Derrick, not Lorenzo, and appellant could have intended to hit Clark in between.

The evidence also could have supported a verdict that appellant's firing of the gun was reckless and consistent with the elements of depraved indifference murder or assault.  The witnesses and medical reports agreed that appellant was drunk at the time of

27

the shooting.  While he and Jacqueline drank every day, there was no suggestion that he became so drunk that she often told him to leave the apartment he had lived in for years, as she did just before the shooting.  Thus, his intoxication could have led the jury to find recklessness, which would have required an acquittal of the charges.  That appellant fired in response to an expression of disbelief that amounted to a dare from Lorenzo, and that Derrick testified that appellant fired first at the ceiling, further supported the conclusion that appellant did not have the intent to kill or injure, but fired wildly and recklessly.

Appellant's alleged statement to Jacqueline, many months after the shooting, that he fired at Lorenzo because he was coming between Jacqueline and appellant was also not strong evidence because it lacked credibility on several levels.  It is difficult to believe appellant would have made such a statement at that time, when both of them surely knew that the intent to shoot Lorenzo was the key element of the People's case.  Indeed, it was more likely that she would have made up such a statement to help shore up the weakest part of the People's case and secure a conviction than that appellant would have blurted it out, to his obvious legal detriment.  Further, Jacqueline's and Lorenzo's testimony made clear that the latter, in fact, was not coming between Jacqueline and appellant in any meaningful way, and shooting at Lorenzo was hardly the way for appellant to preserve his relationship with

28

Jacqueline.   Thus it make no sense that appellant would say this. That Jacqueline could not even recall the year appellant allegedly made the statement makes her claim all the less credible.   In addition, any explanation appellant gave a year or more after the shooting could well not be an accurate account of what appellant was really thinking while drunk at the time of each shot, but would be an after the fact attempt to explain or justify his conduct.

In sum, the evidence did not clearly demonstrate that Lorenzo was near the other shooting victims when the shots were fired.   If he was not, the prosecution failed to prove beyond a reasonable doubt that the shots that hit others were intended for Lorenzo. Moreover, everyone agreed that appellant was drunk at the time of the shooting, which further complicated the issue of his intent. This Court should, therefore, reverse the convictions of transferred intent murder and assault and dismiss those counts of the indictment.

<u>POINT II</u>

APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE PROSECUTOR, WHO, <u>INTER ALIA</u>, IN A CASE WHERE INTENT WAS THE KEY ISSUE, REPEATEDLY MADE FACTUALLY MISLEADING SUMMATION ARGUMENTS NOT SUPPORTED BY THE EVIDENCE CONCERNING THE INTENT ELEMENTS OF THE CRIMES, MISSTATED THE LAW APPLICABLE TO THOSE ELEMENTS, AND VOUCHED FOR HIS CASE WITH REGARD TO THOSE ELEMENTS.  U.S. CONST., AMENDS. V, XIV; N.Y. CONST., ART. I, §6.

The prosecution's theory of the case, as charged in the indictment and to the jury, was that all of the shots were fired at Lorenzo, who suffered the least serious injury, with the intent to kill or seriously physically injure him, not at the three more seriously injured victims (<u>see</u> Point I, <u>ante</u>).  Nonetheless, the prosecutor repeatedly told the jury that it did not matter who appellant intended to hit when he fired the gun, even stating that a generalized intent to kill sufficed for conviction.  He also argued that it did matter where the victims were standing and that evidence relevant to appellant's intent was of no concern.  As the prosecutor's misconduct was directed at the critical issue in the case, appellant's convictions should be reversed.

A prosecutor must refrain from improper methods to obtain a conviction because he represents the state, and his "words and actions carry greater force and hold greater sway with a jury than those of a private attorney." <u>People</u> v. <u>Mott</u>, 94 A.D.2D.2d 415, 418 (4th Dept. 1983).  Nevertheless, throughout his summation, the

prosecutor here persistently violated his fundamental duty to act fairly.

It is "fundamental" that a jury must decide a case solely on the evidence presented and, therefore, "fundamental" that in summation a prosecutor "must stay within the four corners of the evidence." People v. Ashwal, 39 N.Y.2d 105, 109 (1976). Accord, People v. Collins, 12 A.D.3d 33, 39-40 (1st Dept. 2004); People v. Thighpen, 277 A.D.2d 261 (2d Dept. 2000); People v. Clark, 120 A.D.2d 542, 544 (2d Dept. 1986). It is similarly essential that the prosecutor respect the rule against instructing the jury on the law. People v. Johnstone, 131 A.D.2d 782 (2d Dept. 1987)(prosecutor's statements improperly "tended to advise the jury as to the applicable law"); People v. Sepulveda, 105 A.D.2d 854, 857 (2d Dept. 1984) (improper for prosecutor to "usurp the court's function of instructing the jury on the law"). But worse than the prosecutor addressing the law is his misstating it in a manner prejudicial to the defendant. People v. Butler, 185 A.D.2d 141, 144 (1st Dept. 1992)(distortion of law on self-defense); People v. Sepulveda, 105 A.D.2d at 857 (improper statement of reasonable doubt); People v. Pauli, 130 A.D.2d 389, 391-393 (1st Dept. 1987)("inaccurate and prejudicial" accounts of elements of the crimes); People v. Lee, 79 A.D.2d 641, 641-642 (2d Dept. 1980)(misstating requirement for agency defense).

In addition, this Court has repeatedly condemned prosecutorial vouching for the credibility of the People's witnesses and

expressions of a prosecutor's personal opinion of the strength of the prosecution's case and the defendant's guilt. People v. Brown, 26 A.D.3d 392 (2d Dept. 2006)(prosecutor vouched for credibility of People's witnesses); People v. Pagan, 2 A.D.3d 879, 880 (2d Dept. 2003)("prosecutor repeatedly vouched for the complainant's credibility"); People v. Hernandez, 128 A.D.2d 637 (2d Dept. 1987); People v. Farmer, 122 A.D.2d 801, 803 (2d Dept. 1986); See also People v. Wlasiuk, 32 A.D.3d 674, 681 (3d Dept. 2006)(prosecutor expressed personal opinion regarding the evidence); People v. Collins, 12 A.D.3d 33, 37 (1st Dept. 2004)(prosecutor may not vouch for credibility of People's witnesses).

It is also "fundamental" that a prosecutor "should not seek to prejudice the jury by inflammatory comment." People v. Valdivia, 108 A.D.2d 885, 886-887 (2d Dept. 1985). See People v. Shanis, 36 N.Y.2d 697, 699 (1975)("District Attorney . . . resort[ed] to name calling," referring to defendant and his lawyer as "liars"); People v. Reilly, 19 A.D.3d 736, 738 (3rd Dept. 2005)(prosecutor's "improper comments" included calling defendant a "sexual predator"); People v. LaPorte, 306 A.D.2d 93, 97 (1st Dept. 2003)(defendant referred to "more than once" as a "predator"); People v. Robinson, 260 A.D.2d 508 (2d Dept. 1999)(improper to appeal to "sympathies and fears" of jury); People v. Walters, 251 A.D.2d 433 (2d Dept. 1998)("purposefully inflammatory remarks designed to appeal to the jury's sympathy").

In his summation, the prosecutor violated these rules again and again.  Initially, the prosecutor repeatedly used the phrase "killing machine" to describe the gun used in the shooting, contending that it was created for that purpose only.  This argument was factually and legally misleading, as there can be no doubt that guns can be used to threaten, intimidate, rob, or injure, as well as to kill.  Indeed, the court's decision to submit first-degree manslaughter to the jury makes clear that other inferences were possible.  In addition, by describing the process of a bullet "tear[ing] through flesh and bone and organs," the prosecutor engaged in improperly and unnecessarily inflammatory rhetoric.  The repeated use of the improper term "killing machine" was also highly inflammatory.  <u>See</u> <u>People</u> v. <u>Reilly</u>, 19 A.D.3d at 738; <u>People</u> v. <u>LaPorte</u>, 306 A.D.2d at 97.

The prosecutor only made matters worse, and grossly distorted the issues, when he told the jury that it did not have to decide who appellant intended to harm because it could convict appellant if he "had in his head, had in his heart murder . . . the intent to kill anybody" because appellant was responsible for all the damage he caused by firing the gun, <u>i.e.</u>, was guilty (616-617), as if he intended it.  He repeated this argument soon afterwards, including the inflammatory language about appellant's having it in his head and heart to kill, and asserted that the jury did not have to decide at whom appellant intended to shoot, as long as he intended

to kill (618-619).  While the prosecutor also mentioned that the jury could convict if appellant intended to shoot Lorenzo, he never disavowed the alternative uncharged theories he had improperly espoused.

These arguments not only trespassed on the province of the court by instructing the jury on the intent elements of the crimes, they were grossly inaccurate and misleading.  Appellant could be convicted only if he intended to kill or injure Lorenzo, as required by the indictment and the court's charge.  See pp. 22-23, ante.  Whether appellant possessed that intent was the key issue the jury had to decide.  Yet by these arguments, the prosecutor greatly broadened the intent on which a conviction could be based, without a factual or legal basis for doing so.  Similarly, ignoring the necessity of proving that the others hit by gunshots were in the same line of fire as Lorenzo, the prosecutor argued that disagreements about where people were standing when the shots were fired did not "matter" and was not something the jury "ha[d] to decide" (616).  Further, the prosecutor's assurances that there was ample evidence of intent constituted vouching for the People's case on the key issue.  See People v. Wlasiuk, 32 A.D.3d at 681.

Also improper were the prosecutor's contentions that the nature of the argument between appellant and Lorenzo, their relationship, and whether appellant "hated" Lorenzo or Lorenzo taunted him did not matter.  The jury had to decide whether

34

appellant intended to shoot Lorenzo, and all these factual questions were obviously relevant to appellant's intent, although contrary to the prosecutor's interest they revealed the absence of a reason for appellant to want to kill or seriously injure him. Thus, the prosecutor improperly misstated the facts and law and, in effect, vouched for the evidence of intent, in an attempt to steer the jury away from facts he wanted it to overlook. See People v. Wlasiuk, 32 A.D.3d at 681; People v. Collins, 12 A.D.3d at 37; People v. Pauli, 130 A.D.2d at 391-393.

The prosecutor also inaccurately contended that the principle that a person intends the results of his actions pointed to an intent to kill Lorenzo. But since most of the bullets were struck Clark and Tajmere, while Lorenzo suffered the least serious injury, this principle did not support conviction. The prosecutor also inaccurately argued that appellant kept firing in the same line when there was no testimony to that effect, Lorenzo was hit only once, and three other people were shot. See People v. Collins, 12 A.D.3d at 37.

The prosecutor continued his vouching at the end of his summation, repeatedly equating a conviction with the jury's doing what the law required and expressing his confidence that that was what the jury would do. He similarly argued that a guilty verdict would be true and just. The prosecutor's suggestions that the jury needed to do anything other than to determine whether the People

35

had proved every element of the charged crimes beyond a reasonable doubt, such as to do "justice to the offense" and hold appellant responsible for the "damage and misery and death," were inflammatory and otherwise improper. See People v. Burroughs, 280 A.D.2d 965 (4th Dept. 2001)(improper to argue that defendant "needs a strong message"); People v. Dworakowski, 208 A.D.2d 1129 (3rd Dept. 1994)(prosecutor improperly urged jury to "send a message" to the community and "to do their duty for child abuse victims"); People v. Espada, 205 A.D.2d 332 (1st Dept. 1994)(message to the community). As the First Department explained in People v. Nevedo, 202 A.D.2d 183, 185 (1st Dept. 1994), every defendant "is entitled to . . . hav[e] his or her case heard by a jury that finds the facts solely on the evidence, ideally via cool and detached deliberations."

*          *          *

These errors require reversal of appellant's conviction in the interest of justice without regard to harmless error analysis because the prosecutor's summation deprived appellant of his constitutional right to a fair trial. See People v. Crimmins, 36 N.Y.2d 230, 242 (1975); People v. Brown, 26 A.D.3d 392, 393 (2d Dept. 2006); People v. Smith, 288 A.D.2d 496, 497 (2d Dept. 2001); People v. Rivera, 75 A.D.2d 544, 545-546 (1st Dept. 1980). In any event, these errors cannot be deemed harmless. As set forth in Point I ante, the evidence the key issue in the case:    what

appellant intended when he fired each shot.  Moreover, the evidence on this issue was close and complex.  In addition, as the members of Jacqueline's family could have been motivated to protect one of their own had someone in the family, rather than appellant, been the shooter, the jury could reasonably have rejected the People's case in its entirety.  Thus, the prosecutor's misconduct cannot be considered harmless.

As the prosecutor's misconduct went to the heart of the key jury question, the Court should reach this issue and reverse appellant's conviction in the interest of justice.  See People v. Anderson, 35 A.D.3d 871 (2d Dept. 2006); People v. Brown, 26 A.D.3d 392; People v. Pagan, 2 A.D.3d 879 (2d Dept. 2003).  Alternatively, defense counsel's failure to preserve this issue for review constituted a deprivation of the effective assistance of counsel. See People v. Dean, 50 A.D.3d 1052, 1053 (2d Dept. 2008)("[D]efense counsel failed to   . . .  [follow] the required and proper practice . . . [of] object[ing] to the prosecutor's improper statements"); People v. Lindo, 167 A.D.2d 558 (2d Dept. 1990)(failure to object to prosecutor's inflammatory remarks contributed to ineffective assistance); People v. Dombrowski, 163 A.D.2d 873, 874 (4th Dept. 1990)(counsel's errors included "fail[ure] to object to numerous instances of prosecutorial misconduct"); People v. Simmons, 110 A.D.2d 666 (2d Dept.

37

1985)(failure to object to extensive prosecutorial misconduct contributed to ineffectiveness).

In short, the prosecutor's blatant pattern of misconduct in this case denied appellant his due process right to a fair trial. Accordingly, this Court should reverse appellant's conviction, on the law and in the interest of justice, and order a new trial.

<u>POINT III</u>

> APPELLANT WAS ILLEGALLY SENTENCED, IN VIOLATION OF P.L. §70.25, WHEN THE COURT IMPOSED CONSECUTIVE SENTENCES FOR EACH OF THE FOUR COUNTS ALTHOUGH THE PEOPLE DID NOT MEET THEIR BURDEN OF DEMONSTRATING THAT THE CRIMES WERE COMMITTED THROUGH SEPARATE ACTS. U.S. CONST., AMEND. XIV; N.Y. CONST., ART. I, §6.

Under P.L. §70.25(2), the imposition of consecutive sentences is illegal unless the People have satisfied their burden of proving that the crimes at issue were based on "separate and distinct acts." <u>People</u> v. <u>Laureano</u>, 87 N.Y.2d 640, 643 (1996). In particular, a defendant cannot receive consecutive sentences for multiple injuries caused by one bullet. <u>People</u> v. <u>Jones</u>, 41 A.D.3d 507, 508 (2d Dept. 2007). But as the prosecutor admitted in summation, there were more bullet holes than shots and it was impossible to reconstruct the paths of the bullets. Thus, it was impossible to know which injuries were caused by different bullets, and the People failed to satisfy their burden of proving that consecutive sentences were permissible.

38

"When more than one sentence of imprisonment is imposed . . . for two or more offenses committed through a single act or omission . . . the sentences . . . must run concurrently." P.L. §70.25(2) (emphasis added).  Since the People bear the "burden" of demonstrating that consecutive sentences are permissible, uncertainty as to whether separate acts were involved requires the imposition of concurrent sentences.  People v. Parks, 95 N.Y.2d 811, 814-815 (2000); People v. Laureano, 87 N.Y.2d at 643-644 (where trial record did not show which robbery was the predicate for the felony murder conviction, the robbery and murder sentences had to be concurrent).  A defendant may raise the legality of consecutive sentences on appeal as a matter of law even where the issue was not preserved by objection at trial.  People v. Laureano, 87 N.Y.2d at 643; People v. Jones, 41 A.D.3d at 508.

Under P.L. §70.25(2), consecutive sentences are permissible when, based on an examination of the trial record, the crimes were committed by "separate and distinct acts", even if they are part of one criminal transaction.  People v. Laureano, 87 N.Y.2d at 643-645.  But unless the People can establish that injuries to two or more people did not result from the same gunshot, concurrent sentences are required.  People v. Jones, 41 A.D.3d at 508-509. See People v. Rosas, 8 N.Y.3d 493, 498-499 (2007)(consecutive sentences permissible because there was no contention that the same

shot killed both victims); <u>People</u> v. <u>Brathwaite</u>, 63 N.Y.2d 839, 843 (1984)(same).

In this case, the People's proof does not establish that the crimes resulted from separate and distinct gunshots.  That the victims suffered seven gunshot wounds, while only five casings were found in the revolver compels the conclusion, admitted by the prosecutor, that there was no "dispute . . . that there are more holes here in people and in walls than there are rounds from that gun" or that bullets "passed though people and into other people." He also acknowledged that it was impossible to "reconstruct" what happened or to know which bullet passed through which victim before hitting another.  Put simply, the People conceded, consistent with the evidence, that there is no way to prove which victims were hit by the same bullet and which by different bullet.  Therefore, the People have not met their burden of showing that any of the charges resulted from separate and distinct acts, so that the imposition of any consecutive sentences was improper.

Further, the evidence that five bullets had been discharged from the gun did not mean that one or two had not been fired prior to the incident, particularly since the ballistics evidence was only "sometimes" indicative of recent discharge (106-107).  The crime scene and medical evidence, credited by the prosecutor in concluding that appellant did not fire at the ceiling as Derrick testified, was consistent with only three shots, or at most four,

40

being fired in the apartment.  One bullet was found in the bedroom and another was removed from Tajmere's head.  Only the copper jacketing that surrounds a bullet was removed from the closet, and multiple fragments, not a whole bullet, were in Clark's head. Thus, the jacketing and fragments could have come from the same bullet, particularly since the bullet corresponding to the copper jacketing in the closet was not found elsewhere at the scene.  That fewer bullets caused the damage only increases the likelihood that any particular combination of wounds were caused by one bullet, making consecutive sentences all the less justified.

It is feasible that as few as three bullets caused all the damage.  One bullet could have gone through Tajmere's chest and broken apart when it fractured her ribs just before exiting though her back, with one part causing Clark's head injuries and the rest going into the closet.  Another bullet could have caused Clark's abdominal or leg wound, then hit Tajmere in the head.  In the times between the shots, Lorenzo moved to different places in the apartment and Jacqueline left the apartment.  Therefore, there was time for Clark and Tajmere to move to different positions, in reaction to the first or second shot, before subsequent shots were fired.  Bullets could have passed through Lorenzo's and Lewis's legs after exiting Clark's leg or abdomen or before reaching Clark and Tajmere.

41

In short, as the exact positions of the four victims at the time each shot was fired could not be established, the People failed to meet their burden of demonstrating that any specific count was based on injuries caused by a separate gunshot from the injuries for any other counts. As a result, the judgment should be modified as a matter of law so that all four sentences run concurrently.

<u>CONCLUSION</u>

FOR THE REASONS STATED IN POINT I, APPELLANT'S CONVICTION SHOULD BE REVERSED AND THE INDICTMENT DISMISSED; ALTERNATIVELY, FOR THE REASONS STATED IN POINT II, APPELLANT'S CONVICTION SHOULD BE REVERSED AND A NEW TRIAL ORDERED; ALTERNATIVELY, FOR THE REASONS STATED IN POINT III, APPELLANT'S SENTENCES SHOULD BE MODIFIED TO RUN CONCURRENTLY.

Respectfully submitted,

LYNN W. L. FAHEY
Attorney for the Defendant-Appellant

Jonathan M. Kratter
Of Counsel
April 2010

42

CERTIFICATE OF COMPLIANCE
PURSUANT TO 22 NYCRR §670.10(f)


The foregoing brief was prepared on a computer.  A monospaced typeface was used, as follows:

        Name of typeface: Courier
        Point Size: 12
        Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc. is 9505.


                            Jonathan M. Kratter

43

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT C**

Respondent's Main Brief to the Appellate
Division, Second Department

To be argued by:
RHEA A. GROB
10 minutes

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

          -against-

GENERAL WAITERS,

                    Defendant-Appellant.

Appellate Division
Docket Number
08-05247

Kings County
Indictment Number
3464/06

RESPONDENT'S BRIEF

LEONARD JOBLOVE
RHEA A. GROB
Assistant District Attorneys
     of Counsel

June 30, 2010

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

TABLE OF CONTENTS

                                                                    Page

PRELIMINARY STATEMENT ............................................. 1

STATEMENT OF FACTS ................................................ 2
    Introduction ................................................. 2
    The Trial .................................................... 2
        The People's Case ........................................ 2
        Defendant's Case ......................................... 22
    The Verdict and the Sentence ................................. 23

POINT I

    DEFENDANT'S CONTENTION THAT THERE WAS LEGALLY
    INSUFFICIENT EVIDENCE TO SUPPORT HIS CONVICTION IS
    MERITLESS. MOREOVER, THE VERDICT WAS NOT AGAINST THE
    WEIGHT OF THE EVIDENCE ................................. 24

POINT II

    DEFENDANT'S CLAIMS REGARDING THE PROSECUTOR'S SUMMATION
    ARE ENTIRELY UNPRESERVED FOR APPELLATE REVIEW AND ARE
    WITHOUT MERIT ............................................. 36

POINT III

    THE TRIAL COURT PROPERLY IMPOSED CONSECUTIVE SENTENCES
    FOR THE MURDER CONVICTION AS TO TAJMERE CLARK AND THE
    FIRST-DEGREE ASSAULT CONVICTION AS TO MARY LEE CLARK.
    DEFENDANT'S REMAINING CONSECUTIVE SENTENCES SHOULD BE
    MODIFIED TO RUN CONCURRENTLY TO EACH OTHER AND TO THE
    CONSECUTIVE SENTENCES ..................................... 47

CONCLUSION

    FOR ALL OF THE AFOREMENTIONED REASONS, DEFENDANT'S
    JUDGMENT OF CONVICTION SHOULD BE AFFIRMED. DEFENDANT'S
    CONSECUTIVE SENTENCES FOR HIS CONVICTIONS OF THE MURDER
    OF TAJMERE CLARK AND THE FIRST-DEGREE ASSAULT OF MARY
    LEE CLARK SHOULD BE AFFIRMED, AND DEFENDANT'S
    CONSECUTIVE SENTENCES FOR THE ATTEMPTED MURDER OF
    LORENZO WARREN AND FIRST-DEGREE ASSAULT OF SHATASHIA
    LEWIS SHOULD BE MODIFIED TO RUN CONCURRENTLY WITH
    DEFENDANT'S PROPERLY IMPOSED CONSECUTIVE SENTENCES ....... 51

CERTIFICATION

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

              -against-

GENERAL WAITERS,

                    Defendant-Appellant.

Appellate Division
Docket Number
08-05247

Kings County
Indictment Number
3464/06

RESPONDENT'S BRIEF

PRELIMINARY STATEMENT

Defendant, General Waiters, appeals from a judgment of the Supreme Court, Kings County, rendered on June 2, 2008, convicting him, after a jury trial, of one count of second-degree murder, attempted second-degree murder, and two counts of first-degree assault. Defendant was sentenced to consecutive terms of imprisonment of twenty-five years to life on the second-degree murder count, ten years on the attempted murder count, twenty-five years as to the first-degree assault count relating to Mary Lee Clark, and five years as to the first-degree assault count relating to Shatashia Warren and to five years of post-release supervision (Dowling, J., at trial and sentence).

Defendant is incarcerated pursuant to this conviction.

There were no co-defendants.

## STATEMENT OF FACTS

### Introduction

On May 7, 2006, at approximately 11:30 a.m., at 340 Williams Avenue, Apartment 4-I, in Brooklyn, defendant fired a gun at Lorenzo Warren several times, hitting Lorenzo Warren in the thigh, hitting Shatashia Lewis in the thigh, hitting Mary Lee Clark in the head, and killing three year-old Tajmere Clark.

For these acts, defendant was charged under Kings County Indictment Number 3464/2006, with Murder in the Second Degree on a transferred intent theory (P.L. § 125.25[1]); Attempted Murder in the Second Degree (P.L. § 110/125/25[1]); Assault in the First Degree (P.L. § 120.10[1]); and two additional counts of Assault in the First Degree on a transferred intent theory (P.L. § 120.10[1]); Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03[2]); and Criminal Possession of a Weapon in the Fourth Degree (265.01[1]).

### The Trial[1]

#### The People's Case

JACQUELINE WARREN, her sons LORENZO WARREN and DERRICK WARREN, and her daughter SHATASHIA LEWIS lived at 340 Williams Avenue, apartment 4-I (L. Warren: 157, 194; S. Lewis: 297; J.

---

[1] Subsequent to a Huntley hearing, the hearing court suppressed defendant's statements made to law enforcement officials (Minutes of December 7, 2007).

Warren: 380, 424; D. Warren: 469-70).[2]  When Jacqueline first
moved into the apartment, her older daughter Lateisha Warren
lived there with her and Lorenzo (L. Warren: 197; J. Warren: 382,
424-25).  Defendant, General Lee Waiters, also known as "Bubba,"
was Jacqueline's boyfriend and he had lived at the apartment for
about five years in May of 2006, and he was living there when
Derrick and Shatashia moved into the apartment (L. Warren: 158-
59, 194, 202; S. Lewis: 298, 316; J. Warren: 381-82, 425-26; D.
Warren: 470).  Lateisha moved out in about 2004 (L. Warren: 211;
J. Warren: 382, 426).[3]  By May of 2006, Lorenzo often stayed with
his best friend on Putnam Avenue (L. Warren: 158, 195; J. Warren:
385).

Defendant was working when he first moved into the apartment
(L. Warren: 197; J. Warren: 425).  In about 2002, defendant had
an accident at his job and he ceased working (L. Warren: 199; J.
Warren: 384, 426-27).  Defendant never contributed to the lease
payments on the apartment or the food, but he paid the cable bill
(J. Warren: 384-85, 425).  Lorenzo recalled defendant bought a
television set for the apartment (L. Warren: 199).  Lorenzo did
not have any confrontations, problems, or fights with defendant

---

[2] Numbers in parentheses refer to the pages of the trial
transcript and numbers preceded by "S" refer to the sentencing.
Names preceding numbers refer to the witnesses whose testimony is
cited.  For the sake of clarity, members of the Warren family are
referred to by their first names.

[3] Lorenzo believed that Lateisha had moved out months after
defendant moved in (L. Warren: 211).

when defendant first moved into the apartment (L. Warren: 197-98).

Lorenzo spent a few months at the apartment just prior to May of 2006 (L. Warren: 204).  During that time, he had about three or four verbal arguments with defendant (L. Warren: 204-05).  One time, when defendant and Jacqueline were in their bedroom, Lorenzo heard defendant calling Jacqueline all types of names and threatening to hit her and follow her to work (L. Warren: 205-06).  Lorenzo knocked on the door, asked if everything was okay, and defendant told Lorenzo that it does not concern him, and that it is between defendant and Jacqueline, and an argument ensued (L. Warren: 205-06).  Lorenzo had heard his mother and defendant argue in the past but he did not know if defendant and/or Jacqueline were intoxicated during these arguments (L. Warren: 205-07).  Lorenzo had seen defendant intoxicated on several occasions (L. Warren: 207-08).  When intoxicated, defendant would play loud music, his speech slurred, and he would slam things, or he would stumble and fall (L. Warren: 208).

On May 6, 2006, defendant, Shatashia, Jacqueline, Mary Lee Clark and her grandchildren Konisha, Malika, Kia, Tajmere, Calice, and Tiara -- whose ages ranged from a few months to ten years-old with Tajmere being three, and Jacqueline's sister and husband from New Jersey were all at the apartment to celebrate defendant's birthday (S. Lewis: 299, 318-19, 321; J. Warren: 387-

88, 433; D. Warren: 472-73). Shatashia did not recall her brothers being at the party; Jacqueline recalled that Derrick was present some of the time but Lorenzo was not (S. Lewis: 300, 319-20; J. Warren: 434, 439; D. Warren: 474-75).

Jacqueline, defendant, and Mary drank Bacardi Light mixed with soda (J. Warren: 388-89, 434-45). Jacqueline did not remember how many drinks she had but knew that defendant had more than one drink (J. Warren: 389-90). Defendant would drink every day and he became verbally abusive when he drank (J. Warren: 390, 432, 436). That evening, however, he was not verbally abusive (J. Warren: 390-91, 440).

There were no arguments or fights during the party (S. Lewis: 321). Jacqueline's sister and her husband left that night at about 11:00 p.m. (S. Lewis: 320-21; J. Warren: 389, 91). Shatashia went to sleep in the living room on an air mattress, and Mary and her five grandchildren slept in Shatashia's room (Bedroom No. 1) (S. Lewis: 301, 317, 323-24; D. Warren: 476).[4] According to Jacqueline, Mary and three of the children slept on the air mattress in the living room and the other two children were with Shatashia in her bedroom (J. Warren: 391, 440).

---

[4] People's No. 1 in evidence is a not-to-scale layout of the apartment that was referenced throughout the trial and used by all the witnesses to describe their location at varying times in the apartment (58). References to bedroom numbers and locales are based on People's No. 1 in evidence, which appellant, in his brief, states he is providing to the Court (Defendant's Brief at 7, n.3).

Shatashia did not remember if Lorenzo was in the apartment when she went to bed (S. Lewis: 324).   Derrick woke up in the middle of the night and saw Lorenzo (D. Warren: 476-77).   Jacqueline turned in at about 1:00 a.m. and went to her bedroom (Bedroom No. 3) but left defendant up (J. Warren: 391-94).

On May 7, 2006, Lorenzo returned to the apartment at about 2:00 a.m. (L. Warren: 159, 209).   Lorenzo had not been in the apartment since about 8:00 a.m. on May 6, 2006 (L. Warren: 209). Lorenzo looked into his sister's bedroom where he saw Mary and her grandchildren sleeping (L. Warren: 160, 212).   Lorenzo did not see his sister (L. Warren: 212). In the second bedroom, which Lorenzo shared with his brother, Derrick was asleep (L. Warren: 160-61, 203; D. Warren: 471-72, 497).[5]   Lorenzo did not see Jacqueline or defendant who occupied the third bedroom, and he went to sleep (L. Warren: 161, 203).

Lorenzo awoke at about 8:00 a.m.; he saw cereal and milk on the kitchen counter, and he took a bowl of cereal back with him into the room where he watched television, while Derrick continued to sleep (L. Warren: 161-62, 211-134).   At that time, all the doors were closed and no one else was up and about (L. Warren: 213-15).

_____

[5] Shatashia stated that she and Derrick shared Bedroom No. 1 and that Bedroom No.2 was solely Lorenzo's bedroom, but Derrick and Lorenzo both stated that they shared Bedroom No. 1 (S. Lewis: 318; D. Warren: 497).

Jacqueline awoke at about 9:30 a.m. (J. Warren: 395, 441). Defendant and Mary were both in the bedroom, dressed and having a conversation (J. Warren: 396, 441). Jacqueline got up and conversed with them for half an hour before they all went to the living room (J. Warren: 397, 442). No one drank while in the bedroom (J. Warren: 397, 442).

Shatashia and the children were eating cereal for breakfast, that defendant had bought earlier that morning, in the living room at about 10:00 a.m. when the adults entered the room (S. Lewis: 301-02, 325; J. Warren: 397, 442; D. Warren: 477, 500). After breakfast, Shatashia went back into her bedroom with the little kids to watch television and Derrick joined them (S. Lewis: 302, 326; J. Warren: 398; D. Warren: 478; 500). Lorenzo was in his room (Bedroom No. 2) (S. Lewis: 302, 317; D. Warren: 499).[6]

In the living room, Jacqueline, Mary and defendant were drinking Bacardi Light by the table (J. Warren: 398-99, 404, 443-45). Defendant drank too much and wanted another drink but Jacqueline took the bottle and told defendant he had too much to drink and defendant started cursing loudly at Jacqueline, saying "fuck you, bitch" (J. Warren: 399-400, 445). Jacqueline responded in kind, and Mary told defendant to calm down (J. Warren: 400, 446). Defendant said something to Mary, he put his

---

[6] On cross-examination, Shatashia stated that she had not seen Lorenzo at all (S. Lewis: 326).

hands in Jacqueline's face, and they all got loud (J. Warren: 400-01, 405, 446). Defendant was not wearing a coat or jacket at that time (J. Warren: 401).

Shatashia was on the phone with a school friend and Derrick was in the same room with all the kids when they heard an argument coming from the living room (S. Lewis: 303-04, 327-28; D. Warren: 479-80, 500). Shatashia heard Jacqueline's and defendant's voices but did not recall what was said (S. Lewis: 303, 328).

Defendant left the apartment and then he came back in, and he walked directly to the bedroom where he spent 15 to 20 minutes (J. Warren: 402, 451-55). When he came out of the bedroom, he had a jacket on (J. Warren: 402-03). Defendant got into Jacqueline's face again, screaming, yelling, and calling her names (J. Warren: 403, 447). Mary was telling defendant to calm down (J. Warren: 403). Shatashia noticed that the argument had quieted down and then about twenty minutes later it started again (S. Lewis: 304-05, 330).

Lorenzo, who had fallen asleep again, was awakened by his Aunt Mary speaking very loudly (L. Warren: 162, 214-16). Lorenzo realized that Derrick was no longer in the second bedroom with him (L. Warren: 163, 215). Lorenzo exited the bedroom and went to the living room, passing his sister's room which was next to the living room (L. Warren: 163, 216).

Shatashia heard her mother and defendant arguing again from the living room and then Mary got into it and after that she heard Lorenzo come out of his room (S. Lewis: 305, 331, 333). Shatashia heard her mother telling defendant to leave (S. Lewis: 305, 332).

Jacqueline saw Lorenzo standing by Mary, near the part of the living room separating the hallway from the living room (J. Warren: 403, 405). When Lorenzo entered the living room, he saw Jacqueline sitting on the chair next to the couch (L. Warren: 164, 166, 216). Defendant stood by her side, and Mary was sitting in another chair, behind where defendant stood (L. Warren: 166, 216). Defendant was loud and saying offensive things, calling Lorenzo's mother a "bitch" (L. Warren: 167, 216; J. Warren: 456). Jacqueline responded that she wanted defendant "out of here" (L. Warren: 167-68; J. Warren: 405-06, 410, 456). Shatashia, from her bedroom, heard Lorenzo ask defendant to please leave (S. Lewis: 334). Mary said "Bubba, please, just calm down" (L. Warren: 168; J. Warren: 406, 457). Derrick heard Lorenzo get into the argument (D. Warren: 480, 501). Derrick could not recall what was said but remembered that it was loud (D. Warren: 480, 502).

Lorenzo was about ten feet away from defendant by the closet at the entrance to the hallway, and he told defendant to step away from his mother and not to get in her face (L. Warren: 168, 217, 219; J. Warren: 406, 410, 448, 457). Defendant was standing

by the couch and Jacqueline was still sitting in a chair next to the couch (L. Warren: 218; J. Warren: 411, 448-49, 457). Lorenzo was wearing sweatpants and a white T-shirt and defendant wore jeans and a brown jacket (L. Warren: 169; J. Warren: 406).

Defendant told Lorenzo that it did not concern him and that it was between him and Jacqueline (L. Warren: 169, 221). Lorenzo responded that it had everything to do with him because of how defendant was speaking to his mother (L. Warren: 169; S. Lewis: 335; J. Warren: 410, 458). Lorenzo believed that defendant was intoxicated because his speech was slurred (L. Warren: 223). Lorenzo and defendant started to approach each other (L. Warren: 169, 219, 222). Mary got up and held Lorenzo back, pushing him back to the point where he first entered the living room, while Jacqueline got up and pushed defendant toward the apartment door (L. Warren: 169, 222, 224; J. Warren: 411-12, 450, 459).

While Jacqueline and Mary tried to keep defendant and Lorenzo apart, there was a loud exchange of words between them and Derrick came out of Shatashia's room (L. Warren: 169-70, 222, 226-27; S. Lewis 305-06, 336; D. Warren: 481, 501). Derrick left the bedroom door open; Shatashia could not see what was going on, but she heard everyone arguing (S. Lewis: 305-07, 337-38).

When Derrick entered the living room, he saw his brother by the table, his mother near the fish tank, defendant near the door leading into the apartment, and Mary by the end of the living room (by the arrow on the diagram marked BH-1) (D. Warren: 481-

82). Derrick came up on Lorenzo's side and Mary started to push Derrick back (L. Warren: 171, 228-29, 231). Derrick told defendant "not to talk to my aunt like that" (L. Warren: 171, 229). Derrick did not recall saying anything other than "Bubba, leave" (D. Warren: 502).

The children were still in the bedroom watching television when Shatashia exited her bedroom and closed the door behind her (S. Lewis: 307, 338). Shatashia saw everyone standing in the living room, arguing (S. Lewis: 307, 339). Shatashia saw defendant and her mother standing by the front door, Lorenzo about a distance of two or three feet from them by the fish tank, and Derrick by the fire escape window (S. Lewis: 308-09, 340-41). Shatashia stood by the closet at the entrance to the living room from the back hallway and Derrick was right in front of her (S. Lewis: 340-42).

Jacqueline continued to pull on defendant's arm telling him to leave (L. Warren: 172, 226, 230; S. Lewis: 343; J. Warren: 411, 450-51). Shatashia recalled defendant saying to Lorenzo "you don't want me to pull what I got out of my jacket" and Lorenzo responded "you don't have nothing in your jacket" (S. Lewis: 309, 342-43, 346). Derrick recalled defendant saying to Lorenzo "I got something for you" and everybody got quiet (Derrick: 483, 503).

Defendant picked up his arm and put his hand into his jacket (L. Warren: 172, 233). Lorenzo said "you don't have a gun in

11

your pocket" and defendant pulled out a revolver from his coat pocket and pointed it at Lorenzo (L. Warren: 172, 174, 234; J. Warren: 414, 460-61; D. Warren: 484, 504).[7]

Defendant was still standing in front of the couch (L. Warren: 173, 235; J. Warren: 412). Lorenzo was still standing by the hallway leading to the bedrooms (L. Warren: 174, 227, 234). Immediately before the shooting, Shatashia saw Lorenzo walk towards defendant who was by the front door with Jacqueline; Mary still stood in front of the round table behind the couch (by the living room sign) (S. Lewis: 343-44; J. Warren: 413).[8] Jacqueline saw Derrick in the room and noticed that Tajmere had run over to Mary (J. Warren: 413).

As defendant pointed the gun at him, Lorenzo said that the gun can't be loaded (L. Warren: 176, 234-35). Defendant then pulled the trigger (L. Warren: 176, 236). Lorenzo heard his mother scream "Bubba, no" before any shots were fired (L. Warren: 176-77; J. Warren: 414). Jacqueline saw defendant walk towards Lorenzo as he fired the gun (J. Warren: 414). Lorenzo heard a loud noise and felt a sharp pain in his right thigh and looked

---

[7] Jacqueline had never seen a gun in defendant's possession and she never came across one when cleaning or maintaining the apartment; Lorenzo had also never seen the gun before (L. Warren: 172; J. Warren: 395, 412).

[8] Shatashia placed defendant by the GB6 sign on the diagram in evidence, Lorenzo by the GB3 sign and Jacqueline by the word clothing. Mary was by the word living room on the diagram, Derrick was by the BH1 sign, and Shatashia was still behind Derrick (S. Lewis: 347-48).

12

for a hole in his sweatpants to see if he was shot (L. Warren: 176, 237). As he looked down, Lorenzo heard screaming and heard more shots (L. Warren: 176, 242-43). In all, Lorenzo heard about four shots, one after another (L. Warren: 177, 245). After the first shot, Lorenzo looked down, after the second shot, Lorenzo ran towards the fire escape at the end of the living room just before the kitchen, and rested against the wall (L. Warren: 177, 237-41, 245-46).[9]

Lorenzo, Shatashia, and Jacqueline did not see defendant fire any shot toward the ceiling, but Derrick believed that the first shot, before defendant aimed at Lorenzo, was fired toward the ceiling (L. Warren: 237; Shatashia: 349; J. Warren: 462; D. Warren: 503-04).

Shatashia did not see when defendant pulled the gun out, but she saw the fire and heard the first shot (S. Lewis: 310). Shatashia's leg started to burn and bleed and she realized she had been shot in the left thigh (S. Lewis: 310-11, 349-50). Shatashia ran to her bedroom and called 911 (Shatashia: 310-11, 350). Shatashia did not hear the additional shots (S Lewis: 312, 350). After speaking to the 911 operator, Shatashia stayed in her bedroom with the children (S. Lewis: 312).

---

[9] Lorenzo pointed to the location where he went in Defendant's Exhibit F and it was described on the record (240-41).

After the first shot, Jacqueline ran out of the apartment screaming, and began banging on her neighbors' doors (J. Warren: 414-16, 462; D. Warren: 485). Jacqueline heard, in all, about three additional shots, one after the other (J. Warren: 415, 462). Derrick ducked down after the first shot and heard about six shots in all (D. Warren: 485, 505). Defendant walked past Derrick down the hallway towards where Lorenzo had run as he was shooting and then he walked back into the living room (D. Warren: 506-08). Lorenzo, still hearing screams and gunshots, ran back to the living room (L. Warren: 178, 247). Derrick heard the gun click and saw defendant turn and point the gun at him, so Derrick tackled defendant by the fish tank (D. Warren: 486-87, 508-09). Lorenzo saw defendant on the ground and Derrick on the ground with him by the side of the couch (L. Warren: 178, 247-48).

Lorenzo ran over and grabbed defendant's arm that still had the gun in it, he put his arm around defendant's neck and with his hand he held onto defendant's wrist (L. Warren: 179, 248, 251-54). Lorenzo got on top of defendant in a chokehold as defendant tried to get up (L. Warren: 180, 250). Lorenzo picked up the fish tank that was filled with water and hit defendant on his head with the tank which broke, and with a vase (L. Warren: 181, 256-57). Derrick also hit defendant with the vase (L. Warren: 257; D. Warren: 511).

Lorenzo told Derrick to leave and Derrick went towards the door (L. Warren: 180, 254-55; D. Warren: 488). Derrick called

14

Jacqueline and she came back to the apartment and saw Lorenzo in the living room near the now broken fish tank, on top of defendant, punching him in the face while defendant kept pulling the trigger of the gun (L. Warren: 180, 248-49, 255; J. Warren: 416-17; 462-63; D. Warren: 489, 511).  Lorenzo tried to get the gun out of defendant's hand (L. Warren: 180-81, 249-50, 256). Defendant said Lorenzo wasn't strong enough and wasn't causing him any harm, saying "is that all you got," and Lorenzo punched him more (L. Warren: 181; J. Warren: 420, 463; D. Warren: 491).

Lorenzo told Derrick to get the kids out of there, and when Lorenzo looked to the left to see if the kids were in the room, he saw Mary on the floor, face down, and he saw baby shoes under her (L. Warren: 182).  Lorenzo became enraged and told defendant "you killed my aunt" and he hit defendant even more (L. Warren: 182-83).  Jacqueline saw Mary and the bottom of Tajmere's sneakers under Mary (J. Warren: 418).  Jacqueline grabbed defendant's hand that held the gun, as defendant asked her for help, and she pried his finger back, grabbed the gun out of defendant's hand, and ran with the gun out of the apartment to the common hallway (L. Warren: 183, 256, 258-59; J. Warren: 417-18, 464; D. Warren: 492).  Jacqueline threw the gun into the hallway (J. Warren: 418; D. Warren: 492).  Derrick brought the kids out of the apartment to the next door neighbor's apartment (J. Warren: 419; D. Warren: 490-91).  Derrick saw Mary laying face down on the floor and his sister in the hallway on the floor

with blood everywhere (D. Warren: 490). Lorenzo estimated that he was on top of defendant and hitting him for five to ten minutes while his brother got the kids out and the police officers entered the apartment (L. Warren: 183-84).

When Police Officer JOLENE ANDERSON arrived at the building, people were yelling out of windows directing her to the apartment (Anderson: 81-82). On the fourth floor, Police Officer Anderson saw three to four people in front of an apartment door with a revolver at their feet, about two feet from the entrance to the apartment (Anderson: 83, 86). Police Officer Anderson asked "whose gun is that?" and they all pointed inside the apartment (Anderson: 83). Anderson slid the gun over with her foot and tucked it into her waistband (Anderson: 83, 86; J. Warren: 419). The gun was black and was about a foot long with the chamber (Anderson: 83). Anderson did not check the state of the revolver at that time but checked it later and found five empty shell casings (Anderson: 83, 97).[10]

Sergeant TIMOTHY CORLETO and Police Officer Anderson entered the apartment and heard a lot of screaming, saw a lot of blood, water, and glass from a broken fish tank, and observed two men struggling at the entrance of the living room, with the person on top punching the person beneath him (Corleto: 54-57, 60-63, 72; Anderson: 87-88). The police officers separated the two

---

[10] The revolver was admitted into evidence as People's No 3 and the shell casings were admitted as People's No. 5 (84, 98).

individuals and handcuffed them (Corleto: 61; Anderson: 88; L. Warren: 184; D. Warren: 492). One of the handcuffed individuals was defendant, who was semi-conscious and had cuts and bruises about his body, and the second individual, Lorenzo, had what appeared to be a gunshot wound to his leg (Corleto: 64-65).

Sergeant Corleto and Officer Anderson observed a woman, face down, who appeared unconscious by a circular table at the lower right part of the room, behind the couch (Corleto: 66; Anderson: 90-93). A child, Tajmere, was underneath the woman who appeared to have a chest and head wound (Corleto: 67; Anderson 95; L. Warren: 187-88). One of the officers picked up the child and ran downstairs to gave the child to paramedics, who took her to Brookdale Hospital (Corleto: 68; Anderson: 95; L. Warren: 185, 188; D. Warren: 493).

When the police arrived, Shatashia went out into the hallway (S. Lewis: 313). The police officers saw that she had been shot in the leg and Police Officer Anderson told her to remain calm (Corleto: 68-69; Anderson: 90, 94). Defendant, Mary Lee Clark and Shatashia were taken out by stretcher; Lorenzo's handcuffs were removed and he was taken to the hospital (Corleto: 69; L. Warren: 188-90; S. Lewis: 313; J. Warren: 420).

Lorenzo spent several hours in the hospital; the pain from his injury persisted for two to three weeks, and he still has trouble walking (L. Warren: 191-92). Shatashia underwent an operation and remained at the hospital for three to four days (S.

Lewis: 315).   She was given a cane to walk with and was in a lot of pain for a couple of months (S. Lewis: 315).

Doctor MICHELLE SLONE, a senior medical examiner in the Office of the Chief Medical Examiner, and an expert in forensic pathology, performed an autopsy on three year-old Tajmere Clark (Slone: 268-74).[11]   The child had two gunshot wounds to her body (Slone: 275).   Doctor Slone explained that a penetrating gunshot wound is one that enters the body and stays there, and a perforating gunshot wound goes into the body and exits the body (Slone: 276, 279).

One of the wounds was a penetrating gunshot wound to the head (Slone: 276).   The entrance was on the back ride side of the head (Slone: 276).   The bullet fractured the skull, went through the brain, fractured the other side of the skull and lodged in the soft tissue underneath the skin on the left side of the head (Slone: 276).   The bullet was removed and sent to the ballistics lab (Slone: 277).   Doctor Slone determined that the path of the bullet was right to left, back to front and downward (Slone: 278-79).

The second gunshot wound was a perforating wound (Slone: 279).   The entrance wound was on the upper left side of the chest, it fractured a rib, went through the pericardial sack, grazed the heart, went through the upper part of the left lung,

---

[11] On May 9, 2006, Sergeant Corleto identified the body of Tajmere Clark, at the Kings County Morgue (Corleto: 71).

fractured two ribs in the left side of the back and exited the back on the left side (Slone: 279-80). The path and direction of the second wound was front to back, right to left, and slightly downward (Slone: 282).

Doctor Slone also found evidence of a thoracotomy incision which would have been made for attempted resuscitation (Slone: 283). In Doctor Slone's opinion, either gunshot wound would have caused the fatal injury (Slone: 279, 282). Doctor Slone opined that the cause of death was gunshot wounds to the head and torso (Slone: 283).

Doctor Slone also examined the summaries of several surgical operations conducted on Mary Lee Clark during her hospitalization (Slone: 284). Doctor Slone observed that there was one penetrating gunshot wound to the head and two perforating gunshot wounds, one to the abdomen and one to the leg (Slone: 284). An attempt had been made to clean up the area of the entrance wound to the head and portions the skull had been removed because of bleeding and swelling of the brain (Slone: 284). There was also removal of a small portion of the brain that was bruised and some blot clots that were in the brain (Slone: 285). The prognosis for a person with this sort of gunshot wound to the head is very serious and could have permanent implications (Slone: 286). The other two gunshot wounds did not cause any injury to any life-sustaining organ or system (Slone: 285). Mary Lee Clark remains

in a rehabilitation facility in Brooklyn, in a coma, as a result of her injuries (J. Warren: 421-22).

Detective GEORGE BOSTON of the Crime Scene Unit received a six-shot revolver and five spent shells when he arrived at the apartment from Police Officer Anderson (Anderson: 98; Boston: 101-04). Detective Boston processed the gun and shell casings for latent prints with negative results (Boston: 105-06, 108). Detective Boston was able to determine that five of the six cylinders in the revolver showed evidence of discharge (Boston: 107). Detective Boston sent the gun and shell casings to the ballistics department for further analysis (Boston: 108).

Detective Boston prepared a diagram of the apartment which was not to scale, but just an illustration of the layout of the location (Boston: 108-09, 126). Detective Boston found clothing near the front entrance of the apartment, a broken fish tank, and a bullet hole to a wall in the rear of the living room, and a piece of lead was recovered from inside the living room (Boston: 110-14, 134). Detective Boston recovered a piece of copper jacket inside the closet on the other side of the wall from the bullet hole (Boston: 114-15, 134-35). Detective Boston did not find any bullet holes or ballistics evidence in the ceiling of the living room (Boston: 116, 135).

Detective Boston found a piece of lead inside Bedroom No. 1 on his diagram (Boston: 116-20). Detective Boston photographed, packaged and sealed the ballistics evidence that he recovered and

he forwarded them to the ballistics unit of the police department
(Boston: 120-21).   Detective Boston observed blood stains and
blood pools throughout the apartment (Boston: 121-22).   Detective
Boston examined all the walls for ricochet marks or impact marks
but did not find or observe any, nor did he observed any impact
marks on the furniture (Boston: 135-36).

Detective Boston examined the deceased Tajmere Clark at
Brookdale Hospital, and he recovered a shirt that had a bullet
hole in the left side near the chest area (Boston: 124-25).

Detective LUIS FONTANEZ, an expert in the field of firearms
analysis and microscopic comparisons, performed a technical
review of the firearm and ballistics evidence that was recovered
(Fontanez: 359-65).   The gun was a .357 Magnum caliber Arminius
revolver (Fontanez: 365).   Detective Fontanez explained that the
shell casings remain in the gun after the bullets have fired from
this particular weapon (Fontanez: 368-69).   Detective Fontanez
also received five cartridge casings, one piece of copper
jacketing and two deformed bullets (Fontanez: 371).   Four of the
cartridge casings were .357 magnum caliber cartridge casings and
one was a .38 special cartridge casing; all were capable of
having been fired from the .357 caliber revolver (Fontanez: 371-
72).   Detective Fontanez compared the casings against each other
and concluded that they had all been fired from one gun
(Fontanez: 373).   Detective Fontanez also conducted a test firing
of the revolver and compared the shell casings from the test

21

firing against those received from the crime scene and determined that they were all fired from the same revolver (Fontanez: 373).

The copper jacketing recovered had eight right twists, the same class characteristics as the test rounds that were acquired from the recovered revolver (Fontanez: 375). Detective Fontanez concluded that the recovered copper jacketing was fired from the recovered revolver (Fontanez: 375).

Detective Fontanez also examined the two recovered deformed soft-point copper jacketed bullets which were both .38/.357 calibers, determined that they both had the eight right twist class characteristics, compared them microscopically against the test rounds from the gun and concluded that they both had been fired from the same revolver (Fontanez: 375-78).

About a year after the shooting, defendant called Jacqueline and Jacqueline asked him why he did what he did. Defendant responded that he was aiming for Lorenzo because Lorenzo was coming between them (J. Warren: 420-21, 464-66).

### Defendant's Case

Defendant did not present any witnesses on his own behalf but admitted into evidence a portion of his medical records.

<u>The Verdict and the Sentence</u>

The jury convicted defendant of murder in the second degree, attempted murder in the second degree, and two counts of assault in the first degree (700-03).[12]

On June 2, 2008, the court sentenced defendant to consecutive terms of imprisonment of twenty-five years to life for the death of Tajmere Clark, ten years for the attempted murder of Lorenzo Warren, twenty-five years for the assault on Mary Lee Clark, and five years for the assault on Shatashia Lewis, to be followed by five years of post-release supervision (S. 12-13).

---

[12] The court submitted to the jury second-degree murder as to Tajmere Clark on a transferred intent theory, first-degree manslaughter as a lesser-included count of the second-degree murder count, attempted second-degree murder as to Lorenzo Warren, first-degree assault as to Lorenzo Warren in the alternative, first-degree assault as to both Mary Lee Clark and as to Shatashia Lewis, both on a transferred intent theory, and second and fourth-degree criminal weapon possession (670-85). The court also charged the jury on intoxication (685).

POINT I

DEFENDANT'S CONTENTION THAT THERE WAS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT HIS CONVICTION IS MERITLESS.   MOREOVER, THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

Defendant contends that the evidence supporting his convictions of second-degree murder, attempted murder, and two counts of first-degree assault is insufficient and that the verdict is against the weight of the evidence. Defendant's claim is meritless.

When a defendant challenges his conviction on appeal, claiming that his guilt was not proven beyond a reasonable doubt, the conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Accord People v. Contes, 60 N.Y.2d 620, 621 (1983). Once the trier of facts has found against a defendant, the People are entitled to the most permissible inferences in their favor. See People v. Carr-El, 99 N.Y.2d 546, 548 (2002); People v. Benziger, 36 N.Y.2d 29, 32 (1974); People v. Leach, 57 A.D.2d 332, 337 (2d Dep't 1977), aff'd, 46 N.Y.2d 821 (1978). Applying these standards to this case, the People proved beyond a reasonable doubt that defendant, acting with the intent to kill Lorenzo Warren, killed three year-old Tajmere Clark, attempted to kill Lorenzo Warren, and acting

24

with the intent to kill Lorenzo Warren, caused serious physical injury to Mary Lee Clark and Shatashia Lewis.

A person is guilty of intentional murder when, "with intent to cause the death of another person, he causes the death of such person or of a third person."   P.L. § 125.25(1).   It is not necessary to establish that the resulting death is of the defendant's intended victim; rather, what is required is that the requisite intent to kill is established and the death of a person results.   See People v. Fernandez, 88 N.Y.2d 777 (1996). Similarly, a person is guilty of first-degree assault when, "with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."  P.L. § 120.10(1). Thus, "the doctrine of 'transferred intent' serves to ensure that a person will be prosecuted for the crime he or she intended to commit even when, because of bad aim or some other 'lucky mistake,' the intended target was not the actual victim." Fernandez, 88 N.Y.2d at 781.

Accordingly, in the instant case, by finding defendant guilty of intentionally murdering Tajmere Clark, and intentionally assaulting Mary Lee Clark and Shatashia Lewis, the jury found, that defendant had formed the requisite intent to kill Lorenzo Warren when he fired the shots that struck Tajmere, Mary, and Shatashia, regardless of the fact that Tajmere, Mary, and Shatashia were not defendant's intended target.

25

However, defendant alleges on appeal that the evidence was insufficient to prove defendant's intent to kill Lorenzo Warren, and therefore, the verdicts on the transferred intent counts must be reversed.  Defendant's claim is entirely without merit.  The record reflects defendant's intent to kill Lorenzo, and defendant's intent may be inferred from defendant's conduct as well as the surrounding circumstances.  See People v. Steinberg, 79 N.Y.2d 673, 682 (1992); People v. Ozarowski, 38 N.Y.2d 481, 489 (1976).

Viewing the evidence in the light most favorable to the People, a rational jury could have found beyond a reasonable doubt that defendant fired his gun at Lorenzo Warren with the intent to kill him.  As intent is a mental state that is known only to the actor, it must be proven on the basis of inferences drawn from the totality of the circumstances.  People v. Steinberg, 79 N.Y.2d 673 (1992); People v. Smith, 79 N.Y.2d 309 (1992); People v. Wang, 33 A.D.3d 820 (2d Dep't 2006); People v. Hernandez, 257 A.D.2d 664 (2d Dep't 1999).  Intent is an issue to be determined by the trier of fact.  People v. Parker, 304 A.D.2d 146 (4th Dep't 2003); People v. Hernandez, 184 A.D.2d 439 (1st Dep't 1992).  The trier of fact may infer that a defendant intended the natural and probable consequences of his acts.  People v. Getch, 50 N.Y.2d 456, 465 (1980); People v. Torres, 46 A.D.3d 925 (2d Dep't 2007); People v. Fleming, 164 A.D.2d 942 (2d Dep't 1990).  A defendant's intent is rarely proven "by an

explicit expression of culpability by the perpetrator." People v. Barnes, 50 N.Y.2d 375, 381 (1980).

It was reasonable for the jury to conclude that firing multiple gunshots from a dangerous weapon, designed to kill and maim humans, into a room full of people, while pointing the weapon at one specific person, was likely to result in the death of at least one of the people in the room. See People v. German, 243 A.D.2d 647 (2 Dep't 1997) (evidence legally sufficient to establish intent to cause death by defendant's act of pointing gun and firing twice); People v. Francis, 209 A.D.2d 539 (2d Dep't 1994) (intent to kill may be inferred from fact that defendant directed gun towards officer and pulled trigger).

Indeed, Jacqueline Warren testified that about a year after the shooting, she received a call from defendant, and when she asked him "why," he stated that his intent was to get Lorenzo, whom defendant believed was getting between Jacqueline and defendant.

Despite defendant's claim to the contrary (Defendant's Brief at 23-29), the evidence presented to the jury by all the witnesses who testified reflected that defendant pointed the gun at Lorenzo Warren and fired that gun five times. One bullet hit Lorenzo in the thigh; one bullet hit Shatashia in the thigh, one bullet went through a wall and lodged in a closet; one bullet penetrated the brain of Mary Lee Clark putting her into a coma, and one bullet penetrated the brain of Tajmere Clark, killing

her.   The fact that some of the five bullets may have hit more than one of the victims is of no consequence.

In considering whether the evidence was legally sufficient to support defendant's conviction, the facts must be viewed in a light most favorable to the prosecution, must give the People the benefit of every reasonable inference to be drawn from the evidence, and must assume that the jury credited the prosecution's witnesses.   See People v. Ford, 66 N.Y.2d 428, 437(1985); People v. Way, 59 N.Y.2d 361, 365 (1983); People v. Kennedy, 47 N.Y.2d 196, 203 (1979).

Defendant contends that because the witnesses testified sometimes at odds with each other, the evidence was insufficient to prove defendant's intent.   On the contrary, all the witnesses testified to the argument that preceded the shooting and Lorenzo's entrance into the argument with defendant.   Shatashia testified that no one was between defendant and Lorenzo when defendant said "you don't want me to pull out what I got in my jacket" and Lorenzo responded that defendant didn't have anything in his jacket, and defendant proceeded to fire a gun (347-49). Jacqueline, Lorenzo and Derrick all observed defendant as he pulled out the gun and pointed it at Lorenzo.   See People v. Stevens, 44 A.D.3d 882, 883 (2d Dep't 2007) (resolution of issues of credibility primarily question for jury, which saw and heard witnesses; its determination should be accorded great deference on appeal); see also People v. Knapp, 272 A.D.2d 637, 639 (3d

Dep't 2000) (jury free to selectively credit or reject testimony).

While defendant complains that the testimony of the People's eyewitnesses was contradictory, the testimony of those witnesses -- regarding a chaotic morning encounter of escalating violence -- was, in fact, remarkably similar. Jacqueline testified regarding the argument that began when she told defendant he was drinking too much, and she testified that he left and went to the bedroom for some 15 to 20 minutes, and that the arguing resumed when defendant came back to the living room, now wearing a jacket. Shatashia testified that the loud voices she heard outside her bedroom door subsided for about 20 minutes before starting up again. Lorenzo testified that he awoke after having fallen back to sleep and that when he joined the others in the living room, defendant was already wearing his jacket. Derrick testified that when he exited the bedroom, Lorenzo and defendant were already arguing. While there were certainly inconsistencies in the accounts of these witnesses, mostly regarding where, in the living room, everyone was situated when the shooting began and continued, those inconsistencies did not preclude a rational jury from concluding that defendant, took out a gun from his pocket, pointed it at Lorenzo with whom he was having a heated verbal dispute, and fired it. See People v. Gumbs, 58 A.D.3d 641 (2d Dep't 2009) (testimony of eyewitness not incredible as matter of law); People v. Bisono, 37 A.D.3d 844 (2d Dep't 2007)

(resolution of issues of credibility primarily for factfinder, who saw and heard witnesses; factfinder's determination to be accorded great deference on appeal).

The evidence reflected that the witnesses each had a different vantage point from which to describe the argument that turned into a deadly shooting spree in the small living room of 340 Williams Avenue, Apartment 4-I. As the scene unfolded, all of the occupants of the living room entered the room at different times and observed different things. This was not a static environment, rather, the brewing altercation kept escalating and the people within the room moved about as the argument escalated. The fact that Shatashia, who entered the room last, placed defendant and Lorenzo further up in the living room closer to the front door, whereas the other occupants of the living room recalled defendant and Lorenzo more in the middle of the room, is of little consequence, where the witnesses saw defendant with the gun and saw defendant point the gun at Lorenzo as he commenced firing.

Defendant's argument that because Mary Lee Clark and Tajmere Clark suffered the most physical injuries, Mary -- who also argued with defendant, was the intended target instead of Lorenzo (Defendant's Brief at 23-24), ignores the testimony of all the witnesses regarding what occurred in the confined living room space. Defendant simply cannot get around the fact that the witnesses who testified -- Lorenzo, Jacqueline, and Derrick --

all saw defendant point the gun at Lorenzo and then fire. Shatashia saw defendant and Lorenzo facing each other with no one between them, heard the exchange of words, and saw the fire flash from defendant's gun.   Whether it was Lorenzo's goading of defendant that pushed defendant to point the gun at him, or the reasoning he gave Jacqueline a year later, that Lorenzo was coming between them, the evidence, viewed in the light most favorable to the People, allows no other conclusion but that defendant sought to kill Lorenzo when he pointed the gun at him and fired five times.[13]

To the extent that defendant notes that defendant's drinking negated his intent (Defendant's Brief at 29), that argument is also without merit.   Although the witnesses testified that defendant had consumed alcohol that morning, and Lorenzo testified that defendant's speech was slurred, "[a]n intoxicated person can form the requisite criminal intent to commit a crime, and it is for the trier of fact to decide if the extent of the intoxication acted to negate the element of intent."   People v. Martinez, 2010 NY Slip Op 3979 (4th Dep't May 7, 2010) (citations omitted).   See also People v. Alston, 42 A.D.3d 468 (2d Dep't

---

[13] Indeed, "the identity of the intended target is not an element of the crime of attempted murder in the second degree; rather the People must demonstrate that the defendant 'acted with a murderous intent' and need not link that intent to a specific victim." People v. Stanley, 23 A.D.3d 683 (3d Dep't 2005). See also People v. Jones, 41 A.D.3d 507 (2d Dep't 2007) (identity of the intended target is not an essential element of the crime).

2007). Here, the jury clearly determined that the extent of defendant's intoxication was not significant enough to have negated his intent to kill Lorenzo. See People v. Young Min Kwak, 29 A.D.3d 385 (1st Dep't 2006) (the evidence did not indicate that defendant was so intoxicated as to be unable to form the necessary intent); People v. Coleman, 296 A.D.2d 766 (3d Dep't 2002) (requisite intent may be inferred from defendant's actions described by the People's witnesses in their testimony).

For all of the aforementioned reasons, the verdict was also not against the weight of the evidence. In conducting a weight of the evidence review, this Court must first determine whether an acquittal would not have been unreasonable. If so, it must weigh the conflicting testimony, review any rational inferences that may be drawn from the evidence, evaluate the strength of such conclusions, and then decide whether the jury was justified in finding defendant guilty beyond a reasonable doubt. See People v. Danielson, 9 N.Y.3d 342, 348 (2007). In fulfilling this responsibility, courts accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor. See People v. Artis, 63 A.D.3d 1174, 1175 (2d Dep't 2009); People v. Mateo, 2 N.Y.3d 383, 410, cert. denied, 542 U.S. 946 (2004); People v. Romero, 7 N.Y.3d 633, 644-45 (2006); People v Bleakley, 69 N.Y.2d 490, 495 (1987); People v. Popal, 62 A.D.3d 912 (2d Dep't 2009); People v. Singh, 60 A.D.3d 875 (2d Dep't 2009).

In this case, defendant had every opportunity to cross-examine the witnesses with any inconsistencies and defendant took advantage of that opportunity.   See People v. Casey, 61 A.D.3d 1011 (3d Dep't 2009) (verdict not against weight of evidence where inconsistencies in victim's testimony explored at trial and jury had opportunity to observe victim's demeanor and assess his credibility).

While there were minor inconsistencies in the testimonies of the eyewitnesses, for example, where everyone was placed within the living room and their movements in the living room during the shooting, these inconsistencies were not significant and apparently arose from the chaos surrounding the incident and the fact that the witnesses were focused on different things at different times.   Thus, the fact that Shatashia, when she exited her bedroom after Derrick and Lorenzo were already in the living room, placed everyone at slightly different areas within the room, did not render the general account of the shooting by the People's witnesses to be incapable of belief.   See People v. Gissendanner, 48 N.Y.2d 543, 550 (1979) ("what defendant characterizes as a 'diametrically opposed' version of events, not only may be self-explained by the partially obscured view, but need not have been perceived as indicative of anything worse than the kind of discrepancy that differing faculties of concentration and memory will commonly produce in the most honest of witnesses"); People v. Lewis, 66 A.D.3d 601 (1st Dep't 2009) (no

basis for disturbing jury's credibility determinations, including resolution of minor inconsistencies in witnesses' testimony); People v. Gomez, 46 A.D.3d 836, 836-37 (2d Dep't 2007) (same; inconsistencies were matter for jury); People v. Dupont, 283 A.D.2d 587 (2d Dep't 2001) (inconsistencies explored before jury; credibility issues and weight of evidence primarily for jury); People v. Bunn, 210 A.D.2d 421, 421-22 (2d Dep't 1994) (same).

Thus, any inconsistencies in the testimony between the prosecution witnesses were not so great as to render their testimony or the evidence unreliable. See People v. Scipio, 61 A.D.3d 899 (2d Dep't 2009); People v. Sepulveda, 59 A.D.3d 641 (2d Dep't 2009). Moreover, defendant had the opportunity to fully explore any inconsistencies at trial, and, in this case, the jury resolved any such inconsistencies in the People's favor. People v. Fields, 28 A.D.3d 789 (2d Dep't 2006) ("the discrepancies in the victim's prior statements to a police officer and the victim's trial testimony were fully explored at trial and were matters to be considered by the jury in assessing the victim's credibility").

In sum, defendant's present claim that the evidence was insufficient is without merit. When viewed in the light most favorable to the People, the evidence of defendant's intent to kill Lorenzo Warren and his subsequent shooting, causing death and injury to various members of the Warren and Clark families was legally sufficient. See People v. Fernandez, 88 N.Y.2d 777,

(2d Dep't 1996).   Nor was the verdict against the weight of the evidence.   See People v. Browne, 67 A.D.3d 697 (2d Dep't 2009) (great deference accorded to jury's opportunity to view witnesses, hear testimony, and observe demeanor).   Accordingly, defendant's conviction should be affirmed.

<u>POINT II</u>

<u>DEFENDANT'S CLAIMS REGARDING THE PROSECUTOR'S
SUMMATION ARE ENTIRELY UNPRESERVED FOR
APPELLATE REVIEW AND ARE WITHOUT MERIT.</u>

Defendant's claim on appeal that he was prejudiced by the prosecutor's summation is entirely unpreserved for appellate review. Defendant failed to voice even a single objection to the entirety of the prosecutor's summation. Accordingly, defendant has failed to preserve for appellate review his claims of error regarding the prosecutor's summation. <u>See</u> C.P.L. § 470.05(2); <u>People v. Rivera</u>, 73 N.Y.2d 941 (1989); <u>People v. Norman</u>, 40 A.D.3d 1130 (2d Dep't 2007); <u>People v. Ahmed</u>, 40 A.D.3d 869 (2d Dep't 2007); <u>People v. Benson</u>, 38 A.D.3d 563 (2d Dep't 2007); <u>People v. Simon</u>, 35 A.D.3d 894 (2d Dep't 2006).

Furthermore, the prosecutor's remarks during summation were all appropriately responsive to the defense case and were within the permissible bounds of rhetorical argument. <u>See</u> <u>People v. Galloway</u>, 54 N.Y.2d 396, 401 (1981); <u>People v. Casillas</u>, 289 A.D.2d 1063 (4th Dep't 2001); <u>People v. Olsowske</u>, 247 A.D.2d 856 (4th Dep't 1998); <u>People v. Overlee</u>, 236 A.D.2d 133 (1st Dep't 1997).

Defendant, on appeal, alleges that the prosecutor improperly told the jury that it did not matter who defendant intended to hit when he fired the gun, thus misstating the law and usurping the court's role, vouched for prosecution witnesses, and

36

"inflamed" the jury (Defendant's Brief at 30-32).  Defendant's claims are all without merit.

To support a claim that certain remarks in a prosecutor's summation require reversal of a conviction, a defendant must show that he or she was substantially prejudiced by the remarks and thus deprived of a fair trial.  See People v. Roopchand, 65 N.Y.2d 837 (1985).  Broad bounds of rhetorical comment are permissible in a prosecutor's closing argument and are not inappropriate so long as they don't exceed those bounds.  People v. Galloway, 54 N.Y.2d 396 (1981).

As an advocate, counsel is afforded the widest possible latitude, within the four corners of the evidence, (1) to comment upon every pertinent matter or fact bearing upon the questions the jury must decide, and (2) to request that the jury draw fair inferences from the facts.  People v. Ashwal, 39 N.Y.2d 105, 109-10 (1976).  Moreover, a prosecutor's summation must be evaluated in comparison to the defense summation.  People v. Theard, 64 A.D.3d 733 (2d Dep't 2009); People v. Jones, 294 A.D.2d 517 (2d Dep't 2002); People v. Russo, 201 A.D.2d 512, 513 (2d Dep't 1994), aff'd, 85 N.Y.2d 872 (1995).  A prosecutor's summation remarks do not occur in a vacuum, but rather, may be preceded by defense counsel's usage of similar language.  See People v. Arce, 42 N.Y.2d 179, 190-91 (1977).

Defendant alleges that the prosecutor improperly used the phrase "killing machine" in describing the gun used in the

shooting.   Contrary to defendant's argument, the prosecutor's terminology was entirely appropriate and accurate, particularly where defendant argued on summation that he was too intoxicated to form the requisite intent to commit murder.   The prosecutor's argument that the gun was a tool for which a human element was needed, or "[i]t won't be a killing machine except for the human element behind it that has to pull the trigger" (613) was entirely proper where the prosecutor had to prove defendant's intent in his firing of the weapon.

Defendant's further argument that the prosecutor's references to the gun as a killing machine is factually misleading as "guns can be used to threaten, intimidate, rob or injure, as well as to kill" (Defendant's Brief at 33) is absurd. The very fact that a gun is a "killing machine" enables its use to "threaten, intimidate, rob or injure."   The prosecutor's comparison of a gun to a washing machine is instructive, as a washing machine is not a tool capable of firing a shot and killing such as can be used to "threaten, intimidate, rob or injure."   Indeed, by its very definition, a firearm is a deadly weapon.  See P.L. 265.00.

Defendant's complaint with the prosecutor's description of a bullet as tearing through flesh and bone and organs (Defendant's Brief at 33) as unnecessarily inflammatory, is also without merit.  As the medical evidence at trial established, the bullets that perforated and penetrated the victims tore through their

flesh and bones and organs.  See People v. Jones, 294 A.D.2d 517 (2d Dep't 2002) (prosecutor may engage in fair comment on the evidence and the inferences to be drawn therefrom); People v. Green, 182 A.D.2d 704, 705 (2d Dep't 1992) (prosecutor may present to jury an inference that is properly drawn from the facts in evidence).  See also People v. Powell, 288 A.D.2d 239 (2d Dep't 2001) (statement that complainant was "beaten to a bloody pulp" was permissible because it was based on the facts in evidence).

Furthermore, and contrary to defendant's claim, the prosecutor did not distort the issues.  Taken in context and in the entirely of the prosecutor's comments, the prosecutor stated:

> And again, it is not in dispute, ladies and gentlemen, you don't have to decide whether he intended to cause death or any sort of harm to Tajmere Clark – the three-year-old, to Mary Lee Clark – the 50-year-old grandmother, or to Shatashia Lewis – the 14-year-old sister of Lorenzo Warren.
>
> You don't have to decide that.  Why? Because, under our law, ladies and gentlemen, the judge is going to tell you, it doesn't matter.  If when shooting that gun, if when shooting People's Exhibit number 3, General Waiters had in his head, had in his heart murder, had in his head, had in his heart the intent to kill anybody, and in this case particularly if he had the intent to kill Lorenzo Warren when he's firing that gun, he becomes responsible for the damage that was caused by each and every bullet that came out of it.  He's responsible for everything that happened by his act, his human act of willing that killing machine to work, as if he intended it himself.

> In other words, ladies and gentlemen, it doesn't matter if you say that he didn't intend to kill a little girl or that he feels bad about killing a little girl. It doesn't matter. Because, under our law, if he intended to kill Lorenzo Warren with that shot, it doesn't matter if that bullet passed through Lorenzo Warren, if it passed though Mary Lee Clark, if it passed through a wall, or if it hit her directly and killed Tajmere Clark. Under our law, it is just the same as if he intended for that little girl to die

(616-18). The prosecutor repeated that if defendant was shooting at Lorenzo Warren and if he was intending to kill Lorenzo Warren, he's responsible for all of the injuries (618-20). Defendant's current attempt to take the prosecutor's comments out of context and to misconstrue the prosecutor's summation remarks should not be countenanced. Indeed, trial counsel did not voice a single objection to the prosecutor's entire summation. See People v. Overlee, 236 A.D.2d 133, 142 (1st Dep't 1997) (failure to object "is perhaps the best indication of the absence of any prejudice").

Also contrary to defendant's further arguments, the prosecutor did not have to prove where everyone who was hit by a gunshot in the living room stood or that they "were in the same line of fire as Lorenzo" (Defendant's Brief at 34). Rather, the prosecutor merely had to prove that defendant intended to kill Lorenzo Warren and in shooting at him, killed and injured others. The fact that defendant may have had bad aim, and the fact that the shooting occurred in a small confined space merely explains

why so many other people were injured and killed.  Defendant's current speculation that because other people were more seriously injured than Lorenzo, defendant did not harbor the intent to kill Lorenzo, is misplaced.  As the prosecutor noted, again and again, it was his burden to prove that defendant pointed a loaded gun at Lorenzo Warren and pulled the trigger intending to kill him (617, 618, 620, 629, 641).  Furthermore, the prosecutor referred to the evidence where the witnesses stated that defendant pointed the gun at Lorenzo and started to fire.

Nor was it improper for the prosecutor to state that whether defendant "hated" Lorenzo was immaterial (624) (Defendant's Brief at 34-35).  The prosecutor acknowledged that animosity in the days before the crime did not matter, but that what mattered was what occurred on May 7, 2006, when defendant chose to fire his gun pointed at Lorenzo (625-26).  The prosecutor was entitled to make arguments to the jury based on the evidence.

Moreover, telling the jury that defendant deserved to be held accountable for his actions, did not ask the jury to become community avengers (Defendant's Brief at 35-36), and the remarks were not improper.  Cf. People v. Meyers, 11 A.D.3d 221 (1st Dep't 2004) (although prosecutor's suggestions to jury to not allow defendant to "get away" with crime, and to convict him in the "interest of justice" were inappropriately phrased, they did not deprive defendant of a fair trial, and there was no pattern of egregious remarks warranting reversal).  See People v.

41

Hendrix, 60 A.D.3d 1081 (2d Dept' 2009) (prosecutor's remarks
were not so flagrant or pervasive as to deny the defendant a fair
trial).

In any event, even if any of the prosecutor's remarks were
arguably improper, for reversal to be warranted for a summation
error, a defendant must show that he was substantially prejudiced
by the remarks. See People v. Roopchand, 107 A.D.2d 35 (2d
Dep't), aff'd 65 N.Y.2d 837 (1985). Here, the jury could not
have been substantially prejudiced by any of these remarks, which
were not highly inflammatory. Moreover, any possible error was
ameliorated by the court's numerous instructions to the jury that
the arguments, remarks, and summations of counsel are not
evidence (7, 572, 652), and that the jury must base its verdict
on the evidence alone and not be affected by sympathy or other
considerations outside of the evidence (655). These instructions
ensured that the jury was not prejudiced by any possible
rhetorical excesses in the prosecutor's summation. See People v.
Ferguson, 82 N.Y.2d 837, 838 (1993); People v. Boone, 8 A.D.3d 303
(2d Dep't 2004); People v. Greenwood, 294 A.D.2d 598 (2d Dep't
2002); People v. Vasquez, 277 A.D.2d 333 (2d Dep't 2000); People
v. James, 162 A.D.2d 618, 619 (2d Dep't 1990) (all holding that
any prejudice from improper summation comments was ameliorated by
court's curative instructions).

The jury is presumed to have followed the court's
instructions, see People v. Berg, 59 N.Y.2d 294, 299-300 (1983),

and there is no merit to defendant's unpreserved claim that he was deprived of a fair trial by the prosecutor's remarks. <u>See also People v. Miller</u>, 8 A.D.3d 176, 177 (1st Dep't 2004) (brief rhetorical flourishes that may have evoked sympathy did not deprive defendant of fair trial, particularly in light of court's instructions to disregard any considerations of sympathy); <u>People v. Howe</u>, 292 A.D.2d 542 (2d Dep't 2002) (curative instructions dissipated any prejudice from remarks that appealed to sympathy); <u>People v. Garcia</u>, 166 A.D.2d 199, 199-200 (1st Dep't 1990) (summation remarks that were allegedly inflammatory, denigrating of defense, and/or vouching for the People's witnesses, were within bounds of appropriate rhetorical response); <u>People v. Hamilton</u>, 227 A.D.2d 669, 672 (3d Dep't 1996); <u>cf</u>. <u>People v. Graham</u>, 169 A.D.2d 842 (2d Dep't 1991) (defendant not denied fair trial although some of prosecutor's remarks appeared improperly intended to arouse sympathy).

In any event, any possible errors in the prosecutor's summation were harmless in light of the overwhelming evidence of defendant's guilt. <u>See People v. Crimmins</u>, 36 N.Y.2d 230, 242 (1975); <u>People v. Daley</u>, 292 A.D.2d 630 (2d Dep't 2002); <u>People v. D'Alessandro</u>, 184 A.D.2d 114 (1st Dep't 1992). Four eyewitnesses testified that defendant and Lorenzo were arguing, and that defendant took a gun from his pocket and pointed it at Lorenzo and fired. In addition to hitting Lorenzo, defendant's bullets ripped into and through Tajmere Clark, killing her, Mary

Lee Clark, putting her into a coma, and Shatashia Lewis, injuring her leg. Defendant told Jacqueline Warren a year after the shooting that he was aiming for Lorenzo. Accordingly, the evidence clearly established defendant's intent by all the attendant circumstances, of his intent to kill Lorenzo.

Finally, to the extent that defendant claims trial counsel was ineffective for failing to object to the prosecutor's summation (Defendant's Brief at 37), that claim is entirely without any merit. The remarks complained-of on appeal, were not unfair and trial counsel was not ineffective for failing to object to those remarks. See People v. Caban, 5 N.Y.3d 143, 152 (2005); People v. Stultz, 2 N.Y.3d 277, 287 (2004); People v. Adelman, 36 A.D.3d 926, 928 (2d Dep't 2007) (all holding that a defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success); People v. Ahmed, 303 A.D.2d 417 (2d Dep't 2003) (counsel not obligated to present defenses or to make assertions that would have been baseless or spurious); People v. DeFreitas, 213 A.D.2d 96, 97 (2d Dep't 1995) (same); cf. People v. Tonge, 93 N.Y.2d 838, 839 (1999) (defendant not denied the effective assistance of counsel for counsel's failure to object to improper summation comments because, viewed as a whole, counsel's efforts reflected a reasonable strategy under the circumstances); People v. Gonzalez, 44 A.D.3d 790, 791 (2d Dep't 2007) (defense counsel's failure to object to prosecutor's

remarks, without more, did not constitute ineffective assistance).

Moreover, there is a presumption that trial counsel rendered effective assistance. See People v. Rivera, 71 N.Y.2d 705, 709 (1988) (to prevail on a claim of ineffective assistance of counsel, it is incumbent on defendant to demonstrate the absence of strategic or other legitimate explanations for counsel's conduct; absent such a showing, it will be presumed that counsel acted in a competent manner and exercised professional judgment); see also People v. Benevento, 91 N.Y.2d 708, 712 (1998) (counsel's efforts should not be second-guessed with the clarity of hindsight; core inquiry is whether defendant received "meaningful representation" under the totality of the circumstances [quoting People v. Baldi, 54 N.Y.2d 137, 147 (1981)]); People v. Alicea, 229 A.D.2d 80, 86 (1st Dep't 1997) (simple disagreement with strategies and tactics not sufficient to demonstrate ineffective assistance of counsel [citing Strickland v. Washington, 466 U.S. 668, 688-89 (1984)]).

Here, counsel was clearly aggressive and effective in representing defendant. Counsel put forth an argument that defendant did not intend to kill Lorenzo Warren, that defendant was intoxicated at the time of the crime and that his intoxication negated his intent, and that defendant's actions, if anything were reckless, not intentional. Counsel extensively and effectively cross-examined all the witnesses and argued to the

jury that the inconsistencies in their testimony rendered them incredible. Counsel was successful in obtaining an intoxication charge and a charge on the lesser-included count of first-degree manslaughter. Counsel clearly rendered effective assistance to defendant, even if he did not object to summation remarks deemed improper by appellate counsel. See People v. Manley, 60 A.D.3d 870 (2d Dep't 2009) (finding counsel effective after review of "record as a whole").

In sum, defendant's claims are entirely unpreserved. Moreover, the prosecutor's summation did not "demonstrate a persistent, egregious course of conduct that was deliberate and reprehensible." People v. Svanberg, 293 A.D.2d 555 (2d Dep't 2002). The prosecutor's summation remarks were responsive to defendant's summation and constituted fair comment on the evidence. In light of the overwhelming evidence of defendant's guilt, any possible error in the prosecutor's summation was harmless and defendant received the effective assistance of counsel. Accordingly, defendant's conviction should be affirmed.

POINT III

THE TRIAL COURT PROPERLY IMPOSED CONSECUTIVE
SENTENCES FOR THE MURDER CONVICTION AS TO
TAJMERE CLARK AND THE FIRST-DEGREE ASSAULT
CONVICTION AS TO MARY LEE CLARK.  DEFENDANT'S
REMAINING CONSECUTIVE SENTENCES SHOULD BE
MODIFIED TO RUN CONCURRENTLY TO EACH OTHER
AND TO THE CONSECUTIVE SENTENCES.

The trial court properly imposed consecutive sentences on defendant for his convictions of the second-degree murder of Tajmere Clark and the first-degree assault on Mary Lee Clark.  The consecutive sentences were authorized because the murder of Tajmere Clark and the injury to Mary Lee Clark were committed through separate and distinct acts.  See P.L. § 70.25(2).

A court imposing multiple sentences of imprisonment on a person at the same time is, in general, authorized to direct that the two sentences "shall run either concurrently or consecutively."  P.L. § 70.25(1).  That authorization to impose consecutive sentences is limited by Penal Law section 70.25(2), which states:

> When more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences . . . must run concurrently.

In determining whether concurrent sentences are required pursuant to Penal Law § 70.25(2), "the sentencing court must first examine

the statutory definitions of the crimes for which defendant has been convicted." People v. Laureano, 87 N.Y.2d 640, 643 (1996). After considering the statutory definitions for the crimes, the court should then determine the act or omission that constitutes the crime. Id. at 643. If the act or omission is the same, or if the act or omission that constitutes one offense is a material element of the other offense, then consecutive sentences cannot be imposed. Id. Conversely, if the act or omission is not the same for both offenses, and if the act or omission that constitutes each offense is not a material element of the other offense, then consecutive sentences can be imposed. P.L. § 70.25(2); Laureano, 87 N.Y.2d at 643; see also People v. Brown, 80 N.Y.2d 361, 364 (1992) ("trial courts retain consecutive sentence discretion when separate offenses are committed through separate acts, though they are part of a single transaction").

In this case, consecutive sentences were permissible because separate acts constituted the murder of Tajmere Clark and the injury to Mary Lee Clark. Defendant pointed his gun at Lorenzo Warren and fired five shots in the living room of the apartment he shared with Jacqueline Warren and her children. Lorenzo and Shatashia were hit by bullets and sustained leg injuries. A bullet penetrated Tajmere Clark's head, killing her. Another bullet penetrated Mary Lee Clark's head, putting her in a coma. Although the killing and the assaults occurred in the course of one extended transaction, the killing of Tajmere Clark and the

48

assault on Mary Lee Clark were caused by multiple shots and separate bullets.

The medical testimony reflected that the death of three year-old Tajmere Clark was caused by a bullet that penetrated her skull and caused her fatal injury; the act that constituted the first-degree assault on Tajmere's grandmother, Mary Lee Clark, consisted of a bullet that penetrated her brain causing the serious injuries she sustained, rendering her in a coma. Thus, although the murder and injuries in this case occurred in one extended transaction, the death of Tajmere Clark and the serious physical injuries to Mary Lee Clark were caused by separate bullets fired by defendant. Consequently, the imposition of consecutive sentences was proper. See People v. Boone, 30 A.D.3d 535, 536 (2d Dep't 2006) ("the imposition of consecutive terms of imprisonment for the defendant's conviction of two counts of attempted murder in the second degree was permissible because the firing of multiple shots at the two victims constituted separate and distinct acts"); People v. Valdez, 277 A.D.2d 262 (2d Dep't 2000) (although murders occurred in course of one extended transaction, imposition of consecutive sentences was justified where each killing was caused by affirmative act of firing multiple shots); People v. Porter, 265 A.D.2d 363, 364 (2d Dep't 1998) ("the firing of multiple shots at the victims constituted separate acts such that consecutive sentences were permissible"); see also People v. Riley, 309 A.D.2d 879, 881 (2d Dep't 2003); People v.

<u>Reyes</u>, 239 A.D.2d 524, 525 (2d Dep't 1997); <u>People v. Sumpter</u>, 203 A.D.2d 605 (2d Dep't 1994).

Because the evidence does not sufficiently establish whether separate bullets caused the injuries to Lorenzo Warren and Shatashia Lewis, defendant's sentences as to those convictions should be modified to run concurrently to the properly imposed consecutive sentences for the murder of Tajmere Clark and the assault of Mary Lee Clark.

Accordingly, the trial court properly imposed consecutive sentences of twenty-five years to life for defendant's conviction of second-degree murder for the shooting of Tajmere Clark and twenty-five years for defendant's first-degree assault conviction for the shooting of Mary Lee Clark.  <u>See</u> <u>People v. Bonilla</u>, 57 A.D.3d 400 (1st Dep't 2008).  Defendant's remaining sentences of ten years for his attempted murder conviction of Lorenzo Warren and five years for his first-degree assault conviction as to Shatashia Lewis should be modified to run concurrently to each other and to the properly imposed consecutive sentences.

<u>CONCLUSION</u>

<u>FOR ALL OF THE AFOREMENTIONED REASONS, DEFENDANT'S JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.  DEFENDANT'S CONSECUTIVE SENTENCES FOR HIS CONVICTIONS OF THE MURDER OF TAJMERE CLARK AND THE FIRST-DEGREE ASSAULT OF MARY LEE CLARK SHOULD BE AFFIRMED, AND DEFENDANT'S CONSECUTIVE SENTENCES FOR THE ATTEMPTED MURDER OF LORENZO WARREN AND FIRST-DEGREE ASSAULT OF SHATASHIA LEWIS SHOULD BE MODIFIED TO RUN CONCURRENTLY WITH DEFENDANT'S PROPERLY IMPOSED CONSECUTIVE SENTENCES.</u>

Dated:  Brooklyn, New York
        June 30, 2010

                              Respectfully submitted,


                              CHARLES J. HYNES
                              District Attorney
                              Kings County




LEONARD JOBLOVE
RHEA A. GROB
Assistant District Attorneys
        of Counsel

                      Certificate of Compliance
                  Pursuant to 22 NYCRR § 670.10.3(f)


This brief was prepared on a computer.  A monospaced typeface was
used, as follows:

        Name of typeface:  Courier New
        Point size:  12
        Line spacing:  Double

According to the word count of the word processing system used to
prepare the brief, the total number of words in the brief,
inclusive of point headings and footnotes and exclusive of pages
containing the table of contents, proof of service, certificate
of compliance, or any authorized addendum containing statutes,
rules, regulations, etc., is 11,393.




                              Rhea A. Grob
                              Assistant District Attorney

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT D**

Defendant's Pro Se Supplemental Brief to the
Appellate Division, Second Department

General Walters 08A3571
Green Haven Correctional Facility
P.O. Box 4000
Stormville, N.Y. 12582

February 4, 2011

Clerk
Appellate Division, Second Department
45 Monroe Place
Brooklyn, N.Y. 11201

RE: People v. Walters, Indictment Number 3464/06

Dear Clerk:

Please find enclosed the original and 9 copies of a supplemental pro se brief.

As demonstrated by the annexed affidavit of service, all parties have been duly served.

Thank you for your time and cooperation.

Respectfully,

Armand Walters

General Walters

APPEALS ...
KINGS COUNTY ...
11 FEB 10 P12:36

### AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )

COUNTY OF DUTCHESS )ss:

I, General Lee Waiters, being duly sworn, depose and state:

1. I have placed a true copy of a Supplemental Pro Se Brief in the mail depository, located within Green Haven Correctional Facility.

2. I mailed said papers to: Clerk, Appellate Division, Second Department, 45 Monroe Pl., Brooklyn, NY 11201; Charles J. Hynes, Kings County District Attorney, 350 Jay Street, Brooklyn NY 11201.

3. The motion was placed in the mail depository as stated above on the date stated below.

Dated: February  3  , 2011

_General Waiters_
General Waiters 08A3571

SWORN TO BEFORE ME ON

this  3rd  day of February, 2011

_Ellen A. Bohlmann_
NOTARY PUBLIC

**ELLEN A. BOHLMANN**
**Notary Public, State of New York**
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20 13

*Due 7/11 Grob 5/6/11*

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,            AD Docket
                                                #08-05247
                        Respondent,
                                                Kings County
                -against-                       Indictment
                                                #3464/06
GENERAL WAITERS,

                        Appellant,
----------------------------------------X


### SUPPLEMENTAL PRO SE BRIEF


Submitted by,

General Waiters
08A3571
Green Haven C.F.
P.O. Box 4000
Stormville, N.Y. 12582


**To:** Clerk
      Appellate Division, Second Department
      45 Monroe Pl., Brooklyn, N.Y. 11201

      Kings County District Attorney
      Charles J. Hynes
      350 Jay Street
      Brooklyn, N.Y. 11201

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT.........................................1

STATEMENT OF FACTS...........................................1
      Defense Summation......................................3
      Prosecutor's Summation.................................3
      Jury Charge............................................3

ARGUMENT

    THE DEFENDANT WAS DEPRIVED OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL (1) FAILED TO CALL AN EXPERT WITNESS TO EXPLAIN AND INTERPRET MEDICAL RECORS THAT WOULD HAVE ESTABLISHED HOW INTOXICATED DEFENDANT WAS, AND (2) COUNSEL REQUESTED AN INAPPROPRIATE LESSER-INCLUDED OFFENSE THAT FORCED THE JURY TO CONVICT ON THE TOP COUNT...U.S. CONST. 6TH AMDT.; N.Y. CONST. ART. I, SEC.6........................................................4

CONCLUSION

    THE CONVICTION SHOULD BE VACATED AND A NEW TRIAL SHOULD BE GRANTED....................................................13

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

               Respondent,

        -against-

GENERAL WAITERS,

               Appellant,
------------------------------------X

AD Docket
#08-05247

Kings County
Indictment
#3464/06

## SUPPLEMENTAL PRO SE BRIEF

### PRELIMINARY STATEMENT

Defendant, General Waiters, submits this supplemental pro se brief, after receiving a decision and order dated December 8, 2010, granting permission to file such brief. Defendant seeks to appeal a judgement rendered on June 2, 2008, convicting him, after jury trial, of one count of second-degree murder, attempted second-degree murder, and two counts of first-degree assault. Defendant was sentenced to consecutive terms equalling 65 years-to-life. Defendant is incarcerated pursuant to this conviction. There were no co-defendants.

### STATEMENT OF FACTS

Before resting, defense counsel sought to introduce some medical records to support his intoxication defense (TR:531). The court was inclined to let the medical records in that were relevant to Waiters' intoxication only if a medical expert was called to explain the meanings of the records to

1

the jury (Tr:543-544, 547, 549-550, 557). The court, prosecutor and defense counsel were confused as to the meanings of the medical terminology in the records (Tr:55, 543). For example, the judge speculated that "C.N.S." could mean certified nurse (Tr: 551). In any event, the prosecutor expressed a willingness to wait for an expert to be called because they were not under any "time crunch" (Tr: 548). However, defense counsel stated that he did not intend to call any more witnesses and was willing to let the court rule on whether to admit the medical records (Tr:552). According to the record, defense counsel felt the trial testimony that Mr. Waiters was intoxicated was sufficient to allow the records in (Tr: 535). The prosecutor argued, and the court agreed, that the issue was not intoxication, but the level of intoxication, which could negate the intent element of the crime. (Tr: 546-547). As a result of defense counsel's refusal to call a medical expert as a witness, the court only allowed into evidence two documents which simply stated that Mr. Waiters was intoxicated (Tr: 552). There are 53 pages of medical records. There may be more evidence within those records that demonstrate exactly how intoxicated defendant was; however, without the benefit of an expert it is unclear what the medical terminology means. In any event, the documents that showed Mr. Waiters ethyl/alcohol level to be 386.24 mg/dL(at least three times above the legal definition of alcohol intoxication) and the fact that he suffered delirium tremens were never introduced or brought to the

attention of the jury.

**Defense Summation**

In summation, defense counsel argued that Mr. Waiters was intoxicated without giving any direct evidence that would clarify how that intoxication could negate intent. Furthermore, he argued that Mr. Waiters acted recklessly rather than intentionally.

**Prosecutors Summation**

In summation, the prosecutor highlighted the fact that although Mr. Waiters was intoxicated, the defense counsel failed to offer evidence that would show the level of that intoxication. He even alluded to the two medical records, which simply stated that Mr. Waiters was intoxicated, as not being sufficient since they failed to explain the all important issue of "how" intoxicated Mr. Waiters was (Tr: 640-641).

**Jury Charge**

Despite arguing that defendant was too intoxicated to form the intent to be found guilty, Defense counsel only requested for a lesser charge of manslaughter in the first degree, which also has an "intent" element. Defense counsel never requested a lesser charge of manslaughter in the second degree which would have supported his theory that the defendant acted recklessly, due to him being intoxicated, and not intentionally. Furthermore, defense counsel did not request lesser offenses relative to all the other intent crimes for which defendant was charged.

3

ARGUMENT

THE DEFENDANT WAS DEPRIVED OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL (1) FAILED TO CALL AN EXPERT WITNESS TO EXPLAIN AND INTERPRET MEDICAL RECORDS THAT WOULD HAVE ESTABLISHED HOW INTOXICATED DEFENDANT WAS, AND (2) COUNSEL REQUESTED AN INAPPROPRIATE LESSER-INCLUDED OFFENSE THAT FORCED THE JURY TO CONVICT ON THE TOP COUNT.. U.S. Const. 6th. Amdt.; N.Y. Const. art. I, sec. 6.

Defense counsel was ineffective for several reasons. First, counsel, with absolutely no legitimate and apparent trial strategy, neglected to call an expert witness to interpret and explain various medical records that would have established how intoxicated defendant was. Second, defense counsel, although arguing that defendant was too intoxicated to form intent, requested the court submit manslaughter in the first degree, an intent crime, to the jury as a lesser-included offense to second-degree intentional murder. He failed to request manslaughter in the 2nd degree and other "non-intent" crimes.

A criminal defendant is entitled to effect assistance of counsel. People v. Benevento, 91 N.Y.2d 708, 713-14, 674 NYS.2d 629; see also Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). The standard for a claim of ineffective assistance is whether counsel's performance viewed in totality amounts to meaningful representation. People v. Baldi, 59 NY.2d 137, 444 NYS.2d 893 (1981). However, as long as the evidence, the law, and the circumstances of the particular case, viewed in totality and

4

as of the time of the representation, reveal that counsel provided meaningful representation, a defendant's constitutional right to effective assistance of counsel will have been met.  Id.

A single error by counsel can constitute ineffective assistance if the error was of such magnitude that there exists a reasonable likelihood that the outcome of the trial would have been different. People v. Georgiou, 38 A.D.3d 155, 828 NYS.2d 541 (2 Dept 2007). The defendant must demonstrate "the absence of strategic or other legitimate explanations" for counsel's actions. People v. Rivera, 71 NY.2d 705, 709, 530 NYS.2d 52 (1988).

Here, Mr. Waiters defense was that he was too intoxicated to form intent. There was evidence in the form of testimony that Mr. Waiters drank on both the day before and the morning of the incident (Tr. 434, 438, 443-445, 398-399). Defense counsel argued in opening and closing statements that defendant was intoxicated. Thus, his defense was undeniably structured around the defendant's intoxication. Indeed, the fact that the judge gave an intoxication charge demonstrates that intoxication was not the issue. Rather, the issue was whether the defendant was so intoxicated that he could not form the requisite intent to commit the crimes charged.

Before resting, defense counsel sought to introduce several medical records that would support his intoxication argument. This led to a lengthy, rather interesting proceeding on whether the judge should admit these documents

5

into evidence. A couple of the documents unambiguously mentioned the fact that defendant was intoxicated. However, a few of the other documents gave clarity to the level of defendant's intoxication. Due to the ambiguity of the medical terminology and the structuring of the documents, it was unanimously agreed by the judge and the prosecutor that an expert was required to clear up any confusion that these documents would have caused the jury.

Throughout the proceedings, the judge expressed her opinion that an expert should be called to explain these documents. The prosecutor agreed with this reasoning. The judge even implied that she would let the records in if someone were called to explain them. Amazingly, the prosecutor even stated that "it can still be done" because "we aren't under any time constraints." However, defense counsel was adamant in his refusal to call any witnesses and expressed his willingness for the judge to make her ruling on the admittance of the documents bearing in mind that no expert would be called to explain them.

As a result, the judge properly excluded the essential documents that would have needed expert explanation while admitting the unambiguous documents that simply stated the obvious: that Mr. Waiters was intoxicated. Defense counsel's insouciance left the jury to engage in mental acrobatics trying to figure out exactly "how" intoxicated Mr. Waiters was.

It has been held that "establishing that a defendant

6

was intoxicated when he committed a crime in question is not, in and of itself, helpful; the evidence must also lead the fact finder to an inference that intoxication deprived the defendant of the ability to form intent." Combs v. Coyle, 205 F3d 269, 288 (6th Circuit 2000). In this case, such evidence was available but defense counsel never introduced it.

Defense counsel did not have a legitimate reason for failing to call an expert witness. Although it is true that counsel has discretion over what witness to call, a failure to call an expert witness in this case was a deathblow. Had an expert been called he would have explained that Mr. Waiters had an ethyl/alcohol level of 384.26 mg/dl. He would have further interpreted the ethyl/alcohol levels and how that level could have affected Mr. Waiters.

From a general research, an ethyl/alcohol level of 384.26 mg/dl is almost four times above the legal definition of alcoholic intoxication. See Steadman Medical Dictionary. An expert would have explained that once a person reaches this level of three times the level of alcoholic intoxication they are subject to blackouts, which would negate the ability to act conscientiously.

In Miller v. Terhune, the Eastern District in California recently ruled on a case similar to the case at bar. This case lends helpful guidance in demonstrating the importance of an expert. The petitioner in that case brought an ineffective assistance of counsel claim based on defense counsel's failure to present evidence of voluntary

7

intoxication. At an evidentiary hearing, an expert was called, and it was established that the petitioner had a blood alcohol (BAC) level of .30%. The expert testified, "that petitioner's BAC of .30% at 2:25 a.m. indicated a likely BAC between .33% and .34% at the time of the shooting. This qualified as 'extreme alcohol intoxication' at which coma and death can occur." Miller v. Terhune, 510 FSupp.2d 486, 490 (E.D. Cal. 2007).

In the instant case, Mr. Waiters BAC was .38% hours after the shooting. Obviously, it was even higher than that when the incident occurred. In addition, as evidenced in the medical records, defendant suffered from "delirium tremens". Certainly, an expert could have explained to the jury what exactly was "delirium tremens" and what occurs when a person suffers from it. Furthermore, the expert could have testified that once a person suffers from delirium tremens they have reached a poisonous level, which can be fatal if the appropriate detoxification is not administered.

Furthermore, in light of defense counsel's failure to call an expert as stated above, the Miller case is instructive. In Miller, supra, the expert testified that "there is not always a correlation between the degree of physical impairment and the degree of mental impairment." Id at 490. Without the likes of this testimony, the prosecutor was able to grotesquely misconstrue alcohol's effects on a person's brain.

For example, the prosecutor improperly asserted

8

"[defendant] was able to move around. There was nothing that was bothering him in terms of that... you didn't have somebody there who was falling down, rolling down, slobbering drunk."(T:636). This speculative approach could have easily been circumvented by expert testimony. As the petitioner argued in <u>Miller</u>, "without education about the effects of alcohol on the brain, the jury was too willing to follow the prosecutor's lead in attributing to [the defendant] the cognitive processes of a sober person," (at supra 496).

Moreover, the court in <u>Miller</u> agreed and reasoned, "these inconsistencies are exactly why expert testimony would have been helpful." <u>Id</u> at 496. The court held "it is apparent that the trial counsel never investigated the effects of alcohol on petitioner's perception, cognition, or ability to form the requisite intent. Nor did counsel consult any expert who could have educated the jury as to the effects of alcohol. Instead, counsel acted on his own assumptions about intoxication evidence. Accordingly, his choice of strategy was not based on any investigation and was unreasonable under Strickland." <u>Id</u> at 501.

Thus, the same decision should follow in the case at bar. In <u>Miller</u>, the defense counsel elected to abandon the intoxication defense in favor of self-defense, so at least he had a reason, albeit a very weak one, for not producing an expert. Whereas here, the defense counsel pursued an intoxication defense while concomitantly neglecting to call an expert to allow the jury the opportunity to hear direct

evidence that would have supported his argument. This distinction bolsters defendant's ineffective assistance of counsel claim since it illustrates that the defense counsel's failure to investigate and then call an expert witness could not have conceivably been part of a legitimate trial strategy.

The defense counsel's insoluble behavior demonstrates that he failed to investigate the meaning of the medical terms in the documents he sought to introduce. Such negligence places him below the standard of "meaningful representation" as established in People v. Baldi, 54 NY.2d 137, 444 NYS.2d 893 (1981).

It has also been held, where an expert witness's opinion is "crucial to the defense theory[,] defense counsel's failure to have questioned [the expert]... prior to trial is inexcusable" Combs v. Coyle, 205 F.3d 269, 288 (6th Cir.2000).

The defense counsel's fatal error was exploited in the prosecutor's summation when he tauntingly reminded the jury that they were never told exactly "how" intoxicated Mr. Waiters was at the time of the shooting. He then urged them to rely on their experiences of alcoholic intoxication to determine whether Mr. Waiters was too intoxicated to commit these crimes intentionally.

Compounding defense counsel's incompetence was his request of an inappropriate lesser included. A lesser-included offense must be charged, "if there is a reasonable

view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater." See CPL §300.50(1); People v. Scarborough, 49 N.Y.2d 364, 426 N.Y.S.2d 224 (1980); People v. Brockett, 74 A.D.3d 1218, 904 N.Y.S. 2d 172 (AD 2 Dept. 2010). The evidence at trial demonstrated that defendant was intoxicated and, thus was not able to form the requisite intent to have committed an intentional homicide. In his summation, he vehemently argued that Mr. Waiters was too intoxicated to form intent. However, defense counsel requested manslaughter in the first degree as a lesser-included offense to murder in the second degree under the intoxication theory..

Manslaughter in the first degree possesses an intent element. See Penal Law §125.20. Manslaughter in the second degree reads: A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person. Thus, if defense counsel forcefully argued to the jury that defendant recklessly caused the death of Tajmere Clark, would it not have been proper to request manslaughter in the second degree as a lesser-included offense?

Moreover, if defense counsel had requested manslaughter in the second degree, by law of this department the court would have committed reversible error had it denied the request. In People v. Vasquez, the court ruled that the defendant was entitled to manslaughter in the second degree as a lesser-included offense of an intentional crime. It was

11

proved that Vasquez drunk two six-packs of beer shortly before the incident. That was enough for the Second Department to hold that there was a reasonable view of the evidence that Vasquez acted recklessly (and was guilty of the lesser-included offense of manslaughter in the second degree), and not intentionally. See People v. Vazquez, 104 A.D. 2d 429, 478 N.Y.S. 2d 947 (AD 2 Dept. 1984).

Manslaughter in the second degree is a reckless crime and the appropriate lesser-included offense to support the defense counsel's argument that his client was extremely intoxicated. Being that the "court must give the defendant the benefit of the most favorable view of the record," (People v. Collins, 86 A.D. 2d. 616, 446 N.Y.S. 2d. 93 (2 Dept. 1982), People v. Steele, 26 N.Y. 2d. 526, 311 N.Y.S. 2d. 889 (1970), it is reasonable to assume that the trial judge would have accepted the request of this lesser included offense in light of the overwhelming evidence of the defendant's intoxication. That reasonable assumption can be elevated to an appropriate conclusion if the defense counsel called an expert witness to explain Mr. Waiters' level of intoxication. As a result, the jury was left to deliberate on an intentional murder charge or alternatively an "intentional" manslaughter charge.

In sum, if defendant had adequate representation two very important things would have happened at his trial. One, the jury would have been properly educated on "intoxication" and the effects of it on a person's cognitive abilities. Two, a

12

lesser-included offense of manslaughter in the second degree would have been requested. Because of the defense counsel's ineffective assistance, Mr. Waiters is incarcerated with a substantially longer sentence than he should have. The disparity between the defendant's current 65-to-life sentence and the 15 years he could have received should accentuate his counsel's ineffectiveness.

In light of the aforementioned, the following conclusions can be drawn: a) There is no excusable strategy that can make sense of this perfidious representation, b) these errors of the defense counsel unequivocally changed the outcome of the trial.

CONCLUSION

The conviction should be vacated and a new trial should be granted or any other relief that this Court deems proper.

Dated: February 4 , 2011

General Waiters 08A3571
Defendant, Pro se
Green Haven Corr. Fac.
P.O. Box 4000
Stormville, New York 12582

*General Waiters*

13

Legal
Mail

Charles J. Hynes
Kings County D.A.
350 Jay St.
Brooklyn, N.Y. 11201

Legal Ma

Legal Mail

e, N.Y. 12582

ers 08A3571

2007 FEB 10 A 11: 24

RECEIVED
COPY MAILROOM
DISTRICT ATTORNEY KINGS FACILITY

GREEN HAVEN

02 1A
0004623953
MAILED FROM A ZIP CO
UNITED STATES POSTAGE

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT E**

Respondent's Supplemental Brief to the
Appellate Division, Second Department

To be argued by:
RHEA A. GROB
10 minutes

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
_____

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

              -against-

GENERAL WAITERS,

                    Defendant—Appellant.
_____

Appellate Division
Docket Number
08-05247

Kings County
Indictment Number
3464/06

RESPONDENT'S SUPPLEMENTAL BRIEF

LEONARD JOBLOVE
RHEA A. GROB
Assistant District Attorneys
     of Counsel

May 3, 2011

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................1

STATEMENT OF FACTS ...............................................3

ARGUMENT

      DEFENDANT WAS AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL
      AT TRIAL ....................................................3

CONCLUSION

      FOR THE AFOREMENTIONED REASONS, AND FOR THE REASONS
      STATED IN RESPONDENT'S MAIN BRIEF, DEFENDANT'S JUDGMENT
      OF CONVICTION SHOULD BE AFFIRMED ..........................15

CERTIFICATION

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                                    Respondent,

                    -against-

GENERAL WAITERS,

                      Defendant-Appellant.

Appellate Division
Docket Number
08-05247

Kings County
Indictment Number
3464/06

RESPONDENT'S SUPPLEMENTAL BRIEF

PRELIMINARY STATEMENT

Defendant, General Waiters, appeals from a judgment of the Supreme Court, Kings County, rendered on June 2, 2008, convicting him, after a jury trial, of one count of second-degree murder, attempted second-degree murder, and two counts of first-degree assault.  Defendant was sentenced to consecutive terms of imprisonment of twenty-five years to life on the second-degree murder count, ten years on the attempted murder count, twenty-five years as to the first-degree assault count relating to Mary Lee Clark, and five years as to the first-degree assault count relating to Shatashia Warren and to five years of post-release supervision (Dowling, J., at trial and sentence).

Defendant is incarcerated pursuant to this conviction.

Defendant's appellate counsel submitted a brief, filed April 7, 2010, to this Court.  The People filed a response to those

claims on June 30, 2010.  By order dated August 19, 2008, this Court granted defendant's request for permission to file a pro se supplemental brief.  Respondent's supplemental brief addresses those issues raised by defendant in his pro se brief.

STATEMENT OF FACTS

Respondent relies on the Statement of Facts contained in Respondent's main brief to the Appellate Division.[1]

ARGUMENT

DEFENDANT WAS AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

Defendant claims that he was denied the effective assistance of trial counsel because 1) trial counsel failed to call an expert witness to explain and interpret the medical records put into evidence by defendant and 2) trial counsel requested an inappropriate lesser-included offense. Defendant's claims are entirely without merit, and do not establish that he was denied the effective assistance of trial counsel.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that "counsel's representation fell below an objective standard of reasonableness" and that there is a reasonable probability that the outcome of the trial would have been different but for counsel's alleged errors. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). In assessing counsel's performance, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

---

[1] Numbers in parentheses refer to the trial transcript.

challenged action 'might be considered sound trial strategy.'" Id. at 689. "Judicial scrutiny of counsel's performance must be highly deferential." Id.

Under the New York State Constitution, a defendant's constitutional right to effective assistance of trial counsel is satisfied when, under the totality of the circumstances existing at the time of the representation, counsel provided the defendant with "meaningful representation." People v. Henry, 95 N.Y.2d 563, 565 (2000); People v. Benevento, 91 N.Y.2d 708, 712 (1998); People v. Satterfield, 66 N.Y.2d 796, 798-99 (1985); People v. Baldi, 54 N.Y.2d 137, 146-47 (1981). Courts should not "second-guess whether a course chosen by defendant's counsel was the best strategy, or even a good one, so long as defendant was afforded meaningful representation." Satterfield, 66 N.Y.2d at 799-800; see People v. Benn, 68 N.Y.2d 941 (1986).

Although, under the state constitution, a defendant need not show a reasonable probability that he would be acquitted but for counsel's errors, defendant must show that counsel's errors deprived him of a fair trial. Henry, 95 N.Y.2d at 566; Benevento, 91 N.Y.2d at 711-14.

Hindsight does not elevate unsuccessful trial strategies into ineffective assistance of counsel. People v. Benevento, 91 N.Y.2d at 712; People v. Gillespie 36 A.D.3d 626, 627 (2d Dep't 2007); People v. Finley, 27 A.D.3d 763 (2d Dep't 2006). Losing strategies or tactics do not equate to ineffective assistance so

long as a defendant's fundamental right to a fair trial is not jeopardized. People v. Benevento, 91 N.Y.2d at 711.

Under the totality of the circumstances here, defendant's trial counsel rendered meaningful assistance. A review of the record reflects that trial counsel was more than adequately prepared and possessed an in-depth familiarity with the facts of defendant's case. Trial counsel made appropriate motions and objections throughout and cross-examined the witnesses at trial, taking advantage of inconsistencies in their testimonies. Trial counsel successfully obtained suppression of defendant's statements made to the police and successfully obtained an intoxication charge on defendant's behalf and a lesser-included charge of first-degree manslaughter. Counsel argued that defendant did not intend to kill Lorenzo Warren when he fired shots at him, and that he had no transferred intent to cause the death of Tajmere Clark and the injuries sustained by Mary Lee Clark, Shatashia Lewis, and Lorenzo Warren. Defense counsel argued that defendant was intoxicated at the time of the crime and that his intoxication negated his intent.

Defendant's claim that his counsel was ineffective for not calling an expert to the stand to explain the contents of defendant's medical records is without merit. The Court allowed into evidence two pages of the medical records that related that defendant was brought into the hospital in an intoxicated state. The Court disallowed further medical records to be introduced

that discussed defendant's ethyl/alcohol level without a witness
to explain the significance of the testimony.  Further, the
prosecutor had objected to any of defendant's medical records
being introduced at all.  See Trial transcript at 531-56.  Trial
counsel's decision not to put an expert on the stand to further
explain the level of intoxication was strategic.  The witnesses
at trial all testified that defendant was intoxicated at the time
of the incident.  Expert toxicology testimony regarding
defendant's blood alcohol level would have opened up an area for
cross-examination and rebuttal such as testimony from a
toxicologist that an individual's blood alcohol level generally
does not reach its maximum point until about one and one-half
hours after a person stops drinking and that the level of
impairment from alcohol varies from person to person based on
whether an individual is an experienced drinker.  Further
testimony from an expert could well have established that because
defendant was a habitual drinker, his level of intoxication would
not have negated his intent to commit the crimes of which he was
convicted.

Indeed, the colloquy placed on the record reflected that
defendant made statements to the doctors that examined him (Drs.
Drob and Dr. Bardey) that he was not intoxicated and had not been
drinking that morning and that he clearly knew what was going on
and had a specific intent (Trial transcript at 544, 553, 555).
Thus, had counsel put on an expert to testify regarding the level

6

of defendant's intoxication, he would have likely opened the door to the prosecutor being able to call these witnesses to rebut defendant's position that he was so intoxicated that he could not form the intent to commit the crimes. See Barclay v. Spitzer, 371 F. Supp. 2d 273 (2005) (the calling of a doctor would have opened the door to rebuttal by the prosecution using its own doctor).

Accordingly, defense counsel's decision to just have before the jury the testimony of the witnesses that defendant drank from early on in the morning on that day and that portion of the medical records stating defendant was intoxicated when brought into the hospital shortly after the incident, was clearly strategic as an attempt by the defense to have the lay jury infer that defendant's intoxication necessarily negated his intent.

An attorney's decision "whether to call specific witnesses -- even ones that might offer exculpatory evidence -- is ordinarily not viewed as a lapse in professional representation." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000); see also United States v. Schmidt, 105 F.3d 82, 83 (2d Cir. 1997) (the decision of whether or not to call a particular witness is a matter of trial strategy which the courts will generally not second guess); United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in

almost every trial."), <u>cert</u>. <u>denied</u>, 484 U.S. 958 (1987).  <u>See</u>
<u>also</u>, <u>People v. Damphier</u>, 13 A.D.3d 663 (3d Dep't 2004) (failure
to call a specific witness, i.e., a shoe print expert, in and of
itself, does not establish ineffective assistance of counsel);
<u>People v. Chung</u>, 276 A.D.2d 708 (2d Dep't 2000) (failure of
defendant's attorney to call defendant and various witnesses to
testify at trial was matter of trial strategy).

Defendant has failed to establish that testimony by an
expert regarding the level of alcohol in his blood stream would
have been beneficial to him.  <u>See</u> <u>People v. Loret</u>, 56 A.D.3d 1283
(4th Dep't 2008) (counsel's failure to call rebuttal expert
witness did not constitute ineffective assistance absent showing
that expert's testimony would have assisted trier of fact or that
defendant was prejudiced by absence of such testimony).
Defendant's arguments in his memorandum of law regarding blood
alcohol levels are of no significance as they are not specific
regarding the medical records, the conditions under which
defendant was brought into the hospital, and do not take into
account his history of alcoholism which would have affected his
behavior and his ability to form intent.

The medical records, as admitted, were clear and easily
comprehendible to the jury.  The fact that defendant was brought
into the hospital shortly after the incident, in an intoxicated
state, merely buttressed defendant's position, that he was too
drunk to have intended the consequences of his actions.

Moreover, the portion of the medical records admitted, supported the version of events as told by the prosecution witnesses, that defendant had been drinking that morning, along with Jacqueline Warren and Mary Lee Clark.   Thus, despite defendant's contention otherwise, trial counsel's decision not to call an expert witness to testify regarding the additional medical records was not ineffective and those additional records were not before the jury.   The medical records before the jury supported defendant's contention that he was intoxicated at the time of the crime, and still intoxicated when he was brought into the hospital shortly after the shooting incident.

Defendant also contends that his attorney was ineffective for not requesting that the court charge manslaughter in the second degree as a lesser included offense of intentional murder. A charge conference appearing on the record reflects that defense counsel requested that the court charge the jury on first-degree manslaughter as a lesser count of intentional murder over the prosecutor's objection (Trial transcript at 563-64).   Defendant's claim should be foreclosed from review.   Defendant was indicted for the attempted murder of Lorenzo Warren, and on a transferred intent theory, of second-degree murder and first-degree assault charges.   The jury was given an intoxication charge and yet convicted defendant of the second-degree murder charge although it had the option to reject that charge and consider first-degree manslaughter.   Because the jury clearly concluded that defendant

acted intentionally and that his intoxication did not negate his intent when he caused the death of Tajmere Clark and injured the other victims, defendant was not prejudiced by his attorney's decision not to request second-degree manslaughter -- to also consider whether defendant acted merely recklessly in the shooting that caused a death and several injuries. See People v. Green, 5 N.Y.3d 538, 545 (2005); People v. Boettcher, 69 N.Y.2d 174, 180 (1987) (both holding where court charges next lesser included offense of crime charged in indictment but refuses to charge lesser degrees than that, conviction of crime alleged in indictment forecloses challenge to refusal to charge more remote lesser included offenses); People v. Beriguette, 51 A.D.3d 939 (2d Dep't 2008) (claimed error for refusal to charge second-degree manslaughter as lesser included offense of second-degree murder was foreclosed by jury's verdict of second-degree murder and its implicit rejection of first-degree manslaughter charge); People v. Tulloch, 179 A.D.2d 794 (2d Dep't 1992) (same).

Here, defendant fired multiple gunshots into a room full of people, while pointing the gun at one specific person in the room. The evidence presented to the jury by all of the witnesses established that defendant went and retrieved the gun, secreted it under a jacket, and then pointed the gun at Lorenzo Warren and fired that gun five times. One bullet hit Lorenzo Warren in the thigh; one bullet hit Shatashia Lewis in the thigh, one bullet went through a wall and lodged in a closet; one bullet penetrated

the brain of Mary Lee Clark, putting her into a coma; and one bullet penetrated the brain of three-year old Tajmere Clark, killing her.   The Court charged the jury on intoxication, explaining that intoxication, although not a defense, can negate an element of the crime charged.   The Court continued to charge the jury that it could consider whether defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the intent necessary for the commission of the crimes (Trial transcript at 685).   Accordingly, based on the evidence presented, there is no possibility that the jury would have convicted defendant only of second-degree manslaughter had they been given that option, and accordingly, defendant was not prejudiced by his attorney's decision not to request that charge. See People v. Kennedy, 7 A.D.3d 272 (1st Dep't 2004) (where jury rejected first-degree manslaughter and convicted defendant of murder, failure to submit more remote lesser offenses of second degree manslaughter and criminally negligent homicide harmless); People v. Vega, 155 A.D.2d 632 (2d Dep't 1989) (same).   See also People v. Crique, 63 A.D.3d 566 (1st Dep't 2009).

Defendant appears to suggest that because the jury was given the intoxication charge, trial counsel should have requested the second-degree manslaughter charge.   However, a trial court's decision to give an intoxication instruction does not automatically compel submission of lesser included offenses.   See People v. Butler, 84 N.Y.2d 627, 632-34 (1994) (upholding trial

court's refusal to submit lesser-included offenses to the jury and explaining that evidence of intoxication does not automatically entitle a jury to find that a defendant acted recklessly); People v. Cody, 260 A.D.2d 718 (3d Dep't 1999). Here, the evidence presented at trial established that although defendant had been drinking on the morning of the shooting, defendant still had the presence of mind to arm himself with a gun which he had to retrieve from a bedroom in the apartment after arguing with the occupants of the apartment. Defendant then secreted the gun under a jacket. When the argument escalated further, defendant pointed the gun at Lorenzo Warren, with whom he was arguing, and fired five shots in the confines of the small living room of the apartment with several occupants. See People v. Rivera, 2 A.D.3d 542 (2d Dep't 2003) (under no reasonable view of the evidence could jury have found that defendant committed lesser offenses of manslaughter but not greater offense of murder given number of shots fired by defendant at close range; evidence, when viewed most favorably to defendant, did not support his contention that his alcohol consumption affected his mental capacity to commit intentional murder). See also People v. Cesario, 71 A.D.3d 587 (1st Dep't 2010) (no reasonable view of evidence in light most favorable to defendant to submit second-degree manslaughter where during dispute, defendant went to another room of apartment, took pistol from safe, returned and fired multiple shots at two victims;

12

psychiatric expert testimony that defendant experienced loss of control only supported request for defense of extreme emotional disturbance).

Indeed, an attorney is not ordinarily deemed ineffective for failing to request a lesser included offense. A court's failure to submit a statutorily and factually appropriate lesser-included offense "does not constitute error" absent a party's request for such a charge. See C.P.L. § 300.50(2). This waiver provision recognizes that the lack of such a request typically reflects trial strategy. People v. Calderon, 66 A.D.3d 314, 320 (1st Dep't 2009). Here, defense counsel, based upon his success at obtaining an intoxication defense, strategically chose not to request second-degree manslaughter as a lesser included offense. In light of the witness testimony and the prosecutor's concession that defendant was intoxicated, trial counsel sought an acquittal on all charges by reason of defendant's inability to form the intent to commit the crimes charged. The evidence supported the finding that defendant either acted intentionally, or that by reason of intoxication he was unable to form the specific intent. Accordingly, defendant's strategic decision to seek all out acquittals on defendant's behalf did not constitute ineffective assistance. See People v. Lane, 60 N.Y.2d 748, 750 (1983) (defendant not denied ineffective assistance of counsel because failure to request lesser included charge resulted from "all-or-nothing" defense tactic); See People v. Felice, 45 A.D.3d 1442

13

(4th Dep't 2007) (court rejected defendant's contention that it should have charged third-degree assault as lesser included offense of first-degree assault because evidence of intoxication would allow jury to find defendant acted recklessly but not intentionally; evidence supported finding that defendant either intentionally bit victim's nose or by reason of intoxication was unable to form specific intent to do so, evidence did no support finding that defendant recklessly caused injury).

In sum, defendant has failed to show that he was denied the effective assistance of counsel. See People v. Henry, 95 N.Y.2d 563, 565 (2000); People v. Benevento, 91 N.Y.2d 708, 712 (1998); Strickland v. Washington, 466 U.S. 668, 687, 690 (1984). Accordingly, defendant's claims of ineffective assistance should be denied and his conviction should be affirmed.

CONCLUSION

FOR THE AFOREMENTIONED REASONS, AND FOR THE
REASONS STATED IN RESPONDENT'S MAIN BRIEF,
DEFENDANT'S JUDGMENT OF CONVICTION SHOULD BE
AFFIRMED.

Dated:  Brooklyn, New York
        May 3, 2011

                          Respectfully submitted,

                          CHARLES J. HYNES
                          District Attorney
                          Kings County

LEONARD JOBLOVE
RHEA A. GROB
Assistant District Attorneys
        of Counsel

Certificate of Compliance
Pursuant to 22 NYCRR § 670.10.3(f)

This brief was prepared on a computer.  A monospaced typeface was used, as follows:

    Name of typeface:  Courier New
    Point size:  12
    Line spacing:  Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 3,023.

Rhea A. Grob
Assistant District Attorney

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT F**

Defendant's Leave Application to the New
York Court of Appeals

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085    FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
BARRY S. STENDIG

SUPERVISING ATTORNEYS
WINSTON MCINTOSH
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI

SENIOR ATTORNEY
WILLIAM G. KASTIN
STUDENT INTERN COORDINATOR

STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
JONATHAN GARVIN
JOHN GEMMILL
ALLEGRA GLASHAUSSER
LEILA HULL
KENDRA L. HUTCHINSON
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
DAVID G. LOWRY
JESSICA M. MCNAMARA
ANNA PERVUKHIN
DENICE POWELL
KATHLEEN E. WHOOLEY

OF COUNSEL
ANDREW E. ABRAHAM
ALEXIS A. ASCHER
JANET CLAIRE LÊ
ELLEN FRIED
MELISSA S. HORLICK
WILLIAM A. LOEB
REYNA E. MARDER
SONJA MIKOLIC

12   JUN -1  A11 :52

May 30, 2012

Honorable Jonathan Lippman
Chief Judge
Court of Appeals
Court of Appeals Hall
Eagle Street
Albany, New York  12207
Attn:  Andrew W. Klein, Esq.

Re: People v. General Waiters

Your Honor:

Pursuant to Criminal Procedure Law, Section 460.20, I am submitting this letter as an application for permission to appeal to the Court of Appeals in the above-entitled case.  An application has not been made to a justice of the Appellate Division.

On May 8, 2012, the Appellate Division, Second Department, affirmed with opinion a judgment rendered on June 2, 2008, by the Supreme Court, Kings County, convicting appellant of murder and attempted murder in the second degree and assault in the first degree.  Appellant had no co-defendants.

I am enclosing copies of the briefs filed in the Appellate Division and that Court's order. Appellant seeks leave to appeal on every ground raised in the main and pro se briefs filed in the Appellate Division, including all federal and state constitutional claims he raised. I do not expect to send a follow-up letter in support of the application.

Respectfully,

Jonathan M. Kratter, Esq., Ext. 245

cc: Rhea A. Grob, Esq., Appeals Bureau, Kings County District Attorney

2

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)


# EXHIBIT


Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT G**

Respondent's Opposition to Defendant's Leave
Application to the New York Court of Appeals

**OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY**

RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
(718) 250-2000

CHARLES J. HYNES
*District Attorney*

RHEA A. GROB
*Assistant District Attorney*

July 3, 2012

Honorable Carmen Beauchamp Ciparick
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York  12207-1095

                    Re:  People v. General Waiters
                         Kings County Ind. No. 3464/06

Dear Judge Ciparick:

The People oppose defendant's request for leave to appeal to the Court of Appeals.

On May 8, 2012, the Appellate Division, Second Department, unanimously affirmed the judgment of the Supreme Court, Kings County, convicting defendant, after a jury trial, of second-degree murder, attempted second-degree murder, and first-degree assault (two counts), and modified the sentence by ordering that the convictions for attempted second-degree murder and one count of first-degree assault run concurrently with each other and concurrently with the second-degree murder and additional first-degree assault count.  People v. General Waiters, Slip op. No. 2008-05247 (2d Dep't 2012).

The Appellate Division found that the verdict of guilt as to each count was not against the weight of the evidence.  Slip op. at 2.  In addition to finding that defendant failed to preserve his claims regarding the prosecutor's summation, the Appellate Division held that the alleged improper remarks did not deprive defendant of a fair trial.  Slip op. at 2.

The Appellate Division also held that defendant's ineffective assistance of counsel claim could not be resolved on

Hon. Carmen Beauchamp Ciparick
July 3, 2012
Page 2


appeal as the claim is based, in part, on matters not appearing on the face of the record.  Slip op. at 2.

Accordingly, for the reasons set forth in the Appellate Division's decision and in respondent's briefs to that court, the decision affirming defendant's conviction was correct, relied upon established legal precedent, and offers no novel issue for review.  Thus, defendant's leave application should be denied.


Sincerely,

Rhea A. Grob
Assistant District Attorney
(718) 250-2480


cc:   Jonathan M. Kratter, Esq.
      Appellate Advocates
      2 Rector Street, 10th Floor
      New York, New York  10006

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)


# EXHIBIT


Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT H**

Defendant's State Court Motion to Vacate his
Judgment of Conviction

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

**NOTICE OF MOTION TO**
**VACATE JUDGMENT**
**CPL §440.10(1)(h)**

          -against-

GENERAL WAITERS,

Ind. No 3464/06

                           Defendant.
------------------------------------------------------------------x

SIRS:

      PLEASE TAKE NOTICE, that upon the annexed affidavit of General Waiters,

sworn to on the 5th day of October, 2010, exhibits, and all proceedings had herein, a

motion will be made at a term of the Supreme Court, Kings County, at the Courthouse

located at Kings County Court Building, 320 Jay Street, Brooklyn, NY 11201, at 10

o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an

order pursuant to New York State's Criminal Procedure Law ("CPL"), §440.10(1)(h),

vacating the June 2, 2008, judgment of conviction on the grounds that such conviction

was obtained in violation of the defendant's rights under State and Federal Constitutions,

or ordering an evidentiary hearing pursuant to CPL §440.30(5) to further develop the

facts to determine whether the conviction was obtained in violation of the defendant's

rights under State and Federal Constitutions, and for such other and further relief as to the

Court may deem just, proper and equitable.

Dated:        October 5, 2010

                                                  Respectfully submitted,

                                                  *General Waiters*
                                                  General Waiters 08A3571
                                                  Defendant, Pro se
                                                  Green Haven Corr. Fac.
                                                  P.O. Box 4000
                                                  Stormville, New York 12582

TO:    Charles J. Hynes
       District Attorney Kings County
       Renaissance Plaza
       350 Jay Street
       Brooklyn, NY 11201

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,
$\qquad$ Respondent,


-against-                                    **AFFIDAVIT**

Ind. No. 3464/06


GENERAL WAITERS,
$\qquad$ Defendant.
-------------------------------------------------------------------x

State of New York    )

County of Dutchess )ss.:


I, General Waiters, being duly sworn deposes and says:

1.      I am the above-named defendant and I submit this affidavit in support of

a motion to vacate the judgment of conviction pursuant to Criminal Procedure Law

("CPL") §440.10(1)(h), upon contentions that I was deprived of my State and Federal

Constitutional right to effective assistance of counsel.  Specifically, I was deprived of

my rights to effective assistance of counsel because trial counsel failed to (1) call an

expert witness to explain and interpret medical records that would have established

how intoxicated defendant was, and (2) counsel requested an inappropriate lesser

offense that forced the jury to convict on the top count of intentional murder in the

1

second degree, and he failed to request lesser offenses for the remaining intentional counts.

## PROCEDURAL AND FACTUAL HISTORY OF THE CASE

2. It was alleged by the People that on May 7, 2006, at approximately 11:00 a.m., in the County of Kings, defendant, while shooting at Lorenzo Warren, shot and killed Tajmere Clark, and shot and wounded Lorenzo Warren, Mary Lee Clark, and Shatashia Lewis.

3. On May 11, 2006, defendant was indicted by a Kings County Grand Jury of one count of Murder in the Second Degree (P.L. §125.25(1)); Attempted Murder in the second degree (P.L. §§110.00/125.25(1)); three counts of Assault in the first degree (120.10(1)); Criminal Possession of a Weapon in the first and second degree 265.03(2), 265.01(1). The Indictment is attached hereto and made a part hereof at Exhibit A.

3. On June 2, 2008, following a jury trial, defendant was convicted of one count of Murder in the second degree (P.L. §125.25(1)) with respect to victim Tajmere Clark and received 25 years to life; one count of Attempted Murder in the second degree (P.L. §§110/125.25(1)) with respect to victim Lorenzo Warren and received a determinate 10 years; and two counts of Assault in the First degree (P.L. §§120.10(1))

with respect to victims Mary Lee Clark and Shatashia Lewis and received a determinate sentence of 25 years on one assault and 5 years on the other.

4.      The court ordered all sentences to run consecutive. Defendant received an aggregate prison term of 65 years to life.

5.      Timely notice of appeal was filed. The Appellate Division, Second Department, granted defendant poor person status and assigned counsel on appeal.

6.      On April 10, 2010, appellate counsel filed the direct brief. Counsel raised three issues: 1) the verdict was against the weight of the evidence; 2) prosecutorial misconduct; and 3) the sentence was illegal.

7.      The direct appeal is still pending.

8.      The facts relevant to the issue herein are discussed below. For a more detailed treatment of the facts of this case and summary of the trial testimony, see the Statement of Facts contained within defendant's direct appeal brief attached hereto and made a part hereof as Exhibit B.

9.      The defendant, General Lee Waiters, had a problem with alcohol. He and his girlfriend Jacqueline drank every day, finishing a fifth bottle of rum in a day or two.

3

Waiters became verbally abusive when he drank.  They drank with Jacqueline's aunt, Mary Lee Clark, every other weekend (Tr. 286, 390, 436-437)[1].

10.     On May 6, 2006, Jacqueline held a birthday party for Mr. Waiters.  Mr. Waiter's began drinking Bacardi Light rum mixed with soda before 2 p.m., and Jacqueline and the others joined in later.  Mr. Waiters did not stop drinking until well after 11 p.m. (Tr. 434, 438).  The next morning before 11 a.m. Jacqueline, Mary Lee Clark, and General Waiters began drinking rum again.  Approximately a half hour into their "drinking session" Jacqueline tried to prevent Mr. Waiters from consuming any more alcohol by taking the bottle from him as she felt he was drinking too much (Tr: 398-399, 443, 445).  Mr. Waiters responded "fuck you bitch," and she told him "fuck you" back (Tr: 399-400).  This argument escalated into the tragic events that were previously mentioned.

10.     Before resting, defense counsel sought to introduce some medical records to support his intoxication defense (Tr: 531).[2]  The court was inclined to let the medical records in that were relevant to Waiters' intoxication only if a medical expert was called to explain the meanings of the records to the jury (Tr: 543-544, 547, 549-550, 557).

---

[1] Parenthetical references are to trial transcripts.

[2] The medical records that defense counsel sought to introduce are attached hereto in full at Exhibit C.  Each page is consecutively numbered and references to a specific page of the medical records will be delineated as Ex C, followed by the page number.

11.    The court, prosecutor and defense counsel were confused as to the meanings of the medical terminology in the records (Tr: 535, 543).  For example, the judge speculated that "C.N.S." could mean certified nurse (Tr: 551).[3]

12.    In any event, the prosecutor expressed a willingness to wait for an expert to be called because they were not under any "time crunch" (Tr: 548).  However, defense counsel stated that he did not intend to call any more witnesses and was willing to let the court rule on whether to admit the medical records (Tr:552).  According to the record, defense counsel felt the trial testimony that Mr. Waiters was intoxicated was sufficient to allow the records in (Tr: 535).

13.    The prosecutor argued, and the court agreed, that the issue was not intoxication, but the level of intoxication, which could negate the intent element of the crime. (Tr: 546-547).  As a result of defense counsel's refusal to call a medical expert as a witness, the court only allowed into evidence two documents which simply stated that Mr. Waiters was intoxicated (Tr: 552).[4]

14.    There are 53 pages of medical records.  There may be more evidence within those records that demonstrate exactly how intoxicated defendant was; however, without the benefit of an expert it is unclear what the medical terminology means.

---

[3] "CNS" is an abbreviation for central nervous system.  See Stedman's Medical Dictionary, 28th Ed.
[4] The entire colloquy with respect to defense counsel attempting to introduce the medical records and neglecting to call an expert witness is attached hereto as Exhibit D.

15.    In any event, the documents that showed Mr. Waiters ethyl/alcohol level to be 386.24 mg/dL and the fact that he suffered delirium tremens were never introduced or brought to the attention of the jury.  See Exhibit C, pages 2, 38.

Defense Summation

15.    In summation, defense counsel argued that Mr. Waiters was intoxicated without giving any direct evidence that would clarify how that intoxication could negate intent.    Furthermore, he argued that Mr. Waiters acted recklessly rather than intentionally.

Prosecutors Summation

16.    In summation, the prosecutor highlighted the fact that although Mr. Waiters was intoxicated, the defense counsel failed to offer evidence that would show the level of that intoxication.  He even alluded to the two medical records, which simply stated that Mr. Waiters was intoxicated, as not being sufficient since they failed to explain the all important issue of "how" intoxicated Mr. Waiters was (Tr: 640-641).

Jury Charge

17.    Despite arguing that defendant was too intoxicated to form the intent to be found guilty, Defense counsel only requested for a lesser charge of manslaughter in the

first degree, which also has an "intent" element.   Defense counsel never requested a lesser charge of manslaughter in the second degree which would have supported his theory that the defendant acted recklessly, due to him being intoxicated, and not intentionally.   Furthermore, defense counsel did not request lesser offenses relative to all the other intent crimes for which defendant was charged.

## ALLEGATIONS OF FACT[5]

18.    The name and address of the attorney who represented defendant at trial is Calvin J. Simons, 616 Eastern Parkway, Brooklyn, New York 11225, Tel # 718-467-1526.

19.    It is alleged that defense counsel, Calvin J. Simons, without any reasonable or legitimate trial strategy, failed to call an expert witness to testify and interpret medical records relative to how intoxicated defendant was.   Defendant respectfully submits that had Mr. Simons called an expert witness, or requested an adjournment to obtain one, the court would have honored his request.

20. Furthermore, Mr. Simons compounded the error by requesting Manslaughter in the first degree as a lesser-included offense to Murder in the second

---

[5]  In or around July 2010, while incarcerated at the Green Haven Correctional Facility, defendant was scheduled to attend the inmate law library.   While in the law library defendant was scheduled to be interviewed by an "intake" inmate law clerk. Thereafter, in August , 2010, defendant was authorized by the Green Haven Correctional Facility to be assisted, pursuant to Bounds v. Smith, 97 S.Ct 1491 (1977), and Directive 4483, by an inmate law clerk in the preparation and filing of legal papers relative to my criminal case.   The instant motion is drafted with the assistance of said inmate law clerk.

degree under the intentional theory, and not requesting any lesser offenses for the other intent crimes.  Mr. Simons did not request any other lesser offenses to the attempted murder and assault charges.

21.    With respect to the second-degree murder charge, it has been long standing in the Second Department that manslaughter in the second degree is the appropriate lesser offense to support a defense that defendant was intoxicated.  See People v. Vazquez, 104 A.D.2d 429, 478 N.Y.S.2d 947 (2 Dept. 1984); People v. Collins, 86 A.D.2d 616, 446 N.Y.S.2d 93 (2 Dept 1982).  Thus, under the facts of the case at bar, had Mr. Simons' requested Manslaughter in the Second degree, there is a reasonable probability that the court would have granted the request and, if not, the court would have committed reversible error.

22.    On August 2, 2010, defendant wrote Mr. Simons a letter requesting a particular trial strategy for failing to call an expert and requesting manslaughter in the first degree as a lesser offense to intentional murder in the second degree.  See Exhibit E.  Mr. Simons' did not respond to defendant's letter.

23.    In any event, defendant wrote assigned appellate counsel a letter and inquired whether he would raise defense counsel's ineffectiveness on direct appeal. See Exhibit F.  On August 9, 2010, appellate counsel responded and informed defendant that the issue of ineffective assistance of defense counsel was based on information not contained in the appellate record.  See Exhibit G.  Therefore, it is

submitted that the issue raised herein is based upon information not contained in the record and is properly raised in a motion to vacate judgment of conviction pursuant to CPL §440.10(1)(h).

24.   Had Mr. Simons called an expert toxicologist to explain and interpret the medical records, he would have been able to demonstrate before the jury how intoxicated defendant was, as opposed to merely establishing that defendant was intoxicated, and would have been able to get before the jury a expert opinion on how an excessive level of intoxication affects a person's ability to form an intent.

25.   Furthermore, Mr. Simons could have forcefully argued in summations that defendant was not able to form the requisite intent to have committed any of the intentional crime in the indictment.

26.   Moreover, defense counsel could have requested second-degree manslaughter (a non-intent crime) as a lesser-included offense; thus, greatly reducing defendant's sentencing exposure from 65 years to life to, at most, a determinate 36-year sentence.[6]

24.   As more fully articulated in the accompanying memorandum of law, the defendant was deprived of his state and federal Constitutional rights to effective assistance of counsel.

---

[6] One of defendant's issues on direct appeal is that this court erred in running the sentences consecutive. Defendant maintains here that the sentences should have been run concurrent. In that event, defendant's maximum sentencing exposure would be a determine 15 years.

25.    The Court should order an evidentiary hearing in accordance with CPL §440.30(5), to determine whether defense counsel's omissions were, in fact, errors or the result of "reasonable" trial strategy.  The trial record is insufficient to make such determination on its own.

26.    No other request for the same or similar relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Court should vacate the June 2, 2006,   judgment of conviction or, in the alternative, order an evidentiary hearing to determine the truth to the allegations.

Dated: October 5, 2010

*General Waiters*

General Waiters 08A3571
Defendant, Pro se
Green Haven Corr. Fac.
P.O. Box 4000
Stormville, New York 12582

Sworn to before me on

this 5th day of  October, 2010

*Ellen A. Bohlmann*
Notary Public

ELLEN A. BOHLMANN
Notary Public, State of New York
No. 0342485
Qualified in Dutchess County
Term Expires Oct. 31, 20 13

SUPREME COURT OF THE STATE OF NEW YORK
KINGS COUNTY
-----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                        Respondent,

    -against-

GENERAL WAITERS,

                                      Ind #: 3464/2006

                    Defendant-Appellant.
-----------------------------------------------------------------X

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO VACATE JUDGMENT
OF CONVICTION PURSUANT TO CPL §440.10**

                                  General Waiters 08A3571
                                  Pro-se
                                  Green Haven CF
                                  Post Office Box 4000
                                  Stormville, NY 12582

October 5, 2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINKGS
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                                Respondent,

   -against-

GENERAL WAITERS,

                         Defendant-Appellant.
-------------------------------------------------------------------X

                                MEMORANDUM OF

                                LAW

                                Ind #: 3464/06

## STATEMENT OF FACTS

     Defendant relies on the facts and allegation contained in the attached affidavit of General Waiters, and the facts as set forth in the statement of facts within defendant's direct appeal brief at Exhibit B.

## ARGUMENT

THE DEFENDANT WAS DEPRIVED OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL (1) FAILED TO CALL AN EXPERT WITNESS TO EXPLAIN AND INTERPRET MEDICAL RECORDS THAT WOULD HAVE ESTABLISHED HOW INTOXICATED DEFENDANT WAS, AND (2) COUNSEL REQUESTED AN INAPPROPRIATE LESSER-INCLUDED OFFENSE THAT FORCED THE JURY TO CONVICT ON THE TOP COUNT.. *U.S. Const. 6th. Amdt.; N.Y. Const. art. I, sec. 6.*

Defense counsel was ineffective for several reasons. First, counsel, with absolutely no legitimate and apparent trial strategy, neglected to call an expert witness to interpret and explain various medical records that would have established how intoxicated defendant was. Second, defense counsel, although arguing that defendant was too intoxicated to form intent, requested the court submit manslaughter in the first degree, an intent crime, to the jury as a lesser-included offense to second-degree intentional murder. He failed to request manslaughter in the 2nd degree and other "non-intent" crimes.

A criminal defendant is entitled to effect assistance of counsel. People v. Benevento, 91 N.Y.2d 708, 713-14, 674 NYS.2d 629; see also Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). The standard for a claim of ineffective assistance is whether counsel's performance viewed in totality amounts to meaningful representation. People v. Baldi, 59 NY.2d 137, 444 NYS.2d 893 (1981).

However, as long as the evidence, the law, and the circumstances of the particular case, viewed in totality and as of the time of the representation, reveal that counsel provided meaningful representation, a defendant's constitutional right to effective assistance of counsel will have been met.  Id.

A single error by counsel can constitute ineffective assistance if the error was of such magnitude that there exists a reasonable likelihood that the outcome of the trial would have been different.  People v. Georgiou, 38 A.D.3d 155, 828 NYS.2d 541 (2 Dept 2007).   The defendant must demonstrate "the absence of strategic or other legitimate explanations" for counsel's actions.  People v. Rivera, 71 NY.2d 705, 709, 530 NYS.2d 52 (1988).

Here, Mr. Waiters' defense was that he was too intoxicated to form intent. There was evidence in the form of testimony that Mr. Waiters drank on both the day before and the morning of the incident (Tr. 434, 438, 443-445, 398-399).  Defense counsel argued that in opening and closing statements that defendant was intoxicated.  Thus, his defense was undeniably structured around the defendant's intoxication. Indeed, the fact that the judge gave an intoxication charge demonstrates that intoxication was not the issue.  Rather, the issue was whether the defendant was so intoxicated that he could not form the requisite intent to commit the crimes charged.

Before resting, defense counsel sought to introduce several medical records that would support his intoxication argument.  See Exhibit C.  This led to a lengthy, rather

interesting proceeding on whether the judge should admit these documents into evidence. A couple of the documents unambiguously mentioned the fact that defendant was intoxicated. However, a few of the other documents gave clarity to the level of defendant's intoxication. Due to the ambiguity of the medical terminology and the structuring of the documents, it was unanimously agreed by the judge and the prosecutor that an expert was required to clear up any confusion that these documents would have caused the jury.

Throughout the proceedings, the judge expressed her opinion that an expert should be called to explain these documents. The prosecutor agreed with this reasoning. The judge even implied that she would let the records in if someone were called to explain them. Amazingly, the prosecutor even stated that "it can still be done" because "we aren't under any time constraints." However, defense counsel was adamant in his refusal to call any witnesses and expressed his willingness for the judge to make her ruling on the admittance of the documents bearing in mind that no expert would be called to explain them.

As a result, the judge properly excluded the essential documents that would have needed expert explanation while admitting the unambiguous documents that simply stated the obvious: that Mr. Waiters was intoxicated. Defense counsel's insouciance left the jury to engage in mental acrobatics trying to figure out exactly "how" intoxicated Mr. Waiters was.

It has been held that "establishing that a defendant was intoxicated when he committed a crime in question is not, in and of itself, helpful; the evidence must also lead the fact finder to an inference that intoxication deprived the defendant of the ability to form intent." Combs v. Coyle, 205 F3d 269, 288 (6th Circuit 2000). In this case, such evidence was available but defense counsel never introduced it.

Defense counsel did not have a legitimate reason for failing to call an expert witness. Although it is true that counsel has discretion over what witness to call, a failure to call an expert witness in this case was a deathblow. Had an expert been called he would have explained that Mr. Waiters had an ethyl/alcohol level of 384.26 mg/dl.[7] He would have further interpreted the ethyl/alcohol levels and how that level could have affect Mr. Waiters.

From a general research, an ethyl/alcohol level of 384.26 mg/dl is almost four times above the legal definition of alcoholic intoxication. See Steadman Medical Dictionary An expert would have explained that once a person reaches this level of three times the level of alcoholic intoxication they are subject to blackouts, which would negate the ability to act conscientiously.

---

[7] For medical and forensic purposes, the level of ethanol in the blood is measured as the weight of ethanol per volume of blood and expressed as a percentage. Thus, an ethanol concentration of 100 mg/dL (21.7 mmol/L) corresponds to 0.1% (a level widely used in legal definitions of alcoholic intoxication). Stedman's Medical Dictionary, 28th Ed., p. 674 Measurable cognitive impairment occurs at a blood alcohol level of about 0.05%, gait disturbances at 0.10%, slurred speech at 0.15%. A level of 0.3-0.4% leads to unconsciousness, and respiratory arrest occurs around 0.5%. Id

In <u>Miller v. Terhune</u>, the Eastern District in California recently ruled on a case similar to the case at bar. This case lends helpful guidance in demonstrating the importance of an expert. The petitioner in that case brought an ineffective assistance of counsel claim based on defense counsel's failure to present evidence of voluntary intoxication. At an evidentiary hearing, an expert was called, and it was established that the petitioner had a blood alcohol (BAC) level of .30%. The expert testified, "that petitioner's BAC of .30% at 2:25 a.m. indicated a likely BAC between .33% and .34% at the time of the shooting. This qualified as 'extreme alcohol intoxication' at which coma and death can occur." <u>Miller v. Terhune</u>, 510 FSupp.2d 486, 490 (E.D. Cal. 2007).

In the instant case, Mr. Waiters BAC was .38% hours after the shooting. Obviously, it was even higher than that when the incident occurred. In addition, as evidenced in the medical records (see Exhibit "C" at pps. 48-50), defendant suffered from "delirium tremens". Certainly, an expert could have explained to the jury what exactly was "delirium tremens" and what occurs when a person suffers from it. Furthermore, the expert could have testified that once a person suffers from delirium tremens they have reached a poisonous level, which can be fatal if the appropriate detoxification is not administered.

Furthermore, in light of defense counsel's failure to call an expert as stated above, the <u>Miller</u> case is instructive. In <u>Miller</u>, <u>supra</u>, the expert testified that "there is

not always a correlation between the degree of physical impairment and the degree of mental impairment." Id at 490. Without the likes of this testimony, the prosecutor was able to grotesquely misconstrue alcohol's effects on a person's brain.

For example, the prosecutor improperly asserted "[defendant] was able to move around. There was nothing that was bothering him in terms of that... you didn't have somebody there who was falling down, rolling down, slobbering drunk." (T: 636). This speculative approach could have easily been circumvented by expert testimony. As the petitioner argued in Miller, "without education about the effects of alcohol on the brain, the jury was too willing to follow the prosecutor's lead in attributing to [the defendant] the cognitive processes of a sober person," (at supra 496).

Moreover, the court in Miller agreed and reasoned, "these inconsistencies are exactly why expert testimony would have been helpful." Id at 496. The court held "it is apparent that the trial counsel never investigated the effects of alcohol on petitioner's perception, cognition, or ability to form the requisite intent. Nor did counsel consult any expert who could have educated the jury as to the effects of alcohol. Instead, counsel acted on his own assumptions about intoxication evidence. Accordingly, his choice of strategy was not based on any investigation and was unreasonable under Strickland." Id at 501.

Thus, the same decision should follow in the case at bar. In Miller, the defense counsel elected to abandon the intoxication defense in favor of self-defense, so at least

7

he had a reason, albeit a very weak one, for not producing an expert. Whereas here, the defense counsel pursued an intoxication defense while concomitantly neglecting to call an expert to allow the jury the opportunity to hear direct evidence that would have supported his argument. This distinction bolsters defendant's ineffective assistance of counsel claim since it illustrates that the defense counsel's failure to investigate and then call an expert witness could not have conceivably been part of a legitimate trial strategy.

The defense counsel's insoluble behavior demonstrates that he failed to investigate the meaning of the medical terms in the documents he sought to introduce. Such negligence places him below the standard of "meaningful representation" as established in People v. Baldi, 54 NY.2d 137, 444 NYS.2d 893 (1981).

It has also been held, where an expert witness's opinion is "crucial to the defense theory[,] defense counsel's failure to have questioned [the expert]... prior to trial is inexcusable" Combs v. Coyle, 205 F.3d 269, 288 (6th Cir.2000).

The defense counsel's fatal error was exploited in the prosecutor's summation when he tauntingly reminded the jury that they were never told exactly "how" intoxicated Mr. Waiters was at the time of the shooting. He then urged them to rely on their experiences of alcoholic intoxication to determine whether Mr. Waiters was too intoxicated to commit these crimes intentionally.

Compounding defense counsel's incompetence was his request of an inappropriate lesser included. A lesser-included offense must be charged, "if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater." See CPL 300.50(1); People v. Scarborough, 49 N.Y.2d 364, 426 N.Y.S.2d 224 (1980); People v. Brockett, 74 A.D.3d 1218, 904 N.Y.S. 2d 172 (AD 2 Dept. 2010). The evidence at trial demonstrated that defendant was intoxicated and, thus was not able to form the requisite intent to have committed an intentional homicide. In his summation, he vehemently argued that Mr. Waiters was too intoxicated to form intent. However, defense counsel requested manslaughter in the first degree as a lesser-included offense to murder in the second degree under the intoxication theory.

Manslaughter in the first degree possesses an intent element. See Penal Law §125.20. Manslaughter in the second degree reads: A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person. Thus, if defense counsel forcefully argued to the jury that defendant recklessly caused the death of Tajmere Clark, would it not have been proper to request manslaughter in the second degree as a lesser-included offense?

Moreover, if defense counsel had requested manslaughter in the second degree, by law of this department the court would have committed reversible error had it denied the request. In People v. Vasquez, the court ruled that the defendant was entitled to

9

manslaughter in the second degree as a lesser-included offense of an intentional crime. It was proved that Vasquez drunk two six-packs of beer shortly before the incident. That was enough for the Second Department to hold that there was a reasonable view of the evidence that Vasquez acted recklessly (and was guilty of the lesser-included offense of manslaughter in the second degree), and not intentionally. See People v. Vazquez, 104 A.D. 2d 429, 478 N.Y.S. 2d 947 (AD 2 Dept. 1984).

Manslaughter in the second degree is a reckless crime and the appropriate lesser-included offense to support the defense counsel's argument that his client was extremely intoxicated. Being that the "court must give the defendant the benefit of the most favorable view of the record," (People v. Collins, 86 A.D. 2d. 616, 446 N.Y.S. 2d. 93 (2 Dept. 1982), People v. Steele, 26 N.Y. 2d. 526, 311 N.Y.S. 2d. 889 (1970), it is reasonable to assume that the trial judge would have accepted the request of this lesser included offense in light of the overwhelming evidence of the defendant's intoxication. That reasonable assumption can be elevated to an appropriate conclusion if the defense counsel called an expert witness to explain Mr. Waiters' level of intoxication. As a result, the jury was left to deliberate on an intentional murder charge or alternatively an "intentional" manslaughter charge.

In sum, if defendant had adequate representation two very important things would have happened at his trial. One, the jury would have been properly educated on "intoxication" and the effects of it on a person cognitive abilities. Two, a lesser-

included offense of manslaughter in the second degree would have been requested. Because of the defense counsel's ineffective assistance, Mr. Waiters is incarcerated with a substantially longer sentence than he should have.   The disparity between the defendant's current 65-to-life sentence and the 15 (or even 36) years he could have received should accentuate his counsel's ineffectiveness.

In light of the aforementioned, the following conclusions can be drawn: a) There is no excusable strategy that can make sense of this perfidious representation, b) these errors of the defense counsel unequivocally changed the outcome of the trial.

## CONCLUSION

The conviction must be reversed, or alternatively, an evidentiary hearing should be granted to determine if the conviction should be reversed based upon counsel's ineffectiveness.

Dated: October 5, 2010

> General Waiters 08A3571
> Pro-se
> Green Haven CF
> Post Office Box 4000
> Stormville, NY 12582

INDICTMENT

S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K

C O U N T Y   O F   K I N G S

------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

X.     GENERAL WAITERS - AFO,VFO
           DEFENDANT

75A

INDICTMENT NO. 3464/2006
NON-ALIGNED
HOMICIDE

------------------------------------------

COUNTS

MURDER IN THE SECOND DEGREE
ATTEMPTED MURDER IN THE SECOND DEGREE -
ASSAULT IN THE FIRST DEGREE (3 COUNTS)
CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE
CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE

2006 MAY 11  PM 4:20

A TRUE BILL

FOREPERSON

CHARLES J. HYNES
DISTRICT ATTORNEY

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF MURDER IN THE SECOND DEGREE [PL 125.25(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS WITH INTENT TO CAUSE THE DEATH OF LORENZO WARREN, CAUSED THE DEATH OF TAJMERE CLARK BY SHOOTING HER WITH A DEADLY WEAPON, NAMELY: A REVOLVER, THEREBY INFLICTING VARIOUS WOUNDS AND INJURIES UPON TAJMERE CLARK, AND THEREAFTER AND ON OR ABOUT MAY 07, 2006, TAJMERE CLARK DIED OF THE WOUNDS AND INJURIES.

SECOND COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF ATTEMPTED MURDER IN THE SECOND DEGREE [PL 110/125.25(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS WITH INTENT TO CAUSE THE DEATH OF LORENZO WARREN, ATTEMPTED TO CAUSE THE DEATH OF LORENZO WARREN BY MEANS OF A DEADLY WEAPON, NAMELY: A REVOLVER.

THIRD COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF ASSAULT IN THE FIRST DEGREE [PL 120.10(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO LORENZO WARREN, CAUSED SUCH INJURY TO LORENZO WARREN BY MEANS OF A DEADLY WEAPON, NAMELY: A REVOLVER.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF ASSAULT IN THE FIRST DEGREE [PL 120.10(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO LORENZO WARREN, CAUSED SUCH INJURY TO MARY LEE CLARK BY MEANS OF A DEADLY WEAPON, NAMELY: A REVOLVER.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.


FIFTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF ASSAULT IN THE FIRST DEGREE [PL 120.10(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO LORENZO WARREN, CAUSED SUCH INJURY TO SHATASHIA LEWIS BY MEANS OF A DEADLY WEAPON, NAMELY: A REVOLVER.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.


SIXTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE [PL 265.03(2)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS KNOWINGLY AND UNLAWFULLY POSSESSED A LOADED FIREARM, NAMELY: A REVOLVER, WITH INTENT TO USE THE SAME UNLAWFULLY AGAINST ANOTHER.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

SEVENTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE [PL 265.01(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MAY 7, 2006, IN THE COUNTY OF KINGS KNOWINGLY AND UNLAWFULLY POSSESSED A FIREARM, NAMELY: A REVOLVER.

CHARLES J. HYNES
DISTRICT ATTORNEY

B

*To be argued by*
JONATHAN M. KRATTER
*(10 Minutes)*

# New York Supreme Court

### APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* -

GENERAL WAITERS,

*Defendant-Appellant.*

**TO BE HEARD ON THE ORIGINAL RECORD**

Kings County
Ind. No.  3464/06
A.D. No. 08-05247

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
Attorney for Defendant-
Appellant
2 Rector Street, 10th Floor
New York, NY 10006
(212) 693-0085

JONATHAN M. KRATTER
*Of Counsel*
April, 2010

<u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 2

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 3

    Introduction . . . . . . . . . . . . . . . . . . . 3

    The Indictment . . . . . . . . . . . . . . . . . . 4

    People's Case . . . . . . . . . . . . . . . . . . . 5

        The Shooting and its Aftermath - Four Eyewitness
        Accounts . . . . . . . . . . . . . . . . . . . 5

        Injuries, Ballistics Evidence, and Appellant's
        Alleged Statement . . . . . . . . . . . . . . 12

    Defense Case . . . . . . . . . . . . . . . . . . . 15

    Defense Summation . . . . . . . . . . . . . . . . . 15

    Prosecutor's Summation . . . . . . . . . . . . . . 16

    Jury Charge and Verdict . . . . . . . . . . . . . . 19

    Sentencing . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT

<u>POINT I</u>

THE VERDICT WAS AGAINST THE WEIGHT OF THE
EVIDENCE WHERE, PROCEEDING UNDER A THEORY OF
TRANSFERRED INTENT, THE PEOPLE FAILED TO PROVE
THAT APPELLANT INTENDED TO SHOOT THE PERSON
SPECIFIED IN THE INDICTMENT RATHER THAN THE
THREE OTHER PEOPLE WERE SHOT IN ADDITION TO
THAT PERSON (U.S. CONST. AMEND. XIV; N.Y.
CONST. ART. I, §6; <u>JACKSON</u> V. <u>VIRGINIA</u>, 443
U.S. 307 [1979]). . . . . . . . . . . . . . . . . 21

i

POINT II

APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO
A FAIR TRIAL BY THE PROSECUTOR, WHO, <u>INTER
ALIA</u>, IN A CASE WHERE INTENT WAS THE KEY
ISSUE, REPEATEDLY MADE FACTUALLY MISLEADING
SUMMATION ARGUMENTS NOT SUPPORTED BY THE
EVIDENCE CONCERNING THE INTENT ELEMENTS OF THE
CRIMES, MISSTATED THE LAW APPLICABLE TO THOSE
ELEMENTS, AND VOUCHED FOR HIS CASE WITH REGARD
TO THOSE ELEMENTS.  U.S. CONST., AMENDS. V,
XIV; N.Y. CONST., ART. I, §6. . . . . . . . . . . 30

POINT III

APPELLANT WAS ILLEGALLY SENTENCED, IN
VIOLATION OF P.L. §70.25, WHEN THE COURT
IMPOSED CONSECUTIVE SENTENCES FOR EACH OF THE
FOUR COUNTS ALTHOUGH THE PEOPLE DID NOT MEET
THEIR BURDEN OF DEMONSTRATING THAT THE CRIMES
WERE COMMITTED THROUGH SEPARATE ACTS.  U.S.
CONST., AMEND. XIV; N.Y. CONST., ART. I, §6.  . . . 38

CONCLUSION  . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . 43

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     :

                Respondent,     :

                -against-     :

GENERAL WAITERS,     :

                Defendant-Appellant.     :

----------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.   The indictment number in the court below was 3464/06.

2.   The full names of the original parties were People of the State of New York against General Waiters.  There has been no change of parties on appeal.

3.   This action was commenced in Supreme Court, Kings County.

4.   This action was commenced by the filing of an indictment.

5.   This appeal is from a judgment convicting appellant, after a jury trial, of murder in the second degree, attempted murder in the second degree, and assault in the first degree.

6.   This is an appeal from a judgment of conviction rendered June 2, 2008.

7.   Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

1

<u>PRELIMINARY STATEMENT</u>

This is an appeal from a judgment rendered in the Supreme Court, Kings County, on November 13, 2007, convicting appellant, after a jury trial, of murder in the second degree [P.L. §125.25(1)], attempted murder in the second degree [P.L. §§110.00/125.25(1)], and assault in the first degree [P.L. §120.10(1) (2 counts)]. Appellant was sentenced to consecutive prison sentences of 25 years to life for murder, 10 years for attempted murder, and 25 years and 5 years for assault (Dowling, J., at hearing, trial and sentence).

Appellant filed a timely notice of appeal, and on August 20, 2008, this Court granted him leave to appeal as a poor person and assigned Lynn W. L. Fahey as appellate counsel.

Appellant had no co-defendants in the trial court.

Appellant is currently incarcerated pursuant to the judgment. No stay has been sought.

<u>QUESTIONS PRESENTED</u>

1. Whether the verdict was against the weight of the evidence where, proceeding under a theory of transferred intent, the people failed to prove that appellant intended to shoot the person specified in the indictment rather than the three other people were shot in addition to that person (U.S. Const. Amend. XIV; N.Y. Const. Art. I, §6; <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307 [1979]).

2

2.   Whether appellant was denied his due process right to a fair trial by the prosecutor, who, <u>inter alia</u>, in a case where intent was the key issue, repeatedly made factually misleading summation arguments not supported by the evidence concerning the intent elements of the crimes, misstated the law applicable to those elements, and vouched for his case with regard to those elements. U.S. Const., Amends. V, XIV; N.Y. Const., Art. I, §6.

2.   Whether appellant was illegally sentenced, in violation of P.L. §70.25, when the court imposed consecutive sentences for each of the four counts although the people did not meet their burden of demonstrating that the crimes were committed through separate acts.   U.S. Const., Amend. XIV; N.Y. Const., Art. I, §6.

<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

The indictment charged appellant with the attempted murder of his girlfriend's son and transferred intent murder and assault of three other victims on the theory that all the shots were fired at the son.   Appellant had lived with his girlfriend and her family for about six years, and the two drank heavily every day. Appellant was an angry, but not violent, drunk, and she had never seen a gun in his possession.   But the girlfriend and three members of her family testified that in a May 2006 argument between the two in which her aunt and her mid-twenties son participated, appellant fired no more than five shots.   Shot three times, the aunt remains in a coma, and her young granddaughter was killed by shots to her

3

head and chest.  The girlfriend's son and teenaged daughter received leg wounds.

The prosecutor admitted in summation that it was impossible to know exactly where the victims were when the shots were fired, there were more bullet holes than shots, and there was no way to reconstruct exactly what happened.  He also repeatedly argued that, if appellant intended to kill anyone when he fired the gun, the jury should convict him regardless of specifically whom he wanted to kill, adding that a gun was a "killing machine that had only one purpose." The court instructed the jury on the transferred intent theory charged in the indictment, and the jury convicted of attempted murder of the son, transferred intent murder of the aunt's granddaughter, and transferred intent assault of the aunt and the girlfriend's daughter.

The court imposed consecutive sentences for each of the four crimes of which appellant was convicted.

The Indictment

Appellant was charged, inter alia, with the murder of Tajmere Clark by shooting her with the intent to kill Lorenzo Warren, the attempted murder of Lorenzo Warren, and the first-degree assaults of Mary Lee Clark and Shatashia Lewis by shooting them with the intent to cause serious physical injury to Lorenzo Warren (see indictment in court file).

4

<u>People's Case</u>

    <u>The Shooting and its Aftermath - Four Eyewitness Accounts</u>

    <u>Jacqueline Warren</u> and appellant became romantically involved in 1999, and he came to live with her, at 340 Williams Avenue in Brooklyn, the following year.  By 2006, her son <u>Lorenzo</u>, 25 years old at trial, and her teenage son and daughter, <u>Derrick Warren</u> and <u>Shatashia Lewis</u>, also lived in the apartment.[1]  Following a 2002 accident in which appellant was hit on the head at work, he received Worker's Compensation and disability payments.  Lorenzo generally had no problems with appellant, but did not interact with him very much.  They had three or four verbal arguments in the 10 or more months before the incident (Lorenzo: 156-159, 197-201, 204-205; Lewis: 296-298, 316-317; Jacqueline: 380-386, 425-431; Derrick: 469-471).[2]

    Jacqueline and appellant drank every day, finishing a fifth bottle of rum in a day or two.  Appellant became verbally abusive when he drank.  They drank with Jacqueline's aunt, Mary Lee Clark, every other weekend (Jacqueline: 386, 390, 436-437).  The only incident of physical abuse in Jacqueline's relationship with appellant occurred when he pushed her and she pushed him back.

---

    [1] For purposes of clarity, Jacqueline, Lorenzo, and Derrick are referred to by their first names in this brief.

    [2] Numbers in parentheses refer to pages of the trial testimony; numbers in parentheses preceded by "S" refer to the sentencing minutes.

Lorenzo had never seen appellant hit anyone in the family (Lorenzo: 206-207; Jacqueline: 431-433). Jacqueline had never seen appellant in possession of a gun, and while she did the cleaning her apartment, she had never seen a gun there (Jacqueline: 395).

On May 6, 2006, Jacqueline held a birthday party for appellant that was attended by Lewis, Clark and her five grandchildren under the age of 11 (including four-year-old Tajmere Clark), and other family members. Appellant, Jacqueline and Clark began drinking during the afternoon. Lorenzo, Derrick, Clark and her grandchildren stayed at the apartment that night (Lorenzo: 158-159; Lewis: 298-301, 318-322; Jacqueline: 386, 433-435, 438; Derrick: 472-477, 497-498).

The next morning, appellant, Jacqueline, and Clark resumed their drinking in the living room. When Jacqueline told appellant he was drinking "too much," he said loudly: "Fuck you bitch," and she responded in kind. Clark intervened, loudly telling appellant to calm down. The argument escalated as appellant put his hands on Jacqueline's face (Jacqueline: 396-401, 441-447).

Eventually, appellant went into their bedroom, returning after 15 to 20 minutes wearing a jacket. He began screaming at Jacqueline again, calling her names, while Clark, in a loud voice, told him to calm down and Jacqueline told him to leave the apartment (Jacqueline: 401-404, 445-447, 451-457). From the bedrooms, Lorenzo, Derrick, and Lewis all heard the argument,

6

including Clark's voice (Lorenzo: 162, 215-216; Lewis: 303-305, 328-333; Derrick: 500).

A diagram of Jacqueline's apartment (Sergeant Timothy Corleto: 58)[3] reveals that the living room is an elongated rectangle that is longer up and down than side to side.   The entrance to the apartment is in the upper right corner of the living room.   The left half of the lower end of the living room extends further down the page than the right half.   On the left side of this living room extension, in the lower left corner of the room, is an opening to the hall leading to the bedrooms and kitchen.   On the right side of this extension, opposite the opening to the hall, is a wall that contained the fire escape door.   Lorenzo said this area was by the window screen on the floor shown in Appellant's Exhibit F, a photograph (Lorenzo: 239-242).[4]

According to Jacqueline, as the argument continued, she was sitting on the left side of a round table in the lower right portion of the main part of the living room underneath the term "Living Room" on the diagram, Clark was sitting at the bottom of

_____

[3]This diagram, People's Exhibit 1, is being provided to the Court as Appellant's Exhibit A in this appeal.  While the witnesses frequently used a pointer to show where the participants were on the diagram, they did not make any marks on the diagram indicating those locations.

[4]This photograph is being provided to the Court as Appellant's Exhibit B in this appeal.  Also provided, as Appellant's Exhibit C in this appeal, is People's Exhibit 4, a photograph that shows the living room extension from a different angle.

the table near the horizontal wall on the diagram where the main portion of the living room ends, and appellant was standing between them.   Lorenzo went behind Clark near the wall, so that he was in the lower right corner of the main section of the living room. Lorenzo told appellant to "get out of [Jacqueline's] face" and said he was "tired of" hearing appellant talk disrespectfully to Jacqueline and Clark.   The two men yelled at each other, but neither tried to hit the other.   Clark touched Lorenzo's arm in an effort to calm him down (Jacqueline: 402-406, 410-411, 448-450, 453-459).

Jacqueline told appellant to leave, grabbed his arm, and pulled him towards the main door to the apartment.   Appellant cursed at her as they walked there.   Clark's granddaughter, three year old Tajmere Clark, ran to Clark, who was still sitting at the table.   Jacqueline was within arms-length of the door, and appellant was "right behind" her, when he pulled a gun from his jacket and fired at Lorenzo, walking towards Lorenzo as he did so. Jacqueline ran outside the apartment into the hallway, where she heard about four more shots, "[o]ne after the other" (Jacqueline: 411-415, 450-451, 456-462).

Lorenzo said he entered the living room after hearing Clark talking loudly and saw Jacqueline sitting in a chair to the left of the couch, appellant standing to her side, and Clark behind appellant.   Lorenzo testified that those three were not in the

8

lower right corner of the main portion of the living room, but were nearly half way up and to the left of the center of the room. Lorenzo said that he stayed in the lower left portion of the living room, near the closet and the hall to the bedrooms. Appellant was calling Jacqueline names in a loud voice, she told him to leave, and Clark told him to calm down (Lorenzo: 162-164, 166-168, 216-218).

Lorenzo recounted that from a distance of 10 feet, he argued with appellant and told him to step away from Jacqueline and not to "get in [her] face." Appellant told Lorenzo to stay out of the argument as it did not concern him, and the two moved towards each other arguing. Lorenzo concluded that appellant was intoxicated because his speech was "a little bit slurred." Lorenzo had seen appellant substantially more intoxicated about 10 times over the years (Lorenzo: 168-169, 207-208, 217-223).

Lorenzo asserted that Jacqueline and Clark got between the two men. Jacqueline told appellant to leave and pushed him towards the main door to the apartment, while Clark pushed Lorenzo in the opposite direction towards the hall and the bedrooms. Lorenzo said that Derrick entered from the bedroom hall, stood next to Lorenzo, and joined the argument, until Clark left Lorenzo and pushed Derrick back into the hall. As the argument continued, Lorenzo remained where he was and did not advance towards appellant (Lorenzo: 169-171, 222-232).

9

When Lorenzo saw appellant put his hand into his jacket pocket, Lorenzo said:  "You don't have a gun in your pocket." Appellant pulled out a gun and pointed it at Lorenzo, who responded: "You don't have any bullets in that gun." Lorenzo, who had no weapon and never threatened appellant, was still near the entrance to the hall at the bottom left corner of the living room, while appellant was near the center of the room, in front of the couch in back of which was the round table. Jacqueline was next to appellant, but moving back towards the entrance to the apartment (Lorenzo: 172-176, 192-193, 233-235, 243). When appellant pointed the gun and fired a shot, Lorenzo felt a sharp pain in his thigh; he looked down at his thigh and did not see the other shots being fired.  He heard about four shots, "one after another," without delay.  After the second shot, Lorenzo went near the fire escape door in the living room extension and examined his leg until he found a bullet hole in his pants.  By the time of the third shot he had entered the hall to the kitchen and bedrooms (Lorenzo: 176-178, 236-243).

Derrick testified that he left one of the bedrooms in the apartment after he heard Lorenzo join the loud argument.  Derrick stood behind Lorenzo not far from the lower left corner of the living room near the hall, and aside from telling appellant to "Get out," he did not participate in the argument.  Jacqueline and appellant were near the far end of the room, Jacqueline towards the

10

left side and appellant towards the right.  Clark, who was behind Derrick and Lorenzo and even closer to the hallway at the bottom left corner of the living room, never grabbed Derrick or tried to push him out of the room (Derrick: 480-482, 493, 501-502).

Derrick heard appellant say "I got something for you" to Lorenzo, who did not respond.  Appellant "act[ed] like he was walking out the [apartment] door," then turned and pulled a gun from his jacket pocket.  He fired once towards the ceiling, then aimed at Lorenzo, who was by the couch near the center of the living room 7 to 8 feet from appellant, and started shooting. Derrick stayed where he was and ducked while six shots were fired. Lorenzo, and then appellant, ran past Derrick into the hall to the bedrooms, as the shots were fired (Derrick: 483-486, 503-507).

Lewis said she left the same bedroom after Derrick and stopped near him at the bottom of the living room close to the bedroom hall.  She saw appellant, Jacqueline, and Lorenzo at the upper end of the room, with Lorenzo directly to the left of the other two and not far from them.  Clark was to the left of the round table behind the couch, which would put her in the lower right quadrant of the room.  By the time appellant said:  "You don't want me to pull out what I got in my jacket," and Lorenzo responded:  "You don't got nothing in your jacket," Lorenzo had advanced just to the left of appellant, with Jacqueline behind Lorenzo.  Clark, Derrick, and Lewis remained in the corner of the room near the bedroom hallway

11

(Lewis: 307-309, 339-348).  Lewis heard only one shot and saw "the fire" from appellant's gun.  Realizing that she had been shot in the left thigh and seeing Clark lying on the floor, Lewis went into a bedroom and called 911 (Lewis: 310-312, 348-350).

Derrick asserted that after the shooting stopped, appellant, who had gone into the hall to the bedrooms, came back out and, as he passed Derrick, pointed the gun at Derrick's face at point blank range and pulled the trigger.  The gun made a clicking noise but did not fire.  Realizing the gun had no bullets, Derrick tackled appellant, who was moving towards the main apartment door.  They ended up on the floor with Derrick on top (Derrick: 486-487, 507-511).  Then Lorenzo returned, took Derrick's place on top of appellant, and hit him repeatedly.  Lorenzo broke a fish tank filled with water over appellant's head, then continued hitting him as Derrick hit appellant with a vase.  Jacqueline returned from outside the apartment and wrested the gun from appellant's hand. Lorenzo remained on top of appellant until the police arrived (Lorenzo: 178-184, 248-258; Jacqueline: 416-418; Derrick: 488, 511).

### Injuries, Ballistics Evidence, and Appellant's Alleged Statement

Sergeant Corleto and Police Officer Jolene Anderson separated and handcuffed Lorenzo and appellant.  Lorenzo had what appeared to be a gunshot wound, while appellant was semi-conscious.  Both were

12

removed to a hospital, as was Lewis (Corleto: 57-60, 64-65; Anderson: 87-89; Lorenzo: 184, 188-189; Derrick: 492). Lorenzo's wound was cleaned but he received no stitches and was released after five hours. He said the injury still affected him at the time of the trial (Lorenzo: 191-192). Lewis's wound required surgery and several days in the hospital, but she was fine at trial (Lewis: 315).

Corleto and Anderson found Clark lying face down by the round table behind the couch, which would place her in the lower right part of the living room. Tajmere was underneath her (Corleto: 66; Anderson: 90, 93). Tajmere was struck by two bullets, one that entered the back of the right side of her head and was recovered from the left side of her head and another that entered through her left chest, grazed her heart, passed through her left lung, fractured two ribs in her back, and exited through her back (Michelle Slone, M.D.: 274-276, 279-280). These wounds "could" be fatal and were in this case as, together, they caused her death (279, 282-283).

Clark suffered gunshot wounds to her head, abdomen, and leg. One bullet entered her head near her left temple. There was no exit wound, and small multiple bullet fragments remained in her brain. Clark was in a coma at the time of the trial. The bullets that struck Clark's abdomen and leg exited her body without causing injury to a life sustaining organ or system (Slone: 284-286;

13

Jacqueline: 421-422; People's Exhibit 11: 5/30/06 CT scan of head/brain).

The .357 magnum revolver used by appellant contained five empty shell casings that remain when a bullet is fired; all had been discharged by that gun (Anderson: 83-86, 97-99; Lorenzo: 172; Detective Luis Fontanez: 365-373; Jacqueline: 412-413; Derrick: 487-488).  The six-cylinder weapon could hold as many as six rounds, but one of the cylinders contained no evidence of discharge while five had evidence "that sometimes indicates that this cylinder was recently discharged" (Detective George Boston: 106-107).

Boston found a bullet hole in the wall between the living room and a closet where the hall to the bedrooms leaves the living room extension.  He and Fontanez described this evidence (People's Exhibit 8) as part of the copper jacketing of a bullet, which is a coating on the lead part of the bullet that is designed to give the bullet strength and stability.  This jacketing, a deformed copper-jacketed bullet from the bedroom closest to the living room, and the bullet from Tajmere's head had all been fired from appellant's gun.  There were no other bullet fragments or bullet impact marks in the apartment (Boston: 110-123; 114-116, 134-137; Fontanez: 373-377).

Jacqueline claimed that sometime after the incident, appellant told her on the phone that he was aiming at her son because he was

14

coming between them.   While the prosecutor's leading question seemed to elicit that this exchange occurred about a year after the incident, Jacqueline later admitted that she could remember neither the month, nor even the year, of this conversation (420-421, 464-645).

Defense Case

Appellant's hospital records stated that he was brought to the hospital by EMS in an intoxicated state and that medical personnel could not assess him due to that condition (552-553, 556-557).

Defense Summation

Defense counsel stated that although three people in addition to Lorenzo were shot, all of the charges were based on the People's ability to prove that appellant intended to kill Lorenzo (555-557, 604).   Yet Derrick and Lewis testified that people were in different positions than described by Lorenzo at the time of the shooting (595-596, 598-599).   While appellant had lived with the family for years, he had had few prior conflicts with Lorenzo, which was also relevant to whether appellant intended to kill him (580-581).   Lorenzo clearly did not think that appellant intended to harm him physically, as he baited appellant by saying he did not believe that appellant had a gun or that the gun was loaded (591-592).   Counsel further pointed out that appellant drank regularly and often became verbally, although not physically, abusive when he

15

did so, and he was drunk at the time of the incident (578-579, 590, 604).   Thus, the evidence failed to prove appellant's specific intent, and if appellant acted only recklessly, the jury would have to acquit him of the specific intent crimes (604-607).

<u>Prosecutor's Summation</u>

At the start of his summation, the prosecutor argued that the gun used during the crime was a "tool" or "machine" that was created for only one purpose, which was "to cause a piece of metal to go of out of the barrel at supersonic speed and tear through flesh and bone and organs and to kill."   Thus, it had no other purpose than as "a killing machine," a phrase he returned to repeatedly (611-614, 626-627, 632-633).   He further claimed that "we all know that that is a killing machine, and . . . when you point a gun at another human being and pull the trigger . . . [y]ou intend to kill."   He asserted that the mechanics of firing the gun prevented non-intentional reckless or careless discharge of the weapon (626-628).

The prosecutor maintained that the jury did not "have to decide whether [appellant] intended to cause death or any sort of harm to" Tajmere, Clark, or Lewis because

> the judge is going to tell you[] it doesn't
> matter.   If when shooting that gun . . .
> [appellant] had in his head, had in his heart
> murder . . . the intent to kill anybody, and
> in this case particularly the intent to kill
> Lorenzo Warren[,] when he's firing that gun,
> he becomes responsible for the damage that was

>           caused by each and every bullet . . . [and
>           for] his human act of willing that killing
>           machine to work, as if he intended it himself
>           (616-617).

The prosecutor confirmed that Tajmere was in Clark's arms or lap when the shots were fired and added that it did not matter if appellant intended to kill Lorenzo, not Tajmere, or if the bullet passed through Lorenzo or Clark or a wall, because under the law appellant was responsible even if he intended to kill someone else (616-618).   He continued:   "that's the reason you don't have to decide whether he was shooting at" Tajmere or Clark or Lewis because:

>           whether he was or not, if he was shooting at
>           Lorenzo Warren and if he was intending to kill
>           Lorenzo Warren, he's responsible for all for
>           the injuries.
>
>                In other words, if [appellant] has it in
>           his head and . . . his heart to kill, then all
>           of the bloodshed, all of the pain . . . he
>           becomes responsible (618-619).

The prosecutor emphasized that appellant's intent could be gleaned from the results of his actions:  that he hit Lorenzo, "his target" (626-629).  Appellant's intent was further shown because he "kept firing over and over again . . . in the same line" (628). The prosecutor asserted that "any disagreement about where exactly people were standing" did not matter because "everybody who was able to see it," except Derrick, said that appellant pointed the gun at Lorenzo (626, 628).  He admitted that where the people "are exactly at the time that this [] happened, you can't know.  There's

no way to know; there's no way to reconstruct it.  I submit to you it doesn't matter.  It's not something really you have to decide" (616).  The prosecutor maintained that Derrick's testimony that appellant fired at the ceiling was "not true" because no bullet marks were found on the ceiling (626, 628).

Responding to defense counsel's argument about inconsistencies in the testimony of the witnesses, the prosecutor claimed that "it doesn't matter what the nature of the argument was" and that whether appellant "hated" Lorenzo was "totally immaterial" (619-624).  Nor did it matter whether there was previous "animosity" or "bad blood" between them (625).  He also maintained that testimony about whether Lorenzo taunted appellant before the shooting was irrelevant (643).

In concluding, the prosecutor told the jurors that their choice was "clear:" were they "going to make [appellant] responsible for his choices" and "apply the law" or would they not hold him responsible and not apply the law.  He added that he was "confident" that the jurors would "make [appellant], as the law requires, be responsible for his actions on that day and all the damage and misery and death that he caused" (644).  He predicted that the jurors were

> going to come back with your one unanimous
> voice and speak the verdict which is true,
> which is just, and does justice to the offense
> that happened. . . .  And you're going to do
> all that by speaking with your one unanimous
> voice and only one word:  Guilty (645).

18

Jury Charge and Verdict

The court charged the jury that while intoxication was not a defense to a criminal charge, it could consider whether defendant was so intoxicated that he was unable to form the intent necessary for the commission of the crimes (685).

The court submitted to the jury, _inter alia_, second-degree murder of Tajmere, and first-degree manslaughter as a lesser included offense, based on the transferred intent to kill Lorenzo; attempted second-degree murder of Lorenzo; and first-degree assault of Clark and Lewis based on the transferred intent to cause serious physical injury to Lorenzo (671-676, 678-681, 693). It instructed the jury that if it convicted of those four counts it should not consider any of the other counts, namely first-degree manslaughter, first-degree intentional assault of Lorenzo, and weapon possession (672-674, 676-678, 681-685, 689-691).

The jury convicted appellant of all four counts it reached pursuant to the court's instructions (700-703).

19

Sentencing

The prosecutor asked the court to impose "as much time as it can," meaning the maximum sentences running consecutively (S8-9). He made this request even though, in his summation, he had admitted that there was no "dispute . . . that there are more holes here in people and in walls than there are rounds from that gun" or that bullets "passed though people and into other people." Later he added that "whether that bullet passed through Lorenzo and hit [Lewis], or passed through somebody else and then hit her, and passed through her and ended up in the bedroom, because you saw the one bullet that was there in the bedroom . . . who knows?" (630-631).

The court imposed an indeterminate sentence of 25 years to life for murder and determinate sentences of 10 years for attempted murder, 25 years for first-degree assault of Clark, and 5 years for first-degree assault of Lewis. The court directed that all four sentences be served consecutively (S12-13).

C

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

Page 1    of 41

01

| Patient | Visit No./<br>DOB/Age | Visit Dt-Tm/<br>Location | Proc/Evt Time<br>Order/Pt MD  Spec No. Results |
|---|---|---|---|
| Waiters,General | 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | Activated Partial Thromb Result D/T: 05/07/06 by: Owate,Angelina, MT<br>7 May 06  1233  10927210 Anticoagulant: none (norm)<br>Zheng,Yinggang, MD  Diagnosis: Muscle Pain Myalgia (norm)<br>Remark: Spec #10927210: 7 May 06  1233 (norm)<br>aPTT (sec) : 24.4 (norm) |
| Waiters,General | 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | Amylase Level  Result D/T: 05/07/06 by: Young,Lee Jeanne, MT<br>7 May 06  1233  10927210 Amylase (U/L): 79 (norm)<br>Zheng,Yinggang, MD  Comment: K REPEATED,DR TSAI NOTIFIED AT<br>1417,XX4601 (norm)<br>Diagnosis: Muscle Pain Myalgia (norm)<br>Remark: Spec #10927210: 7 May 06  1233 (norm) |
| Waiters,General | 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | CO-Oximetry  Result D/T: 05/07/06 by: Woods,Fannie, MT<br>7 May 06  1233  10927210 BE  (mmol/L): -9.6 (norm)<br>Zheng,Yinggang, MD  COHb  (%): 2.3 (norm)<br>Comment: D. Zheng notified at window (critical<br>repeat )  (norm)<br>Corr pCO2 (mmHg): 37.4 (norm)<br>Corr pH: 7.257 (norm)<br>Corr pO2 (mmHg): 73.6 (norm)<br>FIO2: 21% (norm)<br>HCO3  (mmol/L): 16.5 (norm)<br>MetHb  (%): 0.6 (norm)<br>O2Hb  (%): 86.8 (norm)<br>PCO2  (mmHg): 37.4 (norm)<br>p50  (mmHg): 35.28 (norm)<br>pH: 7.257  (norm)<br>pO2  (mmHg): 73.6 (norm)<br>sO2  (%): 89.4 (norm)<br>tHb  (g/dL): 17.7 (norm)<br>tO2  (vol%): 21.5 (norm) |

Case 1:13-cv-03636-DLI   Document 6-4   Filed 09/18/13   Page 207 of 366 PageID #: 1428

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|

Waiters,General

2308102-1
05/06/1970
36Y

Adult
Emergency -
000

05/07/06 1227

7 May 06  1233  10927210
Zheng,Yinggang, MD

Comprehensive Metabolic   Result D/T: 05/07/06 by: Young,Lee Jeanne, MT
ALT     (U/L): 94 (abn)
AST     (U/L): 190 (abn)
Albumin (g/dL): 4.6 (norm)
Alk Phos (U/L): 85 (norm)
Anion Gap: 32 (abn)
BUN     (mg/dL): 9 (norm)
BUN/Creat Ratio: 7 (abn)
CO2     (mmol/L): 15 (abn)
Ca      (mg/dL): 9.5 (norm)
Cl      (mmol/L): 98 (abn)
Comment: K REPEATED,DR TSAI NOTIFIED AT
1417,X4601 (norm)
Creat   (mg/dL): 1.3 (abn)
D1: ALB,ALT,AST,CO2,TBIL,BUN,CA,GLU,CREA,TP,ALP
(norm)
Diagnosis: Muscle Pain Myalgia (norm)
Gluc    (mg/dL): 126 (abn)
K       (mmol/L): 2.9 (crit)
Na      (mmol/L): 145 (norm)
Pl: Na,K,Cl (norm)
Remark: Dept #CC6437: 7 May 06   1233 (norm)
T Prot  (g/dL): 7.9 (norm)
T. Bili (mg/dL): 1.1 (norm)

Waiters,General

2308102-1
05/06/1970
36Y

Adult
Emergency -
000

05/07/06 1227

7 May 06  1233  10927210
Zheng,Yinggang, MD

Ethyl Alcohol Level        Result D/T: 05/07/06 by: Small,Imelda, MLT
Diagnosis: Muscle Pain Myalgia (norm)
Ethyl Alcohol (mg/dL): 386.24 (crit)
Remark: Spec #10927210: 7 May 06   1233 (norm)

Waiters,General

2308102-1
05/06/1970
36Y

Adult

05/07/06 1227

Hemogram Auto Diff w/rfl    Result D/T: 05/07/06 by: Rashcovan,Alexander, MT
7 May 06  1233  10927210 Atyp Flag: + (norm)

02

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

Page  3   of  41

03

Patient

Waiters,General

| Visit No./ | Visit Dt-Tm/ | Proc/Evt Time | | |
| DOB/Age | Location | Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|
| 2308102-1 | 05/07/06 1227 | Prothrombin Time | | |
| 05/06/1970 | 7 May 06  1233 | 10927210 | Anticoagulant: none (norm) |
| Adult | | Result D/T: 05/07/06 by: Owate,Angelina, MT |

36Y
DOB/Age
05/07/1970
Adult

Emergency - 000

Zheng,Yinggang, MD

Baso  (%): 1.3 (abn)
Baso(K/uL): 0.06 (norm)
Comment: results confirmed by repeat analysis
(norm)
Eos  (%): 1.2 (norm)
Eos (K/uL): 0.05 (norm)
HDW  (%): 2.39 (norm)
Hct  (%): 42.9 (norm)
Hgb (g/dL): 14.5 (norm)
Li: 2.17 (norm)
LI  (%): 7.2 (abn)
LUC (K/uL): 0.32 (norm)
Lym (K/uL): 2.21 (norm)
Lymph (%): 49.2 (abn)
MCH  (pg): 33.9 (abn)
MCHC(g/dL): 33.9 (norm)
MCV  (fL): 100.0 (abn)
MPV  (fL): 9.1 (norm)
MPXI: 7.9 (norm)
Macro Flag: ++ (norm)
Mono  (%): 4.4 (norm)
Mono(K/uL): 0.20 (norm)
NRBC Flag: + (norm)
Neut  (%): 36.7 (abn)
Neut (K/uL): 1.65 (norm)
Plt (K/uL): 142 (norm)
RBC (M/uL): 4.29 (norm)
RDW  (%): 14.4 (norm)
Remark: Spec #10927210: 7 May 06  1233 (norm)
WBC (K/uL): 4.50 (norm)

27 Jun 2006  1228  Generated by Matthews,Melissa,                                Page  4   of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Walters, General | | 36Y | Emergency - 000 | Zheng,Yinggang, MD | D Fibrngn: 360.1 (norm) |
| | | | | | Diagnosis: Muscle Pain Myalgia (norm) |
| | | | | | PT (sec): 13.6 (norm) |
| | | | | | Remark: Spec #10927210: 7 May 06 1233 (norm) |
| | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult 7 May 06 Emergency - 000 | Urinalysis Auto w/rflx t 1233 Zheng,Yinggang, MD | 10927209 | Result D/T: 05/07/06 by: Owate,Angelina, MT |
| | | | | | Amorph material: moderate (abn) |
| | | | | | Bacteria(UF)/hpf: rare (norm) |
| | | | | | Bilirubin: negative (norm) |
| | | | | | Cast(UF)/hpf: 0-2 (norm) |
| | | | | | Casts (/lpf): none (norm) |
| | | | | | Clarity: CLEAR (norm) |
| | | | | | Color: YELLOW (norm) |
| | | | | | Crystals: none seen (norm) |
| | | | | | Diagnosis: Muscle Pain Myalgia (norm) |
| | | | | | Epith Cell(UF)/hpf: 5-10 (norm) |
| | | | | | Flagging (UF): SRC (norm) |
| | | | | | Glucose: negative (norm) |
| | | | | | Hemoglobin: moderate (2+) (abn) |
| | | | | | Ketones: 5 mg/dl (trace) (abn) |
| | | | | | Leuk Esterase: negative (norm) |
| | | | | | Manual Micro Exam: manual micro required (norm) |
| | | | | | Micro Exam: complete (norm) |
| | | | | | Mucous threads: mod (abn) |
| | | | | | Nitrite: negative (norm) |
| | | | | | Prot Confirm: 3+ (abn) |
| | | | | | Protein: >=300 mg/dl (3+) (abn) |
| | | | | | RBC (/hpf): 5-10 (abn) |
| | | | | | RBC(UF)/hpf: 0-2 (norm) |
| | | | | | Remark: Spec #10927209: 7 May 06 1233 (norm) |
| | | | | | Spec Grav: 1.015 (norm) |
| | | | | | Urobilinogen: 1.0 E.U./dl (norm) |
| | | | | | WBC(UF)/hpf: 5-10 (norm) |

04

27 Jun 2006   1228   Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No   for the earliest/latest event times of 30,0

Page  5   of  41

05

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Calcium, Ion 7 May 06 1233 Zheng,Yinggang, MD | 10927210 | Result D/T: 05/07/06 by: Woods,Fannie, MT Calcium Ionized (mg/dL): 4.24 (abn) Comment: D. Zheng notified at window (critical repeat ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Remark: Dept #CC6437: 7 May 06  1233 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Chloride 7 May 06 1233 Zheng,Yinggang, MD | 10927210 | Result D/T: 05/07/06 by: Woods,Fannie, MT Cl (mmol/L): 107 (norm) Comment: D. Zheng notified at window (critical repeat ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Remark: Dept #CC6437: 7 May 06  1233 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Glucose 7 May 06 1233 Zheng,Yinggang, MD | 10927210 | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: D. Zheng notified at window (critical repeat ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Gluc (mg/dL): 128 (abn) Remark: Dept #CC6437: 7 May 06  1233 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Lactate 7 May 06 1233 Zheng,Yinggang, MD | 10927210 | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: D. Zheng notified at window (critical repeat ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Lactate (mmol/L): 15 (crit) Remark: 7 May 06  1233 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Potassium 7 May 06 1233 Zheng,Yinggang, MD | 10927210 | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: D. Zheng notified at window (critical repeat ) (norm) pH: 6.0 (norm) |

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Page  6  of  41

| Patient | Visit No./<br>DOB/Age | Visit Dt-Tm/<br>Location | Proc/Evt Time<br>Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | Whole Blood Sodium<br>7 May 06  1233<br>Zheng,Yinggang, MD | 10927210 | Result D/T: 05/07/06 by: Woods,Fannie, MT<br>Comment: D. Zheng notified at window (critical repeat ) (norm)<br>Diagnosis: Muscle Pain Myalgia (norm)<br>Na (mmol/L): 147 (abn)<br>Remark: Dept #CC6437: 7 May 06  1233 (norm) |
| | 000 | | | | Diagnosis: Muscle Pain Myalgia (norm)<br>K (mmol/L): 3.3 (abn)<br>Remark: Dept #CC6437: 7 May 06  1233 (norm) |
| Waiters,General | 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | CO-Oximetry<br>7 May 06  1239<br>Zheng,Yinggang, MD | 10927221 | Result D/T: 05/07/06 by: Woods,Fannie, MT<br>BE  (mmol/L): -7.9 (abn)<br>COHb  (%): 2.5 (abn)<br>Comment: dr.zheng notified at window ( critical repeated ) (norm)<br>Corr pCO2 (mmHg): 37.1 (abn)<br>Corr pH: 7.293 (abn)<br>Corr pO2 (mmHg): 120 (abn)<br>Diagnosis: Muscle Pain Myalgia (norm)<br>FIO2: 21% (norm)<br>HCO3  (mmol/L): 18.0 (abn)<br>MetHb  (%): 0.9 (abn)<br>O2Hb  (%): 94.2 (norm)<br>pCO2  (mmHg): 37.1 (abn)<br>Remark: Spec #10927221: 7 May 06  1239 (norm)<br>p50  (mmHg): 28.55 (norm)<br>pH: 7.293 (abn)<br>pO2  (mmHg): 120 (abn)<br>sO2  (%): 97.5 (norm)<br>tHb  (g/dL): 13.1 (norm)<br>tO2  (vol%): 17.6 (abn) |

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No   for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Calcium, Ion 7 May 06  1239  10927221 Zheng,Yinggang, MD | | Result D/T: 05/07/06 by: Woods,Fannie, MT Calcium Ionized (mg/dL) : 4.09 (abn) Comment: dr.zheng notified at window ( critical repeated ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Remark: Spec #10927221: 7 May 06  1239 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Chloride 7 May 06  1239  10927221 Zheng,Yinggang, MD | | Result D/T: 05/07/06 by: Woods,Fannie, MT Cl (mmol/L) : 109 (norm) Comment: dr.zheng notified at window ( critical repeated ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Remark: Spec #10927221: 7 May 06  1239 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Glucose 7 May 06  1239  10927221 Zheng,Yinggang, MD | | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: dr.zheng notified at window ( critical repeated ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Gluc (mg/dL) : 114 (abn) Remark: Spec #10927221: 7 May 06  1239 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Lactate 7 May 06  1239  10927221 Zheng,Yinggang, MD | | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: dr.zheng notified at window ( critical repeated ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Lactate (mmol/L) : 10.8 (crit) Remark: Spec #10927221: 7 May 06  1239 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Potassium 7 May 06  1239  10927221 Zheng,Yinggang, MD | | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: dr.zheng notified at window ( critical repeated ) (norm) Diagnosis: Muscle Pain Myalgia (norm) K (mmol/L) : 2.8 (crit) |

27 Jun 2006   1228   Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006   0000 to 17 May 2006   2359

for the chart review group(s): L/All Laboratory No   for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order##/Pt MD | Spec No. | Results |
|---------|--------------------|-----------------------|------------------------------|----------|---------|
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Sodium 7 May 06   1239 Zheng,Yinggang, MD | 10927221 | Remark: Spec #10927221: 7 May 06   1239 (norm) Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: dr.zheng notified at window ( critical repeated ) (norm) Diagnosis: Muscle Pain Myalgia (norm) Na (mmol/L): 147 (abn) Remark: Spec #10927221: 7 May 06   1239 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Urine Toxicology 5 7 May 06   1243 Zheng,Yinggang, MD | 10927225 | Result D/T: 05/07/06 by: Young,Lee Jeanne, MT Barbit            (mAbs): -342 (norm) Barbiturates: none detected (norm) Benzodiaz (mAbs): -629 (norm) Benzodiazepines: none detected (norm) Cocaine          (mAbs): -375 (norm) Cocaine/Metab: none detected (norm) Diagnosis: Muscle Pain Myalgia (norm) Methadone (mAbs): -671 (norm) Methadone: none detected (norm) Opiates           (mAbs): -507 (norm) Opiates: none detected (norm) Remark: Spec #10927225: 7 May 06   1243 (norm) |
| Waiters,General | 2308102-1 05/07/06 1970 36Y | 05/07/06 1227 Adult Emergency - 000 | CO-Oximetry 7 May 06   1410 Zheng,Yinggang, MD | 10927288 | Result D/T: 05/07/06 by: Woods,Fannie, MT BE               (mmol/L): -4.0 (abn) COHb             (%): 3.0 (abn) Comment: D.Zheng notified at window ( critical repeated ) (norm) Corr pCO2 (mmHg): 24.3 (abn) Corr pH: 7.498 (abn) Corr pO2 (mmHg): 135 (abn) Diagnosis: Trauma (norm) FIO2: 21% (norm) |

27 Jun 2006 1228 Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|

CO-Oximetry
7 May 06  1410        10927288
Zheng,Yinggang, MD

Result D/T: 05/07/06 by: Woods,Fannie, MT

```
HCO3       (mmol/L): 21.0 (abn)
MetHb          (%): 1.2 (abn)
O2Hb           (%): 95.6 (norm)
PCO2        (mmHg): 24.3 (abn)
Remark: Spec #10927288: 7 May 06  1410 (norm)
p50         (mmHg): 22.57 (abn)
pH: 7.498 (abn)
pO2         (mmHg): 135 (abn)
sO2            (%): 99.8 (abn)
tHb         (g/dL): 4.7 (abn)
tO2        (vol%): 6.7 (abn)
```

```
BE         (mmol/L): -4.0 (abn)
COHb           (%): 3.0 (abn)
Comment: D.Zheng notified at window ( critical
repeated ) (norm)
Corr pCO2   (mmHg): 24.3 (abn)
Corr pH: 7.498 (abn)
Corr pO2    (mmHg): 135 (abn)
Diagnosis: Trauma (norm)
FIO2: 21% (norm)
HCO3       (mmol/L): 21.0 (abn)
MetHb          (%): 1.2 (abn)
O2Hb           (%): 95.6 (norm)
PCO2        (mmHg): 24.3 (abn)
Remark: Spec #10927288: 7 May 06  1410 (norm)
p50         (mmHg): 22.57 (abn)
pH: 7.498 (abn)
pO2         (mmHg): 135 (abn)
sO2            (%): 99.8 (abn)
tHb         (g/dL): 4.7 (abn)
tO2        (vol%): 6.7 (abn)
```

27 Jun 2006  1228  Generated by Matthews,Melissa,

Page 10     of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

Patient: Walters,General

| Visit No./<br>DOB/Age | Visit Dt-Tm/<br>Location | Proc/Evt Time<br>Orderer/Pt MD | Spec No.  Results |
|---|---|---|---|
| 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | Hemogram Auto Diff w/rfl Result D/T: 05/07/06 by: Brignolle,Marie F., MT<br>7 May 06  1410  10927288<br>Zheng,Yinggang, MD | |

Baso      (%): 0.3 (norm)
Baso(K/uL): 0.03 (norm)
Comment: automated differential confirmed on
smear (norm)
Eos       (%): 0.9 (norm)
Eos (K/uL): 0.07 (norm)
HDW      (%): 2.43 (norm)
Hct       (%): 35.6 (abn)
Hgb  (g/dL): 12.0 (abn)
LI: 2.44 (norm)
LUC      (%): 1.9 (norm)
LUC (K/uL): 0.16 (norm)
Lym (K/uL): 0.40 (abn)
Lymph    (%): 4.8 (abn)
MCH     (pg): 33.1 (abn)
MCHC(g/dL): 33.8 (norm)
MCV     (fL): 98.0 (abn)
MPV     (fL): 9.6 (norm)
MPXI: 10.9 (abn)
Macro Flag: + (norm)
Mono     (%): 5.4 (norm)
Mono (K/uL): 0.44 (norm)
Neut     (%): 86.7 (abn)
Neut (K/uL): 7.18 (norm)
PLT CLMP: + (norm)
Plt (K/uL): 139 (norm)
Plt Est: adequate (norm)
RBC (M/uL): 3.64 (abn)
RDW      (%): 14.3 (norm)
Remark: Spec #10927288: 7 May 06  1410
Scan: reviewed (norm)

27 Jun 2006  1228  Generated by Matthews,Melissa,

Page 11  of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| | | | | | WBC (K/uL): 8.28 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Calcium, Ion 7 May 06 1410 Zheng,Yinggang, MD | 10927288 | Result D/T: 05/07/06 by: Woods,Fannie, MT Calcium Ionized (mg/dL): 3.26 (crit) Comment: D.Zheng notified at window ( critical repeated ) (norm) Diagnosis: Trauma (norm) Remark: Spec #10927288: 7 May 06 1410 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Chloride 7 May 06 1410 Zheng,Yinggang, MD | 10927288 | Result D/T: 05/07/06 by: Woods,Fannie, MT Cl (mmol/L): 109 (norm) Comment: D.Zheng notified at window ( critical repeated ) (norm) Diagnosis: Trauma (norm) Remark: Spec #10927288: 7 May 06 1410 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Glucose 7 May 06 1410 Zheng,Yinggang, MD | 10927288 | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: D.Zheng notified at window ( critical repeated ) (norm) Gluc (mg/dL): 87 (norm) Diagnosis: Trauma (norm) Remark: Spec #10927288: 7 May 06 1410 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - 000 | Whole Blood Lactate 7 May 06 1410 Zheng,Yinggang, MD | 10927288 | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: D.Zheng notified at window ( critical repeated ) (norm) Diagnosis: Trauma (norm) Lactate (mmol/L): 6.6 (crit) Remark: Spec #10927288: 7 May 06 1410 (norm) |
| Waiters,General | 2308102-1 05/06/1970 36Y | 05/07/06 1227 Adult Emergency - | Whole Blood Potassium 7 May 06 1410 Zheng,Yinggang, MD | 10927288 | Result D/T: 05/07/06 by: Woods,Fannie, MT Comment: D.Zheng notified at window ( critical repeated ) (norm) |

11

27 Jun 2006   1228   Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006   0000 to 17 May 2006   2359
for the chart review group(s): L/All Laboratory No   for the earliest/latest event times of 30,0

Page   12   of   41

| Patient | Visit No./<br>DOB/Age | Visit Dt-Tm/<br>Location | Proc/Evt Time<br>Order:/Pt MD | Spec No. | Results |
|---------|------------------------|--------------------------|-------------------------------|----------|---------|
| | | 000 | | | Diagnosis: Trauma (norm)<br>K (mmol/L): 3.7 (norm)<br>Remark: Spec #10927288: 7 May 06   1410 (norm) |
| Waiters,General | 2308102-1<br>05/06/1970<br>36Y | 05/07/06 1227<br>Adult<br>Emergency -<br>000 | Whole Blood Sodium<br>7 May 06  1410  10927288<br>Zheng,Yinggang, MD | | Result D/T: 05/07/06 by: Woods,Fannie, MT<br>Comment: D. Zheng notified at window ( critical<br>repeated ) (norm)<br>Diagnosis: Trauma (norm)<br>Na (mmol/L): 146 (abn)<br>Remark: Spec #10927288: 7 May 06  1410 (norm) |
| Waiters,General | 3046806-11<br>05/06/1970<br>36Y | 05/07/06 1327<br>Surgical<br>Emergency -<br>004 | CO-Oximetry<br>7 May 06  1621    10927401<br>Chi,Thomas, MD | | Result D/T: 05/07/06 by: Warner,Errol,<br>BE        (mmol/L): 1.0 (norm)<br>COHb      (%): 2.5 (abn)<br>Comment: spec repeated kolli notified. (norm)<br>Corr pCO2 (mmHg): 40.4 (norm)<br>Corr pH: 7.410 (norm)<br>Corr pO2  (mmHg): 84.9 (abn)<br>Diagnosis: Trauma (norm)<br>FIO2: 21% (norm)<br>HCO3      (mmol/L): 25.2 (norm)<br>MetHb     (%): 0.9 (abn)<br>O2Hb      (%): 92.9 (abn)<br>PCO2      (mmHg): 40.4 (norm)<br>Remark: Spec #10927401: 7 May 06  1621 (norm)<br>p50       (mmHg): 26.60 (norm)<br>pH: 7.410 (norm)<br>pO2       (mmHg): 84.9 (abn)<br>sO2       (%): 96.2 (norm)<br>tHb       (g/dL): 12.3 (norm)<br>tCO2      (vol%): 16.2 (abn) |
| Waiters,General | 3046806-11 | 05/07/06 1327 | Hemogram Auto Diff w/rfl  Result D/T: 05/07/06 by: Khan,Allah, MT | | |

27 Jun 2006   1228   Generated by Matthews,Melissa,

Page 13   of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No for the earliest/latest event times of 30.0

| Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. Results |
|---|---|---|---|
| 05/06/1970 36Y | Surgical Emergency - 004 | 7 May 06 1621 Chi,Thomas, MD | 10927401 Baso (%): 0.4 (norm) |

Baso (%): 0.4 (norm)
Baso (K/uL): 0.04 (norm)
Comment: automated differential confirmed on smear (norm)
Eos (%): 1.0 (norm)
Eos (K/uL): 0.10 (norm)
HDW (%): 2.45 (norm)
Hct (%): 38.1 (abn)
Hgb (g/dL): 13.1 (abn)
LI: 2.05 (norm)
LUC (%): 1.1 (norm)
LUC (K/uL): 0.11 (norm)
Lym (K/uL): 0.28 (abn)
Lymph (%): 2.9 (abn)
MCH (pg): 33.5 (abn)
MCHC (g/dL): 34.5 (norm)
MCV (fL): 97.0 (abn)
MPV (fL): 8.4 (norm)
MPXI: 11.0 (abn)
Macro Flag: + (norm)
Mono (%): 5.4 (norm)
Mono (K/uL): 0.53 (norm)
Neut (%): 89.2 (abn)
Neut (K/uL): 8.79 (abn)
Plt (K/uL): 113 (abn)
Plt Est: slightly decreased (abn)
RBC (M/uL): 3.93 (abn)
RDW (%): 14.4 (norm)
Remark: Spec #10927401: 7 May 06 1621 (norm)
Scan: reviewed (norm)
WBC (K/uL): 9.85 (norm)

Patient

Waiters,General

3046806-11   05/07/06 1327   Whole Blood Calcium, Ion Result D/T: 05/07/06 by: Warner,Errol,

13

27 Jun 2006 1228 Generated by Matthews,Melissa,

Page 14 of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 05/06/1970 36Y | Surgical Emergency - 004 | 05/07/06 1327 7 May 06 1621 Chi,Thomas, MD | 10927401 | Calcium Ionized (mg/dL): 3.94 (abn) Diagnosis: Trauma (norm) Remark: Spec #10927401: 7 May 06 1621 (norm) |
| Waiters,General | 05/06/1970 36Y | Surgical Emergency - 004 | 05/07/06 1327 7 May 06 1621 Chi,Thomas, MD | 10927401 | Whole Blood Chloride Result D/T: 05/07/06 by: Warner,Errol, Cl (mmol/L): 111 (norm) Comment: spec repeated kolli notified. (norm) Diagnosis: Trauma (norm) Remark: Spec #10927401: 7 May 06 1621 (norm) |
| Waiters,General | 05/06/1970 36Y | Surgical Emergency - 004 | 05/07/06 1327 7 May 06 1621 Chi,Thomas, MD | 10927401 | Whole Blood Glucose Result D/T: 05/07/06 by: Warner,Errol, Comment: spec repeated kolli notified. (norm) Diagnosis: Trauma (norm) Gluc (mg/dL): 106 (abn) Remark: Spec #10927401: 7 May 06 1621 (norm) |
| Waiters,General | 05/06/1970 36Y | Surgical Emergency - 004 | 05/07/06 1327 7 May 06 1621 Chi,Thomas, MD | 10927401 | Whole Blood Lactate Result D/T: 05/07/06 by: Warner,Errol, Comment: spec repeated kolli notified. (norm) Diagnosis: Trauma (norm) Lactate (mmol/L): 3.8 (crit) Remark: Spec #10927401: 7 May 06 1621 (norm) |
| Waiters,General | 05/06/1970 36Y | Surgical Emergency - 004 | 05/07/06 1327 7 May 06 1621 Chi,Thomas, MD | 10927401 | Whole Blood Potassium Result D/T: 05/07/06 by: Warner,Errol, Comment: spec repeated kolli notified. (norm) Diagnosis: Trauma (norm) K (mmol/L): 3.1 (abn) Remark: Spec #10927401: 7 May 06 1621 (norm) |
| Waiters,General | 05/06/1970 36Y | Surgical Emergency - 004 | 05/07/06 1327 7 May 06 1621 Chi,Thomas, MD | 10927401 | Whole Blood Sodium Result D/T: 05/07/06 by: Warner,Errol, Comment: spec repeated kolli notified. (norm) Na (mmol/L): 140 (norm) Diagnosis: Trauma (norm) |

14

27 Jun 2006 1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Page  15  of  41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order:er/Pt MD | Spec No. | Results |
|---------|---------|---------|---------|---------|---------|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 | Activated Partial Thromb Azer,Emil, MD Angus,Lambros, MD | 10927614 | Remark: Spec #10927401: 7 May 06  1621 (norm) |

Result D/T: 05/07/06 by: Owate,Angelina, MT
Anticoagulant: none (norm)
Diagnosis: Fracture Orbit, Closed (norm)
Remark: Spec #10927614: 7 May 06  1949 (norm)
aPTT (sec) : 25.2 (norm)

| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 | CO-Oximetry 7 May 06  1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Warner,Errol, |

BE          (mmol/L): 2.3 (norm)
COHb        (%): 2.2 (abn)
Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED
            (norm)
Corr pCO2  (mmHg): 39.6 (norm)
Corr pH:   7.435 (abn)
Corr pO2   (mmHg): 99.3 (norm)
Diagnosis:  Fracture Orbit, Closed (norm)
FiO2: 21% (norm)
HCO3       (mmol/L): 26.5 (abn)
MetHb      (%): 1.0 (abn)
O2Hb       (%): 95.0 (norm)
PCO2       (mmHg): 39.6 (abn)
Remark: Spec #10927614: 7 May 06  1949 (norm)
p50        (mmHg): 24.97 (norm)
pH:        7.435 (abn)
pO2        (mmHg): 99.3 (norm)
sO2        (%): 98.1 (norm)
tHb        (g/dL): 12.0 (norm)
tO2        (vol%): 16.1 (abn)

| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 | Comprehensive Metabolic 7 May 06  1949 Azer,Emil, MD | 10927614 | Result D/T: 05/07/06 by: Young,Lee Jeanne, MT |

ALT        (U/L): 214 (abn)
AST        (U/L): 523 (abn)

27 Jun 2006  1228  Generated by Matthews,Melissa,                                                    Page  16    of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ | Visit Dt-Tm/ | Proc/Evt Time | | |
|---------|------------|--------------|---------------|---|---|
| | DOB/Age | Location | Orderer/Prt MD | Spec No. | Results |

Waiters,General
DOB/Age: 36Y
Visit No.: 3046806-12
05/06/1970

Visit Dt-Tm/Location: 05/07/06 1601
D3N35-A

Proc/Evt Time: Angus,Lambros, MD

Hemogram Auto Diff w/rfl
7 May 06  1949  10927614
Azer,Emil, MD
Angus,Lambros, MD

Albumin     (g/dL): 3.9  (norm)
Alk Phos    (U/L): 75  (norm)
Anion Gap: 18 (abn)
BUN         (mg/dL): 6  (abn)
BUN/Creat Ratio: 8  (norm)
CO2         (mmol/L): 22  (abn)
Ca          (mg/dL): 8.7  (norm)
Cl          (mmol/L): 104  (norm)
Creat       (mg/dL): 0.8  (norm)
Diagnosis: Fracture Orbit, Closed (norm)
Gluc        (mg/dL): 103  (abn)
Indices     (H): 17  (norm)
Indices     (I): 1  (norm)
Indices     (L): 5  (norm)
K           (mmol/L): 3.1  (abn)
Na          (mmol/L): 144  (norm)
P2: MG, PHOS (norm)
Remark: Dept #CC6530: 7 May 06  1949 (norm)
T Prot      (g/dL): 7.0  (norm)
T. Bili     (mg/dL): 1.3 (abn)

Result D/T: 05/07/06 by: Owate,Angelina, MT
Baso        (%): 0.2 (norm)
Baso(K/uL): 0.02 (norm)
Eos         (%): 0.8 (norm)
Eos (K/uL): 0.08 (norm)
HDW         (%): 2.42 (norm)
Hct         (%): 37.1 (abn)
Hgb         (g/dL): 12.6 (abn)
LI: 2.44 (norm)
LUC         (%): 1.6 (norm)
LUC (K/uL): 0.16 (norm)
Lym (K/uL): 0.40 (abn)

16

27 Jun 2006  1228  Generated by Matthews,Melissa,

Page 17  of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Lymph (%): 14.1 (abn) · MCH (pg): 33.0 (abn) · MCHC(g/dL): 34.1 (norm) · MCV (fL): 96.7 (abn) · MPV (fL): 8.5 (norm) · MPXI: 10.7 (abn) · Macro Flag: + (norm) · Mono (%): 5.9 (norm) · Mono(K/uL): 0.58 (norm) · Neut (%): 77.4 (abn) · Neut(K/uL): 8.60 (abn) · Plt (K/uL): 113 (abn) · RBC (M/uL): 3.84 (abn) · RDW (%): 14.2 (norm) · WBC (K/uL): 9.84 (norm) · Remark: Spec #10927614: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Magnesium Level 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Young,Lee Jeanne, MT · Diagnosis: Fracture Orbit, Closed (norm) · Mg (mg/dL): 1.4 (abn) · Remark: Spec #10927614: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Phosphate Level 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Young,Lee Jeanne, MT · Diagnosis: Fracture Orbit, Closed (norm) · Phos (mg/dL): 3.4 (norm) · Remark: Spec #10927614: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Prothrombin Time 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Owate,Angelina, MT · Anticoagulant: none (norm) · D Fibrngn: 314.5 (norm) · Diagnosis: Fracture Orbit, Closed (norm) · PT (sec): 14.4 (abn) · Remark: Spec #10927614: 7 May 06 1949 (norm) |

17

27 Jun 2006  1228  Generated by Matthews,Melissa,                                    Page 18  of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Whole Blood Calcium, Ion 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Warner,Errol, Calcium Ionized (mg/dL): 4.13 (abn) (norm) Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED Diagnosis: Fracture Orbit, Closed (norm) Remark: Dept #CC6530: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Whole Blood Chloride 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Warner,Errol, Cl (mmol/L): 110 (norm) Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED (norm) Diagnosis: Fracture Orbit, Closed (norm) Remark: Dept #CC6530: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Whole Blood Glucose 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Warner,Errol, Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED (norm) Diagnosis: Fracture Orbit, Closed (norm) Gluc (mg/dL): 106 (abn) Remark: Dept #CC6530: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/07/1970 36Y | 05/07/06 1601 D3N35-A | Whole Blood Lactate 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Warner,Errol, Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED Diagnosis: Fracture Orbit, Closed (norm) Lactate (mmol/L): 3.0 (crit) Remark: Dept #CC6530: 7 May 06 1949 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Whole Blood Potassium 7 May 06 1949 Azer,Emil, MD Angus,Lambros, MD | 10927614 | Result D/T: 05/07/06 by: Warner,Errol, Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED (norm) Diagnosis: Fracture Orbit, Closed (norm) |

18

27 Jun 2006    1228    Generated by Matthews, Melissa,

Page 19    of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. Results |
|---------|--------------------|-----------------------|-----------------------------|------------------|
| Wagers,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Whole Blood Sodium 7 May 06  1949 Azer,Emil, MD Angus,Lambros, MD | Result D/T: 05/07/06 by: Warner, Errol, Comment: MS BOOKER NOTIFIED @X7588-CONFIRMED (norm) Diagnosis: Fracture Orbit, Closed (norm) Na (mmol/L): 140 (norm) Remark: Dept #CC6530: 7 May 06  1949 (norm) |
| Wagers,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Ethyl Alcohol Level 7 May 06  1952 Azer,Emil, MD Angus,Lambros, MD | Result D/T: 05/07/06 by: Small,Imelda, MLT Diagnosis: Fracture Orbit, Closed (norm) Ethyl Alcohol (mg/dL): 158.55 (abn) Remark: Spec #10927620: 7 May 06  1952 (abn) |
| Wagers,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Activated Partial Thromb 8 May 06  0119 Azer,Emil, MD Angus,Lambros, MD | Result D/T: 05/08/06 by: Stuart,Verna N, MT Anticoagulant: none (norm) Diagnosis: Fracture Orbit, Closed (norm) Remark: Spec #10927863: 8 May 06  0119 (norm) aPTT (sec) : 24.0 (norm) |
| Wagers,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Comprehensive Metabolic 8 May 06  0119  10927863 Azer,Emil, MD Angus,Lambros, MD | Result D/T: 05/08/06 by: Han,Ming C, MT ALT (U/L): 239 (abn) AST (U/L): 626 (abn) Albumin (g/dL): 3.9 (norm) Alk Phos (U/L): 72 (norm) Anion Gap: 18 (abn) BUN (mg/dL): 6 (abn) BUN/Creat Ratio: 9 (norm) CO2 (mmol/L): 21 (abn) Ca (mg/dL): 9.6 (norm) Cl (mmol/L): 102 (norm) Creat (mg/dL): 0.7 (norm) |

19

27 Jun 2006   1228   Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006 2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

Page   20   of   41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order/Evt MD | Spec No. | Results |
|---------|--------------------|-----------------------|----------------------------|----------|---------|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A Azer,Emil, MD Angus,Lambros, MD | Ethyl Alcohol Level 8 May 06  0119 | 10927863 | Result D/T: 05/08/06 by: Clarke,Sylvia, MT Diagnosis: Fracture Orbit, Closed (norm) Ethyl Alcohol (mg/dl): 28.09 (abn) Remark: Spec #10927863: 8 May 06  0119 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A Azer,Emil, MD Angus,Lambros, MD | Hemogram Auto Diff w/rfl 8 May 06  0119 | 10927863 | Result D/T: 05/08/06 by: Stuart,Verna N, MT Baso  (%): 0.2 (norm) Baso(K/uL): 0.02 (norm) Comment: automated differential confirmed on smear (norm) Eos  (%): 1.0 (norm) Eos (K/uL): 0.07 (norm) HDW  (%): 2.39 (norm) Hct  (%): 33.3 (abn) Hgb (g/dL): 11.7 (abn) LI: 2.12 (norm) LUC  (%): 1.5 (norm) LUC (K/uL): 0.10 (norm) Lym (K/uL): 0.39 (abn) Lymph (%): 5.6 (abn) MCH (pg): 32.6 (abn) |
| Waiters,General | 3046806-12 05/07/06 1970 36Y | 05/07/06 1601 D3N35-A Azer,Emil, MD Angus,Lambros, MD | | | Diagnosis: Fracture Orbit, Closed (norm) Gluc  (mg/dL): 85 (norm) Indices  (H): 7 (norm) Indices  (I): 1 (norm) Indices  (L): 6 (norm) K  (mmol/L): 3.4 (abn) Na  (mmol/L): 141 (norm) P2: MG,PHOS (norm) Remark: Dept #CC6632: 8 May 06  0119 (norm) T Prot  (g/dL): 7.3 (norm) T. Bili  (mg/dL): 1.5 (abn) |

20

7 Jun 2006   1228   Generated by Matthews,Melissa,                                Page 21   of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|
| 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Magnesium Level 8 May 06  0119 Azer,Emil, MD Angus,Lambros, MD | 10927863 | Result D/T: 05/08/06 by: Han,Ming C, MT Diagnosis: Fracture Orbit, Closed (norm) Mg (mg/dL): 1.7 (norm) Remark: Spec #10927863: 8 May 06  0119 (norm) |
| 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Phosphate Level 8 May 06  0119 Azer,Emil, MD Angus,Lambros, MD | 10927863 | Result D/T: 05/08/06 by: Han,Ming C, MT Diagnosis: Fracture Orbit, Closed (norm) Phos (mg/dL): 2.7 (norm) Remark: Spec #10927863: 8 May 06  0119 (norm) |
| 3046806-12 05/06/1970 36Y | 05/07/06 1601 D3N35-A | Prothrombin Time 8 May 06  0119 Azer,Emil, MD Angus,Lambros, MD | 10927863 | Result D/T: 05/08/06 by: Stuart,Verna N, MT Anticoagulant: none (norm) D Fibrngn: 402.8 (norm) Diagnosis: Fracture Orbit, Closed (norm) PT (sec): 12.9 (norm) Remark: Spec #10927863: 8 May 06  0119 (norm) |

MCHC(g/dL): 35.1  (norm)
MCV    (fL): 92.8  (norm)
MPV    (fL): 9.0   (norm)
MPXI: 4.7  (norm)
Mono   (%): 5.3   (norm)
Mono (K/uL): 0.37  (norm)
Neut   (%): 86.3  (abn)
Neut (K/uL): 6.00  (norm)
Plt  (K/uL): 108   (abn)
Plt Est: slightly decreased (abn)
RBC (M/uL): 3.58  (abn)
RBC Morph: teardrops (abn)
       (%): 14.4  (norm)
RDW
Remark: Spec #10927863: 8 May 06  0119 (norm)
Scan: reviewed  (norm)
WBC (K/uL): 6.95  (norm)

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Patient

Waters,General

| Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orders/Pt MD | Spec No. | Results |
|---|---|---|---|---|
| 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Basic Metabolic Panel 9 May 06 0851 Miller,Andrew, MD Angus,Lambros, MD | 10933188 | Result D/T: 05/09/06 by: Belizaire,Carmelle, MLT Anion Gap: 21 (abn) BUN (mg/dl): 11 (norm) BUN/Creat Ratio : 14 (norm) CO2 (mmol/L): 20 (abn) Ca (mg/dl): 9.8 (norm) Cl (mmol/L): 101 (norm) Creat (mg/dl): 0.8 (norm) D2: CO2,BUN,CA,GLU,CREA,Na,K,Cl,L,H,I (norm) Diagnosis: Trauma (norm) Glucose (mg/dl): 93 (norm) Indices(H): 13 (norm) Indices(I): 3 (norm) Indices(L): 6 (norm) K (mmol/L): 3.6 (norm) Na (mmol/L): 142 (norm) P2: MG, PHOS (norm) Remark: Spec #10933188: 9 May 06 0851 (norm) |
| 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Hemogram No Diff 9 May 06 0851 Miller,Andrew, MD Angus,Lambros, MD | 10933188 | Result D/T: 05/09/06 by: Baum,Rita, MLT CBC only: #5218073490 9 (norm) Comment: results confirmed by repeat analysis (norm) Diagnosis: Trauma (norm) HDW (%): 2.29 (norm) Hct (%): 34.6 (abn) Hgb (g/dl): 11.9 (abn) LI: 2.20 (norm) MCH (pg): 34.0 (abn) MCHC(g/dl): 34.2 (norm) MCV (fl): 99.3 (abn) MPV (fl): 10.5 (norm) |

27 Jun 2006   1228   Generated by Matthews,Melissa,                                          Page 23   of 41

Kings County Hospital Center
Lab Results Listed for Patient

for the chart review group(s): L/All Laboratory No   for the earliest/latest event times of 30,0

7 May 2006   0000 to 17 May 2006   2359

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orders/Pt MD   Spec No. Results |
|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Magnesium Level 9 May 06  0851   10933188 Miller,Andrew, MD Angus,Lambros, MD | Result D/T: 05/09/06 by: Belizaire,Carmelle, MLT Diagnosis: Trauma (norm) Mg (mg/dL): 1.8 (norm) Remark: Spec #10933188: 9 May 06  0851 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Phosphate Level 9 May 06  0851   10933188 Miller,Andrew, MD Angus,Lambros, MD | Result D/T: 05/09/06 by: Belizaire,Carmelle, MLT Diagnosis: Trauma (norm) Phos (mg/dL): 2.2 (abn) Remark: Spec #10933188: 9 May 06  0851 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Basic Metabolic Panel 10 May 06  0855   10938206 Fonji,Bertrand, MD Angus,Lambros, MD | Result D/T: 05/10/06 by: Lee,Harvey D, MT Anion Gap: 19 (abn) BUN (mg/dL): 14 (norm) BUN/Creat Ratio : 20 (norm) CO2 (mmol/L): 22 (abn) Ca (mg/dL): 9.9 (norm) Cl (mmol/L): 105 (norm) Creat (mg/dL): 0.7 (norm) D2: CO2,BUN,CA,GLU,CREA,L,H,I (norm) Diagnosis: Trauma (norm) Glucose (mg/dL): 85 (norm) Indices(H): 1 (norm) Indices(I): 2 (norm) Indices(L): 6 (norm) K (mmol/L): 2.9 (crit) Na (mmol/L): 146 (abn) P2: MG,PHOS,Na,K,Cl (norm) |

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Page  24  of  41

| Patient | Visit No./<br>DOB/Age | Visit Dt-Tm/<br>Location | Proc/Evt Time<br>Orderer/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 3046806-12<br>05/06/1970<br>36Y | 05/07/06 1601<br>D2521-A | Hemogram Auto Diff w/rfl<br>10 May 06  0855<br>Fonji,Bertrand, MD<br>Angus,Lambros, MD | 10938206 | Remark: Spec #10938206: 10 May 06  0855 (norm) |

Result D/T: 05/10/06 by: Gadsden,Lyndia, MT
Remark: Spec #10938206: by:

Baso    (%):  0.1 (norm)
Baso(K/uL):  0.01 (norm)
CBC/Diff:  #521807349O9 (norm)
Eos     (%):  0.4 (norm)
Eos (K/uL):  0.03 (norm)
HDW     (%):  2.16 (abn)
Hct     (%):  34.2 (abn)
Hgb (g/dL):  11.7 (abn)
LI:  2.29 (norm)
LUC     (%):  2.8 (norm)
LUC (K/uL):  0.19 (norm)
Lg Plt Flag: + (norm)
Lym (K/uL):  0.89 (norm)
Lymph   (%):  13.1 (abn)
MCH    (pg):  33.4 (abn)
MCHC(g/dL):  34.3 (norm)
MCV    (fL):  97.6 (abn)
MPV    (fL):  11.7 (norm)
MPXI:  8.6 (norm)
Macro Flag: + (norm)
Mono    (%):  7.9 (norm)
Mono(K/uL):  0.54 (norm)
NRBC Flag: + (norm)
Neut    (%):  75.6 (abn)
Neut (K/uL):  5.14 (norm)
Plt (K/uL):  76 (abn)
RBC (M/uL):  3.51 (abn)
RDW     (%):  13.4 (norm)
Remark: Spec #10938206: 10 May 06  0855 (norm)
WBC (K/uL):  6.80 (norm)

24

Case 1:13-cv-03636-DLI   Document 6-4   Filed 09/18/13   Page 230 of 366 PageID #: 1451

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order=/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|

**Waiters,General**  3046806-12  05/07/06 1601  05/06/1970  D2S21-A  36Y

Magnesium Level  10 May 06  0855  10938206  Fonji,Bertrand, MD  Angus,Lambros, MD
Result D/T: 05/10/06 by: Lee,Harvey D, MT
Diagnosis: Trauma (norm)
Mg (mg/dl): 2.3 (norm)
Remark: Spec #10938206: 10 May 06  0855 (norm)

**Waiters,General**  3046806-12  05/07/06 1601  05/06/1970  D2S21-A  36Y

Phosphate Level  10 May 06  0855  10938206  Fonji,Bertrand, MD  Angus,Lambros, MD
Result D/T: 05/10/06 by: Lee,Harvey D, MT
Diagnosis: Trauma (norm)
Phos (mg/dl): 3.5 (norm)
Remark: Spec #10938206: 10 May 06  0855 (norm)

**Waiters,General**  3046806-12  05/07/06 1601  05/06/1970  D2S21-A  36Y

Comprehensive Metabolic  11 May 06  0909  10942883  Miller,Andrew, MD  Angus,Lambros, MD
Result D/T: 05/11/06 by: Saint-Germain,Lola, MLT
Diagnosis: Trauma (norm)
ALT  (U/L): 115 (abn)
AST  (U/L): 127 (abn)
Albumin  (g/dl): 3.8 (norm)
Alk Phos  (U/L): 57 (norm)
Anion Gap:  16 (abn)
BUN  (mg/dl): 6 (abn)
BUN/Creat Ratio:  9 (norm)
CO2  (mmol/L): 23 (abn)
Ca  (mg/dl): 9.3 (norm)
Cl  (mmol/L): 102 (norm)
Creat  (mg/dl): 0.7 (norm)
D2:
ALB,ALT,AST,CO2,TBIL,BUN,CA,GLU,CK,CREA,TP,ALP
(norm)
Diagnosis: Trauma (norm)
Gluc  (mg/dl): 107 (abn)
Indices  (H): 0 (norm)
Indices  (I): 2 (norm)
Indices  (I): 7 (norm)
Indices  (i): 7 (norm)
K  (mmol/L): 2.8 (crit)
Na  (mmol/L): 141 (norm)

27 Jun 2006  1228  Generated by Matthews,Melissa,                                    Page  26   of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order≥r/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|

**Waiters,General**  3046806-12  05/07/06 1601  Creatine Kinase Total w/  11 May 06  0909 10942883
                      05/06/1970  D2521-A        Radiann,Valentina, MD
                      36Y                         Angus,Lambros, MD

Result D/T: 05/11/06 by: Saint-Germain,Lola, MLT
CK              (U/L): 2501  (crit)
Remark: Dept #CC11218: 11 May 06  0909 (norm)
T Prot        (g/dL): 6.7  (norm)
T. Bili      (mg/dL): 2.0  (abn)
CK-MB         (ng/mL): 1.1  (norm)
CK-MB Index    (%): not calculated  (norm)
Diagnosis: Trauma  (norm)
Remark: Spec #10942883: 11 May 06  0909  (norm)
P2: MG,PHOS,Na,K,Cl (norm)

**Waiters,General**  3046806-12  05/07/06 1601  Hemogram Auto Diff w/rfl  11 May 06  0909 10942883
                      05/06/1970  D2521-A        Miller,Andrew, MD
                      36Y                         Angus,Lambros, MD

Result D/T: 05/11/06 by: Shustova,Sofia, MT
Baso           (%): 0.2  (norm)
Baso(K/uL): 0.01  (norm)
CBC/Diff: ±521807334909  (norm)
Comment: trend checked  (norm)
Eos            (%): 0.8  (norm)
Eos       (K/uL): 0.05  (norm)
HDW            (%): 2.18  (abn)
Hct            (%): 31.3  (abn)
Hgb        (g/dL): 10.8  (abn)
LI: 2.28  (norm)
LUC            (%): 3.8  (norm)
LUC       (K/uL): 0.23  (norm)
Lym       (K/uL): 0.94  (norm)
Lymph         (%): 15.5  (abn)
MCH          (pg): 33.5  (abn)
MCHC(g/dL): 34.4  (norm)
MCV          (fL): 97.5  (abn)
MPV          (fL): 11.5  (norm)
MPXI: 10.6  (abn)
Macro Flag: +  (norm)

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

27 Jun 2006  1228  Generated by Matthews,Melissa,

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

Page  27   of  41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order=/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Magnesium Level 11 May 06 0909 10942883 Miller,Andrew, MD Angus,Lambros, MD | | Result D/T: 05/11/06 by: Saint-Germain,Lola,MLT Diagnosis: Trauma (norm) Mg (mg/dL): 1.7 (norm) Remark: Spec #10942883: 11 May 06  0909 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Phosphate Level 11 May 06 0909 10942883 Miller,Andrew, MD Angus,Lambros, MD | | Result D/T: 05/11/06 by: Saint-Germain,Lola, MLT Diagnosis: Trauma (norm) Phos (mg/dL): 4.0 (norm) Remark: Spec #10942883: 11 May 06  0909 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Troponin I Level 11 May 06 0909 10942883 Radianu,Valentina, MD Angus,Lambros, MD | | Result D/T: 05/11/06 by: Donofrio,W J, MT Diagnosis: Trauma (norm) Remark: Spec #10942883: 11 May 06  0909 (norm) Troponin I (ng/mL): <0.02 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A ⁻Sajed,Dana, MD Angus,Lambros, MD | Basic Metabolic Panel 12 May 06 0843 10947169 | | Result D/T: 05/12/06 by: Holder,Lynmette N, MT Anion Gap: 14 (norm) BUN (mg/dL): 6 (abn) BUN/Creat Ratio : 10 (norm) CO2 (mmol/L): 25 (norm) Ca (mg/dL): 9.3 (norm) Cl (mmol/L): 100 (abn) Comment: K repeated,Ms.Thomas notified at |

Mono (%): 11.8 (abn)
Mono (K/uL): 0.72 (norm)
Neut (%): 68.0 (abn)
Neut (K/uL): 4.15 (norm)
Plt (K/uL): 90 (abn)
RBC (M/uL): 3.21 (abn)
RDW (%): 13.3 (norm)
Remark: Spec #10942883: 11 May 06  0909 (norm)
WBC (K/uL): 6.11 (norm)

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Page 28  of 41

Patient

Waiters,General

| Visit No./ | Visit Dt-Tm/ | Proc/Evt Time | | |
|---|---|---|---|---|
| DOB/Age | Location | Order=r/Pt MD | Spec No. | Results |

| 3046806-12 | 05/07/06 1601 | Hemogram Auto Diff w/rfl | 10947169 | Result D/T: 05/12/06 by: Caridad,Cecilio, MT |
| 05/06/1970 | D2521-A | 12 May 06  0843 | | Atyp Flag: + (norm) |
| 36Y | | Sajed,Dana, MD | | Baso (%): 0.2 (norm) |
| | | Angus,Lambros, MD | | Baso(K/uL): 0.01 (norm) |

ext.7156 (norm)
Creat     (mg/dL): 0.6 (norm)
D2: CO2,BUN,CA,GLU,CREA,L,H,I (norm)
Diagnosis: Trauma (norm)
Glucose (mg/dL): 93 (norm)
Indices(H): 0 (norm)
Indices(I): 2 (norm)
Indices(L): 9 (norm)
K       (mmol/L): 2.9 (crit)
Na      (mmol/L): 139 (norm)
P2: MG,PHOS,Na,K,Cl (norm)
Remark: Spec #10947169: 12 May 06  0843 (norm)

CBC/Diff: ≠5218073490₉ (norm)
Comment: trend checked (norm)
Eos      (%): 0.7 (norm)
Eos (K/uL): 0.04 (norm)
HDW      (%): 2.28 (norm)
Hct      (%): 30.8 (abn)
Hgb (g/dL): 11.1 (abn)
Li: 2.19 (norm)
LUC      (%): 5.3 (abn)
LUC (K/uL): 0.29 (norm)
Lym (K/uL): 1.07 (norm)
Lymph    (%): 19.6 (abn)
MCH (pg): 34.8 (abn)
MCHC(g/dL): 36.1 (abn)
MCV (fL): 96.4 (abn)
MPV (fL): 10.7 (norm)

28

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results listed for Patient
7 May 2006 0000 to 17 May 2006 2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Page  29  of  41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Orderer/Pt MD | Spec No. Results |
|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Magnesium Level 12 May 06  0843  10947169 Sajed,Dana, MD Angus,Lambros, MD | Result D/T: 05/12/06 by: Holder,Lynnette N, MT Comment: K repeated,Ms.Thomas notified at ext.7156 Diagnosis: Trauma  (norm) Mg (mg/dL): 1.5  (norm) Remark: Spec #10947169: 12 May 06  0843  (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Phosphate Level 12 May 06  0843  10947169 Sajed,Dana, MD Angus,Lambros, MD | Result D/T: 05/12/06 by: Holder,Lynnette N, MT Comment: K repeated,Ms.Thomas notified at ext.7156 Diagnosis: Trauma  (norm) Phos (mg/dL): 3.3  (norm) Remark: Spec #10947169: 12 May 06  0843 |
| Waiters,General | 3046806-12 05/07/06 1601 05/06/1970 D2S21-A 36Y | 05/13 May 06  0926  10951279 Sajed,Dana, MD Angus,Lambros, MD | Basic Metabolic Panel | Result D/T: 05/13/06 by: Young,Lee Jeanne, MT Anion Gap: 13  (norm) BUN (mg/dL): 10  (norm) BUN/Creat Ratio : 14  (norm) CO2 (mmol/L): 26  (norm) Ca (mg/dL): 9.5  (norm) Cl (mmol/L): 104  (norm) |

MPXI: 10.9 (abn)
Macro Flag: + (norm)
Mono (%): 15.0 (abn)
Mono(K/uL): 0.81 (norm)
Neut (%): 59.3 (norm)
Neut(K/uL): 3.22 (norm)
Plt (K/uL): 108 (abn)
RBC (M/uL): 3.19 (abn)
RDW (%): 13.3 (norm)
WBC (K/uL): 5.43 (norm)
Remark: Spec #10947169: 12 May 06  0843 (norm)

29

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

Page 30    of 41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order:r/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Hemogram No Diff 13 May 06  0926 Sajed,Dana, MD Angus,Lambros, MD | 10951279 | CBC only:  #521842117784 Result D/T: 05/13/06 by: Khan,Allah, MT |
| | | | | | Diagnosis: Hypokalemia (norm) |
| | | | | | HDW      (%): 2.38  (norm) |
| | | | | | Hct      (%): 29.6  (abn) |
| | | | | | Hgb (g/dL): 10.5  (abn) |
| | | | | | LI: 2.28  (norm) |
| | | | | | MCH (pg): 34.1  (abn) |
| | | | | | MCHC(g/dL): 35.4  (norm) |
| | | | | | MCV (fL): 96.4  (abn) |
| | | | | | MPV (fL): 10.2  (norm) |
| | | | | | Plt (K/uL): 137  (norm) |
| | | | | | RBC (M/uL): 3.07  (abn) |
| | | | | | RDW (%): 13.1  (norm) |
| | | | | | WBC (K/uL): 6.14  (norm) |
| | | | | | Remark: Spec #10951279: 13 May 06  0926  (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Magnesium Level 13 May 06  0926 Sajed,Dana, MD | 10951279 | Result D/T: 05/13/06 by: Ly,David, MT Diagnosis: Hypokalemia (norm) Mg (mg/dL): 1.6  (norm) |

Comment: icteric  (norm)
Creat   (mg/dL): 0.7  (norm)
D1: CO2,BUN,CA,GLU,CREA,Na,K,Cl,L,H,I  (norm)
Diagnosis: Hypokalemia  (norm)
Glucose  (mg/dL): 85  (norm)
Indices(H): 0  (norm)
Indices(I): 2  (norm)
Indices(L): 6  (norm)
K       (mmol/L): 3.2  (abn)
Na      (mmol/L): 143  (norm)
P1: MG,PHOS  (norm)
Remark: Spec #10951279: 13 May 06  0926  (norm)

30

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No for the earliest/latest event times of 30.0

Page 31      of 41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order=r/Pt MD | Spec No. Results |
|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Phosphate Level 13 May 06 0926 10951279 Sajed,Dana, MD Angus,Lambros, MD | Result D/T: 05/13/06 by: Ly,David, MT Diagnosis: Hypokalemia (norm) Phos (mg/dL): 3.8 (norm) Remark: Spec #10951279: 13 May 06 0926 (norm) |
| Waiters,General | | | Angus,Lambros, MD | Remark: Spec #10951279: 13 May 06 0926 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Basic Metabolic Panel 13 May 06 2207 10952426 Fonji,Bertrand, MD Angus,Lambros, MD | Result D/T: 05/14/06 by: Chen,Yan, MT Anion Gap: 13 (norm) BUN (mg/dL): 8 (norm) BUN/Creat Ratio : 11 (norm) CO2 (mmol/L): 25 (norm) Ca (mg/dL): 9.4 (norm) Cl (mmol/L): 107 (norm) Creat (mg/dL): 0.7 (norm) D1: L,H,I (norm) D2: CO2,BUN,CA,GLU,CREA,Na,K,Cl,L,H,I (norm) Diagnosis: Hypokalemia (norm) Glucose (mg/dL): 87 (norm) Indices(H) : 4 (norm) Indices(I) : 1 (norm) Indices(L): 9 (norm) K (mmol/L) : 3.4 (abn) Na (mmol/L): 145 (norm) PI: MG, PHOS (norm) Remark: Spec #10952426: 13 May 06 2207 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Magnesium Level 13 May 06 2207 10952426 Fonji,Bertrand, MD Angus,Lambros, MD | Result D/T: 05/14/06 by: Chen,Yan, MT Diagnosis: Hypokalemia (norm) Mg (mg/dL): 1.7 (norm) Remark: Spec #10952426: 13 May 06 2207 (norm) |
| Waiters,General | 3046806-12 | 05/07/06 1601 | Phosphate Level | Result D/T: 05/14/06 by: Chen,Yan, MT |

31

27 Jun 2006  1228  Generated by Matthews,Melissa,                                                              Page  32   of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order#/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/06/06  2207 D2S21-A | 13 May 06  2207 Fonji,Bertrand, MD Angus,Lambros, MD | 10952426 | Diagnosis: Hypokalemia (norm) Phos (mg/dL): 4.5 (norm) Remark: Spec #10952426: 13 May 06  2207 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06  1601 D2S21-A | Basic Metabolic Panel 14 May 06  0905 Fonji,Bertrand, MD Angus,Lambros, MD | 10952694 | Result D/T: 05/14/06 by: Ly,David, MT Anion Gap: 12 (norm) BUN    (mg/dL): 7 (abn) BUN/Creat Ratio : 10 (norm) CO2    (mmol/L): 26 (norm) Ca     (mg/dL): 9.3 (norm) Cl     (mmol/L): 106 (norm) Creat  (mg/dL): 0.7 (norm) D1: CO2,BUN,CA,GLU,CREA,L,H,I (norm) Diagnosis: Hypokalemia (norm) Glucose (mg/dL): 94 (norm) Indices(H) : 0 (norm) Indices(I) : 1 (norm) Indices(L) : 6 (norm) K      (mmol/L): 3.1 (abn) Na     (mmol/L): 144 (norm) P1: MG, PHOS,Na,K,Cl (norm) Remark: Spec #10952694: 14 May 06  0905 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06  1601 D2S21-A | Magnesium Level 14 May 06  0905 Fonji,Bertrand, MD Angus,Lambros, MD | 10952694 | Result D/T: 05/14/06 by: Ly,David, MT Diagnosis: Hypokalemia (norm) Mg (mg/dL): 1.7 (norm) Remark: Spec #10952694: 14 May 06  0905 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06  1601 D2S21-A | Phosphate Level 14 May 06  0905 Fonji,Bertrand, MD Angus,Lambros, MD | 10952694 | Result D/T: 05/14/06 by: Ly,David, MT Diagnosis: Hypokalemia (norm) Phos (mg/dL): 4.7 (abn) Remark: Spec #10952694: 14 May 06  0905 (norm) |

32

27 Jun 2006  1228  Generated by Matthews,Melissa,

Page  33  of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Visit No./ | Visit Dt-Tm/ | Proc/Evt Time | | |
|---|---|---|---|---|
| DOB/Age | Location | Order/Pt MD | Spec No. | Results |

| 3046806-12 | 05/07/06 1601 | Basic Metabolic Panel | | Result D/T: 05/15/06 by: Belizaire,Carmelle,MLT |
| 05/06/1970 | D2S21-A | 15 May 06  0841 10953805 | | Anion Gap: 10 (norm) |
| 36Y | | Miller,Andrew, MD | | BUN     (mg/dl) : 6 (abn) |
| | | Angus,Lambros, MD | | BUN/Creat Ratio : 9 (norm) |
| | | | | CO2     (mmol/L) : 26 (norm) |
| | | | | Ca      (mg/dL) : 9.2 (norm) |
| | | | | Cl      (mmol/L) : 104 (norm) |
| | | | | Creat   (mg/dL) : 0.7 (norm) |
| | | | | D1: CO2,BUN,CA,GLU,CREA,Na,K,Cl,L,H,I (norm) |
| | | | | Diagnosis: Trauma (norm) |
| | | | | Glucose (mg/dL) : 109 (abn) |
| | | | | Indices (H) : 1 (norm) |
| | | | | Indices (I) : 1 (norm) |
| | | | | Indices (L) : 5 (norm) |
| | | | | K       (mmol/L) : 3.6 (norm) |
| | | | | Na      (mmol/L) : 140 (norm) |
| | | | | P1: MG, PHOS (norm) |
| | | | | Remark: Spec #10953805: 15 May 06  0841 (norm) |

| 3046806-12 | 05/07/06 1601 | Hemogram No Diff | | Result D/T: 05/15/06 by: Shustova,Sofia, MT |
| 05/06/1970 | D2S21-A | 15 May 06  0841 | | CBC only: #52185912801 |
| 36Y | | Miller,Andrew, MD | | Diagnosis: Trauma (norm) |
| | | Angus,Lambros, MD | | HDW     (%) : 2.51 (norm) |
| | | | | Hct     (%) : 31.9 (abn) |
| | | | | Hgb     (g/dL) : 10.5 (abn) |
| | | | | Li: 2.32 (norm) |
| | | | | MCH     (pg) : 32.3 (abn) |
| | | | | MCHC(g/dL) : 33.0 (norm) |
| | | | | MCV     (fL) : 97.7 (abn) |
| | | | | MPV     (fL) : 8.5 (norm) |
| | | | | Plt     (K/uL) : 266 (norm) |
| | | | | RBC     (M/uL) : 3.27 (abn) |
| | | | | RDW     (%) : 13.7 (norm) |

Patient
Walters,General

33

27 Jun 2006  1228  Generated by Matthews,Melissa,                                    Page  34   of  41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order=r/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Walters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 | | | Remark: Spec #10953805: 15 May 06  0841 (norm) WBC (K/uL): 5.05 (norm) |
| Walters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2521-A | Magnesium Level 15 May 06  0841 Miller,Andrew, MD Angus,Lambros, MD | 10953805 | Result D/T: 05/15/06 by: Belizaire,Carmelle, MLT Diagnosis: Trauma (norm) Mg (mg/dL): 1.7 (norm) Remark: Spec #10953805: 15 May 06  0841 (norm) |
| Walters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2521-A | Phosphate Level 15 May 06  0841 Miller,Andrew, MD Angus,Lambros, MD | 10953805 | Result D/T: 05/15/06 by: Belizaire,Carmelle, MLT Diagnosis: Trauma (norm) Phos (mg/dL): 3.8 (norm) Remark: Spec #10953805: 15 May 06  0841 (norm) |
| Walters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2521-A | Basic Metabolic Panel 16 May 06  0824 Sajed,Dana, MD Angus,Lambros, MD | 10958392 | Result D/T: 05/16/06 by: Brits,Margarita, MT Anion Gap: 9 (norm) BUN (mg/dL): 10 (norm) BUN/Creat Ratio : 13 (norm) CO2 (mmol/L): 25 (norm) Ca (mg/dL): 8.7 (norm) Cl (mmol/L): 104 (norm) Creat (mg/dL): 0.8 (norm) D2: CO2,BUN,CA,GLU,CREA,L,H,I (norm) Diagnosis: Trauma (norm) Glucose (mg/dL): 82 (norm) Indices(H): 0 (norm) Indices(I): 1 (norm) Indices(L): 7 (norm) K (mmol/L): 4.3 (norm) Na (mmol/L): 138 (norm) P2: MG,PHOS,Na,K,Cl (norm) Remark: Spec #10958392: 16 May 06  0824 (norm) |
| Walters,General | 3046806-12 | 05/07/06 1601 | Hemogram Auto Diff w/rfl | | Result D/T: 05/16/06 by: Caridad,Cecilio, MT |

34

27 Jun 2006   1228   Generated by Matthews,Melissa,

Page 35   of 41,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No for the earliest/latest event times of 30,0

| Visit No./ | Visit Dt-Tm/ | Proc/Evt Time | | |
|---|---|---|---|---|
| DOB/Age | Location | Order/Evt MD | Spec No. | Results |
| 05/06/1970 | D2S21-A | 16 May 06  0824 | 10958392 | Atyp Flag: + (norm) |
| 36Y | | Sajed,Dana, MD | | Baso   (%): 0.2 (norm) |
| | | Angus,Liambros, MD | | Baso(K/uL): 0.01 (norm) |
| | | | | CBC/Diff:  #5218591280I (norm) |
| | | | | Eos   (%): 1.0 (norm) |
| | | | | Eos (K/uL): 0.04 (norm) |
| | | | | HDW   (%): 2.34 (norm) |
| | | | | Hct   (%): 30.2 (abn) |
| | | | | Hgb (g/dL): 10.0 (abn) |
| | | | | LI: 2.24 (norm) |
| | | | | LUC   (%): 5.0 (abn) |
| | | | | LUC (K/uL): 0.22 (norm) |
| | | | | Lym (K/uL): 1.22 (norm) |
| | | | | Lymph (%): 27.4 (norm) |
| | | | | MCH (pg): 32.9 (abn) |
| | | | | MCHC(g/dL): 33.1 (norm) |
| | | | | MCV (fL): 99.2 (abn) |
| | | | | MPV (fL): 9.7 (norm) |
| | | | | MPXI: 6.3 (norm) |
| | | | | Macro Flag: + (norm) |
| | | | | Mono   (%): 16.0 (abn) |
| | | | | Mono(K/uL): 0.71 (norm) |
| | | | | NRBC Flag: + (norm) |
| | | | | Neut   (%): 50.4 (norm) |
| | | | | Neut(K/uL): 2.24 (norm) |
| | | | | Plt (K/uL): 279 (norm) |
| | | | | RBC (M/uL): 3.04 (abn) |
| | | | | RDW   (%): 13.5 (norm) |
| | | | | Remark:  Spec #10958392: 16 May 06  0824 (norm) |
| | | | | WBC (K/uL): 4.45 (abn) |
| 3046806-12 | 05/07/06 1601 | Magnesium Level | | Result D/T: 05/16/06 by: Brits,Margarita, MT |
| 05/06/1970 | D2S21-A | 16 May 06  0824 | 10958392 | Diagnosis: Trauma (norm) |

Walters,General

35

27 Jun 2006  1228  Generated by Matthews,Melissa,                                    Page 36  of 41

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Evt Time Order;r/Pt MD | Spec No. | Results |
|---|---|---|---|---|---|
| Waiters,General | 36Y | | Sajed,Dana, MD Angus,Lambros, MD | | Mg (mg/dL): 2.0 (norm)<br>Remark: Spec #10958392: 16 May 06  0824 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Phosphate Level 16 May 06  0824 10958392 Sajed,Dana, MD Angus,Lambros, MD | | Result D/T: 05/16/06 by: Brits,Margarita, MT<br>Diagnosis: Trauma (norm)<br>Phos (mg/dL): 4.2 (norm)<br>Remark: Spec #10958392: 16 May 06  0824 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Basic Metabolic Panel 17 May 06  0924 10963122 Fonji,Bertrand, MD Angus,Lambros, MD | | Result D/T: 05/17/06 by: Wong,Keung, MT<br>Anion Gap: 9 (norm)<br>BUN (mg/dL): 8 (norm)<br>BUN/Creat Ratio : 11 (norm)<br>CO2 (mmol/L): 27 (norm)<br>Ca (mg/dL): 9.4 (norm)<br>Cl (mmol/L): 101 (norm)<br>Creat (mg/dL): 0.7 (norm)<br>D2: CO2,BUN,CA,GLU,CREA,Na,K,Cl,L,H,I (norm)<br>Diagnosis: Trauma (norm)<br>Glucose (mg/dL): 101 (abn)<br>Indices(H): 1 (norm)<br>Indices(I): 1 (norm)<br>Indices(L): 10 (norm)<br>K (mmol/L): 4.3 (norm)<br>Na (mmol/L): 137 (norm)<br>P2: MG,PHOS (norm)<br>Remark: Spec #10963122: 17 May 06  0924 (norm) |
| Waiters,General | 3046806-12 05/06/1970 36Y | 05/07/06 1601 D2S21-A | Magnesium Level 17 May 06  0924 10963122 Fonji,Bertrand, MD Angus,Lambros, MD | | Result D/T: 05/17/06 by: Wong,Keung, MT<br>Diagnosis: Trauma (norm)<br>Mg (mg/dL): 1.9 (norm)<br>Remark: Spec #10963122: 17 May 06  0924 (norm) |
| Waiters,General | 3046806-12 | 05/07/06 1601 | Phosphate Level | | Result D/T: 05/17/06 by: Wong,Keung, MT |

36

Case 1:13-cv-03636-DLI   Document 6-4   Filed 09/18/13   Page 242 of 366 PageID #: 1463

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient | | | |
|---|---|---|---|
| | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc/Rvt Time Orderer/Pt MD   Spec No. Results |
| | 05/06/1970   36Y | D2S21-A | 17 May 06  0924  10963122  Diagnosis: Trauma (norm) |
| | | | Fonji,Bertrand, MD          Phos (mg/dL): 4.0 (norm) |
| | | | Angus,Lambros, MD  Remark: Spec #10963122: 17 May 06 0924 (norm) |

Total Visits:              98
Total Events:              99

Total Normal Results:      714
Total Abn/Crit Results:    238
Total Abnormal Results:    224
Total Critical Results:     14
                           -----
Total Results:             952

| Result | Normal | Abn/Crit | Abnormal | Critical | Total |
|---|---|---|---|---|---|
| ALT            (U/L)  | 0 | 4 | 4 | 0 | 4 |
| AST            (U/L)  | 0 | 4 | 4 | 0 | 4 |
| Albumin        (g/dL) | 4 | 0 | 0 | 0 | 4 |
| Alk Phos       (U/L)  | 4 | 0 | 0 | 0 | 4 |
| Amorph material       | 0 | 1 | 1 | 0 | 1 |
| Amylase        (U/L)  | 0 | 1 | 1 | 0 | 1 |
| Anion Gap             | 7 | 6 | 6 | 0 | 13 |
| Anticoagulant         | 6 | 0 | 0 | 0 | 6 |
| Atyp Flag             | 3 | 0 | 0 | 0 | 3 |
| BE             (mmol/L)| 1 | 0 | 0 | 0 | 1 |
| BE             (nmol/L)| 2 | 3 | 3 | 0 | 5 |
| BUN            (mg/dL) | 1 | 3 | 3 | 0 | 4 |
| BUN            (mg/dL) | 6 | 3 | 3 | 0 | 9 |
| BUN/Creat Ratio       | 3 | 1 | 1 | 0 | 4 |
| BUN/Creat Ratio       | 9 | 0 | 0 | 0 | 9 |
| Bacteria(UF)/hpf      | 1 | 0 | 0 | 0 | 1 |
| Barbit         (mAbs) | 1 | 0 | 0 | 0 | 1 |
| Barbiturates          | 1 | 0 | 0 | 0 | 1 |
| Baso   (%)            | 8 | 1 | 1 | 0 | 9 |
| Baso(K/uL)            | 9 | 0 | 0 | 0 | 9 |
| Baso   (%)            | 1 | 0 | 0 | 0 | 1 |
| Benzodiaz (mAbs)      | 1 | 0 | 0 | 0 | 1 |
| Benzodiazepines       | 1 | 0 | 0 | 0 | 1 |
| Bilirubin             | 1 | 0 | 0 | 0 | 1 |
| CBC only              | 3 | 0 | 0 | 0 | 3 |
| CBC/Diff              | 4 | 0 | 0 | 0 | 4 |
| CK             (U/L)  | 0 | 1 | 0 | 1 | 1 |
| CK-MB          (ng/mL)| 1 | 0 | 0 | 0 | 1 |

37

27 Jun 2006   1228   Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No for the earliest/latest event times of 30,0

Page 38   of 41

| Visit No./ | Proc/Evt Time | | | | |
|---|---|---|---|---|---|
| DOB/Age | Location | Orders/Pt MD | Spec No. Results | | |
| CK-MB Index (%) | | 1 | 0 | 0 | 1 |
| CO2 | (mmol/L) | 0 | 4 | 4 | 4 |
| CO2 | (mmol/L) | 7 | 2 | 2 | 9 |
| COHb | (%) | 1 | 0 | 0 | 1 |
| COHb | (%) | 0 | 5 | 5 | 5 |
| Ca | (mg/dL) | 4 | 0 | 0 | 4 |
| Ca | (mg/dL) | 9 | 0 | 0 | 9 |
| Calcium Ionized | (mg/dL) | 0 | 5 | 0 | 5 |
| Cast (UF)/lpf | | 1 | 0 | 1 | 1 |
| Casts | (/lpf) | 1 | 0 | 0 | 1 |
| Cl | (mmol/L) | 3 | 1 | 0 | 4 |
| Cl | (mmol/L) | 8 | 1 | 1 | 9 |
| Cl | (mmol/L) | 5 | 0 | 0 | 5 |
| Clarity | | 1 | 0 | 0 | 1 |
| Cocaine | (mAbs) | 1 | 0 | 0 | 1 |
| Cocaine/Metab | | 1 | 0 | 0 | 1 |
| Color | | 1 | 0 | 0 | 1 |
| Comment | | 49 | 0 | 0 | 49 |
| Corr pCO2 | (mmHg) | 3 | 3 | 3 | 6 |
| Corr pH | | 2 | 4 | 4 | 6 |
| Corr pO2 | (mmHg) | 2 | 4 | 4 | 6 |
| Creat | (mg/dL) | 3 | 1 | 0 | 4 |
| Creat | (mg/dL) | 9 | 1 | 1 | 9 |
| Crystals | | 1 | 0 | 0 | 1 |
| D Fibrngn | | 3 | 0 | 0 | 3 |
| D1 | | 5 | 0 | 0 | 5 |
| D2 | | 7 | 0 | 0 | 7 |
| Diagnosis | | 89 | 0 | 0 | 89 |
| Eos | (%) | 9 | 0 | 0 | 9 |
| Eos | (K/uL) | 9 | 0 | 0 | 9 |
| Epith Cell(UF)/hpf | | 1 | 0 | 0 | 1 |
| Ethyl Alcohol | (mg/dL) | 0 | 3 | 1 | 3 |
| FIO2 | | 6 | 0 | 0 | 6 |

38

Case 1:13-cv-03636-DLI   Document 6-4   Filed 09/18/13   Page 244 of 366 PageID #: 1465

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006  0000 to 17 May 2006  2359

for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30.0

| Patient / DOB/Age | Visit No./ Location | Visit Dt-Tm/ Orderer/Pt MD | Proc/Evt Time | | Spec No. | Results | | | |
|---|---|---|---|---|---|---|---|---|---|
| Flagging (UF) | | | | | 1 | 0 | 0 | 0 | 1 |
| Gluc (mg/dL) | | | | | 1 | 3 | | 3 | 4 |
| Gluc (mg/dL) | | | | | 1 | 4 | | 4 | 5 |
| Glucose | | | | | 1 | 0 | | 0 | 1 |
| Glucose (mg/dL) | | | | | 7 | 2 | | 2 | 9 |
| HCO3 | | | | | 1 | 0 | | 0 | 1 |
| HCO3 (mmol/L) | | | | | 1 | 4 | | 4 | 5 |
| HDW | | | | | 10 | 2 | | 2 | 12 |
| HDW (%) | | | | | 1 | 11 | | 11 | 12 |
| Hct | | | | | 1 | 1 | | 1 | 1 |
| Hemoglobin | | | | | 0 | 1 | | 1 | 12 |
| Hgb (g/dL) | | | | | 1 | 11 | | 11 | 12 |
| Indices (H) | | | | | 3 | 0 | | 0 | 3 |
| Indices (I) | | | | | 3 | 0 | | 0 | 3 |
| Indices (L) | | | | | 3 | 0 | | 0 | 3 |
| Indices (H) | | | | | 9 | 0 | | 0 | 9 |
| Indices (I) | | | | | 9 | 0 | | 0 | 9 |
| Indices (I) | | | | | 9 | 0 | | 0 | 9 |
| Indices (L) | | | | | 1 | 0 | | 0 | 4 |
| K | | | | | 0 | 4 | | 2 | 9 |
| K (mmol/L) | | | | | 4 | 5 | | 3 | 9 |
| K (mmol/L) | | | | | 1 | 4 | | 2 | 5 |
| K (mmol/L) | | | | | 0 | 0 | | 0 | 1 |
| Ketones | | | | | 1 | 1 | | 1 | 5 |
| LI | | | | | 12 | 0 | | 1 | 1 |
| LUC (%) | | | | | 6 | 3 | | 3 | 9 |
| LUC (K/uL) | | | | | 9 | 0 | | 0 | 9 |
| Lactate (mmol/L) | | | | | 0 | 5 | | 5 | 5 |
| Leuk Esterase | | | | | 1 | 0 | | 0 | 1 |
| Lg PLT Flag | | | | | 1 | 0 | | 0 | 1 |
| Lym (K/uL) | | | | | 5 | 4 | | 4 | 9 |
| Lymph (%) | | | | | 1 | 8 | | 8 | 9 |
| MCH (pg) | | | | | 0 | 12 | | 12 | 12 |
| MCHC (g/dL) | | | | | 11 | 1 | | 1 | 12 |
| MCV (fL) | | | | | 1 | 11 | | 11 | 12 |
| MPV (fL) | | | | | 12 | 0 | | 0 | 12 |

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results Listed for Patient
7 May 2006 0000 to 17 May 2006 2359
for the chart review group(s): L/All Laboratory No for the earliest/latest event times of 30,0

Page 40   of 41

| Patient | Visit No./ DOB/Age | Visit Dt-Tm/ Location | Proc./Evt Time Orderer/Pt MD | Spec No. Results | | | |
|---|---|---|---|---|---|---|---|
| MPXI | | | | 4 | 5 | 5 | |
| Macro Flag | | | | 8 | 0 | 0 | 9 |
| Manual Micro Exam | | | | 1 | 0 | 0 | 8 |
| MetHb      (%) | | | | 1 | 0 | 0 | 1 |
| MetHb      (%) | | | | 0 | 5 | 5 | 1 |
| Methadone | | | | 1 | 0 | 0 | 5 |
| Methadone (mAbs) | | | | 1 | 0 | 0 | 1 |
| Mg (mg/dL) | | | | 11 | 1 | 1 | 1 |
| Micro Exam | | | | 1 | 0 | 0 | 12 |
| Mono      (%) | | | | 6 | 3 | 3 | 1 |
| Mono (K/uL) | | | | 9 | 0 | 0 | 9 |
| Mucous threads | | | | 0 | 1 | 1 | 1 |
| NRBC Flag | | | | 3 | 0 | 0 | 3 |
| Na      (mmol/L) | | | | 4 | 0 | 0 | 4 |
| Na      (mmol/L) | | | | 8 | 1 | 1 | 9 |
| Na (mmol/L) | | | | 2 | 3 | 3 | 5 |
| Neut      (%) | | | | 2 | 7 | 7 | 9 |
| Neut (K/uL) | | | | 7 | 2 | 2 | 9 |
| Nitrite | | | | 1 | 0 | 0 | 1 |
| O2Hb      (%) | | | | 1 | 0 | 0 | 1 |
| O2Hb      (%) | | | | 4 | 1 | 1 | 5 |
| Opiates | | | | 1 | 0 | 0 | 1 |
| Opiates (mAbs) | | | | 1 | 0 | 0 | 1 |
| P1 | | | | 5 | 0 | 0 | 5 |
| P2 | | | | 8 | 0 | 0 | 8 |
| PCO2      (mmHg) | | | | 1 | 0 | 0 | 1 |
| PCO2      (mmHg) | | | | 2 | 3 | 3 | 5 |
| PLT CLMP | | | | 1 | 0 | 0 | 1 |
| PT      (sec) | | | | 2 | 1 | 1 | 3 |
| Phos (mg/dL) | | | | 10 | 2 | 2 | 12 |
| Plt (K/uL) | | | | 5 | 7 | 7 | 12 |
| Plt Est | | | | 1 | 2 | 2 | 3 |
| Prot Confirm | | | | 0 | 1 | 1 | 1 |

40

27 Jun 2006  1228  Generated by Matthews,Melissa,

Kings County Hospital Center
Lab Results listed for Patient
7 May 2006  0000 to 17 May 2006  2359
for the chart review group(s): L/All Laboratory No  for the earliest/latest event times of 30,0

| Patient | Visit No./ | Visit Dt-Tm/ | Proc/Evt Time | | | | | |
|---|---|---|---|---|---|---|---|---|
| | DOB/Age | Location | Order(s)/Pt MD | Spec No. | Results | | | |
| Protein (/hpf) | | | | 0 | 1 | 1 | 0 | 1 |
| RBC | | | | 0 | 1 | 1 | 0 | 1 |
| RBC (M/uL) | | | | 1 | 11 | 11 | 0 | 12 |
| RBC Morph | | | | 0 | 1 | 1 | 0 | 1 |
| RBC(UF)/hpf | | | | 1 | 0 | 0 | 0 | 1 |
| RDW (%) | | | | 12 | 0 | 0 | 0 | 12 |
| Remark | | | | 99 | 0 | 0 | 0 | 99 |
| Scan | | | | 3 | 0 | 0 | 0 | 3 |
| Spec Grav | | | | 1 | 0 | 0 | 0 | 1 |
| T Prot (g/dL) | | | | 4 | 0 | 0 | 0 | 4 |
| T. Bili (mg/dL) | | | | 1 | 3 | 3 | 0 | 4 |
| Troponin I (ng/mL) | | | | 1 | 0 | 0 | 0 | 1 |
| Urobilinogen | | | | 1 | 0 | 0 | 0 | 1 |
| WBC (K/uL) | | | | 1 | 1 | 1 | 0 | 1 |
| WBC(UF)/hpf | | | | 11 | 1 | 1 | 0 | 12 |
| aPTT (sec) | | | | 3 | 0 | 0 | 0 | 3 |
| p50 (mmHg) | | | | 1 | 1 | 1 | 0 | 1 |
| p50 (mmHg) | | | | 3 | 2 | 2 | 0 | 3 |
| pH | | | | 3 | 4 | 4 | 0 | 7 |
| pO2 (mmHg) | | | | 1 | 0 | 0 | 0 | 1 |
| pO2 (mmHg) | | | | 1 | 4 | 4 | 0 | 5 |
| sO2 (%) | | | | 3 | 2 | 2 | 0 | 5 |
| sO2 (%) | | | | 1 | 0 | 0 | 0 | 1 |
| tHb (g/dL) | | | | 1 | 0 | 0 | 0 | 1 |
| tHb (g/dL) | | | | 3 | 2 | 2 | 0 | 5 |
| tO2 (vol%) | | | | 1 | 0 | 0 | 0 | 1 |
| tO2 (vol%) | | | | 0 | 5 | 5 | 0 | 5 |

41

KINGS COUNTY HOSPITAL CENTER
BROOKLYN N.Y. 11203

DATE

WARD/LOCATION

MR # 230 8102   D.O.B.

NAME Waiters, General   SEX: ☐ M   ☐ F

ADMISSION #

MEDICARE ☐ YES
☐ NO

IN LEFT COLUMN, ENTER TITLE, DATE & TIME OF NOTATION.

PATIENT'S PROGRESS /COMMUNICATION RECORD

DO NOT USE THESE ABBREVIATIONS:  **KCHC prohibits use of the following abbreviations in any form of documentation or orders.**

**QD or q.d.    µg    Qn    IU    1.0 mg (trailing zero)    .5 (naked decimal)**
**QOD or q.o.d    Ms, MgSO4 or MSO4    U or u    T.I.W.    A.S., A.D. or A.U.**

*Protect Patient Safety: Find an un-approved abbreviation. Immediately contact the author to clarify/correct the abbreviation. Do not assume that you know the meaning.*

TITLE 5/7/2006 DATE/TIME 5pm

**SICU Admission Note**

36 year old male s/p assault/falling, sustaining trauma to right infraorbital region.  + LOC, + AOB.  Pt oriented X1 and verbally responsive.  GCS: 6/4/3

Pt appears to have ruptured globe on admission.

Vitals

**PMHx:** denies

**Allergies:** denies

**Meds:** unk

Meds:

**Labs:**

12.6 / 144 | 104 | 6 / 7.0 | 523 | 75
9.8 113 / 3.1 | 22 | 0.8 103 39 | 214 | 3
37.1

1.4

Ca: 8.7 Mg: 1.4 Phos: 3.4 → replaced

14.4 15.2  ABG (PA) 7.435/35.6/94.3/985/20.5/+23
1.4

Vent:

U tox (—)   Etoh: 158.55

**Radiology:**

CXR: acute pulm process

**Physical Exam:**

Gen: alert , oriented x 1

HEENT: massive R periorbital edema, + blood in mouth, nose, massive labial edema

Chest: cta b/l, breath sounds equal

CVS: rrr

Abdo: soft,

Ext: FROM, 2+ pulses x 4

CNS: unable to assess due to intoxicated state

601-013 Rev. 12/92 5/05 10/05
HHC 2478 (Oct 05)

CTD 42

KINGS COUNTY HOSPITAL CENTER
BROOKLYN N.Y. 11203

| DATE | WARD/LOCATION |
| MR # | D.O.B. |
| NAME | SEX: ☐ M   ☐ F |
| ADMISSION # | MEDICARE ☐ YES |
| | ☐ NO |

IN LEFT COLUMN, ENTER TITLE, DATE & TIME OF NOTATION.

**PATIENT'S PROGRESS /COMMUNICATION RECORD**

DO NOT USE THESE ABBREVIATIONS:  KCHC prohibits use of the following abbreviations in any form of documentation or orders.

| QD or q.d. | µg | Qn | IU | 1.0 mg (trailing zero) | .5 (naked decimal) |
| QOD or q.o.d | Ms, MgSO4 or MSO4 | | U or u | T.I.W. | A.S., A.D. or A.U. |

*Protect Patient Safety: Find an un-approved abbreviation. Immediately contact the author to clarify/correct the abbreviation. Do not assume that you know the meaning.*

| TITLE | DATE/TIME | Observations and Opinions of Visitings, Consultants and House Staff. A Final Discharge Note Must Be Entered on This Sheet. Sign and Date Every Entry. |
|---|---|---|
| MD | 5/4/06 | Trauma |
| | 09 25 | Pt reportedly had some hallucinations. Yest to weds placed back on Librium & Ativan. Tolerating PO diet. |
| | | S/o pain in ® Arm. |
| | | 98   150-163 / 87-90   88-98 |
| | | PE: OD facial Swelling unchanged    S,S RR ®S/U |
| | | CTA ®        Abd: S/NT, ND, ⊕BS    Arm Eccly noses |
| | | & Puncture wounds |
| | | A/P: 36 y o ♂ ⁺ allegedly S/p Attacked Family Members, S/p being beaten & thrown through Aquarium. |
| | | ① ETOH Withdrawl: D/c Librium, ↑ Ativan to 2 mg Q6h. Cont Thiamin & Folate. |
| | | ② Diet: Regular  Pt needs Assistance c eating as he is hand cuffed ®. Cont IVF. |
| | | ③ Psych Consult (P) |
| | | ④ Social/Legal: Yet to be arraigned. Post Arraignment Consider transfer to Bellvue Prison Ward. |
| | | ⑤ facial fx: OMFS & ENT evaluating Pt. |
| | | Miller, Andrew, MD |
| | | 914291 |
| LPN | 5/4/06 | Pt clinical for Semi posture movable movable |
| | 1130 | |

Kings County Hospital Center
Chart Review Print

| Location | Patient Name | | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|---|
| DIS-D2S21-A | Waiters,General | | 3046806 | 3046806-12 | 39Y | M |

Attending Physician
Angus,Lambros

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Psychiatry Inpatient Consult
Event Time: Sun, 14 May 06  1837                 Status: complete

Sun, 21 May 06  1328   Documented by Lev Poberesky, MD

Consult Date/Time   : 14May2006 1837
Consultation Report : INITIAL PSYCHIATRIC CONSULT

       5/14/06

       WAITERS,GENERAL MR: 3046806

       Pt is a 36 y.o. BM with alcohol abuse and dependence,
who came in after allegedly shooting at his family
members who in retaliation beat him up and threw him
through an aquarium.  Pt was placed on Librium and
Ativan, and was taken off Librium as per schedule,
however pt started to hallucinate and was agitated.  He
was placed back on Librium and Ativan which controlled
the agitation, and no new report of hallucination from
staff.  Spoke to consultee who said that they would
cancel the consult as there is no psychiatric question
to answer, but as yet consult has not been cancelled.
According to the girlfriend, the pt does no have any
other psychiatric issues outside of the alcohol
dependence and occasional marijuana smoking.  No hx of
depression, suicidality, homicidality, or psychosis in
the past.
       Attempted to speak to pt.  Pt was only able to
mumble and had difficulty opening his eyes because of
the swelling.  Pt believes he is in Atlanta, Georgia,
and was surprised when he was informed that he was in
bRooklyn.  He also thinks his wife was with him last
night.  Pt is still in delirium.

       A>       alcohol delirium
alcohol dependence

       REC: continue present alcohol detox management.
Recall psychiatry prn
D/W Dr. Poberesky

| | |
|---|---|
| Diagnosis | : Alcoholism |
| Consultant | : Lev Poberesky, MD |
| Consultant ext/pager: | 9172054735 |
| Verifying Attending | : Lev Poberesky, MD |
| Attending Comment | : Case discussed. Agree. |

44

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

```
Sun, 3 Jan 10   0857                                    Page  2 of 2
User ID: 5559
                        Kings County Hospital Center
                            Chart Review Print

Location              Patient Name            Patient Number   Visit Number   Age   Sex
DIS-EP                Waiters,General         3046806          2308102-1      39Y   M

                                      Attending Physician
```

---

Ophthalmology Inpatient Consult -- cont'd

DFE:
MVP: wnl OU
C/D: 0.3 sharp, pink OD, 0.25 sharp, pink OS

CT orbits axial 1mm cuts: limited as head is turned.
(15-16 mm vertically, 7 mm medially displaced, and 14
mm A- P) Large medially displaced lamina papyracea
fracture without muscle entrapment, however MR medially
displaced, Globes OU are spherical, with no retrobulbar
hemorrhage OU, + intraconal air as well as air bubbles
within ethmoid air cells, + mild opacification of both
maxillary sinus right > left.

A/P:      Right orbital medial wall fracture
    Awaiting CT orbits with coronals (reformatted) to
better assess orbit.
    Ice to orbit x 48 hours
    No nose blowing
    Afrin nasal spray tid to nostrils
    Broad spectrum antibiotics (eg, Keflex 500 mg po
qid)
    Pain meds
    Cosopt 1 gtt bid OD (for slightly elevated IOP)
    Once pt more cooperative, will get better history
and re-attempt exam
    Will continue to follow.
    Will discuss with team
Diagnosis         : Fracture Orbit, Closed
Consultant        : Regina Del Rosario, MD
Consultant ext/pager: 917-760-1435
Verifying Attending : John Laudi, MD                         45

Sun, 3 Jan 10   0901                                        Page  1 of 1
User ID: 5559
                    Kings County Hospital Center
                         Chart Review Print

Location          Patient Name              Patient Number    Visit Number    Age    Sex
DIS-D2S21-A       Waiters,General           3046806           3046806-12      39Y    M

                                            Attending Physician
                                            Angus,Lambros
------------------------------------------------------------------------------
Unscheduled F/U (Psychiatry Inpatient Consult)
Event Time: Mon, 15 May 06  1155                    Status: complete

Mon, 15 May 06  1209   Documented by Alan L Tusher, MD

Consult Date/Time    : 15May2006 1155
Consultation Report  : Psych. Follow-up
                            The patient was asleep but easily arousable.  He
                     is disoriented to place ("Woodhole Hospital") and did
                     not know the year but knew it was the "21st century".
                     He also thought it was the ed of Maya and that he had
                     been at his sisters house, down South, yesterday.
                     Imp: Delirium due to medical etiology and/or Etoh
                     withdrawal.
                     Plan: 1.  The nurse reports that he has been   agitated
                     at times and that is when they increase his sedation.
                     Check LFT's since if they are WNL we can start Depakote
                     which may help in the resolution of his delirium.
                            2. Continue Ativan 2 mg po q 6h.  Hold if
                     asleep or id Bp is less than 100/ 60.
                            3. Pt should be on one to one observation.
                            4.  Psych will follow.
Diagnosis            : Delirium, Acute
Consultant           : Alan L Tusher, MD
Consultant ext/pager: (917)433-0863
Verifying Attending  : Alan L Tusher, MD
------------------------------------------------------------------------------


                    * * * End of Report * * *

46

Tue, 27 Jun 06  1227                                    Page  1 of 4

                Kings County Hospital CenterKings County Hospital Center
                              Chart Review Print

Location          Patient Name           Patient Number   Visit Number    Age   Sex
DIS-EP            Waiters,General        3046806          2308102-1        36Y   M

                                         Attending Physician

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Ophthalmology Inpatient Consult
Event Time: Sun, 07 May 06  1632                    Status:  complete

Sun, 07 May 06  1635   Documented by Regina Del Rosario, MD

Consult Date/Time   : 7May2006 1632
Consultation Report : PGY 2 Ophthalmolgy Consult

                    5/7/06
                    Unknown Black Male 2308102 = Waiters, General 3046806

                    36 yo BM + intoxication reportedly started shooting a
                    gun, and in order to be stopped was punched , kicked,
                    was hit over head with fish tank, brought by police
                    with multiple lacerations and swollen right eye. Pt
                    uncooperative with exam. Seen in C1-trauma, pt in C
                    collar, hand-cuffed to bed with paper bags over hands -
                    to be analyzed for gun powder residue. Unable to
                    voluntarily open right eye.

                    PMH: unknown
                    POH: unknown
                    Meds: unknown
                    All: unknown
                    FH: unknown

                    Va: unable to assess, pt uncooperative
                    P: 4-3 OU, no RAPD OU
                    EOM: restricted -2 in all directions of gaze OU, full
                    OS, unable to assess if pain with EOMS or diplopia
                    Ttono: 26, 27, 25 (with eyelid speculum), 20, 22, 19
                    (pt squeezing)

                    PLE (penlight + eyelid speculum OD)
                    LLA: + 3-4 rul and rll edema with 3.5 to 4 cm superior
                    temporal upper eyelid  laceration as well as 4-5 cm
                    laceration infraorbitally, + ecchymoses OU, no
                    crepitus, no resistance to retropulsion, no obvious
                    proptosis, no step off palpable, no hypoesthesia OU
                    SC: dense 4+ chemosis/SCH superior 180 degrees,
                    inferior 180 - no injection or chemosis, + flat SCH 90
                    degrees temporally OS
                    K: grossly clear
                    AC: formed OU, no gross hyphema OU
                    IP: brown, intact OU, round, equal, and reactive pupils
                    OU
                    Lens: clear OU

4 7

Kings County Hospital CenterKings County Hospital Center
Chart Review Print

| <u>Location</u> | <u>Patient Name</u> | <u>Patient Number</u> | <u>Visit Number</u> | <u>Age</u> | <u>Sex</u> |
|---|---|---|---|---|---|
| DIS-EP | Waiters,General | 3046806 | 2308102-1 | 36Y | M |

<u>Attending Physician</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Ophthalmology Inpatient Consult -- cont'd

DFE:
MVP: wnl OU
C/D: 0.3 sharp, pink OD, 0.25 sharp, pink OS


CT orbits axial 1mm cuts: limited as head is turned.
(15-16 mm vertically, 7 mm medially displaced, and 14
mm A- P) Large medially displaced lamina papyracea
fracture without muscle entrapment, however MR medially
displaced, Globes OU are spherical, with no retrobulbar
hemorrhage OU, + intraconal air as well as air bubbles
within ethmoid air cells, + mild opacification of both
maxillary sinus right > left.



A/P:    Right orbital medial wall fracture
    Awaiting CT orbits with coronals (reformatted) to
better assess orbit.
    Ice to orbit x 48 hours
    No nose blowing
    Afrin nasal spray tid to nostrils
    Broad spectrum antibiotics (eg, Keflex 500 mg po
qid)
    Pain meds
    Cosopt 1 gtt bid OD (for slightly elevated IOP)
    Once pt more cooperative, will get better history
and re-attempt exam
    Will continue to follow.
    Will discuss with team
Diagnosis       : Fracture Orbit, Closed
Consultant      : Regina Del Rosario, MD
Consultant ext/pager: 917-760-1435
Verifying Attending : John Laudi, MD
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Kings County Hospital CenterKings County Hospital Center
Chart Review Print

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-D2S21-A | Waiters,General | 3046806 | 3046806-12 | 36Y | M |

Attending Physician
Angus,Lambros

---------------------------------------------------------------

Psychiatry Inpatient Consult
Event Time: Sun, 14 May 06  1837                    Status: complete

Sun, 21 May 06  1328   Documented by Lev Poberesky, MD

Consult Date/Time    : 14May2006 1837
Consultation Report  : INITIAL PSYCHIATRIC CONSULT

             5/14/06

             WAITERS,GENERAL MR: 3046806

             Pt is a 36 y.o. BM with alcohol abuse and dependence,
             who came in after allegedly shooting at his family
             members who in retaliation beat him up and threw him
             through an aquarium.  Pt was placed on Librium and
             Ativan, and was taken off Librium as per schedule,
             however pt started to hallucinate and was agitated.  He
             was placed back on Librium and Ativan which controlled
             the agitation, and no new report of hallucination from
             staff.  Spoke to consultee who said that they would
             cancel the consult as there is no psychiatric question
             to answer, but as yet consult has not been cancelled.
             According to the girlfriend, the pt does no have any
             other psychiatric issues outside of the alcohol
             dependence and occasional marijuana smoking.  No hx of
             depression, suicidality, homicidality, or psychosis in
             the past.
             Attempted to speak to pt.  Pt was only able to
             mumble and had difficulty opening his eyes because of
             the swelling.  Pt believes he is in Atlanta, Georgia,
             and was surprised when he was informed that he was in
             bRooklyn.  He also thinks his wife was with him last
             night. Pt is still in delirium.

             A>        alcohol delirium
             alcohol dependence

             REC: continue present alcohol detox management.
             Recall psychiatry prn
             D/W Dr. Poberesky
Diagnosis            : Alcoholism
Consultant           : Lev Poberesky, MD
Consultant ext/pager: 9172054735
Verifying Attending  : Lev Poberesky, MD
Attending Comment    : Case discussed. Agree.
             ---------------------------------------------------------------

49

Tue, 27 Jun 06   1227                                    Page   4 of 4

                    Kings County Hospital CenterKings County Hospital Center
                              Chart Review Print

<u>Location</u>        <u>Patient Name</u>              <u>Patient Number</u>   <u>Visit Number</u>   <u>Age</u>   <u>Sex</u>
DIS-D2S21-A      Waiters,General              3046806            3046806-12      36Y    M

                                              <u>Attending Physician</u>
                                              Angus,Lambros

-----------------------------------------------------------------------------
Unscheduled F/U (Psychiatry Inpatient Consult)
Event Time: Mon, 15 May 06  1155                        Status: complete

Mon, 15 May 06  1209   Documented by Alan L Tusher, MD

Consult Date/Time    : 15May2006 1155
Consultation Report  : Psych. Follow-up
                            The patient was asleep but easily arousable.  He
                     is disoriented to place ("Woodhole Hospital") and did
                     not know the year but knew it was the "21st century".
                     He also thought it was the ed of Maya and that he had
                     been at his sisters house, down South, yesterday.
                     Imp: Delirium due to medical etiology and/or Etoh
                     withdrawal.
                     Plan: 1.  The nurse reports that he has been   agitated
                     at times and that is when they increase his sedation.
                     Check LFT's since if they are WNL we can start Depakote
                     which may help in the resolution of his delirium.
                            2. Continue Ativan 2 mg po q 6h.  Hold if
                     asleep or id Bp is less than 100/ 60.
                            3. Pt should be on one to one observation.
                            4. Psych will follow.
Diagnosis            : Delirium, Acute
Consultant           : Alan L Tusher, MD
Consultant ext/pager: (917)433-0863
Verifying Attending  : Alan L Tusher, MD
-----------------------------------------------------------------------------



                    * * * End of Report * * *


50

27 Jun 06  1227:44                                      Page   1 of 4

## Kings County Hospital Center
451 Clarkson Avenue
Brooklyn, NY 11203

### Adult Med/Surg/Rehab Discharge Summary

**Patient Information:**

Name:Waiters,General          DOB:6 May 70        Pt Tel#:(718) 485-7101
MR#:3046806                   Sex:M               Pt Loc :IP
Visit#:3046806-12             Age:36Y

****PRELIMINARY INSTRUCTIONS****

**General Discharge Information:**

Date of Admission             05/07/06
Preceptor MD                  Angus,Lambros, MD
Date of Discharge             05/17/06
Discharging MD                Fonji,Bertrand, MD
Admitting Diagnosis           Trauma
 rincipal Diagnosis           Trauma

**Clinical Information**

Admitting History             36 y/o male BIBEMS intoxicated s/p punch in right
                              eye and pushed into fish tank face first. CT scan
                              of facial bones and orbit showed multiple
                              fractures of nasal bone and orbit. Pt was started
                              on antibiotics for these fractures. OMSF saw pt
                              and determined no surgical intervention was
                              needed. Ophthalmology also cleared pt. Pt was
                              initially in ICU for management of DT. PT was
                              subsequently transferred to floor where he was
                              continued on ativan for DT and slowly switched to
                              Librium. Pt is no longer hallucinating and he is
                              AAO x 3. Pt also needed potassium levels
                              correction during stay. Pt is being discharged in
                              stable condition on a detox regimen and topical
                              erythromycin as per optho to f/u in ophthalmology
                              clinic in 1 week
Admitting Vitals              HT:N/A, WT:N/A, BP:168/85, Pulse:103bpm,
                              Resp:20BPM, Temp:99.2F
Admitting Physicial
    General                   normal
Hospital Course               See H and P

**Labs on Admission**         CMP 05/07/06, CBC Dif/rfx 05/07/06, PT 05/07/06,
                              aPTT 05/07/06, CMP 05/08/06, CBC Dif/rfx
                              05/08/06, PT 05/08/06, aPTT 05/08/06

**Labs on Discharge**         CBC Dif/rfx 05/16/06, BMP 05/16/06

**Radiology**                 CT and x-rays

**Discharge Instructions**

51

Case 1:13-cv-03636-DLI   Document 6-4   Filed 09/18/13   Page 257 of 366 PageID #: 1478

# Kings County Hospital Center
451 Clarkson Avenue
Brooklyn, NY 11203

## Adult Med/Surg/Rehab Discharge Summary

**A copy of the Discharge Summary has been given to the patient on discharge**

## Patient Information:

Name:Waiters,General          DOB:6 May 70          Pt Tel#:(718) 485-7101
  MR#:3046806                 Sex:M                Pt Loc :IP
Visit#:3046806-12             Age:39Y

****PRELIMINARY INSTRUCTIONS****

## General Discharge Information:

Date of Admission        05/07/06
Preceptor MD             Angus,Lambros, MD
Date of Discharge        05/17/06
Discharging MD           Fonji,Bertrand, MD
Admitting Diagnosis      Trauma
Principal Diagnosis      Trauma

## Clinical Information

Admitting History        36 y/o male BIBEMS intoxicated s/p punch in right
                         eye and pushed into fish tank face first. CT scan
                         of facial bones and orbit showed multiple
                         fractures of nasal bone and orbit. Pt was started
                         on antibiotics for these fractures. OMSF saw pt
                         and determined no surgical intervention was
                         needed. Ophthalmology also cleared pt. Pt was
                         initially in ICU for management of DT. PT was
                         subsequently transferred to floor where he was
                         continued on ativan for DT and slowly switched to
                         Librium. Pt is no longer hallucinating and he is
                         AAO x 3. Pt also needed potassium levels
                         correction during stay. Pt is being discharged in
                         stable condition on a detox regimen and topical
                         erythromycin as per optho to f/u in ophthalmology
                         clinic in 1 week
Admitting Vitals         HT:N/A, WT:N/A, BP:168/85, Pulse:103bpm,
                         Resp:20BPM, Temp:99.2F
Admitting Physicial
  General                normal
Hospital Course          See H and P

**Labs on Admission**     CMP 05/07/06, CBC Dif/rfx 05/07/06, PT 05/07/06,
                         aPTT 05/07/06, CMP 05/08/06, CBC Dif/rfx
                         05/08/06, PT 05/08/06, aPTT 05/08/06

**Labs on Discharge**     CBC Dif/rfx 05/16/06, BMP 05/16/06

**Radiology**             CT and x-rays

52

**Kings County Hospital Center**
451 Clarkson Avenue
Brooklyn, NY 11203

**Adult Med/Surg/Rehab Discharge Summary**

**A copy of the Discharge Summary has been given to the patient on discharge**

**Patient Information:**

| | | |
|---|---|---|
| Name:Waiters,General | DOB:6 May 70 | Pt Tel#:(718) 485-7101 |
| MR#:3046806 | Sex:M | Pt Loc :IP |
| Visit#:3046806-12 | Age:39Y | |

Discharge Instructions

| | |
|---|---|
| Discharge Disposition | discharged to NYPD |
| Discharge Prescriptions | Chlordiazepoxide HCL  10 mg Capsule x 5 tab po tid   1000/1400/1800; Chlordiazepoxide HCL  10 mg Capsule x 4 tab po tid   1000/1400/1800 x1; Chlordiazepoxide HCL  10 mg Capsule x 3 tab po tid   1000/1400/1800 x1; Chlordiazepoxide HCL  10 mg Capsule x 2 tab po tid   1000/1400/1800 x1; Chlordiazepoxide HCL  10 mg Capsule x 1 tab po tid   1000/1400/1800 x1 |
| Discharge Diet | Regular |
| Discharge Activities | Activities as tolerated |
| Condition at Discharge | stable |
| F/U Appointments | |
| Patient Education | diagnosis this visit discussed, pt/caregiver verbalized understanding |

WT Monitoring Education no

**Signatures**

Res/PA/NP/MW Sign       Fonji,Bertrand, MD

A complete list of medications was provided to the patient
upon discharge from facility



PROCEEDINGS                                    531

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  Okay.

3        Certainly, the Court has inquired.

4        I do not know whether, in fact, you wish to

5   rest on the record and then go into the pre-charge

6   conference so that we could go into closing arguments?

7        Certainly, if you rest, I'll entertain your

8   motions and then go into the pre-charge conference, so

9   that when the jury comes out we can then move from

10  there.  Or, I can have them brought in, you'll rest, and

11  certainly we'll go into the motions and the pre-charge

12  conference.

13       MR. SIMONS:  Whatever way the Court wants to

14  do it.

15       THE COURT:  I'll do it formally.  I'll have

16  the jury brought in, have the defendant rest, and then

17  entertain whatever motions you will have, and then we'll

18  go into the pre-charge conference.

19       Both sides are ready for the jury?

20       MR. SIMONS:  Yes.

21       MR. HALE:  Yes.

22       MR. SIMONS:  Actually, the defense does have

23  one thing to do.  The defense will introduce a certified

24  copy of Mr. Waiters' medical record.  That's all the

25  defense will do.

PROCEEDINGS                                              532

1          MR. HALE:  What relevance?

2          THE COURT:  Certainly --

3          MR. SIMONS:  Well, these are his medical

4     records from the injuries that he sustained.  There's

5     already been testimony he was taken off with a

6     stretcher, and these are his injuries.

7               This also goes towards his intoxication

8     defense.  In the record, it clearly shows that he was

9     very intoxicated, and he was treated for that.

10         MR. HALE:  Not without any explanation, Judge.

11         COURT OFFICER:  Ready for the jury, your

12    Honor?

13         THE COURT:  No, not quite yet.

14         MR. HALE:  It's simply not relevant.

15         MR. SIMONS:  Well, intoxication is a defense,

16    so it is relevant.  15.25 of the C.J.A. puts

17    intoxication as a defense for any pertinent element of

18    the charges.  In the medical records, it clearly shows

19    and it does state that he was intoxicated.  This would

20    be the day of the incident.  The Court has already heard

21    testimony regarding injuries sustained by Mr. Waiters

22    and how he was carried off on the stretcher.  So, this

23    is pertinent to this case.

24         MR. HALE:  Except that his injuries aren't

25    relevant to any issue in the trial.

PROCEEDINGS                             533

1              THE COURT:  Certainly, while they may not be,

2       the limited issue that he's raising in terms of

3       intoxication may bear upon and does bear upon his

4       intent.

5              MR. HALE:  Maybe if I can see exactly what

6       that says at what point, where it says intoxication.

7              MR. SIMONS:  Your Honor, the People have a

8       copy of his entire medical records.  So this is nothing

9       new.  It's throughout the whole medical records.

10             I mean, there's also other issues regarding a

11      statement allegedly made by Mr. Waiters after the fish

12      tank was thrown on top of his head.  I mean, the medical

13      records will clearly show that he did suffer a

14      concussion and injuries from that, which would put in

15      question any statement that he allegedly made after a

16      fish tank was dropped on his head.

17             MR. HALE:  Not without any explanation, Judge.

18      I don't think that we can get to B from A.

19             THE COURT:  I'm saying, certainly, as to the

20      intoxication that they're raising, if there is a

21      specific portion of the medical records that would be

22      relevant, I can see having those admitted, Mr. Simons.

23             MR. HALE:  That's why I just asked counsel

24      which part.

25             MR. SIMONS:  Your Honor, it's throughout, I

PROCEEDINGS                                        534

1       believe, the entire medical record.

2                  THE COURT:  I'm talking about from the date

3       that he was seen.  Because basically it's at the time

4       that he was admitted into the hospital.

5                  MR. SIMONS:  Yes.  He was seen on May 7th of

6       '06, and I believe the E.M.S. and ambulance report

7       there's a notation of an overdose of E-T-H-O-H

8       substance, which is alcohol.  His blood work that was

9       taken --

10                 (Pause in the proceedings)

11                 THE COURT:  I'm waiting on you, Mr. Simons.

12                 MR. SIMONS:  Oh.  I thought you were waiting

13      for something else.

14                 THE COURT:  No, no.  I'm waiting on you,

15      Mr. Simons, to indicate and to show Mr. Hale what you're

16      referring to so that those portions can be extracted

17      from the medical records that you're proffering.

18                 MR. SIMONS:  In the medical record, I believe,

19      there was a date May 7th of '06, there's a notation of

20      Mr. Waiters --

21                 THE COURT:  Mr. Hale, do you have that or do

22      you wish to look on with him?

23                 MR. HALE:  I'm going to have to look on with

24      him because I didn't bring that copy over.

25                 THE COURT:  Okay.

-VMG-

PROCEEDINGS                        535

1          MR. SIMONS:  There's a notation where he was

2    intoxicated.  There's also in here--and I'll have to

3    find it--where he is prescribed medicine because of his

4    intoxicated state.  They have readings from lab reports.

5          His diagnosis was alcoholism when he did enter

6    the hospital.

7          MR. HALE:  Just to note, alcoholism is

8    different than being intoxicated.

9          THE COURT:  That is correct.

10          MR. SIMONS:  In his lab report, they have a

11   reading from May 7th, which is described here, his

12   alcohol level was in the critical state.

13          THE COURT:  Certainly, that would be relevant.

14          Mr. Hale?

15          MR. HALE:  Here's what it says:  Ethyl

16   alcohol--this is a parenthetical--(mg/dl): 386.24

17   (CRIT).  That's a parenthetical.  What does that mean?

18          I mean, if it's causes any sort of conjecture

19   or if there's any sort of ambiguity about it, you know,

20   it can't be just in the written document.

21          MR. SIMONS:  It doesn't show --  I mean, all

22   the testimony has already been that Mr. Waiters was

23   drinking and intoxicated.  And the medical records,

24   throughout the medical records, when he arrived at the

25   hospital, says he was intoxicated.

PROCEEDINGS                              536

1              THE COURT:  As I said, if there's something

2     which says that, will you show it to Mr. Hale so we can

3     pull out those documents, and certainly that would be

4     relevant to be submitted before the jury.

5              MR. HALE:  Except voluntary intoxication is

6     not a defense.  It has to be intoxication that rises to

7     the level that negatives an element of the crime.  The

8     jury would have to conjecture on this.  There's nothing

9     in there that allows them, without explanation, to

10    evaluate at what level his intoxication is.  If at all.

11             THE COURT:  Well, I don't know if he has it.

12    I'm giving him an opportunity to go over it, Mr. Hale.

13             MR. HALE:  Okay.

14             MR. SIMONS:  Does the Court want me to pull

15    out all the reports that make reference to intoxication?

16             THE COURT:  That's correct.

17             MR. SIMONS:  Okay.  I can do that.

18             (Pause in the proceedings)

19             MR. SIMONS:  Your Honor, I believe I've found

20    the pertinent information regarding intoxication.  I

21    guess, just so the record is clear, it was the defense's

22    intent to present all the medical records regarding the

23    injuries sustained by Mr. Waiters because the defense

24    feels that the jury needs to know that that was part of

25    the incident, the injuries that he sustained.

-VMG-

1              It's my understanding the Court is not

2      permitting the defense to do that.

3              THE COURT:   That is correct.

4              MR. SIMONS:   I would take an exception to

5      that.

6              But I do have the other records pertaining to

7      the intoxication.   I know some of it still needs to be

8      redacted because they have other information, but it

9      does clearly show that when he was admitted into the

10     hospital that he was intoxicated.

11             THE COURT:   Do you have those records for

12     Mr. Hale to review?   Certainly, if there's a question,

13     the Court will also review them.

14             (Handed to Mr. Hale)

15             MR. HALE:   If I can just review these for a

16     moment, your Honor, for the Court?

17             THE COURT:   Certainly.

18             MR. HALE:   The first page, is entitled "Adult

19     Medical Surgical Rehab Discharge Summary".   Under

20     "clinical information" it says:   "Admitting History."

21     Again, that means it's taken from somewhere else.   It

22     says:   "36 Y/O male, BIB EMS," all caps, "intoxicated,

23     S/P, punch in right eye and pushed in a fish tank face

24     first."

25             Well, there is a reference to him having "DT".

1    Again, I can't expect the jury to know that that means

2    delirium tremens without any sort of expert testimony.

3              That is the discharge summary.

4              And there's a number of other things on there,

5    your Honor, that first page.

6              The second piece of paper is called an

7    "Ambulance Call Report".  This was referenced to by

8    Mr. Simons before.  Under the center section of the

9    piece of paper, there's is "presenting problem".  There

10   are a number of boxes which would be checked out.  One

11   of those boxes is for "overdose"; that box is filled in.

12   Below that, where it has a line, it's printed

13   "substance" underneath, it says "ETOH".

14             That's it on that.

15             Again, a lot of other information.

16             The third piece of paper is "Patient's

17   Progress Communication Record".  It's dated May 7th;

18   there is no time on it.

19             At the bottom, it says "CNS:".  What that

20   means, I have no idea.  It says:  "Unable to assess due

21   to intoxicated state."  That's printed; that's not in

22   handwriting.

23             The next page is also a "Patient's Progress

24   Communication Record".  It's from the 8th of May, 2006,

25   6 a.m.  I'll be darned if I can see anything on here

1     relating to alcohol.

2              Maybe you can point that out to me.

3              (Pause in the proceedings)

4              MR. HALE:  Oh, yeah, there's a handwritten

5     notation that says "ETOH: 28.09".

6              The next one, again, it's another "Patient's

7     Progress Communication Record", the 8th of May, 8 a.m.

8     Again, in handwriting, "ETOH: 28".

9              The next piece of paper is "Kings County

10    Hospital Chart Review, Ophthalmology Inpatient Consult".

11    It's dated the 7th of May, '06.  Again, in terms of

12    history:  "36 Y/O B/M, plus intoxication, reportedly

13    started shooting a gun.  In order to be stopped, he was

14    punched, kicked and hit over the head."  It's the same

15    narrative as the other --  as the Discharge Summary.

16             The next paper is dated the 21st of May, '06.

17    It's the "Initial Psychiatric Consult".

18             Again, I don't know how this can get put in

19    without proffering the psychiatric defense.

20             Actually, the consult time was the 14th of

21    May; the document was completed on the 21st of May.

22             It says:  "Patient is a 36-year-old B/M with

23    alcohol abuse and dependence, who came in after

24    allegedly shooting at his family members, who in

25    retaliation beat him up and threw him through an

PROCEEDINGS                    540

1     aquarium."

2          It states in here, "According to the

3     girlfriend, the patient does not have any other

4     psychiatric issues outside the alcohol dependence and

5     occasional marijuana smoking."

6          It says:  "Recommended continue present

7     alcohol detox management.

8          The next couple pieces of paper are lab

9     results.  They're kept as a record in terms of

10    chronology.

11         It states for Mr. Waiters on the first one--I

12    think we referred to this before:  "Ethyl alcohol,

13    (mg/dl):  386.24 (CRIT)".

14         THE COURT:  It has ethanol alcohol actually

15    listed on that document?

16         MR. HALE:  It says "ethyl alcohol", and then

17    it has the "mg/dl" and gives that number.

18         THE COURT:  Okay.

19         MR. HALE:  I think the next page does the same

20    thing.  Right.  Here it says:  "Ethyl alcohol, mg/dl:

21    158.55 (ABN)".  That's still for the 7th, although it

22    doesn't give a time.

23         The last one, again for the 7th, I guess

24    that's 4:01 p.m.  No, I'm incorrect about that.

25         Again, it says:  "Ethyl alcohol, mg/dl:  28.9

PROCEEDINGS                    541

1    (ABN)

2              Here's the problem, your Honor.  One, a lot of

3    these things are referenced to alcoholism as opposed to

4    alcohol level.  There is no definition about what these

5    levels mean.  A lot of them, it's very cryptic about.

6    For instance, when you just have the report that says

7    "ETOH", it's certainly not within the realm of lay

8    people to understand what that is.

9              A lot of this in terms of "admitting history",

10   we don't know if it's based on actual observation or if

11   it's based upon reportage from somewhere else.

12             Now, medical reports are generally admissible,

13   your Honor, when they have to do with an injury which is

14   part of the issue in the case.  I'm not even sure that

15   they're even admissible for this purpose at all, in

16   terms of trying to say what his alcohol level is.

17             Again, you're talking about intoxication.

18   Yes, intoxication is a defense, but only to the extent

19   that it nullifies an element in the crime, and the

20   element that we're usually talking about is intent.

21   There's absolutely no way from this that would cause a

22   jury other than to just completely speculate on what his

23   level of intoxication is or whether it would nullify.

24   In other words, it's less guidance --  It's actually a

25   problem for the jury to speculate about this.  I don't

PROCEEDINGS                    542

1    think that without explanation, medical or otherwise,

2    about what any of this means, that it is at all

3    relevant.  In fact, it would be completely misleading to

4    the jury.

5              THE COURT:  Officer, may I have those, please.

6              (Handed to the Court)

7              (Pause in the proceedings)

8              THE COURT:  Certainly, I've listened to the

9    arguments of both sides.

10             Over the People's objection, I'm going to

11   allow the proffered records to come in, which would

12   clearly indicate that at the time that he was admitted

13   to the hospital he was intoxicated.  I know that there

14   is an issue.

15             I'm also going to allow the part of the

16   records which mentions ethanol alcohol to be admitted.

17             The other portions certainly are not relevant.

18   In terms of the history, I'm not going to allow that to

19   be admitted.  Certainly, as to whether he suffers with a

20   history of alcohol abuse, that would not be relevant in

21   terms of his treatment and the diagnosis or

22   recommendations.  That's not really relevant.

23             I am going to allow certain portions in.  For

24   instance: "CNS:  Unable to assess due to intoxicated

25   state."  Again, that would be relevant to the time and

-VMG-

PROCEEDINGS                                      543

1       the place that the event occurred.  So that I will, in

2       fact, allow.

3                   MR. HALE:  Your Honor, to that end, what is

4       "CNS"?

5                   THE COURT:  That could be certified nursing?

6                   MR. HALE:  Exactly.  Could be.

7                   THE COURT:  Could be.  But, certainly, I'm

8       going to allow that line.  Anything that's not relevant

9       I would, in fact, redact.  It's going to be redacted

10      except for the certain portions which says "intoxicated"

11      and the dates on which in fact that observation was

12      made.

13                  MR. HALE:  Of course, there's also not a time

14      there, your Honor.

15                  Here's where the problem comes in, too.  Does

16      that come in --  Is that a treatment thing?  Is that an

17      opinion of whoever was looking at him?  Who was the

18      person that was looking at him?  Did it take into

19      account that he had a head injury at the same time?

20      What are we supposed to do with that?

21                  Like I said, I don't even know what "CNS"

22      means.  The Court doesn't know.  Does the jury know?

23                  THE COURT:  Certainly, one of the things that

24      we can do, which probably should have been done, was

25      either to have someone brought in or to call to find out

PROCEEDINGS                    544

1    what the definition of that is.

2              MR. HALE:  Exactly.

3              I think it doesn't become relevant until those

4    people do testify.

5              Now, here's the other thing that goes along

6    with all this, your Honor.  I don't know that this jury

7    is going to known that ethyl alcohol is the by-product

8    of drinking alcohol.  They're also not going to know on

9    those parts of the lab reports where they have the

10   little parenthesis and it says what level and whether

11   it's CRIT or ABN or NOR.  They're not going to be able

12   to quantify that whatsoever, your Honor.  So, how are

13   they going to determine at what level the intoxication

14   is?

15             Then there is another problem.  That is that

16   in proffering this, and perhaps making the argument to

17   the jury, it ignores what Mr. Simons already knows,

18   which is this defendant, in talking to both Doctor Drobb

19   and Doctor Bardey, said that he hadn't been drinking

20   that morning, was not intoxicated, and was able to give

21   a coherent version, his coherent version about what had

22   happened.

23             THE COURT:  Mr. Hale, certainly there was

24   testimony from the witness, Miss Warren, which indicated

25   that, in fact, he was drinking.

-VMG-

PROCEEDINGS                              545

1          MR. HALE:  I don't dispute that, your Honor.

2          What I do dispute is making the argument that

3     he's intoxicated while then having in the back pocket

4     his own statement that he's not.  And then can I

5     introduce those statements to rebut?

6          THE COURT:  May I see counsel at sidebar,

7     please.

8          (Off-the-record discussion held at the bench)

9          THE COURT:  Mr. Hale?

10         MR. HALE:  Your Honor, again, it's my position

11    that the parts which the Court is considering allowing

12    in in this case, again, remembering that medical records

13    admissible, if at all, are for the treatment of an

14    individual when that injury is part and parcel or

15    germane to the case.

16         Mr. Waiters' hospitalization is from injuries

17    that were sustained after the incident in question and

18    are not admissible because they do not involve any issue

19    for the jury to decide in this case.  Therefore, any

20    reference that is made in those medical records to his

21    intoxication or his level of alcohol would, one, not be

22    admissible even if his overall medical condition was an

23    issue in the case, because it does not have anything to

24    do with his treatment on it.  And this all comes out in

25    the C.P.L.R. in terms of the purposes of medical

PROCEEDINGS                     546

1    records, where it has the hearsay exception.

2            Taking them out of that realm and taking them

3    just piecemeal in this regard, they are pure hearsay

4    because they don't go to any issue in the case.

5            Now, we are not talking about unavailable

6    witnesses who have made these observations.  Those are

7    available witnesses, according to the hospital records.

8    Therefore, if you want somebody to testify or if you

9    want to put in evidence of his intoxication and to make

10   sure that the jury understands the levels of

11   intoxication, because if the Court thinks that this is

12   admissible, and I submit that it is not because it's

13   hearsay, then they would be able to assess at what

14   level.

15           The issue is not whether he is intoxicated.

16   Because, as we know, the C.P.L. says intoxication is not

17   a defense.

18           THE COURT:  That's true.  However, the jury

19   may take into consideration in determining whether there

20   was intent.

21           MR. HALE:  Right.

22           So, the important part is not intoxication,

23   but the level of intoxication.

24           Now, the jury, if they just hear this, they're

25   going to be given numbers, which mean nothing.  They're

PROCEEDINGS                                    547

1    going to be given opinions, which mean nothing.  They're

2    not going to be able to assess that level of

3    intoxication.  That's the issue for the jury.  Not

4    whether he was or whether he wasn't, but whether it

5    negatives an element of the crime.

6            Now, I don't know how anybody from this record

7    can argue without testifying, without speculating.  I

8    don't know that it can be done.  I don't see any way

9    that it can be done.

10           If it is that ambiguous and if it would tend

11   to mislead the jury, then it shouldn't be admitted.  At

12   least not without some support with it that says what

13   these things mean.

14           THE COURT:  Quite frankly, Mr. Hale, I would

15   agree with you that the best way would have been to get

16   someone from the hospital to certainly interpret the

17   records as to those limited issues.  Quite frankly, I

18   don't know why, you know, someone wasn't called or at

19   the very least to get an assessment by the doctor who

20   appeared, even if it was by the People, something that

21   would assist.

22           MR. HALE:  Well, I'm not in a position of

23   assisting him, your Honor.

24           THE COURT:  I understand that.  Nor should you

25   be.  But I'm saying that that is possibly one way that

PROCEEDINGS                                548

1    it could have been rectified.

2         MR. HALE:  My position is it's the only way,

3    your Honor.

4         What is Mr. Simons going to get up there and

5    say?  That this level means something?  That this

6    person's observation is any better than any other

7    person's observation?  That one person's intox, what

8    does it mean in a medical standpoint?  Does it mean that

9    he can't form intent?  I mean, this is all going to be

10   speculation.  What's he going to do, testify?  Then it

11   becomes impossible for me to rebut.  Nor should I have

12   to.

13        Again, you say it might be the better course.

14   We're still not under a time crunch here, Judge.  It can

15   be done.

16        Again, my concern is this jury speculates.

17        THE COURT:  Mr. Simons, do you wish to

18   respond?

19        MR. SIMONS:  Just briefly, Judge.

20        I believe Mr. Hale must have forgotten during

21   his opening he stated Mr. Waiters was intoxicated.

22   Because he stated after Mr. Waiters has a drink, that

23   changed his demeanor and he became an abusive person.

24   Every witness that has testified so far has made

25   reference to Mr. Waiters drinking.  I believe Lorenzo,

-VMG-

PROCEEDINGS                    549

1    said he was intoxicated before the incident.  Jackie

2    says he was drinking.

3         So, this is not as big an issue as I believe

4    the People have made it out, because if he checks his

5    opening, he spent a lot of time making reference to how

6    intoxicated Mr. Waiters was and how that intoxication

7    changed him to commit the act that he's being charged

8    with.  So, I believe this is relevant.

9         THE COURT:  I agree that it is relevant.  My

10   point, Mr. Simons, is this:  That there's some portions

11   of the record that the Court is inclined to allow to get

12   introduced that need to have an explanation, because

13   "CNS", if it's a nursing assistant, certainly that

14   should be broken down.  I tend to agree with Mr. Hale as

15   to those points, and even with the level --  the amounts

16   of the ethanol alcohol.  There should be some assistance

17   to the jury.

18        Again, I'm inclined to allow you to do it.

19   The only thing that I'm saying is that there should have

20   been someone to at least, certainly for the jury's

21   edification, be able to explain what that means so that

22   they should have some kind of understanding as to those

23   numbers.

24        MR. HALE:  Here's the other part, your Honor.

25   Again, what I have said, it wasn't evidence.

PROCEEDINGS                           550

1        THE COURT:  No, it's not evidence.  I hear

2  you.

3        MR. HALE:  But, again, if there is already

4  evidence that he was drinking, if there is already

5  evidence and they're talking about his behavior at the

6  time this was going on in terms of saying well, he's

7  drinking or well, he's intoxicated, then what is even

8  the necessity for having any of this brought in?  It

9  seems to me then just to be --  Since it is under this

10 hearsay sort of thing, what is the necessity for even

11 having this in?

12        THE COURT:  Certainly, as I said, while I'm

13 inclined to allow it in, the better course would be to

14 have a witness to be able to explain certain terminology

15 which is included in the records.

16        Because, again, as I said, I will allow you to

17 introduce it, Mr. Simons, but certainly there should be

18 an explanation in terms of what you pulled out, what I

19 have before the Court currently as what you seek to

20 introduce as part of the certified medical records.

21        MR. SIMONS:  Well, just based on the Court's

22 decision, because it was my intention, I believe the

23 records would show that Mr. Waiters was intoxicated on

24 the day of the incident, which I believe that's the

25 essence of what the records are showing, to be

-VMG-

1      consistent with all the other witnesses.

2              Who "CNS" is --

3              THE COURT:  The other thing that concerns me

4      is the ethanol alcohol level, what that means.

5      Otherwise, there would be no basis to seek to introduce

6      that.

7              So, apparently, Mr. Simons, you also believe

8      that there's some relevance to having that portion of

9      the medical record introduced, and it would be for the

10     edification of the jury in terms of what that

11     specifically means.

12             MR. SIMONS:  Well, your Honor, it is the

13     defense opinion that the ethanol alcohol level, and as

14     made reference to each level, whether it's normal,

15     abnormal or a critical stage.  I mean, it's either

16     normal or it's not normal.  I believe this is a common

17     sense type of issue not beyond the realm of the jury.

18             I know the People object to it for more

19     strategic reasons, but I believe it is not beyond the

20     realm of the jury to understand that.

21             THE COURT:  Well, I know that there's

22     common-law indicia of intoxication, but certainly this

23     would go beyond the common-law indicia of intoxication.

24             So, if you're seeking to have blood levels,

25     the amount of ethanol alcohol in Mr. Waiters' blood

PROCEEDINGS                          552

1    stream, then clearly there should be someone to explain

2    it for the edification of the jury as to what, in fact,

3    that would mean.  Otherwise, there's no point to seek to

4    introduce those levels of ethanol alcohol in his blood

5    stream.

6            MR. SIMONS:  Your Honor, the defense at this

7    point is not introducing any additional witnesses at

8    this point.

9            We would request that the Court permit all the

10   information in, and we're prepared for the Court to make

11   its ruling based on the defense not presenting any

12   additional witnesses at this time.

13           THE COURT:  May I see counsel at sidebar.

14           (Off-the-record discussion held at the bench)

15           THE COURT:  It's the Court's understanding

16   that the defense is not going to be calling any medical

17   witness in order to certainly enlighten the jury as to

18   what the numbers mean contained in the medical records.

19           So, at this point, the Court only has two

20   pages before it with two lines, one indicating:  CNS

21   unable to assess due to intoxicated state.  And the

22   other that says:  36-year-old male intoxicated, or BIB

23   EMS, brought in by E.M.S. intoxicated.

24           That's really the two lines that would be

25   relevant.  Everything else that was handed up to the

PROCEEDINGS                                              553

1    Court really would not be without an explanation by

2    medical personnel to explain what the ethanol alcohol

3    level would be and certainly the amounts and how that

4    affected the defendant as far as this case is concerned.

5    Everything else is going to be redacted, any kind of

6    trauma or anything else but those two lines on those two

7    pages of the medical records that I have before me.

8              Do you understand that, Mr. Simons, and is

9    that what you're saying you wish to go forward with?

10             MR. SIMONS:  Your Honor, I would, of course,

11   take exception to your ruling, but, yes, I'm prepared to

12   go forward with that.

13             THE COURT:  Mr. Hale, is there anything you

14   wish to say?

15             MR. HALE:  Well, I guess let's then ask

16   whether his having put at least those portions of the

17   records in whether it's relevant and admissible to call

18   either Doctor Drobb or Doctor Bardey for the limited

19   purpose of saying that they had a conversation with

20   Mr. Waiters and that they had discussed the incident and

21   that he indicated that he was not intoxicated at the

22   time of the incident?

23             MR. SIMONS:  Your Honor, I don't know whether

24   we would really have to address that.  That's not proper

25   in any sense.  That doesn't rebut the medical records.

PROCEEDINGS                          554

1     Also, there's no basis for that.  These aren't

2     statements coming from Mr. Waiters.  These are medical

3     records.  So, we can't even rebut a medical record from

4     a statement of --  It's not relevant.  It's improper.

5          MR. HALE:  Except for the whole reason that

6     they're being admitted is because that they mean

7     something.  They mean something to counsel, they mean

8     something to the defendant.  They mean that he's going

9     to argue that he was so intoxicated that he couldn't

10    form intent.

11          THE COURT:  I mean, certainly, he has a right

12    to make that argument, and certainly there was evidence

13    adduced by the People's witnesses which indicated that,

14    in fact, he had been drinking.

15          As I said, certainly, there is common-law

16    indicia of intoxication, so certainly you don't have to

17    be an expert witness, and certainly the People's

18    witnesses testified to the fact that there had been --

19    that the defendant had been heavily drinking.

20          Now, if you're saying that that's subjective

21    in terms of what one person may do in terms of whether

22    two drinks is enough to intoxicate one person or five

23    drinks would be enough to intoxicate another person, so

24    it depends on their alcohol tolerance level, certainly

25    if that's what you're saying, Mr. Hale, I'm not quite

PROCEEDINGS                555

1    sure --

2         MR. HALE:  I don't think the Court

3    understands.

4         The issue is --  It's not whether he was

5    taking a drink and it's not whether he was intoxicated.

6    The issue is was he so intoxicated that it negatived the

7    element of the crime.  He gave accounts to both

8    Doctor Drobb and Doctor Bardey in which he talks about

9    that he clearly knew what was going on and that he had a

10   specific intent.

11        THE COURT:  I understand it, Mr. Hale.

12   However, what I'm going to do is allow the defense, over

13   your objections --  I understand your arguments.  I

14   certainly would disagree them.  I'm going to allow them

15   to introduce the medical records.

16        And you're saying that they're certified

17   medical records, the two pages, which redact everything

18   but the reference to the defendant being intoxicated.

19        This is going to be handed back to the defense

20   as not relevant.  These are the two pages that it would

21   be, and they would have to be redacted appropriately.

22        (Handed to Mr. Simons)

23        THE COURT:  What I would be inclined to do is

24   have the jury brought in, certainly I'll ask whether the

25   defense rests, you'll indicate that you're offering

PROCEEDINGS                          556

1     Defendant's E in evidence, with the appropriate

2     redactions.  That will be done over the People's

3     objection, which will be noted for the record.

4                 Actually, that would be H, I believe.

5                 MR. SIMONS:  H, right.

6                 THE COURT:  It will be marked Defendant's H

7     for identification.

8                 (Received and marked Defendant's Exhibit H for

9     identification)

10                COURT OFFICER:  So marked.

11                THE COURT:  Are both sides ready?

12                MR. SIMONS:  Yes.

13                MR. HALE:  Yes, your Honor.

14                (Pause in the proceedings)

15                COURT OFFICER:  Ready for the jury, your

16    Honor?

17                THE COURT:  Both sides are ready?

18                MR. HALE:  Yes.

19                MR. SIMONS:  Yes.

20                THE COURT:  Ready.

21                COURT OFFICER:  Jury entering.

22                (At this time, the jury entered the courtroom)

23                THE CLERK:  The jury is now present.

24                Do the attorneys waive the roll call?

25                MR. SIMONS:  Yes.



General Lee Waiters
DIN # 08A3571
Green Haven Corr. Fac.
Post Office Box 4000
Stormville, NY 12582


August 2, 2010


Calvin J. Simons, Esq.
616 Eastern Parkway
Brooklyn, NY 11225


Re: <u>People v. Waiters Ind # 3464/2006</u>


Dear Mr. Simons:

Please answer the following questions as they pertain to your representation of Mr. Waiters during the trial of the above referenced case:

1.      Please provide the reason(s), if any, for not calling an expert witness to testify with respect to certain medical terminology relating to the intoxication of Mr. Waiters?

2.      Please explain what investigation you have conducted with respect to Mr. Waiters' intoxication defense?

3.      Please provide the reason(s), if any, for requesting that the court charge, as a lesser included offense, Manslaughter in the First Degree.

4.      Please read the attached pages of Mr. Waiters' direct appeal brief relative to the prosecutor's alleged prejudicial remarks. Please provide the reason(s), if any, for not objecting to the comments as outlined therein.

5.      Please state what experts, if any, you consulted with respect to the intoxication of Mr. Waiters.

Letter to Calvin Simons, Esq
August 2, 2010
Page 2


Currently before the Appellate Division, Second Department, is a motion to stay the appeal pending the outcome of a motion pursuant to CPL §440.10 relating to your representation of Mr. Waiters.   Your cooperation in this matter would be greatly appreciated.

Mr. Waiters humbly awaits your most expedient response.  Thank you.


Very truly yours,

General Waiters


GW/eap

Cc:    Jonathan Mr. Kratter
       Appellate Counsel
       2 Rector Street, 10th Fl
       New York, NY 10006
       212-693-0085



General Lee Waiters
DIN # 08A3571
Green Haven Corr. Fac.
Post Office Box 4000
Stormville, NY 12582


August 2, 2010


Jonathan Mr. Kratter
Appellate Counsel
2 Rector Street, 10th Fl
New York, NY 10006


Re: People v. Waiters Ind #3464/2006


Dear Mr. Kratter:

As you are aware, I have submitted a motion to the appellate division requesting that the appeal proceedings be stayed and held in abeyance so that I can file a CPL §440.10 motion.

I have mailed trial counsel a letter asking questions relating to his representation of me. I am enclosing a copy of the letter. At a suitable time, can you please contact him and follow-up on the letter?

Just to bring you up to speed, there were various medical documents that demonstrated how intoxicated I was during the time of the crime. According to these medical records, my ethyl-alcohol level was 386.24 ml. At trial, my attorney refused to call an expert to interpret the significance of that alcohol level as well as other medical terminology contained within those documents. After doing just a preliminary research, I've learned that an ethyl-alcohol level of 100 ml is the legal definition of "intoxication". I was almost 4 times the legal definition of intoxication. Furthermore, for every hour that elapses the body burns alcohol. My blood was taken approximately 2 hours after the crimes. Thus, an expert could have testified to approximately how intoxicated I was during both the crime and at least two hours after the crime.

Furthermore, my research demonstrated that a person nearing 4 times the legal limit of intoxication has "black out" and his central nervous system is listed as "critical." Additionally, people have died of alcohol poisoning at approximately 400mg/dl. The jury was not aware of these very important facts because defense counsel did not call an expert.

Briefly, I was entirely too intoxicated to form the requisite intent to commit the crimes for which I was charged with. Had defense counsel called an expert to testify and interpret the numbers and medical terminology, counsel could have proved to the jury "how" intoxicated I was, not just that I was intoxicated.

Defense counsel also committed a grave error by arguing that I was too intoxicated to form intent, but then requesting, as a lesser-included offense to the intentional murder, Manslaughter in the First degree. Based on my research, Manslaughter in the First Degree is also an "intent" crime. The appropriate charge, as the appellate division, second department has held, is Manslaughter in the Second degree, a reckless crime. People v. Vasquez, 104 A.D2d 429, 478 NYS.2d 947 (2 Dept 1984). It defies logic why defense counsel would argue that I was too intoxicated to form the intent to murder, but could have formed the intent to cause serious physical injury. He placed the jury in the position to disregard the intoxication defense because if they believed that I was intoxicated, they would have had to acquit on all charges (because they were intent crimes).

I noticed that you did not argue that counsel was ineffective for the above stated reasons. Are you of the opinion that the record is not factually adequate to have permitted a review of the claim on direct appeal? Have you considered the above-mentioned issue? Have you already contacted defense counsel with respect to the above-mentioned issue?

Lastly, do you know of or in contact with any expert toxicologist? I would like to consult with one just to obtain an affidavit briefly explaining some of the terminology of the medical documents.

Any help you can provide in this matter would be greatly appreciated. I will send you a draft of the CPL §440 motion before it is submitted for your review.


Very truly yours,

General Waiters

GW/eap

G

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085   FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
BARRY S. STENDIG

SUPERVISING ATTORNEYS
WINSTON MCINTOSH
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE

ANDREW E. ABRAHAM
ALEXIS A. ASCHER
SARAH J. BERGER
STEVEN R. BERNHARD
ERIN R. COLLINS
DENISE A. CORSI
A. ALEXANDER DONN
JONATHAN GARVIN
JOHN GEMMILL
KENDRA L. HUTCHINSON
WILLIAM G. KASTIN
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
KATHERINE A. LEVINE
LISA NAPOLI
ANNA PERVUKHIN
DENICE POWELL

OF COUNSEL
RACHEL ALTSTEIN
KATHLEEN BAER-TRUER
ELLEN FRIED
MELISSA S. HORLICK
REYNA E. MARDER
SONIA MIKOLIĆ-TORREIRA
MICHELLE VALLONE

August 9, 2010

Mr. General Waiters
08-A-3571
Green Haven Correctional Facility
P.O. Box 4004
Stormville, NY 12582

Dear Mr. Waiters:

     In response to your letter dated a week ago, the ineffectiveness issue you discuss would be based on information not contained in the appellate record. Indeed, most of the claims in your letter are not in the record. Thus, this issue cannot be raised in your direct appeal, and as I have written before, I am assigned to your direct appeal only. Contacting your trial attorney about this issue could only produce additional information that is not part of the record, so I have not done so. For your information, a 440 motion does not have to be brought prior to the direct appeal, but can be brought during that process or afterwards.

Yours truly,

Jonathan M. Kratter, Esq.

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT I**

Respondent's Opposition to Defendant's State
Court Motion to Vacate his Judgment of
Conviction

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:   CRIMINAL TERM PART 1

THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

           -against-

GENERAL WAITERS,

                    Defendant.

AFFIRMATION IN
OPPOSITION TO
DEFENDANT'S MOTION
TO VACATE JUDGMENT

Kings County
Indictment Number
3464/06

      RHEA A. GROB, an attorney admitted to practice in the State of New York and an Assistant District Attorney in the County of Kings, affirms the following to be true under penalty of perjury:

      1.   This affirmation is submitted in opposition to defendant's motion, dated October 5, 2010, pursuant to C.P.L. § 440.10 to vacate his judgment of conviction.

      2.   The following statements are made upon information and belief based upon the records and files of the Kings County District Attorney's Office and the transcripts of defendant's trial.

      3.   On May 7, 2006, at about 11:30 a.m., at 340 Williams Avenue, Apartment 4-I, in Brooklyn, defendant fired a gun at Lorenzo Warren several times, hitting Warren in the thigh, hitting Shatashia Lewis in the thigh, hitting Mary Lee Clark in the head which put her in a coma, and killing three year-old Tajmere Clark.

4.    For these acts, defendant was charged, by Kings County Indictment Number 3464/2006, with one count of Murder in the Second Degree on a transferred intent theory (N.Y. Penal Law § 125.25[1]), Attempted Murder in the Second Degree (N.Y. Penal Law § 110/125.25[1]), Assault in the First Degree (P.L. § 120.10[1]), two additional counts of Assault in the First Degree on a transferred intent theory (N.Y. Penal Law § 120.10[1]), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01[1]).

5.    Defendant was convicted, after a jury trial, of second-degree murder, attempted second-degree murder and two counts of first-degree assault.    Defendant was sentenced to consecutive terms of imprisonment of twenty-five years to life on the murder count, ten years on the attempted murder count, twenty-five years on the first-degree assault count relating to Mary Lee Clark, and five years on the first-degree assault count relating to Shatashia Warren and to five years of post-release supervision (Dowling, J.), at trial and sentence).

6.    In a brief filed in April of 2010, defendant appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Department (hereinafter "Appellate Division").  See N.Y. Crim. Proc. Law § 450.10(1).    Defendant's

appellate attorney, in a brief on defendant's behalf, raised the following claims:

> (POINT I)
> THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE WHERE, PROCEEDING UNDER A THEORY OF TRANSFERRED INTENT, THE PEOPLE FAILED TO PROVE THAT APPELLATANT INTENDED TO SHOOT THE PERSON SPECIFIED IN THE INDICTMENT RATHER THAN THE THREE OTHERE PEOPLE WERE (sic) SHOT IN ADDITION TO THAT PERSON (U.S. CONST. AMEND. XIV; N.Y. CONST. ART. I, §6; <u>JACKSON V. VIRGINIA</u>, 443 U.S. 307[1979]).

> (POINT II)
> APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE PROSECUTOR, WHO, <u>INTER ALIA</u>, IN A CASE WHERE INTENT WAS THE KEY ISSUE, REPEATEDLY MADE FACTUALLY MISLEADING SUMMATION ARGUMENTS NOT SUPPORTED BY THE EVIDENCE CONCERNING THE INTENT ELEMENTS OF THE CRIMES, MISSTATED THE LAW APPLICABLE TO THOSE ELEMENTS, AND VOUCHED FOR HIS CASE WITH REGARD TO THOSE ELEMENTS. U.S. CONST., AMENDS. V, XIV; N.Y. CONST., ART. I, § 6.

> (POINT III)
> APPELLANT WAS ILLEGALLY SENTENCED, IN VIOLATION OF P.L. §70.25, WHEN THE COURT IMPOSED CONSECUTIVE SENTENCES FOR EACH OF THE FOUR COUNTS ALTHOUGH THE PEOPLE DID NOT MEET THEIR BURDEN OF DEMONSTRATING THAT THE CRIMES WERE COMMITTED THROUGH SEPARATE ACTS. U.S. CONST., AMEND. XIV; N.Y. CONST., ART. I, §6.

7.   Defendant sought permission to file a supplemental <u>pro se</u> brief which was granted by the Appellate Division on June 8, 2010.

8.   Respondent filed a response to the main brief filed by defendant's appellate counsel on June 30, 2010.

9.   In a Decision and Order dated December 8, 2010, the

Appellate Division enlarged defendant's time to serve and file his supplemental brief until February 8, 2011.

12. Defendant's current motion before this Court, pursuant to C.P.L. § 440.10, alleges that he was denied the effective assistance of trial counsel because (1) counsel failed to call an expert witness to explain and interpret defendant's medical records that defendant put into evidence at trial, and because (2) "counsel requested an inappropriate lesser offense that forced the jury to convict on the top count of intentional murder in the second degree, and he failed to request lesser offense for the remaining intentional counts" (Defendant's Motion at 1-2).

13. Defendant's motion should be summarily denied as defendant's claims of ineffective assistance of counsel are readily discernable from the record, and accordingly, defendant could have raised and can raise these claims on his pending appeal. In any event, defendant's claims are without any merit.

14. Defendant is currently incarcerated pursuant to his judgment of conviction.

WHEREFORE, and for the reasons stated in the attached Memorandum of Law, defendant's motion to vacate his judgment of conviction should be denied.

Dated:      Brooklyn, New York
            December 21, 2010

                                    _____
                                    Rhea A. Grob
                                    Assistant District Attorney
                                    (718) 250-2480

General Waiters
08-A-3571
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York  12582

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:   CRIMINAL TERM PART 1

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,


                    -against-


GENERAL WAITERS,

                              Defendant.

MEMORANDUM OF LAW

Kings County
Indictment Number
3464/06


## MEMORANDUM OF LAW

### DEFENDANT'S MOTION TO VACATE HIS JUDGMENT OF CONVICTION SHOULD BE SUMMARILY DENIED.

Defendant claims in the instant motion that he was denied the effective assistance of counsel because trial counsel failed to call an expert witness at trial to explain the medical records that defendant put into evidence, and because trial counsel requested an inappropriate lesser offense that forced the jury to convict of the top count of intentional second-degree murder and counsel failed to request lesser offenses regarding the remaining intentional counts given to the jury.

Defendant's claims regarding the effective assistance of counsel could be raised on direct appeal as they are based on facts readily discernable from the record on appeal. Accordingly, those claims are procedurally barred from this Court's review. See C.P.L. § 440.10(2)(b) ("[C]ourt must deny a motion to vacate a

judgment when: [T]he judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal"). See People v. Cooks, 67 N.Y.2d 100 (1986) (proper remedy for defect that appears on the record is a direct appeal from judgment of conviction rather than a motion to vacate judgment). See also People v. Cuadrado, 9 N.Y.3d 362, 364-65 (2007) (Court of Appeals stresses importance of application of mandatory procedural bar even in case of alleged fundamental error).

In any event, defendant's claims are without merit. Under the totality of the circumstances, trial counsel in this case rendered meaningful assistance. A defendant's constitutional right to effective assistance of trial counsel is satisfied when, under the totality of the circumstances existing at the time of the representation, counsel provided the defendant with "meaningful representation." People v. Henry, 95 N.Y.2d 563, 565 (2000); People v. Benevento, 91 N.Y.2d 708, 712 (1998); People v. Satterfield, 66 N.Y.2d 796, 798-99 (1985); People v. Baldi, 54 N.Y.2d 137, 146-47 (1981).

Courts should not "second-guess whether a course chosen by defendant's counsel was the best strategy, or even a good one, so long as defendant was afforded meaningful representation." Satterfield, 66 N.Y.2d at 799-800; see People v. Benn, 68 N.Y.2d

941 (1986). Although, under the state constitution, a defendant need not show a reasonable probability that he would be acquitted but for counsel's errors, defendant nevertheless must show that counsel's errors deprived him of a fair trial. Henry, 95 N.Y.2d at 566; Benevento, 91 N.Y.2d at 711-14.

Under both the state and federal standards, reviewing courts "must avoid confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis." Benevento, 91 N.Y.2d at 712 (internal quotation marks and citation omitted); see Strickland, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

Here, defendant has failed to meet these highly demanding standards. See Kimmelman v. Morrison, 477 U.S. 365, 382 (1986). A review of the record reflects that trial counsel was more than adequately prepared and possessed an in-depth familiarity with the facts of defendant's case. Trial counsel made appropriate motions and objections throughout and cross-examined the witnesses at trial, taking advantage of inconsistencies in their testimonies. Trial counsel successfully obtained suppression of defendant's statements made to the police and successfully obtained an

intoxication charge on defendant's behalf and a lesser-included charge of first-degree manslaughter. Counsel argued that defendant did not intend to kill Lorenzo Warren when he fired shots at him, and that he had no transferred intent to cause the death of Tajmere Clark and the injuries sustained by Mary Lee Clark, Shatashia Lewis, and Lorenzo Warren. Defense counsel argued that defendant was intoxicated at the time of the crime and that his intoxication negated his intent.

Defendant's claim that counsel was ineffective for not calling an expert to the stand to explain the contents of defendant's medical records is without merit. The Court allowed into evidence two pages of the medical records that related that defendant was brought into the hospital in an intoxicated state. The Court disallowed further medical records to be introduced that discussed defendant's ethyl/alcohol level without a witness to explain the significance of the testimony. Further, the prosecutor had objected to any of defendant's medical records being introduced at all. See Trial transcript at 531-56. Trial counsel's decision not to put an expert on the stand to further explain the level of intoxication was strategic. The witnesses at trial all testified that defendant was intoxicated at the time of the incident. Expert toxicology testimony regarding defendant's blood alcohol level would have opened up an area for cross-examination and rebuttal such as testimony from a toxicologist

4

that an individual's blood alcohol level generally does not reach its maximum point until about one and one-half hours after a person stops drinking and that the level of impairment from alcohol varies from person to person based on whether an individual is an experienced drinker. Further testimony from an expert could well have established that because defendant was a habitual drinker, his level of intoxication would not have negated his intent to commit the crimes of which he was convicted.

Indeed, the colloquy placed on the record reflected that defendant made statements to the doctors that examined him (Drs. Drob and Dr. Bardey) that he was not intoxicated and had not been drinking that morning and that he clearly knew what was going on and had a specific intent (Trial transcript at 544, 553, 555). Thus, had defendant put on an expert to testify regarding the medical records, he would have likely opened the door to the prosecutor being able to call these witnesses to rebut defendant's position that he was so intoxicated that he could not form the intent to commit the crimes. See Barclay v. Spitzer, 371 F. Supp. 2d 273 (2005) (the calling of a doctor would have opened the door to rebuttal by the prosecution using its own doctor).

Accordingly, defense counsel's decision to just have before the jury the testimony of the witnesses that defendant drank from early on in the morning on that day and the portion of the medical records stating defendant was intoxicated when brought into the

5

hospital shortly after the incident, was clearly strategic as an attempt by the defense to have the lay jury infer that defendant's intoxication necessarily negated his intent.

An attorney's decision "whether to call specific witnesses -- even ones that might offer exculpatory evidence -- is ordinarily not viewed as a lapse in professional representation." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000); see also United States v. Schmidt, 105 F.3d 82, 83 (2d Cir. 1997) (the decision of whether or not to call a particular witness is a matter of trial strategy which the courts will generally not second guess); United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."), cert. denied, 484 U.S. 958 (1987).   See also, People v. Damphier, 13 A.D.3d 663 (3d Dep't 2004) (failure to call a specific witness, i.e., a shoe print expert, in and of itself, does not establish ineffective assistance of counsel).

Defendant has failed to establish that testimony by an expert regarding the level of alcohol in his blood stream would have been beneficial to him. See People v. Loret, 56 A.D.3d 1283 (4th Dep't 2008) (counsel's failure to call rebuttal expert witness did not constitute ineffective assistance absent showing that expert's testimony would have assisted trier of fact or that defendant was

6

prejudiced by absence of such testimony). Defendant's arguments in his memorandum of law regarding blood alcohol levels are of no significance as they are not specific regarding the medical records, the conditions under which defendant was brought into the hospital, and do not take into account his history of alcoholism which would have affected his behavior and his ability to form intent.

The medical records, as admitted, were clear and easily comprehendible to the jury. The fact that defendant was brought into the hospital shortly after the incident, in an intoxicated state, merely buttressed defendant's position, that he was too drunk to have intended the consequences of his actions. Moreover, the portion of the medical records admitted, supported the version of events as told by the prosecution witnesses, that defendant had been drinking that morning, along with Jacqueline Warren and Mary Lee Clark. Thus, despite defendant's contention otherwise, trial counsel's decision not to call an expert witness to testify regarding the additional medical records was not ineffective and those additional records were not before the jury. The medical records before the jury supported defendant's contention that he was intoxicated at the time of the crime, and still intoxicated when he was brought into the hospital shortly after the shooting incident.

7

Defendant's additional contention that his attorney was ineffective for not requesting that the court charge manslaughter in the second degree as a lesser included offense of intentional murder is also a claim that appears on the face of the record, and thus, could be raised on appeal. A charge conference appearing on the record reflects that defense counsel requested the court charge the jury on first-degree manslaughter as a lesser count of intentional murder over the prosecutor's objection (Trial transcript at 563-64). Thus, the claim is improperly brought in this forum and can still be raised on appeal. See C.P.L. § 440(2)(b).

In any event, defendant's claim should be foreclosed from review. Defendant was indicted for the attempted murder of Lorenzo Warren, and on a transferred intent theory, of second-degree murder and first-degree assault charges. The jury was given an intoxication charge and yet convicted defendant of the second-degree murder charge although it had the option to reject that charge and consider first-degree manslaughter. Because the jury clearly concluded that defendant acted intentionally and that his intoxication did not negate his intent when he caused the death of Tajmere Clark and injured the other victims, defendant was not prejudiced by his attorney's decision not to request second-degree manslaughter, to also consider whether defendant acted merely recklessly in the shooting that caused a

8

death and several injuries. See People v. Green, 5 N.Y.3d 538, 545 (2005); People v. Boettcher, 69 N.Y.2d 174, 180 (1987) (both holding where court charges next lesser included offense of crime charged in indictment but refuses to charge lesser degrees than that, conviction of crime alleged in indictment forecloses challenge to refusal to charge more remote lesser included offenses); People v. Beriguette, 51 A.D.3d 939 (2d Dep't 2008) (claimed error for refusal to charge second-degree manslaughter as lesser included offense of second-degree murder was foreclosed by jury's verdict of second-degree murder and its implicit rejection of first-degree manslaughter charge); People v. Tulloch, 179 A.D.2d 794 (2d Dep't 1992) (same).

Here, defendant fired multiple gunshots into a room full of people, while pointing the gun at one specific person in the room. The evidence presented to the jury by all of the witnesses established that defendant went and retrieved the gun, secreted it under a jacket, and then pointed the gun at Lorenzo Warren and fired that gun five times. One bullet hit Lorenzo Warren in the thigh; one bullet hit Shatashia Lewis in the thigh, one bullet went through a wall and lodged in a closet; one bullet penetrated the brain of Mary Lee Clark, putting her into a coma; and one bullet penetrated the brain of three-year old Tajmere Clark, killing her. The Court charged the jury on intoxication, explaining that intoxication, although not a

defense, can negate an element of the crime charged.  The Court continued to charge the jury that it could consider whether defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the intent necessary for the commission of the crimes (Trial transcript at 685). Accordingly, based on the evidence presented, there is no possibility that the jury would have convicted defendant only of second-degree manslaughter had they been given that option, and accordingly, defendant was not prejudiced by his attorney's decision not to request that charge.  See People v. Kennedy, 7 A.D.3d 272 (1st Dep't 2004) (where jury rejected first-degree manslaughter and convicted defendant of murder, failure to submit more remote lesser offenses of second degree manslaughter and criminally negligent homicide harmless); People v. Vega, 155 A.D.2d 632 (2d Dep't 1989) (same).  See also People v. Crique, 63 A.D.3d 566 (1st Dep't 2009).

Defendant appears to suggest that because the jury was given the intoxication charge, trial counsel should have requested the second-degree manslaughter charge.  However, a trial court's decision to give an intoxication instruction does not automatically compel submission of lesser-included offenses.  See People v. Butler, 84 N.Y.2d 627, 632-34 (1994) (upholding trial court's refusal to submit lesser-included offenses to the jury and explaining that evidence of intoxication does not automatically

entitle a jury to find that a defendant acted recklessly); People v. Cody, 260 A.D.2d 718 (3d Dep't 1999). Here, the evidence presented at trial established that although defendant had been drinking on the morning of the shooting, defendant still had the presence of mind to arm himself with a gun which he had to retrieve from a bedroom in the apartment after arguing with the occupants of the apartment. Defendant then secreted the gun under a jacket. When the argument escalated further, defendant pointed the gun at Lorenzo Warren, with whom he was arguing, and fired five shots in the confines of the small living room of the apartment with several occupants. See People v. Rivera, 2 A.D.3d 542 (2d Dep't 2003) (under no reasonable view of the evidence could jury have found that defendant committed lesser offenses of manslaughter but not greater offense of murder given number of shots fired by defendant at close range; evidence, when viewed most favorably to defendant, did not support his contention that his alcohol consumption affected his mental capacity to commit intentional murder). See also People v. Cesario, 71 A.D.3d 587 (1st Dep't 2010) (no reasonable view of evidence in light most favorable to defendant to submit second-degree manslaughter where during dispute, defendant went to another room of apartment, took pistol from safe, returned and fired multiple shots at two victims; psychiatric expert testimony that defendant experienced

loss of control only supported request for defense of extreme emotional disturbance).

Defense counsel, based upon his success at obtaining an intoxication defense, strategically chose not to request second-degree manslaughter as a lesser-included offense. In light of the witness testimony and the prosecutor's concession that defendant was intoxicated, trial counsel sought an acquittal on all charges by reason of defendant's inability to form the intent to commit the crimes charged. The evidence supported the finding that defendant either acted intentionally, or by reason of intoxication, he was unable to form the specific intent. Accordingly, defendant's strategic decision to seek all out acquittals on defendant's behalf did not constitute ineffective assistance. See People v. Felice, 45 A.D.3d 1442 (4th Dep't 2007) (court rejected defendant's contention that it should have charged third-degree assault as lesser-included offense of first-degree assault because evidence of intoxication would allow jury to find defendant acted recklessly but not intentionally; evidence supported finding that defendant either intentionally bit victim's nose or by reason of intoxication was unable to form specific intent to do so, evidence did no support finding that defendant recklessly cause injury).

Thus, defendant has failed to show that he was denied the effective assistance of counsel. See People v. Henry, 95 N.Y.2d

563, 565 (2000); People v. Benevento, 91 N.Y.2d 708, 712 (1998);
Strickland v. Washington, 466 U.S. 668, 687, 690 (1984).
Accordingly, defendant's motion to vacate his judgment of
conviction should be denied.

## CONCLUSION

FOR THE AFOREMENTIONED REASONS, DEFENDANT'S
MOTION TO VACATE HIS JUDGMENT OF CONVICTION
SHOULD BE SUMMARILY DENIED.


Dated:     Brooklyn, New York
           December 21, 2010



                              Respectfully submitted,


                              CHARLES J. HYNES
                              District Attorney
                              Kings County


LEONARD JOBLOVE
RHEA A. GROB
Assistant District Attorneys
      of Counsel

14

525

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS : CRIMINAL TERM : PART 1

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK      :      INDICTMENT NO.
                                                    3464/06

                    - against -            :

GENERAL WAITERS                            :

                          DEFENDANT        :      TRIAL

- - - - - - - - - - - - - - - - - - - - -X

                              320 JAY STREET
                              BROOKLYN, NEW YORK   11201

                              MAY 12, 2008

BEFORE:      HONORABLE DEBORAH A. DOWLING

                                        JUSTICE, AND A JURY

APPEARANCES:

            CHARLES J. HYNES, ESQ.
                  District Attorney, Kings County
                  BY:  MARK HALE, ESQ.
                        Assistant District Attorney

            CALVIN J. SIMONS, ESQ.
                  Attorney for Defendant
                  616 Eastern Parkway
                  Brooklyn, New York

                              VINCENT M. GERALDI, JR.
                              MARC SHIFFMAN
                              SENIOR COURT REPORTERS

-VMG-

PROCEEDINGS                               526

1      THE CLERK:  Case on trial, General Waiters.

2      The defendant is present with his attorney.

3      The district attorney is present.

4      THE COURT:  Certainly, are there any matters

5  to go on the record before I bring the jury in?

6      MR. SIMONS:  Yes.

7      Your Honor, I believe, as I told the Court on

8  the last date, there was an intent of the defendant to

9  call several witnesses.  Detective Amato was one of the

10  people that I asked the People to bring in.  They did

11  bring him in.  I did talk to him this morning, and after

12  talking to him, I've decided not to call him as a

13  witness.

14      There was also --

15      THE COURT:  And, certainly, you discussed that

16  with Mr. Waiters?

17      MR. SIMONS:  Yes.

18      THE COURT:  I have to say it for the record as

19  well because, again, I don't want Mr. Waiters to come

20  back and say, you know, my lawyer never discussed that

21  with me, I didn't agree with it, or whatever the

22  situation is.

23      MR. SIMONS:  Yes.

24      I also did talk to Mr. Waiters, and there was

25  a -- as I told the Court, there was a good possibility

-VMG-

PROCEEDINGS                                527

1     that we were going to call Doctor Drobb on his behalf.

2     Mr. Waiters has informed me he does not want

3     Doctor Drobb to testify, and I will not be calling

4     Doctor Drobb as a witness.

5                 THE COURT:  Now, I know, Mr. Waiters, your

6     attorney is here to speak on your behalf, but I have to

7     say this, sir, that it is the Court's understanding that

8     it is your decision not to call that expert witness to

9     come and testify in your case, sir.

10                Is that correct, Mr. Waiters?

11                THE DEFENDANT:  Yes, ma'am.

12                THE COURT:  Are you doing that of your own

13    free will, sir?

14                THE DEFENDANT:  Yes, ma'am.

15                THE COURT:  Because, certainly, throughout the

16    course of this trial, it was the Court's understanding

17    that certainly there was a good likelihood -- not that

18    you had to call any witnesses, but that there was, in

19    fact, a good likelihood that an expert witness would be

20    called to testify in your behalf.

21                Is that correct, sir?

22                THE DEFENDANT:  Yes, ma'am.

23                THE COURT:  Certainly, I would have to ask,

24    Mr. Waiters, are you doing this of your own free will,

25    sir?

PROCEEDINGS                                    528

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Because I would not want you to

3    come back to court on any other date and tell me, you

4    know what, Judge?  I wanted to call Doctor Drobb, but

5    guess what?  My lawyer, Mr. Simons, stopped me from

6    doing that.  Or, I wanted to testify and somehow my

7    lawyer stopped me from testifying.  I also wanted to

8    call the police officer as a witness and my lawyer told

9    me, you know, not to do that.

10          Again, whatever decision you make,

11    Mr. Waiters, it has to be your decision, because you

12    cannot come back to court on any other date and tell me

13    that you wanted to do something but somehow your lawyer

14    forced you not to do it or told you not to do it or

15    anything else.

16          Is that understood by you, Mr. Waiters?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Do you have any questions about

19    anything that I'm saying to you, sir?

20          THE DEFENDANT:  No, ma'am.

21          THE COURT:  Because if you have any questions,

22    Mr. Waiters, you have to ask me now.  Because, again,

23    it's the Court's understanding that you're not going to

24    call an expert witness in this case and you're not going

25    to call Police Officer Amato to testify in this case as

1    well.

2                    Is that correct, Mr. Waiters?

3                    THE DEFENDANT:  Yes, ma'am.

4                    THE COURT:  Counsel, certainly, I'll bring the

5    jury out and I'm going to ask whether, in fact, you'll

6    rest and at that point I would need an answer.

7                    MR. SIMONS:  Yes.

8                    Just so the record is also clear that I've

9    discussed this with Mr. Waiters in detail, and I know

10   the Court has brought it up throughout the proceedings,

11   whether he would be testifying on his own behalf, and

12   he's informed me that he does not wish to testify on his

13   behalf.

14                   THE COURT:  Okay.  Certainly, Mr. Waiters, I

15   have to ask you, is that correct, sir, that you do not

16   wish to testify?  Not that you have to testify,

17   Mr. Waiters, because you absolutely do not have to

18   testify.  But my concern is if you give up or waive that

19   right to testify, you cannot come back to court on any

20   other date and say you know what my lawyer told me, I

21   couldn't get up on that witness stand and I couldn't

22   tell my side of the story.

23                   Is that understood by you, sir?

24                   THE DEFENDANT:  Yes, your Honor.

25                   THE COURT:  And this is your choice, sir?

PROCEEDINGS                               530

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  And, again, I would have to ask

3   you, Mr. Waiters, are you doing this because you want to

4   do this, by not testifying?  Is that correct?

5        THE DEFENDANT:  Yes, ma'am.

6        THE COURT:  Okay.  Because if you have any

7   questions or doubts, the time to get them answered or

8   resolved in your mind, Mr. Waiters, is before you do

9   anything.  Once you do it, you can't come back at a

10  later point in time and say I didn't understand it, I

11  was confused, I didn't know what I was doing, or somehow

12  you thought this is what your lawyer wanted you to do or

13  somehow the Court wanted you to do.

14        Every defendant accused of a crime has the

15  right to remain silent and not say anything.  Just like

16  every defendant accused of a crime has the right to

17  testify in their own behalf.  That is a choice that

18  every defendant must make.  Certainly, with the advice

19  and assistance of counsel, but ultimately it's an

20  individually decision that has to be made by the

21  defendant himself or herself.

22        Is that understood by you?

23        THE DEFENDANT:  Yes, ma'am.

24        THE COURT:  And you've made your decision; is

25  that correct, Mr. Waiters?

-VMG-

PROCEEDINGS                       531

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Okay.

3          Certainly, the Court has inquired.

4          I do not know whether, in fact, you wish to

5    rest on the record and then go into the pre-charge

6    conference so that we could go into closing arguments?

7          Certainly, if you rest, I'll entertain your

8    motions and then go into the pre-charge conference, so

9    that when the jury comes out we can then move from

10   there.  Or, I can have them brought in, you'll rest, and

11   certainly we'll go into the motions and the pre-charge

12   conference.

13         MR. SIMONS:  Whatever way the Court wants to

14   do it.

15         THE COURT:  I'll do it formally.  I'll have

16   the jury brought in, have the defendant rest, and then

17   entertain whatever motions you will have, and then we'll

18   go into the pre-charge conference.

19         Both sides are ready for the jury?

20         MR. SIMONS:  Yes.

21         MR. HALE:  Yes.

22         MR. SIMONS:  Actually, the defense does have

23   one thing to do.  The defense will introduce a certified

24   copy of Mr. Waiters' medical record.  That's all the

25   defense will do.

PROCEEDINGS                                    532

1          MR. HALE:  What relevance?

2          THE COURT:  Certainly --

3          MR. SIMONS:  Well, these are his medical

4    records from the injuries that he sustained.  There's

5    already been testimony he was taken off with a

6    stretcher, and these are his injuries.

7          This also goes towards his intoxication

8    defense.  In the record, it clearly shows that he was

9    very intoxicated, and he was treated for that.

10          MR. HALE:  Not without any explanation, Judge.

11          COURT OFFICER:  Ready for the jury, your

12    Honor?

13          THE COURT:  No, not quite yet.

14          MR. HALE:  It's simply not relevant.

15          MR. SIMONS:  Well, intoxication is a defense,

16    so it is relevant.  15.25 of the C.J.A. puts

17    intoxication as a defense for any pertinent element of

18    the charges.  In the medical records, it clearly shows

19    and it does state that he was intoxicated.  This would

20    be the day of the incident.  The Court has already heard

21    testimony regarding injuries sustained by Mr. Waiters

22    and how he was carried off on the stretcher.  So, this

23    is pertinent to this case.

24          MR. HALE:  Except that his injuries aren't

25    relevant to any issue in the trial.

PROCEEDINGS                                    533

1        THE COURT:  Certainly, while they may not be,

2   the limited issue that he's raising in terms of

3   intoxication may bear upon and does bear upon his

4   intent.

5        MR. HALE:  Maybe if I can see exactly what

6   that says at what point, where it says intoxication.

7        MR. SIMONS:  Your Honor, the People have a

8   copy of his entire medical records.  So this is nothing

9   new.  It's throughout the whole medical records.

10       I mean, there's also other issues regarding a

11  statement allegedly made by Mr. Waiters after the fish

12  tank was thrown on top of his head.  I mean, the medical

13  records will clearly show that he did suffer a

14  concussion and injuries from that, which would put in

15  question any statement that he allegedly made after a

16  fish tank was dropped on his head.

17       MR. HALE:  Not without any explanation, Judge.

18  I don't think that we can get to B from A.

19       THE COURT:  I'm saying, certainly, as to the

20  intoxication that they're raising, if there is a

21  specific portion of the medical records that would be

22  relevant, I can see having those admitted, Mr. Simons.

23       MR. HALE:  That's why I just asked counsel

24  which part.

25       MR. SIMONS:  Your Honor, it's throughout, I

PROCEEDINGS                              534

1    believe, the entire medical record.

2            THE COURT:  I'm talking about from the date

3    that he was seen.  Because basically it's at the time

4    that he was admitted into the hospital.

5            MR. SIMONS:  Yes.  He was seen on May 7th of

6    '06, and I believe the E.M.S. and ambulance report

7    there's a notation of an overdose of E-T-H-O-H

8    substance, which is alcohol.  His blood work that was

9    taken --

10           (Pause in the proceedings)

11           THE COURT:  I'm waiting on you, Mr. Simons.

12           MR. SIMONS:  Oh.  I thought you were waiting

13   for something else.

14           THE COURT:  No, no.  I'm waiting on you,

15   Mr. Simons, to indicate and to show Mr. Hale what you're

16   referring to so that those portions can be extracted

17   from the medical records that you're proffering.

18           MR. SIMONS:  In the medical record, I believe,

19   there was a date May 7th of '06, there's a notation of

20   Mr. Waiters --

21           THE COURT:  Mr. Hale, do you have that or do

22   you wish to look on with him?

23           MR. HALE:  I'm going to have to look on with

24   him because I didn't bring that copy over.

25           THE COURT:  Okay.

-VMG-

PROCEEDINGS                                   535

1        MR. SIMONS:  There's a notation where he was

2   intoxicated.  There's also in here--and I'll have to

3   find it--where he is prescribed medicine because of his

4   intoxicated state.  They have readings from lab reports.

5        His diagnosis was alcoholism when he did enter

6   the hospital.

7        MR. HALE:  Just to note, alcoholism is

8   different than being intoxicated.

9        THE COURT:  That is correct.

10        MR. SIMONS:  In his lab report, they have a

11   reading from May 7th, which is described here, his

12   alcohol level was in the critical state.

13        THE COURT:  Certainly, that would be relevant.

14        Mr. Hale?

15        MR. HALE:  Here's what it says:  Ethyl

16   alcohol--this is a parenthetical--(mg/dl): 386.24

17   (CRIT).  That's a parenthetical.  What does that mean?

18        I mean, if it's causes any sort of conjecture

19   or if there's any sort of ambiguity about it, you know,

20   it can't be just in the written document.

21        MR. SIMONS:  It doesn't show --  I mean, all

22   the testimony has already been that Mr. Waiters was

23   drinking and intoxicated.  And the medical records,

24   throughout the medical records, when he arrived at the

25   hospital, says he was intoxicated.

PROCEEDINGS                                              536

1      THE COURT:  As I said, if there's something

2   which says that, will you show it to Mr. Hale so we can

3   pull out those documents, and certainly that would be

4   relevant to be submitted before the jury.

5      MR. HALE:  Except voluntary intoxication is

6   not a defense.  It has to be intoxication that rises to

7   the level that negatives an element of the crime.  The

8   jury would have to conjecture on this.  There's nothing

9   in there that allows them, without explanation, to

10  evaluate at what level his intoxication is.  If at all.

11     THE COURT:  Well, I don't know if he has it.

12  I'm giving him an opportunity to go over it, Mr. Hale.

13     MR. HALE:  Okay.

14     MR. SIMONS:  Does the Court want me to pull

15  out all the reports that make reference to intoxication?

16     THE COURT:  That's correct.

17     MR. SIMONS:  Okay.  I can do that.

18     (Pause in the proceedings)

19     MR. SIMONS:  Your Honor, I believe I've found

20  the pertinent information regarding intoxication.  I

21  guess, just so the record is clear, it was the defense's

22  intent to present all the medical records regarding the

23  injuries sustained by Mr. Waiters because the defense

24  feels that the jury needs to know that that was part of

25  the incident, the injuries that he sustained.

PROCEEDINGS                                        537

1          It's my understanding the Court is not

2    permitting the defense to do that.

3          THE COURT:  That is correct.

4          MR. SIMONS:  I would take an exception to

5    that.

6          But I do have the other records pertaining to

7    the intoxication.  I know some of it still needs to be

8    redacted because they have other information, but it

9    does clearly show that when he was admitted into the

10   hospital that he was intoxicated.

11         THE COURT:  Do you have those records for

12   Mr. Hale to review?  Certainly, if there's a question,

13   the Court will also review them.

14         (Handed to Mr. Hale)

15         MR. HALE:  If I can just review these for a

16   moment, your Honor, for the Court?

17         THE COURT:  Certainly.

18         MR. HALE:  The first page, is entitled "Adult

19   Medical Surgical Rehab Discharge Summary".  Under

20   "clinical information" it says:  "Admitting History."

21   Again, that means it's taken from somewhere else.  It

22   says:  "36 Y/O male, BIB EMS," all caps, "intoxicated,

23   S/P, punch in right eye and pushed in a fish tank face

24   first."

25         Well, there is a reference to him having "DT".

PROCEEDINGS                                    538

1    Again, I can't expect the jury to know that that means

2    delirium tremens without any sort of expert testimony.

3              That is the discharge summary.

4              And there's a number of other things on there,

5    your Honor, that first page.

6              The second piece of paper is called an

7    "Ambulance Call Report".  This was referenced to by

8    Mr. Simons before.  Under the center section of the

9    piece of paper, there's is "presenting problem".  There

10   are a number of boxes which would be checked out.  One

11   of those boxes is for "overdose"; that box is filled in.

12   Below that, where it has a line, it's printed

13   "substance" underneath, it says "ETOH".

14             That's it on that.

15             Again, a lot of other information.

16             The third piece of paper is "Patient's

17   Progress Communication Record".  It's dated May 7th;

18   there is no time on it.

19             At the bottom, it says "CNS:".  What that

20   means, I have no idea.  It says:  "Unable to assess due

21   to intoxicated state."  That's printed; that's not in

22   handwriting.

23             The next page is also a "Patient's Progress

24   Communication Record".  It's from the 8th of May, 2006,

25   6 a.m.  I'll be darned if I can see anything on here

PROCEEDINGS                          539

1    relating to alcohol.

2              Maybe you can point that out to me.

3              (Pause in the proceedings)

4              MR. HALE:  Oh, yeah, there's a handwritten

5    notation that says "ETOH: 28.09".

6              The next one, again, it's another "Patient's

7    Progress Communication Record", the 8th of May, 8 a.m.

8    Again, in handwriting, "ETOH: 28".

9              The next piece of paper is "Kings County

10   Hospital Chart Review, Ophthalmology Inpatient Consult".

11   It's dated the 7th of May, '06.  Again, in terms of

12   history:  "36 Y/O B/M, plus intoxication, reportedly

13   started shooting a gun.  In order to be stopped, he was

14   punched, kicked and hit over the head."  It's the same

15   narrative as the other --  as the Discharge Summary.

16             The next paper is dated the 21st of May, '06.

17   It's the "Initial Psychiatric Consult".

18             Again, I don't know how this can get put in

19   without proffering the psychiatric defense.

20             Actually, the consult time was the 14th of

21   May; the document was completed on the 21st of May.

22             It says:  "Patient is a 36-year-old B/M with

23   alcohol abuse and dependence, who came in after

24   allegedly shooting at his family members, who in

25   retaliation beat him up and threw him through an

-VMG-

PROCEEDINGS                            540

1    aquarium."

2              It states in here, "According to the

3    girlfriend, the patient does not have any other

4    psychiatric issues outside the alcohol dependence and

5    occasional marijuana smoking."

6              It says:  "Recommended continue present

7    alcohol detox management.

8              The next couple pieces of paper are lab

9    results.  They're kept as a record in terms of

10   chronology.

11             It states for Mr. Waiters on the first one--I

12   think we referred to this before:  "Ethyl alcohol,

13   (mg/dl):  386.24 (CRIT)".

14             THE COURT:  It has ethanol alcohol actually

15   listed on that document?

16             MR. HALE:  It says "ethyl alcohol", and then

17   it has the "mg/dl" and gives that number.

18             THE COURT:  Okay.

19             MR. HALE:  I think the next page does the same

20   thing.  Right.  Here it says:  "Ethyl alcohol, mg/dl:

21   158.55 (ABN)".  That's still for the 7th, although it

22   doesn't give a time.

23             The last one, again for the 7th, I guess

24   that's 4:01 p.m.  No, I'm incorrect about that.

25             Again, it says: "Ethyl alcohol, mg/dl:  28.9

PROCEEDINGS                                    541

1   (ABN).

2              Here's the problem, your Honor.  One, a lot of

3   these things are referenced to alcoholism as opposed to

4   alcohol level.  There is no definition about what these

5   levels mean.  A lot of them, it's very cryptic about.

6   For instance, when you just have the report that says

7   "ETOH", it's certainly not within the realm of lay

8   people to understand what that is.

9              A lot of this in terms of "admitting history",

10  we don't know if it's based on actual observation or if

11  it's based upon reportage from somewhere else.

12             Now, medical reports are generally admissible,

13  your Honor, when they have to do with an injury which is

14  part of the issue in the case.  I'm not even sure that

15  they're even admissible for this purpose at all, in

16  terms of trying to say what his alcohol level is.

17             Again, you're talking about intoxication.

18  Yes, intoxication is a defense, but only to the extent

19  that it nullifies an element in the crime, and the

20  element that we're usually talking about is intent.

21  There's absolutely no way from this that would cause a

22  jury other than to just completely speculate on what his

23  level of intoxication is or whether it would nullify.

24  In other words, it's less guidance --  It's actually a

25  problem for the jury to speculate about this.  I don't

PROCEEDINGS                                542

1    think that without explanation, medical or otherwise,

2    about what any of this means, that it is at all

3    relevant.   In fact, it would be completely misleading to

4    the jury.

5              THE COURT:   Officer, may I have those, please.

6              (Handed to the Court)

7              (Pause in the proceedings)

8              THE COURT:   Certainly, I've listened to the

9    arguments of both sides.

10             Over the People's objection, I'm going to

11   allow the proffered records to come in, which would

12   clearly indicate that at the time that he was admitted

13   to the hospital he was intoxicated.   I know that there

14   is an issue.

15             I'm also going to allow the part of the

16   records which mentions ethanol alcohol to be admitted.

17             The other portions certainly are not relevant.

18   In terms of the history, I'm not going to allow that to

19   be admitted.   Certainly, as to whether he suffers with a

20   history of alcohol abuse, that would not be relevant in

21   terms of his treatment and the diagnosis or

22   recommendations.   That's not really relevant.

23             I am going to allow certain portions in.   For

24   instance:   "CNS:   Unable to assess due to intoxicated

25   state."   Again, that would be relevant to the time and

PROCEEDINGS                      543

1    the place that the event occurred.  So that I will, in

2    fact, allow.

3              MR. HALE:  Your Honor, to that end, what is

4    "CNS"?

5              THE COURT:  That could be certified nursing?

6              MR. HALE:  Exactly.  Could be.

7              THE COURT:  Could be.  But, certainly, I'm

8    going to allow that line.  Anything that's not relevant

9    I would, in fact, redact.  It's going to be redacted

10   except for the certain portions which says "intoxicated"

11   and the dates on which in fact that observation was

12   made.

13             MR. HALE:  Of course, there's also not a time

14   there, your Honor.

15             Here's where the problem comes in, too.  Does

16   that come in --  Is that a treatment thing?  Is that an

17   opinion of whoever was looking at him?  Who was the

18   person that was looking at him?  Did it take into

19   account that he had a head injury at the same time?

20   What are we supposed to do with that?

21             Like I said, I don't even know what "CNS"

22   means.  The Court doesn't know.  Does the jury know?

23             THE COURT:  Certainly, one of the things that

24   we can do, which probably should have been done, was

25   either to have someone brought in or to call to find out

-VMG-

PROCEEDINGS                         544

1    what the definition of that is.

2              MR. HALE:  Exactly.

3              I think it doesn't become relevant until those

4    people do testify.

5              Now, here's the other thing that goes along

6    with all this, your Honor.  I don't know that this jury

7    is going to known that ethyl alcohol is the by-product

8    of drinking alcohol.  They're also not going to know on

9    those parts of the lab reports where they have the

10   little parenthesis and it says what level and whether

11   it's CRIT or ABN or NOR.  They're not going to be able

12   to quantify that whatsoever, your Honor.  So, how are

13   they going to determine at what level the intoxication

14   is?

15             Then there is another problem.  That is that

16   in proffering this, and perhaps making the argument to

17   the jury, it ignores what Mr. Simons already knows,

18   which is this defendant, in talking to both Doctor Drobb

19   and Doctor Bardey, said that he hadn't been drinking

20   that morning, was not intoxicated, and was able to give

21   a coherent version, his coherent version about what had

22   happened.

23             THE COURT:  Mr. Hale, certainly there was

24   testimony from the witness, Miss Warren, which indicated

25   that, in fact, he was drinking.

PROCEEDINGS                                    545

1              MR. HALE:  I don't dispute that, your Honor.

2              What I do dispute is making the argument that

3    he's intoxicated while then having in the back pocket

4    his own statement that he's not.  And then can I

5    introduce those statements to rebut?

6              THE COURT:  May I see counsel at sidebar,

7    please.

8              (Off-the-record discussion held at the bench)

9              THE COURT:  Mr. Hale?

10             MR. HALE:  Your Honor, again, it's my position

11   that the parts which the Court is considering allowing

12   in in this case, again, remembering that medical records

13   admissible, if at all, are for the treatment of an

14   individual when that injury is part and parcel or

15   germane to the case.

16             Mr. Waiters' hospitalization is from injuries

17   that were sustained after the incident in question and

18   are not admissible because they do not involve any issue

19   for the jury to decide in this case.  Therefore, any

20   reference that is made in those medical records to his

21   intoxication or his level of alcohol would, one, not be

22   admissible even if his overall medical condition was an

23   issue in the case, because it does not have anything to

24   do with his treatment on it.  And this all comes out in

25   the C.P.L.R. in terms of the purposes of medical

PROCEEDINGS                    546

1    records, where it has the hearsay exception.

2              Taking them out of that realm and taking them

3    just piecemeal in this regard, they are pure hearsay

4    because they don't go to any issue in the case.

5              Now, we are not talking about unavailable

6    witnesses who have made these observations.  Those are

7    available witnesses, according to the hospital records.

8    Therefore, if you want somebody to testify or if you

9    want to put in evidence of his intoxication and to make

10   sure that the jury understands the levels of

11   intoxication, because if the Court thinks that this is

12   admissible, and I submit that it is not because it's

13   hearsay, then they would be able to assess at what

14   level.

15             The issue is not whether he is intoxicated.

16   Because, as we know, the C.P.L. says intoxication is not

17   a defense.

18             THE COURT:  That's true.  However, the jury

19   may take into consideration in determining whether there

20   was intent.

21             MR. HALE:  Right.

22             So, the important part is not intoxication,

23   but the level of intoxication.

24             Now, the jury, if they just hear this, they're

25   going to be given numbers, which mean nothing.  They're

-VMG-

PROCEEDINGS                                547

1    going to be given opinions, which mean nothing.  They're

2    not going to be able to assess that level of

3    intoxication.  That's the issue for the jury.  Not

4    whether he was or whether he wasn't, but whether it

5    negatives an element of the crime.

6              Now, I don't know how anybody from this record

7    can argue without testifying, without speculating.  I

8    don't know that it can be done.  I don't see any way

9    that it can be done.

10              If it is that ambiguous and if it would tend

11    to mislead the jury, then it shouldn't be admitted.  At

12    least not without some support with it that says what

13    these things mean.

14              THE COURT:  Quite frankly, Mr. Hale, I would

15    agree with you that the best way would have been to get

16    someone from the hospital to certainly interpret the

17    records as to those limited issues.  Quite frankly, I

18    don't know why, you know, someone wasn't called or at

19    the very least to get an assessment by the doctor who

20    appeared, even if it was by the People, something that

21    would assist.

22              MR. HALE:  Well, I'm not in a position of

23    assisting him, your Honor.

24              THE COURT:  I understand that.  Nor should you

25    be.  But I'm saying that that is possibly one way that

PROCEEDINGS                                    548

1    it could have been rectified.

2              MR. HALE:  My position is it's the only way,

3    your Honor.

4              What is Mr. Simons going to get up there and

5    say?  That this level means something?  That this

6    person's observation is any better than any other

7    person's observation?  That one person's intox, what

8    does it mean in a medical standpoint?  Does it mean that

9    he can't form intent?  I mean, this is all going to be

10   speculation.  What's he going to do, testify?  Then it

11   becomes impossible for me to rebut.  Nor should I have

12   to.

13             Again, you say it might be the better course.

14   We're still not under a time crunch here, Judge.  It can

15   be done.

16             Again, my concern is this jury speculates.

17             THE COURT:  Mr. Simons, do you wish to

18   respond?

19             MR. SIMONS:  Just briefly, Judge.

20             I believe Mr. Hale must have forgotten during

21   his opening he stated Mr. Waiters was intoxicated.

22   Because he stated after Mr. Waiters has a drink, that

23   changed his demeanor and he became an abusive person.

24   Every witness that has testified so far has made

25   reference to Mr. Waiters drinking.  I believe Lorenzo

-VMG-

PROCEEDINGS                                549

1    said he was intoxicated before the incident.  Jackie

2    says he was drinking.

3            So, this is not as big an issue as I believe

4    the People have made it out, because if he checks his

5    opening, he spent a lot of time making reference to how

6    intoxicated Mr. Waiters was and how that intoxication

7    changed him to commit the act that he's being charged

8    with.  So, I believe this is relevant.

9            THE COURT:  I agree that it is relevant.  My

10   point, Mr. Simons, is this:  That there's some portions

11   of the record that the Court is inclined to allow to get

12   introduced that need to have an explanation, because

13   "CNS", if it's a nursing assistant, certainly that

14   should be broken down.  I tend to agree with Mr. Hale as

15   to those points, and even with the level --  the amounts

16   of the ethanol alcohol.  There should be some assistance

17   to the jury.

18           Again, I'm inclined to allow you to do it.

19   The only thing that I'm saying is that there should have

20   been someone to at least, certainly for the jury's

21   edification, be able to explain what that means so that

22   they should have some kind of understanding as to those

23   numbers.

24           MR. HALE:  Here's the other part, your Honor.

25   Again, what I have said, it wasn't evidence.

-VMG-

PROCEEDINGS                              550

1      THE COURT:  No, it's not evidence.  I hear

2  you.

3      MR. HALE:  But, again, if there is already

4  evidence that he was drinking, if there is already

5  evidence and they're talking about his behavior at the

6  time this was going on in terms of saying well, he's

7  drinking or well, he's intoxicated, then what is even

8  the necessity for having any of this brought in?  It

9  seems to me then just to be --  Since it is under this

10  hearsay sort of thing, what is the necessity for even

11  having this in?

12      THE COURT:  Certainly, as I said, while I'm

13  inclined to allow it in, the better course would be to

14  have a witness to be able to explain certain terminology

15  which is included in the records.

16      Because, again, as I said, I will allow you to

17  introduce it, Mr. Simons, but certainly there should be

18  an explanation in terms of what you pulled out, what I

19  have before the Court currently as what you seek to

20  introduce as part of the certified medical records.

21      MR. SIMONS:  Well, just based on the Court's

22  decision, because it was my intention, I believe the

23  records would show that Mr. Waiters was intoxicated on

24  the day of the incident, which I believe that's the

25  essence of what the records are showing, to be

1          consistent with all the other witnesses.

2                    Who "CNS" is --

3                    THE COURT:  The other thing that concerns me

4          is the ethanol alcohol level, what that means.

5          Otherwise, there would be no basis to seek to introduce

6          that.

7                    So, apparently, Mr. Simons, you also believe

8          that there's some relevance to having that portion of

9          the medical record introduced, and it would be for the

10         edification of the jury in terms of what that

11         specifically means.

12                   MR. SIMONS:  Well, your Honor, it is the

13         defense opinion that the ethanol alcohol level, and as

14         made reference to each level, whether it's normal,

15         abnormal or a critical stage.  I mean, it's either

16         normal or it's not normal.  I believe this is a common

17         sense type of issue not beyond the realm of the jury.

18                   I know the People object to it for more

19         strategic reasons, but I believe it is not beyond the

20         realm of the jury to understand that.

21                   THE COURT:  Well, I know that there's

22         common-law indicia of intoxication, but certainly this

23         would go beyond the common-law indicia of intoxication.

24                   So, if you're seeking to have blood levels,

25         the amount of ethanol alcohol in Mr. Waiters' blood

PROCEEDINGS                              552

1    stream, then clearly there should be someone to explain

2    it for the edification of the jury as to what, in fact,

3    that would mean.  Otherwise, there's no point to seek to

4    introduce those levels of ethanol alcohol in his blood

5    stream.

6              MR. SIMONS:  Your Honor, the defense at this

7    point is not introducing any additional witnesses at

8    this point.

9              We would request that the Court permit all the

10   information in, and we're prepared for the Court to make

11   its ruling based on the defense not presenting any

12   additional witnesses at this time.

13             THE COURT:  May I see counsel at sidebar.

14             (Off-the-record discussion held at the bench)

15             THE COURT:  It's the Court's understanding

16   that the defense is not going to be calling any medical

17   witness in order to certainly enlighten the jury as to

18   what the numbers mean contained in the medical records.

19             So, at this point, the Court only has two

20   pages before it with two lines, one indicating:  CNS

21   unable to assess due to intoxicated state.  And the

22   other that says:  36-year-old male intoxicated, or BIB

23   EMS, brought in by E.M.S. intoxicated.

24             That's really the two lines that would be

25   relevant.  Everything else that was handed up to the

PROCEEDINGS                                        553

1    Court really would not be without an explanation by

2    medical personnel to explain what the ethanol alcohol

3    level would be and certainly the amounts and how that

4    affected the defendant as far as this case is concerned.

5    Everything else is going to be redacted, any kind of

6    trauma or anything else but those two lines on those two

7    pages of the medical records that I have before me.

8            Do you understand that, Mr. Simons, and is

9    that what you're saying you wish to go forward with?

10           MR. SIMONS:  Your Honor, I would, of course,

11   take exception to your ruling, but, yes, I'm prepared to

12   go forward with that.

13           THE COURT:  Mr. Hale, is there anything you

14   wish to say?

15           MR. HALE:  Well, I guess let's then ask

16   whether his having put at least those portions of the

17   records in whether it's relevant and admissible to call

18   either Doctor Drobb or Doctor Bardey for the limited

19   purpose of saying that they had a conversation with

20   Mr. Waiters and that they had discussed the incident and

21   that he indicated that he was not intoxicated at the

22   time of the incident?

23           MR. SIMONS:  Your Honor, I don't know whether

24   we would really have to address that.  That's not proper

25   in any sense.  That doesn't rebut the medical records.

-VMG-

PROCEEDINGS                                    554

1    Also, there's no basis for that.  These aren't

2    statements coming from Mr. Waiters.  These are medical

3    records.  So, we can't even rebut a medical record from

4    a statement of --  It's not relevant.  It's improper.

5            MR. HALE:  Except for the whole reason that

6    they're being admitted is because that they mean

7    something.  They mean something to counsel, they mean

8    something to the defendant.  They mean that he's going

9    to argue that he was so intoxicated that he couldn't

10   form intent.

11           THE COURT:  I mean, certainly, he has a right

12   to make that argument, and certainly there was evidence

13   adduced by the People's witnesses which indicated that,

14   in fact, he had been drinking.

15           As I said, certainly, there is common-law

16   indicia of intoxication, so certainly you don't have to

17   be an expert witness, and certainly the People's

18   witnesses testified to the fact that there had been --

19   that the defendant had been heavily drinking.

20           Now, if you're saying that that's subjective

21   in terms of what one person may do in terms of whether

22   two drinks is enough to intoxicate one person or five

23   drinks would be enough to intoxicate another person, so

24   it depends on their alcohol tolerance level, certainly

25   if that's what you're saying, Mr. Hale, I'm not quite

PROCEEDINGS                                    555

1    sure --

2              MR. HALE:  I don't think the Court

3    understands.

4              The issue is --  It's not whether he was

5    taking a drink and it's not whether he was intoxicated.

6    The issue is was he so intoxicated that it negatived the

7    element of the crime.  He gave accounts to both

8    Doctor Drobb and Doctor Bardey in which he talks about

9    that he clearly knew what was going on and that he had a

10   specific intent.

11             THE COURT:  I understand it, Mr. Hale.

12   However, what I'm going to do is allow the defense, over

13   your objections --  I understand your arguments.  I

14   certainly would disagree them.  I'm going to allow them

15   to introduce the medical records.

16             And you're saying that they're certified

17   medical records, the two pages, which redact everything

18   but the reference to the defendant being intoxicated.

19             This is going to be handed back to the defense

20   as not relevant.  These are the two pages that it would

21   be, and they would have to be redacted appropriately.

22             (Handed to Mr. Simons)

23             THE COURT:  What I would be inclined to do is

24   have the jury brought in, certainly I'll ask whether the

25   defense rests, you'll indicate that you're offering

PROCEEDINGS                                      556

1      Defendant's E in evidence, with the appropriate

2      redactions.  That will be done over the People's

3      objection, which will be noted for the record.

4                  Actually, that would be H, I believe.

5                  MR. SIMONS:  H, right.

6                  THE COURT:  It will be marked Defendant's H

7      for identification.

8                  (Received and marked Defendant's Exhibit H for

9      identification)

10                 COURT OFFICER:  So marked.

11                 THE COURT:  Are both sides ready?

12                 MR. SIMONS:  Yes.

13                 MR. HALE:  Yes, your Honor.

14                 (Pause in the proceedings)

15                 COURT OFFICER:  Ready for the jury, your

16     Honor?

17                 THE COURT:  Both sides are ready?

18                 MR. HALE:  Yes.

19                 MR. SIMONS:  Yes.

20                 THE COURT:  Ready.

21                 COURT OFFICER:  Jury entering.

22                 (At this time, the jury entered the courtroom)

23                 THE CLERK:  The jury is now present.

24                 Do the attorneys waive the roll call?

25                 MR. SIMONS:  Yes.

-VMG-

PROCEEDINGS                                    557

1          MR. HALE:  Yes.

2          THE COURT:  Good afternoon, jurors.

3          Jurors, at this time, the People have rested.

4    The defense has two options.  The defense may rest or

5    they may choose to call witnesses.  But, again, the

6    defense has no obligation or burden to do anything

7    whatsoever, so certainly the defense need not call any

8    witnesses.

9          Does the defense rest?

10         MR. SIMONS:  Your Honor, at this time, the

11   defense would like to move into evidence, I believe as

12   Defense Exhibit H, certified medical records of

13   Mr. General Waiters from Kings County Hospital, which

14   has been subject to some redaction.

15         THE COURT:  Certainly, Defendant's H will be

16   admitted into evidence, over the People's objection,

17   which is noted for the record, with the appropriate

18   redactions.

19         (Received and marked Defendant's Exhibit H in

20   evidence)

21         MR. SIMONS:  With that, your Honor, the

22   defense rests.

23         THE COURT:  Certainly, jurors, at this time,

24   it will be necessary to consult with the attorneys.

25         What I'm going to permit you to do at this

-VMG-

PROCEEDINGS                            558

1    point is to take your luncheon recess and return at

2    2:15.

3              Again, I'll remind you, please do not discuss

4    any aspect of the case amongst yourselves or with anyone

5    else, or permit anyone else to discuss it in your

6    presence.

7              You'll follow the direction of the court

8    officer.

9              (At this time, the jury left the courtroom)

10             THE COURT:  Any motions you wish to make at

11   this time?

12             MR. SIMONS:  Yes, your Honor.

13             At the end of the case, at this time the

14   defense would move that the Court dismiss all of the

15   charges against Mr. General Waiters, in that the People

16   have failed to make out each and every element of all

17   the charges.

18             Your Honor, specifically, as far as the murder

19   count, the People have failed to establish that

20   Mr. Waiters at any point intended to cause the death of

21   Mr. Lorenzo Warren, which would be that element of that

22   charge.

23             As far as attempted murder, the People have

24   also failed to prove that Mr. Waiters intended to cause

25   the death of Lorenzo Warren.

PROCEEDINGS                                    559

1        As far as the Assault in the First Degree is

2   concerned, first with Mr. Lorenzo Warren, the People

3   have not only failed to prove intent to cause serious

4   physical injury, I believe the People have failed to

5   prove that Mr. Lorenzo Warren suffered a serious injury.

6        Specifically, in order to establish serious

7   physical injury under subsection 10 of the Criminal

8   Procedure Law or the Penal Law, the People would have to

9   prove that in order for him to sustain a serious

10  physical injury, it has to be by means of a physical

11  injury which creates a substantial risk of death, or

12  which causes death or serious or protracted

13  disfigurement, protracted impairment of health, or

14  protracted loss or impairment of the function of any

15  bodily organ.

16        In this particular case, as far as Mr. Warren

17  is concerned, the People provided no medical records

18  whatsoever and there was no testimony besides I believe

19  Mr. Warren saying that he did suffer some pain to

20  establish a serious physical injury.

21        Therefore, the People have failed to prove

22  assault --  they failed to prove a serious physical

23  injury to Mr. Lorenzo Warren.

24        I'll move on to Shatashia Lewis.  Also, in

25  that count, the People have failed to prove that

PROCEEDINGS                              560

1    Mr. Waiters intended to cause physical injury to Lorenzo

2    Warren, but also they failed to prove a serious physical

3    injury pertaining to Miss Lewis.

4            Once again, they did not provide any medical

5    record to support that, and she did mention that yes,

6    there was some blood involved and I believe there was

7    some pain, but she did not describe a serious physical

8    injury under the statute in order to support that

9    charge.

10           Therefore, for all these reasons, I would move

11   that these charges be dismissed against Mr. Waiters.

12           THE COURT:  Mr. Hale?

13           MR. HALE:  Your Honor, on both the murder and

14   the attempted murder count, the jury could well and

15   easily find from the proof that shooting at another

16   individual five times is intent to kill.  I don't think

17   that there's any problem with that.

18           As to the issues of serious physical jury with

19   regard to Lorenzo Warren and Shatashia Lewis, both of

20   them described having gunshot wounds to the leg, both of

21   them described hospitalization, and in Ms. Lewis' case a

22   number of days of hospitalization, including an

23   operation, and both of them described pain of long

24   standing and difficulty in terms of walking in which

25   they had to have assistance in walking through the use

PROCEEDINGS                    561

1   of canes and or crutches. I believe that that does

2   establish, it's certainly a jury question as to whether

3   they sustained serious physical injury or not.

4           In that regard, your Honor, and for all the

5   other reasons that are on the record, I would ask that

6   counsel's motion be denied.

7           THE COURT: Certainly, based upon the

8   testimony and evidence adduced at this trial, sufficient

9   evidence has been adduced to submit to the jury for

10  their ultimate determination on all issues of fact.

11          So, defense counsel's motion is going to be

12  denied.

13          I asked both counsel whether they had any

14  special requests to charge outside of the ordinary. If

15  not, we're going to move into the precharge conference,

16  and I will tell you the charges I intend to give and

17  you'll let me know whether, in fact, there are any other

18  charges that you wish the Court to give.

19          MR. SIMONS: Judge, I don't know if you

20  classify this as out of the ordinary, but the defense

21  would request a charge on intoxication as pertaining to

22  the intent elements of the charges.

23          THE COURT: I give a basic final general

24  charge. The charge is divided into two parts. Laws for

25  the Court, indictment carries no implication of guilt,

PROCEEDINGS                                562

1  presumption of innocence, evidence only from the

2  witnesses, inferences from the evidence, sympathy and

3  punishment not to be considered, disregard excluded

4  matters, rulings by the Court, facts for the jury,

5  credibility of witnesses, police officer as a witness,

6  an expert witness charge, falsus in uno.

7          Mr. Simons, I do not know whether you would be

8  requesting the following charge:  Jurors, I charge you

9  that our law says that a defendant has the right to

10 remain silent and not testify.  The fact that a

11 defendant did not testify is not a factor from which any

12 inference unfavorable to the defendant may be drawn.  In

13 arriving at its verdict, the jury is not to consider in

14 any way the fact that the defendant did not testify, nor

15 should you speculate as to why the defendant did not

16 testify.

17          MR. SIMONS:  Yes, I am requesting that.

18          THE COURT:  I give a definition of intent.

19          I don't know, People, if you're requesting a

20 definition of motive or not?  That motive is not an

21 element of the crime.

22          MR. HALE:  Yes, that's fine.  I would like

23 that, your Honor.

24          THE COURT:  Burden of proof, reasonable doubt,

25 unanimous verdict.  I would, in fact, give the

PROCEEDINGS                                    563

1    intoxication charge, which is the standard charge under

2    15.25.

3              People, you're seeking to submit all of the

4    counts in the indictment to the jury; is that correct,

5    Mr. Hale?

6              MR. HALE:  I am, your Honor.

7              I know the Court just talked about intent, I

8    subsume within that would be, because the indictment

9    alleges transferred intent, that the Court would explain

10   that also.

11             THE COURT:  That's correct.

12             MR. HALE:  Okay.

13             THE COURT:  At the time of the reading of the

14   specific charges, certainly the transferred intent is

15   included as part of that charge.

16             MR. HALE:  Okay.

17             THE COURT:  Any other charges?

18             MR. SIMONS:  Yes, your Honor.

19             The defense would be requesting Manslaughter

20   in the First Degree, as a lesser charge of intentional

21   Murder in the Second Degree.

22             THE COURT:  Mr. Hale, do you wish to be heard

23   on that?

24             MR. HALE:  Again, your Honor, I don't see a

25   reasonable view of the evidence from firing five shots

-VMG-

1   at another individual that there was less than intent to

2   kill.

3              It's the Court's decision.

4              THE COURT:  Certainly, this Court would be, in

5   fact, inclined to give a charge of Manslaughter in the

6   First Degree, based upon all of the testimony that has

7   been adduced at this trial.  So, I will, in fact, grant

8   that request.

9              There is a verdict sheet, and there will be a

10  copy of the proposed verdict sheet, which includes the

11  eight counts at this point.  I'll give the parties an

12  opportunity to review it before you make your closing

13  arguments.

14             Any other matters to go on the record before

15  we recess for the luncheon break?

16             MR. HALE:  Not from the People, your Honor.

17             MR. SIMONS:  No, your Honor.

18             THE COURT:  I'll see the parties at 2:15.  At

19  that time, you'll have a copy of the proposed verdict

20  sheet to review.

21                  *          *          *          *

22             (At this time, a luncheon recess was taken,

23  and the trial adjourned to 2:15 p.m.)

24

25

1    the People have failed to prove beyond a reasonable

2    doubt any one or more of those elements, then you must

3    find the defendant not guilty of Criminal Possession of

4    a Weapon in the Fourth Degree, as charged in this count.

5            Now, jurors, under our law, intoxication is

6    not as such a defense to a criminal charge.  But

7    evidence of the defendant's intoxication may be

8    considered by you whenever it is relevant to negative an

9    element of the crime charged.

10           So, in determining whether the defendant had

11   the intent necessary to commit a crime, you may consider

12   whether the defendant's mind was affected by intoxicants

13   to such a degree that he was incapable of forming the

14   intent necessary for the commission of any of the crimes

15   charged that I just submitted to you.

16           Now, jurors, counts were submitted to you in

17   the alternative for legal reasons, and you must not

18   consider the fact that I'm submitting a count to you in

19   the alternative as any indication that the Court has any

20   opinion about the defendant's guilt or non-guilt on any

21   of the crimes that have been charged.

22           Now, jurors, in evaluating the evidence and

23   the issues that have been presented to you, you should

24   use your common sense, knowledge, and experience, and

25   certainly you should use the knowledge and experience

# M E M O R A N D U M

SUPREME COURT :  KINGS COUNTY   (Criminal Term, Part 1)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PEOPLE OF THE STATE OF NEW YORK,

              By: DOWLING, J.

    - against -       Dated: January 24, 2010

              Indictment No.: 3464/06

GENERAL WAITERS

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

   The defendant submitted the instant motion seeking to vacate the judgment of conviction rendered against him, on June 2, 2008, pursuant to Criminal Procedure Law (CPL) section 440.10(1)(h).  The defendant contends that the judgement of conviction was obtained in violation of his rights under the constitution of New York State and the United States constitution.  Specifically, the defendant argues that he was deprived of effective assistance of counsel because trial counsel failed to call an expert witness to explain his medical records to show how intoxicated he was at the time of the offense.  The defendant also asserts that he failed to receive effective assistance of counsel because his trial attorney requested that the court charge him with an inappropriate lesser offense and failed to request lesser offense for the remaining intentional counts charged in the indictment.  The People submitted an affirmation in opposition to the defendant's motion.

   Criminal Procedure Law §440.10(2)(c) also provides that the Court **must** deny a motion to vacate a judgment if :

"sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, [and] no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period . . ." *CPL* §440.10(2)(c)."

In this case the defendant submitted an appeal of his conviction on June 8, 2010 and has been given an extension until February 8, 2011 to file a supplemental brief by the Appellate Division.   It is clear that the claims raised by the defendant are readily ascertainable from the record and could have been raised in the defendant's appellate brief. In fact the defendant still has sufficient time to raise those claims in his supplemental brief. Accordingly, the defendant's motion is denied as it is procedurally barred pursuant to CPL §440.10(2)(c).

This shall constitute the decision and order of this Court.

_____
Deborah A. Dowling, **JSC**

ENTERED

JAN 26 2011

NANCY T. SUNSHINE
COUNTY CLERK

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT J**

Defendant's Reply to Respondent's Opposition
to his State Court Motion to Vacate his
Judgment of Conviction

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------- X
THE PEOPLE OF THE STATE OF NEW YORK

                               Respondent,

             -against-

GENERAL WAITERS,

                         Defendant,
--------------------------------------- X

**Reply to the D.A.'s Opposition to the Motion to Vacate Judgement**
Ind. No. 3464/06

## EVIDENTIARY HEARING IS REQUIRED

    The court should order an evidentiary hearing in accordance with CPL §440.30(5), to determine whether defense counsel's omissions were, in fact, errors or the result of "reasonable" trial strategy. The trial record is insufficient to make such determination on its own and counsel never responded to defendant's inquiries concerning his strategy. The ADA's speculative approach supports defendants contention that an evidentiary hearing is necessary as there remains issues of fact in dispute.

    Specifically, the ADA erroneously contends that trial counsel's failure to call an expert witness to explain pertinent records which would support his intoxication defense was strategic. Such conjecture has no support without any testimonial evidence from the trial counsel himself. Relying on Barclay v Spitzer, 371 F.Supp.2d 273 (E.D.N.Y. 2005), to support the claim that expert testimony would have opened the door to the prosecution calling it's own rebuttal witness is a lame attempt to fit a square peg into a round hole. In Barclay, an

1

*evidentiary hearing* was ordered by the Court of Appeals for the Second Circuit since the record was deemed insufficient. This ruling was based on the fact that counsel never responded to the appellant's claims. Therefore, a trial strategy could not be assessed based on a cold record, similar to the case at bar. That case was a sexual assault case in which the defendant disputed the claim that he had the physical capability to commit the crime since he walked with a cane. During the *evidentiary hearing* it became apparent that the calling of a doctor to testify regarding these contentions could have easily been refuted by the prosecution's own witnesses. That case has many distiguishable differences that should be noted. In the instant case trial counsel's theory was predicated on the defendant's intoxication. There was no dispute as to whether the defendant was intoxicated or not. This was universally accepted by counsel as well as the D.A. and the Judge. The issue was whether that intoxication reached a level that would negate the intent element that was needed to convict on the top count in the indictment. Therefore, a rebuttal witnesses refutation of those facts would have been futile.

Another alarmingly speculative assertion is the ADA's contention that "[e]xpert toxicology testimony regarding defendant's blood alcohol level would have opened an area for cross-examination and rebuttal such as testimony from a toxicologist that an individual's blood alcohol level generally does not reach its maximum point until about one and one-half hours after a person stops drinking and that the level of

impairment from alcohol varies from person to person based on whether an individual is an experienced drinker. Further testimony from an expert could well have established that because defendant was a habitual drinker, his level of intoxication would not have negated his intent to commit the crimes of which he was convicted." These statements of pure conjecture have no documentary support therefore no leg to stand on. The ADA totally ignores the evidence brought by defendant in his Memorandum of Law via <u>Miller v. Terhune</u>, 510 F.Supp.2d 486 (E.D. Cal 2007). Such imaginitive conclusions demonstrate the need for an evidentiary hearing to clear up the questions of fact.

The ADA's opposition repeatedly relies on case law that contradicts the facts as well as the law governing this case. For instance, the ADA uses <u>People v Beriguete</u>, 51 A.D.3d 939 (2d Dep't 2008). In that case the County Court rejected the defense's request for a manslaughter in the second degree charge as a lesser-included offense of murder in the second degree. Thus it was foreclosed by the jury's verdict finding him guilty of murder in the second degree, the crime alleged in the indictment, and it's implicit rejection of the lesser-included offense of manslaughter in the first degree. This is clearly distinguishable from the case at bar where trial counsel failed to request the appropriate lesser-included offense of manslaughter in the second degree, therefore precluding the Court from even deciding on the issue.

Similarly, the ADA erroneously applies <u>People v Kennedy</u>, 7

3

A.D.3d 272 (1st Dep't 2004) where the petitioner's IAC claim was rejected. His claim was based on counsel's failure to request manslaughter in the second degree as a lesser-included offense. In that case the defendant's guilt was established by overwhelming evidence. That case did not rely on an intent element such as this one. Defendant's intoxication was undoubtedly established, however, due to counsel's failure to even attempt to put an expert toxicology witness on the stand, it was never established if his intoxication reached such a level that could negate his intent.

In conclusion, instead of shopping around departments outside of this jurisdiction for cases that are factually dissimilar to the case at bar, it would have been more beneficial for the ADA to observe the clearly established law in this department. In People v. Vasquez, 104 A.D.2d 429 (2d Dept 1984) the court ruled that the defendant was entitled to manslaughter in the second degree as a lesser-included offense of an intentional crime. It was proved that Vasquez drunk two six-packs of beer shortly before the incident. That was enough for the Second Department to hold that there was a reasonable view of the evidence that Vasquez acted recklessly (and was guilty of the lesser-included offense of manslaughter in the second degree), and not intentionally. Thus, contrary to the ADA's assertion, trial counsel's request of a lesser-included offense of manslaughter in the first degree and his failure to request manslaughter in the second degree does not seem to be a legitimate trial strategy. If he truly desired an "all or

nothing" approach, why would he have even requested a lesser-included offense in the first place? However, these are issues that should be resolved at an evidentiary hearing. This avenue would allow the defendant to meet his ultimate burden of persuasion by directing these relevant questions to the trial attorney himself.

Dated: December 30, 2010

General Waiters

*General Waiters*

cc:  Charles J. Hynes, D.A.
     Renaissance Plaza
     350 Jay St.
     Brooklyn, N.Y. 11201-2908

UNITED STATES POSTAGE

$ 00.44⁰
02 1A          DEC 31 2010
000 4623953
MAILED FROM ZIP CODE 12582

GREENHAVEN

CORRECTIONAL FACILITY

Legal
Mail
*

N HAVEN CORRECTIONAL FACILITY
OX 4000
MVILLE, NEW YORK 12582-4000

General Waters DIN: 08A3571

Charles J. Hynes, D.A.
Renaissance Plaza
350 Jay St.
Brooklyn, N.Y. 11201

Legal
Mail
*

COURTESY COPY
ORIGINAL FILED ON ECF
13-CV-3636(JG)

# EXHIBIT

Waiters v. Lee

E.D.N.Y.

13-CV-3636(JG)

**EXHIBIT K**

The State Court Decision Denying Defendant's
Motion to Vacate his Judgment of Conviction

# M E M O R A N D U M

SUPREME COURT :  KINGS COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PEOPLE OF THE STATE OF NEW YORK,

                 - against -

GENERAL WAITERS

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

(Criminal Term, Part 1)

By: DOWLING, J.

Dated: January 24, 2010

Indictment No.: 3464/06

The defendant submitted the instant motion seeking to vacate the judgment of conviction rendered against him, on June 2, 2008, pursuant to Criminal Procedure Law (CPL) section 440.10(1)(h).  The defendant contends that the judgement of conviction was obtained in violation of his rights under the constitution of New York State and the United States constitution. Specifically, the defendant argues that he was deprived of effective assistance of counsel because trial counsel failed to call an expert witness to explain his medical records to show how intoxicated he was at the time of the offense.  The defendant also asserts that he failed to receive effective assistance of counsel because his trial attorney requested that the court charge him with an inappropriate lesser offense and failed to request lesser offense for the remaining intentional counts charged in the indictment.  The People submitted an affirmation in opposition to the defendant's motion.

Criminal Procedure Law §440.10(2)(c) also provides that the Court **must** deny a motion to vacate a judgment if :

1

> "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, [and] no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period . . ." *CPL* §440.10(2)(c)."

In this case the defendant submitted an appeal of his conviction on June 8, 2010 and has been given an extension until February 8, 2011 to file a supplemental brief by the Appellate Division.   It is clear that the claims raised by the defendant are readily ascertainable from the record and could have been raised in the defendant's appellate brief. In fact the defendant still has sufficient time to raise those claims in his supplemental brief. Accordingly, the defendant's motion is denied as it is procedurally barred pursuant to CPL §440.10(2)(c).

This shall constitute the decision and order of this Court.

_____
Deborah A. Dowling, **JSC**

ENTERED

JAN 2 6 2011

NANCY T. SUNSHINE
COUNTY CLERK

2