```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF KINGS:  CRIMINAL TERM:  PART: 1
      ---------------------------------------------X
 3    THE PEOPLE OF THE STATE OF NEW YORK,
                                        Indict. No.
 4
                                        3464/06
 5              -against-
                                        Cont'd Hearing
 6    GENERAL WAITERS,

 7                        Defendant.
      ---------------------------------------------X
 8

 9                              320 Jay Street
                                Brooklyn, New York 11201
10                              May 29, 2014

11

12    B E F O R E:

13                     HONORABLE DEBORAH A. DOWLING,
                                Justice
14


15    A P P E A R A N C E S:

16

17              OFFICE OF KENNETH P. THOMPSON, ESQ
                     District Attorney, Kings County
18                   BY:  MARK HALE, ESQ.
                     BY:  RHEA GROB, ESQ.
19                   Assistant District Attorneys

20
                GARY FARRELL, ESQ.
21                   Attorney for the Defendant
                     305 Broadway
22                   New York, New York

23

24

25                              THERESA J. SANTILLI, CSR
                                Official Court Reporter
```

Proceedings                                                    53

1          THE CLERK:  This is 1 on the calendar, 3464 of

2     2006, People of the State of New York against General

3     Waiters.

4          MR. FARRELL:  For Mr. Waiters, Gary Farrell,

5     305 Broadway, New York, New York.

6          Good morning.

7          THE COURT:  Good morning.

8          MR. HALE:  For the District Attorney, by Mark

9     Hale.

10         MS. GROB:  Rhea Grob, G-R-O-B.

11         Good morning.

12         THE COURT:  Good morning.

13         THE CLERK:  The defendant is now present and

14    before the Court.

15         MR. FARRELL:  Your Honor, before I call the

16    next witness who I understand is outside, I have a brief

17    application.  I would ask for a copy of the minutes

18    pursuant to county law.  Mr. Waiters was indigent at the

19    trial you presided over.  He remains indigent.

20         THE COURT:  Certainly if you're appointed 18B

21    you're entitled to the minutes.

22         MR. FARRELL:  Okay.

23         THE COURT:  Any matters to go on the record

24    before we begin?

25         MR. FARRELL:  No, your Honor, not from the

1         defense.

2                    MR. HALE:  No, your Honor.

3                    MR. FARRELL:  Judge, the defense calls Calvin

4         Simons.

5                    A COURT OFFICER:  Ready, your Honor?

6                    THE COURT:  Yes.

7                    A COURT OFFICER:  Watch your step, remain

8         standing and face the clerk.

9                    THE CLERK:  Raise your right hand.

10    C A L V I N     S I M O N S, a witness called on behalf

11    of the Defense, having been first duly sworn, was

12    examined and testified under oath as follows:

13                   THE CLERK:  Have a seat.

14                   THE WITNESS:  Thank you.

15                   THE CLERK:  Pull up your chair, speak in the

16        microphone.

17                   In a loud, clear voice state for the record

18        your full name.

19                   THE WITNESS:  Calvin J. Simons.

20                   THE CLERK:  Thank you.  There's water there for

21        your convenience.

22                   THE COURT:  Good morning, Mr. Simons.

23                   Again, I'm going to ask that you please keep

24        your voice up and speak as loud as you were just talking.

25                   Certainly, Mr. Simons, if any of the attorneys

1    ask you a question and you're not quite sure what they're

2    asking you, I don't want you to guess.  If the question

3    isn't clear to you, you let them know, they will

4    rephrase, and then you'll answer the question after it's

5    been rephrased.

6              Certainly, I will say to you if any of the

7    attorneys make an objection, do not answer the question

8    until after I've ruled on that objection.

9              Do you understand that, Mr. Simons?

10             THE WITNESS:  Yes.

11             THE COURT:  You may inquire.

12             MR. FARRELL:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. FARRELL:

15        Q    Good morning, Mr. Simons.

16        A    Good morning.

17        Q    How long have you been an attorney?

18        A    Since 1983.

19        Q    Where did you begin your career as far as

20   practicing as an attorney?

21        A    The Legal Aid Society.

22        Q    And in the criminal defense division?

23        A    Yes.

24        Q    How long were you there?

25        A    I left in 1997, I believe.

1        Q      And have you been in private practice ever

2    since?

3        A      Yes.

4        Q      And are you currently -- well, I'll

5    withdraw that.   Thank you.

6               Did there come a time you became a member

7    of the Assigned Counsel Plan for the Second Department?

8        A      Yes.

9        Q      When was that?

10       A      1997.

11       Q      And when you came out in 1997 were you

12   immediately what's known as felony certified?

13       A      Yes.

14       Q      And did there come a point that you became

15   certified to handle people charged with A-1 felonies,

16   such as homicide?

17       A      Yes.

18       Q      When was that, sir?

19       A      '97.

20       Q      And from 1997 up to and including today,

21   as you sit here on the stand, do you continue to

22   represent people charged with homicides?

23       A      Yes.

24       Q      And I know it might be tough but I'm only

25   asking for an estimate, how many such assignments do

1    you think you've received from 1997 to the present?

2          A     Hundreds.

3          Q     Mr. Simons, I'm asking you about a

4    specific case back in May of 2006, did there come a

5    time you were assigned to represent a man named General

6    Waiters?

7          A     Yes.

8          Q     Do you see Mr. Waiters in court today?

9          A     Yes.

10         Q     The gentleman sitting next to me in the

11   white shirt?

12         A     Yes.

13         Q     At what point in the case were you

14   assigned to represent Mr. Waiters, as best as you can

15   recall?

16         A     It was -- I believe it was May 17, 2006,

17   and I received it I believe it was in part 10, who was

18   Judge Walsh at the time.

19         Q     Would you agree with me that you were

20   assigned at the initial proceeding, he was brought into

21   court and arraigned on this Indictment 3464 of 2006?

22         A     Yes.

23               THE COURT:  And certainly, if you need to

24        refresh your recollection, Mr. Simons, you'll let the

25        Court know and I'll give you an opportunity to do that.

1          MR. FARRELL:  Your Honor, I'd ask that the

2     witness be shown what's already admitted for purposes of

3     this hearing as Defendant's A in evidence.

4          Q    Mr. Simons, have you had a chance to look

5  at those documents?

6          A    Yes.

7          Q    Looking at the first page, do you

8  recognize it?

9          A    Yes.

10          Q    What is it?

11          A    The first page appears to be -- it's a

12  subpoena that I signed.

13          Q    That you prepared and had Judge Dowling --

14  had submitted to Judge Dowling for her signature to

15  obtain the records of your then-client General Waiters;

16  correct?

17          A    Yes.

18          Q    And that subpoena was dated within two

19  weeks of your initial appearance on the case, June 2nd,

20  2006; correct?

21          A    It's dated June 2nd, 2006.

22          Q    And could you tell us, Mr. Simons, why was

23  this one of the first things that you did in connection

24  with the representation of Mr. Waiters, subpoenaing

25  those records?

1          A     Why I subpoenaed the records?

2          Q     Yes.

3          A     I reviewed and subpoenaed everything.   If

4     specifically that was the first thing I did, I'm not

5     sure if it was the first thing I did, but it was one of

6     many things that I did.

7          Q     I totally agree with that.

8                If you could tell us why these records,

9     though, did you believe they were important or could

10    potentially be important to the case?

11         A     Yes.  I subpoenaed almost everything I

12    could subpoena involving Mr. Waiters.

13         Q     Now, once you received these records,

14    Mr. Simons, did there come a time that you reviewed

15    them?

16         A     Yes.

17         Q     Now, Mr. Simons, I'm not trying to be

18    facetious, but do you have any medical training

19    yourself?

20         A     No.

21         Q     Were you a science major in college?

22         A     No.

23         Q     Prior to this case, had you ever had

24    occasion to review medical records before?

25         A     Yes.

1    Q    Prior to this case, meaning being assigned

2    to represent General Waiters, did you ever engage an

3    expert such as a medical doctor to assist you in the

4    review of medical records?

5    A    Yes.

6    Q    Do you recall who that was, who you used

7    and for what case and when that was?

8              MR. HALE:  I'm going to object as to relevance.

9              THE COURT:  Sustained.  Don't answer.

10             MR. FARRELL:  If I could, Judge, I know you

11        don't take argument, with all respect, I do think in a

12        hearing like this I think it would be fair to give us a

13        little leeway with respect to the core issue here, which

14        is about the use of an expert, Judge, in this case.

15             THE COURT:  Well, certainly it's about the use

16        of an expert in this case, not about experts as used in

17        other cases, so I'm sustaining the objection.

18             MR. FARRELL:  Understood, your Honor.

19    Q    With respect to this case, Mr. Simons, you

20    did ask and received approval from her Honor, Justice

21    Dowling, to gain the assistance of the Walker

22    Investigative Agency to assist you with the case;

23    correct?

24    A    Yes.

25    Q    And you did ask for and again receive

1   approval from Justice Dowling to get the assistance of

2   Dr. Sanford Drob, a noted forensic psychologist, with

3   respect to this case; correct?

4           A     Yes.

5           Q     Mr. Simons, would you agree with me that

6   you never asked Justice Dowling to have a medical

7   doctor assigned to assist you with the review of

8   records in this case?

9           A     I never asked, that's correct.

10          Q     And you never asked her for a certified or

11  I should say registered nurse who has experience in

12  reviewing medical terms, you never asked for a nurse to

13  be assigned to assist you?

14          A     I never asked her.  I used one, but I

15  never asked.

16          Q     So it's your testimony that you had a

17  medical doctor that you paid privately to assist you in

18  this case?

19          A     No.  I had a medical doctor I did not have

20  to pay.

21          Q     Is it a friend or a relative?

22          A     My father is an internist, my brother is a

23  trauma surgeon, my mother is a nurse, registered nurse,

24  and I believe one of the investigators is also a nurse.

25          Q     When you say "one of the investigators,"

1    you mean somebody from Walker?

2          A     Yes.

3          Q     So it's your testimony that you used these

4    relatives to assist your reading of these records; is

5    that it?

6          A     Yes.

7                MR. FARRELL:  Your Honor, I would ask now,

8          based on that testimony, for a little leeway to ask the

9          question:  Did you ever use any of those relatives to

10         testify on any case you've ever had?

11         A     I believe I did in -- I would have to

12   check my notes, but I think a long time ago I did have

13   one of my relatives, he might have testified.  I don't

14   remember.

15         Q     And you answered the question and you were

16   allowed to answer the question that you had previously

17   used an expert through the Assigned Counsel Plan to

18   assist you as well to review records on another case;

19   isn't that correct?

20         A     I have done that too, yes.

21         Q     Okay.  And you had -- did that person,

22   whoever it was, testify at the trial -- at a trial?

23         A     As a medical person, I don't think so.  I

24   don't know.  I'd have to check my files.

25         Q     I'm sorry.  Did you finish your answer?

1          A      Yes.

2          Q      For those cases that you did use an

3    Assigned-Counsel-Plan expert, were your

4    family unavailable to help you, those that are skilled

5    in the medical profession?

6                 MR. HALE:  Objection, your Honor.

7                 THE COURT:  Sustained.  Don't answer.

8          Q      With respect for not asking Judge Dowling

9    for the assistance of an approved expert from the

10   Assigned Counsel Plan, did you have a strategic reason

11   for not doing that?

