UNITED STATES DISTRICT COURT  
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

GENERAL WAITERS,

                              Petitioner,

        - versus -

WILLIAM LEE,

                              Respondent.

MEMORANDUM  
AND ORDER

13-CV-3636 (JG)

A P P E A R A N C E S

    GARY FARRELL, ESQ.  
        305 Broadway, Suite 1400  
        New York, New York 10007  
        *Attorney for Petitioner*

    CHARLES J. HYNES  
        Kings County District Attorney's Office  
        350 Jay Street  
        Brooklyn, New York 11201  
    By:   Rhea Ann Grob  
        *Attorneys for Respondent*

JOHN GLEESON, United States District Judge:

       General Waiters brings this habeas petition, seeking relief from a state court judgment convicting him of murder in the second degree, attempted murder in the second degree, and assault in the first degree.  Waiters claims that he was deprived of his Sixth Amendment right to effective assistance of counsel at trial.  Oral argument was held on July 24, 2015.  For the reasons set forth below, the petition is granted.

BACKGROUND

The offense conduct, trial court proceedings, sentencing, and state court appellate procedural history are set forth in my November 5, 2013 Order, and I assume familiarity with those facts for the purposes of this memorandum. The conviction arose out of a shooting on the morning of May 7, 2008, in which Waiters fired a gun during an argument, killing a child and injuring three others.

A.    *The Instant Habeas Petition, the § 440 Motion, and the § 440 Hearing*

Waiters filed the instant *pro se* petition for a writ of habeas corpus on June 26, 2013. In his petition, he presents only the ineffective assistance claims raised in both his *pro se* supplemental brief on direct appeal of his conviction and in his motion pursuant to N.Y. Crim. Proc. L. § 440. On November 5, 2013, I stayed the petition to allow Waiters to renew his § 440 motion in state court and to complete the exhaustion of his ineffective assistance claims. I also appointed counsel Gary Farrell to represent Waiters. *See* Memorandum and Order (Nov. 5, 2013) (Gleeson, J.), ECF No. 7.

Waiters then filed another § 440 motion in Kings County Supreme Court, claiming that he was deprived of effective assistance because trial counsel (a) failed to call an expert witness to explain and interpret Waiters's medical records, which established he had a .39 blood alcohol content ("BAC") reading shortly after the shooting, (b) requested the wrong lesser-included offense instruction, and (c) failed to impeach a witness at trial with prior statements she had given to a defense investigator.

The state court conducted an evidentiary hearing on May 28 and 29, 2014. Waiters called two witnesses: Dr. Richard Stripp, a forensic toxicologist, and Calvin Simons, Waiters's trial counsel. The State, for its part, did not call any witnesses.

1. *Dr. Richard Stripp's Testimony*

Dr. Stripp testified as an expert in forensic toxicology. H. Tr. 9.[1] He reviewed Waiters's hospital records from May 7, 2006 to May 14, 2006, which showed that when Waiters was admitted to King County Hospital on May 7, 2006 at 12:33 pm, he had a BAC of 386 milligrams per deciliter, *i.e.* .39 percent. H. Tr. 10, 17, 24. This was "significantly elevated" and approached the level at which it could kill an average person. H. Tr. 18. The legal limit for driving in the State of New York, by comparison, is 80 milligrams per deciliter, or .08 percent. H. Tr. 19. Since Waiters weighed 130 pounds, Stripp estimated that he would have had to drink approximately sixteen standard alcoholic drinks (a one-ounce shot of hard liquor, twelve-ounce beer or four to five ounces of table wine) that morning to achieve that level. H. Tr. 26-27.

Stripp testified that one would expect a typical person with a .39 BAC to experience significant motor and cognitive impairment, as well as blackouts and amnestic effects. H. Tr. 24. However, the magnitude of these effects would vary significantly depending on the person's tolerance. H. Tr. 11-12. "A more tolerant person would still experience overt intoxication, but the actual magnitude of the effects would be lessened." H. Tr. 25. Stripp further noted that a person's mental functioning could be affected to greater degree than their physical functioning. H. Tr. 26. Since the shooting occurred one hour earlier, Waiters's BAC "could have been slightly higher, but it also could have been at that level or even slightly lower," depending on the drinking pattern on the day in question. H. Tr. 19-20.

The hospital records for May 7 also showed Waiters had alcohol on his breath, experienced loss of consciousness, and did not know the time or where he was. H. Tr. 49. Waiters stated he had been drinking, and the emergency personnel could not assess his central

---

[1] The transcript of the evidentiary hearing is referenced as "H. Tr." and is attached as an exhibit to Waiters's memorandum in support of his petition. ECF Nos. 11-3, 11-4.

