UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
GENERAL WAITERS,

                                    Petitioner,

                                                              **REPORT AND**
                                                              **RECOMMENDATION**
              -against-                                       13-CV-3636-MKB-SJB


WILLIAM LEE,
*Superintendent of Greene Haven Correctional Facility*,

                                    Respondent.
----------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

        On June 26, 2013, General Waiters ("Waiters") filed a petition for a writ of

habeas corpus.  On September 26, 2015, the Honorable John Gleeson granted the

petition on the grounds that Waiters's trial counsel was constitutionally deficient for

failing to call a medical expert or introduce medical records to explain the implications

of Waiters's intoxication in his murder trial.  On May 22, 2017, the Second Circuit

reversed and remanded the case for consideration of Waiters's remaining ineffective

assistance allegations.  *Waiters v. Lee*, 857 F.3d 466, 484 (2d Cir.), *cert. denied sub*

*nom. Waiters v. Griffin*, 138 S. Ct. 385 (2017) ("*Waiters*").  The Court concludes that his

remaining claims of ineffective assistance of counsel are without merit.  As such, it is

respectfully recommended that the petition be denied, and a certificate of appealability

be issued.

                                    Facts

        The factual background, based on the uncontroverted trial testimony and

evidence, is recounted at length in *Waiters*.  To the extent there are facts necessary to

the Court's recommendation not contained in the Second Circuit's recitation, they are cited to and discussed herein.

On May 6, 2006, Waiters's then-girlfriend Jacqueline Warren ("Warren") held a birthday party for Waiters at her apartment where Waiters also resided. The party was attended by "Warren's teenage children Derrick and Shatashia, who lived with Warren; her sister and sister's husband; and her aunt Mary Lee Clark ("Clark") and Clark's five grandchildren." *Waiters*, 857 F.3d at 469.

Waiters had started drinking earlier in the day, and had additional drinks during the party. Around 11:00 p.m., Warren's sister and brother-in-law left. Clark and her grandchildren spent the night. Warren's 23-year-old son, Lorenzo, who did not attend the birthday party, returned home at about 2:00 a.m. *Id.* at 469-70.

The next morning, Waiters awoke before 9:30 a.m. and went out to purchase cereal and milk. Then, before 11:00 a.m., he began drinking with Warren and Clark for about half an hour. "Shortly thereafter, Warren took the bottle from Waiters, telling him he'd had 'too much to drink.'" *Id.* at 470. Waiters resisted, and an argument ensued. Waiters left the apartment, and returned about 10 minutes later. *Id.* Waiters proceeded to the couple's bedroom, where he remained for 15 to 20 minutes before returning to the living room, wearing a jacket. *Id.* He began screaming and yelling at Warren. Warren demanded that he leave. *Waiters*, 857 F.3d at 470.

Lorenzo then emerged from his bedroom and entered the living room, and told Waiters to "step away from [his] mother" and to not "get in [her] face." Lorenzo then moved closer to Waiters; Warren and Clark separated the two men. *Id.*

Derrick and Shatashia Warren had entered the living room by this point, and heard Waiters tell Lorenzo, "I got something for you," and "you don't want me to pull

what I got out of my jacket." Lorenzo taunted Waiters. Waiters pulled out a revolver and pointed it at Lorenzo. After Lorenzo responded, "That gun isn't loaded. You don't have any bullets in that gun[,]" Waiters "rapidly fired multiple shots." Waiters hit Lorenzo and Shatashia in the thigh; Clark in the head, abdomen, and leg; and three-year-old Tajmere Clark, who had run out to her grandmother, in the head and chest. Clark eventually died from her injuries after Waiters's trial; Tajmere Clark died at the scene. *Id.*

Waiters attempted to leave, pointing the gun at Derrick, who stood between Waiters and the front door, and pulled the trigger. The gun clicked—without firing—apparently out of ammunition. Waiters then moved toward the exit but Derrick tackled him to the ground. Lorenzo got on top of Waiters; Waiters continued pointing his gun "wildly" and squeezing the trigger. "Waiters ultimately sustained a concussion after Lorenzo hit him with a fish tank and Derrick hit him with a vase." *Id.* at 470-71.

Police and paramedics responded to the scene. Waiters was transported to the hospital, and medical records, which were not before the jury but are part of the record, indicated Waiters was intoxicated and had an ethyl alcohol level of 386.24, the equivalent of a 0.39 BAC, as of 12:33 p.m., approximately an hour after the events in question. "Waiters was alert on admission, but confused and unaware of the time or where he was. He experienced continued disorientation and reported hallucinations in the days thereafter[.]" *Id.* at 471.

<u>Procedural History</u>

Waiters was charged in the Supreme Court of the State of New York, Kings County, with one count of murder in the second degree, (N.Y. Penal Law § 125.25(1)), for the death of Tajmere Clark; one count of attempted murder in the second degree,

(N.Y. Penal Law §§ 110.00 and 125.25(1)), for the attempted murder of Lorenzo; three counts of assault in the first degree, (N.Y. Penal Law § 120.10(1)), for injuries to Lorenzo, Clark, and Shatashia Lewis; one count of criminal possession of a weapon in the second degree, (N.Y. Penal Law § 265.03(2)); and one count of criminal possession of a weapon in the fourth degree, (N.Y. Penal Law § 265.01(1)).  (Indictment No. 3464/2006, attached as Ex. H to Response to Order to Show Cause, Dkt. No. 6 ("Indictment")).

On May 5, 2008, Waiters's jury trial began.  He was represented by attorney Calvin Simons ("Simons").  On May 13, 2008, the jury convicted Waiters of murder in the second degree for Tajmere Clark's death, attempted murder in the second degree as to Lorenzo, and assault in the first degree as to Clark and Shatashia Lewis.  (Transcript of Proceedings before the Honorable Deborah A. Dowling dated April 30, 2008, attached as Ex. A to Response to Order to Show Cause, Dkt. No. 6 ("Trial Tr.") at 700:25-701:14).  The trial court sentenced Waiters to consecutive sentences of 25 years to life for second-degree murder, 10 years for second-degree attempted murder, 25 years and five years for each of the assault counts, respectively, and five years of post-release supervision.  (Transcript of Proceedings before the Honorable Deborah A. Dowling dated June 2, 2008, attached as Ex. A to Response to Order to Show Cause, Dkt. No. 6 ("June 2 Sentencing Tr.") at 12:17-13:4).

Waiters filed a pro se motion to vacate his conviction under New York Criminal Procedure Law § 440.10(1)(h) and a direct appeal.  In his 440.10 motion, Waiters maintained that Simons was constitutionally ineffective for failing to call an expert witness to interpret his hospital records and testify about his intoxication, and for not requesting that the trial court charge the jury on second-degree manslaughter.  (440.10

Motion, attached as Ex. H to Response to Order to Show Cause, Dkt. No. 6 ("440.10 Mot.")).  On January 26, 2011, the state trial court denied Waiters's 440.10 motion as procedurally barred because his conviction could be reversed on direct appeal.  (Order Denying 440.10 Motion, attached as Ex. K to Response to Order to Show Cause, Dkt. No. 6).  The New York Appellate Division Second Department denied leave to appeal. *Waiters*, 857 F.3d at 474.

