UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

GENERAL WAITERS,

                          Petitioner,

         v.

WILLIAM LEE, *Superintendent of Greene Haven
Correctional Facility*,

                        Respondent.

**MEMORANDUM & ORDER**
13-CV-3636 (MKB) (SJB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Petitioner General Waiters brings the above-captioned petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, alleging that his confinement in state custody violates the United

States Constitution.  (Pet. for Writ of Habeas Corpus ("Pet."), Docket Entry No. 1.)  Petitioner's

claims arise from a judgment of conviction after a jury trial in New York Supreme Court, Kings

County ("Trial Court"), for murder in the second degree, attempted murder in the second degree,

and assault in the first degree.  (Tr. of Proceedings before the Hon. Deborah A. Dowling dated

Apr. 30, 2008 ("Tr.") 700:25–701:14, annexed to Resp. to Order to Show Cause as Ex. A, Docket

Entry Nos. 6-1–3.)  On July 6, 2016, the Court referred the petition to Magistrate Judge Lois

Bloom for a report and recommendation.  (Order dated July 6, 2016.)  By report and

recommendation dated October 3, 2018, Magistrate Judge Sanket J. Bulsara[1] recommended that

the Court deny the petition and grant a certificate of appealability (the "R&R").  (R&R, Docket

Entry No. 45.)  Petitioner objected to the R&R, (Pet'r Obj. to R&R ("Pet'r Obj."), Docket Entry

---

[1]  The case was subsequently reassigned to Judge Bulsara on September 15, 2017.  (Case
reassignment dated Sept. 15, 2017.)

No. 48), and Respondent objected to the recommendation that the Court grant a certificate of appealability, (Letter dated Oct. 5, 2018 ("Resp't Letter"), Docket No. 47.)

For the reasons discussed below, the Court adopts the R&R, denies the petition, and grants a certificate of appealability.

## I.   Background

### a.   Factual background

The Court assumes familiarity with the facts of the case as set forth in detail in the R&R and *Waiters v. Lee*, 857 F.3d 466, 484 (2d Cir. 2017), *cert. denied sub nom. Waiters v. Griffin*, ---U.S. ---, 138 S. Ct. 385 (2017).

On May 6, 2006, Petitioner's then-girlfriend, Jacqueline Warren ("Warren"), hosted a birthday party for Petitioner at her apartment, where Petitioner also resided. *Waiters*, 857 F.3d at 469. The party was attended by "Warren's teenage children Derrick and Shatashia,[2] who lived with Warren; her sister and sister's husband and her aunt Mary Lee Clark ('Clark') and Clark's five grandchildren." *Id*.

Petitioner, who had begun drinking earlier in the day, continued to drink at the party which ended around "11:00 [PM], when Warren's sister and brother-in-law left." *Id.* "Clark and her grandchildren stayed the night." *Id.* Warren's twenty-three-year-old son, Lorenzo, resided in the apartment as well, and although he did not attend the party, he returned home at about 2:00 AM. *Id.* at 469–70.

Prior to 9:30 AM the next morning, Petitioner went out to purchase cereal and milk for everyone. *Id.* Before 11:00 AM, Petitioner resumed drinking with Warren and Clark, and after about a half hour of drinking, Warren took the bottle from Petitioner, telling him he had had "too

---

[2] Because multiple individuals involved in the events giving rise to this action have the last name "Warren," the Court refers to Warren's children by their first names.

much to drink." *Id.* at 470 (citation omitted). Petitioner resisted and argued with Warren. *Id.* Petitioner then left the apartment, returning about ten minutes later, and proceeded to the couple's bedroom. *Id.* Petitioner remained in the couple's bedroom for approximately fifteen to twenty minutes before returning to the living room, wearing a jacket, while screaming and calling Warren names. *Id.* Clark implored Petitioner to calm down, but Petitioner continued to exchange curses with Warren and Warren demanded that Petitioner leave the apartment. *Id.*

Lorenzo came out from his bedroom "to intervene, telling Petitioner to 'step away from [his] mother' and to 'not get in [her] face.'" *Id.* Lorenzo moved closer to Petitioner, at which point Warren and Clark separated them. *Id.* Derrick and Shatashia were drawn to the living room by the commotion and heard Petitioner tell Lorenzo, "I got something for you," and "you don't want me to pull what I got out of my jacket." *Id.* When Lorenzo openly doubted that Petitioner had anything in his jacket, Petitioner pulled out a gun and pointed it at Lorenzo. *Id.* Lorenzo "continued to taunt Petitioner, stating, "[t]hat gun isn't loaded. You don't have any bullets in that gun.'" *Id.*

Petitioner then rapidly fired multiple shots, aiming at Lorenzo from a distance of seven or eight feet. *Id.* "Warren saw Petitioner shoot at Lorenzo as 'he started going toward where Lorenzo was standing.'" *Id.* Petitioner's shots hit Lorenzo and Shatashia in their thighs, Clark in the head, abdomen and leg, and Clark's three-year-old grandchild Tajmere[3] in the head and chest. *Id.* Tajmere died at the scene and Clark died from her injures after Petitioner's trial. *Id.*

After the shooting, Petitioner attempted to leave the apartment, pointing the gun at Derrick, who was blocking the front door. *Id.* Petitioner aimed the gun point-blank at Derrick's

---

[3] Because multiple individuals involved in the events giving rise to this action have the last name "Clark," the Court refers to Clark's grandchildren by their first names.

face and pulled the trigger but the gun clicked and did not fire, apparently because it was out of ammunition.  *Id.*  Petitioner then moved toward the door, but Derrick tackled him to the ground. *Id.*  Lorenzo got on top of Petitioner, who continued pointing his gun "wildly" and pulling the trigger.  *Id.*  Lorenzo began punching Petitioner but Petitioner taunted Lorenzo saying he "wasn't strong enough" and "wasn't causing him any harm," and stating, "is that all you got?"  *Id.* at 470–71.  Lorenzo then hit Petitioner in the head with a fish tank and Derrick hit Petitioner with a vase, at which point Petitioner yelled to Warren for help.  *Id.* at 471.  Petitioner sustained a concussion.  *Id.*