12                MR. HALE:  Objection.

13                THE COURT:  I'll overrule it.

14         A      A strategic for not?

15         Q      Requesting an expert from the Assigned

16   Counsel Plan in this case, the case of People versus

17   General Waiters, did you have a strategic reason for

18   not asking for an expert from the Assigned Counsel

19   Plan?

20         A      Well, from what I remember, I did

21   request -- I think I did request Dr. Drob, who is an

22   expert.

23         Q      But he's a forensic psychologist, he's not

24   an M.D., would you agree with that?

25         A      Well, he's a psychologist, yes.

1      Q      Right.  He's not a medical doctor;

2   correct, you agree with that?

3      A      He has medical training, his medical

4   training to the extent he's a psychologist.

5      Q      We would agree he's a psychologist?

6              THE COURT:  Allow him to finish his answer.

7      A      I think he does have to go to medical

8   school, I think.  I don't know his specific training,

9   but, um, he was there.  And like I told you, my father

10  is an internist and my brother is a surgeon, so I've

11  consulted them on this and many cases.

12     Q      Would you agree the reason you had Judge

13  Dowling appoint Dr Drob is for his expertise as a

14  psychologist, is that fair to say?

15     A      Yes.  And I had used Dr Drob before, and

16  I've also used Dr Drob and there was another doctor,

17  Dr. Berger, at the same time on another case.

18     Q      Another case?

19     A      I used them both on the same case before.

20     Q      But not the Waiters' case?

21     A      Not the Waiters' case.

22             MR. FARRELL:  I'd ask this be marked or deemed

23        marked, your Honor, as Defendant's B for identification,

24        and shown to the witness.

25             THE COURT:  It will be marked as B and shown to

1          the People.

2                    MR. HALE:  No objection.

3                    MR. FARRELL:  Thank you.

4                    I'm going to offer it without objection then as

5          Defendant's B for purposes of the hearing.

6                    THE COURT:  What's been marked as Defendant's B

7          will be in evidence on consent.

8                    MR. FARRELL:  And now shown to the witness.

9                    We can put it up on the screen.  That's great,

10         Officer.  Thank you.

11              Q    Mr. Simons, if you want to look at this at

12         the desk, please let me know.  I'm doing my best with

13         this.

14                   This is an order signed by Judge Dowling,

15         it looks like on July 3rd, 2006?

16                   THE COURT:  That's 5th.

17                   MR. FARRELL:  Thanks, Judge.

18              Q    July 5th, 2006.  Would you agree with me

19         this is an order you had prepared to have Dr.  Drob, a

20         qualified, New-York-State-licensed psychologist, and

21         that these are -- this is an order to permit

22         psychological examination; correct?

23              A    Yes.

24              Q    And you prepared to have Waiters examined

25         for psychological examination and testing; correct?

1      A    That what's the order says.

2      Q    That's the way you worded it?

3      A    That's what the order says.

4      Q    Okay.  I know it was a long time ago,

5   Mr. Simons.  Can you tell us as you sit here today, how

6   many hours, if it can be measured in hours, the time

7   you spent reviewing the medical records that are

8   admitted at this hearing?

9      A    Specifically?

10     Q    Yes, if you could.

11     A    I couldn't.  I would have to check.  I

12  don't know.  I'm sure it was a lot, but --

13     Q    Okay.  Fair enough.

14          I'm going to show you some specific pages

15  of the records admitted into evidence, Mr. Simons, and

16  ask you a few questions about them.

17          This is page 4 of Exhibit A, can you tell

18  us what that means to you, Mr. Simons?

19     A    Today?  You want to know what it means

20  today?

21     Q    Yes.  If you understand, can you tell the

22  Court what does this mean, this notation?

23     A    E.T.O.H., from my memory, I think it has

24  to do with alcohol.

25     Q    Page 5, this is tough to read, I don't

1    know if you can make it out, Mr. Simons.  If you have

2    the -- I'm using a copy to make it easier, if you could

3    look at page 5 of the exhibit.

4                THE COURT:  It's right there.

5         Q    The third line.  The numbers are at the

6    bottom.  The third line down during the "Treatment

7    Response Section," middle of the third line.

8                THE COURT:  Give him an opportunity to locate

9       it.

10               When you have, just indicate that, Mr. Simons.

11        A    You said page 5?

12        Q    Yes.

13        A    Are you counting the first page?

14        Q    Yes.  The subpoena is page 1.  There

15   should be a number 5 at the bottom.

16        A    Okay.  What are you looking at?

17        Q    You see the word "confused"?

18        A    "Confused," right.

19        Q    The word after it, or the notation after

20   it?

21        A    Is that an "S.T.S."?

22        Q    Correct.  What's the next two words, what

23   do they mean to you?

24        A    E.T.O. -- it looks like "E.T.O.H. intake."

25        Q    Yes.  My question is:  What does that mean

1    to you?

2          A     Today I couldn't answer that.  I could

3    answer it then when I consulted with my experts, but

4    today --

5          Q     As you sit here today, Mr. Simons, I know

6    it was a long time ago, do you have a specific

7    recollection of the consultation with you and your

8    experts concerning page 5 of the record and what, if

9    any, significance that notation "E.T.O.H. intake" may

10   have had to this case?

11         A     Put it this way, I know I consulted with

12   various people regarding everything on the record.  I

13   can't tell you today, and I'm not going to try to

14   guess.

15         Q     Okay.  Page 6 of the records, last page,

16   last notation on the page, "C.N.S.: Unable to assess

17   due to intoxicated state," that's pretty clear.  As you

18   sit here today, or based upon your recollection of your

19   consultations with your experts, can you tell us what

20   "C.N.S." means?

21         A     As I say, today I can't tell you.

22         Q     Okay.  Top of the page there's some

23   abbreviations "L.O.C." and "A.O.B.," can you tell us

24   what either of those mean?

25               MR. HALE:  Your Honor, I'm going to object and

1        if I could ask the witness to step out for a moment just

2        so I can make a record.

3                THE COURT:  Certainly.  Have him step in the

4        back hall.

5                (Whereupon, the witness exited the courtroom.)

6                MR. HALE:  Your Honor, in terms of asking the

7        witness what his present memory of these particular terms

8        means are, one, I don't know that it's particularly

9        relevant, but two, this is going over items that were in

10       fact admitted into evidence to the jury upon Mr. Simons'

11       application at the time of trial.  This isn't things that

12       were excluded by the Court or necessarily needed any sort

13       of explanation.  And remembering that Mr. Simons both had

14       these items admitted and received the intoxication charge

15       from the Court, so I don't know that any of this is

16       relevant whatsoever.

17               MR. FARRELL:  Judge, if I may, you, after

18       extensive argument, and I'm going to get to that, after a

19       25-page colloquy when Mr. Simons attempted to admit these

20       records en masse without an expert witness, the Court,

21       after hearing strenuous objection from Mr. Hale, admitted

22       two lines on two -- there were two pages of those records

23       admitted.  That's it.  It's not this part.  "L.O.C." and

24       "A.O.B." were not admitted to the jury, and Mr. Hale made

25       an argument that the Court found compelling at the time

1    that it would be unfair to admit medical terminology

2    without someone to explain it, and I totally understand

3    that, and I respect the Court's ruling on that.

4            But for this hearing, the gravamen of our claim

5    is Mr. Simons, on no less than five occasions you

6    strongly suggested to the defense attorney, Mr. Simons,

7    that he should get a doctor in here and then you would

8    let all those records in.

9            So I think this is fair questioning to probe

10   the witness' memory on his claim that he discussed these

11   records in great detail with family members that are

12   doctors, and I'm sure that's true, so I think it's fair

13   examination.

14           I don't plan to go through every record.  I

15   have a few more questions about some records that I

16   believe are significant that the jury definitely did not

17   see, and then I'm going to move on.

18           MR. HALE:  That's already part of the record.

19   I don't know what going and asking what does this mean,

20   what does it mean to you now, what did it mean to you

21   then, I don't know that it's relevant whatsoever to the

22   issue.

23           You know, it's part of the record that he asked

24   for these to be brought it, it's also part of the record

25   that the Court would not admit some of the items without

1    explanation by an expert.  The expert obviously testified

2    yesterday, for whatever worth the explanations are.  This

3    just seems to be -- it doesn't seem to be relevant to

4    keep asking him what his recollection is and whether he

5    asked these particular things to be admitted.  He asked

6    for everything to be admitted.  It's part of the record.

7              THE COURT:  Certainly without more I'm going to

8    sustain the objection.  Certainly it would be relevant as

9    to why he decided not to have -- to call the doctor.

10             MR. FARRELL:  I got it, Judge.  I can move on.

11             THE COURT:  That's relevant, okay, but

12   certainly as to the individual terms, I'm sure if you

13   asked me about some of the terms, I wouldn't recollect if

14   in fact it was brought out, or certainly whether it's a 3

15   or a 5.  I could tell, certainly nobody else can tell.

16             MR. FARRELL:  I get it, Judge.  I'm going to

17   move on then.  I understand the Court's ruling.  I

18   respectfully except.

19             THE COURT:  Your exception is noted for the

20   record.

21             A COURT OFFICER:  Witness entering.

22             (Whereupon, the witness resumed the stand.)

23             THE COURT:  Mr. Simons, I'm going to remind you

24   you're still under oath.  You're still sworn to tell the

25   truth.

1    DIRECT EXAMINATION

2    BY MR. FARRELL:   (Cont'd)

3         Q    Mr. Simons, back in 2006 and 2007, based

4    on your review of the records, your own review,

5    together in consultation with your brother and your

6    father, would it be fair to say that you believed that

7    those records showed that General Waiters was very

8    drunk when he was taken into Kings County Hospital on

9    the morning of this tragic shooting, the afternoon,

10   around noontime, whatever it was?

11        A    It's my understanding, 'cause I haven't

12   reviewed this in years --

13        Q    Understood.

14        A    (Cont'g) -- that he was intoxicated.

15   Whether it was very drunk or not, you know, that's a

16   different issue.

17             MR. FARRELL:   Okay.  Based on that answer, your

18        Honor, I'd ask for a little leeway with respect to one

19        more document.

20        Q    Page 119 of the medical records there's a

21   reference, this was the blood alcohol, the actual blood

22   alcohol taken at 12:33 P.M., Mr. Simons, and the

23   reading was 386.24 (C.R.I.T.).  Do you recall that

24   document, and do you recall actually arguing to Judge

25   Dowling that the jury should see this because it shows

1   the defendant's level of intoxication?

2        A    Offhand, like I said, I haven't read the

3   minutes.  If it's in the trial minutes, I stand by

4   whatever I said during the trial minutes.  I haven't

5   seen it.  No one showed it to me.  No one told me what

6   this is about.  So if it's in the trial minutes, I'll

7   stand by that.

8        Q    And I totally respect your recollection

9   from ten years ago is what it is, but I have to ask, as

10  you sit here today, do you recall noticing or being --

11  having this being brought to your attention by anyone

12  you consulted with in this case that this level is

13  essentially five to six times the legal limit for

14  driving of alcohol, that that's what it is, did you

15  know that at the time?

16            MR. HALE:  Objection.

17            THE COURT:  I will sustain it as to the form.

18       Q    Mr. Simons, did anyone that you consulted

19  with bring it to your attention that this is considered

20  an extreme level of intoxication?

21       A    As I said, it sounds like I made an

22  argument, and it's in the minutes, it's in the record,

23  and, um, like I said, I haven't seen it.  No one showed

24  it.  You can refresh my recollection with the minutes,

25  otherwise I will stand by whatever I said back then

Defense Witness-Simons-Direct/Farrell                    74

1    when it was fresh in my mind, 'cause I can't remember

2    everything offhand now.