3

nervous system due to his intoxicated state. H. Tr. 15. Waiters's liver function tests were abnormal, which is consistent with excessive alcohol intake, but also more indicative of long-term, rather than short-term, alcohol abuse. H. Tr. 18, 36-37.

Dr. Stripp testified that Waiters's BAC would have affected his functioning and judgment. He further testified that there is no way a forensic toxicologist could say that a particular BAC reading would negate the intent element of murder. H. Tr. 38-39. In other words, forensic toxicologists cannot determine from a given BAC whether a person had lost the ability to form an intent to murder – and Stripp could not draw any such conclusion with respect to Waiters – due to the significant variation in alcohol's effect among individuals, which cannot be ascertained. H. Tr. 31-32. Stripp later qualified that testimony by stating that since a .39 BAC was so high, "even for a highly tolerant drinker, you would still expect to see overt intoxication, because typically tolerance at the very greatest level might reduce the effects in half." H. Tr. 37-38. One would still expect to see signs of intoxication, but the magnitude of it would be lessened by the tolerance. H. Tr. 38.

2.   *Trial Counsel's Testimony*

Waiters's trial attorney testified that he had handled hundreds of homicide cases over his approximately 31-year career working for the Legal Aid Society and in private practice. H. Tr. 55-57. He was assigned to represent Waiters on May 17, 2006, and shortly thereafter subpoenaed Waiters's hospital records. H. Tr. 57-59. Trial counsel had no medical training. H. Tr. 59. He did not request the court to assign a medical doctor to help him review the hospital records, but instead relied on family members with medical training. H. Tr. 60-62.

Trial counsel believed that Waiters was intoxicated when he was admitted to the hospital, but not necessarily drunk. H. Tr. 72. He had discussed the records showing the blood

alcohol level results and how Waiters had appeared intoxicated to the medical staff.  H. Tr. 74-75, 80.  According to trial counsel, Waiters informed him that though he had drunk five cups of Bacardi Light and Pepsi on the night of May 6, and had another drink around 8:00 am on May 7, Waiters "wasn't intoxicated" and "did not feel drunk at all."  H. Tr. 74-75, 78, 90.

Waiters did get approval to have Dr. Sanford Drob, a forensic psychologist, assist him in the case, and served notice of an intent to present a psychiatric defense.  H. Tr. 64, 84.  Dr. Drob interviewed Waiters and wrote a report.  In October 2007, months before trial, trial counsel wrote a letter to Waiters stating that after reviewing the reports of Dr. Drob, the "extreme emotional disturbance defense will be difficult."  H. Tr. 86.  Despite this, the decision to not call Dr. Drob as a witness was made at trial.  H. Tr. 85, 129.  When asked if his defense was in fact extreme emotional disturbance, trial counsel responded somewhat vaguely that the plan was to have both Dr. Drob and Waiters testify, but "throughout the trial, you know, as things went, . . . I did not call Dr. Drob, and Mr. Waiters refused to testify."  H. Tr. 85.  When pressed further, counsel elaborated as follows:

> A.  Mr. Waiters was going to testify about the incident and whatever he said would have been fine for the case, and then the hope would be that he would explain the situation, even if he explained it the way he explained to Dr. Drob and the other doctor [Dr. Barday], and then he would give some remorse regarding the victims that he shot.
>
> Q.  Again, along the lines of he didn't intend to hurt anybody and he felt real bad about what had happened?
>
> A.  That's what -- you put a defendant on to testify to explain the situation and that's what you hope he says, but whatever he says would have been fine for his defense.

H. Tr. 129-30.

5

When questioned about his trial strategy, counsel insisted that "there definitely was a plan," but he was unable to say specifically what the plan was. H. Tr. 94-95. When asked whether the strategy included a defense of intoxication, trial counsel responded, "based on the record it appears, yes, that was part of it." H. Tr. 131-32. He could not remember why he did not impeach Jasmine Warren, Waiters's girlfriend, with her prior statement that Waiters had consumed about a pint of liquor by himself on the morning of the shooting. Counsel stated, "I had a plan of why I asked specific questions and there must have been a reason why I did not ask specific questions," but he could not recall at the hearing six years later what his reasoning was. H. Tr. 99-100.