Waiters then filed a supplemental brief in his direct appeal and alleged ineffective assistance of counsel for the same reasons as those identified in his 440.10 motion. *People v. Waiters*, 943 N.Y.S.2d 589, 590-91 (2d Dep't 2012); (Supplemental Brief to the Appellate Division, Second Department, attached as Ex. D to Response to Order to Show Cause, Dkt. No. 6).  On May 8, 2012, the Appellate Division modified Waiters's sentence by directing that portions of it run concurrently, but otherwise rejected Waiters's appeal.  *Waiters*, 943 N.Y.S.2d at 591.  The Appellate Division also determined that Waiters's ineffective assistance of counsel claim should be brought in a 440.10 proceeding.  *Id.*  The New York Court of Appeals denied leave to appeal.  *People v. Waiters*, 19 N.Y.3d 1002 (2012).

A year later, on June 26, 2013, Waiters filed a pro se habeas petition in this Court, alleging, once again, that Simons was constitutionally ineffective for the same reasons he previously identified.  Judge Gleeson appointed counsel and stayed the case to permit Waiters to exhaust his claims through a renewed 440.10 motion.  (Order Staying Case, Dkt. No. 7).  The original trial judge held an evidentiary hearing on Waiters's renewed 440.10 motion on May 28-29, 2014.  (Transcript of Proceedings Before the Honorable Deborah Dowling, attached as Exs. 3-4, to Motion to Lift Stay ("Lift Stay Mot."), Dkt. No. 11 ("440.10 Hr'g Tr.").  Following the hearing, on October 14,

2014, the trial court denied Waiters's renewed 440.10 motion, finding that Simons's failure to call a medical expert to explain Waiters's medical records and BAC amounted to a permissible "tactical decision" under *Strickland v. Washington*, 466 U.S. 668 (1984).  (Decision and Order dated October 14, 2014, attached as Ex. 8 to Lift Stay Mot., Dkt. No. 11 ("Oct. 2014 Decision") at 7).  The Appellate Division denied leave to appeal. (Decision and Order on Application dated April 20, 2015, attached as Ex. 9 to Lift Stay Mot., Dkt. No. 11).

Waiters thereafter returned to federal district court.  Judge Gleeson lifted the stay, ordered additional briefing, and held oral argument on Waiters's habeas petition on July 24, 2015.  (Order dated May 20, 2015; Minute Entry dated July 24, 2015).  On September 26, 2015, Judge Gleeson granted Waiters's petition for a writ of habeas corpus, ordering Waiters's release within 45 days.  *Waiters v. Lee*, No. 13-CV-3636, 2015 WL 5692840, at *8 (E.D.N.Y. Sept. 26, 2015), *vacated and remanded*, 857 F.3d 466 (2d Cir. 2017).  The district court concluded that Simons's failure to introduce medical records that demonstrated Waiter's BAC of 0.39 to the jury constituted ineffective assistance of counsel.  *Id.* at *6 ("Waiters's counsel's failure to call a medical expert so that the jury would know he had a .39 BAC shortly after the shooting, and what that meant with regard to Waiters's capacity to form the requisite intent to murder, fell below an objective standard of reasonableness.").  The State filed a stay application with the Second Circuit, which was granted on April 5, 2016.  *Waiters*, 857 F.3d at 477; (Order dated April 5, 2016, Dkt. No. 34).

On May 22, 2017, the Second Circuit reversed the district court's judgment. *Waiters*, 857 F.3d at 484.  The Court of Appeals rejected Waiters's ineffective assistance of counsel claim based on Simons's failure to call a medical expert.  The Court concluded

that Waiters failed to demonstrate prejudice from Simons's error, namely that but for

the error, "the result of the proceeding would have been different." *Id; Greiner v. Wells*,

417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 694).  The Court

reasoned:

> We are not persuaded that, had the jury also heard from a medical expert
> and reviewed the full set of medical records, there is a sufficiently strong
> probability that it would have found differently such that the state trial
> court's determination to the contrary was unreasonable. While such
> evidence could have been proffered, it would not likely have made a
> difference in light of the strong, specific testimonial evidence indicating
> that Waiters formed the requisite intent to commit his crimes.

*Waiters*, 857 F.3d at 481.  Because Judge Gleeson had not considered the other

ineffective assistance claims, it remanded for consideration of "Simons's alleged

failure to (a) ask that the jury be charged on second-degree manslaughter, and

(b) impeach Warren with prior inconsistent statements[.]"  *Id.* at 484.  Judge

Jacobs dissented.  *Id.* (Jacobs, J., dissenting).

<u>Discussion</u>

I.    <u>Standard for Habeas Relief for *Strickland* Claims</u>

A petitioner's claim that he received ineffective assistance of counsel fails unless

he satisfies the well-established two prong inquiry set forth in *Strickland*:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the 'counsel' guaranteed the defendant by the Sixth
> Amendment.   Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.

466 U.S. at 687.  This two-part inquiry into counsel's performance "must be highly

deferential" and "every effort [must] be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  A defendant

must "overcome the 'presumption that, under the circumstances, the challenged action

might be considered sound trial strategy.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002)

(quoting *Strickland*, 466 U.S. at 689).

Where a habeas petitioner brings a *Strickland* claim in federal court following a

state court's decision on that claim, the federal court does not conduct a *de novo* review.

Rather, the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") requires the

federal court accord the state court's decision deference.  Under AEDPA, a federal court

may not grant habeas relief unless a state court's adjudication of a claim "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Knowles

v. Mirzayance*, 556 U.S. 111, 121 (2009) (quoting AEDPA).

As a result, in this case the Court does not simply apply the familiar *Strickland*

standard.  That is, this Court may not simply determine whether petitioner's counsel

performance was deficient and whether that failure prejudiced the petitioner.  *Knowles*,

556 U.S. 122 ("The question 'is not whether a federal court believes the state court's

determination' under the *Strickland* standard 'was incorrect[.]'") (quoting *Schriro*, 550

U.S. at 473)); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  Rather, because of §

2254(d)(1), this Court must determine whether the state court's application of

*Strickland* itself was unreasonable.  *Knowles*, 556 U.S. at 122 ("[S]uch relief may be

granted only if the state-court decision unreasonably applied the more general standard

for ineffective-assistance-of-counsel claims established by *Strickland*.").  That is,

determine whether the state court's application of *Strickland* was (1) contrary to or (2)

8

an unreasonable application of clearly established Federal Law.  *See* 28 U.S.C. § 2254(d)(1).[1]

The Court briefly pauses to discuss the interplay between § 2254(d)(1) and § 2254(d)(2).  Section 2254(d)(2) provides an avenue for habeas relief provided Waiters could demonstrate that the state court's adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).  So, for example, should a party contend that a state court erroneously determined that his counsel made a strategic decision not to call a witness, that factual determination would be analyzed by a federal court under § 2254(d)(2).  However, "[w]hether the state court reasonably determined that there was a strategic decision under § 2254(d)(2) is a different question from whether the strategic decision itself was a reasonable exercise of professional judgment under *Strickland* or whether the application of *Strickland* was reasonable[.]"  *Wood v. Allen*, 558 U.S. 290, 304 (2010).  The question of whether the application of *Strickland* was reasonable is made by reference to § 2254(d)(1).  *Id.*

II.   Application

In this instance, the relevant state court, the Supreme Court of Kings County, rejected the two remaining ineffective assistance claims that were unaddressed by the District Court—(1) the failure to impeach Warren about her testimony concerning Waiters's alcohol consumption, and (2) the failure to ask the jury to be instructed on the