Police and paramedics responded to the scene, and Petitioner was transported to the hospital.  *Id.*  According to medical records, Petitioner was intoxicated with a blood alcohol level ("BAC") of 0.39 as of 12:33 PM, approximately an hour after the events in question.[4]  *Id.* Medical records further indicated that "[Petitioner] was alert on admission, but confused and unaware of the time or where he was," and that he "experienced continued disorientation and reported hallucinations [in] the days thereafter."  *Id.*

### b.   Indictment

Petitioner was charged in the Trial Court with one count of murder in the second degree, N.Y. Penal Law § 125.25(1); one count of attempted murder in the second degree, N.Y. Penal Law § 110 and § 125.25(1); three counts of assault in the first degree, N.Y. Penal Law § 120.10(1); one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03(2); and one count of criminal possession of a weapon in the fourth degree, N.Y. Penal

---

[4]  Although part of the record, the information about Petitioner's BAC was not presented to the jury.  *Waiters v. Lee*, 857 F.3d 466, 471 (2d Cir. 2017), *cert. denied sub nom. Waiters v. Griffin*, --- U.S. ---, 138 S. Ct. 385 (2017).

Law § 265.05(1).  (Indictment No. 3464/2006, annexed to Resp. to Order to Show Cause as Ex. H, Docket Entry No. 6-4.)

### c.  Trial

Petitioner's jury trial began on May 5, 2008.  (Tr. 1.)  He was represented by attorney Calvin Simons, Esq. ("Trial Counsel").  (*Id.* at 2.)

### i.  Prosecution's case

Lorenzo and Warren testified for the prosecution.  *Waiters*, 857 F.3d at 471.  Lorenzo testified that Petitioner appeared drunk during the altercation and that his "speech . . . was a little bit slurred."  *Id.*  He further testified that "he had previously seen Petitioner intoxicated about [ten] times and that [Petitioner] had been more intoxicated on those other occasions."  *Id.*

Warren testified that Petitioner drank on a daily basis, and that it caused Petitioner to be verbally abusive.  *Id.*  When asked on the stand, she did not recall how much Petitioner drank at his birthday party or the next morning.  *Id.*  Warren did recall that she drank with Petitioner and Clark for half an hour the morning of the incident before taking the bottle of Bacardi away from him.  *Id.*  Warren also testified that approximately one year after the shootings in spring of 2007, Petitioner telephoned her and explained that "he was aiming after [Lorenzo] . . . [b]ecause he was coming between" them.  *Id.* at 471–72 (citations omitted).

### ii.  Warren's out-of-court statement

In June of 2006, Warren made a statement to an investigator working for the defense. (Client/Witness Statement dated June 15, 2006 ("Witness Statement"), annexed to Pet'r Suppl. Mem. in Supp. of Pet. as Ex. 1, Docket Entry No. 42-1.)  The investigator's report states that "Warren states that on May 6, 2006, she, [Petitioner,] and . . . Clark had drank [sic] about a little less than a quart of liquor between themselves.  (*Id.*)  Warren further stated that "[t]he next

morning, at about 8:30 [AM] on May 7, 2006, [Petitioner] got up and started 'sipping' liquor again," and "had about a pint by himself." (*Id.*)

### iii.    Defense's case

During the defense's case in chief, Petitioner chose not to pursue an affirmative defense of extreme emotional distress. *Waiters*, 857 F.3d at 472. Trial Counsel did attempt to introduce into evidence "certified medical records of Petitioner's hospital visit in support of the argument that Petitioner was intoxicated and unable to form intent." *Id.* The prosecution objected and the Trial Court admitted two redacted pages of the medical records which revealed that Petitioner had arrived at the hospital in an intoxicated state and that as a result the hospital staff treating him were unable to evaluate his "CNS [central nervous system]." *Id.* The portions of the medical records admitted did not include Petitioner's elevated BAC of 0.39. *Id.* at 471. In addition, Trial Counsel did not impeach Warren on cross-examination with the Witness Statement. (Tr. 443–45.)

### iv.    Summations

In summation, Trial Counsel argued that Petitioner's intoxication prevented him from forming the requisite intent and that Petitioner's actions were merely reckless. *Waiters*, 857 F.3d at 473. In response, the prosecution argued that the trial testimony and the actions Petitioner took "suggested he was not so severely intoxicated that he was unable to form intent." *Id.*

### v.    Jury charge and deliberation

Trial Counsel requested and the judge agreed to instruct the jury on intoxication and first-degree manslaughter. (Tr. 561: 20–22, 565:19–21.)

On May 13, 2008, the jury convicted Petitioner of murder in the second degree, attempted murder in the second degree, and assault in the first degree. (Tr. 700:25–701:14.)

### d.   Post-trial proceedings

Petitioner filed both a *pro se* motion to vacate his conviction under New York Procedure Law § 440.10(1)(h) ("440 Motion") and a direct appeal with the assistance of counsel.  (440 Mot., annexed to Resp. to Order to Show Cause as Ex. H, Docket Entry No. 6-4); *People v. Waiters*, 943 N.Y.S.2d 589 (App. Div. 2012).

### i.   First 440 Motion

In his 440 Motion, Petitioner argued that Trial Counsel was constitutionally ineffective for (1) failing to call an expert witness to interpret his hospital records and (2) failing to request that the Trial Court charge the jury on lesser included offenses to the attempted murder and assault charges.  (440 Mot. 153–54.)

On January 26, 2011, the court denied Petitioner's 440 Motion as procedurally barred since facially sufficient facts appeared in the record to permit review on direct appeal.  (Order Denying 440 Mot., annexed to Resp. Order to Show Cause as Ex. K, Docket Entry No. 6-4.)  The New York Appellate Division, Second Department, denied leave to appeal.  *Waiters*, 857 F. 3d at 474.