3         Q    Does seeing this record in any way refresh

4    your recollection that based on your own review of the

5    records and as you've already testified, your extensive

6    discussion with medical professionals, does it refresh

7    your recollection that you knew or had reason to know

8    that waiters was very intoxicated when he was taking to

9    K.C.H.?

10        A    Okay.  There's -- I was aware of the

11   records.  I had a conversation with Mr. Waiters and I

12   know what Mr. Waiters said and I know what everyone

13   else said.  So my argument was based on -- and I did

14   factor in things that he said specifically.

15        Q    So you're leading up to my next question.

16   Thank you.

17             Did you ever discuss with Mr. Waiters the

18   significance of the blood alcohol level found within

19   those records?

20        A    And I guess for the record, I am -- I can

21   only assume and ask the Court that he waived his

22   attorney-client privilege?

23             MR. FARRELL:  Judge, I believe he can answer.

24             THE COURT:  Certainly he has by indicating

25        ineffective assistance of counsel.

1           MR. FARRELL:  I'd agree with that, for the

2      record.

3           A    I discussed this with Mr. Waiters a lot.

4  The problem is his response, and I can tell you his

5  response was he was not drunk, he was not drinking that

6  day, or I think he had a drink early in the day and he

7  was -- I think he mentioned he was recovering.  He had

8  drank the night before, but he informed me that he was

9  not -- did not feel drunk at all.

10          Q    And Mr. Simons, that's your testimony

11  based upon your recollection of ten years ago, that you

12  remember clearly that waiters told you what you just

13  testified to?

14          A    Well, I took notes.

15          Q    Right.  And you have those with you today?

16          A    Yes, I do.

17          MR. FARRELL:  I would ask that they be

18      produced, your Honor.  If we take -- I don't know the

19      Court would like to do it.  I would -- I think in

20      fairness, both sides would like a copy of them.  We can

21      take a brief break for them to be copied, or I certainly

22      have material to work through and we can get them later.

23          MR. HALE:  I don't think that's necessary.  If

24      he needs to refresh his recollection from his notes --

25          MR. FARRELL:  I think now he's testifying in

1    large part based upon his memory, which he said needs to

2    be refreshed. I think in fairness we should have a copy

3    of them.

4              THE COURT: Certainly you're not entitled to a

5    copy of his notes.

6              MR. FARRELL: Well, if that's the Court's

7    ruling, of course I respect it. I do think it's not

8    unfair and it could be probative and relevant to the

9    whole nature of the hearing.

10             I mean, he turned over his file to me, he

11   didn't turn over those notes that he has, and I think he

12   should. That's my request.

13             THE COURT: He's not required to turn over the

14   notes.

15   Q    Mr. Simons, where did you have --

16             THE COURT: In the audience, counsel, I'm

17   talking to Mr. Trabulsi, don't hold your conversations in

18   here.

19             MR. FARRELL: May I continue, Judge?

20             THE COURT: Yes, please.

21             MR. FARRELL: Thank you.

22   Q    Mr. Simons, can you recall when that

23   conversation took place that you just told us about?

24   A    If I can check my notes I can.

25             THE COURT: Certainly, with the Court's

1       permission.

2               A    Okay.  I'm looking for the date.  I talked

3       to Mr. Waiters I think it was in '06.  It might have

4       been one of the initial conversations, but as we were

5       talking, I took notes.

6               Q    Understood.

7               A    And I wrote down --

8               Q    As you sit here today, I know it was a

9       long time ago, did this conversation take place at

10      Riker's Island where he was housed, did it take place

11      in the courthouse, on a video conference?

12              A    This particular one for some reason I

13      didn't put the location and time.  It probably occurred

14      either while he was incarcerated or video.  I don't

15      remember which one.

16              Q    As you sit here today, do you recall

17      visiting him at Riker's Island during the course of the

18      two-year pendency of the case?

19              A    No.  I did not visit him at Riker's

20      Island.  I don't believe so.

21              Q    So would it be fair to say you either

22      spoke to him in this building personally on the third

23      floor or via video conference on the fourth floor?

24              A    Yes.

25              Q    And is it your testimony that he had --

1    that it was Waiters that initiated, that it wasn't in

2    response -- I'll withdrawal that.  It's a bad question.

3              It's your testimony that Waiters told you

4    when you asked him about that morning, he told you he

5    wasn't drinking, is that your testimony?

6         A    No.  During one of our conversations I

7    believe he stated that he had, um, the evening before,

8    12 o'clock, he had I think it was five cups of Bicardi

9    Light and Pepsi and I believe he said he was tipsy and

10   he was not drunk.  And then that morning I think during

11   one of my conversations with him they had one cup at 8

12   A.M., they were drinking.  He was drinking with I

13   believe Miss Mary and they had one cup.

14        Q    That's what General Waiters told you?

15        A    Yes, on that occasion.

16        Q    Were there other occasions that he told

17   you he had way more to drink than that or any more to

18   drink than that, I should say?

19        A    Let me see.  You're talking about the

20   morning?

21        Q    Yes, the morning.

22             Just so we're clear, you'd agree the night

23   before was his birthday, May 6th, and there was a party

24   for him at the apartment, the apartment of the tragic

25   shooting?

1          A     Well, that's what he told me.

2          Q     That's what several witnesses testified to

3    under oath at the trial as well; right?

4          A     Probably.  Like I said, I don't remember

5    all the details.  If it's in the minutes, I'm not going

6    to disagree with what's in the minutes.

7                Put it this way, I don't remember it.  I'm

8    checking my notes.  I don't see --

9          Q     Let me ask you this, Mr. Simons:  After

10   Waiters told you that, did you confront him with the

11   fact that medical records suggest that he was four or

12   five times as drunk as the law allows in New York to

13   drive a car at the time he was admitted?

14               MR. HALE:  Objection.

15               THE COURT:  Sustained.  Don't answer.

16         Q     Mr. Simons, by the way, did you ever give

17   Waiters a copy of his medical records --

18               MR. HALE:  Objection.

19         Q     (Cont'g) -- at any time prior to the

20   trial?

21               MR. FARRELL:  That's a fair question.

22               THE COURT:  Let me decide, Mr. Farrell.

23               MR. FARRELL:  You got it.  I'm sorry.

24               THE COURT:  Overruled.

25         A     I gave Mr. Waiters a lot of his reports.

1    I think I gave it to him.  I don't remember

2    specifically, but I know I routinely gave him his

3    documents.  I don't know specifically if he had the

4    medical records or not.

5         Q    Okay.  As you sit here today, and I know

6    it was a long time ago, do you have a recollection of

7    discussing the medical records, specifically the blood

8    alcohol level contained in there, with Mr. Waiters at

9    any time prior to the trial?

10        A    All -- I remember discussing everything

11   with Mr. Waiters, the whole case.  The whole --

12        Q    I understand that.

13        A    (Cont'g) -- thing.

14        Q    I'm asking you about a specific issue,

15   namely what the medical records suggested in terms of

16   how intoxicated he appeared to the medical people, did

17   you ever discuss that with him?

18        A    I'm sure I did.  I mean, I can't remember

19   specifically each element, but we discussed everything.

20        Q    Did you discuss with him the fact that

21   your investigator, Mr. Walker, obtained a statement

22   from Jacqueline Warren just weeks after this tragic

23   shooting where she said that at 8:30 A.M. General

24   Waiters started sipping liquor again.  He had about a

25   pint by himself?  Do you remember getting that

1    statement sent to you from Mr. Walker, your

2    investigator?

3          A    I don't.  If it's in the file, if I gave

4    it to you and it's there --

5          Q    Right.

6                MR. FARRELL:  I'm going to ask it be deemed

7          marked.  I'll show it to the prosecution and then show it

8          to the witness to see if it refreshes his recollection.

9                MR. HALE:  Your Honor, again, this is part and

10         parcel of what Miss Warren testified to during the trial.

11         There's no dispute as to that, so I don't know how this

12         is at all relevant.

13               MR. FARRELL:  Again, that's not accurate.  At

14         the trial she never said he drank a pint of liquor.  I

15         can tell you that because I read the record a few times.

16         She wouldn't commit to anything other than he was

17         drinking, and I'm going to ask questions about that

18         later.

19               THE COURT:  Is there still an objection?

20               MR. HALE:  There's still an objection, your

21         Honor.

22               THE COURT:  I'm going to sustain the objection.

23               MR. FARRELL:  Judge, with all respect --

24               THE COURT:  I'll have it marked for

25         identification purposes.

1          MR. FARRELL:  I didn't offer it in evidence.  I

2      just wanted, in fairness, I like to show things to my

3      adversary before I have them shown to the witness.

4          THE COURT:  As I said, I'll mark it for

5      identification.

6          MR. FARRELL:  My purpose was not to admit it,

7      just to show it to this witness to see if it refreshes

8      his recollection because he said I'm not sure what was in

9      there.  He didn't doubt me, he's not suggesting I'm

10     making up documents, but it's fair to the witness.  He

11     should see the document, Judge, and it should refresh his

12     recollection that that's what the statement was, that he

13     drank a pint, from the witness.

14         THE COURT:  I'll have it marked for

15     identification purposes, but my ruling is still the same.

16     I'm not going to have him look at the document.  It's

17     marked so it preserves the record, but I'm not going to

18     have it shown to the witness.

19     Q    Do you ever recall having a conversation

20 with General Waiters about the fact that there were

21 people at the party that stated he was very intoxicated

22 that morning, that in fact that he was drinking that

23 morning, did you ever ask him about that?  Because it

24 would be so inconsistent with what you claim he said,

25 that he wasn't drinking at all?

Defense Witness-Simons-Direct/Farrell

1          MR. HALE:  I object to the question.

2          THE COURT:  Sustained only as to the form.

3     Q     Do you recall having any conversations

4  with Mr. Waiters about the fact that there were

5  witnesses who had given statements to the effect that

6  he was drinking that morning, not just the night before

7  but that morning also?

8     A     You know, I remember having conversations

9  with Mr. Waiters and just informing him that maybe some

10  of the witnesses were saying things differently than

11  what he was saying.  Specifically that, I mean, we

12  discussed everything.  But I do remember letting him

13  know there were some witnesses who were not agreeing

14  with some of the things that he was saying.

15     Q     Mr. Simons, did you ever suggest to

16  Mr. Waiters that it would benefit him to state that he

17  was not drinking on the morning of the shooting?

18          MR. HALE:  Objection.

19          THE COURT:  I'm going to overrule.

20     A     No.  I didn't suggest for him to state

21  anything.

22     Q     What was the purpose in engaging Dr. Drob

23  to assist you in the defense of General Waiters?

24     A     Because when I got the case, and just so

25  you know, I was on the capital panel so --

1      Q     As was I, sir.

2      A     (Cont'g) -- all that training, you

3  investigate everything.  So this was something that

4  became an issue, and we investigated that, and many

5  other things, so.

6      Q     Mr. Simons, in your dealings with

7  Mr. Waiters, did you find him to be a somewhat limited

8  individual mentally?

9           MR. HALE:  Objection.

10           THE COURT:  Sustained.

11      Q     How would you describe General Waiters'

12  intelligence in your dealings with him?

13           MR. HALE:  Objection.

14           THE COURT:  Sustained.  Don't answer.

15      Q     Do you recall actually serving psychiatric

16  notice in this case upon the People and filing such

17  with the Court that you were going to present a

18  psychiatric defense at trial?

19      A     I believe I did file.  I'm sure it's in

20  the file, but.

21      Q     And in fact, the evidence, the notice you

22  filed was challenged by the prosecution as being

23  insufficient, and then you amended the notice shortly

24  before the trial in February of 2008, do you recall

25  that?