3. *The Hearing Court's Decision*

In an October 14, 2014 Decision and Order ("Hearing Court Decision"), the hearing court denied Waiters's § 440 motion to vacate his conviction. The court noted that Waiters's "intoxicated state was explored before the jury and the jury rejected those claims." Hearing Court Decision at 7. Waiters's own insistence that he was not intoxicated at the time of the shooting put trial counsel in "the untenable position of setting forth a theory which was not consistent with the defendant's own position" and, as such, counsel's failure to call a medical expert was not "inexplicably prejudicial" and "amounted to a mere tactical decision." *Id.*

The court observed further that Dr. Stripp's testimony could not establish that Waiters's BAC negated his intent to commit the crime. *Id.* Though Dr. Stripp established that the defendant had "a particularly high blood alcohol level," he also testified that the effects "could vary greatly depending on the defendant's tolerance." *Id.* The court found there was no testimony establishing that medical testimony about Waiters's level of intoxication would have changed the jury's finding. *Id.*

The hearing court also noted, without further elaboration, that "[f]or each claim raised by the defendant there are equally plausible explanations why trial counsel proceeded in the manner which he did." *Id.* at 8.  On similar grounds, the hearing court rejected claims that counsel's failure to impeach a material witness and request of the wrong lesser-included offense charge constituted ineffective assistance.  *Id.*  Waiters failed to show the prejudice necessary to satisfy the *Strickland* test, the court held, because, "as the trial court, having viewed the evidence first hand, there is [] little doubt the claims raised by the defendant would [not] have served to change the jury's verdict."  *Id.*

Waiters sought leave to appeal the denial of his § 440 motion to the Appellate Division, Second Department, which denied his application on April 20, 2015.  Having finally exhausted his ineffective assistance claim in state court, Waiters moved to lift the stay of his habeas petition, and I granted the application on May 20, 2015.  The parties submitted supplemental papers in support of and in opposition to the petition, and I heard oral argument on July 24, 2015.

## DISCUSSION

A.  *Legal Standards for Habeas Relief*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas relief is available when a "person in custody pursuant to the judgment of a State court . . . is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A federal court may grant habeas relief "with respect to a[] claim that was adjudicated on the merits in State court proceedings" only if the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[2] In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Harrington v. Richter*, 562 U.S. 86, 99-100 (2011); *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 562 U.S. at 102.

---

[2] This limitation on relief is frequently referred to as "AEDPA deference." *E.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

8

B.     *Ineffective Assistance*

To establish a claim of ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must show (1) that counsel supplied deficient representation, and (2) that the petitioner suffered prejudice as a result of that deficient performance.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  "The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks omitted).  To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.[3]

In deciding an ineffectiveness claim, a court "must consider the totality of the evidence before the judge or jury," keeping in mind that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture."  *Id.* at 695-96.  As a result, a court views trial counsel's errors in the aggregate to determine whether his performance was deficient and whether any prejudice resulted.  *See Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).  However, even a single error will suffice "if that error is sufficiently egregious and prejudicial," *Murray v. Carrier*, 477 U.S. 478, 496 (1986), and ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others.  *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

---

[3]     The Second Circuit has recognized that New York's test for ineffective assistance of counsel differs from, but is not contrary to the federal *Strickland* standard.  *See Rosario v. Ercole*, 617 F.3d 118, 123-26 (2d Cir. 2010) ("We emphasize again that the New York state standard for ineffective assistance of counsel is not contrary to *Strickland*."); *accord Cornell v. Kirkpatrick*, 665 F.3d 369, 382 n.11 (2d Cir. 2011).

C.  *Analysis*

Since the state court held a hearing on Waiters's claim that he was deprived of the effective assistance of counsel, and the New York State Appellate Division denied him leave to appeal, the hearing court's decision is subject to AEDPA deference. The question before me is whether the state court's rejection of Waiters's claim was "contrary to" or "an unreasonable application of" *Strickland* or whether it was based on unreasonable fact determinations. *See* 28 U.S.C. § 2254(d).

1.  *Deficient Performance*

Waiters's counsel's failure to call a medical expert so that the jury would know he had a .39 BAC shortly after the shooting, and what that meant with regard to Waiters's capacity to form the requisite intent to murder, fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. To be sure, "there is no per se rule that requires trial attorneys to seek out an expert," *Gersten v. Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005), and an attorney's "failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002). But a strategy borne of "ignorance, inattention or ineptitude" requires a different result. *See Cox v. Donnelly*, 387 F.3d 193, 201 (2d Cir. 2004). In this case, trial counsel's decision not to call a medical expert to explain Waiters's medical records and the impact of those records on this case was anything but a well-reasoned strategic decision. Having decided at the eleventh hour to substitute intoxication for extreme emotional disturbance as the defense, counsel failed to call the medical expert that defense needed. As a result, the jury had no way of appreciating that Waiters's BAC was astonishingly high, almost five times the legal limit in New York.[4]

---

[4] The legal limit in New York is .08. *See* N.Y. Veh. & Traf. Law § 1192.