---

[1] Because *Strickland* itself requires deference to a lawyer's strategic decisions, when a state court adjudicates an ineffective assistance claim, the federal court's deference to the state court ruling—required by section 2254(d)—results in "double deference."  *Waiters*, 857 F.3d at 477 n.20 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

lesser-included offenses of second-degree manslaughter and second-degree assault.  It

concluded that:

> [C]ounsel's alleged failure to impeach a material witness and decision to
> seek specific lesser included offenses do not rise to the level of ineffective
> assistance of counsel.  In each instance, Mr. Simons had a reasonable and
> legitimate strategy for pursuing the defendant's case in the manner in which
> he did.  Trial counsel's conduct did not constitute egregious or prejudicial
> error.  The legal determination is whether Mr. Simon[s]'s conduct
> constituted egregious and prejudicial error such the defendant did not
> receive a fair trial.  The evidence presented establish[ed] the defendant
> received a fair trial with the benefit of effective representation.  Moreover,
> as the trial court, having viewed the evidence first hand, there is a little
> doubt the claims raised by the defendant would have served to change the
> jury's verdict.[2]  Accordingly, there is no basis to find trial counsel acted in
> [a] manner which was ineffective as a matter of law.

(Oct. 2014 Decision at 7-8).  The state court, in other words, addressed and rejected the

two *Strickland* claims now before this Court.

Waiters contends that the state court's decision was "objectively unreasonable,"

(Supplemental Memorandum in Support of Petition for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254, Dkt. No. 42 ("Dec. 2017 Br.") at 14), but does not say

which provision of § 2254 permits habeas relief.

To the extent that Waiters is advancing an argument under § 2254(d)(1), Waiters

has not explained how the October 2014 Decision rejecting his *Strickland* claims was

contrary to or an unreasonable application of clearly established Federal law.  A state

court decision is "contrary to" Federal law "if the state court applies a rule different from

the governing law set forth in [the Supreme Court's] cases, or if it decides a case

differently" than the Supreme Court has "on a set of materially indistinguishable facts."

---

[2] The sentence as written by the state trial court does not appear to comport with
the remainder of the opinion.  The context of this sentence suggests the court intended
to find that Waiters's claims "would [not] have served to change the jury's verdict."

*Bell*, 535 U.S. at 694.  An "unreasonable application" is where "the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case."  *Id.*  Waiters has not identified a Supreme Court decision finding that the failure to request a lesser-included instruction constitutes deficient performance; or that the failure to impeach a witness constitutes deficient performance.  In other words, he provided no authority or basis for the Court to determine that the state court's October 2014 *Strickland* rulings were unreasonable.

Nonetheless, the October 2014 Decision is, at best, a cursory one, devoid of analysis.  It rejects Waiters's ineffective assistance of counsel arguments by parroting back the *Strickland* standards with little else.  For example, the court concluded that his counsel "had a reasonable and legitimate strategy for pursuing the defendant's case in the manner in which he did," without identifying the strategy or analyzing its reasonableness.  (Oct. 2014 Decision at 8).  Likewise, the statement that "[t]rial counsel's conduct did not constitute egregious or prejudicial conduct . . . such the defendant did not receive a fair trial," is one conclusory statement laden onto another.  *Id.*  In this "absence of any expressed reasoning," the Court must "turn directly to the facts of the case to determine whether *Strickland* was applied unreasonably."  *Cox v. Donnelly*, 387 F.3d 193, 197 (2d Cir. 2004); *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) ("The Appellate Division unfortunately did not enlighten us as to its reasoning for denying Eze's ineffective assistance claim. . . .  [W]hen a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate

decision was an 'unreasonable application' of clearly established Supreme Court precedent.") (quotations omitted).[3]

The Court concludes that the state court's application of *Strickland* to the facts of Waiters's case was not unreasonable:

A.   <u>Failure to Seek Lesser-Included Offense Instruction</u>

Waiters was charged with and found guilty for the second-degree murder of Tajmere Clark.  The jury was instructed on first degree manslaughter as a lesser-included offense.  (Trial Tr. at 672:8-673:25).  Waiters was also charged with and found guilty of first degree assault with respect to Clark and Shatashia Lewis.  No lesser-included offense instruction was provided for the assault charges.  (*Id.* at 676:16-681:17; 701:16-22).  The prosecution proceeded on a transferred intent theory on the murder charge—that Waiters intended to kill Lorenzo, but ended up killing Tajmere Clark, and he was therefore still liable for murder in the second degree.[4]

---

[3] There are no factual findings provided that support the state court's decision on the *Strickland* challenges.  As a result, there is no reason to apply § 2254(d)(2)'s deferential standard to factual findings.

[4] A person may be guilty of second-degree murder when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25(1).  That is, "where the resulting death is of a third person who was not the defendant's intended victim, the defendant may nonetheless be held to the same level of criminal liability as if the intended victim were killed.  In other words, the identity of the victim is irrelevant if the requisite intent to kill is established and death of a person results.  In such cases, the defendant's intent to kill the intended victim is said to be 'transferred' to the actual victim to establish all of the elements of the completed crime of intentional murder."  *People v. Fernandez*, 88 N.Y.2d 777, 781 (1996).  This doctrine serves to "ensure that a person will be prosecuted for the crime he or she intended to commit even when, because of bad aim or some 'lucky mistake,' the intended target was not the actual victim."  *Id.*

Waiters first contends that Simons's failure to ask that the jury be instructed on manslaughter in the second degree was deficient performance. Murder is an intent crime; second-degree manslaughter has a mens rea of recklessness.[5] The argument is meritless.

It is well established that a lawyer's decision not to ask that the jury be instructed on lesser-included offenses—with the objective of having the jury acquit on the more serious offense (a so called "all or nothing" strategy)—cannot be a basis to find that counsel was ineffective. *See Cruz v. Superintendent*, No. 13-CV-2414, 2016 WL 2745848, at *9 (S.D.N.Y. May 11, 2016) ("[M]any courts have held that a lawyer's strategic decision to go for broke, and not to request a lesser-included offense instruction or to pursue certain defenses that could dilute that strategy, cannot provide a basis for claiming ineffective assistance of counsel.") (quotations omitted) (collecting cases). "[T]he decision of whether to request submission of a lesser included offense is a matter well within the judgment of trial counsel." *Breazil v. Superintendent Artis*, No. 15-CIV-1912, 2015 WL 9581816, at *22 (E.D.N.Y. Dec. 30, 2015); *Hernandez v. Larkin*, No. 12-CIV-8090, 2013 WL 4453316, at *15 (S.D.N.Y. Aug. 19, 2013) ("[C]ourts afford substantial deference to a counsel's tactical decision that he would not request a lesser included offense charge[.]") (quotations omitted).

As a result, if Simons's strategy was to have the jury acquit Waiters on the more serious murder charge—by demonstrating that Waiters's intoxication made it impossible for him to have the necessary intent to be guilty of murder—the failure to ask

---

[5] "Under New York law, a person is guilty of manslaughter in the second degree when 'he recklessly causes the death of another person.'" *Perez v. Greiner*, No. 01-CIV-7140, 2003 WL 21203351, at *4 n.9 (S.D.N.Y. May 21, 2003) (citing N.Y. Penal Law § 125.15(1)).

for a lesser-included manslaughter instruction could not be ineffective assistance of counsel. *E.g.*, *Ramdeo v. Phillips*, No. 04-CV-1157, 2007 WL 1989469, at *34 (E.D.N.Y. July 9, 2007) ("[T]rial counsel's failure to request a charge on the lesser included offense of manslaughter in the second degree did not constitute ineffective assistance of counsel."); *Cassie v. Graham*, No. 06-CIV-5536, 2007 WL 506754, at *25 (S.D.N.Y. Jan. 31, 2007) (rejecting ineffective assistance claim based on failure to request manslaughter instruction in second-degree murder prosecution), *report and recommendation adopted*, 2009 WL 362134 (Feb. 10, 2009).