### ii.   Direct appeal

In April of 2010, Petitioner filed a direct appeal arguing that (1) the verdict was against the weight of the evidence, (2) he was denied his due process right to a fair trial because the prosecutor repeatedly made factually misleading summation arguments, and (3) he was illegally sentenced.  *People v. Waiters*, 943 N.Y. S.2d 589, 590–91 (App. Div. 2012); (Def. Main Br. to the App. Div., 2d Dep't, annexed to Resp. to Order to Show Cause as Ex. B, Docket Entry No. 6-4).  After the denial of his 440 Motion, Petitioner submitted a *pro se* supplemental brief in support of his direct appeal, dated February 4, 2011, in which he alleged ineffective assistance of counsel for the same two reasons identified in his 440 Motion.  *People v. Waiters*, 943 N.Y.S.2d

589, 590–91 (App. Div. 2012); (Suppl. Br. to the App. Div., 2d Dep't, annexed to Resp. to Order

to Show Cause as Ex. D, Docket Entry No. 6-4).

On May 8, 2012, the Appellate Division modified Petitioner's sentence, directing that

portions of it run concurrently, but otherwise rejected Petitioner's appeal.  *Waiters*, 943 N.Y.S.2d

at 591.  The Appellate Division determined that a 440 proceeding would be the appropriate

forum for reviewing the ineffective assistance of counsel claims.  *Id.*  The New York Court of

Appeals denied leave to appeal.  *People v. Waiters*, 19 N.Y.3d 1002 (2012).

### iii.    Filing of habeas petition

On June 26, 2013, Waiters filed a *pro se* habeas petition under 28 U.S.C. § 2254(d),

alleging that Trial Counsel provided ineffective assistance of counsel for the two reasons stated

in his 440 Motion as well as Trial Counsel's failure to impeach Warren.  (Pet.)  On November 5,

2013, former District Judge John Gleeson[5] appointed counsel and stayed the case while

Petitioner exhausted his claims through a renewed 440 Motion.  (Order dated Nov. 5, 2013,

Docket Entry No. 7.)

### iv.    Renewed 440 Motion

In May of 2014, the Trial Court held evidentiary hearings on Petitioner's renewed 440

Motion.  (Tr. of Proceedings before the Hon. Deborah Dowling ("440 Mot. Hr'g Tr."), annexed

to Mot. to Lift Stay as Exs. 3–4, Docket Entry Nos. 11-3–4.)  Following the hearing, in October

of 2014, the Trial Court denied Petitioner's renewed 440 Motion, finding that Trial Counsel's

failure to call a medical expert to explain the medical records and BAC constituted a permissible

"tactical decision" under *Strickland v. Washington*, 466 U.S. 688 (1984), and that Trial Counsel's

"alleged failure to impeach a material witness and decision to seek specific lesser included

---

[5]   The case was reassigned to the undersigned on June 30, 2016.  (Order Reassigning
Case dated June 30, 2016.)

offenses [and not others] do not rise to the level of ineffective assistance of counsel" (the

"October 2014 State Court Decision"). (Oct. 2014 State Ct. Decision 7, annexed to Mot. to Lift

Stay as Ex. 8, Docket Entry No. 11-8.) The Appellate Division denied leave to appeal.

(Decision & Order on Appl. dated Apr. 20, 2015, annexed to Mot. to Lift Stay as Ex. 9, Docket

Entry No. 11-9.)

   **v.**  **Habeas decision and appeal to the Second Circuit**

   After the denial of Petitioner's renewed 440 Motion, Judge Gleeson lifted the stay and

ordered additional briefing. (Order dated May 20, 2015.) On July 24, 2015, Judge Gleeson

heard oral arguments on the petition. *Waiters*, 857 F.3d at 476–77. On September 25, 2015, the

Court granted the petition for a writ of habeas corpus and ordered Petitioner's release within

forty-five days. *Waiters v. Lee*, No. 13-CV-3636, 2015 WL 5692840, at *8 (E.D.N.Y. Sept. 26,

2015), *vacated and remanded*, 857 F.3d 466 (2d Cir. 2017). The Court concluded that Trial

Counsel's failure to introduce medical records that demonstrated Petitioner's BAC of 0.39 to the

jury or call an expert witness to explain the records constituted ineffective assistance of counsel.

*Id.* at *6. Respondent filed an application for a stay pending appeal, and on April 5, 2016, the

Second Circuit granted the stay. *Waiters*, 857 F.3d at 477; (Order dated Apr. 5, 2016, Docket

Entry No. 34).

   On May 22, 2017, the Second Circuit reversed the Court's ruling. *Waiters*, 857 F.3d at

484. In a split decision, the Second Circuit rejected Petitioner's ineffective assistance of counsel

claim based on Trial Counsel's failure to call a medical expert, and concluded that Petitioner

failed to demonstrate prejudice from Trial Counsel's error. *Id.* Because the Court had not

considered the other ineffective assistance claims, it remanded for consideration of Trial

Counsel's alleged failure to (1) ask that the jury be charged on lesser included offenses, and (2)

impeach Warren with her prior inconsistent statements. *Id.* at 484. Judge Dennis Jacobs

dissented, finding that Trial Counsel provided ineffective assistance of counsel by failing to "introduce and explain evidence that his 130-pound client had sixteen alcoholic drinks before committing the crime." *Id.* at 490 (Jacobs, J., dissenting).

### iii. Proceedings after remand

On October 17, 2018, Judge Bulsara issued an R&R recommending that the Court deny the petition and issue a certificate of appealability. (R&R 35.)

On October 5, 2018, Respondent filed a letter requesting that the Court accept the Judge Bulsara's recommendation that the petition be denied and objecting to the portion of the R&R recommending that the Court grant a certificate of appealability. (Resp't Letter.)