1        A     Probably.

2        Q     Was your defense extreme emotional

3   disturbance, Mr. Simons; is that what you were planning

4   to proffer at the trial, the affirmative defense of

5   extreme emotional disturbance?

6        A     Um, at the trial the plan was to call Dr.

7   Drob and the plan was Mr. Waiters was going to testify.

8   Both of them would testify.  And throughout the trial,

9   you know, as things went, Dr. Drob, I did not call Dr.

10  Drob, and Mr. Waiters refused to testify.

11       Q     So it's your testimony now that it was

12  only at the trial that you decided not to call Dr.

13  Drob?

14       A     It's my recollection I believe Dr. Drob's

15  name was on the witness list.

16       Q     And again, the question is as simple as I

17  can make it:  Is it your testimony that at the trial

18  during May of 2008, is that when you decided that it

19  would not be helpful to the defense to call Dr. Drob?

20       A     Yes, during the trial.

21            MR. FARRELL:  I'd ask this be marked,

22       previously shown to the People, marked as Defendant's D

23       for identification, and shown to the witness.

24            THE COURT:  The letter D, as in David.

25            MR. FARRELL:  D, as in dog.

tjs

Defense Witness-Simons-Direct/Farrell                    86

1                THE COURT:  I said D, as in David.

2                MR. FARRELL:  Thanks, Judge.

3                A COURT OFFICER:  Show Defense D to the

4      witness?

5                THE COURT:  Show it to the witness, yes.

6      A     Okay.

7      Q     Are you familiar with that, Mr. Simons?

8      A     Yes.

9      Q     In fact, isn't it a letter written by you

10     to your then client General Waiters back in October of

11     2007 where you stated that after reviewing the reports

12     of both doctors, your -- this is you writing to

13     Waiters, "your extreme emotional disturbance defense

14     will be difficult, and Dr. Drob may not be able to

15     testify in your behalf," isn't that the words you chose

16     to write to your client several months before the trial

17     unfolded?

18     A     Yes, that's in the letter.

19     Q     And that's what you believed, that this

20     wasn't a viable defense, extreme emotional disturbance?

21     A     I didn't say that.

22     Q     You didn't say it in those words, but

23     weren't you alluding to the fact that when you said

24     that it would be difficult and Drob may not be able to

25     testify, could you explain what you meant by your use

tjs

1    of those words?

2         A    I had -- I was consulting with Dr. Drob

3    and during my consultation with Dr. Drob it's my

4    understanding he did not really believe he was going to

5    be able to help Mr. Waiters.  He thought his testimony

6    may actually hurt more than it would help.

7              MR. FARRELL:  Judge, for the record, since it's

8         been authenticated by the witness I'd offer Defense D in

9         evidence.

10             THE COURT:  Any objection?

11             MR. HALE:  No.

12             THE COURT:  Defendant's D will be in evidence.

13             A COURT OFFICER:  So marked, your Honor.

14             THE COURT:  You can put it on top of the

15        defendant's exhibits.  There should also be B there, the

16        order for psychological testing.

17             Do you still have that exhibit, counsel?

18             MR. FARRELL:  Yes, Judge.  I'm sorry.

19             THE COURT:  That should be handed to the court

20        officer.

21             MR. FARRELL:  Yes, it should be.

22             Could I have D so we can put it on the screen,

23        Officer, when you can?

24        Q    And further, Mr. Simons, you would agree

25    that you wrote:  "The defense is difficult because of

Defense Witness-Simons-Direct/Farrell                          88

1    the statement of all the witnesses is that Lorenzo did

2    not threaten you before the shooting.  Your testimony

3    may be the only evidence of a treat," -- I'm sure you

4    meant "threat," -- "and if the jury does not believe

5    you, then you will probably be convicted."

6              And that's what you believed at the time

7    you wrote the letter; right, that statement?

8         A    I wrote the letter.

9         Q    Right.

10        A    That's what's in the letter.

11        Q    Okay.  That's enough about the letter.

12   It's in evidence.

13             Once you served notice that Dr. Drob may

14   testify, would you agree -- do you recall that the

15   People, as was their right, engaged a mental health

16   professional on their own to interview General Waiters,

17   Alexander Sasha Barday, do you recall that, Mr. Simons?

18        A    I believe -- I think you're correct.

19        Q    And do you recall if you attended that

20   interview, meaning the interview of General Waiters by

21   the D.A.'s doctor, Dr. Sasha Barday?

22        A    That I don't remember.  I'm not sure.  I

23   don't think so, but I don't remember.

24        Q    You realize under the statute you have an

25   absolute right to be present for that interview, though

1    it's not required, you know that; right?

2          A    Yes.

3          Q    And as you sit here today, you're not sure

4    if you attended or not?

5          A    Right.  I don't remember.

6          Q    Mr. Simons, you recall reviewing Dr.

7    Barday's report based upon his examination of the

8    relevant documents and his interview with Mr. Waiters;

9    correct?

10         A    Yes.

11         Q    Do you recall him noting that Mr. Waiters

12   had been consuming alcohol for a substantial period of

13   time prior to the incident and was intoxicated at the

14   time he shot the victim, do you remember that

15   conclusion by Dr. Barday?

16         A    I mean, I have to look at his report, if

17   it's in the report, because I did read the report.

18         Q    And you're not challenging my reading of

19   the report?

20         A    Well, I don't --

21         Q    Do you want to see the report?

22         A    I mean, I think I may have a copy.  If

23   it's in the report --

24         Q    Page 15.

25         A    If it's in the report and you read it

1    accurately, then it's correct.

2         Q    Okay.  Did you find that disturbing,

3    Mr. Simons, that after General Waiters, according to

4    you, stated that he wasn't drinking that morning, that

5    the D.A.'s expert would come out with a conclusion that

6    Waiters was in fact intoxicated at the time he shot the

7    victim?

8              MR. HALE:  Objection.

9              THE COURT:  Sustained.  Don't answer.

10        Q    Is it your testimony, Mr. Simons, as you

11   sit here today, as far as you know, General Waiters

12   never told you that he was drunk on the morning of the

13   shooting from drinking continually through the night of

14   his birthday party up to and including waking up at

15   Kings County Hospital, he never told that to you?

16        A    I remember him saying him drinking and I

17   think he might have gone to sleep at 12 or something

18   and then he woke up and he, you know -- I have to check

19   his notes.  He might have said he had a drink and then

20   he wasn't -- he informed me he wasn't intoxicated.

21        Q    Okay.  Let's fast forward now to the

22   trial, the People of the State of New York versus

23   General Waiters, May, 2008, before her Honor, the

24   Honorable Deborah Dowling, Calvin Simons for the

25   defense, what was your defense going into the trial?

1          A     I'm sure if you look at the record and I

2     guess my opening statement may say something of what

3     the defense was, and --

4          Q     Well, do you believe that, as you sit here

5     today, that you laid out a defense in your opening

6     statement?

7          A     I don't know.  I don't remember.

8               MR. FARRELL:  I'm going to ask that this be

9        marked my next number, please, your Honor.

10              THE COURT:  E, as in Eddie, for identification

11        purposes.

12              MR. FARRELL:  Thank you.

13         Q     While the officer is marking that,

14    Mr. Simons, before openings, as we both know, voir dire

15    is an important part of a trial.  Do you recall the

16    theme of your voir dire in the People versus General

17    Waiters?

18         A     No, I don't.

19         Q     I mean, I've seen you, for example, in a

20    case many, many years ago when I was a prosecutor, and

21    you prevailed at a misidentification trial.  You voir

22    dired extensively, from the moment you got up to the

23    moment you summed up, that was your theme, mis-

24    identification.  Did you have a theme during this voir

25    dire?

Defense Witness-Simons-Direct/Farrell                    92

1              MR. HALE:  Objection.

2              THE COURT:  Sustained.  Don't answer.

3              Certainly, the exhibit has been marked as E.

4       Do you wish to have that shown to the witness?

5              MR. FARRELL:  Yes.  I ask it be admitted

6       hopefully without objection as to the opening statement

7       of Mr. Simons in the People versus General Waiters.

8              MR. HALE:  That's fine.

9              THE COURT:  No objection, so what has been

10      marked Defendant's E will be in evidence.

11          Q     Okay.  Please take a moment, Mr. Simons,

12      it's about two pages, your opening, transcribed, so it

13      shouldn't take more than that, but please have a look

14      at it.

15          A     Do you want me to read it?

16          Q     Read it to yourself.  It's in evidence, I

17      guess.

18              Would you agree that your opening

19      statement did not set forth a defense of extreme

20      emotional disturbance or intoxication?  In fact, you

21      spent the little time you spent talking about the fact

22      that no one -- that Mr. Waiters did not intend to kill

23      the little girl or to shoot Miss Clark or to shoot Miss

24      Lewis, that's pretty much all you said, would you agree

25      with that?

1       A    Well, the opening speaks for itself, so.

2       Q    Okay.  Would you agree that it didn't

3  speak too loudly or clearly in terms of any defense,

4  did it?

5                 MR. HALE:  Objection.

6                 THE COURT:  Sustained.

7                 And certainly it's in evidence for the Court.

8       Q    Let me ask you this, Mr. Simons:  Did you

9  understand the People's theory of their case, that this

10 was a transferred intent case, that they weren't

11 suggesting that Waiters tried to kill the young girl or

12 to injure Mary Lee Clark or to injure Shantasia Lewis,

13 did you understand that?

14                MR. HALE:  Objection.  It's outside --

15                THE COURT:  Sustained.

16                MR. HALE:  If I may for just a moment, your

17    Honor, there's a specific scope to this hearing, which

18    was on the application of counsel.  This is way outside

19    this scope.

20                MR. FARRELL:  Judge, I.A.C., ineffective

21    assistance of counsel, encompasses the whole of the case.

22    There's no scope.  The People consented to a hearing.

23    The scope is I.A.C. for the case, for the representation,

24    and certainly, respectfully, an opening statement is part

25    of that.  It's counsel's conduct from the beginning time

1      where he meets the client, his preparation for trial and

2      the trial itself.

3               So I think I'm not going to belabor the point,

4      I plan to move on, I think that was a fair question.

5               MR. HALE:  Your Honor, there's specific

6      allegations of ineffective assistance of counsel.  That

7      was the basis for the Court granting the hearing, on the

8      specific allegations.  It's not just oh, it's ineffective

9      assistance of counsel, anything goes.

10              THE COURT:  Certainly what the law says is that

11     there is a standard and whether in fact the conduct of

12     the attorney fell below that standard.  So it's not an

13     entire review, but certainly it is a review by the Court

14     of whether in fact the defense fell below the standard

15     that is required by law.

16          Q   Mr. Simons, again, during this -- after

17     your opening, what was your -- what was your goal; what

18     were you trying to accomplish by your cross examination

19     of the People's witnesses in terms of a defense?

20          A   You know, as I told you, you did not

21     provide anything for me to review so I did not read all

22     the questions.  There definitely was a plan.  I can't

23     tell you specifically what it was today, but -- and you

24     gave me nothing to review before this.

25          Q   In fairness, wasn't it your position you

1    were not going to speak about the case until the

2    privilege was discussed in open court before Judge

3    Dowling, wasn't that your position to both myself and

4    the prosecution?

5              A    No.

6              Q    That wasn't?

7              A    No.

8              Q    You said, Gary, sure, ask me anything you

9    want, I'm happy to discuss it with you, is that what

10   you're saying?