The hearing court found that counsel's decisions were tactical because the medical expert, Dr. Stripp, could not say whether a .39 level of intoxication absolutely negated the specific intent required for second-degree murder and first-degree assault. Hearing Court Decision at 7. The government further argues that the hearing court's finding was reasonable because the hospital records suggest that Waiters was a habitual drinker, and thus might have a higher tolerance for alcohol, which would mitigate the effect of a .39 BAC. Avoiding this harmful evidence, the argument continues, is supposedly what prompted trial counsel not to call a medical expert.

These arguments defy logic. No reasonable defense attorney would forego introducing hospital records objectively showing a .39 BAC based on these concerns. The accuracy and authenticity of the .39 reading has never been in dispute. Dr. Stripp's made it clear that a forensic toxicologist could never testify that a BAC level negated specific intent.[5] *See* H. Tr. 31-32, 46. And the evidence of Waiters's tolerance, at best, would have mitigated slightly the probative force of the .39 BAC. No reasonable defense attorney would opt to keep the jury ignorant of Waiters's astronomically high BAC on the off chance that it might not be astronomical enough. *See Harris v. Artuz*, 288 F. Supp. 2d 247, 260 (E.D.N.Y. 2003) (Weinstein, J.), *aff'd*, 100 F. App'x 56 (2d Cir. 2004) ("Even if it could be shown that defense counsel was aware of the documents, 'the failure to introduce this evidence, without any plausible justification, appears to be a significant dereliction by the defense.'" (quoting *Eze*, 321 F.3d at 126-27)).

---

[5] "Q. For instance, there is nothing in your science or nothing in your expertise that could tell when an individual along the continuum of blood alcohol content losses [sic] the ability to form intent; isn't that correct? A. Well, no, because there is significant variation. Q. So you have no opinion as to whether Mr. Waiters could have formed intent; isn't that correct? A. I can only opine to the effects of alcohol." H. Tr. 32.

11

The importance of the hospital records was not lost on the trial court, which implored trial counsel on four separate occasions to call an expert to explain the significance of the medical records. T. Tr. 543-44, 547, 549, 551-52. In response to the prosecution's argument that one particular medical abbreviation was undefined, the trial court observed, "Certainly, one of the things that we can do, which probably should have been done, was either to have someone brought in or to call to find out what the definition of that is." Tr. 543-44. Outside the presence of the jury, the trial court elaborated on its concerns at some length:

> [T]he best way would have been to get someone from the hospital to certainly interpret the records . . . . Quite frankly, I don't know why, you know, someone wasn't called or at the very least to get an assessment by the doctor who appeared, even if it was by the People, something that would assist. . . . [T]here's some portions of the record that the Court is inclined to allow to get introduced that need to have an explanation . . . . There should be some assistance to the jury. Again, I'm inclined to allow you to do it. The only thing that I'm saying is that there should have been someone to at least, certainly for the jury's edification, be able to explain what that means so that they should have some kind of understanding as to those numbers.

T. Tr. 547, 549. Yet, inexplicably, trial counsel failed to call an expert. T. Tr. 552.

If strategic concerns animated his decision, trial counsel could not remember them at the hearing. *See* H. Tr. 109 ("Q. . . . if you had a strategic reason for not going forward to try to get a doctor to come in, I'd like to hear it, if you have a reason? A. I don't remember. I don't remember, to be honest with you."). Indeed, when asked point blank what his defense was, counsel responded, "I'm sure if you look at the record and I guess my opening statement may say something of what the defense was." H. Tr. 91. The opening statement, however, did not present any defense theory, much less one centering on intoxication. T. Tr. 49-51.[6]

---

[6] The thrust of trial counsel's opening statement emphasized that Waiters was not being charged with wanting or intending to injure Tajmere Clark, Mary Lee Clark, or Shatashia Lewis. *See* T. Tr. 49-51.