Indeed, if counsel is pursuing an "all or nothing" strategy, it is counterproductive to ask for an instruction on a lesser-included offense. For example, in a murder case, if the jury were instructed on murder and a lesser-included offense of reckless manslaughter, convincing the jury that a defendant lacked the intent to kill because he was merely reckless would result in a guilty verdict. "Submission of lesser included offenses may give the jury a basis for finding a defendant guilty of *a crime* where the prosecution was unable to prove the elements of the original crime charged beyond a reasonable doubt." *Colon v. Smith*, 723 F. Supp. 1003, 1008 (S.D.N.Y. 1989) (emphasis added). However, if the jury were not instructed on manslaughter, and a lawyer makes the same argument, it leaves open the possibility that the jury may acquit on the sole charge of murder. That would permit the defendant to walk free. As a result, "where counsel pursues an exculpatory defense . . . such a choice practically precludes a request for an instruction on a lesser included offense." *Rios v. United States*, No. 91-CV-4384, 1992 WL 328931, at *6 (E.D.N.Y. Oct. 13, 1992); *e.g.*, *U.S. ex rel. Johnson v. Vincent*, 507 F.2d 1309, 1313 (2d Cir. 1974) (Lumbard, J., concurring) ("[T]he deliberate strategy of Johnson's trial counsel was to separate the events that occurred on the roof from

14

those in the apartment by stressing that Johnson was not present when the murder occurred and that the prior events in the apartment were unrelated.  If this could be done, Johnson would be home free on the murder charge.  This attempt to have Johnson completely exonerated would have been seriously jeopardized if the jury was given the additional choice of finding Johnson guilty of assault.").

Waiters disputes that Simons was pursuing any strategy in failing to ask for a lesser-included instruction of manslaughter in the second degree.  According to Waiters, at the 440.10 hearing "the prosecutor asked trial counsel directly if it was his strategy to go 'all or nothing' . . . and he unequivocally stated, 'No.'"  (Dec. 2017 Br. at 8 (citing 440.10 Hr'g Tr. at 123)).  That is inaccurate.  The 440.10 hearing took place several years after Waiters's trial; as a result, at the hearing Simons could not recall the strategy employed at the trial.  Simons did not lack a strategy.  He simply could not remember exactly what it was:

> Q:     I'm asking a question that is not on the record.  Did you have any strategic reason for not requesting Manslaughter in the Second Degree as a lesser included of Murder in the Second Degree?
>
> A:     At the time I guess I requested the charges, whatever I was thinking at the time I based it on what was going on at the time.  So I can't say I thought about it, I can't say I didn't think about it, I don't remember.  I don't see any notes on that.

(440.10 Hr'g at 118:1-9; 119:21-24 ("I mean, like I said, I haven't read the charge conference and I would hope I would have requested everything that I thought should have been requested at the time.").  As for "unequivocally" stating "No," that admission was not—as Waiters suggests—in response to whether there was a strategy or not, but whether he could remember whether it was a strategy.  (*Id.* at 123:13-15 (Q: "*Do you recall* that as being a specific strategy in this case?"  A: "No.") (emphasis added)).  The

answer to the very next question demonstrates that Simons was not saying he lacked a strategy, but that he could not remember it.  (*Id.* at 123:16-22 (Q: "Let me ask you this, sir: Coupled with your request for an intoxication charge, which you got, could that have been the reasonable strategy in not asking for the lesser includeds [sic] that included a reckless element?"  A: "To answer that, *as I said*, I don't remember what the specific strategy was at this time.") (emphasis added)).

That Simons could not recall the strategy does not mean that he lacked one and does not mean that his performance was deficient.  "[The] inability to remember his reasons for conducting the trial in the manner that he did . . . is insufficient evidence to overcome the presumption of constitutionally effective counsel[.]"  *Greiner v. Wells*, 417 F.3d 305, 326 (2d Cir. 2005).  Where a reasonable trial strategy is evident on the record, then the failure to recollect the strategy is irrelevant.  *Id.* ("Time inevitably fogs the memory of busy attorneys.  That inevitability does not reverse the *Strickland* presumption of effective performance.").

And the record here does demonstrate that Simons was pursuing an all or nothing strategy seeking acquittal on the murder charge and having Waiters walk free. That is evident in the other testimony at the 440.10 hearing that Waiters now ignores. Simons intended to obtain an acquittal on the murder charge by demonstrating Waiters's intoxication:

> Q:    It was intoxication, ultimately your defense before the jury was that he could not form the specific intent due to voluntary intoxication, would you agree with that?
>
> A:    That was—
>
> Q:    That was part and parcel of your defense?

> A:      It appears from especially what you read earlier today that that was part of it, yes.

(440.10 Hr'g Tr. at 114:3-10).  That strategy is also evident from other portions of the trial record.  Simons attempted to get witnesses to concede that Waiters was intoxicated on the morning of the incident.  (*E.g.*, Trial Tr. at 207:9-12 (Q: "Now at the time – at this verbal argument, do you know whether Mr. Waiters was intoxicated at the time that he told you this was really none of your concern?") (cross-examination of Lorenzo); 223:7-8 (Q: "Now, were you able to determine whether Mr. Waiters was intoxicated or drunk at this time?") (same); 445:10-12 (Q: "And how long were you drinking before I believe you mentioned to Mr. Waiters that he was drinking too much?") (cross-examination of Jacqueline Warren)).  The absence of intent was the basis of Waiters's motion for acquittal after the close of the People's case, (*id.* at 515:1-2 ("Specifically, they have failed to prove that Mr. Waiters intended to kill Lorenzo Warren in the first place.")), and after the defense rested, (*id.* at 558:18-25).  And during the closing argument he focused on Waiters's lack of intent, and how alcohol negated Waiters's intent:

> And taking out a gun, that's also inexcusable.  But you have to remember what is the one thing that everyone did say of Mr. Waiters?  That he was intoxicated.  That he acted differently when he drank than when he didn't drink.  That when he drank, that he was verbally abusive versus when he didn't drink he's going out buying cereal and milk for people.
> And you say, what does this really have to do with anything?  Well, when you evaluate the facts and the circumstances and put everything together, and the reason I went through all that, their relationship and the family that he had with Mr. Waiters, *you're going to have to evaluate and determine did Mr. Waiters really intend to kill Lorenzo.*
> . . . .
> *But as I stated, the evidence is clear from the witnesses that Mr. Waiters was intoxicated.*
> You will see evidence on the medical record for Mr. Waiters that, yes, he was intoxicated.  And you say what does that have to do with anything?  Well, the issue here is not whether the People prove all this happened was an accident.  Because if you believe it was an accident, then they have not— they fail to prove he intended to kill or injury anybody.  *It's also not an issue*

> *of whether he was reckless.*  Whether that being intoxicated made him reckless.  *Because I submit to you if you believe his actions, based on what you know about him, his interaction with the family was reckless, meaning he had no business having that gun, he had no business taking out that gun, but is his alcohol that made him not think right and he was reckless, then you would have to find him not guilty of these intent crimes. He's not being charged with being reckless.*  Whether it's five shots, ten shots, one shot, the issue still is what was his state of mind.