On November 13, 2018, Petitioner filed his objections to the R&R. (Pet'r Obj.) Petitioner objects to Judge Bulsara's recommendation that the Court deny the petition as to all three of his claims. (*Id.*) Petitioner asserts that Judge Bulsara: (1) erred in finding that Trial Counsel's failure to request the lesser included offenses involving recklessness did not constitute ineffective assistance of counsel, (*id.* at 3–7); (2) erred in finding that Trial Counsel was not ineffective for failing to impeach key witness Warren, (*id.* at 7–10); and (3) ruled incorrectly on the cumulative error claim, and argues that Trial Counsel's errors must be considered in the aggregate, (*id.* at 10–14).

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation

to which the party objected.  *Id*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir.

2015).  The district court may adopt those portions of the recommended ruling to which no

timely objections have been made, provided no clear error is apparent from the face of the

record.  *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1

(E.D.N.Y. Nov. 24, 2015).  The clear error standard also applies when a party makes only

conclusory or general objections.  *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016)

(holding that "general objection[s] [are] insufficient to obtain *de novo* review by [a] district

court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific

written objections to the [magistrate judge's] proposed findings and recommendations."

(emphasis added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) ("Merely

referring the court to previously filed papers or arguments does not constitute an adequate

objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d

758, 766 (2d Cir. 2002))).

### ii.    Habeas

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody

pursuant to a state court judgment may only be brought on the grounds that his or her custody is

"in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A petitioner is required to show that the state court decision, having been adjudicated on the

merits, is either "contrary to, or involved an unreasonable application of, clearly established

Federal law" or "based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Shoop v. Hill*, --- U.S. ---

, --, 139 S.Ct. 504, 406 (2019) (per curiam) ("[H]abeas relief may be granted only if the state

court's adjudication resulted in a decision that was contrary to, or involved an unreasonable

application of, Supreme Court precedent that was clearly established at the time of the adjudication." (internal quotation marks and citation omitted)); *Kernan v. Hinojosa*, --- U.S. ---, ---, 136 S. Ct. 1603, 1604 (2016) (per curiam); *Hittson v. Chatman*, --- U.S. ---, ---, 135 S. Ct. 2126, 2126 (2015); *Woods v. Donald*, 575 U.S. 312, 313 (2015) (per curiam); *Johnson v. Williams*, 568 U.S. 289, 292 (2013). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001)); *see also Kernan*, 136 S. Ct. at 1606; *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam) ("As we have repeatedly emphasized, however, circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court [under] § 2254(d)(1)."); *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the Kentucky Supreme Court's decision."). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 412–13. In order to establish that a state court decision is an unreasonable application of federal law, the state court decision must be "more

than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The decision must be "objectively unreasonable." *Id.*

A court may also grant habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "[S]tate-court factual determinations [are not] unreasonable 'merely because [a federal post-conviction court] would have reached a different conclusion in the first instance.'"  *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Rather, factual determinations made by the state court are "presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Even if "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to'" overturn a state court factual determination.  *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).  A court may overturn a state court's factual determination only if the record cannot "plausibly be viewed" as consistent with the state court's fact-finding or if "a reasonable factfinder must conclude" that the state court's decision was inconsistent with the record evidence.  *Rice*, 546 U.S. at 340–41.

**b.   Ineffective assistance of counsel claim**

In support of his ineffective assistance of counsel claim, Petitioner argues that (1) Trial Counsel failed to request that the jury be charged with the proper lesser included offenses involving recklessness, and (2) Trial Counsel was ineffective for failing to impeach key witness Warren with the Witness Statement.  (Pet'r Obj. 3–10.)

"The Sixth Amendment right to counsel is the right to effective assistance of counsel." *Buck v. Davis*, 580 U.S. ---, ---, 137 S. Ct. 759, 775 (2017) (quoting *Strickland*, 466 U.S. at 686); *see also Premo v. Moore*, 562 U.S. 115, 121 (2011).  "A defendant who claims to have been

denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." *Buck*, 580 U.S. at ---, 137 S. Ct. at 775 (citing *Strickland*, 466 U.S. at 687); *see also Sexton v. Beaudreaux*, --- U.S. ---, ---, 138 S.Ct. 2555, 2558 (2018) ("To prove ineffective assistance of counsel, a petitioner must demonstrate both deficient performance and prejudice."). "Recognizing the 'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence,' . . . counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 689–90); *see also Bierenbaum v. Graham*, 607 F.3d 36, 50–51 (2d Cir. 2010) (stating that the *Strickland* standard is "highly deferential" to eliminate the "distorting effects of hindsight" (quoting *Strickland*, 466 U.S. at 689)). The "highly deferential" *Strickland* standard is made "doubly so" on habeas review, as AEDPA requires deference to the state court's ruling. *Premo*, 562 U.S. at 122; *accord Santone v. Fischer*, 689 F.3d 138, 154 (2d Cir. 2012). Thus, on habeas review, "the question is not whether counsel's actions were reasonable . . . [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. "Surmounting *Strickland*'s high bar is never an easy task." *Id.* (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

As discussed further below, none of Petitioner's arguments demonstrate that the Appellate Division's decision denying his ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court." *See Richter*, 562 U.S. at 98.

### i. Trial Counsel's failure to request lesser included offenses of second-degree manslaughter and reckless assault in the second degree did not constitute ineffective assistance of counsel

As Judge Bulsara discussed in the R&R, Petitioner has not identified a Supreme Court decision finding that the failure to request a lesser-included instruction constitutes deficient performance, (R&R 11), nor has he identified any such case in his objections to the R&R, (Pet'r Obj. 3–10). Therefore, Petitioner has not shown that the October 2014 State Court Decision as to Trial Counsel's alleged failure to seek lesser included offenses and decision not to impeach a material witness was an unreasonable application of any clearly established federal law. The Court nevertheless addresses both of Petitioner's objections to the R&R's recommendation on this issue.

First, Petitioner argues that the conclusion in the R&R that Petitioner would not have been entitled to the lesser included charges of manslaughter in the second degree and reckless assault in the second degree if Counsel had requested them because no reasonable view of the evidence supported them "is flatly wrong." [6] (Pet'r Obj. 3.)