11             A    No.  I informed you there's an

12   attorney-client privilege, but if you are the attorney,

13   you could sit down and talk to me and ask me questions

14   and prepare me as a witness, 'cause -- that's it.

15             Q    Do you recall questioning witnesses?  You

16   did; right?  You questioned some witnesses, some you

17   had no questions for, is that fair to say, at this

18   trial?

19             A    I don't remember.

20             Q    Okay.  Would you agree as a general

21   principle that you tried, from the occurrence

22   witnesses, the people that were there at the time of

23   this tragic shooting, to elicit the fact that General

24   Waiters was drinking both at the night of his party and

25   the morning of the incident, is that fair to say?

1          A     If it's -- hopefully it's obvious in the

2     trial minutes.  Like I said, I haven't reviewed the

3     trial minutes.

4          Q     Well, you had them in your possession.

5     You just recently gave them to me, that's fair to say,

6     right, a few weeks ago, we met at the Marriott and you

7     gave me the minutes?

8          A     I don't have all the trial minutes, I

9     think I gave you some of the minutes and I didn't

10    review --

11         Q     I'll ask you --

12               THE COURT:  Allow him to finish his answer

13         before you pose another question.

14         A     I did not review the entire file because

15    it wasn't clear what we were doing, and no one really

16    explained it to me.

17         Q     Do you recall asking, on page 443,

18    Jacqueline Warren, you remember her as an important

19    witness in the case; correct, the girlfriend at the

20    time of Mr. Waiters?

21         A     The girlfriend, okay.

22         Q     Do you recall you asking these questions,

23    line 18:

24               "Question:  Now, while you were in the living

25         room with Mr. Waiters and your aunt, at some point you

1        guys started drinking?

2                "Answer:  Yes.

3                "Question:  And around that time, this was in

4        the morning?

5                "Answer:  It had to be -- it had to have been

6        before 11.

7                "Question:  And I believe you said you had at

8        least two Bicardi Lights and soda; correct?

9                "Answer:  Yes.

10               "Question:  When you had these drinks, were

11       they in a cup or glass, or how did you drink them?

12               "Answer:  In a plastic cup.

13               "Question:  How big was the cup you were

14       drinking from?

15               "Answer:  A small plastic cup.

16               "Question:  You see that little cup in front of

17       you?

18               "Answer:  Yes.

19               "Question:  Was it bigger than that cup or

20       smaller than that cup, or about the same size?

21               "Answer:  Same size.

22               "Question:  And that's an eight-ounce cup?

23               "The Court:  I don't know that that is.

24               "Mr. Simons:  So the jury can see.

25               "Mr. Hale:  I guess.

1          "Question:  And you had two of those?

2          "Answer:  Yes.

3          "Question:  And you said that Mr. Waiters, you

4     observed him drink some Bicardi Light and soda; correct?

5          "Answer:  Yes.

6          "Question:  Was he drinking out of the same

7     size cup?

8          "Answer:  I don't remember.

9          "Question:  And as I believe you stated, you

10    don't know how many drinks he had?

11         "Answer:  No, I don't.

12         "Question:  Now, do you know whether he had

13    more than one?

14         "Answer:  No, I don't."

15         So you would trust I read those questions

16    and answers correctly, Mr. Simons, or do you want to

17    see the transcript?

18         A     You have the transcript.

19         Q     Do you want to see it?

20         A     No, because the transcript is in evidence

21    so.

22         Q     My purpose in reading that was to attempt

23    to refresh your recollection about the fact that you

24    did cross examine Jacqueline Warren about the

25    defendant's drinking both that night and particularly

1    that morning; correct?  That's what I just read, right,

2    you'd agree with that?

3            A    Okay.  If that's what's in the minutes.

4            Q    And now my question is -- and Judge, I'm

5    re-applying to use Defendant's C for this purpose --

6    that Miss Warren answered that she did not know whether

7    he had more than one, that's what I just read,

8    Mr. Simons; correct?  So my question is:  Didn't you

9    have a statement from Miss Warren that you could have

10   impeached her with wherein she told Mr. Walker that

11   Waiters in fact drank a pint by himself starting at

12   8:30 on May 7th?  Do you recall having that at your

13   disposal and being able to have impeached the witness

14   if you chose to?

15           A    Okay.  You --

16               MR. FARRELL:  Judge, could he look at this?

17       Just for the purpose of looking at it to refresh his

18       recollection, can he look at Defendant's C.

19               MR. HALE:  Can he answer the question before he

20       makes the application.

21               THE COURT:  Certainly.

22           A    I had everything I guess at my disposal.

23   At the time I was fully aware of my questioning and I'm

24   sure I had a plan of why I asked specific questions and

25   there must have been a reason why I did not ask

1    specific questions.  So I can't answer that today

2    because I don't remember.  But during the course of the

3    trial I tried to ask all the questions that I can.

4    Sometimes I forget to ask a question, but I try to at

5    the time ask everything I know I should ask.

6         Q    Right.  But my question is:  Weren't you

7    trying to help the defense, General Waiters, by

8    eliciting the fact that he was drunk that morning?

9         A    Today I don't remember the whole thing.

10   It appears that I was trying to get that information

11   out.  But like I said, my whole questioning goes

12   through the whole scope of the trial, what I think is

13   common, what I think he's going to testify to,

14   everything.

15        Q    Mr. Simons, I know you've done this with

16   great success on many trials, you know how to impeach a

17   witness with a prior inconsistent statement; correct?

18        A    Yes.

19        Q    Would you agree with me that when

20   Jacqueline Warren answered under oath to your question:

21   "And as I believe you stated," bottom of page 444, "and

22   as I believe you stated, you don't know how many drinks

23   he had?, "Answer:  No, I don't," you'd agree with me

24   your investigator Mr. Walker obtained a statement where

25   Jacqueline Warren stated that he started drinking at

1    about 8:30, that he had about a pint himself, that that

2    was a classic inconsistency, would you agree with that?

3         A    You know, I don't know, because there's --

4    sometimes there's a reason you ask a question,

5    sometimes there's a reason you don't ask a question.

6         Q    Right.

7         A    And I can't answer that because I don't

8    remember what was going on at the time.

9         Q    And I need to ask you this then:  As you

10   sit here today, did you have a strategic reason for

11   failing to impeach Jacqueline Warren on the amount of

12   liquor Waiters had consumed that morning, did you have

13   a strategic reason that you can articulate?

14        A    I don't remember.

15        Q    Isn't it true that at the end of the

16   People's case you sought to introduce the defendant's

17   records from Kings County Hospital en masse from May

18   7th to May 17th of 2006?

19        A    You know, I'm sure the record will speak

20   for itself on that one.  I can't remember offhand but I

21   probably did.  I don't know.

22             MR. FARRELL:  I'd ask this be marked for

23        identification, previously shown and given to the People.

24             THE COURT:  That will be marked as F for

25        identification purposes.

1           MR. HALE:  Which one is that?  I'm sorry, Gary.

2           MR. FARRELL:  That's the proceedings, 5/31.  It

3      was in the packet I gave you last week.

4           THE COURT:  And then I would show whatever has

5      been marked as F, I would show it to the People.

6           MR. HALE:  Thank you.

7           A COURT OFFICER:  Show it to the People?

8           THE COURT:  Yes.

9      Q     I apologize, Mr. Simons, that I didn't

10     give it to you beforehand.  I misunderstood your

11     position on, quote/unquote, being prepped.

12          I'd ask you to take a minute to read your

13     application -- well, I'd offer it in evidence.

14          THE COURT:  Please don't make statements.  I'm

15     going to strike the statements that you made.

16          If there is a question for the witness, ask the

17     question, but don't clutter the record with any asides to

18     the witness.  It's not appropriate.

19          MR. FARRELL:  You're right.

20          I offer this as an exhibit in evidence.

21          MR. HALE:  No objection.  I think the record --

22          THE COURT:  Defendant's F will be in evidence.

23     Q     Mr. Simons, the bottom of page 531, do you

24     remember, I'd like to think that you remember that you

25     did offer a certified copy of the records from K.C.H.;

1    right?

2         A    I don't remember offhand, but according to

3    here, I did, so.

4         Q    And then on page 532 the reason you're

5    arguing that this goes toward his intoxication defense

6    is in the record it clearly shows that he was very

7    intoxicated and he was treated for that.   Those are

8    your words, you'd acknowledge that; right, Mr. Simons?

9    And you go on to note --

10             THE COURT:   There's a question before the

11        witness.

12             MR. FARRELL:   You're right.   He didn't answer,

13        Judge.

14        A    No.   What -- you were paraphrasing what I

15    said.

16        Q    I don't think I was.

17        A    I missed it.

18        Q    Okay.   Page 532, line 3.

19        A    Oh.   Line 3.

20        Q    To line 9.

21        A    Okay.   Yeah, I see that.

22        Q    Okay.   And going down from line 15 to line

23    23, you're making the argument that, "Judge, this goes

24    to the intoxication defense," even citing the section

25    of the C.J.A. as intoxication as a defense to pertinent

1    elements of the charges, and in these records it

2    clearly shows, and it does state, that he was

3    intoxicated, this would be the day of the incident, do

4    you recall that?

5             A    Well, it says so.

6             Q    It says so.  You don't have to recall it.

7    You're right.

8                  I'd ask you to move with me to page 543,

9    there's extended colloquy going back and forth between

10   the parties, and reading from line 7 -- I'm sorry, line

11   23, the bottom of page 543:

12                 "The Court:  Certainly one of the things that

13            we can do, which probably should have been done, was

14            either to have someone brought in or called to find out

15            what the definition of that is."

16            A    What are you reading?

17            Q    I'm reading from the bottom of page 543,

18   line 23, after extended colloquy between yourself and

19   the prosecution about which records should come in, if

20   any should come in, etcetera.

21                 I'm sorry.  I should have went back.  I'm

22   sorry, Mr. Simons.  Could we go back to 540 -- 535,

23   line 10:

24                 "In his lab report," this is you arguing to the

25            Court, "in his lab report they have a reading from May

1    7th which is described here, his alcohol level was in the

2    critical state.

3              "The Court:  Certainly that would be relevant.

4    Mr. Hale?

5              "Mr. Hale:  Well, here's what it says.  'Ethyol

6    alcohol, this is parenthetical, (MG/DL:386.24) C.R.I.T.,'

7    that's a parenthetical.  What does that mean?  I mean, if

8    it causes any sort of conjecture, if there's any sort of

9    ambiguity about it, you know, it can't be just in the

10   written document."

11             Mr. Simons, remember I showed you that

12   record before as part of the Exhibit A, the lab record

13   that shows specifically 386.24?

14        A    Okay.

15        Q    Right.  So is it clear now to you after --

16   and I know it's a ten-year-old case, or almost

17   approaching ten, that that is exactly what you were

18   trying to do.  You were trying to get the jury to see

19   how drunk Mr. Waiters was when he was admitted to the

20   hospital?

21        A    Well, I'm going by what I guess I said

22   back then.

23        Q    Right.  And you'd agree with that, would

24   you?  Would you?  I shouldn't say you should.

25        A    I was trying to get all the records in.

Defense Witness-Simons-Direct/Farrell                      106

1        Q     And specifically you handed up a record

2    that Mr. Hale seized on, the part of the actual alcohol

3    reading, but it was in medical terms and that was his

4    objection, that a jury would speculate about what it

5    meant without an expert to explain it, would you agree

6    with that?

7        A     Well, I don't know about -- say that

8    again.

9        Q     Ultimately you were unsuccessful in

10   getting that reading to the jury, 386.24 critical, that

11   jury that convicted Waiters in about an hour, they

12   never heard that, did they, they never saw that part of

13   the record?