12

Waiters's alleged insistence that he was not intoxicated at the time of the shooting did not justify trial counsel's decision not to call an expert witness. Apart from the fact that no reasonable jury could credit these alleged statements in light of the .39 BAC, trial counsel actually pursued an intoxication defense at trial, albeit belatedly and in supposed contravention of his client's position. Having elected that course, Waiters's alleged statements have no bearing on trial counsel's subsequent decision not to call a medical expert.

I acknowledge that the hearing court's determination that trial counsel's decision was strategic is a factual finding entitled to deference under 28 U.S.C. §§ 2254(d)(2) & (e)(1).[7] *See Thompson v. Keohane*, 516 U.S. 99, 111-12 (1995) ("'what happened' issues . . . warrant[] a presumption of correctness" under § 2254(d)); *Wood*, 558 U.S. at 300-01. To overcome this deference, a defendant must show "by clear and convincing evidence" that the state court's determination was incorrect, 28 U.S.C. § 2254(e)(1), or that it was an "unreasonable determination" in light of the evidence. 28 U.S.C. § 2254(d)(2). I conclude that Waiters has made the requisite showing. Trial counsel's decision simply was not a tactical choice; it was incompetence. *See Harris*, 288 F. Supp. 2d at 259-60 (finding trial counsel was ineffective based upon, *inter alia*, failing to call a medical expert or to introduce medical records); *Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (ineffective assistance where counsel's failure to call medical expert was not a strategic decision).

Accordingly, I find unreasonable the hearing court's determination that trial counsel provided adequate representation under *Strickland*.

---

[7] It remains an open question in the Second Circuit whether there is any meaningful difference between the unreasonableness inquiry under § 2254(d)(2) and the examination of fact findings to which § 2254(e)(1) accords deference. *See Green v. Travis*, 414 F.3d 288, 298 n.6 (2d Cir. 2005); *Wood v. Allen*, 558 U.S. 290, 300-01 (2010). Since Waiters meets both standards, I need not reach this question.

2. *Prejudice*

With respect to *Strickland*'s second prong, it is clear the deficient representation directly prejudiced the proceedings and deprived Waiters of a fair trial. But for the failure to call a medical expert, the jury would have seen objective proof that Waiters had a .39 BAC. Under New York law, evidence of intoxication may be offered to negate an element of a charged crime, *see* N.Y. Penal Law § 15.25, and in this case, as the government admits, "the evidence of intoxication was such that the jury could have found it negated defendant's intent to kill." *See* Opp. at 19-20; *People v. Johnson*, 717 N.Y.S.2d 668 (3d Dep't 2000). Here, "intent was not only at issue, it was the *sole* issue on which [defendant's] conviction depended." *See Cox*, 387 F.3d at 199 (finding *Strickland* prejudice standard met on habeas review) (emphasis in original); *see also Miller v. Terhune*, 510 F. Supp. 2d 486, 503-05 (E.D. Cal. 2007) (counsel's failure to retain expert on the effects of intoxication and present such evidence to the jury satisfied *Strickland* requirement of prejudice). The advantage of an objective medical record showing a .39 BAC over mere "intoxication" borders on the self-evident. For proof, one need look no further than the trial summation, where the prosecutor exploited the jury's lack of knowledge on this very point:

> Is he too drunk? Have you heard any evidence at all, ladies and gentlemen, that would suggest that he was so drunk that he couldn't intend what happened? The medical records are saying he was intoxicated. What does that mean? I don't know, ladies and gentlemen. It's something you don't know, and you can't guess. It's somebody's observations at a hospital. Great. How are you able to tell intoxication from the effects of getting hit over the head with a fish aquarium? Who knows?

T. Tr. 640-41.

Had trial counsel called an expert witness, he would have been able to fend off this argument. Indeed, he would have been able to argue that Waiters was so drunk that he was

14

at risk of dying solely from the alcohol in his bloodstream.  I conclude that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The state court's determination to the contrary was an unreasonable application of the *Strickland* standard.[8]

## CONCLUSION

For the reasons stated above, Waiters's petition is granted.  Respondent is directed to release Waiters within 45 days of this order unless the State declares its intention, within those 45 days, to retry Waiters on the charges against him.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 26, 2015
       Brooklyn, New York

---

[8] I have determined habeas relief is warranted on the ground that the state court's determination that trial counsel was not ineffective when he failed to call a medical expert was an unreasonable application of *Strickland*.  Thus, I need not address the other respects in which Waiters claims his trial counsel was ineffective, *i.e.* failing to impeach a witness with her prior statement that Waiters drank about a pint of liquor by himself on the morning of the shooting, and failing to request lesser included charges of second-degree manslaughter and second-degree assault.