(*Id.* at 604:10-25 (emphasis added); 605:10-606:8 (emphasis added); *see also* 578:23-25 ("[T]his will help you determine what his intent was, what the intent was and what happened back on May 7th."); 579:9-10 ("[A]lcohol affected Mr. Waiters and his behavior."); 585:20 ("[W]ith the drinking came the problem."); 586:15-19 ("[B]ecause as all the witnesses have said, the People said in opening, and the whole point is when he drinks, he does not act in the same manner as when he does not, does not drink.")).

Simons was making a focused argument to the jury in closing.  He was asking the jury to conclude that Waiters was reckless, and as a result he could not have been guilty of an intent-based crime: "[H]is alcohol that made him not think right and he was reckless, then you would have to find him not guilty of these intent crimes."  (*Id.* at 606:3-5).  These are the hallmarks of an all or nothing strategy seeking to get a defendant acquitted on a murder charge, and avoid having the jury convict on manslaughter, by declining to seek a reckless manslaughter instruction.  *See, e.g.*, *People v. Clarke*, 865 N.Y.S.2d 211, 212 (1st Dep't 2008) ("The trial record supports the conclusion that defense counsel had chosen an 'all-or-nothing' strategy in that she opposed the prosecutor's request to charge first-degree manslaughter, and she withdrew her request to submit first-and second-degree assault.  The fact that defense counsel requested an intoxication charge is consistent with such a strategy, since intoxication goes to the issue of intent.  Defendant would have been entitled to a complete acquittal if

the jury found that he was too intoxicated to form an intent to kill or seriously injure the victim, and the record supports the inference that this was counsel's goal."); *cf. People v. Lane*, 60 N.Y.2d 748, 750 (1983) ("The attorney's failure to request a charge of the lesser included offense of criminal trespass resulted from an 'all-or-nothing' defense tactic. . . . [C]ounsel adequately explained the essence of the lack of intent defense in his summation.").

Waiters now contends that Simons, having argued to the jury that Waiters was reckless, should have asked the jury to be instructed on second-degree manslaughter. (Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, Dkt. No. 13 ("June 2015 Br.") at 13; Dec. 2017 Br. at 8-9 ("[A]ny competent counsel . . . in a case in which the defense was the accused's inability to form the requisite intent for a specific intent crime would be to ask for an instruction for manslaughter in the second degree[.]")).  That would have been self-defeating and a classic case of a lesser-included offense undermining the all or nothing strategy.  Simons argued in closing "[Waiters is] not being charged with being reckless."  (Trial Tr. at 606:5-6).  He could not have made such a statement had he requested a second-degree manslaughter instruction, which is a reckless crime.  And while he could have still told the jury that Waiters was reckless, doing so—with the jury being instructed on the second-degree manslaughter—would have assured conviction on the manslaughter count.

To be sure, there are two possible strategies: one, pursue an all or nothing strategy, argue that the defendant was reckless, not ask for a lesser-included charge of reckless manslaughter, and ask the jury to acquit on the intent crime of murder; two, pursue a compromise strategy, argue that the defendant was reckless, ask for the lesser-

included charge of reckless manslaughter, and thereby effectively concede that the defendant should be convicted for reckless manslaughter, but still argue that he is not guilty of the more serious intent crime.  There are risks and benefits to both.

In the first, the defendant could walk free if the jury acquits; but the risk is that the jury, having no fallback option, and faced with a defendant who took acts that lead to a death, convicts on the more serious charge.  *Illescas v. Lee*, No. 11-CV-5835, 2013 WL 1247513, at *10 (E.D.N.Y. Mar. 26, 2013) ("Had counsel succeeded in excluding all lesser included offenses, it is possible that petitioner might have been fully acquitted. But the risk of an all-or-nothing defense is that the jury might instead have convicted petitioner of intentional murder."); *People v. McGee*, 20 N.Y.3d 513, 520 (2013) ("[W]here the proof against a defendant is relatively weak and the charges very serious, a defendant may elect not to request a lesser included offense so that the jury is forced to choose between conviction of a serious crime or an acquittal, with the hope that the jury will be sympathetic to defendant and uncomfortable convicting on scant evidence.").

With the second strategy, there is little chance of the defendant walking free. Having conceded recklessness and asked for an instruction of reckless manslaughter, the defendant has essentially conceded guilt to that crime; but the jury, knowing that the defendant is not walking free, may be able to conclude he is not guilty of the more serious charge.  *People v. Turner*, 5 N.Y.3d 476, 483 (2005) ("A defendant who thinks his chances of acquittal are small may welcome giving the jury an opportunity for a compromise verdict.").  But which option is appropriate is peculiar to the defendant and the facts and circumstances of his case.  That is what makes the choice a strategic one, not amenable to a finding that counsel was deficient for failing to pick the alternative.

*See Poux v. Superintendent, Southport Corr. Facility*, No. 12-CV-1362, 2014 WL
1894314, at *11 (E.D.N.Y. May 5, 2014) ("[T]rial counsel therefore cannot be faulted for
foregoing a potentially fruitful course of conduct if that choice also entails a significant
potential downside, or if he otherwise had a reasonable justification for the decision.")
(quotations omitted); *e.g.*, *Ramdeo*, 2007 WL 1989469, at *34 ("Trial counsel's decision
not to request a charge on manslaughter in the second degree was, therefore, a strategic
one, and cannot provide a basis for claiming ineffective assistance of counsel."); *Leath v.
Smith*, No. 14-CV-2804, 2015 WL 5730577, at *4 (E.D.N.Y. Sept. 28, 2015) ("Trial
counsel may have also decided strategically against exposing Petitioner to the risk of
conviction on the reckless manslaughter charge, should Petitioner be acquitted of the
second degree murder charge.").

Waiters argues that Simons made a clear error in failing to appreciate that
reckless manslaughter was second-degree manslaughter, and erroneously asked for an
instruction on first degree manslaughter, a specific intent crime. (Trial Tr. at 563:19-21
("The defense would be requesting Manslaughter in the First Degree, as a lesser charge
of intentional Murder in the Second Degree."). As evidence, Waiters contends that there
was no evidence in the record that he had an extreme emotional disturbance ("EED"),
which is an element of first degree manslaughter. (Dec. 2017 Br. at 8-9). In that vein,
Waiters also argues that Simons's request for a first degree manslaughter instruction
demonstrates that he was not pursuing an all or nothing strategy. These arguments are
without merit. If Simons was under the mistaken impression that he had asked for a
reckless manslaughter charge at the charge conference (which took place before closing
argument), then he would not have argued to the jury that "[Waiters was] not being
charged with being reckless." (Trial Tr. at 606:5-6). (And he would likely have objected

when the jury was charged and when he did not hear a manslaughter charge based on recklessness; he did not).  That there was insufficient evidence in the record for a first degree manslaughter instruction is not evidence that an all or nothing strategy was not being pursued.  At worst, it is an error for the court to have provided the first-degree manslaughter instruction, but that fact does not demonstrate that Simons was seeking an instruction on reckless manslaughter.  *See Poux*, 2014 WL 1894314, at *11 ("[T]he existence of the lesser included first-degree manslaughter charge does not detract from the tactical nature of this decision.  The tactical advantage existed . . . in that Petitioner would not be exposed to the risk of being convicted under the lesser included charge of second-degree manslaughter if the jury were to acquit him of first-degree manslaughter."); *Illescas*, 2013 WL 1247513, at *10 (finding that defense was pursing all or nothing strategy despite the fact that counsel permitted instruction on first-degree manslaughter).