---

[6] The Court notes that based on the facts of the crime, it is unclear from the record whether the Trial Court would have had to issue a jury instruction on second-degree manslaughter had counsel requested it. In support of his argument that the Trial Court was required to do so, Petitioner cites *People v. Brantley*, 618 N.Y.S.2d 342 (App. Div. 1994), in which the Appellate Division reversed a conviction due to the trial court's failure to charge manslaughter in the second degree as a lesser included offense of murder in the second degree. The *Brantley* court explained:

> [W]here there is a reasonable view of the evidence, when considered favorably to the defendant, that would have permitted a finding that defendant acted recklessly, the court is required to submit the lesser included offense to the jury. Upon our review of the record, we conclude that the evidence of the quantity of alcohol the defendant consumed during the afternoon before the crime, and the evidence that he was continuing to drink just before the shooting, was sufficient to require that the court charge the jury to consider manslaughter in the second degree as a lesser included offense of intentional murder as requested by defense counsel. . . .

After *de novo* review of this issue, the Court agrees with Judge Bulsara and therefore adopts his recommendation.  The relevant inquiry before the Court is not whether the Trial Court would have had to charge the jury as to lesser included offenses if requested, but whether Trial Counsel's decision to not request that the Trial Court charge the jury with lesser included offenses deprived Petitioner of his constitutional right to effective assistance of counsel.  It did not.

A lawyer's tactical decisions are given great deference in the face of an ineffective assistance of counsel claim.  *See Strickland*, 466 U.S. at 690 ("Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement."); *see also Woods v. Etherton*, --- U.S.---, ---, 136 S. Ct. 1149, 1151 (2016) ("[F]ederal courts are to afford both the state court and the defense attorney the benefit of the doubt." (internal quotation marks and citations omitted)).  In New York, "courts have uniformly decided that whether or not to ask the trial judge to instruct the jury on lesser-

---

*Brantley*, 618 N.Y.S.2d at 342 (citations omitted).  It appears, however, that in a subsequent decision in 1994, the New York Court of Appeals, in *People v. Butler*, 84 N.Y.2d 627 (1994), overruled the Appellate Division's November of 1994 ruling in *Brantley*.  *See Butler*, 84 N.Y.2d at 779.  In *Butler*, the court ruled that the consumption of even a large quantity of alcohol does not trigger an inference that any actions of the defendant are unintentional.  *Id.* Since *Butler*, New York courts have reiterated that an intoxication instruction does not necessarily warrant a second-degree manslaughter instruction; the inquiry is dependent on the specific facts.  *See, e.g.*, *People v. Rivera*, 989 N.Y.S.2d 446, 454–55 (2014) (agreeing that, "in light of the facts in *Butler*, no instruction on either first- or second-degree manslaughter was warranted or compelled," and finding that since the record did not support that defendant acted with mere recklessness, "there exists no reasonable basis in the evidence for finding guilt of the lesser count and rejection of the greater count") (internal quotation marks omitted); *People v. Spina*, 713 N.Y.S.2d 394, 396 (App. Div. 2000) ("The court properly determined that the nature and number of injuries suffered by the victims was indicative of a brutality inconsistent with recklessness or criminal negligence and therefore, despite the alleged intoxication of defendant, no reasonable jury could conclude that defendant did not intend to cause the death of his victims.").  However,  the issue of whether or not the Trial Court improperly refused to issue a jury instruction is not before the Court as Petitioner never raised it on any appeal related to his case nor in the petition before the Court.

included offenses is a matter of strategy and tactics ceded by a defendant to his lawyer." *People v. Colville*, 20 N.Y.3d 20, 29 (2012). A trial counsel's strategic decision to "go for broke[7] cannot form the basis for an ineffective-assistance claim, particularly on federal habeas." *Cruz v. Superintendant*, No. 13-CV-2414, 2016 WL 2745848, at *9 (S.D.N.Y. May 11, 2016); *see also Domingo v. Greiner*, No. 99-CV-1906, 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002) ("While with hindsight, counsel's decision not to seek a lesser included offense charge did not prove successful, his decision not to give the jury an option that could result in a compromise verdict was not unreasonable."). Furthermore, "[t]he tactical decision to pursue a complete, exculpatory defense rather than a partial one enjoys substantial deference." *Rios v. United States*, No. 91-CV-4384, 1992 WL 328931, at *7 (E.D.N.Y. Oct. 13, 1992) (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)); *see also United States v. DiTommaso*, 817 F.2d 201, 216 (2d Cir. 1987).

Petitioner argues that there is no evidence that Trial Counsel adopted an all or nothing strategy, asserting that "[Trial Counsel] clearly testified that he did not recall utilizing an 'all or nothing' strategy in this case," (Pet'r Obj. 6), but Petitioner mischaracterizes the hearing

---

[7] In explaining this strategy and why it is tactical, Judge Bulsara quoted *People v. McGee*, 20 N.Y.3d 513, 520 (2013), which states that "where the proof against a defendant is relatively weak and the charges very serious, a defendant may elect not to request a lesser included offense so that the jury is forced to choose between conviction of a serious crime or an acquittal, with the hope that the jury will be sympathetic to defendant and uncomfortable convicting on scant evidence." (R&R 20 (quoting *McGee*, N.Y.3d at 520).) Petitioner argues that Judge Bulsara mistakenly relied on *McGee*, and attempts to distinguish his case from *McGee* by arguing that the evidence in *McGee* was "scant," and therefore the strategy would not have worked in his case. (Pet'r Obj. 7.) Contrary to Petitioner's claim, the evidence in *McGee* was not scant. *See id.* at 517 ("Here, there was ample independent evidence that a crime was committed since a civilian eyewitness testified about the . . . shooting incident, several police officers recounted the events . . . and [an officer] described the firing of shots at his vehicle."). As Petitioner correctly notes, the evidence in the instant case is similarly "hardly scant." (Pet'r Obj. 7.) While Petitioner may have been less sympathetic to the jury than the defendant in *McGee*, Trial Counsel still chose to employ the all or nothing strategy.

transcript.  The relevant portion of Trial Counsel's testimony at the 440 Motion hearing reads:

> Q:    Do you recall that as being a specific strategy in this case?
>
> A:    No.
>
> Q:    Let me ask you this, sir: Coupled with your request for an intoxication charge, which you got, could that have been the reasonable strategy in not asking for the lesser includeds [sic] that included a reckless element?
>
> A:    To answer that, as I said, I don't remember what the specific strategy was at this time.