14              MR. HALE:  The record speaks for itself, your

15       Honor.

16              THE COURT:  Is that an objection?

17              MR. HALE:  That is an objection, your Honor.

18       I'm sorry.

19              THE COURT:  I'm going to sustain it as to the

20       form, because, again, I don't know whether it took an

21       hour for the jury to convict the defendant or not.

22       Q     Would it be fair to say, Mr. Simons, that

23   you were not able to get that reading to the jury that

24   convicted Mr. Waiters, that they never saw that

25   notation of 386.24?

Defense Witness-Simons-Direct/Farrell                    107

1          A     I believe the record speaks for itself.   I

2    mean, it's -- I'm not going against the record so the

3    record is clear whether they got to hear it or not.

4          Q     Okay.  Back to page 543, the bottom:

5                "The Court:  Certainly one of the things we can

6          do, which probably should have been done, was either to

7          have someone brought in or to call to find out what the

8          definition of that is."

9                And then Mr. Hale says:  "Exactly."

10               I'm going to not read every reference,

11   but, Mr. Simons, as you said very often, you're not

12   going to refute the record, and if the record says on

13   five separate occasions Judge Dowling suggested that

14   you should bring in a witness to testify about the

15   records, you wouldn't refute that, would you?

16               MR. HALE:  Objection.

17               THE COURT:  I will sustain it as to the form as

18         to what the Court suggested.

19         Q     Okay.  547, line 14:

20               "The Court:  Quite frankly, Mr. Hale, I would

21         agree with you, that the best way would have been to get

22         someone from the hospital to certainly interpret the

23         records as to those limited issues.  Quite frankly, I

24         don't know why, you know, someone wasn't called or at the

25         very least to get an assessment by the doctor who

1          appeared, even if it was by the People, something that

2          would assist."

3                    Do you recall, or do you acknowledge,

4     Mr. Simons, those comments made by the Judge during

5     this extended colloquy?

6                    MR. HALE:  Objection.

7                    THE COURT:  I will sustain it.  Certainly it's

8          in the record.

9               Q    Mr. Simons, there came a time at page 552

10    that you stated:

11                   "Your Honor, the defense at this point is not

12         introducing any additional witnesses at this point.  We

13         would request that the Court permit all the information

14         in, and we're prepared for the Court to make its ruling

15         based on the defense not presenting any additional

16         witnesses at this time."

17                   That's when you rested your case

18    essentially, is that fair to say?

19              A    I'm sure the record -- I guess, if that's

20    the end of the case.

21              Q    My question is, and this isn't on the

22    record, you never asked -- did you ever ask Judge

23    Dowling for a continuance to subpoena a doctor from

24    K.C.H. or for additional time to have an expert

25    appointed or somebody you knew brought in so he or she

1  could testify about the meaning of some of those

2  records so the jury would not have to speculate?

3       A    The record is clear I don't think I did,

4  but everything is on the record.

5       Q    Okay.  Then this is definitely not on the

6  record.

7            Was there a strategic reason behind your

8  failure to request a continuance or to subpoena a

9  doctor from K.C.H. or to get an expert to come in to

10 explain the relevance and significance of those medical

11 terms contained in the medical records?

12      A    All I do remember somewhat is toward the

13 end of the case when Dr Drob was not going to testify

14 and then Mr. Waiters refused to testify, I guess

15 whatever I was thinking back then, it was my mind the

16 case was finished so I rested.  So whatever is on the

17 record is on the record.  I didn't ask for anything

18 additional at that time.

19      Q    And again, if you had a strategic reason

20 for not going forward to try to get a doctor to come

21 in, I'd like to hear it, if you have a reason?

22      A    I don't remember.  I don't remember, to be

23 honest with you.

24      Q    Page 552, last reference to this, after

25 you said you're not going to present any additional

1   witnesses the Court stated:

2                   "It's the Court's understanding the defense is

3           not going to call any medical witnesses in order to

4           certainly enlighten the jury as to what the numbers mean

5           contained in the medical record, so at this point the

6           Court only has two pages before it with two lines, one

7           indicating 'C.N.S., unable to assess due to intoxicated

8           state,' and the other one says '36-year-old male

9           intoxicated or B.I.B. E.M.S., brought in by E.M.S.,

10          intoxicated. That's really the two lines that would be

11          relevant.  Everything else" -- and then the Court makes a

12          further ruling.

13                  So based on that, Mr. Simons, you remember

14      then that of all those records, only two lines were

15      being admitted to the jury; correct?

16                  MR. HALE:  Objection.

17                  THE COURT:  I will sustain it.  It's in

18          evidence.  It certainly will speak for itself.

19          Q       After this proceeding and those limited

20      records being admitted, Mr. Simons, you recall, as

21      there is in every case, a charge conference?

22                  THE COURT:  Counsel, let me say this, it's

23          after 1 o'clock.

24                  MR. FARRELL:  I'm sorry, Judge.  I lost track.

25                  THE COURT:  I'm hoping, Mr. Simons, you're

1      going to be available this afternoon?

2                    THE WITNESS:  Yes.

3                    THE COURT:  Okay.  We'll pick up at 2:15

4      because it's after 1, and they have to bring in -- bring

5      back up the defendant.  So at 2:15 we'll reconvene.

6                    I certainly, Mr. Simons, I would have to inform

7      you, as I would instruct you as any witness, you may not

8      discuss the content of your testimony with anyone.

9                    You may step down.  And I'll see the parties at

10     2:15.

11                   MR. FARRELL:  Thank you.

12                   THE COURT:  Certainly, all the exhibits,

13     there's one on the screen, should be handed to the court

14     officer.  The exhibit that was on the screen.

15                   MR. FARRELL:  Yes, Judge.  Which letter was

16     that?  I'm sorry.  I have a lot of papers here.

17                   THE COURT:  That's D, I believe, or if it's not

18     D, E.  One or the other.

19                   (Luncheon recess)

20                   THE CLERK:  This is a recall of General

21     Waiters, Indictment 3464 of 2006.

22                   The defendant is present with his attorney.

23     The district attorneys are present.

24                   THE COURT:  Any matters to go on the record

25     before I bring the witness back in?

1              MR. HALE:  Not from me, Judge.

2              MR. FARRELL:  Ready to go, Judge.  Thank you.

3              THE COURT:  Bring the witness in.

4              A COURT OFFICER:  Ready, your Honor?

5              THE COURT:  Yes, please.

6              (Whereupon, the witness resumed the stand.)

7              THE COURT:  Good afternoon.

8              THE WITNESS:  Good afternoon.

9              THE COURT:  I'm going to remind you your still

10      under oath.  You're still sworn to tell the truth.

11              Mr. Farrell.

12              MR. FARRELL:  Thank you, your Honor.

13      DIRECT EXAMINATION

14      BY MR. FARRELL:  (Cont'd)

15              Q     Mr. Simons, I think you mentioned on more

16      than one occasion that the defendant refused to testify

17      at his trial, do you recall that?

18              A     Yes.

19              Q     Can you recall the specifics of how that

20      came to pass, your discussion with him about

21      testifying, could you enlighten us on how that

22      happened?

23              A     Of how --

24              Q     How -- what's the basis of you saying that

25      he refused to testify?

1      A      Because I asked him to, and he said he

2  didn't want to testify.

3      Q      Did you advise him as his lawyer who sat

4  with him throughout the trial that it would be in his

5  interest to testify?

6      A      Yes.

7      Q      Even though you already testified and

8  acknowledged on numerous occasions that the transcript

9  speaks for itself, the witnesses said that he was

10 drinking that morning; right?

11     A      Okay.

12     Q      And it's your position that Waiters never

13 told you he was drinking at all; right?

14     A      Okay.

15     Q      And your defense was --

16     A      I never said he was never drinking.

17     Q      That morning, the morning of the incident

18 maybe had one drink, I think was your testimony, is

19 what he told you during various conversations?

20     A      Right.

21            THE COURT:  Is that correct?

22            THE WITNESS:  Yes.

23     Q      Is that correct?

24     A      Yes.

25     Q      Would you agree, though, that your

1    defense, as it unfolded, we're all trial lawyers

2    here -- sorry, I withdraw that.

3             It was intoxication, ultimately your

4    defense before the jury was that he could not form the

5    specific intent due to voluntary intoxication, would

6    you agree with that?

7        A    That was --

8        Q    That was part and parcel of your defense?

9        A    It appears from especially what you read

10   earlier today that that was part of it, yes.

11       Q    And yet, you just said that you were

12   advising Mr. Waiters to testify, however, it would have

13   been his position that he wasn't intoxicated; is that

14   right?

15       A    Yes.

16       Q    Don't you see a conflict there between

17   your defense then and what the client would have said?

18             MR. HALE:  Objection.

19             THE COURT:  Sustained.

20       Q    Do you recall at what point during the

21   proceedings you had this discussion with Mr. Waiters

22   where you advised him to testify and he told you I'm

23   not doing it?

24       A    Well, his -- his final decision is at

25   the -- I believe towards the end of the case when he

1    said he did not want to testify.

2         Q    Is it your position that's on the record?

3         A    I don't know.  I mean, put it this way,

4    the record speaks for itself, so.

5         Q    We all believe that at this point,

6    Mr. Simons.  My question to you is:  Do you recall

7    whether or not that statement by Mr. Waiters where he

8    essentially refused to testify was on the record?

9         A    I don't know.  Like I said, the record

10   speaks for itself.

11            MR. FARRELL:  I'm going to ask this be marked

12       as my next exhibit, your Honor, which is Defendant's?

13            THE COURT:  G.

14            MR. FARRELL:  Thank you.

15            I've given a copy to the People.  Hopefully it

16       will be admitted without objection.  It will be my last

17       exhibit.  I'm almost done.  This is the proceeding

18       starting on 560.

19            A COURT OFFICER:  Do you want me to show it to

20       the witness?

21            MR. FARRELL:  Yes.  I think the People are

22       going to graciously let this go in without objection and

23       I would ask it be admitted as Defense G without

24       objection.

25            THE COURT:  Mr. Hale, any objection?

1              MR. HALE:  No objection.

2              THE COURT:  What has been marked as G will be

3         in evidence.

4              MR. FARRELL:  Thank you, your Honor.

5         Q     As is the case in all trials there is a

6    charge conference at the end of all the evidence in the

7    case; correct?

8         A     Yes.

9         Q     Directing your attention to page 561, line

10   19, you stated as follows:

11              "Mr. Simons:  Judge, I don't know if you

12        classify this as out of the ordinary, but the defense

13        would request a charge on intoxication as pertaining to

14        the intent elements of the charges."

15              You -- and I know the transcript speaks

16   for itself, but you did affirmatively request the

17   charge of intoxication which her Honor, Judge Dowling,

18   granted you?

19        A     Yes, that's what's in the record.

20        Q     Why?  Why did you ask for that charge?

21        A     You're asking me why?

22        Q     I'm asking you why did you request that

23   charge?

24        A     Apparently at the time I felt that charge

25   was appropriate for the circumstances and evidence in

1    the case.

2         Q    And there came a point during the charge

3    conference that the Court asked the parties if any

4    lesser included offenses should be charged.  Do you

5    recall that?

6         A    Is that in the record?  I don't know.  I

7    don't remember.

8         Q    Okay.  I'm directing your attention to

9    563, Mr. Simons, line 18, in response to the Court's

10   question:

11              "Any other charge, Mr. Simons?