Ultimately, Simons chose the all or nothing strategy.  It did not work.  In his habeas petition, Waiters believes Simons chose incorrectly, and should have taken the compromise position.  *E.g.*, Dec. 2017 Br. at 9 ("Had the jurors accepted the intoxication defense, but found petitioner nonetheless responsible for his conduct nevertheless, they could have convicted him for reckless manslaughter[.]").  That kind of second-guessing and hindsight does not amount to a viable claim of ineffective assistance of counsel. *Domingo v. Greiner*, No. 99-CIV-1906, 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002) ("While with hindsight, counsel's decision not to seek a lesser included offense charge did not prove successful, his decision not to give the jury an option that could result in a compromise verdict was not unreasonable. . . .  Counsel's decision not to pursue this dangerous strategy was well within the range of tactical strategy that is left to the

professional judgment of defense counsel, and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'") (quoting *Strickland*, 466 U.S. at 689).

There is a separate, independent barrier to this *Strickland* claim.  Waiters was not entitled to the lesser-included offense instruction.  Under New York criminal procedure, a defendant is only entitled to a lesser included offense instruction if "there is a reasonable view of the evidence" that supports a finding that he committed "only the lesser, but not the greater, offense." *Mazariego v. Kirkpatrick*, No. 16-CV-2290, 2017 WL 3206321, at *7 (E.D.N.Y. July 26, 2017); *see* N.Y. Penal Law §§ 1.20(37), 300.50(1). A reasonable view of the evidence does not exist, and a lesser-included offense instruction is inappropriate, "if, on the whole record, there is not some *identifiable, rational basis* on which the jury could reject a portion of the prosecution's case which is indispensable to establishment of the higher crime and yet accept so much of the proof as would establish the lesser crime[.]" *People v. Scarborough*, 49 N.Y.2d 364, 369-70 (1980) (emphasis added).  A "reasonable view" of the evidence is not "any view of the evidence." *Id.* "In assessing whether there is a reasonable view of the evidence, the proof must be looked at in the light most favorable to [the] defendant." *Id.* at 373 (quotations omitted).

Waiters assumes that the trial court would have instructed the jury on second-degree manslaughter had his counsel simply asked for the charge.  That is incorrect. "[T]o obtain a second-degree manslaughter instruction, defendant needed to show that a reasonable view of the evidence supported finding that he recklessly caused . . . death *without intending to cause serious physical injury*." *People v. Rivera*, 23 N.Y.3d 112, 122 (2014) (emphasis added); *compare Campaneria v. Reid*, 891 F.2d 1014, 1022-23

(2d Cir. 1989) ("An intent to shoot another is, by its nature, an intent to cause another serious physical injury. . . .  Because Campaneria admitted that he shot at Sanchez intentionally, no reasonable view of the evidence can support Campaneria's claim that he was entitled to an instruction on the lesser included offense of second-degree manslaughter."), *with People v. Stanfield*, 36 N.Y.2d 467, 470 (1975) ("[T]he actor perceives the risk, but consciously disregards it."), *People v. Cherry*, 2014-10909, 2018 WL 3371421, at *2 (2d Dep't July 11, 2018) (requiring manslaughter instruction where record suggested defendant did not intend to pull trigger, despite confronting victim with loaded weapon), *and People v. Davis*, 47 N.Y.S.3d 399, 400 (2d Dep't 2017) (same).

There is no reasonable view of the evidence that suggests Waiters did not intend to cause serious physical injury to Lorenzo.  "In New York, it is settled law that '[r]epeated shots, blows or acts of violence point towards deliberate action.'" *Mazariego*, 2017 WL 3206321, at *7 (quoting *People v. Sanducci*, 195 N.Y. 361, 367-68 (1909)); *see also Campaneria*, 891 F.2d at 1022 ("An intentional shooting, even absent the specific intent to kill required for murder in the second degree, is not mere recklessness.  An intent to shoot another is, by its nature, an intent to cause another serious physical injury.").  The record is unidirectional on this point: Waiters intended to cause serious physical injury to and did injure Lorenzo.  Waiters told Lorenzo, "I got something for you," before he pulled out a revolver and then pointed it at Lorenzo. *Waiters*, 857 F.3d at 470.  After Lorenzo taunted Waiters, Waiters pulled the trigger multiple times, and the record indicates Waiters was aiming at Lorenzo.  *Id.*  While pulling the trigger, Waiters continued to advance towards Lorenzo.  *Id.*  Without any

evidence that Waiters did not intend to seriously harm Lorenzo, Waiters was not entitled to a second-degree manslaughter instruction.

Even if the record could be construed to suggest that Waiters did not intend to cause serious physical injury, there is no reasonable view of the evidence that would permit a reasonable jury to conclude that Waiters acted recklessly.  The facts recited above all demonstrate Waiters acted intentionally.  *Rice v. Hoke*, 846 F.2d 160, 166 (2d Cir. 1988) ("Rice's second claim that the evidence warranted an instruction on manslaughter in the second degree is equally meritless. . . .  Here the shooting was the result of a series of deliberate acts."); *see, e.g.*, *Perez v. Greiner*, No. 01-CIV-7140, 2003 WL 21203351, at *4 (S.D.N.Y. May 21, 2003) ("[T]he evidence overwhelmingly indicates that Perez intended to kill Martinez: Perez approached Martinez, who was defenseless, and shot him five times, including three shots to the head, at close range.  Consequently, the record does not provide any basis to conclude that Perez only intended to seriously injure the victim or that he only acted recklessly."); *People v. Cesario*, 900 N.Y.S.2d 4, 4 (1st Dep't 2010) ("During a dispute, defendant went to another room of the apartment, took a pistol from a safe, returned, shot one victim six times, and shot the other victim three times.  Since defendant had to squeeze the trigger of his semiautomatic weapon nine separate times, there is no reasonable possibility that the weapon was discharged through careless handling.  Furthermore, nothing in the prosecution or defense case tended to explain why defendant would fire nine shots, other than to hit his victims."); *People v. Rose*, 617 N.Y.S.2d 301, 301 (1st Dep't 1994) (manslaughter instruction not appropriate where "defendant pointed the gun at the victim's head from only a short distance away and fired a shot into the victim's eye.").

The consumption of alcohol—even a large quantity of it—does not automatically trigger an inference that any actions of the defendant are unintentional.  *See People v. Butler*, 84 N.Y.2d 627, 632-33 (1994); *cf. Rivera*, 23 N.Y.3d at 124 n.9 ("On the dissent's theory of reckless manslaughter, though, the jury would have to speculate that defendant was too drunk to realize that he actually plunged the knife three times into Ojeda, as the undisputed forensic evidence showed, rather than merely waving it indiscriminately and defensively at a crowd . . . .  This goes well beyond viewing the evidence in the light most favorable to the defendant; . . . [it is] a scenario . . . [based] on the assumption that he may have been so drunk during the fight that he was unable to accurately recall afterwards how it had unfolded.").  The evidence is, despite the consumption of alcohol, that Waiters was able to and did act intentionally.  As a result, Waiters would not be entitled to a lesser-included instruction of second-degree manslaughter, and Simons's failure to request that instruction could not amount to ineffective assistance of counsel.[6]

B.  Failure to Impeach

Waiters contends that Simons's failure to impeach Jacqueline Warren, who was Waiters's girlfriend at the time, with a prior inconsistent statement amounts to ineffective assistance of counsel.