(440 Mot. Hr'g Tr. 123:13–22.)  Despite Trial Counsel's lack of memory about what tactics he employed at a trial held six years prior to the hearing, the Court finds that there is sufficient evidence in the record to indicate that Trial Counsel did employ an all or nothing strategy, including Trial Counsel's examination of witnesses to elicit testimony that Petitioner was intoxicated on the morning of the shooting[8] and closing argument.  During the closing argument, Trial Counsel focused on Petitioner's lack of intent, and how alcohol negated Petitioner's intent:

> And taking out a gun, that's also inexcusable. But you have to remember what is the one thing that everyone did say of [Petitioner]? That he was *intoxicated*.
> . . . .
> *But as I stated, the evidence is clear from the witnesses that [Petitioner] was intoxicated.* You will see evidence on the medical record for [Petitioner] that, yes, he was intoxicated. And you say what does that have to do with anything? Well, the issue here is not whether the People prove all this happened was an accident. Because if you believe it was an accident, then they have not — they fail to prove he intended to kill or injury anybody. *It's also not an issue of whether he was reckless*. Whether that being intoxicated made him reckless. *Because I submit to you if you believe his actions, based on what you know about him, his interaction with the family was reckless, meaning he had no business having that gun, he had no business taking out that gun, but is his* [sic] *alcohol that*

---

[8]  (*See* Tr. 223:7–8 (Q: "Now, were you able to determine whether [Petitioner] was intoxicated or drunk at this time?"); *id.* at 445:10–12 (Q: "And how long were you drinking before I believe you mentioned to [Petitioner] that he was drinking too much?").)

> *made him not think right and he was reckless, then you would have
> to find him not guilty of these intent crimes. He's not being charged
> with being reckless.* Whether it's five shots, ten shots, one shot, the
> issue still is what was his state of mind.

(Tr. 604:10–13, 605:10–606:8 (emphasis added).)  Trial Counsel's closing statement makes clear

that his strategy was to argue for an acquittal on the basis that, while the evidence may

demonstrate that Petitioner's conduct was reckless, the prosecution was unable to prove the mens

rea element for the charged crimes.  In view of the fact that Trial Counsel all but conceded that

Petitioner's conduct was reckless, this argument is inconsistent with a charge to the lesser

included offenses involving recklessness.  The Court therefore adopts Judge Bulsara's finding

that "the record here does demonstrate that Trial Counsel was pursuing an all or nothing

strategy."  (R&R 16.)

Petitioner also alleges that even if Trial Counsel did adopt an all or nothing strategy, "it

would have been deficient for any defense lawyer to employ [such a] strategy in this case."

(Pet'r Obj. 6.)  This argument is without merit as "[t]he question is whether an attorney's

representation amounted to incompetence under 'prevailing professional norms,' not whether it

deviated from best practices or most common custom."  *Richter*, 562 U.S. at 105 (quoting

*Strickland*, 466 U.S. at 690).  Trial Counsel's decision to strategically attempt to obtain an

acquittal as opposed to a compromise verdict by choosing not to request a lesser included offense

does not amount to ineffective assistance of counsel.  *See Cruz*, 2016 WL 2745848, at *9

("[M]any courts have held that a lawyer's strategic decision to go for broke, and not to request a

lesser-included offense instruction or to pursue certain defenses that could dilute that strategy,

cannot provide a basis for claiming ineffective assistance of counsel." (citations omitted)).

The Court finds, consistent with Judge Bulsara's finding, that Trial Counsel's decision to

not request that the jury be charged with lesser included offenses does not amount to a violation

of Petitioner's Sixth Amendment right to effective assistance of counsel.

> ii.   **Trial counsel was not ineffective for failing to impeach key witness Warren with the Witness Statement**

Petitioner objects to Judge Bulsara's finding that Warren's trial testimony was not inconsistent with the Witness Statement made to an investigator.  (Pet'r Obj. 8.)  After *de novo* review, the Court agrees and adopts Judge Bulsara's recommendation that this argument is unavailing.

A witness may only be impeached with her prior statement if that prior statement is inconsistent with her trial testimony.  *See United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.  As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent."); *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) ("A witness's prior statement may be offered to impeach that witness's credibility if (1) the statement is inconsistent with the witness's trial testimony, (2) the witness is afforded an opportunity to deny or explain the same, and (3) the opposing party is afforded the opportunity to cross-examine the witness thereon." (citing Fed. R. Evid. 613(b))); *United States v. Ghailani*, 761 F. Supp. 2d 114, 117–18 (S.D.N.Y. 2011) ("First, the [c]ourt must determine whether the proffered statement in fact is inconsistent with the testimony sought to be impeached.  The test is whether there is any variance between the statement and the testimony that has a reasonable bearing on credibility." (internal quotation marks and citations omitted)).  However, in order for a judge to permit impeachment, there need not be direct contradiction.  *See People v. Bornholdt*, 33 N.Y.2d 75, 88 (1973) ("[T]he test of inconsistency . . . is not limited to outright contradictions."); *see also United States v. Trzaska*, 111 F.3d 1019, 1024 (2d Cir. 1997) ("It is well settled that for two statements to be inconsistent, they 'need not be diametrically opposed.'"

(citing *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988))).  However, "a witness may

not be impeached simply by showing that he omitted to state a fact, or to state it more fully at a

prior time.  It need also be shown that at the prior time the witness' attention was called to the

matter and that he was specifically asked about the facts embraced in the question propounded at

trial." *Bornholdt*, 33 N.Y.2d at 88.; *see also People v. Jordan*, 24 N.Y.S.3d 61, 62–63 (App. Div.