12              "Yes, your Honor.  The defense would be

13        requesting Manslaughter in the First Degree as a lesser

14        charge of intentional Murder in the Second Degree."

15              You now recognize, and I'm sure would

16   acknowledge that the transcript speaks for itself, and

17   you did ask for Man 1 as a lesser included; correct?

18        A    Yes.

19        Q    Mr. Simons, did you ask -- did you

20   consider asking -- let me ask it first this way:  Did

21   you ask Judge Dowling to submit the additional lesser

22   included of Manslaughter in the Second Degree?

23        A    I mean, put it this way, I don't know.  I

24   don't think so but I'm sure the record, as I say, will

25   speak for itself.

1      Q      I'm asking a question that is not on the

2  record.  Did you have any strategic reason for not

3  requesting Manslaughter in the Second Degree as a

4  lesser included of Murder in the Second Degree?

5      A      At the time I guess I requested the

6  charges, whatever I was thinking at the time I based it

7  on what was going on at the time.  So I can't say I

8  thought about it, I can't say I didn't think about it,

9  I don't remember.  I don't see any notes on that.

10     Q      You would agree as a very experienced

11  lawyer that Manslaughter in the Second Degree is, and

12  can be given, as a lesser included of Murder in the

13  Second Degree; the Man 2 is a lesser included under the

14  specific facts of certain cases?

15     A      Man 2 is a lesser included from?

16     Q      Murder 2, intentional, that's my question

17  to you, do you agree with it?

18     A      I don't know.  Maybe certain cases, I

19  don't know.

20     Q      You'd agree as an experienced practitioner

21  and veteran of hundreds, as you testified, of A-1

22  assignments that Manslaughter in the Second Degree, the

23  state of mind is reckless as opposed to intentional,

24  would you agree with that?

25     A      For Man 2?

1          Q     Yes.

2          A     Yes.

3          Q     And would you agree that the intoxication

4     defense is -- negates specific intent but does not

5     negate reckless conduct, would you agree with that as a

6     principle of law?

7          A     It negates the intent.

8          Q     Specific intent?

9          A     It does negate intent.

10         Q     Right.   There were several other counts

11    that Mr. Waiters was facing involving different victims

12    from the child, you know that; correct?

13         A     Yes.

14         Q     For example, Lorenzo Warren, there was a

15    count pertaining to Attempted Murder in the Second

16    Degree and Assault in the First Degree.   My question

17    is:  Did you consider requesting reckless Assault in

18    the Second Degree under Penal Law 120.05, sub 4, for --

19    as a lesser included under that -- those counts of

20    Attempted Murder and Assault in the First Degree?

21         A     Um, if it's in the record.   I mean, like I

22    said, I haven't read the charge conference and I would

23    hope I would have requested everything that I thought

24    should have been requested at the time.

25         Q     So you'd agree then if you failed to

1    request for any of the Assault in the First Degrees for

2    Miss Clark and Miss Lewis, if there was no request for

3    Assault in the Second Degree under a reckless theory

4    it's because you felt it wasn't appropriate to make, is

5    that fair to say?

6          A    If I didn't make it for whatever reason,

7    which I can't tell you specifically now, I didn't make

8    it.  Otherwise I would have made it.

9          Q    That's my last question:  Can you

10   articulate a specific strategic reason for not

11   requesting assault in the second degree under a

12   reckless theory for the Assault 1 counts pertaining to

13   Lorenzo Warren, Miss Clark and Miss Lewis?

14         A    That I wouldn't remember.

15         Q    And again, Mr. Simons, I apologize.  I'm

16   sure you never had a copy of your own summation

17   transcript, would that be fair to say?

18         A    I mean, I don't think they gave it to me.

19         Q    They traditionally don't.  I think we all

20   know that?

21               THE COURT:  Let's not make statements and

22        clutter the record.  I'm going to strike it.  If there's

23        a question, you can certainly inquire.

24         Q    Mr. Simons, do you recall making an

25   argument to the jury:  "The evidence is clear," page

1   605, "the evidence is clear from witnesses that

2   Mr. Waiters was intoxicated.  You will see evidence on

3   the medical record he was intoxicated."?  Does that

4   sound -- does that refresh your recollection as an

5   argument you may well have made in this case based on

6   the evidence as it came in?

7        A    I do not remember the summation.  If it's

8   in the record, it's in the record.  Otherwise, I don't

9   remember specifically.

10       Q    Do you recall stating:  "It's not an issue

11  of whether he was reckless," on page 605?

12       A    I don't.  I don't remember the summation

13  so.

14       Q    Do you agree that if, as you say, the

15  record speaks for itself, and if it was in the record

16  that you made those statements, would you agree that

17  the jury could have seen a lot more evidence of

18  intoxication if the records, the medical records from

19  K.C.H., had been admitted in their entirety?

20            MR. HALE:  Objection.

21            THE COURT:  Sustained.  Don't answer.

22       Q    You ended with the statement, or in your

23  last page on 607:  "This was an unforgivable situation,

24  a sad situation, but it was not an intentional act."

25  Yet, you'd acknowledge if it's in the record it's in

1    the record.  Would you agree then that requesting

2    lesser includeds for reckless mental state might have

3    been helpful in this situation?

4         A    You know, like I said, I'm sticking with

5    the record.  I don't know.  I mean, I asked for things

6    I thought I should have asked for, and to go back and

7    guess of what could have, I really can't do that.

8         Q    I understand, sir.  Thank you for your

9    patience.

10                   MR. FARRELL:  Nothing further.

11                   THE COURT:  Cross examination?

12                   MR. HALE:  Sure.

13   CROSS EXAMINATION

14   BY MR. HALE:

15        Q    Mr. Simons.

16        A    Mr. Hale.

17        Q    I'll start with the last first.  Sir, as

18   we've seen from the record, you did not request

19   Manslaughter in the Second Degree nor the Reckless

20   Assault.  You'll take that as a given, it's in the

21   record.

22        A    If it's in the record.

23        Q    Sir, understanding that intoxication does

24   not preclude a conviction for a reckless crime, would

25   it have been a reasonable strategy to go, as we say,

1   all or nothing; that is that if Mr. Waiters was not

2   convicted of the intent crimes, then if there was no

3   reckless crimes charged, then he would not have been

4   convicted at all, is that a reasonable strategy?

5        A     Is your question is that a reasonable

6   strategy, or was that the specific strategy here?

7        Q     I'm asking you generally, sir, is that a

8   reasonable strategy?

9        A     Yes.

10             MR. FARRELL:  I'll object to that general

11      question.

12             THE COURT:  I'll sustain it.

13        Q     Do you recall that as being a specific

14   strategy in this case?

15        A     No.

16        Q     Let me ask you this, sir:  Coupled with

17   your request for an intoxication charge, which you got,

18   could that have been the reasonable strategy in not

19   asking for the lesser includeds that included a

20   reckless element?

21        A     To answer that, as I said, I don't

22   remember what the specific strategy was at this time.

23        Q     Let me ask you this, though, sir:  Do you

24   recall whether you had conversations with your client

25   about the impact of various charges and whether such

1    charges should be submitted to the jury, do you recall

2    whether you did or not?

3         A    That I don't recall.  Probably not,

4    though.

5         Q    Sir, with regard to the trial, as part of

6    the trial I think that you've testified that in the

7    early phases of the prosecution you had the defendant

8    examined by Dr. Drob to see whether there was any

9    psychiatric or psychological issues that might form a

10   defense; is that correct?

11        A    Yes.

12        Q    Now, before that time you had, as I think

13   you've testified, had had a conversation with

14   Mr. Waiters where he had indicated to you that he had a

15   specific recollection of the event and it did not

16   include him being drunk; is that correct?

17        A    Yes.  We had numerous conversations.

18        Q    Would it be fair to say, sir, that those

19   conversations included his position that he had

20   retrieved the weapon because he was afraid of or

21   defending himself against the older son Lorenzo and

22   fired the gun not intending to hit anybody but just to

23   scare Lorenzo?

24        A    During our conversations, and if I can

25   refer to my notes, most, I believe, of the

1    conversations there was a -- he fired the weapon to

2    scare.  I believe one conversation he might have fired

3    to hit him in the leg.  So like I said, we had multiple

4    conversations so it was either to scare him or to hit

5    him in the leg.

6            Q    At any point did you have any conversation

7    to the effect that Mr. Waiters said, you know, I'd like

8    to help you out, Mr. Simons, but I was so drunk I don't

9    remember what happened or what I did?

10           A    No.

11           Q    Now, you recall that Dr. Drob issued a

12   report at the conclusion of his psychological

13   examination, do you not?

14           A    Yes.

15               MR. HALE:  Can we have this as People's -- what

16      number would we be?

17               THE COURT:  It would be 1 for the purposes of

18      the hearing.

19               MR. HALE:  For the purposes of the hearing,

20      People's 1.

21               THE COURT:  Showing that to defense counsel, or

22      do you have a copy?

23               MR. FARRELL:  I have a copy.

24               MR. HALE:  Could I offer that in evidence, sir?

25               THE COURT:  Any objection?

1                    MR. FARRELL:  No objection.

2                    THE COURT:  People's 1 will be in evidence.

3                    A COURT OFFICER:  So marked.

4          Q     Now, sir, I'm going to ask you to look at

5     the report, and specifically to a section which it

6     describes the defendant's -- and I'll find a page

7     reference -- description of the event.  I'll give you a

8     page reference, I'm sorry.

9                    It starts at page 5 and continues to the

10    middle or to the top of page 7.  If you could just look

11    at that, sir.

12         A     Okay.  You want me to read it?

13         Q     I'm sorry?

14         A     Do you want me to read it or do you have a

15    question?

16         Q     I just want you to read it and then I will

17    have a question, if that's okay.

18         A     Okay.

19         Q     Now, sir, the statement that he gave to

20    the -- Mr. Waiters gave to Dr. Drob concerning the

21    incident was in large part consistent with what he had

22    told you earlier; isn't that correct?

23         A     Yes, it's very similar.

24         Q     And at no point during that interview did

25    he indicate to Dr. Drob that he was so drunk that he

1    couldn't recall or so drunk that he couldn't control

2    his actions, did he?

3         A    Well, Dr. Drob didn't write that, no.

4         Q    He didn't write that down?

5         A    Right.

6         Q    In terms of what the report says?

7         A    Yes.

8         Q    And in fact, the report indicates again

9    that Mr. Waiters had said to Dr. Drob, as per the

10   report, that in fact he had not been drinking for some

11   time, he had been drinking earlier but not at or around

12   the time of the incident; is that correct?

13        A    Yes.

14        Q    Sir, you also recall that because of your

15   interview of Mr. Waiters by Dr. Drob that he was also

16   interviewed and evaluated by Dr. Barday as hired by the

17   People; is that correct?

18        A    Yes.

19             MR. HALE:  If we could have this as People's 2

20        for the hearing.

21             MR. FARRELL:  No objection.

22             THE COURT:  People's 2 will be in evidence.

23             A COURT OFFICER:  So marked.

24        Q    Again, sir, I'm going to direct you to a

25   specific part of that report, and this starts at the

1    bottom of page 6 and continues to about three-quarters

2    of the way down on page 7.  If you could read that,

3    please.

4              A    Okay.

5              Q    You've had an opportunity to do so, sir?

6              A    Yes.

7              Q    Is it also fair to say, sir, in

8    conversation was Dr. Barday, as indicated by the report

9    of Dr. Barday, that again, the defendant, Mr. Waiters,

10   told a similar story to the effect that he was -- felt

11   threatened and was firing to scare Lorenzo and, again,

12   did not have intent to hurt or injure anybody?