---

[6] Nor would Waiters be entitled to a reckless assault instruction (*i.e.* second-degree assault, "recklessly caus[ing] serious physical injury to another person by means of a deadly weapon or a dangerous instrument," N.Y. Penal Law § 120.05; or third degree assault, "recklessly caus[ing] physical injury to another person," *id.* § 120.00). *See, e.g., Baker v. Lempke*, No. 07-CV-1179, 2010 WL 1730034, at *11 (N.D.N.Y. Apr. 26, 2010) (rejecting failure to instruct on lesser-included offense of second-degree assault argument as "[t]here is no reasonable view of the evidence that would allow a jury to find that Baker acted recklessly.").

Warren testified at trial about her recollection of the events of May 7, 2006.  This included testimony about the consumption of alcohol by Waiters.  On direct examination, Warren testified that both she and Waiters were drinking that morning.  (Trial Tr. at 398:14-19).  She had two drinks.  (*Id*. at 398:22-23).  The prosecutor asked Warren, "[D]id you observe how many drinks [Waiters] had?"; she replied, "No."  (*Id*. at 398:24-399:1).  She did say, however, that "Waiters had drank too much," which prompted Waiters and Warren to argue.  (*Id*. at 399:10-11).  As a result, she took the bottle of alcohol away from Waiters and told him, "You had too much to drink."  (*Id*. at 399:24-25 ("I took the bottle, and he wanted a drink.  I told him, I said, 'You had too much to drink.'")).

On cross-examination, Warren confirmed that she saw Waiters drinking that morning.  (Trial Tr. at 444:19-21).  Simons first asked Warren if Waiters "was drinking out of the same sized cup" as her aunt; Warren stated that she did not remember.  (*Id*. at 444:22-23).  He then then asked her whether she knew how many drinks Waiters had; she again confirmed that she did not know.  (*Id*. at 444:24-445:4 (Q: "And as I believe you stated, you don't know how many drinks he had?"  A: "No, I don't."  Q: "Now do you know whether he had more than one?"  A: "No, I don't.")).  She went on say that she believed that Waiters had been drinking for around 30 minutes before they started arguing.  (*Id*. at 445:10-15).

Some two years before the trial, Warren told a defense investigator that on "May 7, 2006 [Waiters] got up and started 'sipping' liquor again.  He had about a pint by himself."  (Client/Witness Statement, attached as Ex. 1 to Dec. 2017 Br., Dkt. No. 42).  Waiters now argues that Warren's testimony about his alcohol consumption was

inconsistent with these 2006 statements, and Simons's failure to impeach and cross examine Warren with those statements was error.  The contention is meritless.  *First,* the statements contained in the investigator's report were not inconsistent with her trial testimony.  *Second*, even if the trial judge had believed that Warren's trial testimony was inconsistent with her earlier statements, it would have made little sense for any lawyer to impeach her credibility, because Warren's trial testimony was consistent with the defendant's theory of the case—that Waiters was intoxicated at the time of the shooting.  The Court addresses each of these points below.

It is hornbook evidence law that a witness may not be impeached with a prior statement unless the prior statement is inconsistent with her trial testimony.  *United States v. Hale*, 422 U.S. 171, 176 (1975) ("As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent.").  As to how Warren's trial testimony is inconsistent with her 2006 statements, Waiters takes a number of different positions:

Following the 440.10 hearing, Waiters first argued that at trial Warren "did not recall whether or not [Waiters] was drinking," having previously told the investigator that Waiters had been drinking.  (Memorandum of Law, attached as Ex. 5 to Lift Stay Mot., Dkt. No. 11 ("July 2014 Br.") at 14).  That is simply not true.  Warren *did* remember that Waiters had been drinking; indeed at trial, she said she was forced to take the alcohol bottle away from Waiters, and recalled telling him that he had "too much to drink."  (Trial Tr. at 399:24-25).  What Warren could not remember was the *number* of drinks Waiters had consumed.  But she was certainly not testifying that Waiters was not drinking or not drinking heavily.

Thereafter, Waiters—again after the 440.10 hearing—argued that Warren's trial testimony was inconsistent because Warren allegedly told the investigator Waiters was "drinking heavily all morning," but then at trial did "not recall whether or not [Waiters] was drinking immediately prior to the incident." (Memorandum in Response to the People's Opposition to Defendant's Motion to Vacate Judgment, attached as Ex. 7 to Lift Stay Mot., Dkt. No. 11 ("Sept. 2014 Br.") at 4). This is also incorrect. Warren never told the investigator Waiters was "drinking heavily all morning"—she said he was "sipping" alcohol and consumed a pint by himself. And at trial she did not deny that Waiters was drinking heavily; in fact she confirmed that he was, by recounting how she told Waiters he had too much to drink, and that is what prompted their argument.

Before the District Court in 2015, Waiters next argued that Warren's testimony was inconsistent for another reason: at trial she could not recall whether Waiters had more than one drink, but told the investigator he had more than a pint. (June 2015 Br. at 10). This is, at best, a minor inconsistency, if it even amounts to one. Warren's testimony on direct was that Waiters had too much to drink. However, unlike Warren's aunt, Waiters was drinking directly *from a bottle* (which she had to take from him). (Trial Tr. at 399:24-25 ("I took the bottle, and he wanted a drink. I told him, I said, 'You had too much to drink.'")). The question of "how many drinks" makes little sense in that context. Someone drinking rum from a bottle is not consuming a quantity of cups or a number of mixed drinks. There is no easily quantifiable "number" of drinks when someone is drinking from a bottle. Warren was not asked how much Waiters had to drink or what quantity of alcohol he had consumed. Had she been asked such a question and said "I don't know," that is potentially inconsistent with her statement to the investigator, where she did know how much, namely a pint of alcohol. But not

29

knowing how many "drinks" Waiters had is not necessarily inconsistent with telling an investigator Waiters consumed a pint of alcohol.

Following the Second Circuit's decision, Waiters argued that Warren "would only admit that [Waiters] was drinking but . . . refused to admit that he had more than one drink that morning." (Dec. 2017 Br. at 4; Supplemental Reply Memorandum in Support of Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, Dkt. No. 44 ("Feb. 2018 Br.") at 2). This characterization is false. (Trial Tr. at 390:5-9 (Q: "Mr. Waiters, did you observe how much he had to drink? A: "No." Q: "Did he have more than one?" A: "Yes.")). Warren did more than "only admit that Waiters was drinking"; she said he was drinking for 30 minutes, "drank too much," and argued with him about his drinking. And she hardly "refused" to admit that he had more than one drink. After being asked whether Waiters was drinking out of a cup, Warren said she did not know if he had more than one drink. Again, given that Simons was focusing on cups and drinks, while Warren was referencing a bottle, and that Warren had already testified that Waiters had "too much," there was no inconsistency with her statements to the investigator. Simons even adopts Warren's characterization regarding the bottle of alcohol during closing. (*Id.* at 588:25-589:3 ("Because after we know there was something about a bottle between—there is an argument over a bottle between Mr. Waiters and Jacqueline.")).