2016) ("The court properly exercised its discretion in precluding defendant from impeaching the

victim with an alleged prior inconsistent statement because the purported inconsistency rests on a

slender semantic basis and lacks probative value." (internal quotation marks and citations

omitted)); *People v. Keys*, 794 N.Y.S.2d 916, 916 (App. Div. 2005) ("[A] witness may not be

impeached simply by showing that he or she omitted to state a fact or to state it more fully at a

prior time.").

Two years before trial, Warren told a defense investigator that on "May 7, 2006

[Petitioner] got up and started 'sipping liquor again.  He had about a pint by himself.'"  (Witness

Statement.)  During her direct examination at trial, Warren testified that she did not observe how

many drinks Petitioner had, but that "[Petitioner] had drank too much," and, as a result, they had

begun to argue and she took the alcohol bottle away from Petitioner and told him, "[y]ou had too

much to drink."  (Tr. 398:24–399:1, 399:10–11, 399:24–25.)  On cross-examination, Warren

confirmed that she saw Petitioner drinking Bacardi Light and soda the morning of the shooting,

but she did not recall the size of the cup he was drinking out of, how many drinks he had, or

whether it was more than one drink.  (*Id.* at 444:19– 445:4.)  Warren further testified on cross-

examination that she believed that Petitioner had been drinking for about half an hour before she

told him that he was drinking too much.  (*Id.* at 445:10–15.)

Warren's statement to the investigator, as memorialized in the Witness Statement, and

Warren's testimony at trial do not amount to impeachable inconsistency since Warren consistently stated that Petitioner had been drinking the morning of the shooting.  In June of 2015 in a brief to this Court in further support of his petition, Petitioner raised for the first time that, at trial, Warren could not remember whether Petitioner had had more than one drink, but, according to the Witness Statement, told the investigator he had more than a pint.  (Pet'r Mem. in Supp. of Pet.10, Docket Entry No. 13.)  Regardless of this minor inconsistency, Trial Counsel was able to elicit from Warren that Petitioner had been drinking that morning, and had been drinking enough that Warren told him he had had too much.  (Tr. 444:19–445:15.)  Petitioner further objects to the portion of the R&R that concluded that even if there was an inconsistency in Warren's statements, there would have been no reason to impeach her because she stated that Petitioner was drinking too much, which supported Trial Counsel's case theory.  (Pet'r Obj. 8 (citing R&R 28).)  In support, Petitioner points to Judge Jacobs' dissenting opinion on appeal stating that "[Warren's] testimony that [Petitioner] had had only one drink could have been impeached with her prior statement to the defendant's investigator that Petitioner drank a pint of liquor by himself that morning," (*id* (citing *Waiters*, 857 F.3d at 487 n.4)).  This statement is taken out of context as the Second Circuit did not consider the merits of this claim, and Judge Jacobs merely noted that this claim must be evaluated when considering the "cumulative effect of all of counsel's unprofessional errors," *Waiters*, 857 F.3d at 487 n.4 (citing *Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005)).

Petitioner also argues that "[t]he R&R completely failed to address the damning testimony Warren gave concerning a [tele]phone call [Petitioner] made after he was arrested and before the trial wherein he allegedly admitted that he was 'aiming after Lorenzo' because Lorenzo was 'coming between them.'"  (Pet'r Obj. 9.)  Petitioner argues that "[t]he impeachment

material that Trial Counsel had in his possession but inexplicably failed to use to impeach

Warren would have supported an argument that she was intentionally minimizing Petitioner's

level of intoxication and fabricating [Petitioner's] 'admission' that he had been aiming to shoot

Lorenzo." *Id.*

The Court agrees with Judge Bulsara that undermining Warren's credibility as to

Petitioner's level of intoxication would not have made sense in the context of Petitioner's trial

strategy.  Trial Counsel argued that Petitioner's level of intoxication precluded him from forming

the requisite intent for the charged counts.  (Tr. 604:10–13, 605:10–606:8.)  Warren testified that

Petitioner had "too much to drink."  (*Id.* at 399:10-11.)  Under these circumstances, Trial

Counsel's strategic decision not to impeach on this issue does not give rise to a viable claim of

ineffective assistance of counsel.  *Lavayen v. Duncan*, 311 F. App'x 468, 471 (2d Cir. 2009)

("The decision 'whether to engage in cross-examination, and if so to what extent and in what

manner' is generally viewed as a strategic decision left to the sound discretion of trial counsel."

(quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002))).

Moreover, Trial Counsel addressed the "damning testimony" through cross-examination.

The damning testimony was not that Petitioner had been drinking the morning of the shooting,

but that he had apparently admitted to Warren that he had been aiming to shoot Lorenzo.  Trial

Counsel employed his expertise and executed a strategy to attack that statement through cross-

examination:

> Q:   And you testified regarding one particular conversation that
> you had in – you said it was about a year after the incident?
>
> A:   Yes
>
> Q:   And do you remember what month it was that you had this
> conversation?
>
> A:   No.

Q:     Do you remember whether it was in the fall[,] the spring, or the summer or the wintertime?

A:     No.

Q:     And do you remember the time of the day that you had this conversation?

A:     Day.

                                    . . .

Q:     Did you talk to any assistant district attorneys about this conversation?

A:     No.

Q:     You did not tell any assistant district attorneys that you had this conversation and what [Petitioner] told you?

A:     I don't remember.

Q:     Well, at some point did you tell Mr. Hale [the prosecutor] about this conversation?

A:     No.

Q:     Do you know who Mr. Hale is?

A:     Yes.

Q:      Okay.

        And you don't remember telling any district attorney about this conversation?

A:     No.

Q:     Do you remember telling any police officers about this conversation?

A:     No.

(Tr. 464:12–24,466:14–467:7.)  Trial Counsel did address Warren's damning testimony, casting doubt on the testimony through cross-examination.  The Court will not second-guess the tactical choice made by Trial Counsel with regard to how to discredit Warren's testimony about the telephone call between Warren and Petitioner.  *See Arkin v. Bennett*, 282 F. Supp. 2d 24, 37

(S.D.N.Y. 2003) (refusing to "second-guess trial counsel's decision not to pursue [the] other more minor avenues of impeachment," where the petitioner alleged ineffective assistance of counsel for his attorney's failure to impeach witnesses, but counsel had thoroughly cross-examined the witnesses on the relevant points).