13             A    Yes.

14             Q    And I think that you were shown earlier

15   your opening statement to the jury in the trial of this

16   case, and that pretty much was the substance of your

17   opening statement, that he didn't intend to shoot or

18   hurt anyone; is that correct?

19             A    I'll stand by whatever I said.

20             Q    Okay.  Now, it's true, sir, that in

21   neither report did either of the doctors opine that in

22   any way Mr. Waiters was suffering from an

23   alcohol-induced psychosis or anything of that nature;

24   is that correct?

25             MR. FARRELL:  I'd object to that.  He can't

1    testify.  The reports are in evidence, Judge.  I'll rely

2    on you to read them.

3              THE COURT:  I'm going to overrule it and permit

4    the witness to answer.

5         Q    If you can, sir.

6         A    The reports really speak for themselves.

7    I don't think there's anything.  I don't remember

8    seeing any of those words in any of these reports or

9    anything.

10        Q    Now, during the course of the trial, and I

11   believe you've testified about this already, you had

12   intended to call Dr. Drob; is that correct?

13        A    Yes.

14        Q    And during the course of the trial or some

15   time before the trial, did it become your opinion that

16   in fact Dr. Drob's examination, his evaluation and his

17   conclusion would not establish a defense or a

18   mitigation to the charges?

19        A    I believe at some point in the trial, and

20   then talking to Dr. Drob, I made the decision that his

21   testimony would not help Mr. Waiters so I didn't call

22   him.

23        Q    Now, you had indicated that the plan was

24   that Mr. Waiters would in fact testify; is that

25   correct?

1    A    Yes.

2         Q    And sir, what was the expected testimony

3    to be, if you recall?

4         A    Mr. Waiters was going to testify about the

5    incident and whatever he said would have been fine for

6    the case, and then the hope would be that he would

7    explain the situation, even if he explained it the way

8    he explained to Dr. Drob and the other doctor, and then

9    he would give some remorse regarding the victims that

10   he shot.

11        Q    Again, along the lines of he didn't intend

12   to hurt anybody and he felt real bad about what had

13   happened?

14        A    That's what -- you put a defendant on to

15   testify to explain the situation and that's what you

16   hope he says, but whatever he says would have been fine

17   for his defense.

18        Q    And as I think that you indicated to

19   Mr. Farrell on direct examination, you did not place

20   yourself in a position of suggesting to him any

21   particular story to tell or any particular defense that

22   might come up?

23        A    No.  I did not tell him what his defense

24   should be.

25        Q    And the decision not to testify, whose

1   decision was that?

2        A    That was Mr. Waiters'.

3        Q    And he did that after consultation with

4   yourself; is that correct?

5        A    Yes.

6             MR. HALE:  Excuse me just a moment.

7             THE COURT:  Certainly.

8        Q    Now, sir, I know -- well, you don't

9   remember having a specific strategy in mind with regard

10  to this case because of the time passage; right?

11       A    Yes.

12       Q    Can you say, sir, whether if not

13  remembering the particulars of the strategy whether you

14  were pursuing a strategy that you felt was in the best

15  interest of Mr. Waiters?

16       A    Yes.

17             MR. HALE:  I have no further questions, your

18     Honor.

19             MR. FARRELL:  A little redirect, your Honor, if

20     I may?

21             THE COURT:  Certainly.

22  REDIRECT EXAMINATION

23  BY MR. FARRELL:

24       Q    With regard to the last question,

25  Mr. Simons, did that strategy, that strategy included

Defense Witness-Simons-Redirect/Farrell                    132

1    intoxication, the defense of intoxication; correct?

2          A    I mean, based on the record it appears,

3    yes, that was part of it.

4          Q    Mr. Hale asked you about Dr. Drob and

5    whether you expected him to testify during the trial,

6    and you said you made a determination during the trial

7    that his testimony would not help, is that fair to

8    characterize your testimony?

9          A    Yes.

10              MR. FARRELL:  Officer, could we have the letter

11         that's admitted in evidence, the letter from Mr. Simons

12         to Mr. Waiters.

13              THE COURT:  That would be D.  D, as in David.

14              MR. FARRELL:  The letter from Mr. Simons to

15         Mr. Waiters.

16              A COURT OFFICER:  You said D?

17              THE COURT:  D.

18              MR. FARRELL:  You can give it to Mr. Simons.

19         Q    Mr. Simons, I know you've seen that letter

20    before.  Isn't it true that months before the trial,

21    late in the fall, October of 2007, you recognized Drob

22    wasn't going to help the defense and you told that to

23    Waiters in that letter; isn't that right?

24         A    Yeah.  I told him that in the letter that

25    the defense would be difficult but the ultimate

1    decision whether he was going to testify wasn't until

2    the very end.

3           Q    The ultimate decision of whether Drob

4    would testify?

5           A    Yes.

6           Q    Did you testify on cross that the

7    testimony that you would have elicited from

8    Mr. Waiters, had he chose to testify, was that he

9    wasn't trying to hurt anybody and that he was sorry

10   about what happened, that would have been his defense?

11          A    No, I didn't say that.

12          Q    Well, what do you believe his defense

13   would have been had he testified?

14          A    No.  He would have testified about the

15   whole incident from the -- whatever he was going to say

16   regarding the family, his problems with Lorenzo, his

17   fears, his concerns, everything.

18          Q    Yet, it's your testimony that at no time

19   did Mr. Waiters admit to you that he was drinking up to

20   a pint of booze that morning, the morning of the

21   shooting?

22               MR. HALE:  Objection.  It's improper redirect.

23               THE COURT:  I will sustain it as to the form of

24       the question.

25          Q    Did Mr. Waiters, you -- Mr. Simons, as an

1   experienced lawyer, you knew that Dr. Drob's report and

2   what Mr. Waiters was telling you, that they

3   contradicted the medical records from K.C.H., you knew

4   that; right?

5          A    I knew what he said, I knew what Dr. Drob

6   said, I knew what the medical records said, so.

7          Q    And as an experienced defense lawyer, you

8   knew that there was a contradiction; right?  On the one

9   hand the record said he was very drunk, yet he's saying

10  he wasn't drinking for eight or nine hours.

11         A    Um, I know what the medical records said,

12  I know what he said and what he said repeatedly, so I

13  have to make decisions based on what my client wants

14  and what he wants to do.

15         Q    And in this case your testimony is that he

16  did not want to testify, you've been clear about that;

17  correct?

18         A    He -- on the day he was supposed to

19  testify he said he did not want to testify.

20         Q    Yet you made no such record before the

21  Court that you had this discussion, that you advised

22  him it's his right and his right alone to testify and

23  that he was not invoking his constitutional right, you

24  didn't do that on the record, did you?

25         A    You know, I don't know.  I don't know if

Proceedings                                   135

1    the Court did.  Usually the Court does it.  The Judge

2    does that.  So if it's in the record, it's in the

3    record.

4                    MR. FARRELL:  I have nothing further.

5                    THE COURT:  Any recross?

6                    MR. HALE:  I don't have any recross, but thank

7         you.

8                    THE COURT:  Thank you.  You may step down and

9         step out of the courtroom.

10                   THE WITNESS:  Thank you.

11                   THE COURT:  Any other witnesses, Mr. Farrell?

12                   MR. FARRELL:  No, your Honor.  The defense has

13        no other witnesses.  Thank you.

14                   THE COURT:  People?

15                   MR. HALE:  Your Honor, the People have no

16        witnesses.  I just want to make sure that the entirety of

17        the trial record is in evidence for the Court to

18        consider.  There's passages there that relate to the

19        incident.  As Mr. Simons said repeatedly, the record

20        speaks for itself.

21                   THE COURT:  The record speaks for itself, so it

22        would be, it's part of the court proceeding and certainly

23        the parties are relying on it to make their arguments one

24        way or the other.  And so, certainly, the trial record

25        has to be somewhere in the courthouse.  But the record as

1        a whole, that's what the parties are relying on, the

2        certified records, the transcripts made by the reporters.

3               MR. HALE:  And if the Court doesn't have it, we

4        can provide a copy of the certified record.

5               But, your Honor, the People have no evidence.

6               THE COURT:  And I believe you indicated that

7        you wanted to make your closing in writing?

8               MR. FARRELL:  In writing, Judge.  I did put in

9        what I think is a substantial memoranda of law; however,

10       based on the testimony, I certainly would seek leave to

11       supplement that with additional arguments.  And I think

12       the People reserved their right to make that

13       argument-in-chief or their legal argument-in-chief.

14              MS. GROB:  That's correct, your Honor.

15              MR. FARRELL:  What do you think in terms of a

16       date?

17              May we approach to discuss a briefing schedule?

18              THE COURT:  You can do it on the record.

19              MR. FARRELL:  We can do it on the record.

20              THE COURT:  It's going to be on the record.  I

21       don't want Mr. Waiters to think the Court is saying

22       something to counsel that he's not aware of, so let's do

23       it on the record.

24              Even if you tell me that, for instance, today

25       is the 29th that you need until the 30th of June to

Proceedings                                    137

1    complete whatever arguments you would have in writing,

2    Mr. Farrell, certainly I would give you that.

3              Then People, I don't know how much time you

4    would need after that in order to put in your papers, and

5    I would give you that additional time.  But I would be

6    inclined to do it this way.  If in fact Mr. Farrell says

7    that he's going to submit his papers on the 30th, then I

8    would have the case put on for the 30th so that I know

9    that his papers have been done, you have them in hand and

10   stamped.

11             People, then you can give me an estimate of how

12   much time you would need in order to reply to that, with

13   the understanding that, certainly, Mr. Farrell may

14   certainly want to submit some papers and reply to your

15   papers and we can factor that in.  But at least we'll

16   have a more accurate assessment of how much time, People,

17   you would need to respond.

18             MR. FARRELL:  Judge, that's a fair schedule.

19   Just because of some personal time and a trial, if I

20   could have one more week, if I could have my papers to

21   you and the People for July 7th, that would be my

22   application.

23             THE COURT:  Under those circumstances I'm going

24   to put it on for July the 7th.  Certainly you can come in

25   with your papers, Mr. Farrell, in order to serve on the

1    People, but I'm telling you now that once the People have

2    given me their assessment as to how much time they need,

3    then I'm going to be inclined to give them the same kind

4    of time that you've had to reply.

5            MR. FARRELL:  That's more than reasonable.

6            MS. GROB:  Thank you, your Honor.

7            THE COURT:  I'm not going to shortchange you on

8    the time.  If he's asking for five weeks, I'll give you

9    five weeks to respond.

10           MR. HALE:  With that kind of adjournment

11   Mr. Waiters will go upstate.  I don't know if you want to

12   do an intermediary adjournment.

13           MR. FARRELL:  If it's okay with you, and I know

14   it's some inconvenience to the Court, if we can do the

15   ten days.  Not that you have to see him, I will see

16   Mr. Waiters on those ten days, as we've been doing.

17           THE COURT:  The problem is since it's such a

18   lengthy adjournment I don't believe we need to keep him

19   downstate for that length of time.

20           MR. HALE:  Then I'll do an order to produce him

21   to bring him back here.

22           MR. FARRELL:  All right, your Honor.  Thank

23   you.

24           (Continued on following page for transcription

25   purposes.)

1          MR. HALE:  Thank you.

2          THE COURT:  July 7th.

3                        CERTIFIED TO BE A TRUE
                         AND CORRECT TRANSCRIPT
4

5                        _Theresa Santilli_
                         THERESA SANTILLI
6                        OFFICIAL COURT REPORTER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25