To be sure, contradiction is not required for a trial judge to permit impeachment. "[T]he test of inconsistency . . . is not limited to outright contradictions between a witness' prior statements and [her] trial testimony[.]" *People v. Bornholdt,* 33 N.Y.2d 75, 88 (1973); *see United States v. Trzaska,* 111 F.3d 1019, 1024 (2d Cir. 1997) ("It is well settled that for two statements to be inconsistent, they need not be diametrically

opposed.") (quotations omitted); *People v. Wise*, 46 N.Y.2d 321, 326 (1978) ("Nor need

there be a direct and positive contradiction.  It is enough that the testimony and the

statements are inconsistent and tend to prove differing facts.") (quotations omitted).

That being said, there must be inconsistency.  *Bornholdt*, 33 N.Y.2d at 88.  In evaluating

whether inconsistency exists, a court should do so in "accord[] with human experience."

*Id.* at 89.  That is, "unless asked directly about a matter a person may quite normally

omit it from a narrative description."  *Id.*

The 2006 report does not have Warren stating how many drinks Waiters had—

but that Waiters had a pint of alcohol; and at trial Warren is not asked directly whether

Waiters had a pint of alcohol.  The right to impeach a witness with a prior statement is

not automatic.  A lawyer must not assume, but demonstrate, the inconsistency exists.  A

precise question must be asked.  Without it, the necessary foundation for impeachment

is absent, as it was in this case.[7]

---

[7] The statements about Waiters drinking a pint of alcohol are contained in the investigator's report, not in a document prepared by Warren herself.  Under the federal rules of evidence, "a third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization."  *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992) (quotations omitted); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980).  And as a result, "in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words."  *Almonte*, 956 F.2d at 29.  In federal court, the proponent of the statement must prove that the notes or document "reflect the witness's own words rather than the note-taker's characterization[.]"  *Id.*  In New York, the witness must also subscribe to the statements.  *Larkin v. Nassau Electric R. Co.*, 205 N.Y. 267, 269 (1912) ("In case the statements are in writing and unsubscribed, the paper must be shown or read to the witness and marked for identification and, if subscribed, the signature, and, in case he so demands, the paper must be shown to him. The attention of a witness having been thus called to the contradictory statements, they may be proven and introduced in evidence in the regular course of the trial.").  (If the witness denies making the statement, the third party could be called to testify that the witness did in fact make the prior statement.  *E.g.*, *People v. Wise,* 46 N.Y.2d 321, 324-25 (1978)).  As result, Warren could only be impeached with the statements contained in

The one current running through these varying positions on Warren's testimony is the suggestion that Simons should have been trying to undercut Warren's testimony. (*E.g.* June 2015 Br. at 10 ("The available impeachment evidence could have undercut Warren's credibility on the crucial issue of Waiters'[s] level of intoxication at the time of the shooting."); Dec. 2017 Br. at 4 ("Had trial counsel used his investigator's report effectively, he would have . . . corroborated his sole defense of intoxication . . . and he would have potentially discredited Jacqueline Warren's testimony in the eyes of the jury."); *id.* at 5 ("Had Simons impeached her credibility with respect to the amount of liquor Waiters consumed, he could have further argued that this testimony was likewise unreliable[.]")).  That is the sole purpose of impeachment via prior inconsistent statement.  "[A] prior inconsistent statement is not used 'assertively'.  The fact finder is not asked to believe it, or even to choose between it and the contrary trial testimony.  Rather, the prior statement and the trial testimony are merely set against each other.  The very fact that the witness necessarily erred in making one or the other—because both cannot be true—tends to undermine the witness's credibility."  *People v. Hults*, 76 N.Y.2d 190, 202-03 (1990).

But undermining Warren's credibility simply makes no sense.  If Warren had disputed that Waiters was drunk on the morning of the shooting or Warren had denied that he was drinking heavily, then undermining her credibility would have been

---

the 2006 report if she were asked to confirm that she in fact made those statements to the investigator.  If she admitted to making the statements, then they could be used to undermine her credibility by contrasting the statements to her trial testimony.  If she denied making the statements, she could be impeached by having the investigator called to testify.  There is nothing in the record to suggest that Warren would have subscribed to the statements in the investigator's report; there is, therefore, further reason to doubt that impeachment would have even been permitted at all.

appropriate.  Warren, however, was giving testimony supporting Waiters's intoxication defense.  It would be quite a curious choice—and an illogical one at that—to undermine Warren's credibility when she had testified that Waiters had "too much to drink"; that she told Waiters that; and his drunken state is what caused Waiters and Warren to argue.  Perhaps there is some reason that Simons should have impugned Warren's credibility.  If so, it is a mystery to the Court.  Nonetheless, making the decision not to impeach her was well within the range of reasonable strategic decisions a counsel could make during the trial.  This failure to impeach Warren could not, therefore, give rise to a viable claim of ineffective assistance of counsel.  *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim.") (quoting *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987)); *Arkin v. Bennett*, 282 F. Supp. 2d 24, 40 (S.D.N.Y. 2003) ("[Q]uestions of cross-examination strategy, especially where the impeachment value is highly dubious, will not support a claim of ineffective assistance of counsel.").

III.   Aggregation of Errors

Finally, Waiters argues that the aggregation of these alleged errors by Simons constituted ineffective assistance of counsel.  In limited circumstances, cumulative errors may serve as the basis for habeas relief.  *See United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999).  However, "implicit in such a claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually *errors*."  *Joyner v. Miller*, 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (collecting cases); *Lumpkin*, 192 F.3d at 290.

For the reasons discussed, the failure to ask for a lesser-included offense and failure to impeach Warren were not errors.  They cannot be aggregated to form the basis for habeas relief.  *E.g.*, *Lumpkin*, 192 F.3d at 290 ("[T]he accumulation of non-errors does not warrant a new trial.").[8]

IV.     Certificate of Appealability

Rule 22(b) of the Federal Rules of Appellate Procedure provides that "[i]n a habeas corpus proceeding in which the detention complained of arises from process issued by a state court . . . the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b).  Section 2253(c) provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A "substantial showing" does not require that a petitioner demonstrate that he would prevail on the merits in his appeal, but only that the issues he raises are "debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are adequate to deserve encouragement to proceed further."  *Miller-EL v. Cockrell*, 537 U.S. 322, 336 (2003) (quotations omitted).  In light of the Second Circuit's split decision, its direction to remand for consideration of all of Waiters's arguments, and Judge Jacobs's view that "[t]he mandate in this case, which vacates and remands for consideration of this claim of ineffectiveness (and another), therefore leaves open the way to an ultimate ruling on remand that Waiters's counsel was ineffective and that prejudice resulted[,]" *Waiters*,

---

[8] Waiters did not make a cumulative error claim in any state proceeding. Waiters, therefore, has "procedurally defaulted his cumulative-error claim" and "is ineligible for habeas relief on his cumulative-error claim."  *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006).

857 F.3d at 487 n.4 (Jacobs, J., dissenting), the Court recommends that the certificate be issued.

Conclusion

For the reasons stated above, the Court respectfully recommends that the petition be denied, and a certificate of appealability be issued.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time may waive the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[] [judge's] report operates as a waiver of any further judicial review of the magistrate[] [judge's] decision.") (quotations omitted).

*/s/ Sanket J. Bulsara October 3, 2018*
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York