### iii.   Trial Counsel's errors must be considered in the aggregate

Petitioner also argues that since the R&R incorrectly held that the ineffective assistance claims were without merit, the errors alleged were not properly considered in the aggregate.[9] (Pet'r Obj. 12–14.)

The Court finds, on *de novo* review, that because the decisions not to ask for lesser-included offense instructions or impeach Warren were not errors, they cannot be aggregated to form the basis for habeas relief.  Accordingly, the Court adopts Judge Bulsara's recommendation, (R&R 34), as there are no errors to aggregate with Trial Counsel's error of not calling an expert to explain the medical records, which the Second Circuit determined on appeal not to be prejudicial.  *See Waiters*, 857 F.3d at 484; *Strickland*, 466 U.S. at 687.  Trial Counsel did not commit reversible error as to any of the challenges raised in the petition, and the accumulation of non-errors does not amount to a successful claim.  *See United States v. Gramins*, 939 F.3d 429, 456–57 (2d Cir. 2019) ("Because we conclude that the admission of [the witness's] testimony did

---

[9]  Petitioner also disputes the footnote in the R&R indicating that because he did not make a cumulative error claim in any state proceeding he is ineligible for habeas relief on this ground.  The R&R relied on *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006), in which the Second Circuit held that the petitioner's use of the transition phrase "was exacerbated by" and the plural noun "rulings" in his brief did not fairly present his cumulative-error claim to the state courts and therefore the claim  was procedurally barred.  (R&R 34.)  The Court agrees with Petitioner that his case is distinguishable from *Jimenez* as memoranda and motions submitted by both Petitioner and Respondent addressed the cumulative effect of Trial Counsel's alleged errors. (*See* Pet'r Obj. 11–12; Mem. in Supp. 17, annexed to Mot. to Lift Stay as Ex. 1, Docket Entry No. 11-1); Mem. in Opp. 44, annexed to Mot. to Lift Stay as Ex. 6, Docket Entry No. 11-6.)) Had the Court determined that the claims before it were meritorious, the Court would have considered them in the aggregate.

not constitute error at all, we necessarily conclude that this case does not present the same

'combination of errors' that the district court believed amounted to 'cumulative prejudice.'");

*United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999) ("[T]he accumulation of non-errors

does not warrant a new trial.").

### c.      Certificate of appealability

Respondent objects to Judge Bulsara's recommendation that the Court grant Petitioner a

certificate of appealability.  (Resp't Letter.)  In support, Respondent argues that Judge Bulsara's

stated reason for recommending that the Court grant a certificate of appealability rests on the

Second Circuit's decision rather than any showing of independent assessment.  (*Id.*)

Respondent's objection to the certificate of appealability is one sentence long, and states:

> Given that the Second Circuit has already heard an appeal in this
> case, and given that the Magistrate Judge's stated reason for
> recommending a certificate of appealability apparently rests entirely
> on the Second Circuit's decision (see Decision at 34–35) – rather
> than on any independent assessment that [Petitioner] has made a
> substantial showing of the denial of a constitutional right – the
> decision whether to grant a certificate of appealability would more
> appropriately be left to the Second Circuit.

(*Id.*)  An objection is conclusory when it simply states that the magistrate judge's

recommendations is "wrong and unjust" or "simply restates the relief sought."  *Scholfield v.*

*Dep't of Corr.*, No. 91-CV-1691, 1994 WL 119740, at *2 (S.D.N.Y. Apr. 6, 1994).  Respondent's

objection is general and conclusory, and fails to make any argument as to why Judge Bulsara's

recommendation, even if based entirely on the Second Circuit's decision, is faulty.  As such, the

Court reviews the objection for plain error.  *See* 28 U.S.C. § 636(b)(1)(C); *Benitez v. Parmer*,

654 F. App'x 502, 504 (2d Cir. 2016) ("[The petitioner's] general objection was insufficient to

obtain de novo review by the district court"); *Sibley v. Choice Hotels Int'l., Inc.*, 304 F.R.D. 125,

129 (E.D.N.Y. 2015) ("[I]f a party makes only conclusory or general objections. . . the [c]ourt

reviews the [r]eport and [r]ecommendation only for clear error." (internal quotation marks and citations omitted)). The Court finds no plain error and therefore adopts the recommendation of the R&R to grant Petitioner a certificate of appealability.

A court must issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that a habeas petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck*, 137 S. Ct. at 773 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and "[courts] should not decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief." *Welch v. United States*, --- U.S. ---, ---, 136 S. Ct. 1257, 1263–64 (2016) (quoting *Miller-El*, 537 U.S. at 337). In fact, a certificate of appealability may issue even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 327.

While the Court denies Petitioner's claims for habeas relief on the basis of ineffective assistance of counsel, the Court acknowledges that there has been a substantial showing such that another court could resolve the issues differently. The original ruling by Judge Gleeson and split decision by the Second Circuit, in particular Judge Jacobs' view that remanding the case would leave "open the way to an ultimate ruling on remand that Petitioner's counsel was ineffective and

that prejudice resulted," demonstrates that jurists of reason could disagree as to the result. Therefore, the Court grants Petitioner a certificate of appealability on the issue of whether he was denied his constitutional right to the effective assistance of counsel.

### III.  Conclusion

For the foregoing reasons, the Court adopts the R&R, denies the petition for a writ of habeas corpus, and issues a certificate of appealability for consideration of whether Trial Counsel's decision not to (1) ask that the jury be charged with lesser included offenses involving recklessness and (2) impeach Warren with prior statements constituted ineffective assistance of counsel depriving Petitioner of his Sixth Amendment right to counsel.

Dated: June 23, 2020
      Brooklyn, New York

                              SO ORDERED:

                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge